IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

DELCATH SYSTEMS, INC.
1100 Summer Street, Third Floor
Stamford, Connecticut 06905

                 Plaintiff,

       v.

ROBERT LADD, LADDCAP VALUE
PARTNERS LP, LADDCAP VALUE
ADVISORS LLC and LADDCAP VALUE
ASSOCIATES LLC
650 Fifth Avenue, Suite 600
New York, New York 10019

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. _____

## COMPLAINT

Plaintiff Delcath Systems, Inc. ("Delcath" or the "Company"), through its undersigned counsel, alleges as follows:

## SUMMARY OF ACTION

1.      This action concerns a continuing campaign by defendants Robert Ladd, Laddcap Value Partners LP ("Laddcap"), Laddcap Value Advisors LLC and Laddcap Value Associates LLC (collectively, the "Ladd Defendants") to force, through misinformation, the sale of Delcath. Since late last year, the Ladd Defendants have tried numerous ploys and have now taken steps to initiate a consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own slate of directors.  Rather than play by the rules, the Ladd Defendants have made materially false and misleading statements and omissions in violation of the Securities and Exchange Act of 1934 ("Exchange Act").  The Ladd Defendants have, *inter alia*, publicly

disseminated misleading valuations of the Company, mischaracterized discussions with the Company in an effort to discredit Delcath's directors, failed to disclose the group of persons and entities with whom they are acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock, and failed to disclose their underlying motive for the consent solicitation – the immediate sale of the Company.  In addition, the Ladd Defendants have failed to disclose material information about the Ladd Defendants' nominees to lead the Company, including the filing for Chapter 7 bankruptcy by Paul William Frederick Nicholls, a significant financial restatement at Seitel Corporation while Fred S. Zeidman served on Seitel's Audit Committee, the financial woes that beset the UCLA hospital system during the tenure of Michael Karpf, M.D., as Vice Provost, and the abysmal performance of the Laddcap hedge fund run by Robert B. Ladd.  If the Ladd Defendants' misleading statements and omissions are left uncorrected and the Ladd Defendants' proposed consent solicitation is allowed to proceed, the Ladd Defendants could take control of the Company based on their misstatements and omissions. Delcath brings this lawsuit for injunctive relief because Delcath's shareholders are entitled to make decisions on the future of their Company based on full and accurate information.

2.      Delcath is a development stage company developing a drug delivery system that is hoped will provide a meaningful treatment for certain types of cancer.

3.      Mr. Ladd is the principal of Laddcap, an under-performing hedge fund.

4.      In October 2005, Mr. Ladd disclosed that Laddcap had acquired over 5% of the outstanding shares of Delcath stock and openly declared that Laddcap would "seek to cause [Delcath] to merge with or into, consolidate with, transfer all or substantially all of its assets to, or otherwise engage in any business combination with, one or more other parties" and, if

necessary to achieve its goals, "seek the removal of one or more members of the Company's board of directors and/or executive officers."

5.    In January 2006, Mr. Ladd submitted for a vote at Delcath's annual shareholder meeting in June 2006 a proposal to recommend that Delcath's Board of Directors (the "Board") immediately retain an investment bank to explore the sale of the Company.

6.    Delcath's Board opposed Mr. Ladd's proposal because, *inter alia*, "the Board believes that, if the Company obtains premarket approval from the FDA, the value of the Company's technology (and therefore the value of the Company) will be substantially increased beyond what could reasonably be expected to be obtained in a sale of the Company today."

7.    Mr. Ladd nonetheless urged Delcath shareholders to support his proposal contending, *inter alia*, that "Delcath's low enterprise value is reflective of management's and the Board's self-serving policies."

8.    Over the last three years, Delcath stock has appreciated by more than 450%.  By contrast, the annual returns for the Laddcap hedge fund in 2004 and 2005 were 0.7% and –1.7%, respectively.  Thus, were it not for Laddcap's investment in Delcath stock, the performance of the Laddcap fund would be even more embarrassing.

9.    On June 9, 2006, just four days before Delcath's annual shareholder meeting, the Ladd Defendants filed a Schedule 14A Proxy Solicitation (the "Valuation Proxy Solicitation") indicating that they had obtained a valuation of Delcath from two established investment banking firms, Fulcrum Global Partners LLC ("Fulcrum") and Glocap Funding, LLC ("Glocap"), with "decades of experience."  The valuation, which was included in the Valuation Proxy Solicitation, indicated that Fulcrum and Glocap had been retained as "independent third parties."  Noting that "the midpoint of this valuation, $8.44 per share, is more than fifty percent (50%) greater than last

night's closing price of Delcath stock," the Ladd Defendants asserted that "Delcath's current leadership lacks . . . independent expertise and experience" and urged shareholders to vote in favor of Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

10.    Unbeknownst to Delcath and its shareholders, the two "independent" investment banking firms "with decades of experience" were anything but independent or experienced.  For example, John Codling, an individual who, upon information and belief, is collaborating with Mr. Ladd in his proxy fight, was affiliated with one of the purported "independent" investment banking firms.  In addition, one of the supposed investment banking firms with "decades of experience" did not historically engage in traditional investment banking activities and had sold its entire research division so that it had no experienced investment banker or analyst to value a company like Delcath.  Moreover, neither of the supposed investment banking firms with "decades of experience" had previously issued a single fairness opinion or valuation on a public company on file with the Securities and Exchange Commission ("SEC").

11.    Moreover, though the valuation of the Ladd Defendants' investment banking firms was based on, *inter alia*, "information provided by LaddcapValue" and the Ladd Defendants' investment banking firms "relied upon and assumed, [but] have not attempted to independently investigate or verify . . . the accuracy, completeness or reasonableness of such information, including published forecasts, projections, estimates (collectively, 'Projections') or other information," the valuation was conspicuously devoid of any disclosure of the underlying assumptions or projections supplied to or relied upon by the Ladd Defendants' investment banking firms in making their valuation.  As if the assumptions and projections underlying the valuation were somehow unnecessary to a reasonable understanding and assessment of the

valuation, the Valuation Proxy Solicitation stated in conclusory fashion that "subject to the disclaimers included in the [valuation], our Advisors estimate the present value of Delcath at between $130 million and $200 million, or between $6.65 and $10.23 per share."

12.     In the three business days following the filing on June 9, 2006 of the misleading Valuation Proxy Solicitation indicting Delcath's Board and management for failing to achieve shareholder value consistent with the "independent" valuation of the Ladd Defendants' "experienced" investment banking firms, the price of Delcath stock plummeted more than 15%. The Ladd Defendants exploited the decline in the price of Delcath stock by acquiring for the Laddcap hedge fund 63,700 shares of Delcath stock between June 9, 2006 and June 13, 2006.

13.     On June 13, 2006, Delcath's shareholders approved at the annual meeting Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

14.     Based on the misleading "independent" valuation of the Ladd Defendants' "experienced" investment banking firms, the Ladd Defendants are intent on forcing a short-sighted sale of the Company so that they can extract a quick profit and boost the short-term performance of the under-performing Laddcap hedge fund.  By contrast, Delcath's Board is interested in maximizing long-term shareholder value for all of Delcath's shareholders and believes that "if the Company obtains premarket approval from the FDA, the value of the Company's technology (and therefore the value of the Company) will be substantially increased beyond what could reasonably be expected to be obtained in a sale of the Company today."

