# Exhibit 53

SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

# FORM 10-K

FOR ANNUAL AND TRANSITION REPORTS
PURSUANT TO SECTIONS 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934

[X]   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2002

OR

[ ]   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934



Commission File Number 0-14488

SEITEL, INC.
(Exact name of registrant as specified in charter)

| Delaware | 76-0025431 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification Number) |
| 10811 S. Westview Circle Building C, Suite 100 Houston, Texas | 77043 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (713) 881-8900

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, par value $0.01 | OTC Bulletin Board Toronto Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:   None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes   [X]        No   [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. _____

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).

Yes   [ ]        No   [X]

The aggregate market value of the voting stock held by non-affiliates of the registrant at June 28, 2002 was approximately $25,151,000. On March 27, 2003, there were a total of 25,375,683 shares of Common Stock outstanding.

Documents Incorporated by Reference:

| Document | Part |
|---|---|
| None | |

Item 1.   **Business**

### General

Seitel, Inc. (the "Company") was formed in 1982 and owns a library of onshore and offshore seismic data that it offers for license to oil and gas companies. The Company believes that its library of onshore three-dimensional ("3D") seismic data is the largest available for licensing in the United States and Canada. Seitel's onshore library also encompasses a substantial amount of two-dimensional ("2D") seismic data. The Company's library of offshore data includes both 3D and 2D data covering extensive parts of the Gulf of Mexico shelf and certain deep water areas in the central Gulf of Mexico and offshore Texas. The Company regularly adds to its library of seismic data by conducting new programs for its own account which are partially underwritten or sponsored by customers and by the acquisition, through purchase or non-monetary exchanges, of existing surveys in selected areas. The Company also creates new value-added products by applying advanced seismic data processing or other quantitative analytical techniques to selected portions of its library.

As of December 31, 2002, the Company has ownership in approximately 19,500 square miles of onshore 3D data in North America, approximately 10,000 square miles of offshore 3D data in the Gulf of Mexico and approximately 1.1 million linear miles of 2D seismic data onshore and offshore North America. The Company conducts its seismic data creation and licensing business through two wholly owned subsidiaries, Seitel Data, Ltd. in the United States and Olympic Seismic Ltd. in Canada.

To support its seismic data licensing business, the Company maintains warehouse and storage facilities in Houston, Texas and Calgary, Alberta, Canada, and offers, through its wholly owned subsidiaries, Seitel Solutions, Ltd. and Seitel Solutions Canada Ltd. (collectively, "Solutions"), the ability to access and interact with the seismic data owned and marketed by the Company, via a standard web browser and the Internet.

Until August 2002, the Company was engaged in the exploration for and development, production and sale of natural gas and oil through its wholly owned subsidiaries, DDD Energy, Inc. and Endeavor Exploration LLC (collectively "DDD"). In August and September 2002, the Company sold a substantial majority of its oil and gas assets for cash. The Company's remaining oil and gas assets are not material and consist of non-operated working interests in six properties for which the Company continues to seek buyers.

Seitel is a Delaware corporation with its principal offices in Houston, Texas and Calgary, Alberta Canada. In addition, the Company has marketing offices in Denver, Colorado and New Orleans, Louisiana. Unless the context requires otherwise, references to "we", "our" and the "Company" refer to Seitel, Inc. and its subsidiaries.

### Restatement of Financial Statements

In February 2002, following a Staff Accounting Bulletin No. 101 ("SAB 101") restatement by an industry colleague, the Company reevaluated the application of SAB 101 to its core business of seismic data licensing and its revenue recognition policies under certain types of contracts for the creation of new seismic surveys. This process resulted in a determination that it was appropriate to change the Company's revenue recognition policies for transactions for seismic data licensing and for certain data creation activities. As a result of this decision, the Company restated its results for the nine months ended September 30, 2001, and for the year ended December 31, 2000. The restatement had the impact of reducing previously reported revenue by $42.7 million and net income by $14.4 million for the nine months ended September 30, 2001 and by $25.5 million and $22.9 million, respectively, for the year ended December 31, 2000. The restatement had no effect on the amount or timing of cash received by the Company during those periods.

Based upon SAB 101, effective January 1, 2000, the Company recognizes revenue under seismic data licensing contracts when the customer has signed a contract, a licensing agreement is in place, specific data has been selected by and such data is available for delivery to the customer or the contract has expired without full selection having occurred and receipt of the license price is reasonably assured.