15.     To force the sale of the Company, and with the misleading "independent" valuation of the Ladd Defendants' "experienced" investment banking firms in hand as purported evidence that "Delcath's current leadership lacks . . . independent expertise and experience," the

Ladd Defendants first demanded a special shareholder meeting to vote on proposals to "remove all of Delcath's directors" and "terminate immediately" the "term of office of the current President and Chief Executive Officer."

16.     In an apparent scheme designed to lull the Company into a false sense of calm, the Ladd Defendants then contacted Delcath, indicated after discussions their support for the Company's business plan, and, on July 10, 2006, entered into an agreement to withdraw their demand for a special shareholder meeting to remove Delcath's directors.  Indeed, Delcath and the Ladd Defendants were working together so closely that they exchanged drafts of their respective public filings announcing the agreement.

17.     On July 27, 2006, however, less than three weeks after agreeing to withdraw their demand for a special shareholder meeting to vote on a proposal to remove all of Delcath's directors, the Ladd Defendants reversed course and issued a written consent to action to initiate the process for commencing a consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own slate of directors.  That morning, Jonathan A. Foltz, a Delcath employee and consultant for 14 years, suddenly resigned and was identified as a member of the Ladd Defendants' slate of directors.  Upon information and belief, Mr. Foltz illicitly provided company information to the Ladd Defendants.

18.     On August 1, 2006, the Ladd Defendants filed a Schedule 14A Preliminary Proxy Statement ("Preliminary Consent Solicitation") for their proposed consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own slate of directors.  The Preliminary Consent Solicitation is fraught with material misstatements and omissions.  For example, in an effort to discredit Delcath's directors and disavow discussions with the Company leading up to their agreement just three weeks earlier to withdraw their demand for a special

shareholder meeting to vote on a proposal to "remove all of Delcath's directors," the Ladd Defendants profess in the Preliminary Consent Solicitation "surprise" that Delcath has "rejected" their efforts to "engage in a meaningful dialogue."  The Ladd Defendants neglect to mention, *inter alia*, that following the annual shareholder meeting on June 13, 2006, Mr. Ladd and M.S. Koly, Delcath's President and CEO, had what appeared at the time to be a number of constructive calls.  During the calls, Mr. Ladd indicated to Mr. Koly that he no longer wanted to remove Mr. Koly or Samuel Herschkowitz, M.D., Chairman of Delcath's Board, and was satisfied with the Company's business plan.  The Preliminary Consent Solicitation also omits material information about the Ladd Defendants' slate of directors.  Though in an August 3, 2006 letter to Delcath shareholders the Ladd Defendants describe their slate of directors as having the "necessary skills, resources and relevant experience," the Ladd Defendants fail to disclose material information about the Ladd Defendants' nominees, including the filing for Chapter 7 bankruptcy by Paul William Frederick Nicholls, a significant financial restatement at Seitel Corporation while Fred S. Zeidman served on Seitel's Audit Committee, the financial woes that beset the UCLA hospital system during the tenure of Michael Karpf, M.D., as Vice Provost, and the abysmal performance of the Laddcap hedge fund run by Robert B. Ladd.

19.     Moreover, the Preliminary Consent Solicitation misleads shareholders as to the true motive of the Ladd Defendants' proposed consent solicitation – *i.e.*, to force a prompt sale of the Company.  After nearly a year of repeated attempts to force a sale of the Company, the Ladd Defendants would have shareholders believe that they suddenly have a newfound interest in developing Delcath's long-term business.

20.     The Ladd Defendants' filing of their Schedule 14A Definitive Proxy Statement ("Definitive Ladd Consent Solicitation") is imminent.  Once the Definitive Ladd Consent

Solicitation is filed, the consent solicitation commences and Delcath's directors could be removed at any time.

21.      In addition to misleading Delcath's shareholders with their proxy materials, the Ladd Defendants have failed to comply with their obligation to disclose to Delcath's shareholders the identity of and the nature of their relationship with persons and entities with whom they are acting together as a group for the purpose of acquiring, holding, voting or disposing of Delcath stock.  Upon information and belief, as discussed herein, the Ladd Defendants are part of such a group.

22.      If left uncorrected, the misstatements and omissions of the Ladd Defendants will deprive Delcath's shareholders the opportunity to make decisions on the future of their Company based on full and accurate information.  Delcath brings this suit so that the Ladd Defendants will be required to correct their misstatements and omissions and be enjoined from making additional misstatements and omissions.

## **JURISDICTION AND VENUE**

23.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 78aa, 78(m)(d)(3), 78(n)(a) and 28 U.S.C. § 1331.

24.      Venue is proper in this District pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).

25.      Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the propriety of the Ladd Defendants' statements and disclosures under Sections 13(d) and 14(a) of the Exchange Act and SEC Rules 13d-1, 13d-5 and 14a-9.

## THE PARTIES

### Delcath

26.     Founded in 1988, plaintiff Delcath Systems, Inc. is a Delaware corporation with its principal place of business at 1100 Summer Street, Third Floor, Stamford, Connecticut.

27.     Delcath is developing a drug delivery system capable of introducing, and removing, high dose chemotherapy agents to a diseased organ system while greatly inhibiting their entry into the general circulation system.  It is hoped that the Delcath system will provide a meaningful treatment for certain types of cancer.

28.     In February 2006, the Food and Drug Administration ("FDA") granted to Delcath a Special Protocol Assessment ("SPA") that essentially will allow Delcath to proceed on a fast track to possible premarket approval from the FDA.  With the SPA, the FDA has approved a testing protocol to determine whether patients using the Delcath system experience a reduction in tumor burden or zero progression of a tumor for a longer period of time than those receiving the best alternative care.  On March 1, 2006, testing under the SPA commenced at the National Cancer Institute.

### The Ladd Defendants

29.     In the Ladd Defendants' Schedule 13D filings, defendant Robert Ladd has represented himself to be the managing member of defendant Laddcap Value Advisors LLC, a Delaware limited liability company, which is the general partner of defendant Laddcap Value Partners LP, a Delaware limited partnership.  In the Valuation Proxy Solicitation and Preliminary Consent Solicitation, Mr. Ladd has represented himself to be the managing member of defendant Laddcap Value Associates LLC, which he also purports is the general partner of defendant Laddcap Value Partners LP.  The principal place of business for Mr. Ladd and his Laddcap entities is 650 Fifth Avenue, Suite 600, New York, New York.  A Schedule 13D Amendment

filed on July 27, 2006 indicates that the Laddcap hedge fund is "the record holder of 2,163,527 shares" of Delcath stock and that "Mr. Ladd is deemed to beneficially own 2,163,527 Shares, or 11.1% of the Shares deemed issued and outstanding." The Schedule 13D Amendment also indicates that Mr. Ladd "possesses the sole power to vote and the sole power to direct the disposition of all securities of the Company held by Laddcap."

**Delcath Stock Overwhelmingly Outperforms The Laddcap Hedge Fund**

30.    Over the last three years, Delcath stock has appreciated by more than 450%. Nonetheless, the Ladd Defendants have repeatedly disparaged and harassed Delcath's Board and management in an attempt to bully the Company into undertaking actions so that the Laddcap hedge fund can realize a quick, short-term profit on its recently purchased shares of Delcath stock to offset the abysmal performance of its remaining investment portfolio. Indeed, though the Laddcap hedge fund describes its "primary mission" as "generat[ing] above average, consistent positive returns," its performance has been consistently well below the market average. For example, the annual return in 2004 for the Laddcap fund was 0.7%, whereas the annual return in 2004 for the S&P SmallCap 600 was 21.59%. The annual return in 2005 for the Laddcap fund was –1.7%, whereas the annual return in 2005 for the S&P SmallCap 600 was 6.65%.