With respect to contracts for the creation of new data, in 2000 and 2001, the Company entered into certain acquisition contracts under which both the Company and the customer jointly participated in the acquisition process. Consequently, the Company did not assume the sole risk of service throughout the acquisition process. The Company recognized revenue under these contracts consistent with its revenue recognition policies for acquisition contracts. Under these contracts, the Company determined that revenue previously recognized for amounts funded by customers should be used to reduce the Company's recorded cost of creating the seismic data. The Company continues to have sole ownership of the newly created data. See Note A of the Consolidated Financial Statements for a complete description of the Company's revenue recognition accounting policies.

As a result of the restatement described above, Forms 10-K, 10-Q, 8-K, S-1, S-3, proxy materials and other public filings and amendments to any of them filed by the Company and press releases made by the Company prior to April 1, 2002 should not be relied on.

## Recent Developments

*Non-Compliance with Debt Covenants and Certain Other Defaults*

As a result of the restatement of its financial statements, the impairment and sale, at a substantial loss, of its oil and gas properties and poor financial results in the first quarter of 2002, the Company was not in compliance with, among other things, the limitation on total debt, minimum net worth, interest coverage and limitation on restricted payments and investments covenants in its Senior Note Agreements dated December 28, 1995, February 12, 1999 and October 15, 2001 ("Senior Notes"). The aggregate principal amount outstanding pursuant to the Senior Notes was $255 million on March 27, 2003. Effective June 21, 2002, the Company entered into a standstill agreement (the "Standstill") with the holders of its Senior Notes ("Noteholders") pursuant to which the Noteholders agreed not to exercise remedies available to them under the Senior Notes as a result of existing defaults. The Standstill has been amended and extended and, subject to certain conditions, presently expires on June 2, 2003. The Standstill provides for an increase in the interest rate payable on the Senior Notes of 25 basis points per annum above the interest rate originally provided for in each Note. In addition, an amendment to the Standstill in December 2002 provided for the deferral until June 2, 2003 of the $10 million principal payment that was scheduled to be paid on December 30, 2002.

During the continuance of the Standstill, various existing covenants are suspended and replaced with certain enumerated covenants, including the requirement that the Company receive Noteholder approval to make certain investments or payments out of the ordinary course of business, incur additional debt, create liens or sell assets. The Standstill may terminate prior to June 2, 2003 if, among other things, (i) there is an event of default by the Company under the Standstill or any subsequent defaults under the existing Senior Notes; (ii) the Company defaults on the payment of any non-excluded debt of $5,000,000 or more; (iii) the Company does not have all documentation in place to implement a restructuring of the Senior Notes by April 10, 2003; or (iv) on five business days' notice, the holders of a majority of the unpaid principal of the Senior Notes determine to terminate the Standstill for any reason or for no reason.

The Company is negotiating with the Noteholders to implement a restructuring of the Senior Notes; however, there can be no assurance that such negotiations will be successful or that they will result in a modification under which the Company can operate. If the Company is unable to obtain such long-term modifications, the Noteholders could elect to accelerate the debt. Based on the Company's present financial condition, if such debt were to be accelerated the Company would be unable to satisfy its obligation under the Senior Notes without additional or replacement sources of financing. It is likely that the Company would not be able to obtain such financing on satisfactory terms or at all. A restructuring or acceleration of the Senior Notes could result in the Company filing for protection under Chapter 11 of the U.S. Bankruptcy Code.

The Company is not in compliance with the minimum net worth, leverage ratio and interest coverage covenants contained in a term loan extended to Seitel Data, Ltd. The loan has an outstanding balance of $6,250,000 on March 27, 2003. The lender has issued a notice of default but has not accelerated the debt. The Company has made all principal and interest payments due to date on the term loan.

The Company is in default of a guaranty issued in support of a lease for a jet aircraft leased by a wholly owned subsidiary of the Company. The lease is an operating lease and is not capitalized for financial statement purposes. The lessor has notified the Company and its subsidiary of the default, has accelerated and demanded payment of the obligations (approximately $3.3 million) pursuant to the lease and has demanded return of the jet aircraft. If the aircraft is repossessed and sold by the lessor, it is likely that a deficiency will result, and in such event, the Company or its subsidiary will be responsible for the payment of such deficiency. Depending on the magnitude of the deficiency, if any, the Company and its subsidiary may be unable to pay such deficiency or such payment, if made by the Company, could create a default pursuant to the Standstill. Please read Item 3. "Legal Proceedings."

*Substantial Doubt About Our Ability to Continue as a Going Concern*

As a result of the Company's non-compliance with certain of the covenants of its debt agreements and the default under the jet aircraft lease, there is substantial doubt about the Company's ability to continue as a going concern, which includes recovering assets and satisfying liabilities in the normal course of business.