**THE LADD DEFENDANTS' REPEATED ATTEMPTS
TO TAKE CONTROL AND FORCE THE SALE OF DELCATH**

**The Ladd Defendants File A Schedule 13D Indicating That,
If Necessary To Force A Sale Of The Company, They Will
Seek The Removal Of Delcath's Board And Management**

31.    On October 17, 2005, Mr. Ladd filed a Schedule 13D indicating that Laddcap had become the holder of 5.1% of the outstanding shares of Delcath stock and that Laddcap would, *inter alia*, "seek to cause [Delcath] to merge with or into, consolidate with, transfer all or

substantially all of its assets to, or otherwise engage in any business combination with, one or more other parties" and, if necessary to achieve its goals, "seek the removal of one or more members of the Company's board of directors and/or executive officers."

32.     On October 24, 2005, Mr. Ladd filed a First Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 6.3% of the outstanding shares of Delcath stock.

33.     On November 10, 2005, Mr. Ladd filed a Second Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 7.4% of the outstanding shares of Delcath stock.  Mr. Ladd also disclosed that he was "interviewing candidates to propose for election to the board of directors of the Company" and that he "may communicate with other shareholders of the Company in order to call a special meeting of the shareholders of the Company to propose that the Company retain the services of a nationally recognized investment banking and/or merger advisory firm."

34.     On December 14, 2005, Mr. Ladd filed a Third Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 8.6% of the outstanding shares of Delcath stock.

35.     On January 6, 2006, Mr. Ladd filed a Fourth Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 9.3% of the outstanding shares of Delcath stock.

**The Ladd Defendants Submit, And Delcath Opposes, A Proposal**
**To Retain An Investment Bank To Explore The Sale Of Delcath**

36.     On January 10, 2006, Mr. Ladd filed a Fifth Amendment to his Schedule 13D indicating that Laddcap had submitted a shareholder proposal for inclusion in Delcath's proxy statement for the annual shareholder meeting on June 13, 2006.  Mr. Ladd's proposal requested a

shareholder vote on whether to "recommend that the Company's Board of Directors immediately retain the services of a nationally recognized investment banking and/or merger advisory firm with expertise in the medical device industry to assist the Company in exploring a potential sale to or business combination with a third party to maximize stockholders value."

37.    On April 24, 2006, Delcath filed a Schedule 14A Proxy Statement and included Mr. Ladd's requested shareholder proposal. Delcath also included in the Schedule 14A a statement from its Board opposing Mr. Ladd's proposal because, *inter alia*, "the Board believes that, if the Company obtains premarket approval from the FDA, the value of the Company's technology (and therefore the value of the Company) will be substantially increased beyond what could reasonably be expected to be obtained in a sale of the Company today."

**Though Not Eligible To Call A Special Shareholder Meeting, The Ladd Defendants Make Their First Demand For A Special Shareholder Meeting**

38.    On April 27, 2006, the Ladd Defendants demanded a special shareholder meeting to vote on three items, including a proposal to "terminate immediately" Delcath's President and CEO. Delcath advised the Ladd Defendants that they were not eligible under Delcath's certificate of incorporation and by-laws to call a special shareholder meeting

39.    On April 28, 2006, Mr. Ladd filed a Sixth Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 10.0% of the outstanding shares of Delcath stock. The Sixth Amendment attached an April 27, 2006 letter in which Mr. Ladd claimed that "Delcath's low enterprise value is reflective of management's and the Board's self-serving policies."

**The Ladd Defendants Purport To Address Their Eligibility Problems
And Make A Second Demand For A Special Shareholder Meeting**

40.     On May 11, 2006, the Ladd Defendants sent a letter indicating that they had taken steps to become eligible to call a special shareholder meeting and again demanded a special meeting to vote on three items, including a proposal to "terminate immediately" Delcath's President and CEO.

41.     On May 19, 2006, Delcath filed a Form 8-K indicating that, at the request of the Ladd Defendants, a special shareholder meeting had been scheduled for August 25, 2006.

42.     On May 24, 2006, Mr. Ladd filed a Seventh Amendment to his Schedule 13D indicating that Mr. Ladd had omitted certain sales of Delcath stock in the Sixth Amendment to his Schedule 13D.

**The Ladd Defendants File Proxy Materials Requesting Shareholders To Vote For
Their Proposal To Retain An Investment Bank To Explore The Sale Of The Company**

43.     On May 25, 2006, Laddcap filed a Schedule 14A Proxy Solicitation containing a shareholder letter requesting that shareholders eligible to vote at the annual meeting on June 13, 2006 (a) withhold their votes for the re-election of Victor Nevins and Mark Corigliano as directors; and (b) vote in favor of Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

44.     On May 26, 2006, Laddcap filed a Schedule 14A Preliminary Proxy Statement containing another shareholder letter requesting that shareholders eligible to vote at the annual meeting on June 13, 2006 (a) withhold their votes for the re-election of Victor Nevins and Mark Corigliano as directors; and (b) vote in favor of Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

**The Ladd Defendants Continue Their Efforts To Force A Sale Of The Company**
**By Filing A Lawsuit And Making Their Third Demand For A Special Shareholder Meeting**

45.    On June 6, 2006, just one week before the scheduled annual meeting on June 13, 2006, the Laddcap hedge fund commenced suit against Delcath in the Court of Chancery of the State of Delaware relating to supposed "concerns regarding the propriety of certain actions taken by Delcath's officers and directors."  The Laddcap hedge fund subsequently agreed to dismiss the lawsuit *after* the annual meeting.

46.    On June 6, 2006, the Ladd Defendants made a "new demand . . . to immediately call a special meeting of the shareholders" to vote on six items, including proposals to "remove all of Delcath's directors" and "terminate immediately" Delcath's President and CEO.

47.    On June 8, 2006, the Ladd Defendants filed a Schedule 14A Preliminary Proxy Statement containing a third shareholder letter requesting that shareholders eligible to vote at the annual meeting on June 13, 2006 (a) withhold their votes for the reelection of Victor Nevins and Mark Corigliano as directors; and (b) vote in favor of Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

48.    On June 8, 2006, Mr. Ladd also filed an Eighth Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 10.4% of the outstanding shares of Delcath stock.

**The Ladd Defendants Make Public A Supposedly "Independent" Valuation To**
**Disparage Delcath's Board And Management And Push For A Sale Of The Company**

49.    On June 9, 2006, the Ladd Defendants filed a Schedule 14A Proxy Solicitation (the "Valuation Proxy Solicitation") stating that Laddcap had retained two "investment banking firms" with "decades of experience" who estimated the present value of Delcath at "between $6.65 and $10.23 per share."  The valuation, which was included in the Valuation Proxy

Solicitation, indicated that Fulcrum and Glocap had been retained as "independent third parties." Noting that "the midpoint of this valuation, $8.44 per share, is more than fifty percent (50%) greater than last night's closing price of Delcath stock," the Ladd Defendants asserted that "Delcath's current leadership lacks . . . independent expertise and experience" and urged Delcath shareholders to vote in favor of their proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

50.     In the three business days following the June 9, 2006 filing of the Valuation Proxy Solicitation indicting Delcath's management and Board for failing to achieve shareholder value consistent with the "independent" valuation provided by the Ladd Defendants' investment banking firms, the price of Delcath stock plummeted more than 15%.  The Ladd Defendants exploited the decline in the price of Delcath stock caused by the Ladd Defendants' misleading Valuation Proxy Solicitation by acquiring for the Laddcap hedge fund 63,700 shares of Delcath stock between June 9, 2006 and June 13, 2006.