*Internal and Securities and Exchange Commission Investigations*

The Company is the subject of a formal investigation by the Securities and Exchange Commission's ("SEC") Office of Enforcement. During the course of an internal investigation, the Company discovered that two former executive officers may have improperly converted corporate funds for their personal use, including certain unearned advances. Immediately following such discovery, the Company notified the SEC regarding the findings of the internal investigation. In December 2002, the SEC issued an "Order Directing Private Investigation and Designating Officers To Take Testimony," commonly called a formal order of investigation. The Company recently was notified by the Enforcement Division of the SEC that it intends to recommend that the SEC initiate an administrative proceeding against the Company for alleged books and records and internal control violations. The Company has cooperated fully with the SEC during the course of its investigation. The Company is in settlement discussions with the SEC to resolve such matters, but is unable to predict when or if a settlement will be reached. The U.S. Attorney's office for the Southern District of Texas also is investigating events leading up to the departures of the former executives.

The Company has sought reimbursement from the former executives and such executives have each sued the Company seeking damages for breach of employment contracts, wrongful termination, defamation and other matters. A jury verdict substantially in favor of one of the former executives has been rendered although judgment on such verdict, and the amount awarded pursuant thereto, has not yet been entered. Please read Item 3. "Legal Proceedings."

*New York Stock Exchange Listing and Toronto Stock Exchange Listing*

In March 2003, the Company's common stock was delisted from trading on the New York Stock Exchange ("NYSE"). The Company's shares currently trade on the Over-the-Counter ("OTC") Bulletin Board, in the "pink sheets" maintained by the National Quotation Bureau, Inc. and the Toronto Stock Exchange. Such alternative markets are generally considered to be less efficient than, and not as broad as, the NYSE. As a result, the market price for our common stock may become more volatile than it has been historically. In addition, these markets may provide less liquidity to shareholders than previously may have been available when the stock was traded on the NYSE. Furthermore, while the Company is currently trading on the Toronto Stock Exchange, there can be no assurance that the Company will continue to be listed on that exchange.

*Litigation*

The Company is a party to a significant number of shareholder and derivative lawsuits as well as lawsuits with former executive officers and directors and others. The Company intends to vigorously defend these lawsuits and pursue any available counterclaims. Please read Item 3. "Legal Proceedings."

**Description of Operations**

**Seismic Data Licensing and Library Creation**

The Company markets licenses to seismic data from its library to the oil and gas industry. The Company's data library includes onshore and offshore 2D and 3D data and offshore multi-component data. The Company has ownership in approximately 1.1 million linear miles of two-dimensional and approximately 29,500 square miles of three-dimensional seismic data concentrated primarily in the major North American oil and gas producing areas. The main areas of focus include the onshore, offshore and transition zone of the U.S. Gulf Coast extending from Texas to Florida, North Louisiana, Mississippi, East Texas, the Rocky Mountain region and Western Canada. In addition, the Company owns some international seismic surveys in the Continental Shelf areas offshore the United Kingdom and Ireland.

---

Three-dimensional seismic data provides a graphic depiction of the earth's subsurface from two horizontal dimensions and one vertical dimension, rendering a more detailed picture than 2D data, which presents a cross-sectional view from one vertical and one horizontal dimension. The more comprehensive geophysical information provided by 3D surveys significantly enhances an interpreter's ability to evaluate the probability of the existence and location of oil and gas deposits. The use of 3D surveys has been demonstrated to increase drilling success rates and, correspondingly, lower exploration and development costs. However, the cost to create 3D seismic data is significantly more than the cost to create 2D seismic data. As a result, 2D data remains important for preliminary, broad-scale exploration evaluation as well as in determining the location and design of 3D surveys. 3D surveys can then be used for more site-specific analysis to maximize actual drilling potential and success.