51.     On June 13, 2006, Delcath announced that Delcath's shareholders at the annual shareholder meeting had approved Mr. Ladd's proposal to recommend that the Board immediately retain an investment bank to explore the sale of the Company.

52.     On June 14, 2006, Mr. Ladd filed a Ninth Amendment to his Schedule 13D indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 10.8% of the outstanding shares of Delcath stock.

**Delcath's Board Implements A Number Of Initiatives**
**In The Wake Of The Annual Shareholder Meeting, Including**
**An Initiative To Add Two New Independent Directors**

53.     On June 27, 2006, Delcath issued a letter outlining a number of initiatives Delcath's Board had decided to implement in the wake of the annual shareholder meeting.  The

initiatives included adding two new independent directors to the Board by the end of 2006 and

expanding Delcath's investor and public relations campaign to introduce the Delcath story to new

institutional investors and major broadcast and print media.  Though the letter indicated that

Delcath also had commenced discussions with investment banking firms regarding a possible

engagement to assist the Board with its continuing evaluation of all available options, Delcath's

Board reiterated that "a sale of the Company prior to the completion of [the] pivotal Phase III

trial is premature and would significantly limit the long-term value shareholders could realize if,

as we expect, FDA approval of the Delcath system is granted."

**Delcath Is Selected To Join The Russell Microcap Index**

     54.     On July 5, 2006, Delcath announced that it had been selected to join the Russell

Microcap Index.  As Delcath explained in its press release, "Russell indexes are widely used by

investment managers and institutional investors for index funds and as benchmarks for both

passive and active investment strategies."  Delcath's President and CEO, M.S. Koly, commented

that the selection of Delcath for the Russell Microcap Index "reflects the strong progress we have

achieved in our Phase III clinical trial for the treatment of metastatic melanoma in the liver."

**The Ladd Defendants, In A 180° Turnabout, Indicate Their Support For Delcath's**
**Management And Agree To Withdraw Their Demand For A Special Shareholder Meeting**

     55.     Following the annual shareholder meeting, Mr. Ladd contacted M.S. Koly,

Delcath's President and CEO.  Over the course of approximately one to two weeks, Mr. Ladd and

Mr. Koly had what appeared at the time to be a number of constructive calls.  During the calls,

Mr. Ladd indicated to Mr. Koly that he no longer wanted to remove Mr. Koly or Samuel

Herschkowitz, M.D., Chairman of Delcath's Board, and was satisfied with the Company's

business plan.  While Mr. Ladd initially proposed that Mark Corigliano, Victor Nevins and

Daniel Isdaner resign from the Board, Mr. Ladd effectively ratified the Board's initiative to

instead add two new independent directors by agreeing after the announcement of the Board's initiative to (1) withdraw their demand for a special shareholder meeting to vote on proposals to remove Delcath's directors and terminate Delcath's President and CEO; (2) dismiss the Laddcap hedge fund's lawsuit against Delcath; (3) send to the Company the names and/or resumes of candidates Mr. Ladd wished to be considered for the two new director positions; and (4) provide suggested investment banks for Delcath to contact.  In the spirit of cooperation, Mr. Koly sent to Mr. Ladd for his review the resumes of potential candidates for the new director positions.  In addition, Mr. Koly sent to Mr. Ladd for his review and comment a draft press release regarding the agreement reached between the parties, and Mr. Ladd likewise provided to Mr. Koly for his review and comment a draft of a Schedule 13D filing announcing the agreement reached between the parties.

56.     On July 11, 2006, Delcath issued its press release announcing the Ladd Defendants' agreement to withdraw their demand for a special shareholder meeting and dismiss the Laddcap hedge fund's lawsuit against Delcath in Delaware.  Delcath's President and CEO, M.S. Koly, commented that Delcath was "pleased to report this breakthrough event for our shareholders" and that Delcath "look[ed] forward to moving on and focusing on maximizing shareholder value over the long term."

57.     On July 11, 2006, Mr. Ladd filed a Tenth Amendment to his Schedule 13D likewise indicating that the Ladd Defendants had reached an agreement to withdraw their demand for a special shareholder meeting and dismiss the lawsuit in the Delaware state court that the Laddcap hedge fund had brought against Delcath just prior to the annual shareholder meeting in June 2006: "Effective July 10, 2006, Laddcap entered into a written agreement . . . with the Company in which Laddcap and the Company agreed that: (i) Laddcap would withdraw its

requests for a special meeting of Delcath's stockholders pursuant to Laddcap's letters dated May

11, 2006 and June 6, 2006, and (ii) Laddcap and the Company would immediately dismiss

without prejudice the Delaware Stockholder Litigation."

**Delcath Reports Positive Business Developments In Quarterly Update**

58.    On July 17, 2006, Delcath issued its quarterly shareholder update.  The update

reported on a number of positive developments, including the successful enrollment of new

patients for clinical trials and the approval, pending no objection from outside parties, of

Delcath's application for a patent relating to the Company's balloon catheter which is used to

used to restrict blood flow from the liver to the heart.  The update also reported that Delcath's

Board remained on schedule to fill the two new independent director positions by the end of

2006 and was continuing to have discussions with several investment banking firms regarding

their possible engagement assist the Board in evaluating all available options.

**The Ladd Defendants Suddenly Reverse Course And Take Steps
To Initiate A Consent Solicitation To Remove Delcath's Directors**

59.    On July 27, 2006, just weeks after agreeing to withdraw their demand for a

special shareholder meeting to vote on a proposal to remove all of Delcath's directors, the Ladd

Defendants issued a written consent to action ("Consent to Action") to initiate the process for

commencing a consent solicitation to remove Delcath's directors and replace them with the Ladd

Defendants' own slate of directors.  The Consent to Action identifies the following actions for

which the Ladd Defendants will be soliciting shareholder consents: (1) "The removal without

cause of M.S. Koly, Samuel Herschkowitz, M.D., Mark A. Corigliano, Daniel Isdaner and Victor

Nevins as directors of the Company and any other person or persons (other than the persons

elected pursuant to this proposed action by written consent) elected or appointed to the Board of

Directors of the Company prior to the effectiveness of these proposals; (2) the election of the

following five persons as directors of the Company to fill the vacancies resulting from proposal 1:  Jonathan A. Foltz, Michael Karpf, M.D., Robert B. Ladd, Paul William Frederick Nicholls and Fred S. Zeidman; and (3) The repeal of each provision of the Company's Bylaws and amendments of the Bylaws that are adopted after December 31, 2005 and before the effectiveness of the foregoing two proposals."

60.     Just hours before the Ladd Defendants issued their Consent to Action on July 27, 2006, Jonathan A. Foltz, one of the individuals identified in the Consent to Action as part of the Ladd Defendants' slate of directors, suddenly resigned as a consultant to Delcath.  Mr. Foltz had been a Delcath employee and consultant for 14 years, was involved in almost all aspects of Delcath's operations, and had access to company trade secrets and other confidential and proprietary information.  Upon information and belief, Mr. Foltz illicitly provided company information to the Ladd Defendants for their anticipated consent solicitation.

61.     On July 28, 2006, Mr. Ladd filed an Eleventh Amendment to his Schedule 13D describing his Consent to Action and indicating that Laddcap had acquired additional Delcath stock and that he had increased his beneficial ownership to 11.1% of the outstanding shares of Delcath stock.