The Company has expanded its seismic activities to include multi-component data. In a standard 3D seismic survey, only pressure waves are measured and recorded, whereas in a multi-component survey not only pressure waves but also shear waves are measured and recorded. Pressure waves are affected by the fluids in rock formation, whereas shear waves are not. By

| | |
|---|---|
| **EHI Holdings, Inc. | Delaware |
| Endeavor Exploration LLC | Delaware |
| Energy Venture Holdings LLC | Delaware |
| **Express Energy I, LLC | Delaware |
| **Exsol, Inc. | Delaware |
| **Geo-Bank, Inc. | Texas |
| Matrix Geophysical, Inc. | Delaware |
| N360X, L.L.C. | Texas |
| Olympic Seismic Ltd. | Alberta, Canada |
| SEIC, Inc. | Delaware |
| SEIC Business Trust | Alberta, Canada |
| SEIC Holdings Ltd. | Alberta, Canada |
| **SEIC L.L.C. | Delaware |
| SEIC Partners Limited Partnership | Alberta, Canada limited partnership |
| SEIC Trust Administration, Ltd. | Alberta, Canada |
| Seitel Canada Holdings, Inc. | Delaware |
| Seitel Canada, L.L.C. | Delaware |
| Seitel Data Corp. | Delaware |
| Seitel Data, Ltd. | Texas limited partnership |
| Seitel Delaware, Inc. | Delaware |
| **Seitel Gas & Energy Corp. | Delaware |
| **Seitel Geophysical, Inc. | Delaware |
| Seitel IP Holdings, LLC | Delaware |
| Seitel International, Inc. | Cayman Islands |
| Seitel Management, Inc. | Delaware |
| **Seitel Natural Gas, Inc. | Delaware |
| Seitel Offshore Corp. | Delaware |
| **Seitel Power Corp. | Delaware |
| Seitel Solutions Canada Ltd. | Alberta, Canada |
| Seitel Solutions, Inc. | Delaware |
| Seitel Solutions, LLC | Delaware |
| Seitel Solutions, Ltd. | Texas limited partnership |
| Seitel Solutions Holdings, LLC | Delaware |
| Seitel International BV | Netherlands |
| Seitel International, CV | Netherlands |
| SI Holdings, G.P. | Delaware |
| **Vision Energy, Inc. [1] | Delaware |
| **818312 Alberta Ltd. | Alberta, Canada |

(1)  Seitel, Inc. owns 19%.
**   Dormant

---

## Item 2.  *Properties*

The Company leases office and warehouse space in Houston and Calgary and office space in New Orleans, Louisiana and Denver, Colorado. The size and condition of the spaces are appropriate for the Company's business.

In June 2002, the Company's Board of Directors unanimously adopted a plan to dispose of the Company's oil and gas operations by sale. In August and September 2002, the Company sold a substantial majority of the oil and gas exploration and production properties and related assets of DDD. The Company received cash proceeds related to the disposal of $25.7 million in 2002. The Company's remaining oil and gas assets are not material and consist of non-operated working interests in six oil and gas properties for which the Company continues to seek buyers. The oil and gas operations are reported as discontinued operations in the Company's consolidated financial statements.

## Item 3.  *Legal Proceedings*

The Noteholders, holding an aggregate principal amount of $255 million of unsecured Notes, have made demand upon the

Company and certain of its former and current officers and directors for money damages arising from alleged negligent actions and/or misrepresentations of those officers and directors. The Noteholders allege that their claims include that: (a) officers and directors of the Company negligently misrepresented the value of the Company's business at the time of the issuance of the Notes; (b) officers and directors of the Company negligently omitted and failed to disclose to the Noteholders accounting and other business practices that materially overstated the value of the Company's business at the time of the issuance of the Notes; and (c) officers and directors of the Company negligently failed to discover accounting and other business practices that materially overstated the value of the Company and report such matters to the Noteholders, in violation of fiduciary and other duties owed to the Noteholders. The Noteholders allege that money damages arising from the foregoing claims are not fully quantified, but will exceed $20 million and will include, without limitation, the lost value of the Noteholders' investment in the Senior Notes. Notice of the demand has been provided by the Company to its insurance carriers. The Noteholders have not commenced litigation with respect to their alleged claims. The Noteholders are Principal Life Insurance Company, Principal Life Insurance Company, on behalf of one or more separate accounts, CGU Life Insurance Company of America, Wind River Corporation, Allstate Life Insurance Company, Allstate Life Insurance Company of New York, Massachusetts Mutual Life Insurance Company, C.M. Life Insurance Company, MassMutual Asia Limited, Provident Life and Accident Insurance Company, The Paul Revere Life Insurance Company, The Guardian Insurance & Annuity Company, Inc., Fort Dearborn Life Insurance Company, The Guardian Life Insurance Company of America, Berkshire Life Insurance Company of America, MONY Life Insurance Company, MONY Life Insurance Company of America, Phoenix Life Insurance Company, Connecticut General Life Insurance Company, Life Insurance Company of North America, Nationwide Life Insurance Company, Nationwide Life and Annuity Insurance Company, United of Omaha Life Insurance Company, Reliastar Life Insurance Company, Reliastar Life Insurance Company f/k/a Northern Life Insurance Company, Reliastar Life Insurance Company of New York, Security Connecticut Life Insurance Company, Trustmark Life Insurance Co., American Investors Life Insurance Company, Lonestar Partners, L.P., Pan-American Life Insurance Company, Oxford Life Insurance Company, United Life Insurance Company, SunAmerica Life Insurance Company, Republic Western Insurance Company, Cohanzick High Yield Partner, L.P., and Cohanzick Credit Opportunities Fund Ltd.