62.     On August 1, 2006, the Ladd Defendants filed a Schedule 14A Preliminary Proxy Statement ("Preliminary Consent Solicitation") for their proposed consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own slate of directors.  In a remarkable about-face from the discussions between Mr. Ladd and Mr. Koly which led to the Ladd Defendants' agreement just three weeks earlier to withdraw their demand for a special shareholder meeting to vote on a proposal to remove Delcath's directors, the Ladd Defendants profess in the Preliminary Consent Solicitation "surprise" that Delcath has "rejected" their efforts

to "engage in a meaningful dialogue."  The Ladd Defendants also purport to provide in the Preliminary Consent Solicitation information about their proposed slate of directors.  However, that information is misleadingly incomplete.  For example, Preliminary Consent Solicitation fails to disclose the filing for Chapter 7 bankruptcy by Paul William Frederick Nicholls, a significant financial restatement at Seitel Corporation while Fred S. Zeidman served on Seitel's Audit Committee, the financial woes that beset the UCLA hospital system during the tenure of Michael Karpf, M.D., as Vice Provost, and the abysmal performance of the Laddcap hedge fund run by Robert B. Ladd.  In addition, the Ladd Defendants fail to disclose in the Preliminary Consent Solicitation their underlying motive for undertaking the consent solicitation.  Upon information and belief, the consent solicitation is but another step in the Ladd Defendants' continuing campaign to force a sale of the Company so that they can extract a quick profit and boost the short-term performance of the under-performing Laddcap hedge fund.  Indeed, it defies belief that after nearly a year of repeated attempts to force a sale of the Company, the Ladd Defendants suddenly have a newfound interest in developing Delcath's long-term business.

63.    The Ladd Defendants' filing of their Schedule 14A Definitive Proxy Statement ("Definitive Ladd Consent Solicitation") is imminent.  Once the Definitive Ladd Consent Solicitation is filed, the consent solicitation commences and Delcath's directors can be removed immediately and at any time within 60 days of July 27, 2006, the record date for the proposed consent solicitation.

## MATERIAL MISSTATEMENTS AND OMISSIONS
## IN PROXY SOLICITATION MATERIALS

64.    There are a series of material misstatements and omissions in the proxy solicitation materials that the Ladd Defendants have filed and disseminated as part of their campaign to force the sale of Delcath.

## VALUATION PROXY SOLICITATION

### Undisclosed Relationship with Fulcrum

65.     The Valuation Proxy Solicitation fails to disclose that John Codling, an individual who, upon information and belief, has collaborated with Mr. Ladd in his proxy battle against the Company, was affiliated with one of the investment banking firms that issued the valuation.  The valuation filed by the Ladd Defendants represents that the investment banking firms are "independent third parties."

66.     In late 2005, John Codling, then a broker with Westrock Advisors, Inc., made numerous harassing calls to Delcath.  As a result, Delcath lodged a formal complaint with Westrock's compliance officer.  During one call in November 2005, Mr. Codling indicated that Delcath had "pissed off" its largest investor by not first discussing a private placement with the investor or Mr. Codling.  Mr. Codling has represented that he introduced and/or recommended Delcath stock to Mr. Ladd and others and is collaborating with Mr. Ladd in his proxy battle against the Company.

67.     On the evening of June 13, 2006, Mr. Codling called the public relations representative of Delcath.  During that call, Mr. Codling represented that he was affiliated with Fulcrum, one of the supposedly "independent" investment banking firms that issued the valuation for the Ladd Defendants, and suggested that the public relations representative speak with Delcath about retaining Fulcrum as its investment bank to explore the sale of the Company.  Upon information and belief, Mr. Codling and Michael Petrycki, the CEO of Fulcrum who signed the valuation, were also both affiliated with the New York office of National Securities Corporation.

68.    By not disclosing that an individual who has a personal relationship with Mr. Ladd and who has collaborated with Mr. Ladd in his proxy battle against the Company was affiliated with one of the investment banking firms that issued the valuation, the Valuation Proxy Solicitation creates the material misimpression that the Ladd Defendants have obtained a valuation regarding the present value of Delcath from "independent" investment banking firms.

### Undisclosed Lack of Credentials of Fulcrum

69.    The Valuation Proxy Solicitation prepared by the Ladd Defendants also falsely represents that Fulcrum is an "investment banking firm" with "decades of experience."

70.    According to a December 2005 press release, Fulcrum was not formed until 2001 and "does not engage in traditional investment banking activities."  Moreover, Fulcrum sold its entire research division in December 2005, or seven months prior to when it issued the valuation included in the Valuation Proxy Solicitation.  According to one former Fulcrum health care analyst, after the research division was sold in December 2005, "the company was pretty much just a shell."

71.    On June 6, 2006, one day *before* Fulcrum issued its valuation of Delcath, the *New York Post* reported that Fulcrum had "shut its books and resigned from the National Association of Securities Dealers."

72.    The Valuation Proxy Solicitation creates the material misimpression that the valuation was provided by established investment banking firms when, in fact, Fulcrum did not historically engage in traditional investment banking activities and had sold its entire research division so that it had no experienced investment banker or analyst to value a company like Delcath.  The Valuation Proxy Solicitation also creates the material misimpression that Fulcrum has "decades of experience" in, *inter alia*, "providing fairness opinions."  A review of public

SEC filings has failed to yield a single fairness opinion or valuation on a public company issued by Fulcrum.

### Undisclosed Lack of Credentials of Glocap

73.    The Valuation Proxy Solicitation also falsely portrays the credentials of Glocap. According to the Valuation Proxy Solicitation, Glocap has "decades of experience" in, *inter alia*, "providing fairness opinions."

74.    According to Glocap's annual report, Glocap was not organized until August 1999.  Moreover, a review of public SEC filings has failed to yield a single fairness opinion or valuation on a public company issued by Glocap.

75.    The Valuation Proxy Solicitation thus creates the material misimpression that the valuation was provided by established investment banking firms when, in fact, Glocap does not appear to have issued a single fairness opinion or valuation on a public company on file with the SEC.

76.    Upon information and belief, there also may be undisclosed relationships between Glocap and the Ladd Defendants, including the Laddcap hedge fund.  According to Glocap's annual report, it was specifically organized to raise capital for, *inter alia*, hedge funds.

### Undisclosed Assumptions and Projections Used in Making Valuation

77.    The Valuation Proxy Solicitation also is materially misleading because it fails to disclose the underlying assumptions and projections used by the "independent" investment banking firms in making their valuation.

78.    The valuation by Fulcrum and Glocap purports to be based on, *inter alia*, "information provided by LaddcapValue regarding Delcath" and "such other information . . . as [Fulcrum and Glocap] deemed relevant."

79.    Though supposedly "independent," Fulcrum and Glocap "relied upon and assumed, [but] have not attempted to independently investigate or verify . . . the accuracy, completeness or reasonableness of such information, including published forecasts, projections, estimates (collectively, 'Projections') or other information."

80.    Moreover, the Valuation Proxy Solicitation contains no disclosure of the assumptions or projections supplied to or relied upon by Fulcrum and Glocap in making their valuation.  Instead, as if the assumptions and projections underlying the valuation were somehow unnecessary to a reasonable understanding and assessment of the valuation, the Valuation Proxy Solicitation states in conclusory fashion that "subject to the disclaimers included in the [valuation], our Advisors estimate the present value of Delcath at between $130 million and $200 million, or between $6.65 and $10.23 per share."