---

The Company and certain of its former and current officers and directors have been named as defendants in eleven lawsuits brought as class actions alleging violations of the federal securities laws, all of which were consolidated by an Order entered August 7, 2002, under Cause No. 02-1566, styled *In re Seitel, Inc. Securities Litigation*, in the United States District Court for the Southern District of Texas. The Court appointed a lead plaintiff and lead counsel for plaintiffs, who subsequently filed a consolidated amended complaint, which added the Company's auditors, Ernst & Young LLP, as a defendant. The consolidated amended complaint alleges that during a proposed class period of May 5, 2000 through April 1, 2002, the defendants violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 by overstating revenues in violation of generally accepted accounting principles. The plaintiffs seek an unspecified amount of actual and exemplary damages, costs of court, pre- and post-judgment interest and attorneys' and experts' fees. The Company intends to vigorously defend these consolidated lawsuits. The Company and the individual defendants have filed motions to dismiss the consolidated amended complaint. No discovery has been conducted.

The Company has been named as a nominal defendant in seven stockholder derivative actions filed in various courts: *Almekinder v. Frame, Valice, Pearlman, Craig, Lerner, Stieglitz, Zeidman, Hoffman, and Seitel, Inc.*, No. H-02-2960, In the United States District Court for the Southern District of Texas; *Basser v. Frame, Valice, Kendrick, Pearlman, Fiur, Zeidman, Stieglitz, Craig, Lerner, and Seitel, Inc.*, No. H-02-1874, In the United States District Court for the Southern District of Texas; *Berger v. Frame, Pearlman, Valice, Craig, Stieglitz, Lerner, Zeidman, Fiur, and Seitel, Inc.*, No. 19534-NC, In the Court of Chancery, State of Delaware, Castle County; *Chemical Valley & North Central West Virginia Carpenters Pension Plan v. Frame, Valice, Hoffman, Pearlman, Craig, Lerner, Stieglitz, Zeidman, Fiur, and Seitel, Inc.*, No. 02-CV-3343, In the United States District Court for the Southern District of Texas; *Couture v. Frame, Valice, Craig, Lerner, Stieglitz, Zeidman, Hoffman, and Seitel, Inc.*, No. 20002-37065, In the 80th Judicial District Court, Harris County, Texas; *Talley v. Frame, Valice, Pearlman, Craig, Lerner, Stieglitz, Zeidman, Hoffman, and Seitel, Inc.*, In the 151st Judicial District Court, Harris County, Texas; and *Zambie v. Frame, Pearlman, Valice, Craig, Zeidman, Lerner, Stieglitz, Fiur, Ernst & Young LLP, and Seitel, Inc.*, In the 333rd Judicial District Court, Harris County, Texas. The plaintiffs generally allege that the defendants breached and conspired to breach fiduciary duties to the Company's shareholders by failing to maintain adequate accounting controls and by using improper accounting and auditing practices and procedures. Certain of the plaintiffs also assert causes of action for mismanagement, waste of corporate assets and unjust enrichment. The *Zambie* case also alleges professional negligence against Ernst & Young LLP. The plaintiffs seek judgments for unspecified amounts of compensatory damages, including return of salaries and other payments to the defendants, exemplary damages, attorneys' fees, experts' fees and costs. The Company's Board of Directors appointed a special litigation committee to conduct an independent investigation of the allegations asserted in the derivative lawsuits. The special litigation committee completed its investigation and its report has been delivered to the Company. The Company filed its motion to dismiss in Delaware Chancery court on March 20, 2003. The parties have agreed to stay the Texas state court cases pending the outcome of the Texas federal court derivative cases. The federal court derivative cases have been consolidated, and the Company intends to move to stay the cases pending resolution by the Delaware court.