81.    The SEC Division of Corporate Finance has made clear that the inclusion of valuations in proxy soliciting materials "is only appropriate and consonant with Rule 14a-9 under the Securities Exchange Act of 1934" if the valuations are "accompanied by disclosure which facilitates shareholders' understanding of the basis for and limitations on the projected realizable values" and warned that "where the valuations are so qualified and subject to such material limitations and contingencies, inclusion in proxy soliciting material of specific realizable values may be unreasonable."  To avoid scrutiny from the SEC, the Ladd Defendants have conveniently omitted the valuation from their proposed proxy statement for the consent solicitation.

82.    Here, by omitting disclosure of the assumptions and projections supplied to and relied upon by Fulcrum and Glocap in making their valuation, the Valuation Proxy Solicitation fails to provide Delcath's shareholders an adequate basis for understanding and assessing the valuation and creates the material misimpression that the valuation of the "independent" and

"experienced" investment banking firms is based on objective, non-controversial assumptions and projections. Upon information and belief, disclosure of the assumptions and projections underlying the valuation would reveal that the valuation is so qualified and subject to material limitations and contingencies that it is unreasonable to include or reference it in proxy soliciting material.

## PRELIMINARY CONSENT SOLICITATION

### Mischaracterization Of Discussions With Company

83.    The Preliminary Consent Solicitation falsely represents that Delcath "rejected" the Ladd Defendants' efforts to "engage in a meaningful dialogue" and mischaracterizes the discussions between Mr. Ladd and Mr. Koly which led to the Ladd Defendants' agreement just three weeks earlier to withdraw their demand for a special shareholder meeting to vote on a proposal to remove Delcath's directors.

84.    Far from "rejecting" any efforts to "engage in a meaningful dialogue," Delcath representatives have met or spoke with Mr. Ladd on a number of occasions over the past year. Most recently, following the annual shareholder meeting in June 2006, Mr. Ladd and Mr. Koly had what appeared at the time to be a number of constructive calls. During the calls, Mr. Ladd indicated to Mr. Koly that he no longer wanted to remove Mr. Koly or Samuel Herschkowitz, M.D., Chairman of Delcath's Board, and was satisfied with the Company's business plan. While Mr. Ladd initially proposed that Mark Corigliano, Victor Nevins and Daniel Isdaner resign from the Board, Mr. Ladd effectively ratified the Board's initiative to instead add two new independent directors by agreeing after the announcement of the Board's initiative to (1) withdraw their demand for a special shareholder meeting to vote on proposals to remove Delcath's directors and terminate Delcath's President and CEO; (2) dismiss the Laddcap hedge

fund's lawsuit against Delcath; (3) send to the Company the names and/or resumes of candidates Mr. Ladd wished to be considered for the two new director positions; and (4) provide suggested investment banks for Delcath to contact.  In addition, Mr. Koly sent to Mr. Ladd for his review and comment a draft press release regarding the agreement reached between the parties, and Mr. Ladd likewise provided to Mr. Koly for his review and comment a draft of a Schedule 13D filing announcing the agreement reached between the parties.

85.    The Preliminary Consent Solicitation thus creates the material misimpression that Delcath's Board and management have acted unreasonably and ignored Delcath's largest shareholder when in fact Mr. Ladd gave Delcath's Board and management every reason to believe that the parties had engaged in a cooperative process and that the Ladd Defendants supported the Company's business plan.  Upon information and belief, the Ladd Defendants deliberately lulled the Company into a false sense of calm in order to ambush the Company with its consent solicitation.

### Misleading Information About The Ladd Defendants' Slate Of Directors

86.    In addition, the Preliminary Consent Solicitation provides misleadingly incomplete information about the slate of directors with whom the Ladd Defendants wish to replace Delcath's current directors.  The Preliminary Consent Solicitation asserts that, unlike the Ladd Defendants' slate of directors, Delcath's current directors are too "inexperienced" to effectively lead the Company.

87.    The Ladd Defendants have failed to provide material information about their desired slate of directors.

**Paul William Frederick Nicholls:**  The Preliminary Consent Solicitation fails to disclose that that one of the Ladd Defendants' nominees to lead the Company, Paul William

Frederick Nicholls, filed for Chapter 7 personal bankruptcy in 2002. According to Mr. Nicholls' bankruptcy petition, he amassed debt of $105,349.75 on 9 credit cards, including credit cards issued by luxury retailers such as Bloomingdale's, Bergdorf Goodman and Macy's, and had assets of just $4,050, consisting of $2,500 in household goods and furnishings, $1500 in wearing apparel, and $50 in cash. Plainly, Delcath's shareholders are entitled to know whether the Ladd Defendants' nominees are capable of managing their own personal finances, much less the business of a public company.

**Fred S. Zeidman:** The Preliminary Consent Solicitation fails to disclose that there was a significant financial restatement at Seitel Corporation when Fred S. Zeidman, another one of the Ladd Defendants' nominees to lead the Company, served on the Seitel's Audit Committee. In April 2002, Seitel announced that it was restating its financial statements because of improper accounting during the previous seven fiscal quarters. Mr. Zeidman served on Seitel's Audit Committee during each of those fiscal quarters. The restatement resulted in a reduction of more than $68 million in revenues. In 2001, Seitel stock peaked at $22.72. Following Seitel's announcement in April 2002 that it would be restating earnings, Seitel's stock dropped to a low of $0.49 in the fourth quarter of 2002. In March 2003, Seitel's stock was delisted from trading on the New York Stock Exchange. In July 2003, Seitel went into bankruptcy. Mr. Zeidman was named as a defendant in seven shareholder derivative suits relating to the improper accounting at Seitel. Plainly, Delcath's shareholders are entitled to know about the track record of the Ladd Defendants' nominees in serving as directors of other public companies.

**Michael Karpf, M.D.:** The Preliminary Consent Solicitation fails to disclose the financial woes that the UCLA hospital system suffered during the tenure of Michael Karpf, M.D., as Vice Provost from 1996 to 2003. According to the *Wall Street Journal*, between 1998

and 2000, the net income of the UCLA hospital system dropped from $51 million to less than $5 million.  In 2002, despite being the largest medical system in the University of California chain, UCLA reported net income of only $7.2 million as compared with $36.5 million for Irvine, $35.3 million for Davis, $30.3 million for San Diego and $29.0 million for San Francisco.  Despite these poor financial results, UCLA awarded bonuses totaling about $1.4 million to top hospital officials between 2000 and 2004.  Dr. Karpf's base salary in 2002 was $436,600, higher than his counterparts at the other University of California medical systems.  In October 2002, The Hunter Group was hired to conduct a review of the UCLA hospital system.  In March 2003, UCLA announced that it had received a preliminary report from The Hunter Group recommending that the UCLA hospital system overhaul its unprofitable clinics and reduce staff by 475 positions.  By October 2003, Dr. Karpf had left the UCLA hospital system for the University of Kentucky.  Plainly, Delcath's shareholders are entitled to know about the track record of the Ladd Defendants' nominees in running businesses.

**Robert B. Ladd:**  The Preliminary Consent Solicitation fails to disclose the abysmal performance of the Laddcap hedge fund run by Robert B. Ladd.  Indeed, though the Laddcap hedge fund describes its "primary mission" as "generat[ing] above average, consistent positive returns," its performance has been consistently well below the market average.  For example, the annual return in 2004 for the Laddcap fund was 0.7%, whereas the annual return in 2004 for the S&P SmallCap 600 was 21.59%.  The annual return in 2005 for the Laddcap fund was –1.7%, whereas the annual return in 2005 for the S&P SmallCap 600 was 6.65%.  Plainly, Delcath's shareholders are entitled to know about the track record of the Ladd Defendants' nominees in their business endeavors.