The Company has sued its former chairman of the board in *Seitel, Inc. v. Pearlman*, C.A. No. H.-02-1843, In the United States District Court in the Southern District of Texas. The Company seeks a declaratory judgment with respect to the employment agreement between Mr. Pearlman and the Company, and asserts claims for breach of fiduciary duty, aiding and abetting breaches of fiduciary duty, and unjust enrichment. Following his resignation as chairman of the board, Mr. Pearlman and the Company entered into negotiations for a restructuring of his employment agreement. During the negotiations, a document was

created that Mr. Pearlman now alleges has superseded the employment agreement. The Company asserts that neither its Board of Directors, nor any of its committees, approved the document. The Company seeks a judgment declaring the effect of Mr. Pearlman's resignation on the employment agreement, whether the Company owes any amounts under the employment agreement as a result of his resignation and, if so, how much, and a judgment that the subsequent document is not binding on the Company and is not enforceable by Mr. Pearlman against the Company. The Company also asserts that Mr. Pearlman breached his duties to the Company and aided and abetted breaches of fiduciary duty by other former officers and directors. Mr. Pearlman has filed counterclaims asserting that the Board of Directors approved the subsequent document and asserts causes of action for breach of contract, fraud, negligent misrepresentation and promissory estoppel. Mr. Pearlman seeks to be realigned as the plaintiff in the action, actual damages in an amount exceeding $4,000,000, punitive damages, attorneys' fees, costs and expenses. The Court has denied Mr. Pearlman's request to be realigned, subject to reconsideration at a time closer to trial. The Court also ordered the Company to pay into the registry of the Court $297,381.59 that had been held for Pearlman's benefit under an Incentive Compensation Agreement or Supplemental Income Trust Agreement, which the Company has done. By agreement of the parties, the Court ordered the release of the funds in the Court's registry to Mr. Pearlman on March 27, 2003. Discovery has commenced. Mr. Pearlman has filed a motion for summary judgment, which the Company has opposed. The Company intends to vigorously pursue its claims and defend against the counterclaims.

---

The Company has been sued by its former chief financial officer in *Valice v. Seitel*, in the 55th Judicial District Court of Harris County, No. 2002-30195. Ms. Valice filed suit against the Company alleging a breach of her employment contract by virtue of her termination and alleging that a press release announcing her termination was defamatory. The Company filed a counter claim against Ms. Valice seeking to recover unearned advances she received from the Company and amounts due on two notes that were accelerated pursuant to their respective terms. The case was tried in the 152nd Judicial District Court of Harris County beginning March 10, 2003. On March 18, 2003 the jury returned its verdict in the case, finding that the Company did not have cause to terminate her contract under its terms and awarded her $4,240,580 in damages; it also found defamation occurred and awarded her $159,436.50 in compensatory and $621,293 in punitive damages. The jury also ruled in favor of the Company, finding that the plaintiff breached her fiduciary duties to the Company and its shareholders and awarded the Company $621,293 in damages. It also found for the Company on the two stock notes and awarded it $396,007.50, the balance due plus interest accrued since August 6, 2002, the date of the acceleration and demand for payment was made. The requests of each party for attorneys' fees will be determined by the court. No judgment has as yet been entered by the court on the verdict and the Company intends to vigorously pursue all available post verdict relief in this matter, including seeking a judgment notwithstanding the verdict as to those parts of the verdict favorable to plaintiff.

The Company has been sued by its former chief executive officer in *Frame v. Seitel*, in the 113th Judicial District Court of Harris County, No. 2002-35891. Mr. Frame filed suit against the Company alleging a breach of his employment contract by virtue of his asserted termination and alleging that a press release announcing his termination was defamatory. He also seeks a declaratory judgment that certain funds he received from the Company were proper and do not have to be repaid. The Company has answered and asserted various defenses. The Company also has filed a counter suit to recover the approximately $4,200,000 in corporate funds that the Company believes he inappropriately converted for his personal use and benefit and over $800,000 due on two notes that were accelerated pursuant to their respective terms. The Company intends to vigorously defend the suit and pursue its counterclaim. Discovery is underway although Mr. Frame has filed a motion to abate the case pending finalization of certain other matters. The Company is opposing Mr. Frame's motion to abate.

The Company is a party to a suit for geophysical trespass entitled *Joy Resources, Inc. v. Seitel Data, Ltd.*, Cause No. 01-02-00828-CV, in the 1st Court of Appeals, Houston, Texas. The plaintiff is appealing a final judgment by the trial court holding that the plaintiff is not entitled to recover an injunction or to recover damages against the Company. The plaintiffs assert that the Company obtained seismic data about mineral interests leased by the plaintiff by placing seismic equipment on property adjacent to the property leased by the plaintiff. The trial court held that no cause of action exists where the seismic equipment is not located on the property leased by the plaintiff. The briefing has been completed in this matter, and the parties are awaiting an argument schedule from the 1st Court of Appeals in Houston, Texas. The Company intends to vigorously represent its interests in this appeal.