88. The Preliminary Consent Solicitation also falsely states that neither Laddcap nor the Ladd Defendants' director nominees "has any agreement, arrangement or understanding with respect to any future employment by the Company or its affiliates."  As discussed above, just hours before the Ladd Defendants issued their Consent to Action on July 27, 2006, Jonathan A. Foltz, a Delcath employee and consultant for 14 years, suddenly resigned as a consultant to Delcath.  Mr. Foltz was then identified as one of the Ladd Defendants' director nominees in the Consent to Action.  It simply defies belief that Mr. Foltz would have resigned from Delcath after 14 years without any understanding with the Ladd Defendants concerning his future employment at Delcath.

### Undisclosed Motive For Consent Solicitation

89. The Preliminary Consent Solicitation also is materially misleading because it fails to disclose the Ladd Defendants' underlying motive for undertaking the consent solicitation.

90. Upon information and belief, the consent solicitation is but another step in the Ladd Defendants' continuing campaign to force a sale of the Company so that they can extract a quick profit and boost the short-term performance of the under-performing Laddcap hedge fund.

91. Indeed, the Ladd Defendants' actions over the past year have consistently been designed to force an immediate sale of the Company.  Moreover, John Codling, the individual who introduced Delcath stock to Mr. Ladd and who, upon information and belief, is collaborating with Mr. Ladd in his proxy battle, has suggested that Delcath retain Fulcrum, one of the purported "independent" investment banks that provided the Ladd Defendants a valuation for the Valuation Proxy Solicitation, to explore the sale of the Company.

92. However, Delcath's Board has maintained that "a sale of the Company prior to the completion of [the] pivotal Phase III trial is premature and would significantly limit the long-

term value shareholders could realize if, as we expect, FDA approval of the Delcath system is granted."

93.    Upon information and belief, the Ladd Defendants' underlying and ulterior motive for the consent solicitation is to install a slate of directors who will agree to an immediate sale of the Company.

94.    The Preliminary Consent Solicitation thus creates a material misimpression as to the true purposes for the consent solicitation.

## MATERIAL MISSTATEMENTS AND OMISSIONS IN THE LADD DEFENDANTS' SCHEDULE 13D FILINGS

95.    The Ladd Defendants also have failed to comply with their disclosure obligations in their Schedule 13D filings.  As described below, upon information and belief, the Ladd Defendants are part of a group of persons and entities acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock.  Yet, the Ladd Defendants' Schedule 13D filings are devoid of any disclosures regarding the group.

96.    As discussed above, during a call with a Delcath representative in November 2005, Mr. Codling indicated that he represented approximately 7.5% of the outstanding shares of Delcath stock and that Delcath had "pissed off" its largest investor by not first discussing a private placement with him or the investor.  Upon information and belief, the investor Mr. Codling was referring to on the call was Mr. Ladd.  Mr. Codling has represented that he introduced and/or recommended Delcath stock to Mr. Ladd and others, speaks to Mr. Ladd almost every day, and with Mr. Ladd "controls the entire float" of Delcath.

97.    On the evening of June 13, 2006, Mr. Codling called the public relations representative of Delcath.  During that call, Mr. Codling indicated that he represented in excess of 15% of the outstanding shares of Delcath stock.  Mr. Ladd's most recent amendment to his

Schedule 13D indicates that he is the beneficial owner of 11.1% of the outstanding shares of Delcath stock.

98.     Though Mr. Codling is collaborating with Mr. Ladd in his proxy battles against the Company and purports to represent and control shares in excess of those owned by Mr. Ladd, there is no disclosure in the Ladd Defendants' Schedule 13D filings of the group of persons and entities acting together with Mr. Codling and Mr. Ladd for the purpose of acquiring, holding, voting or disposing of Delcath stock.

99.     One of the stockholders the Ladd Defendants are working with is Tom Mowry. In an e-mail to a group of Delcath shareholders on December 13, 2005, Mr. Mowry indicated that he has "regular contact" with Mr. Ladd and that he was obtaining information from the shareholders for Mr. Ladd, including the amount of shares they owned and whether they were "willing or not to collectively proxy [their] shares," for a potential meeting of the group.  In a self-serving attempt to, as Mr. Mowry describes it, "CYA," Mr. Mowry stated: "I do not represent Robert Ladd as a legal entity, and have only been given permission to solicit as an unofficial representative of a potential meeting of common shareholders of DCTH.  (this seems enough to CYA)  I am sort of acting as proxy for Rob (Ladd) the 13D filer."

100.     Though Mr. Mowry is acting as an "unofficial representative" and "proxy" for Mr. Ladd, there is no disclosure in the Ladd Defendants' Schedule 13D filings of Mr. Mowry, the terms and nature of the relationship between Mr. Ladd and Mr. Mowry or the group of shareholders who indicated to Mr. Mowry that they were willing to "collectively proxy [their] shares" with Mr. Ladd.

### COUNT I
### (Violation of 15 U.S.C. 78n(a) and 17 C.F.R. § 240.14a-9)

101.    Delcath repeats and realleges each and every allegation set forth in paragraphs 1 through 100 as if fully set forth herein.

102.    This Count is brought against all the Ladd Defendants.

103.    In connection with the annual meeting of Delcath shareholders on June 13, 2006 and the proposed consent solicitation on the actions described in the Preliminary Consent Solicitation, the Ladd Defendants have been and continue to be engaged in a proxy solicitation governed by Section 14(a) of the Exchange Act.

104.    As described above, in the Valuation Proxy Solicitation and Preliminary Consent Solicitation and in oral statements to Delcath shareholders about the status of the consent solicitation, the Ladd Defendants have made numerous misleading misstatements and omissions of material facts in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9.

105.    The materially misleading misstatements and omissions in the Valuation Proxy Solicitation and Preliminary Consent Solicitation and in oral statements to Delcath shareholders about the status of the consent solicitation were made by the Ladd Defendants with at least the negligent state of mind required under Section 14(a) of the Exchange Act and SEC Rule 14a-9.

106.    As discussed above, based on their misleading Valuation Proxy Solicitation and Preliminary Consent Solicitation and misleading oral statements to Delcath shareholders about the status of the consent solicitation, the Ladd Defendants are intent on taking control of the Company and forcing a short-sighted sale of the Company so that they can extract a quick profit and boost the short-term performance of the under-performing Laddcap hedge fund.

107.    If left uncorrected, the materially misleading misstatements and omissions in the Valuation Proxy Solicitation and Preliminary Consent Solicitation and in oral statements to

Delcath shareholders about the status of the consent solicitation will deprive Delcath's shareholders the opportunity to make decisions on the future of their Company based on the full and accurate information to which they are entitled, and both Delcath and its shareholders will be irreparably harmed.

108.    Accordingly, Delcath is entitled to (a) a declaration that the Valuation Proxy Solicitation and Preliminary Consent Solicitation violate Section 14(a) of the Exchange Act and SEC Rule 14a-9; (b) an order requiring the Ladd Defendants to correct by public means the misleading misstatements and omissions in the Valuation Proxy Solicitation and Preliminary Consent Solicitation and enjoining the Ladd Defendants and other persons or entities acting in concert with them from exercising any rights as Delcath stockholders, including their rights to vote or submit shareholder consents, until the Ladd Defendants correct by public means their material misstatements and omissions; (c) an order enjoining the Ladd Defendants from soliciting shareholder consents in connection with the actions described in the Preliminary Consent Solicitation until 60 days after the Ladd Defendants correct by public means their material misstatements and omissions in the Valuation Proxy Solicitation and Preliminary Consent Solicitation; (d) an order enjoining the Ladd Defendants from taking any action based on any consents that they may have obtained, or may obtain, pursuant to the proposed consent solicitation; and (e) a permanent injunction preventing the Ladd Defendants from making any additional misstatements or omissions in connection with, or otherwise related to, proxy battles or shareholder votes or consent solicitations, including the solicitation of shareholder consents on the actions described in the Preliminary Consent Solicitation.