The Company and its subsidiary, Seitel Data, Ltd., are parties to a class action for geophysical trespass entitled *Juan O. Villarreal v. Grant Geophysical, Inc., et al.*, Cause No. DC-00-214, in the 229th District Court of Starr County, Texas. The plaintiffs have sued a number of defendants, including Seitel, Inc. and Seitel Data, Ltd. The plaintiffs allege that certain defendants conducted unauthorized 3-D seismic exploration of the mineral interests, and sold the information obtained to other defendants. The plaintiffs seek an unspecified amount of damages. All of the defendants have obtained summary judgments dismissing the plaintiffs' claims, and the case is now on appeal before the San Antonio Court of Appeals under Cause No. 04-02-00674-CV. The Company intends to vigorously represent its interests in this appeal.

The Company is a party to a suit entitled *Bank One, N.A. v. Paul Frame and Seitel, Inc.*, Cause No. 2002-43070, in the 133rd Judicial District of Harris County, Texas. The plaintiff has sued on a corporate guarantee of a note executed by the plaintiff in favor of Paul Frame. The plaintiff alleges that Frame has defaulted on the note in the amount of $540,000. The Company has filed a motion for summary judgment alleging that the guarantee was executed by Frame and not authorized by the Board of Directors, and further that the plaintiff and Frame novated the original note, which was guaranteed, with a subsequent note for which there

was no guarantee. Each party has filed a Motion for Summary Judgment. The Company intends to vigorously defend the suit.

---

The Company has sued its former in-house counsel and law firm in *Seitel, Inc. v. Cynthia Moulton and Franklin Cardwell and Jones, P.C.*, Cause No. 2003-09151 in the 127th Judicial District Court of Harris County, Texas. The suit alleges negligence, breach of fiduciary duty and breach of contract surrounding the settlement of a personal lawsuit against the former chief executive officer and other aspects of representation. The Company seeks recovery for fees paid and related expenses. Initial pleadings were filed on February 21, 2003. Discovery has not yet commenced.

On March 27, 2003 the Company was served with a complaint filed by the General Electric Credit Corporation of Tennessee ("GE") in the District Court No. 333rd of Harris County, Texas, styled *General Electric Credit Corporation of Tennessee, as Plaintiff v. N360X, LLC and Seitel, as Defendants*. The complaint alleges that the Company, as guarantor, and its wholly owned subsidiary N360X, LLC, as leasee, have defaulted on an agreement for the lease of a jet aircraft. GE has accelerated the obligation and has demanded payment of $3,320,432.49 that GE claims is due pursuant to the lease. The Company has not yet filed its answer. The case is in its early stages and no discovery has yet been conducted. The Company has accrued $1.5 million as an estimate of the deficiency that would result if the Plantiff's claims were to be sustained, the aircraft sold and the proceeds of such sale were to be applied to the payments otherwise due under the lease.

In addition to the lawsuits described above, the Company is involved from time to time in ordinary, routine claims and lawsuits incidental to its business. In the opinion of management, uninsured losses, if any, resulting from the ultimate resolutions of these matters should not be material to the Company's financial position or results of operation.

It is not possible to predict or determine the outcomes of the legal actions brought against it or by it, or to provide an estimate of all additional losses, if any, that may arise. At December 31, 2002, the Company has accrued amounts it believes are probable of being paid relative to all of the litigation and claims set forth above. However, if one or more of the parties were to prevail against the Company in one or more of the cases described above, the amounts of any judgments against the Company or settlements that the Company may enter into, in addition to liabilities recorded by the Company at December 31, 2002, could be material to the Company's financial statements for any particular reporting period.