109.    Delcath has no adequate remedy at law.

## COUNT II
## (Violation of 15 U.S.C. 78m(d), 17 C.F.R. § 240.13d-1 and 17 C.F.R. § 240.13d-5)

110.    Delcath repeats and realleges each and every allegation set forth in paragraphs 1 through 109 as if fully set forth herein.

111.    This Count is brought against all the Ladd Defendants.

112.    As discussed above, there is no disclosure in the Ladd Defendants' Schedule 13D filings of the group of persons and entities acting together with Mr. Codling and Mr. Ladd for the purpose of acquiring, holding, voting or disposing of Delcath stock or of Mr. Mowry, the terms and nature of the relationship between Mr. Ladd and Mr. Mowry or the group of shareholders who indicated to Mr. Mowry that they were willing to "collectively proxy [their] shares" with Mr. Ladd.

113.    In violation of Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5, the Ladd Defendants have not disclosed the identity and the nature of their relationship with the group of persons and entities with whom they are acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock. *See*, *e.g.*, 15 U.S.C. § 78m(d)(1) & (3). For example, under Item 6 of the Schedule 13D filed by the Ladd Defendants in October 2005 concerning "contracts, arrangements, understandings or relationships with respect to securities of the issuer," Mr. Ladd indicated that were "none." In the eleven amendments filed by the Ladd Defendants to the original Schedule 13D, there has been no amended response to Item 6.

114.    If left uncorrected, the materially misleading misstatements and omissions in the Ladd Defendants' Schedule 13D filings will deprive Delcath's shareholders of the full and accurate information to which they are entitled and both Delcath and its shareholders will be irreparably harmed.

115.    Accordingly, Delcath is entitled to (a) a declaration that the Ladd Defendants' Schedule 13D filings violate Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5; (b) an order requiring the Ladd Defendants to correct by public means the misleading misstatements and omissions in their Schedule 13D filings and enjoining the Ladd Defendants from any trading in Delcath stock until the Ladd Defendants correct by public means their material misstatements and omissions; and (c) a permanent injunction preventing the Ladd Defendants from making any additional misstatements or omissions in connection with, or otherwise related to, their Schedule 13D filings.

116.    Delcath has no adequate remedy at law.

## COUNT III
### (Violation of 15 U.S.C. 78t(a))

117.    Delcath repeats and realleges each and every allegation set forth in paragraphs 1 through 116 as if fully set forth herein.

118.    This Count is brought against defendants Robert Ladd, Laddcap Value Advisors LLC and Laddcap Value Associates LLC

119.    Mr. Ladd acted as a controlling person of defendants Laddcap Value Advisors LLC, Laddcap Value Associates LLC and Laddcap Value Partners LP within the meaning of Section 20(a) of the Exchange Act.  Indeed, Mr. Ladd has represented himself to be the "managing member" of Laddcap Value Advisors LLC and Laddcap Value Associates LLC, each of which is described in SEC filings as the general partner of Laddcap Value Partners LP.  Mr. Ladd thus had the power to control or influence the particular acts of Laddcap Value Advisors LLC, Laddcap Value Associates LLC and Laddcap Value Partners LP giving rise to the violations of Section 14(a) of the Exchange Act, SEC Rule 14a-9, Section 13(d) of the Exchange

Act, SEC Rule 13d-1 and SEC Rule 13d-5 alleged herein.  As a controlling person of each of the Laddcap entities, Mr. Ladd is liable pursuant to Section 20(a) of the Exchange Act.

120.    Defendants Laddcap Value Advisors LLC and Laddcap Value Associates LLC also are liable pursuant to Section 20(a) of the Exchange Act for the violations of Section 14(a) of the Exchange Act, SEC Rule 14a-9, Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5 by Laddcap Value Partners LP.  Indeed, in filings with the SEC, both Laddcap Value Advisors LLC and Laddcap Value Associates LLC have been described as the "general partner" of Laddcap Value Partners LP.  Laddcap Value Advisors LLC and Laddcap Value Associates LLC thus both had the power to control or influence the particular acts of Laddcap Value Partners LP giving rise to the securities violations alleged herein.  As controlling persons of Laddcap Value Partners LP, Laddcap Value Advisors LLC and Laddcap Value Associates LLC are liable pursuant to Section 20(a) of the Exchange Act.

121.    Delcath has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Delcath prays for a judgment against the Ladd Defendants as follows:

a)      declaring that the Valuation Proxy Solicitation violates Section 14(a) of the Exchange Act and SEC Rule 14a-9;

b)      declaring that the Preliminary Consent Solicitation violates Section 14(a) of the Exchange Act and SEC Rule 14a-9;

c)      declaring that the Ladd Defendants' Schedule 13D filings violate Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5;

d)      ordering the Ladd Defendants to correct by public means their material misstatements and omissions and to file with the SEC accurate disclosures required by Section

14(a) of the Exchange Act, SEC Rule 14a-9, Section 13(d) of the Exchange Act, SEC Rule 13d-1 and SEC Rule 13d-5;

        e)      enjoining the Ladd Defendants and other persons or entities acting in concert with them from exercising any rights as Delcath stockholders, including their rights to vote or submit shareholder consents, until the Ladd Defendants correct by public means their material misstatements and omissions;

        f)      enjoining the Ladd Defendants and other persons or entities acting in concert with them from soliciting shareholder consents in connection with the actions described in the Preliminary Consent Solicitation until 60 days after the Ladd Defendants correct by public means their material misstatements and omissions in the Valuation Proxy Solicitation and Preliminary Consent Solicitation;

        g)      enjoining the Ladd Defendants from making or disseminating any additional misstatements or omissions in connection with, or otherwise related to, proxy battles or shareholder votes or consent solicitations, including the solicitation of shareholder consents on the actions described in the Preliminary Consent Solicitation;

        h)      enjoining the Ladd Defendants and other persons or entities acting in concert with them from any trading in Delcath stock until the Ladd Defendants correct by public means their material misstatements and omissions in their Schedule 13D filings;

        i)      enjoining the Ladd Defendants from making any additional misstatements or omissions in connection with, or otherwise related to, their Schedule 13D filings;

        j)      awarding Delcath its costs and disbursements in this action, including reasonable attorneys' and experts' fees; and

        k)        granting Delcath such other and further relief as this Court may deem just

and proper.

Dated:   Washington, D.C.
            August 4, 2006

                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:  _/S/_____
                                              Paul Blankenstein
                                              (D.C. Bar No. 304931)

                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
                                        Tel:  (202) 955-8500
                                        Fax:  (202) 530-9559

                                        Attorneys for Plaintiff
                                        Delcath Systems, Inc.


GIBSON, DUNN & CRUTCHER LLP
Adam H. Offenhartz
Aric H. Wu
Oliver M. Olanoff
200 Park Avenue, 47th Floor
New York, NY  10166-0193
Tel:  (212) 351-4000
Fax:  (212) 351-4035