The Company has resolved its disputes with Winthrop Resources Corporation ("Winthrop"). Previously, the Company was party to an action in Texas styled Cause No. 2002-34994, *Seitel, Inc., et al v. Winthrop Resources Corporation, et al*, in the 280th Judicial District Court, Harris County, Texas, and was a party in a Minneapolis action styled No. CT 02-011613, *Winthrop Resources Corporation v. Seitel, Inc*., Hennepin County District Court, Minnesota, as well as being a party to another Minneapolis action styled No. CT 02-019448, *Seitel, Inc. v. Dale Olsen*, Hennepin County District Court, Minnesota, all of which actions arose out of an equipment lease for computer equipment primarily used in the Company's Houston and Calgary data centers. Winthrop had alleged claims for breach of contract, an action for account stated, and replevin, and sought damages and sought a court order requiring the Company to return the equipment. The Company had brought claims seeking to set aside the lease on grounds that the lease delivered was not as represented and sought damages from Winthrop. As a result of the settlement of these disputes, the parties agreed to dismiss all litigation and enter into a new lease agreement. The settlement resulted in lower monthly payments by the Company to Winthrop with a discounted prepayment option and provides the Company with full title to all of the leased equipment upon completion of the lease payments. Specifically, the Company made an initial payment of $1.58 million, plus applicable taxes, to Winthrop in consideration for past due lease payments, and agreed to make 33 monthly payments of $165,000, plus applicable taxes. At the conclusion of the lease, the Company may purchase the leased equipment, in whole but not in part, for $810,000, less a credit of $309,910 in respect of a cash deposit held by the lessor. At any time after the initial payment and the first twelve months' payments, the Company has the right to prepay the remaining balance of payments collapsed to present value using a 15% discount factor.

The Company has settled its dispute with Rimco Production Company, Inc. ("Rimco"), styled *Rimco Production Company, Inc. v. Seitel Data, Ltd.*, Cause No. 2002-42420, in the 295th District Court of Harris County, Texas, in which Rimco alleged that Seitel Data, Ltd. breached an agreement to provide seismic data as soon as it was processed. The settlement did not have a material impact on the Company or its financial condition.

---

Item 4.   *Submission of Matters to a Vote of Security Holders*

No matters were submitted to a vote of security holders during the fourth fiscal quarter of 2002.

PART II

Item 5.   *Market for Registrant's Common Stock and Related Stockholder Matters*

The Company's Common Stock currently trades in the over-the-counter market on the OTC Electronic Bulletin Board. Prior to March 17, 2003, the Company's Common Stock traded on the NYSE. The Company's Common Stock is also traded on the TSE. The following table sets forth the high and low sales prices for the Common Stock for 2002 and 2001 as reported by the NYSE.

|  | 2002 | | 2001 | |
| --- | --- | --- | --- | --- |
|  | High | Low | High | Low |
| First Quarter | $ 14.08 | $ 8.20 | $ 22.72 | $ 16.29 |
| Second Quarter | 11.00 | 1.00 | 20.16 | 13.03 |
| Third Quarter | 1.01 | .37 | 14.36 | 8.89 |
| Fourth Quarter | .88 | .49 | 14.20 | 9.55 |

During the first quarter of 2003, through March 14, 2003, the high and low closing price for the Common Stock on the NYSE was $.68 and $.22, respectively. On March 27, 2003, the closing bid price for the Common Stock on the OTC Electronic Bulletin Board was $.20. To the best of the Company's knowledge, there were approximately 863 record holders of the Company's Common Stock as of March 27, 2003.

In March 2003, the Company's common stock was delisted from trading on the NYSE. The Company's shares currently trade on the OTC Bulletin Board, in the "pink sheets" maintained by the National Quotation Bureau, Inc. and the Toronto Stock Exchange. Such alternative markets are generally considered to be less efficient than, and not as broad as, the NYSE. As a result, the market price for our common stock may become more volatile than it has been historically. In addition, these markets may provide less liquidity to shareholders than previously may have been available when the stock was traded on the NYSE. Furthermore, while the Company is currently trading on the Toronto Stock Exchange, there can be no assurance that the Company will continue to be listed on that exchange.

**Dividend Policy**

The Company did not pay cash dividends during 2001 or 2002, and it intends to retain future earnings, if any, in order to provide funds for use in the operation and expansion of its business. In addition, the payment of dividends is dependent upon earnings, capital requirements, financial conditions, and other factors and is restricted pursuant to the Senior Notes, and as a result, it is unlikely that cash dividends will be paid in the foreseeable future.

---

**Equity Compensation Plans**

The table below provides information relating to the Company's equity compensation plans as of December 31, 2002:

| Plan Category | Number of securities to be issued upon exercise of outstanding options and warrants | Weighted average exercise price of outstanding options and warrants | Number of securities remaining available for future issuance under compensation plans (excluding securities reflected in first column) |
| --- | --- | --- | --- |
| Equity compensation approved by security holders | 2,542,219 | $13.44 | 1,316,546 |
| Equity compensation not approved by security holders | 3,091,699 | $13.15 | 1,532,255 |
| Total | 5,633,918 | $13.28 | 2,848,801 |