IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DELCATH SYSTEMS, INC.

                Plaintiff,

        v.

ROBERT LADD, LADDCAP VALUE
PARTNERS LP, LADDCAP VALUE
ADVISORS LLC and LADDCAP VALUE
ASSOCIATES LLC

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 1:06CV01391 RBW

Honorable Reggie B. Walton

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 530-9559

Attorneys for Plaintiff
Delcath Systems, Inc.

August 9, 2006

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 4

    I.     THE PARTIES ................................................................................................ 4

          A.    Delcath ................................................................................................ 4

          B.    The Ladd Defendants .................................................................... 4

    II.    THE LADD DEFENDANTS' CAMPAIGN TO FORCE,
         THROUGH MISINFORMATION, THE SALE OF DELCATH ......... 5

          A.    The Ladd Defendants' Undisclosed Group ................................ 5

          B.    The Ladd Defendants' Handpicked Director Nominees ........... 6

          C.    The Ladd Defendants' Scheme To Force A Sale Of Delcath .... 9

               1.    The Ladd Defendants Disseminate
                   A Misleading Valuation Of The Company ..................... 9

               2.    The Ladd Defendants Mischaracterize
                   Discussions With The Company ................................... 10

               3.    The Ladd Defendants Mislead Investors About The
                   True Motive For Their Proposed Consent Solicitation ... 11

    III.   STATUS OF THE LADD DEFENDANTS'
         PROPOSED CONSENT SOLICITATION ......................................... 12

ARGUMENT ................................................................................................................ 13

DELCATH IS ENTITLED TO EXPEDITED DISCOVERY IN
CONNECTION WITH ITS MOTION FOR A PRELIMINARY INJUNCTION ...... 13

    I.     THE *NOTARO* TEST AND REASONABLENESS TEST ................. 13

    II.    DELCATH IS ENTITLED TO EXPEDITED
         DISCOVERY UNDER THE *NOTARO* TEST ................................... 14

          A.    The Ladd Defendants' Consent Solicitation Exposes Delcath
              And Its Shareholders To Irreparable Harm ............................. 15

**TABLE OF CONTENTS**
(continued)

Page

B.    Delcath Is Likely To Prevail On The Merits ........................................... 17

    1.    The Ladd Defendants' Schedule 13D
       Filings Plainly Violate Section 13(d)........................................... 17

    2.    The Ladd Defendants' Solicitation
       Materials Plainly Violate Section 14(a)....................................... 19

        a.    Misleading Information About The Ladd
           Defendants' Slate Of Director Nominees......................... 20

        b.    Misleading Valuation....................................................... 23

        c.    Mischaracterization Of Discussions With Company....... 25

        d.    Undisclosed Motive For Consent Solicitation ................. 26

C.    The Expedited Discovery Delcath Seeks Is Connected To The
    Avoidance Of Irreparable Harm To Delcath And Its Shareholders......... 27

D.    The Injury That Would Result To Delcath And
    Its Shareholders Without Expedited Discovery
    Far Outweighs Any Injury To The Ladd Defendants .............................. 28

III.    DELCATH IS ENTITLED TO EXPEDITED
    DISCOVERY UNDER THE REASONABLENESS TEST ................................. 30

CONCLUSION..................................................................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bender v. Jordan,* __ F. Supp. 2d __, 2006 WL 2042962 (D.D.C. July 21, 2006) ........ 16, 17, 19

*Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F. Supp. 787 (S.D.N.Y. 1978)............ 21, 22, 23

*Bertoglio v. Texas Int'l Co.,* 488 F. Supp. 630 (D. Del. 1980) ...................................... 20

*Disability Rights Council of Greater Washington v. Washington
Metropolitan Area Transit Auth.,* 234 F.R.D. 4 (D.D.C. 2006).................................... 13, 14, 30

*Drobbin v. Nicolet Instrument Corp.,* 631 F. Supp. 860 (S.D.N.Y. 1986) ................................... 17

*Ellsworth v. United States,* 917 F. Supp. 841 (D.D.C. 1996) ................................................. 13, 29

*General Steel Indus., Inc. v. Walco Nat'l Corp.,* 1981 WL 17552 (E.D. Mo. 1981).................... 26

*Keybank, Nat'l Ass'n v. Quality Payroll Sys.,*
2006 WL 1720461 (E.D.N.Y. June 22, 2006) ................................................................. *passim*

*Krauth v. Executive Telecard, Ltd.,* 890 F. Supp. 269 (S.D.N.Y. 1995) ...................................... 16

*Lebhar Friedman, Inc. v. Movielab, Inc.,* 1987 WL 5793 (S.D.N.Y. Jan. 13, 1987) .................. 15

*Lichtenberg v. Besicorp Group Inc.,* 43 F. Supp. 2d 376 (S.D.N.Y. 1999)............................ 16, 20

*Lone Star Steakhouse & Saloon, Inc. v. Adams,* 148 F. Supp. 2d 1141 (D. Kan. 2001) .............. 16

*Macke Co. v. Allegheny Beverage Corp.,* 1980 WL 1424 (D.D.C. July 11, 1980) ...................... 13

*Mendell v. Greenberg,* 927 F. 2d 667 (2d Cir. 1990) ............................................................ 26, 27

*MONY Group, Inc. v. Highfields Capital Management, L.P.,*
368 F.2d 138 (2d Cir. 2004) ......................................................................................... 15

*Notaro v. Koch,* 95 F.R.D. 403 (S.D.N.Y. 1982)......................................................... *passim*

*Piper v. Chris-Craft Indus.,* 430 U.S. 1 (1977)................................................................ 15

*Rafal v. Geneen,* 1972 WL 323 (E.D. Pa. 1972)............................................................... 20

*Riggs Nat'l Bank of Washington, D.C. v. Allbritton,*
516 F. Supp. 164 (D.D.C. 1981)......................................................................... 16, 17, 19

*SEC v. Savoy Indus., Inc.,* 587 F. 2d 1149 (D.C. Cir. 1978)............................................. 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*SEC v. Willis*, 472 F. Supp. 1250 (D.D.C. 1978) ........................................................................... 20

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126 (1976) .............................. 20

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.*,
  749 F. Supp. 473 (S.D.N.Y. 1990) ...................................................................................... 28, 29

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982) .................................................................... 17

*Wilson v. Great American Industries, Inc.*, 855 F.2d 987 (2d Cir. 1988).................................... 20

### Statutes

15 U.S.C. § 78m(d) ..................................................................................................................... *passim*

15 U.S.C. § 78n(a) ...................................................................................................................... *passim*

17 C.F.R. § 240.13d-1................................................................................................................... 18, 19

17 C.F.R. § 240.13d-5................................................................................................................... 18, 19

17 C.F.R. § 240.14a-9................................................................................................................... 20, 24

### Other Authorities

*Interpretative Release Relating to Proxy Rules,* Exchange Act Release No. 16833,
  1980 SEC LEXIS 1414 (May 23, 1980)................................................................................... 24

Plaintiff Delcath Systems, Inc. ("Delcath" or the "Company") respectfully submits this memorandum of points and authorities in support of its motion, pursuant to Rules 26(d), 30(a)(2)(C), 33(a), 34(b) and 36(a) of the Federal Rules of Civil Procedure, for expedited discovery in preparation for a hearing on its motion for a preliminary injunction to prevent defendants Robert Ladd, Laddcap Value Partners LP ("Laddcap"), Laddcap Value Advisors LLC and Laddcap Value Associates LLC (collectively, the "Ladd Defendants") from conducting their proposed consent solicitation relating to the control of the Company until after a trial on the merits can be held.

## INTRODUCTION

Delcath is a development stage company advancing a drug delivery system that is hoped will provide a meaningful treatment for certain types of cancer. The Ladd Defendants are taking steps to initiate on behalf of Laddcap, a hedge fund, a consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own handpicked slate of directors. The Ladd Defendants want Delcath's directors removed so that they can force a prompt sale of the Company and turn a quick profit on the Laddcap hedge fund's recently purchased Delcath stock.

Rather than play by the rules, the Ladd Defendants have made myriad materially false and misleading statements and omissions in violation of Sections 13(d) and 14(a) of the Securities and Exchange Act of 1934 ("Exchange Act"). In its motion for a preliminary injunction filed this same day, Delcath requests that the Court enjoin the Ladd Defendants from conducting the consent solicitation until there has been a trial on the merits of Delcath's claims.

Plaintiff has already provided a substantial record in support of its preliminary injunction motion. Out of necessity, though, the record is limited to the information that Delcath has been able to uncover to date. Discovery from the Ladd Defendants and parties allied with them will

afford the Court a fuller record upon which to address issues regarding the misrepresentations and omissions in the Ladd Defendants' solicitation materials and Schedule 13D filings. Among other things, Delcath seeks expedited discovery relating to:

- **The Ladd Defendants' Relationship With Jonathan A. Foltz:**

  In connection with their consent solicitation, the Ladd Defendants appear to have obtained improperly non-public company information from Jonathan A. Foltz, a Delcath employee and consultant of 14 years who suddenly resigned and then was identified just hours later as one of the Ladd Defendants' handpicked director nominees. Certain statements in the Ladd Defendants' preliminary consent solicitation statement already confirm that Mr. Foltz has shared proprietary company information with the Ladd Defendants. On August 4, 2006, the Superior Court for the State of Connecticut issued an order enjoining Mr. Foltz from further "disclosing, disseminating and/or using" any non-public company information. On August 7, 2006, pursuant to that order, a court-appointed custodian, a computer expert and a Connecticut Marshall arrived at the home of Mr. Foltz to temporarily seize his computers so that copies of certain material could be made.

  Delcath seeks expedited discovery concerning what non-public company information the Ladd Defendants may have obtained from Mr. Foltz and what undisclosed arrangements or understandings the Ladd Defendants may have with Mr. Foltz regarding compensation or his future employment with the Company.

- **The Ladd Defendants' Undisclosed Group:**

  The Ladd Defendants appear to be part of an undisclosed group of persons and entities with whom they are acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock. For example, there is substantial reason to believe that the Ladd Defendants are collaborating with (1) John Codling, the individual who introduced and/or recommended Delcath stock to Mr. Ladd and others and who has indicated that he represents in excess of 15% of the outstanding shares of Delcath stock; and (2) Thomas Mowry, a Delcath shareholder who has on at least one occasion indicated that he was acting as an "unofficial representative" and "proxy" for Mr. Ladd in obtaining information from other Delcath shareholders, including the amount of shares they owned and whether they were "willing or not to collectively proxy [their] shares."

  Delcath seeks expedited discovery concerning the identity of the persons and entities with whom the Ladd Defendants are working – including Messrs. Codling and Mowry – as well as the nature of the Ladd Defendants' relationship with those persons and entities.

- **The Ladd Defendants' Misleading Valuation:**

  The Ladd Defendants appear to have falsely represented that a valuation they disseminated to Delcath's shareholders was rendered by two "independent" investment banks with "decades of experience." For example, John Codling, who is collaborating with Mr. Ladd in his proxy fight, has indicated that he was affiliated with Fulcrum Global Partners LLC ("Fulcrum") when it issued the valuation for the Ladd Defendants. Moreover, Fulcrum had sold its entire research division so that it had no experienced staff to value a company like Delcath, and neither Fulcrum nor Glocap Funding, LLC ("Glocap") had previously issued a single fairness opinion or valuation on a public company on file with the Securities and Exchange Commission. In addition, there is no disclosure of the underlying assumptions and projections for the suspect valuation rendered by Fulcrum and Glocap.

  Delcath seeks expedited discovery concerning the relationship between the Ladd Defendants and these banks, the nature of the banks' work as well as the assumptions and projections the banks used in valuing the Company.

- **The Ladd Defendants' Director Nominees:**

  The Ladd Defendants have failed to disclose material information about each of their director nominees. By way of example, the Ladd Defendants have failed to disclose that one of the nominees filed for Chapter 7 personal bankruptcy in 2002 and may have misled the bankruptcy court and his creditors in connection with his bankruptcy filing. As another example, the Ladd Defendants have failed to disclose that another nominee served on the board of directors of a public company during the period in which the company had to restate its financials and subsequently file for bankruptcy and is Chairman of the board of directors of another company that also experienced significant accounting problems.

  Delcath seeks expedited discovery to further develop the record with respect to the Ladd Defendants' nominees because Delcath's shareholders are entitled to know, *inter alia*, whether the nominees are capable of managing their own personal finances, much less the business of a public company, whether the nominees have the integrity to serve on the board of a public company, and the track record of the nominees in serving as directors of other public companies.

Delcath respectfully urges the Court to grant expedited discovery on these and other important issues described herein in preparation for a hearing on Delcath's motion for a preliminary injunction. In its First Combined Discovery Requests, a copy of which is attached to

Delcath's motion, Delcath propounds document requests, interrogatories and requests for admission relating to facts that render the Ladd Defendants' public statements materially false and misleading. Delcath anticipates proceeding with depositions of the Ladd Defendants, the Ladd Defendants' director nominees and other persons identified as having knowledge relevant to those facts, after Delcath receives the Ladd Defendants' discovery responses. Delcath also anticipates that it will conduct limited third party discovery.

For all the reasons set forth herein, Delcath respectfully requests that this Court permit expedited discovery prefatory to the hearing on Delcath's motion for a preliminary injunction.

## STATEMENT OF FACTS

### I.  THE PARTIES

#### A.  Delcath

Founded in 1988, Delcath is a development stage company developing a drug delivery system that is hoped will provide a meaningful treatment for certain types of cancer. *See* Declaration of Oliver Olanoff in Support of Plaintiff's Motion for Preliminary Injunction, executed on August 8, 2006 ("Olanoff Decl."), Ex. 2 at 3. Between May 15, 2003 (near the completion of a public offering for Delcath stock) and July 26, 2006 (the last trading day before the Ladd Defendants commenced their latest attempt to take control of Delcath), Delcath stock appreciated by approximately 916%. *See* Olanoff Decl. Ex. 5.

#### B.  The Ladd Defendants

Laddcap Value Partners LP ("Laddcap") is a hedge fund. The annual returns for the Laddcap hedge fund in 2004 and 2005 were 0.7% and –1.7%, respectively. *See* Olanoff Decl. Ex. 6 at 1. Defendant Robert Ladd has represented himself to be the managing member of defendant Laddcap Value Advisors LLC, which is the general partner of Laddcap. *See* Olanoff

4

Decl. Ex. 9 at 2-3. Mr. Ladd also has represented himself to be the managing member of defendant Laddcap Value Associates LLC, which he also purports is the general partner of Laddcap. *Id.* Ex. 31 at 3. Mr. Ladd "possesses the sole power to vote and the sole power to direct the disposition of all securities of the Company held by Laddcap." *Id.* Ex. 9 at 2.

## II.   THE LADD DEFENDANTS' CAMPAIGN TO FORCE, THROUGH MISINFORMATION, THE SALE OF DELCATH

Since late last year, the Ladd Defendants have made repeated attempts to take control and force the sale of Delcath so that they can extract a quick profit and boost the short-term performance of the under-performing Laddcap hedge fund. The Ladd Defendants have, *inter alia*, (1) sought to have the Company immediately retain an investment bank to explore the sale of the Company; (2) solicited Delcath shareholders to withhold votes in the director elections at Delcath's annual shareholder meeting; (3) filed a lawsuit against Delcath relating to supposed "concerns regarding the propriety of certain actions taken by Delcath's officers and directors;" (4) demanded special shareholder meetings to "remove all of Delcath's directors" and "terminate immediately" Delcath's President and CEO; and (5) most recently, initiated a consent solicitation to remove Delcath's directors and replace them with the Ladd Defendants' own slate of directors. *See* Olanoff Decl. Ex. 46.

In order to get their way, the Ladd Defendants have resorted to a campaign of misinformation.

### A.   The Ladd Defendants' Undisclosed Group

As an initial matter, the Ladd Defendants have omitted any disclosure of the persons and/or entities with whom they working as a group in acquiring, holding, voting or disposing of

5

Delcath stock.  There is substantial reason to believe that the Ladd Defendants are part of such a group:

> **John Codling:**  John Codling has represented that he introduced and/or recommended Delcath stock to Mr. Ladd, speaks to Mr. Ladd almost every day, and with Mr. Ladd controls the float of Delcath.  *See* Declaration of Todd Fromer in Support of Plaintiff's Motion for Preliminary Injunction, executed on August 4, 2006 ("Fromer Decl."), ¶¶ 4-5.  Mr. Codling also has asked that Delcath retain Fulcrum Global Partners LLC, an investment bank with whom Mr. Codling is affiliated and one of the supposedly "independent" investment banks from whom the Ladd Defendants obtained a valuation of the Company, to explore a sale of the Company.  *Id.* ¶ 7.  During a call on June 13, 2006, Mr. Codling indicated that he represented in excess of 15% of the outstanding shares of Delcath stock.  *Id.* ¶ 7.  A Schedule 13D filing on July 28, 2006 indicates that Mr. Ladd is the beneficial owner of 11.1% of the outstanding shares of Delcath stock.  *See* Olanoff Decl. Ex. 47.  Though Mr. Codling is collaborating with Mr. Ladd in his proxy battles against the Company and represents and controls shares in excess of those owned by Mr. Ladd, there has been no disclosure of the group of persons and entities acting together with Mr. Codling and Mr. Ladd for the purpose of acquiring, holding, voting or disposing of Delcath stock.

> **Thomas Mowry:**  One of the stockholders the Ladd Defendants are working with is Thomas Mowry.  In an e-mail to a group of Delcath shareholders on December 13, 2005, Mr. Mowry indicated that he has "regular contact" with Mr. Ladd, was acting as an "unofficial representative" and "proxy" for Mr. Ladd in obtaining information from shareholders, including the amount of shares they owned and whether they were "willing or not to collectively proxy [their] shares."  Olanoff Decl. Ex. 12.  Though Mr. Mowry is acting as an "unofficial representative" and "proxy" for Mr. Ladd, there is no disclosure in the Ladd Defendants' Schedule 13D filings of Mr. Mowry, the terms and nature of the relationship between Mr. Ladd and Mr. Mowry or the group of shareholders who indicated to Mr. Mowry that they were willing to "collectively proxy [their] shares" with Mr. Ladd.

## B.    The Ladd Defendants' Handpicked Director Nominees

In their consent solicitation materials, the Ladd Defendants contend that their handpicked slate of directors to replace Delcath's current directors have the "necessary skills, resources and relevant experience" (Olanoff Decl. Ex. 49 at 4) but omit significant facts about each of their five handpicked nominees:

**Paul William Frederick Nicholls:**  One of the Ladd Defendants' nominees, Paul William Frederick Nicholls, not only filed for Chapter 7 personal bankruptcy in 2002, but also may have misled the bankruptcy court and his creditors in connection with his bankruptcy filing.  Among other things, Mr. Nicholls amassed debt of $105,349.75 on 9 credit cards, including credit cards issued by luxury retailers such as Bloomingdale's, Bergdorf Goodman and Macy's.  *See* Olanoff Decl. Ex. 50 at 11-12.  Mr. Nicholls represented in his bankruptcy petition that he paid monthly rent of $2,500.  *Id.* at 16.  Delcath has learned that the monthly "rent" Mr. Nicholls reported likely was "rent" paid to his wife.  Mr. Nicholls resided then and continues to reside now in a Manhattan apartment building owned by his wife.  The apartment building owned by Mr. Nicholls' wife was appraised in 2004 at $3.6 million.  *Id.* Ex. 51.  Mr. Nicholls did not disclose in his bankruptcy petition that his "rent" was paid to his wife.

**Fred S. Zeidman:**  Another of the Ladd Defendants' nominees, Fred S. Zeidman, served on the Audit Committee of Seitel Corporation during each of the seven fiscal quarters for which financial results were restated because of premature revenue recognition on contracts.  *See* Olanoff Decl. Exs. 52, 54-55.  The restatement resulted in a reduction of more than $68 million in revenues.  *Id.* Ex. 52 at 6-8.  In 2001, Seitel stock peaked at $22.72.  *Id.* at 5.  Following Seitel's announcement in April 2002 that it would be restating earnings, Seitel's stock dropped to a low of $0.49 in the fourth quarter of 2002.  *Id.* Ex. 53 at 9.  In March 2003, Seitel's stock was delisted from trading on the New York Stock Exchange.  *Id.*  In July 2003, Seitel went into bankruptcy.  *See id.* Ex. 56.  Mr. Zeidman was named as a defendant in seven shareholder derivative suits relating to the accounting issues that led to the restatement.  *See id.* Ex. 53 at 6.

In addition, Mr. Zeidman is Chairman of the Board of Directors of Emerge Capital Corporation, a company that has twice in 2006 been forced to admit that it has significant deficiencies in its accounting processes constituting material weaknesses as defined by the Public Company Accounting Oversight Board. Those weaknesses resulted in the company improperly accounting for financial transactions on the books of a predecessor company with whom it merged in August 2005, and forced the combined company in May 2006 to restate its consolidated financial statements for fiscal year 2004 and interim periods in 2004 and 2005.  The material weaknesses in the company's accounting procedures were exacerbated by the failure of Mr. Zeidman and the other Emerge board members to hire a full time CFO until June 2006 – eleven months after the merger.  *See id.* Exs. 57-58.

**Michael Karpf, M.D.:**  Michael Karpf, M.D., another of the Ladd Defendants' nominees, sat as Vice Provost of the UCLA hospital system through its period of financial woes, necessitating the hiring of an outside consulting firm to ascertain what went wrong.  Dr. Karpf served as Vice Provost from 1996 to 2003.  *See* Olanoff Decl. Ex. 48 at 13.  Between 1998 and 2000, the net income of the UCLA hospital system dropped from $51 million to less than $5 million.  *Id.* Ex. 59 at 2. In 2002, despite being the largest medical system in the University of California

chain, UCLA reported net income of only $7.2 million as compared with $36.5 million for Irvine, $35.3 million for Davis, $30.3 million for San Diego and $29.0 million for San Francisco. *Id.* Ex. 60 at 2. In October 2002, The Hunter Group was hired to conduct a review of the UCLA hospital system. *Id.* at 1. In March 2003, UCLA announced that it had received a preliminary report from The Hunter Group recommending that the UCLA hospital system overhaul its unprofitable clinics and reduce staff by 475 positions. *Id.* Ex. 61 at 1-2. By October 2003, Dr. Karpf had left the UCLA hospital system for the University of Kentucky. *Id.* Ex. 48 at 13.

**Robert B. Ladd:** The performance of the Laddcap hedge fund run by Robert B. Ladd has been abysmal. For example, the annual return in 2004 for the Laddcap hedge fund was 0.7%, whereas the annual return in 2004 for the S&P SmallCap 600 was 21.59%. *See* Olanoff Decl. Exs. 6-7. The annual return in 2005 for the Laddcap hedge fund was –1.7%, whereas the annual return in 2005 for the S&P SmallCap 600 was 6.65%. *Id.* Exs. 6, 8.

**Jonathan A. Foltz:** Just hours before the Ladd Defendants issued on July 27, 2006, a written consent to action to initiate the process for commencing a consent solicitation, Jonathan A. Foltz, one of the individuals identified in the consent to action as part of the Ladd Defendants' slate of directors, suddenly resigned as a consultant to Delcath. *See* Declaration of M.S. Koly in Support of Plaintiff's Motion for Preliminary Injunction, executed on August 4, 2006 ("Koly Decl."), ¶ 15. Mr. Foltz had been a Delcath employee and consultant for 14 years. *Id.* It defies belief that Mr. Foltz would have resigned from Delcath after 14 years without any understanding with the Ladd Defendants concerning his future employment at Delcath. Yet, the Ladd Defendants have failed to disclose what arrangements they may have with Mr. Foltz with respect to his future employment at the Company.

The Ladd Defendants also have failed to disclose what non-public company information they may have obtained from Mr. Foltz who, prior to his sudden resignation on July 27, 2006, was involved in almost all aspects of Delcath's operations and had access to company trade secrets and other confidential and proprietary information. *See* Koly Decl. ¶ 15. Certain statements in the Ladd Defendants' preliminary consent solicitation statement already confirm that Mr. Foltz has shared proprietary company information with the Ladd Defendants. *See* Olanoff Decl. Exs. 62-64. On August 4, 2006, the Superior Court for the State of Connecticut issued an order enjoining Mr. Foltz from further "disclosing, disseminating and/or using" any non-public company information. Olanoff Decl. Ex. 64. On August 7, 2006, pursuant to that order, a court-appointed custodian, a computer expert and a Connecticut Marshall arrived at the home of Mr. Foltz to temporarily seize his computers so that copies of certain material could be made. *Id.*

### C.    The Ladd Defendants' Scheme To Force A Sale Of Delcath

Contrary to the desire of the Ladd Defendants that the Company be promptly sold,

Delcath's Board of Directors has maintained that "a sale of the Company prior to the completion

of [the] pivotal Phase III trial is premature and would significantly limit the long-term value

shareholders could realize if, as we expect, FDA approval of the Delcath system is granted."

Olanoff Decl. Ex. 41 at 5.

In order to take control and force a sale of the Company, the Ladd Defendants have gone

to great lengths to mislead Delcath's shareholders.

### 1.    The Ladd Defendants Disseminate A
### Misleading Valuation Of The Company

On June 9, 2006, the Ladd Defendants filed a Schedule 14A Proxy Solicitation (the

"Valuation Proxy Solicitation") stating that Laddcap had retained two "investment banking

firms" with "decades of experience" who estimated the present value of Delcath at "between

$6.65 and $10.23 per share." Olanoff Decl. Ex. 31 at 3. The valuation, which was included in

the Valuation Proxy Solicitation, indicated that the investment banking firms had been retained

as "independent third parties." *Id.* Noting that "the midpoint of this valuation, $8.44 per share, is

more than fifty percent (50%) greater than last night's closing price of Delcath stock," the Ladd

Defendants asserted that "Delcath's current leadership lacks . . . independent expertise and

experience." *Id.* at 3-4.

Unbeknownst to Delcath and its shareholders, the two "independent" investment banking

firms with "decades of experience," Fulcrum Global Partners LLC ("Fulcrum") and Glocap

Funding, LLC ("Glocap"), were anything but independent or experienced:

**Fulcrum Not Independent:** Mr. Codling, who as noted above is collaborating with Mr. Ladd in his proxy fight, was affiliated with Fulcrum when it issued the valuation for the Ladd Defendants, and has since asked Delcath to retain Fulcrum to explore the sale of the Company. *See* Fromer Decl. ¶ 7.

**Fulcrum And Glocap Not Experienced:** Fulcrum had sold its entire research division so that it had no experienced investment banker or analyst to value a company like Delcath. *See* Olanoff Decl. Ex. 32. Moreover, neither Fulcrum nor Glocap had previously issued a single fairness opinion or valuation on a public company on file with the Securities and Exchange Commission.

**Underlying Assumptions And Projections Not Disclosed:** The supposedly "independent" Fulcrum and Glocap valuation purports to be based on, *inter alia*, "information provided by LaddcapValue regarding Delcath" and "such other information . . . as [Fulcrum and Glocap] deemed relevant." Olanoff Decl. Ex. 41 at 5. There is no disclosure, however, of the assumptions or projections supplied to or relied upon by Fulcrum and Glocap. Disclosure of the assumptions and projections underlying the valuation would reveal that the valuation is so qualified and subject to material limitations and contingencies that it is unreasonable to include or reference it in proxy soliciting material.

## 2. The Ladd Defendants Mischaracterize Discussions With The Company

In an effort to portray Delcath's directors as unreasonable and unresponsive, the Ladd Defendants also have falsely represented that Delcath "rejected" the Ladd Defendants' efforts to "engage in a meaningful dialogue." Olanoff Decl. Ex. 48 at 9.

Far from "rejecting" any efforts to "engage in a meaningful dialogue," Delcath representatives have met or spoke with Laddcap representatives on a number of occasions over the past year. *See* Koly Decl. ¶¶ 2. Most recently, following the annual Delcath shareholder meeting in June 2006, Mr. Ladd and Mr. Koly had what appeared at the time to be a number of constructive calls. *Id.* ¶ 5. During the calls, Mr. Ladd indicated to Mr. Koly that he no longer wanted to remove Mr. Koly or Samuel Herschkowitz, M.D., Chairman of Delcath's Board, and was satisfied with the Company's business plan. *Id.* ¶ 6. In addition, after Delcath announced its Board's initiative to add two new independent directors, Mr. Koly invited Mr. Ladd to submit the

10

names and resumes of candidates Laddcap would like to be considered. Mr. Ladd agreed to do so and also to withdraw Laddcap's demand for a special shareholder meeting to vote on its proposal to remove Delcath's directors. *Id.* ¶ 7. Moreover, Mr. Koly sent to Mr. Ladd for his review and comment a draft press release regarding the agreement reached between the parties, and Mr. Ladd likewise provided to Mr. Koly for his review and comment a draft of a Schedule 13D filing announcing the agreement reached between the parties. *Id.* ¶ 14.

The Ladd Defendants thus gave Delcath's Board and management every reason to believe that the parties had engaged in a cooperative process and that the Ladd Defendants supported the Company's business plan. The Ladd Defendants' assertion that Delcath "rejected" the Ladd Defendants' efforts to "engage in a meaningful dialogue" could not be any further from the truth.

It is now clear that the dialogue between the parties leading up to the Ladd Defendants' agreement to withdraw Laddcap's demand for a special shareholder meeting to vote on its proposal to remove all of Delcath's directors was orchestrated by the Ladd Defendants to lull the Company into a false sense of calm. On July 27, 2006, without any prior notice or explanation and just weeks after agreeing to withdraw Laddcap's demand for a special shareholder meeting to vote on its proposal to remove Delcath's directors, the Ladd Defendants issued a written consent to action ("Consent to Action") to initiate the process for commencing a consent solicitation to remove Delcath's directors. *See* Olanoff Decl. Exs. 46-47.

### 3.   The Ladd Defendants Mislead Investors About The True Motive For Their Proposed Consent Solicitation

In connection with their proposed consent solicitation, the Ladd Defendants would have shareholders believe that they suddenly have a newfound interest in developing Delcath's long-term business. *See* Olanoff Decl. Ex. 48 at 3. All the machinations of the Ladd Defendants, however, have been designed to force the sale of the Company so that they can extract a quick

11

profit for the under-performing Laddcap hedge fund. *See*, *e.g.*, *Id.* Ex. 6. The proposed consent solicitation is no different. The Ladd Defendants want Delcath's directors removed and replaced with their own handpicked slate of directors not because they care about developing Delcath's long-term business, but because Delcath's directors will not agree to a short-sighted sale of the Company that would jeopardize the development of the Delcath system and limit the long-term value shareholders could realize if, for example, FDA approval of the Delcath system is granted. *See* Olanoff Decl. Ex. 45 at 5.

## III.   STATUS OF THE LADD DEFENDANTS' PROPOSED CONSENT SOLICITATION

The Ladd Defendants' filing of their Schedule 14A Definitive Proxy Statement is imminent. Once it is filed, the consent solicitation commences and Delcath's directors can be removed immediately at any time within 60 days of July 27, 2006, the record date for the proposed consent solicitation. If the Ladd Defendants' misleading statements and omissions are left uncorrected and the Ladd Defendants' proposed consent solicitation is allowed to proceed, the Ladd Defendants could take control of the Company based on their misstatements and omissions. Delcath filed its motion for a preliminary injunction to prevent the Ladd Defendants from taking over the Company based upon false and misleading information. Delcath brings this motion for expedited discovery so that it might provide the Court with an even fuller record than already submitted for the preliminary injunction hearing.

12

## ARGUMENT

### DELCATH IS ENTITLED TO EXPEDITED DISCOVERY IN CONNECTION WITH ITS MOTION FOR A PRELIMINARY INJUNCTION

"Courts have wide discretion with respect to discovery and Federal Rule of Civil Procedure 34(b) expressly provides that courts may expedite discovery." *Ellsworth v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996).

Here, expedited discovery before the preliminary injunction hearing is appropriate because it will enable the Court to assess more effectively the parties' respective interests and the plaintiff's likelihood of prevailing on the merits. Indeed, it is well established that "expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth*, 917 F. Supp. at 844. Thus, courts in this circuit repeatedly have granted expedited discovery where, as here, preliminary injunctive relief is sought. *Id.* at 844 (granting plaintiff expedited discovery); *Macke Co. v. Allegheny Beverage Corp.*, 1980 WL 1424, at *1 n.1 (D.D.C. July 11, 1980) (granting expedited discovery in advance of preliminary injunction hearing).

## I.   THE *NOTARO* TEST AND REASONABLENESS TEST

"To determine whether expedited discovery is appropriate, courts have developed two commonly recognized approaches:  (1) the *Notaro* test and (2) the reasonableness, or good cause, test." *Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006).

The test articulated by the court in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982) requires a demonstration of (1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable

injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted.

As Magistrate Judge Gacciola recently noted, "more recent cases have rejected the *Notaro* test in favor of a reasonableness test, particularly in cases where the expedited discovery is related to a motion for preliminary injunction." *Disability Rights Council*, 234 F.R.D. at 6. "Under the reasonableness test, courts consider the reasonableness of the request in light of the entire record to date and all of the surrounding circumstances." *Id.* "Factors commonly considered in determining the reasonableness of expedited discovery include (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id.*

Under either the *Notaro* test or reasonableness test, Delcath is entitled to expedited discovery. *See Keybank, Nat'l Ass'n v. Quality Payroll Sys.*, 2006 WL 1720461, at *4 (E.D.N.Y. June 22, 2006) (granting expedited discovery because "under either test, I find that Plaintiff has satisfied the standard for obtaining expedited discovery.")

## II.   DELCATH IS ENTITLED TO EXPEDITED DISCOVERY UNDER THE *NOTARO* TEST

Delcath is entitled to discovery even under the more stringent *Notaro* test which, as noted by Magistrate Judge Gacciola, increasingly has been rejected in favor of the more liberal reasonableness test by courts "particularly in cases where the expedited discovery is related to a motion for preliminary injunction." *Disability Rights Council*, 234 F.R.D. at 6.

14

A.    **The Ladd Defendants' Consent Solicitation Exposes
Delcath And Its Shareholders To Irreparable Harm**

The *Notaro* criteria of irreparable harm is easily satisfied. Indeed, there can be no question that the Ladd Defendants' proposed consent solicitation exposes Delcath and its stockholders to irreparable harm. The Ladd Defendants' proxy solicitation materials and Schedule 13D filings contain material misstatements and omissions bearing directly on the decision presented to Delcath's shareholders concerning whether Delcath's current directors should be removed and replaced with directors beholden to the Ladd Defendants. Once the consent solicitation commences, Delcath's directors can be removed *immediately* upon receipt of consents from a majority of the Company's shares. Thus, if the Ladd Defendants' misleading statements and omissions are left uncorrected and the Ladd Defendants' proposed consent solicitation is allowed to proceed, Delcath and its shareholders could be irreparably harmed through the loss of control of their Company. *See Piper v. Chris-Craft Indus.*, 430 U.S. 1, 42 (1977) ("in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, is the time when relief can best be given"); *MONY Group, Inc. v. Highfields Capital Management, L.P.*, 368 F.2d 138, 147 (2d Cir. 2004) ("It is well-established that a transaction – particularly a change-of-control transaction – that is influenced by noncompliance with the disclosure provisions of the various federal securities laws can constitute irreparable harm."); *Lebhar Friedman, Inc. v. Movielab, Inc.*, 1987 WL 5793, at *5 (S.D.N.Y. Jan. 13, 1987) ("If this injunction were not granted, Movielab's shareholders could elect a Board of Directors based on misleading information which has been presented to them in violation of the securities laws. Courts recognize that the wrongful positioning of corporate heads wreaks irreparable harm on a corporation and its shareholders.").

Moreover, as Judge Collyer recently held in granting a preliminary injunction for alleged violations of Section 13(d) and Section 14(a), irreparable injury results if shareholders are "deprived of their statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions." *Bender v. Jordan*, __ F. Supp. 2d __, 2006 WL 2042962, at *27 (D.D.C. July 21, 2006) (granting preliminary injunction); *Riggs Nat'l Bank of Washington, D.C. v. Allbritton*, 516 F. Supp. 164, 181 (D.D.C. 1981) (granting preliminary injunction based on alleged Exchange Act violations because "shareholders will be irreparably injured without injunctive relief by being compelled to make an important investment decision based upon an Offer to Purchase which is incomplete and materially misleading."); *Lichtenberg v. Besicorp Group Inc.*, 43 F. Supp. 2d 376, 390 (S.D.N.Y. 1999) (granting preliminary injunction based on alleged Exchange Act violations because "irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholder's voting rights will be frustrated") (quoting *Krauth v. Executive Telecard, Ltd.*, 890 F. Supp. 269, 287 (S.D.N.Y. 1995)) (alteration in original).

Monetary damages will not remedy the ability of Delcath's shareholders to effectively exercise their corporate suffrage rights, nor could it compensate Delcath for being forced into a change of control. *See Riggs*, 516 F. Supp. at 181 (granting preliminary injunction because "the injury that will result cannot be alleviated by the payment of damages").

Furthermore, even if the consent solicitation were allowed to proceed and the Ladd Defendants lost the consent battle, Delcath would be irreparably harmed because its shareholders would be left with negative impressions of Delcath's Board based upon the Ladd Defendants' false and misleading statements and omissions. *See Lone Star Steakhouse & Saloon, Inc. v. Adams*, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001). This type of damage "to the Board's

16

reputation and concomitant decrease in the level of shareholder trust cannot be quantified and cannot be compensated in a post-vote exercise of the court's equitable power." *Id.*

Accordingly, absent preliminary injunctive relief, Delcath and its shareholders will sustain irreparable harm from the uncorrected, materially false and misleading public statements by the Ladd Defendants. *See Bender*, 2006 WL 2042962, at *28; *Riggs*, 516 F. Supp. at 18.

**B.      Delcath Is Likely To Prevail On The Merits**

Delcath easily satisfies the *Notaro* criteria that there be some probability of success on the merits. *See Keybank*, 2006 WL 1720461, at *4 (granting expedited discovery because "plaintiff has shown some possibility of success").

### 1.      The Ladd Defendants' Schedule 13D<br>Filings Plainly Violate Section 13(d)

The Ladd Defendants have violated Section 13(d) and the SEC rules promulgated thereunder by failing to disclose in their Schedule 13D filings the identity and the nature of their relationship with the group of persons and entities with whom they are acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock. *See SEC v. Savoy Indus., Inc.*, 587 F. 2d 1149, 1164-65 (D.C. Cir. 1978) (finding Section 13(d) violation because defendant failed to disclose that he was member of group); *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982) (finding Section 13(d) violation because defendants "reached an understanding to act in concert in disposing of their shares, but failed to disclose this fact as required by Section 13(d)"); *Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 886-87, 914 (S.D.N.Y. 1986) (granting preliminary injunction based on alleged Section 13(d) violation).

Section 13(d) requires groups who beneficially own more than 5% of an issuer's stock to disclose, *inter alia*, the identity of the members of the group and the nature of the relationship of

the group of persons and entities acting together. *See* 15 U.S.C. § 78m(d)(1) & (3). SEC Rule 13d-5 provides that "when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d-5(b)(1).

Here, there is substantial reason to believe that the Ladd Defendants are part of such a "group." For example, the Ladd Defendants are collaborating with John Codling, the individual who introduced and/or recommended Delcath stock to Mr. Ladd and others and who has indicated that he represents in excess of 15% of the outstanding shares of Delcath stock. *See* Fromer Decl. ¶¶ 4-7. Mr. Codling and Mr. Ladd speak almost every day, have made joint phone calls to Delcath representatives and, according to Mr. Codling, together "control the entire float" of Delcath. *Id.* In addition, Mr. Codling has represented that he is affiliated with Fulcrum, one of the supposedly "independent" investment banks from whom the Ladd Defendants obtained a valuation of the Company, and has since asked Delcath to retain Fulcrum to explore a sale of the Company. *See* Fromer Decl. ¶ 7. Because Mr. Ladd is collaborating with Mr. Codling in the Ladd Defendants' proxy battle against the Company and because Mr. Codling has indicated that he represents shares in excess of those owned by Mr. Ladd, the Ladd Defendants are required to disclose in their Schedule 13D filings, *inter alia*, the identity and the nature of their relationship with Mr. Codling as well as the identity and nature of their relationship with any persons and entities acting together with the Ladd Defendants and Mr. Codling for the purpose of acquiring, holding, voting or disposing of Delcath stock. *See* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1(k)(1); 17 C.F.R. § 240.13d-5(b)(1). The Ladd Defendants have made no such disclosure.

The Ladd Defendants also have failed to disclose the nature of their relationship with Thomas Mowry, a Delcath stockholder. In an e-mail to a group of other Delcath shareholders, Mr. Mowry indicated that he has "regular contact" with Mr. Ladd and was acting as an "unofficial representative" and "proxy" for Mr. Ladd in obtaining information from shareholders, including the amount of shares they owned and whether they were "willing or not to collectively proxy [their] shares." Olanoff Decl. Ex. 12. Because Mr. Ladd is collaborating with Mr. Mowry in the Ladd Defendants' proxy battle against the Company, the Ladd Defendants are required to disclose in their Schedule 13D filings, *inter alia*, the identity and the nature of their relationship with Mr. Mowry as well as the identity and nature of their relationship with any persons and entities acting together with the Ladd Defendants and Mr. Mowry for the purpose of acquiring, holding, voting or disposing of Delcath stock. *See* 15 U.S.C. 78m(d); 17 C.F.R. § 240.13d-1(k)(1); 17 C.F.R. § 240.13d-5(b)(1). The Ladd Defendants have made no such disclosure.

Delcath's shareholders are entitled to know the identity of the group members and the nature of the Ladd Defendants' relationship with the group members because it relates directly to their decision about whether to remove Delcath's directors and turn control of the Company over to the Ladd Defendants. Indeed, the very purpose of Section 13(d) is to "allow investors an opportunity to know the potential changes in corporate control and to evaluate the situation." *Bender*, 2006 WL 2042962, at *13.

## 2. The Ladd Defendants' Solicitation Materials Plainly Violate Section 14(a)

To prevail on a claim under Section 14(a) of the Exchange Act and the SEC rules promulgated thereunder, a plaintiff must show that solicitation materials contain a false or misleading statement of material fact or omit to state a material fact necessary to make a statement not false or misleading and that the misstatement or omission was the result of

19

knowing, reckless or negligent conduct. *See SEC v. Willis*, 472 F. Supp. 1250, 1268 (D.D.C. 1978); *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *Lichtenberg*, 43 F. Supp. 2d at 385.

A "material" fact is one that a reasonable shareholder would consider important to know in deciding how to vote. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 2131 (1976). However, "plaintiffs need not prove that disclosure of the omitted fact would cause a shareholder to change his vote." *Lichtenberg*, 43 F. Supp. 2d at 385. *See also Riggs*, 516 F. Supp. at 172.

As discussed below, Delcath can demonstrate that the misstatements and omissions in the Ladd Defendants' solicitation materials violate Section 14(a) of the Exchange Act and the SEC rules promulgated thereunder.

### a.    Misleading Information About The Ladd Defendants' Slate Of Director Nominees

"Without question, § 14(a) of the [Exchange] Act and proxy solicitation rules adopted by the S.E.C. require that shareholders be informed of relevant information regarding a [director] nominee's business experience, involvement in legal proceedings concerning securities violations, and general fitness to hold office." *Bertoglio v. Texas Int'l Co.*, 488 F. Supp. 630, 660 (D. Del. 1980).

Here, the Ladd Defendants have provided misleadingly incomplete information about their slate of director nominees. *See Rafal v. Geneen*, 1972 WL 323, at *2 (E.D. Pa. 1972) (enjoining board election because failure to disclose information about director nominees was "an omission which certainly might be considered important by a reasonable shareholder who is in the process of deciding how to vote").

The Ladd Defendants contend that their slate of nominees to replace Delcath's current directors have the "necessary skills, resources and relevant experience" (Olanoff Decl. Ex. 49 at 5) but omit in their Schedule 14A Preliminary Proxy Statement ("Preliminary Consent Solicitation") for the proposed consent solicitation significant facts about their handpicked nominees:

- Paul William Frederick Nicholls filed for Chapter 7 personal bankruptcy in 2002 and may have misled the bankruptcy court and his creditors in connection with his bankruptcy filing by failing to disclose that the monthly "rent" he claimed to pay at the time was to his wife who owns the Manhattan apartment building in which Mr. Nicholls and his wife reside. *See* Olanoff Decl. Exs. 50 at 16, 51 at 1. Delcath's shareholders are entitled to know whether the Ladd Defendants' nominees are capable of managing their own personal finances, much less the business of a public company, and whether the Ladd Defendants' nominees have the integrity to serve on the board of a public company. *See Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F. Supp. 787, 792 (S.D.N.Y. 1978) (granting preliminary injunction because of failure to disclose information that may have "an adverse affect upon the shareholders' decision on the integrity and fitness of the individual defendants to hold office").

- Fred S. Zeidman served on the Audit Committee of Seitel Corporation during each of the seven fiscal quarters for which financial results were restated because of premature revenue recognition on contracts, and was named as a defendant in seven shareholder derivative suits relating to the accounting issues that led to the restatement. *See* Olanoff Decl. Exs. 52, 54-55. The restatement resulted in a reduction of more than $68 million in revenues and Seitel's stock eventually was delisted from trading on the New York Stock Exchange. *Id.* Ex. 52 at 6-8, Ex. 53 at 9.

  Mr. Zeidman also is Chairman of the Board of Directors of Emerge Capital Corporation, a company that has twice in 2006 been forced to admit that it has significant deficiencies in its accounting processes constituting material weaknesses as defined by the Public Company Accounting Oversight Board. Those weaknesses resulted in the company improperly accounting for financial transactions on the books of a predecessor company with whom it merged in August 2005, and forced the combined company in May 2006 to restate its consolidated financial statements for fiscal year 2004 and interim periods in 2004 and 2005. The material weaknesses in the company's accounting procedures were exacerbated by the failure of Mr. Zeidman and the other Emerge board members to hire a full time CFO until June 2006 – eleven months after the merger. *See id.* Exs. 57-58.

Delcath's shareholders are entitled to know about Mr. Zeidman's track record in serving as a director of other public companies. *See Berkman*, 454 F. Supp. at 791-92 (S.D.N.Y. 1978) (failure to disclose "track record" of director is material defect under Rule 14a-9).

- Michael Karpf, M.D., sat as Vice Provost of the UCLA hospital system through its period of financial woes, necessitating the hiring of an outside consulting firm to ascertain what went wrong. Between 1998 and 2000, the net income of the UCLA hospital system dropped from $51 million to less than $5 million. *See* Olanoff Decl. Ex. 59 at 2. By the end of 2002, the UCLA hospital system had only $20,000 in cash. *Id.* at 1. In October 2002, The Hunter Group was hired to conduct a review of the UCLA hospital system. *Id.* at 1. In March 2003, UCLA announced that it had received a preliminary report from The Hunter Group recommending that the UCLA hospital system overhaul its unprofitable clinics and reduce staff by 475 positions. *Id.* Ex. 60 at 1-2. By October 2003, Dr. Karpf had left the UCLA hospital system for the University of Kentucky. *Id.* Ex. 48 at 13. Delcath's shareholders are entitled to know the track record of the Ladd Defendants' nominees in running businesses. *See Berkman*, 454 F. Supp. at 791-92.

- Robert B. Ladd runs a hedge fund the performance of which has been abysmal by any standards. *See* Olanoff Decl. Ex. 6 at 1. For example, the annual returns in 2004 and 2005 for the Laddcap hedge fund were 0.7% and –1.7%, respectively. *Id.* Delcath's shareholders are entitled to know the track record of the Ladd Defendants' nominees in running businesses. *See Berkman*, 454 F. Supp. at 791-92.

Moreover, with respect to former Delcath employee and consultant Jonathan A. Foltz, the Ladd Defendants have failed to disclose what non-public company information they obtained from Mr. Foltz who, prior to his sudden resignation on July 27, 2006, was involved in almost all aspects of Delcath's operations and had access to company trade secrets and other confidential and proprietary information. Certain statements in the Ladd Defendants' Preliminary Consent Solicitation already confirm that Mr. Foltz has shared proprietary company information with the Ladd Defendants. For example, the Ladd Defendants' proposal for "establishing a collaboration with a filter expert to improve and customize the filters for use within the Delcath system, as well as for future filter variations to address alternative uses of Delcath's device" is something the Company had been working on, but was not generally known to the public. *See* Olanoff

Decl. Exs. 62-64. On August 4, 2006, the Superior Court for the State of Connecticut issued an order enjoining Mr. Foltz from further "disclosing, disseminating and/or using" any non-public company information. Olanoff Decl. Ex. 62 at 3. In addition, the Ladd Defendants have falsely represented that they do not have "any agreement, arrangement or understanding with respect to any future employment by the Company or its affiliates." Olanoff Decl. Ex. 48 at 19. It defies belief that Mr. Foltz would have abruptly resigned from Delcath after 14 years without any understanding from the Ladd Defendants concerning his future employment at Delcath.

### b.   Misleading Valuation

In connection with their scheme to force a sale of the Company, the Ladd Defendants also falsely represented through their Valuation Proxy Solicitation that they obtained an "independent" valuation of the Company from investment banks with "decades of experience." Olanoff Decl. Ex. 31 at 3. *See Berkman*, 454 F. Supp. at 789-92 (finding proxy materials to be materially misleading because they failed to disclose that a valuation was performed by an investment bank with a conflict of interest).

First, the valuation was not obtained from "independent third parties." Olanoff Decl. Ex. 31 at 6. John Codling, who as noted above is collaborating with Mr. Ladd in his proxy fight, was affiliated with Fulcrum when it issued the valuation for the Ladd Defendants, and has since asked Delcath to retain Fulcrum to explore the sale of the Company. *See* Fromer Decl. ¶ 7.

Second, the valuation was not obtained from investment banks with "decades of experience" in, *inter alia*, "providing fairness opinions." Olanoff Decl. Ex. 31 at 3. Glocap was not organized until August 1999, and a review of public SEC filings has failed to yield a single fairness opinion or valuation on a public company that previously was issued by Glocap. *Id.* Ex. 34 at 10. Fulcrum was not formed until 2001, and "does not engage in traditional investment

banking activities." *Id.* Ex. 32 at 1. Moreover, Fulcrum sold its entire research division in December 2005, or seven months prior to when it issued the valuation. *Id.* On June 6, 2006, one day *before* Fulcrum issued its valuation of Delcath, the *New York Post* reported that Fulcrum had "shut its books and resigned from the National Association of Securities Dealers." *Id.* Ex. 33 at 1.

Third, there is no disclosure of the assumptions or projections supplied to or relied upon by Fulcrum and Glocap in making their valuation, which purports to be based on, *inter alia*, "information provided by LaddcapValue regarding Delcath" and "such other information . . . as [Fulcrum and Glocap] deemed relevant." *Id.* Ex. 31 at 6. Though supposedly "independent," Fulcrum and Glocap "relied upon and assumed, [but] have not attempted to independently investigate or verify . . . the accuracy, completeness or reasonableness of such information, including published forecasts, projections, estimates (collectively, 'Projections') or other information." *Id.*

The failure to disclose the underlying assumptions and projections used by Fulcrum and Glocap is a plain violation of Section 14(a). Indeed, the SEC Division of Corporate Finance has made clear that the inclusion of valuations in proxy soliciting materials "is only appropriate and consonant with Rule 14a-9 under the Securities Exchange Act of 1934" if the valuations are "accompanied by disclosure which facilitates shareholders' understanding of the basis for and limitations on the projected realizable values" and warned that "where the valuations are so qualified and subject to such material limitations and contingencies, inclusion in proxy soliciting material of specific realizable values may be unreasonable." *Interpretative Release Relating to Proxy Rules,* Exchange Act Release No. 16833, 1980 SEC LEXIS 1414, at *3 (May 23, 1980) (Olanoff Decl. Ex. 35).

### c.    Mischaracterization Of Discussions With Company

In addition, the Ladd Defendants have falsely represented that Delcath "rejected" the Ladd Defendants' efforts to "engage in a meaningful dialogue." Olanoff Decl. Ex. 48 at 9. Indeed, far from "rejecting" any efforts to "engage in a meaningful dialogue," Delcath representatives have met or spoke with Laddcap representatives on a number of occasions over the past year. *See* Koly Decl. ¶¶ 2. Most recently, following the annual shareholder meeting in June 2006, Mr. Ladd and Mr. Koly had what appeared at the time to be a number of constructive calls. *Id.* ¶ 5. During the calls, Mr. Ladd indicated to Mr. Koly that he no longer wanted to remove Mr. Koly or Samuel Herschkowitz, M.D., Chairman of Delcath's Board, and was satisfied with the Company's business plan. *Id.* ¶ 6. In addition, after Delcath announced its Board's initiative to add two new independent directors, Mr. Koly invited Mr. Ladd to submit the names and resumes of candidates Laddcap would like to be considered. Mr. Ladd agreed to do so and also to withdraw Laddcap's demand for a special shareholder meeting to vote on its proposal to remove Delcath's directors. *Id.* ¶ 13.

The Ladd Defendants' assertion that Delcath "rejected" the Ladd Defendants' efforts to "engage in a meaningful dialogue" creates the material misimpression that Delcath's Board and management have acted unreasonably and ignored Delcath's largest shareholder when in fact Mr. Ladd gave Delcath's Board and management every reason to believe that the parties had engaged in a cooperative process and that the Ladd Defendants supported the Company's business plan. It is now apparent that the dialogue between the parties leading up to the Ladd Defendants' agreement to withdraw Laddcap's demand for a special shareholder meeting to vote on its proposal to remove all of Delcath's directors was orchestrated by the Ladd Defendants to lull the Company into a false sense of calm.

25

Reasonable shareholders would find the Ladd Defendants' mischaracterization of their

discussions and negotiations with the Company material to their decision about whether to

remove Delcath's directors. *See General Steel Indus., Inc. v. Walco Nat'l Corp.*, 1981 WL

17552, at *5 (E.D. Mo. 1981) ("facts relating to the integrity . . . are material and must be

disclosed").

### d.   Undisclosed Motive For Consent Solicitation

The Ladd Defendants' consent solicitation materials also are materially misleading

because they fail to disclose the Ladd Defendants' underlying motive for the proposed consent

solicitation – *i.e.*, an immediate sale of the Company. *See* Olanoff Decl. Exs. 48-49.

As the Second Circuit noted in finding that a proxy statement improperly failed to

disclose a shareholder's true motive in disposing his controlling interest in a company, "a proxy

statement should honestly, openly and candidly state all the material facts, *making no

concealment of the purposes for the proposals it advocates.*" *Mendell v. Greenberg*, 927 F. 2d

667, 670 (2d Cir. 1990) (emphasis added), *amended* 938 F. 2d 1528 (2d Cir. 1991). "Unlike

poker where a player must conceal his unexposed cards, the object of a proxy statement is to put

all one's cards on the table face up." *Id.*

Here, the Ladd Defendants have failed to be candid or open about the underlying motive

for their consent solicitation. Instead, the Ladd Defendants would have Delcath's shareholders

believe that they suddenly have a newfound interest in developing Delcath's long-term business.

*See* Olanoff Decl. Ex. 48 at 3. That is materially misleading. The Ladd Defendants' actions over

the past year have consistently been designed to force a sale of the Company. Moreover, John

Codling, who is collaborating with Mr. Ladd in his proxy battle against the Company and who

has represented that he is affiliated with Fulcrum, one of the supposedly "independent"

26

investment banks from whom the Ladd Defendants obtained a valuation of the Company, has asked Delcath to retain Fulcrum to explore a sale of the Company. *See* Fromer Decl. ¶ 7.

Reasonable shareholders would find the Ladd Defendants' true motive for the consent solicitation material to their decision about whether to remove Delcath's directors and turn control of the Company over to the Ladd Defendants and their handpicked nominees to the Company's Board. *See Mendell*, 927 F. 2d at 670.

* * *

In sum, Delcath is likely to prevail on both its Section 13(d) and Section 14(a) claims because of the numerous false and materially misleading statements and omissions contained in the Ladd Defendants' proxy materials and Schedule 13D filings.

### C.    The Expedited Discovery Delcath Seeks Is Connected To The Avoidance Of Irreparable Harm To Delcath And Its Shareholders

The third *Notaro* criteria also is easily satisfied because the expedited discovery Delcath seeks is connected to the avoidance of irreparable harm to Delcath and its shareholders. *See Keybank*, 2006 WL 1720461, at *5 (granting expedited discovery because "there is some connection between documents requested here and the avoidance of irreparable injury").

The discovery Delcath seeks bears directly on whether and to what extent the Ladd Defendants' solicitation materials and Schedule 13D filings contain material misstatements and omissions. Delcath seeks expedited discovery relating to: (1) the non-public company information the Ladd Defendants may have obtained from Mr. Foltz and the undisclosed arrangements or understandings the Ladd Defendants may have with Mr. Foltz regarding compensation or his future employment with the Company; (2) the undisclosed group of persons and entities with whom the Ladd Defendants are acting together for the purpose of acquiring, holding, voting or disposing of Delcath stock; (3) undisclosed material information about the

27

Ladd Defendants' director nominees; (4) undisclosed relationships between the Ladd Defendants

and the supposedly "independent" investment banking firms that issued the valuation included by

the Ladd Defendants in the Valuation Proxy Solicitation; (5) the undisclosed lack of credentials

on the part of Fulcrum and Glocap, which the Ladd Defendants falsely represented had "decades

of experience" in, *inter alia*, "providing fairness opinions"; (6) the undisclosed assumptions and

projections underlying the suspect Fulcrum and Glocap valuation; (7) the undisclosed dialogue

with the Ladd Defendants that led to the Ladd Defendants' agreement to withdraw their demand

for a special shareholder meeting to vote on Laddcap's proposal to remove Delcath's directors;

and (8) the undisclosed motive for the Ladd Defendants' consent solicitation.

 If, as Delcath expects, the expedited discovery it seeks helps demonstrate that the Ladd

Defendants' public statements are materially false and misleading, Delcath and its shareholders

will avoid the irreparable harm that could result if the consent solicitation were allowed to

proceed and a change in control of the Company allowed to occur based on the Ladd Defendants'

false and misleading statements. *See Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*

749 F. Supp. 473, 475 (S.D.N.Y. 1990) ("There is a basis to conclude that expedited discovery

may have some connection with the avoidance of irreparable harm. Inquiry into these areas on

an expedited basis may very well lead to evidence of continuing infringement by this defendant

or others; it may also lead to the discovery of future plans to infringe or the discovery of

additional infringing merchandise.").

### D. The Injury That Would Result To Delcath And Its Shareholders Without Expedited Discovery Far Outweighs Any Injury To The Ladd Defendants

 The fourth and final *Notaro* criteria also is easily met. The balance of hardships weighs

strongly in favor of Delcath. There can be no question that the injury that would result to

Delcath and its shareholders without expedited discovery is greater than any injury the Ladd Defendants would suffer if expedited discovery is granted. *See Keybank*, 2006 WL 1720461, at *5 (granting expedited discovery because injury to plaintiff without expedited discovery was greater than any injury defendants could claim from having to provide the discovery); *Twentieth Century Fox*, 749 F. Supp. at 475 (granting expedited discovery because "the Court also does not find that expedited discovery would pose a substantial hardship to [defendant] Mow Trading or [its principal] Mr. Yun.").

Delcath and its shareholders will suffer irreparable harm if preliminary injunctive relief is denied because Delcath is not granted expedited discovery to demonstrate that the Ladd Defendants' solicitation materials and Schedule 13D filings contain material misstatements and omissions. Absent preliminary injunctive relief, the Ladd Defendants' consent solicitation will proceed and a change of control at the Company could occur based on the Ladd Defendants' misstatements and omissions.

By contrast, the specter of any harm to the Ladd Defendants – let alone greater harm than what Delcath and its shareholders would suffer – is particularly remote in this case. The Ladd Defendants and the persons or entities with whom they are acting together are in possession of the information sought. There is no significant burden, much less injury, that would inflicted upon the Ladd Defendants by expedited discovery. *See Twentieth Century Fox*, 749 F. Supp. at 475 (granting expedited discovery because "the information sought should be within the possession and control of Mow Trading" and irreparable harm to plaintiff without expedited discovery "is of far greater significance than any inconvenience to defendant from such expedited discovery").

\* \* \*

In sum, Delcath is entitled to expedited discovery even under the more stringent *Notaro* test which, as noted by Magistrate Judge Gacciola, increasingly has been rejected in favor of the more liberal reasonableness test by courts "particularly in cases where the expedited discovery is related to a motion for preliminary injunction." *Disability Rights Council*, 234 F.R.D. at 6.

## III.    DELCATH IS ENTITLED TO EXPEDITED DISCOVERY UNDER THE REASONABLENESS TEST

Plainly, if Delcath is entitled to expedited discovery under the more stringent *Notaro* test, it also is entitled to expedited discovery under the more liberal reasonableness test. *First*, a motion for preliminary injunction is pending. *See Ellsworth*, 917 F. Supp. at 844 ("expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings"). *Second*, the expedited discovery sought is appropriately directed towards ascertaining facts bearing directly on whether and to what extent the Ladd Defendants' solicitation materials and Schedule 13D filings contain material misstatements and omissions. *Third*, the injury that would result to Delcath and its shareholders without expedited discovery is greater than any injury the Ladd Defendants would suffer if expedited discovery is granted. *See Keybank*, 2006 WL 1720461, at \*5 ("[T]he injury which KeyBank faces in not having Quality Payroll provide its customer documentation to KeyBank is far greater than in directing them to provide it. This factor also satisfies the so-called 'reasonableness test' for expedited discovery.") *Fourth*, Delcath has properly moved for expedited discovery promptly following notice of the Ladd Defendants' consent solicitation.

## CONCLUSION

For the reasons set forth above, Delcath respectfully requests that this Court grant its

motion for expedited discovery prefatory to a hearing on its motion for a preliminary injunction.

Dated:  Washington, D.C.
        August 9, 2006

                        GIBSON, DUNN & CRUTCHER LLP


                        By:  /s/ Andrew S. Tulumello
                             Andrew S. Tulumello
                             (D.C. Bar No. 468351)
                             Matthew R. Estabrook
                             (D.C. Bar No. 477880)

                        1050 Connecticut Avenue, N.W.
                        Washington, D.C.  20036
                        Tel:  (202) 955-8500
                        Fax:  (202) 530-9559

                        Attorneys for Plaintiff
                        Delcath Systems, Inc.


GIBSON, DUNN & CRUTCHER LLP
*(Motions for pro hac vice pending):*
Adam H. Offenhartz
Aric H. Wu
Oliver M. Olanoff
200 Park Avenue
New York, NY  10166-0193
Tel:  (212) 351-4000
Fax:  (212) 351-4035

# ON-LINE CASES CITED

Westlaw.

2006 WL 2042962                                                                 Page 1
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Morton A. BENDER, et al., Plaintiffs,
v.
Carolyn D. JORDAN, et al., Defendants.
**Civil Action No. 06-92(RMC).**

July 21, 2006.

**Background:** Shareholder of federally chartered savings and loan brought action against some of institution's directors, including its chairman, vice chairman, and two board members, and institution's former acting president-chief executive officer (CEO), asserting claims for alleged violations of federal securities laws and seeking both injunctive and monetary relief. Shareholder moved for preliminary injunction, and defendants moved to dismiss complaint.

**Holdings:** The District Court, Collyer, J., held that:
(1) as a matter of apparent first impression, shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase;
(2) shareholder established likelihood of success on the merits of claim for alleged violation of Securities Exchange Act's disclosure requirements;
(3) shareholder established likelihood of success on the merits of claim for alleged violation of proxy solicitation statute;
(4) shareholder could bring direct action for alleged violations of corporate bylaws and Robert's Rules of Order;
(5) shareholder established likelihood of success on merits of claim alleging violation of institution's bylaws and Robert's Rules of Order;
(6) shareholder established irreparable harm; and
(7) doctrine of laches did not apply.
Ordered accordingly.

**[1] Injunction** 🔑138.1

212k138.1 Most Cited Cases
In considering a request for preliminary injunctive relief, court must examine (1) whether there is a substantial likelihood that plaintiff will succeed on the merits, (2) whether plaintiff will be irreparably injured if an injunction is not granted, (3) whether an injunction will substantially injure the other party, and (4) whether the public interest will be furthered by the injunction; these factors interrelate on a sliding scale and must be balanced against each other, and a particularly strong showing on one or more factors can mitigate a weaker showing on another.

**[2] Injunction** 🔑132
212k132 Most Cited Cases

**[2] Injunction** 🔑147
212k147 Most Cited Cases
A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.

**[3] Action** 🔑3
13k3 Most Cited Cases
*Cort* factors for determining whether Congress intended to provide implied private right of action include (1) whether plaintiff is one of the class for whose benefit the statute was enacted, (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy, (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law; these factors are not necessarily entitled to equal weight, and the central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action.

**[4] Action** 🔑3
13k3 Most Cited Cases
The question of the existence of a statutory cause of action is one of statutory construction, and the appropriate starting place is therefore the text of the statute itself.

**[5] Action** 🔑3
13k3 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                    Page 2
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

In divining legislative intent respecting existence of implied private cause of action, courts look to the design of the statute as a whole, in addition to considering the text of the statute, and, to the extent useful, legislative history.

**[6] Securities Regulation** 🔑173
349Bk173 Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase creates an implied private right of action for injunctive relief brought by an issuer of securities. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[7] Securities Regulation** 🔑53.15
349Bk53.15 Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase was not enacted for the benefit of the issuer; its sole purpose was the protection of shareholders. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[8] Securities Regulation** 🔑173
349Bk173 Most Cited Cases
Shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[9] Securities Regulation** 🔑173
349Bk173 Most Cited Cases
Shareholder of savings and loan had implied private cause of action against institution's directors and former acting president-chief executive officer (CEO) for injunctive relief under provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase, particularly given parties' battle for corporate control and injunctive relief previously sought against shareholder by institution, presumably at directors' behest, under same statute. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[10] Securities Regulation** 🔑178.1
349Bk178.1 Most Cited Cases
Shareholder of savings and loan established likelihood of success on the merits in seeking preliminary injunctive relief based on claim that institution's directors and former acting president-chief executive officer (CEO), acting through institution's chairman and vice chairman, acquired beneficial ownership of shares and voting power of securities firm and related stockholders, and thus violated requirement, under Securities Exchange Act, that stock buyers disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase by not filing requisite disclosures. Securities Exchange Act of 1934, § 13(d)(1, 2), 15 U.S.C.A. § 78m(d)(1, 2); 17 C.F.R. § § 240.13d-2(a), 240.13d-3(a), 204.13d-5.

**[11] Securities Regulation** 🔑52.19
349Bk52.19 Most Cited Cases
Shareholder of financial institution, who already owned 7.2 percent of institution's shares at the time he acquired voting power over additional shares constituting nearly 10 percent of institution's outstanding shares, was required to amend his Schedule 13D "promptly" under Securities Exchange Act. Securities Exchange Act of 1934, § 13(d)(2), 15 U.S.C.A. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a).

**[12] Securities Regulation** 🔑49.20
349Bk49.20 Most Cited Cases
To prevail on claim under provision of Securities Exchange Act governing solicitation of proxies, plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused plaintiff injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[13] Securities Regulation** 🔑49.22(3)
349Bk49.22(3) Most Cited Cases

**[13] Securities Regulation** 🔑49.26(3)
349Bk49.26(3) Most Cited Cases
Materiality is the touchstone of the analysis for claim under provision of Securities Exchange Act governing solicitation of proxies. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[14] Securities Regulation** 🔑49.26(3)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                    Page 3
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

349Bk49.26(3) Most Cited Cases
Plaintiffs need not allege other-shareholder reliance
to maintain a claim under provision of Securities
Exchange Act governing solicitation of proxies.
Securities Exchange Act of 1934, §   14(a), 15
U.S.C.A. § 78n(a).

**[15] Securities Regulation** 🔑49.22(2)
349Bk49.22(2) Most Cited Cases

**[15] Securities Regulation** 🔑49.26(3)
349Bk49.26(3) Most Cited Cases
A misrepresentation or omission is "material," for
purposes of provision of Securities Exchange Act
governing solicitation of proxies, if there is a
substantial likelihood that a reasonable shareholder
would consider it important in deciding how to vote;
in other words, there must be a substantial likelihood
that the disclosure of the omitted fact would have
been viewed by the reasonable investor as having
significantly altered the total mix of information
made available. Securities Exchange Act of 1934, §
14(a), 15 U.S.C.A. § 78n(a).

**[16] Securities Regulation** 🔑49.30
349Bk49.30 Most Cited Cases
In the context of claims under provision of Securities
Exchange Act governing solicitation of proxies, issue
of materiality is a mixed question of law and fact that
involves a delicate assessment of the inferences a
reasonable shareholder would draw from a proxy
statement and a projection of the significance of these
inferences to the hypothetical reasonable shareholder.
Securities Exchange Act of 1934, §   14(a), 15
U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[17] Securities Regulation** 🔑49.16
349Bk49.16 Most Cited Cases
Letter purportedly sent by committee to save federal
financial institution to institution's shareholders
qualified as "solicitation" for purposes of securities
rule expressly prohibiting false or misleading proxy
solicitations, in that letter was part of "grass roots"
strategy concocted by institution employee and
representative of public relations firm to persuade
recipients not to sell their shares to shareholder
attempting to gain control of institution or his allies,
and advocated "yes" vote for board of directors' slate
in upcoming board election. 17 C.F.R. § § 240.14a-
1(*l*)(1)(iii), 240.14a-9.

**[18] Securities Regulation** 🔑49.16
349Bk49.16 Most Cited Cases
Letter sent to shareholders of troubled federal

financial institution qualified as "solicitation" for
purposes of securities rule expressly prohibiting false
or misleading proxy solicitations, given that
institution's employee and public relations firm
played substantial role in sending of letter, by
reviewing and editing drafts and providing inside
information known only to institution, and that letter,
though not explicitly urging vote in favor of
management's nominees for board members,
generally questioned past performance and motives
of shareholder seeking control of institution, alleged
various regulatory violations by such shareholder,
lauded imagination and courage of incumbent
directors, and urged shareholders to "do the right
thing." 17 C.F.R. § § 240.14a-1(*l*)(1)(iii), 240.14a-9.

**[19] Securities Regulation** 🔑49.21
349Bk49.21 Most Cited Cases
Correspondence sent by financial institution to its
shareholders contained false and misleading
statements, for purposes of shareholder's claim that
some of institution's directors and its former acting
president-chief executive officer (CEO) violated
proxy solicitation statute, in that two letters falsely
represented that they were authored independent of
institution, correspondence indicated that
shareholder, who sought to gain control of institution,
had brought baseless lawsuits against institution and
was source of its financial difficulties, and
shareholders were incorrectly told that shares held by
brokers would not be voted in impending board
election absent shareholder instructions. Securities
Exchange Act of 1934, §   14(a), 15 U.S.C.A. §
78n(a); 17 C.F.R. § 240.14a-9.

**[20] Securities Regulation** 🔑49.26(3)
349Bk49.26(3) Most Cited Cases
Causation.
False and misleading statements in correspondence
sent by financial institution to shareholders were
"material," for purposes of shareholder's claim that
some of institution's directors and its former acting
president-chief executive officer (CEO) violated
proxy solicitation statute, in that reasonable investor
would have lent importance to facts that, contrary to
representations in correspondence, institution's
management decisions and unrelated lawsuits were to
blame for institution's financial woes, rather than
shareholder seeking to gain control of institution, that
shareholder had not brought baseless lawsuits against
institution, that institution had editorial control over
purportedly independent letters sent to shareholders,
and that shares held by brokers would be voted in the
absence of shareholder instructions in upcoming

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                                Page 4
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

election. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[21] Securities Regulation ☞49.26(3)**
349Bk49.26(3) Most Cited Cases
When there has been a finding of materiality of false or misleading statements in proxy solicitation, shareholder has made a sufficient showing of causal relationship between violation of proxy solicitation statute and injury for which he seeks redress if he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the challenged transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[22] Securities Regulation ☞178.1**
349Bk178.1 Most Cited Cases
Shareholder sufficiently demonstrated likelihood of causal connection between proxy solicitations and election of board of director nominees supported by financial institution's management in seeking preliminary injunction based on claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that votes of minority shareholders were necessary to elect management slate and solicitations were essential link in securing those votes. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[23] Corporations ☞320(4)**
101k320(4) Most Cited Cases
Shareholder alleged special injury unique from that suffered by financial institution, and thus could bring direct action against institution's directors and former acting president-chief executive officer (CEO) for alleged violations of corporate bylaws and Robert's Rules of Order, when gravamen of shareholder's complaint was that defendants conspired, in violation of Securities Exchange Act and bylaws, to rig director election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying votes improperly so as to keep complaining shareholder from participating in matters of corporate governance. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[24] Corporations ☞202**
101k202 Most Cited Cases
Shareholder can bring a direct action, even when there is harm done to the corporation generally, if he alleges a special injury unique from that suffered by the corporation, and such "special injury" can arise in

two contexts: when allegedly wrongful conduct violates a duty to complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, and when the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends.

**[25] Injunction ☞138.42**
212k138.42 Most Cited Cases
Shareholder seeking preliminary injunction, based on claim that financial institution's directors and acting former president-chief executive officer (CEO) violated corporate bylaws and Robert's Rules of Order in conducting shareholder meeting, established substantial likelihood of demonstrating that provision of Robert's Rules prohibiting changing or revoking of vote in director election after polls were closed governed meeting, that unilaterally allocation of proxies after polls were closed was prohibited action under Robert's Rules, and that, in a contested election, permitting management alone to allocate votes after polls closed was incompatible with duty of independent inspector of elections (IIOE) to conduct election with fairness to all shareholders.

**[26] Corporations ☞198(3)**
101k198(3) Most Cited Cases

**[26] Corporations ☞283(1)**
101k283(1) Most Cited Cases
Corporation's failure to hold separate meeting to vote on allocation of management proxies in director election did not violate provision of bylaws indicating that proxies solicited on management's behalf were to be voted as directed by shareholder or, in the absence of direction, as determined by majority of board of directors, given that bylaw did not expressly require that meeting be held and master ballot was signed by majority of board of directors.

**[27] Injunction ☞138.42**
212k138.42 Most Cited Cases
Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[27] Securities Regulation 178.1**
349Bk178.1 Most Cited Cases
Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[28] Injunction 138.6**
212k138.6 Most Cited Cases
To establish irreparable injury in support of preliminary injunctive relief, injury must be both certain and great, and must be actual and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, and injury must also be beyond remediation.

**[29] Injunction 138.6**
212k138.6 Most Cited Cases
Possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm supporting preliminary injunction.

**[30] Injunction 138.42**
212k138.42 Most Cited Cases
Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve

the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[30] Securities Regulation 178.1**
349Bk178.1 Most Cited Cases
Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[31] Equity 65(1)**
150k65(1) Most Cited Cases
Doctrine of unclean hands did not apply to bar equitable relief in shareholder's favor in his action for alleged securities violations against some of financial institution's directors and institution's former acting president-chief executive officer (CEO), given that shareholder had neither abused the judicial process nor brought baseless actions against institution or its directors.

**[32] Securities Regulation 134**
349Bk134 Most Cited Cases
Doctrine of laches did not apply to bar equitable relief in shareholder's favor in his action against some of financial institution's directors and institution's former acting president-chief executive officer (CEO) for alleged securities violations, given that shareholder moved for preliminary injunction two days after filing complaint and less than three months after challenged election of directors, that shareholder could reasonably have required several months to craft complaint in light of secrecy in which directors had operated, and that shareholder did not appear to have reason to have suspected defendants' involvement in challenged proxy solicitation until after litigation began.

**[33] Equity 67**
150k67 Most Cited Cases

**[33] Equity 69**
150k69 Most Cited Cases

**[33] Equity 72(1)**
150k72(1) Most Cited Cases
"Laches" is an equitable doctrine founded on the notion that equity aids the vigilant and not those who slumber on their rights, and, to establish this defense, defendants must show (1) a lack of diligence by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                                    Page 6
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

plaintiff that (2) has caused them prejudice.
<u>Dale A. Cooter</u>, <u>Donna S. Mangold</u>, Cooter, Mangold, Tompert & Wayson, LLP, Washington, DC, for Plaintiffs.

<u>Peter Emanuel Strand</u>, Shook, Hardy & Bacon, L.L.P., <u>Haig V. Kalbian</u>, Kalbian Hagerty L.L.C., Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

<u>COLLYER</u>, District Judge.

*1 Morton A. Bender and a majority of the Board of Directors of Independence Federal Savings Bank ("IFSB" or "Bank") are opposing contestants for control of the future direction of the Bank. The Bank was labeled a "troubled" institution by the Office of Thrift Supervision ("OTS") in 2003 and has never shed that label. Together with his wife, Mr. Bender owns 21% of the Bank's outstanding stock. He has been an active and vociferous critic of the Bank's management since 2003 and has tried, with varying degrees of success, to change its direction by voting his candidates onto the Bank's Board of Directors. A majority of the Board of Directors has, to put it mildly, resisted Mr. Bender's efforts. [FN1] The last such vote for members of the Board was held in October 2005. That voting process was riddled with improprieties, of which Mr. Bender complains here.

In this suit, [FN2] Mr. Bender sues certain of the Bank's Directors: chairman Carolyn D. Jordan, vice chairman David Wilmot, and Board members Michael J. Cobb, William B. Fitzgerald IV, and Eugene K. Youngentob ("Director Defendants"), and its former Acting President and Chief Executive Officer, Thomas L. Batties. The Bank itself is a nominal defendant. Mr. Bender [FN3] alleges that the Director Defendants and Mr. Batties violated numerous securities laws and the Bank's bylaws by their actions leading up to, and in conducting, a shareholders' meeting in October 2005. As relief, Mr. Bender seeks an injunction requiring the Defendant Directors and Mr. Batties to comply with their disclosure obligations under § 13(d) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), <u>15 U.S.C. § 78m(d)</u>, and regulations promulgated thereunder; to neutralize shares that the Defendant Directors and Mr. Batties allegedly acquired in violation of those obligations; to void the election results from the October 26, 2005, Shareholders' Meeting; to compel accurate proxy disclosures pursuant to § 14(a) of the Exchange Act, <u>15 U.S.C. § 78n(a)</u>, and accompanying regulations; to forbid

further shareholders' meetings until the procedural irregularities are resolved; and to compel adherence to the Bank's bylaws in any future meetings. Mr. Bender also seeks a court order preventing IFSB from indemnifying, or making advance payments to, the Director Defendants and Mr. Batties for expenses and fees incurred in defending this action. Finally, Mr. Bender prays for $10 million in compensatory damages, $10 million in punitive damages, and an award of attorneys' fees. Compl. at 38-39.

As preliminary relief, Mr. Bender requests an injunction specifying that, until further order of the Court, no proxy materials shall be disseminated to Bank shareholders; no annual or special shareholders' meeting shall occur; and that the Bank shall be prevented from indemnifying, or making advance payments to, the Defendant Directors and Mr. Batties for their defense expenses. [FN4] Pls.' Proposed Order at 46-47 [Dkt. # 37]. The Director Defendants and Mr. Batties oppose the application for a preliminary injunction and move to dismiss Mr. Bender's Complaint on various grounds.

*2 Although the Complaint brings six counts against Defendants, only four of those request preliminary injunctive relief and are relevant for present purposes: alleged violations of § 13(d) of the Exchange Act (Count I) and § 14(a) of the Exchange Act (Count II); alleged violations of the Bank's bylaws (Count III); and the request for a declaratory judgment barring indemnification and advancement of fees (Count VI).

This opinion addresses Counts I, II, and III only; the Court defers decision on Count VI. Finding in Mr. Bender's favor on the main points, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court.

### I. FINDINGS OF FACT
This matter came on for hearing during three successive weeks, working around the Court's criminal trial schedule. Witnesses for IFSB included Ms. Jordan, Messrs. Wilmot and Batties, and Christopher Chambers, a part-time in-house lawyer at the Bank. From their testimony, one has to conclude that this is the most incurious group of persons in the world. Faced with a crisis at the Bank that all were working frantically to address, they say they never spoke to one another, never followed up on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assignments, never read email or talked to their assistants, and cannot remember the details of critical conversations. To a person, they were evasive, nonresponsive, and internally contradictory. It is an understatement to say that the Court has a difficult time crediting much of their testimony. For present purposes, the Court makes the following findings of fact:

## A. Background Facts

1. IFSB is a federally-chartered savings and loan ("S & L"), with its principal place of business in the District of Columbia. Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of OTS. IFSB is a historically Black-owned-and-operated S & L that concentrates its marketing and loans in the Black and African-American community.

2. Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are members of the Bank's Board of Directors and, until June 21, 2006, Defendant Batties was its Acting President and Chief Executive Officer. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); *Id.* at 73 (Wilmot); *Id.* at 114 (Batties); Fitzgerald Dep. 44; Defs.' Rule 8K Notice [Dkt. # 49]. Defendants Jordan, Wilmot, and Batties are attorneys and members of the Bar of the District of Columbia. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); *Id.* at 73 (Wilmot); *Id.* at 114 (Batties). The Defendants and all other Bank Directors are African-American.

3. The Bank's fiscal year ends on December 31 of each year. *Id.* at 52 (Jordan). The Board of Directors scheduled a Special Meeting in lieu of the Annual Meeting of Shareholders for May 11, 2005; thereafter, the meeting was scheduled and re-scheduled and ultimately conducted on October 26, 2005. *Id.* at 115-16 (Batties); *Id.* at 6 (Jordan).

*3 4. Plaintiffs Morton and Grace Bender own approximately 21% of the Bank's outstanding shares as joint tenants. Defs.' Exh. 211. The Benders are White.

## B. Communications in Advance of the May 11, 2005, Meeting and Its Delay

5. In anticipation of the scheduled May 11, 2005, meeting, at which three directors would be elected to the Bank's Board, Mr. Bender notified the Bank's secretary, by letter dated April 26, 2005, that he would be nominating two persons for election to the Board. Mr. Bender wrote to all shareholders on May 2, 2005, [FN5] setting forth his positions regarding the Bank's performance and providing information regarding his nominees. Defs.' Exhs. 207, 208.

6. Mr. Bender had previously submitted a draft

copy of his May 2, 2005, letter to OTS and had made certain amendments to it at the request of OTS. Defs.' Exh. 205; Defs.' Exh. 208. However, the May 2, 2005, letter did not contain all of the changes the federal agency had requested. Defs.' Exh. 208.

7. A different letter was sent to shareholders dated May 4, 2005, purportedly from the "Committee to Save Independence Federal Savings Bank" (the "Committee" and the "Committee Letter"). Trial Exh. 1. The Committee Letter was apparently signed by Bishop Clarence Long and Reverend Douglas Moore, who are prominent African-American clergy in the District of Columbia. *Id.* Reverend Walter Fauntroy, a prominent clergyperson and former District representative to the U.S. House of Representatives, was a visible supporter. Fauntroy Dep. 12-14.

• Reverend Fauntroy testified that he had no role in authorship of the letter and did not see it until the day of his deposition. Fauntroy Dep. 65-67.

• Bishop Long testified that he did not write the letter, that he did not authorize anyone to send it on his behalf, and that he saw it for the first time at a press conference on May 10, 2005. Long Dep. 26-27, 36.

• Reverend Moore testified that he has no idea how the letter went out with his name on it; he did not remember seeing it before his deposition. Moore Dep. 37-42, 47.

8. Testimony from Christopher Chambers, an attorney and part-time Bank employee, clarified the provenance of the Committee Letter. Mr. Chambers worked with Judy Smith of Impact Strategies, a public relations ("PR") firm retained by the Bank, to provide information for the Committee Letter and to set its tone and arrange its mailing. Apr. 28, 2006, Hr'g Tr. 57, 67-68 (Chambers). As Mr. Chambers described in an email, he was actively involved in:

PR and grassroots--lining up folks and implementing the strategy, beginning the tactics. There is now a list of small shareholders, but we must be careful to have the "Committee to" contact them, and of course it's not going to be a question of supporting the current management slate--now it is a question of not selling to [B]ender or his allies. Pls.' Exh. 106 (Apr. 18, 2005, email). Further, Mr. Chambers wrote that he had "some deliverables to Impact Strategies so that they may complete their tasks regarding grassroots and media work." Pls.' Exh. 107 (April 22, 2005, email). Ms. Smith forwarded two mailings for the Bank's use, telling Mr. Chambers that she would call to "di[s]cuss contacting potential signers." Pls.' Exh. 105 (May

2006 WL 2042962                                                                                          Page 8
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

4, 2005, email). As Mr. Chambers informed Mr. Batties on May 5, 2005:

*4 Judy Smith is planning the Committee to Save IFSB-related press conference ASAP. FYI the grass roots packages have gone out (last night). They are not as inflammatory as originally envisioned; they are more akin to shareholder fight-letters. I will forward you the essence of what went out to smaller shareholders.... Additionally, another 1500-1800 ... letters went out to friends of the bank....

Consequently ... the fur will be flying.... Bender's putative nominees have been painted in the Committee mailings as innocent puppets at best, racial traitors at worst, so I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting their own horns.

Pls.' Exh. 104 (May 5, 2005, email).

9. Mr. Batties instructed Mr. Chambers to work with Ms. Smith, and Mr. Chambers sent Mr. Batties copies of all email exchanges between Mr. Chambers and Ms. Smith (as an addressee in either the "to" line or the "cc" line). Apr. 28, 2006, Hr'g Tr. 92 (Chambers); *see* Pls.' Exhs. 104-109. Each was sent to Mr. Batties' IFSB email address or to Mr. Batties' home email address or to both. Pls.' Exhs. 104-109. Mr. Chambers also talked directly with Mr. Batties about "grass roots, direct mail, lobbying[,] the whole thing." Apr. 28, 2006, Hr'g Tr. 94 (Chambers). [FN6]

10. Mr. Batties testified that he had no involvement in the Committee Letter. Apr. 21, 2006, Hr'g Tr. 117-19 (Batties). He further testified that he did not read the emails from Mr. Chambers when they were sent and did not know if Judy Smith of Impact Strategies was involved with the Committee or the Committee Letter. *Id.* at 126-31 (Batties). Given the importance of the efforts against Mr. Bender, Mr. Batties' direct instructions to Mr. Chambers, and the involvement of Ms. Jordan, chairman of the Board, and other Board members, the Court does not credit Mr. Batties' denials.

• Mr. Batties appears to have been directly involved with contacts with Reverend Fauntroy and Bishop Long. *See* Pls.' Exh. 108 ("Thomas might have to make *another* call to both [Rev. Fauntroy and Bishop Long]." (emphasis added)).

• Mr. Batties appears to have been making the important decisions rather than delegating them to a part-time employee. *See* Pls.' Exh. 104 ("The bigger shareholders have been contacted.... I don't know how much you would be involved in that

specific aspect of preparatory work, Charlie, but my vote is that you attend, *pending what Thomas decides."* (emphasis added)).

• Mr. Batties received oral reports and copies of all emails from Mr. Chambers. Apr. 28, 2006, Hr'g Tr. 91-94 (Chambers).

• Mr. Batties admitted that some of the information in the Committee Letter and its attachments could only have come from confidential OTS examination reports, which are maintained in the Bank's file. Apr. 21, 2006, Hr'g Tr. 120- 24 (Batties).

*5 • Mr. Batties' professed inattention and ignorance of the Committee and the Committee Letter rings hollow. The Bank paid Impact Strategies to develop the PR program, of which the Committee Letter was a part. The Bank paid Impact Strategies, and its own employee, Mr. Chambers, to write the Committee Letter and to mail it. Based on the contents of the Committee Letter, Mr. Chambers or some other Bank representative was the source of confidential Bank documents and information. Only 28 people work in the Bank office where Mr. Batties works and Mr. Chambers has a desk immediately outside Mr. Batties' office. Apr. 21, 2006, Hr'g Tr. 132 (Batties). Mr. Chambers reported to Mr. Batties by email and in-person conversations on his activities. From these facts, the Court concludes that Mr. Batties authorized and was aware of Mr. Chambers' participation in the creation and mailing of the Committee Letter. It also finds that Mr. Batties authorized and was aware that the Committee was being portrayed falsely to shareholders and the public as an independent group. *See* Pls.' Exh. 104 ("The Committee to Save IFSB is an independent association."); Trial Exh. 1, Committee Letter ("Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission.").

• Further, the Court finds that it is more likely than not that certain Directors of the Bank were, at a minimum, informed of the Committee Letter before its mailing. The emails strongly suggest that Defendants Jordan, Wilmot and Fitzgerald were either involved in, or aware of, the fabrication of the Committee and the Committee Letter. *See* Pls.' Exh. 107 (Apr. 22, 2005, email) ("Pls. note that in addition to Carolyn Jordan of our Board, Director David Wilmot, Esq. wishes to be included in some of these discussions confidentially."); Pls.' Exh. 104 (May 5, 2005, email) ("I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting

2006 WL 2042962                                                                                      Page 9
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

their own horns.").

11. On May 9, 2005, OTS notified Mr. Bender that it was "considering whether to issue a cease and desist order, and to assess civil money penalties, against you for false and misleading statements" contained in Mr. Bender's May 2, 2005, letter to shareholders. Defs.' Exh. 208. Mr. Bender sent a detailed response to OTS, Pls.' Exh. 113, and OTS notified Mr. Bender on September 14, 2005, that no enforcement action would be taken. See Defs.' Exh. 214.

12. On May 10, 2005, OTS sent a letter to IFSB indicating its initiation of an investigation into the Committee Letter and asking IFSB to tell OTS "whether any officer, director or employee of Independence is affiliated with the Committee or has provided information to the Committee." Defs.' Exh. 209. The Bank conducted an "investigation" limited to officers (vice presidents and above) and Board members, which, naturally, failed to ask Mr. Chambers anything. Apr. 21, 2006, Hr'g Tr. 143-44 (Batties). The Bank's responses all declared no role in providing information to the Committee. Mr. Chambers helped process these inquiries and compile the response to OTS but, because "[t]he [Bank's] position was I believe it was Mr. Batties and the board members" who were asked to respond, he did not correct their erroneous response to OTS. Apr. 28, 2006, Hr'g Tr. 67 (Chambers). In fact, Mr. Chambers was intimately involved in developing the Committee Letter and creating the charade that a Committee even existed. Id. at 68.

*6 13. Mr. Batties and all Director Defendants have consistently denied any individual or Bank involvement with the preparation or mailing of the Committee Letter. See Defs.' Opp'n ¶ 27 ("No officer, director of employee of the Bank was involved with the Committee [L]etter."); Apr. 21, 2006, Hr'g Tr. 119-24 (Batties) (same). Those denials were obviously untrue but no one has so informed OTS, even now. By letter dated September 14, 2005, OTS notified the Bank that no enforcement action would be taken with regard to the May 4 Committee Letter. See Defs.' Exh. 215.

14. The shareholders' meeting scheduled for May 11, 2005, was continued to June 8, 2005. Because new proxy materials were not ready, the meeting was again continued to September 14, 2005. Mr. Bender filed an amended Schedule 13D [FN7] in early September, indicating that he had filed a change-of-control application with OTS and, upon its approval, would seek to increase his ownership interest to 51% through purchases from existing shareholders. Defs.' Exh. 211. As a result, the

Board continued the shareholders' meeting to October 26, 2005. [FN8] Trial Exh. 47.

**C. Communications In Advance of the October 26, 2005, Shareholders' Meeting**

15. On October 3, 2005, Mr. Bender sent a letter to IFSB shareholders which identified his nominees for directors as Osborne George and John Silvaneous Wilson Jr. ("Bender Nominees"). Trial Exh. 33. The letter explained that Mr. Bender was not soliciting proxies and that the only way to vote for the Bender Nominees was to attend the meeting in person or to send someone with a legal proxy.

16. The Bank distributed its proxy materials to shareholders on October 4, 2005. The Bank's nominees for directors were Marion O. Greene Jr. and Defendants Fitzgerald and Wilmot ("Management Nominees"). Trial Exh. 2.

17. On October 21, 2005, a letter was sent to shareholders by Gilbert Douglas and Catherine McPhail, IFSB shareholders. See Trial Exh. 3. Mr. Douglas drafted the letter with input from Mr. Chambers, who "responded positively" when Mr. Douglas suggested sending a letter. Apr. 28, 2006, Hr'g Tr. 75 (Chambers). Mr. Chambers reviewed and commented upon one or more drafts of the letter, id. at 77-78, put Mr. Douglas in contact with Impact Strategies so that the letter could be mailed, id. at 80, and helped Mr. Douglas find citations to bank documents for the text. Id. at 76-77. "[I]t did not occur" to Mr. Chambers that the Committee Letter had forced a postponement of the May 11 shareholders' meeting and that sending another letter might not be a good idea. Id. at 86.

**D. The Thompson and Doley Shares**

18. On March 3, 2005, Doley Securities LLC entered into an agreement to purchase all of the IFSB shares owned by Carver Bancorp Inc. ("Carver") for $10.50 per share. [FN9] Trial Exh. 58 (Securities Share Agreement). At the time, Carver owned 150,000 shares, or 9.47% of the total IFSB shares outstanding. See Trial Exhs. 58, 59. Prior to the purchase of Carver shares, Doley Securities and its affiliates owned 3,834 IFSB shares. Trial Exh. 59.

*7 19. Some of the shares purchased by Doley Securities were retained by that firm; some were sold to Logan Delany, a friend of Mr. Doley; and others were sold to clients of Doley Securities (collectively, "Doley Participants"). Doley Dep. 90-95. All told, the Doley Participants together owned 154,685 shares of IFSB stock, which was just under 10% of the total shares outstanding. Neither Doley Securities nor any of the Doley

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Participants has ever filed a Form 13D with OTS. *See* Trial Exh. 2 at 20-21; May 4, 2006, Hr'g Tr. 89 (Freedman).

20. Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005, Record Date for the Shareholders' Meeting, Jeffrey Thompson--a friend and client of Defendant Wilmot and a partner with Defendant Cobb in the same accounting firm--purchased 98,600 shares of IFSB stock. Trial Exh. 42. Mr. Thompson filed a Schedule 13D in late September indicating that he owned 111,600 shares, which is 7.2% of IFSB stock. *Id.*

21. On the evening of October 25, 2005, Mr. Doley was contacted by Ms. Jordan, who then connected Mr. Wilmot to the call at approximately 11 p.m. Doley Dep. 158-59; Apr. 21, 2006, Hr'g Tr. 74 (Wilmot). The parties discussed the sale of the Doley Participants' shares, to persons suggested by Mr. Wilmot. [FN10] Doley Dep. 158-62; Apr. 21, 2006, Hr'g Tr. 74-77 (Wilmot) (Wilmot suggested Jeffrey Thompson, Bob Johnson, and a Mr. Liggen). Immediately upon hanging up the telephone, Mr. Wilmot called Mr. Thompson and left a message, talked directly to Mr. Liggen, and then talked to Mr. Thompson. *Id.* at 76- 77.

22. The evidence shows that Mr. Thompson was willing to purchase the Doley Participants' stock, at $18 per share (well above market), conditioned upon Mr. Doley's voting all shares for the Management Nominees. *Id.* at 99; *see* Trial Exh. 70. However, a combination of the Doley Participants' stock and the stock Mr. Thompson already owned would exceed 10% of the Bank's outstanding shares; no such agreement could be reached without prior OTS approval. Apr. 21, 2006, Hr'g Tr. 101 (Wilmot); *see* 12 C.F.R. § 574.3(b). Apparently for this reason, Mr. Thompson directed his counsel, Daniel Weitzel, to prepare a purchase agreement for the Doley Participants' stock with Mr. Wilmot's name on it as the purchaser. *Id.; see* Trial Exh. 70. Mr. Weitzel forwarded the purchase agreement to Marie Wood, Mr. Wilmot's assistant, by email to her home on the evening of October 25, 2005. Defs.' Supp. Facts ¶ 3. Ms. Wood then forwarded Mr. Weitzel's email and attached draft purchase agreement to Mr. Doley during the evening of October 25, 2005. *Id.* ¶ 5. When Mr. Wilmot talked to Mr. Thompson "shortly after talking to Mr. Doley" around 1 a.m. on October 26, 2005, Mr. Thompson explained his plan. Mr. Wilmot testified that he responded, "[Y]ou can't do that." Apr. 21, 2006, Hr'g Tr. 101 (Wilmot).

23. Mr. Doley traveled from New York on October 26 to attend the shareholders' meeting, which was scheduled to start at 11 a.m. He planned to vote all Doley Participant shares for Mr. Bender's nominees. Delany Dep. 43 ("Q. And did Doley tell you that was his intention? A. Yes."). [FN11] In part because Mr. Doley had not arrived on time, Royer Dep. 51-52, and in part because Mr. Bender had made two challenges to the vote-counting procedure which threw the Board into a tizzy, the start of the meeting was delayed to 3 p.m. by the unilateral action of Ms. Jordan. Apr. 21, 2006, Hr'g Tr. 8 (Jordan). [FN12] As soon as Mr. Doley arrived, he was whisked away by Ms. Jordan to lunch at the Prime Rib, a local restaurant, even though the Bank was buying lunch for all shareholders at the Mayflower Hotel because the meeting was delayed. *Id.* at 34-35. According to Ms. Jordan, she and Mr. Doley did not at any time discuss the Bank. *Id.* at 34-36. The Court declines to credit this testimony: Ms. Jordan was a singularly incredible witness and, at a minimum, she would have explained to Mr. Doley why the meeting was continued to 3 p.m., but her denials were absolute.

*8 24. Mr. Royer and then Mr. Wilmot joined Ms. Jordan and Mr. Doley at the Prime Rib. A discussion ensued concerning whether there was a buyer for the stock Mr. Doley controlled. Apr. 21, 2006, Hr'g Tr. 39 (Jordan) ("There was a discussion of, it was Mr. Doley I guess inquiring whether there would be anyone interested in buying his stock and that he was interested in selling."). Messrs. Wilmot and Doley discussed a purchase whereby either Mr. Wilmot or a group assembled by Mr. Wilmot would purchase the Doley Participants' shares. Delaney Dep. 39-40; Doley Dep. 184-85; Royer Dep. 76. The price per share under discussion was either $17.00, Thompson Dep. 110-11, or $18.00, Delany Dep. 39- 40; Doley Dep. 184-85. A down payment of $1.00 per share was also discussed. Delany Dep. 50-51; *see also* Doley Dep. 185. [FN13]

25. An integral part of the sale agreement required Mr. Doley to vote the shares he controlled for the Management Nominees. Delany Dep. 39-40, 44; *see also* Trial Exhs. 70-77. Mr. Doley called Mr. Delany and said that he was going to vote for the Management Nominees and that Mr. Delany should do so as well. Delany Dep. 43-44. Mr. Doley told Mr. Delany "that there were a bunch of people from the community saying if Bender takes over the Bank, they were going to withdraw their money." Delany Dep. 38; *see also id.* at 46, 133. Mr. Delany's initial response to Mr. Doley's calls was negative; he said, "no, I am voting for Bender

because Bender knows how to make money."
Delany Dep. 39. Ultimately, Mr. Doley called after
he "met with a group of people"--at the Prime Rib--
and told Mr. Delany "that [Mr.] Wilmo[ ]t is
thinking about putting together a group that would
buy--that would be willing to buy my stock for $18
... but the condition of that was that the
management had to retain control of the Bank. I
asked Harold [Doley] whether that was real,
whether he had the money, and Harold said, yes, he
thought it was real and that he had the money." *Id.*
at 39-40. Mr. Delaney responded that he "still
thought that Bender knew how to make money,
Wilmo[ ]t could not write a check." *Id.* at 41. In
one call, Mr. Doley told Mr. Delany that he had
been promised a deposit worth $1 per share. *Id.* at
50; *see* Doley Dep. 185. Based on these
discussions, Mr. Delany agreed to vote his shares
for the Management Nominees. Delany Dep. 46.

26. Proxies representing the Doley Participants'
shares were faxed from Doley Securities in New
Orleans to the Mayflower Hotel on October 26,
2005, between 12:47 and 12:55 p.m. (presumably
Central Time). *See* Trial Exh. 56; Doley Dep. 47.
They were then voted by Mr. Doley for the
Management Nominees. *See* Trial Exh. 56.

27. At his deposition, Mr. Thompson produced an
Adams National Bank cashier's check dated
October 26, 2005, in the amount of $165,000,
made payable to David Wilmot, and apparently
endorsed by Mr. Wilmot. *See* Trial Exh. 78. The
tale of this check is convoluted and need not be
detailed here. Suffice it to say that, at the direction
of Mr. Wilmot's assistant, this check was deposited
into an escrow account at Mr. Wilmot's firm, and a
cashier's check dated October 26, 2005, in the
amount of $163,000 and made payable to Harold
Doley, was issued by United Bank, where "David
Wilmot & Associates" has two accounts. *See* Pls.'
Exh. 115. It is unclear whether the check for
$163,000 was ever delivered to Mr. Doley;
eventually, on November 14, 2005, it was returned
to United Bank and split between two law firm
accounts. The Court finds, based on the evidence
of record, that the check to Mr. Doley was
designed to provide the $1 per share earnest
money. It constitutes a clear and tangible piece of
evidence that there was an agreement to sell the
Doley Participants' shares on October 25, 2005.

*9 28. The sale of the Doley Participants' stock
never occurred. Delany Dep. 54-57. In fact,
Messrs. Doley and Delaney consulted counsel in
the weeks after the shareholders' meeting and were
told "do not reach an agreement, do not reach a
forward agreement, cease and desist from all

negotiations, there will be no agreement, written or
verbal." Doley Dep. 185. The legal problem was
that any "[s]hort swing profit" would have had to
have been disgorged to the Bank because the Doley
Participants' stock had been held for less than six
months. Delany Dep. 54-55. [FN14] Mr. Doley
complained that he had "been boondoggled or
snooked, whatever the word you use, by the people
at--at Independence." Doley Dep. 6. [FN15]

**E. The Shareholders' Meeting**

29. The Shareholders' Meeting was convened at 3
p.m. on October 26, 2005. During the course of the
meeting, Mr. Bender made two formal proxy
challenges. *See* Trial Exhs. 17, 18. Ms. Jordan
promptly ruled the challenges "out of order," Apr.
21, 2006, Hr'g Tr. 43 (Jordan), and the Independent
Inspector of Elections ("IIOE") "did not want to go
against the wishes of the Chair." Dunlop Dep. 92.
As a result the IIOE "did not rule on the
challenges, and really did not consider the
challenges." *Id.* at 114.

30. One of Mr. Bender's challenges was based on
the fact that the master ballot (which represented
proxies received by management) was submitted to
the IIOE without allocating the votes among the
candidates. Trial Exh. 17. Thus, after the Director
Defendants received the report reflecting the
proxies giving authority to management to vote,
Trial Exh. 12, the Director Defendants were able to
allocate their votes in such a way as to ensure the
election of two of the Management Nominees.
[FN16] This allocation took place on October 28,
2005, long after the polls closed on October 26,
2005. *Id.*

31. The second of Mr. Bender's challenges was
based on the fact that votes by brokers who had not
received instruction from the owner of shares held
by the broker were counted in favor of
Management Nominees, despite the clear
instructions in the Bank's proxy materials to the
contrary. Trial Exh. 18. Before the Shareholders'
Meeting, the Bank had told its shareholders:

Q. What will happen if I abstain from voting or fail
to vote?

A.... If you fail to vote for the election of directors,
the votes of those supporting Bender's nominees
will have a greater impact in helping Bender gain
operating control of the Bank.

....

Q. If my broker or other nominee holds my shares
for me, will my broker or such other nominee vote
those shares for me?

A. Your broker or other nominee will vote your
shares only if you provide instructions on how to

2006 WL 2042962                                                                                    Page 12
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. **Your broker will not vote your shares without your instructions.**

*10 Trial Exh. 2 at 11. Both of these answers were incorrect, Apr. 28, 2006, Hr'g Tr. 119 (Riley), and votes cast by brokers who were not instructed on how to vote were all counted for the Management Nominees, in an amount of approximately 396,000 shares. May 2, 2006, Hr'g Tr. 82 (Freedman). [FN17]

32. The non-instructed broker votes were counted for the Management Nominees pursuant to the "10-day rule" of the New York Stock Exchange. Apr. 28, 2006, Hr'g Tr. 102 (Riley) ("[T]he New York Stock Exchange has a rule that allows the brokers to vote the shares of people who have not responded to them [to give instructions on how to vote].... If they haven't responded in 10 days prior to the meeting and it's a routine matter, the broker has the right to vote those shares on that routine matter."). Only "smart investors" would know that the consequence of not instructing your broker is that the broker votes for management. *Id.* at 128. When a Board election is not "contested," it is considered a routine matter on which non-instructed brokers automatically vote for management.

33. Although Mr. Bender proposed two nominees to the IFSB Board who were running in opposition to the management candidates, the election at the October 2005 Shareholders' Meeting was not considered "contested" in the parlance of Wall Street. As explained by Mr. Riley, "A contested election is one in which there are two proxies, and two proxy committees and material is sent out to the stock holders ... from both sets of [committees]." Apr. 28, 2006, Hr'g Tr. 106 (Riley). When, as here, there are two nominated slates without competing proxies, it is not considered a "contested" election because "a contested election requires a mechanism to gather votes.... [T]he only way that the, the [S]treet and the industry [have] of conducting a contested election is to have two sets of proxies." *Id.* at 106-07. The situation facing Mr. Bender--in which OTS approved his proxy material and told him he could solicit votes but could not collect proxies--created a "Catch-22." *Id.* at 148. With "two slates in competition with each other ..., a contest exist[ed]" *in fact* but was not recognized by ADP Proxy Services, the company that collected the votes, because only the Bank was allowed to solicit proxies. *Id.* at 146-47.

34. Mr. Riley opined that "[t]he practice of

allocating votes [after the polls close] is available to both the management proxy committee, and to a competing proxy committee if one exists. This process insures that neither side in a contested election has an undue advantage after the votes have been cast." *Id.* at 161. The process "only works" when competing sides can allocate their votes at the same time. *Id.* In the October 2005 Board election, however, Mr. Bender was forced to allocate his votes while the polls remained open and the Defendant Directors allocated their votes two days later.

35. The Court finds that counting the broker "routine" votes for the Management Nominees was in direct contradiction to the Proxy Statement issued by the Bank. The Court also finds that the Bank's Proxy Statement was materially wrong: it said that a failure to instruct a broker on how to vote would (1) help Mr. Bender and (2) result in no vote being cast. In fact, a failure to instruct a broker on how to vote (1) resulted in a vote for the Management Nominees and (2) reduced the chances that any of Mr. Bender's candidates would be elected. Given the Bank's intense attention to broker votes, [FN18] the Court also finds that it is likely that the misstatement in the Bank's proxy materials was intentional.

## II. LEGAL STANDARDS
### A. Preliminary Injunction

*11 [1][2] In considering a request for preliminary injunctive relief, a court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs. Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C.Cir.1998). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360-61 (D.C.Cir.1999). A particularly strong showing on one or more factors can mitigate a weaker showing on another. *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995); *Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843-45 (D.C.Cir.1977). A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C.Cir.2004).

### B. Motion to Dismiss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                              Page 13
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

In addition to opposing the Plaintiffs' application for preliminary injunctive relief, Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The plaintiffs need not plead the elements of a prima facie case in the complaint. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C.Cir.2000). In deciding a Rule 12(b)(6) motion, the court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F.Supp.2d 191, 196 (D.D.C.2002) (citation omitted).

### III. DISCUSSION
### A. Count I: Section 13(d) of the Exchange Act

Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. SEC v. Bilzerian, 29 F.3d 689, 692 n. 3 (D.C.Cir.1994). In Count I, Mr. Bender alleges that the Director Defendants and Mr. Batties violated § 13(d) by acting as a group, together with Messrs. Thompson and Doley, to acquire, hold, vote, or dispose of more than 5% of IFSB's outstanding stock and that no Schedule 13D was ever filed. Mr. Bender seeks injunctive relief--but not damages--to remedy Defendants' alleged violations of § 13(d). Complaint ¶¶ 41-49; Pls.' Opp'n to Defs.' Mot. at 4.

#### 1. Standing

**\*12** As a preliminary matter, Defendants move to dismiss on the ground that an implied private right of action for injunctive relief is available, if at all, only to an issuer of securities--not an individual shareholder. Defs.' Mot. at 3-4. The issue before the Court, then, is whether Congress intended to provide a private remedy to individual shareholders, in the form of injunctive relief, for violations of § 13(d) of the Exchange Act. This question has not been definitively answered in this circuit.

[3][4][5] The analytical starting point is Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which "articulated four factors for the courts to weigh in discerning congressional intent to provide an implied private right of action." Tax Analysts v. IRS, 214 F.3d 179, 185 (D.C.Cir.2000). The four Cort factors, as they are now known, are:

> (1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

Id. at 185-86 (quoting Cort, 422 U.S. at 78, 95 S.Ct. 2080). The Cort factors are not necessarily entitled to equal weight, however, and the "central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action." Touche Ross & Co. v. Redington, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). "The question of the existence of a statutory cause of action is, of course, one of statutory construction." Id. at 568, 99 S.Ct. 2479. The appropriate starting place is therefore the text of the statute itself. Id. In divining legislative intent, courts also look to the design of the statute as a whole and, to the extent useful, legislative history. See, e.g., Edelson v. Ch'ien, 405 F.3d 620, 632-33 (7th Cir.2005).

[6][7] In this enterprise, the Court is not without guidance. The Courts of Appeals are in widespread agreement that § 13(d) creates an implied private right of action for injunctive relief brought by an issuer of securities. See, e.g., GAF Corp. v. Milstein, 453 F.2d 709, 719-20 (2d Cir.1971); Dan River Inc. v. Unitex Ltd., 624 F.2d 1216, 1224 (4th Cir.1980); Indiana Nat'l Corp. v. Rich, 712 F.2d 1180, 1185 (7th Cir.1983); Fl. Comm. Banks v. Culverhouse, 772 F.2d 1513 (11th Cir.1985); Chevron Corp. v. Pennzoil Co., 974 F.2d 1156, 1158 (9th Cir.1992). What is critical to recognize is that these decisions rest on the concept that the issuer's standing under § 13(d) is representational. Indeed, § 13(d) was not enacted for the benefit of the issuer; its "sole purpose was the protection of shareholders." Indiana Nat'l, 712 F.2d at 1185. It is "for this limited purpose, therefore, [that] the issuer corporation acts on the shareholders' behalf in bringing a suit for injunctive relief until an accurate Schedule 13D is filed." Id.

**\*13** The reasons for this are practical and widely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recognized. One is that because Schedules 13D must be sent to the issuer and the SEC or OTS--but not to shareholders--shareholders normally do not have immediate access to the filings. *Indiana Nat'l,* 712 F.2d at 1184; *GAF Corp.,* 453 F.2d at 721. Another is that shareholders are "generally unaware of the necessary background information to judge the truth or falsity of the statements" in a Schedule 13D. *GAF Corp.,* 453 F.2d at 721. In short, the cases recognize that shareholders often do not have the knowledge, expertise, or incentive to maintain an action under § 13(d) and, for that reason, allow an issuer to maintain an action on the shareholders' behalf. They do not, however, suggest that a shareholder who *does* have such knowledge and expertise cannot maintain an action on his own--rather, it is from this antecedent concept that the issuer's standing flows. Indeed, this much was assumed in the earliest cases, *see GAF, 453 F.2d at 719 & n. 21,* and is not called into question by the more recent ones, *see, e.g., Sea Containers,* 890 F.2d at 1208 (ruling on a § 13(d) claim by plaintiff, an issuer, and a § 13(d) counterclaim by defendant, a minority shareholder, without specifically addressing the standing issue). And this conclusion is consistent with the D.C. Circuit's recognition that § 13(d) "was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation." *SEC v. Savoy Industs. Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978); *see also Sea Containers,* 890 F.2d at 1209; *Edelson,* 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."). [FN19]

In support of a contrary conclusion, Defendants cite district court cases holding that shareholders cannot mount a private right of action for *damages* under § 13(d). Defs.' Mot. at 3-4 (citing, *inter alia, Berman v. Metzger,* No. 80-0394, 1981 WL 1596, at *1, 1981 U.S. Dist. LEXIS 10866, at *2 (D.D.C. Feb. 9, 1981)). The considerations governing the right to injunctive relief, however, are quite different, *see, e.g., Hallwood Realty Partners v. Gotham Partners,* 286 F.3d 613, 620-21 (2d Cir.2002) (concluding that injunctive relief, but not damages, furthers congressional intent), and the damages cases do not control the outcome here.

[8][9] Contrary to Defendants' protestations, the Court makes no new law here; it merely recognizes

what has always been assumed: Because the foundation for the issuer's standing is its action on behalf of shareholders, a shareholder *a fortiori* has standing to seek injunctive relief. Even were this not the case, it would be appropriate to recognize a shareholder's standing here. In a battle for corporate control, it has long been understood that § 13(d) was not meant to be a weapon wielded only by issuers attempting to fend off takeover bids. *Rondeau,* 422 U.S. at 58, 95 S.Ct. 2069. In fact, not two years ago, the Bank, presumably at Defendants' direction, sought injunctive relief against Plaintiffs under § 13(d). *Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203 (D.D.C.2004). [FN20] "[W]here a legal structure of private statutory rights has developed without clear indications of congressional intent, the contours of that structure need not be frozen absolutely when the result would be demonstrably inequitable to a class of would-be plaintiffs with claims comparable to those previously recognized." *Va. Bankshares v. Sandberg,* 501 U.S. 1083, 1104, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). To place the parties on the "same footing," it is appropriate to consider "policy reasons for deciding where the outer limits of the right should lie." *Id.* at 1104-05, 111 S.Ct. 2749. Here, both congressional intent and fundamental fairness demand that if an issuer can advance a private right of action to defend shareholder rights, shareholders must have a private right of action against hidden machinations by that issuer's directors. Preserving the availability of injunctive relief under § 13(d) to shareholders as well as issuers "avoid[s] tipping the balance" that Congress sought to achieve. *Rondeau,* 422 U.S. at 58, 95 S.Ct. 2069; *see Hallwood,* 286 F.3d at 621.

*14 Because a private right of action is "consistent with the legislative scheme and necessary for the protection of investors," *Rondeau,* 422 U.S. at 62, 95 S.Ct. 2069, the Court will deny Defendants' motion to dismiss as to this claim.

**2. Likelihood of Success on the Merits**

[10] As noted above, § 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, [FN21] the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *Bilzerian,* 29 F.3d at 692 n. 3. In addition, an amendment must be submitted "promptly" any time there is a "material change" in the facts set forth in the Schedule 13D. 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). The SEC has promulgated regulations reiterating and elaborating

on these statutory requirements. These regulations define a "material change" to mean "[a]n acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities." 17 C.F.R. § 240.13d-2(a). [FN22] A "beneficial owner" includes, in turn, "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares ... [v]oting power which includes the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3(a). Finally, the regulations provide:

> when two or more persons agree to act together for the purpose of acquiring, holding, *voting* or disposing of equity securities of an issuer, *the group formed thereby shall be deemed to have acquired beneficial ownership,* for purposes of Section 13(d) and (g) of the [Exchange] Act, *as of the date of such agreement,* of all equity securities of that issuer beneficially owned by any such person.

17 C.F.R. § 240.13d-5(b)(1) (emphasis added). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Morales v. Quintel Entm't Inc.,* 249 F.3d 115, 124 (2d Cir.2001). Such a group "need only have combined to further a common objective regarding one of the [listed] ... activities." *Id.; see also Gen. Aircraft,* 556 F.2d at 95.

The Court concludes that there is a substantial likelihood that Mr. Bender will succeed on the merits of demonstrating that the Director Defendants, through their chairman and vice chairman, acted as a group with Mr. Thompson to acquire the Doley Participants' shares--and voting power--to solidify their control of the IFSB Board. The record facts strongly suggest that, on the eve and day of the Shareholders' Meeting, Ms. Jordan and Mr. Wilmot facilitated Mr. Thompson's purchase of the Doley Participants' shares, on the express condition that Mr. Doley would vote those shares for the Management Nominees.

On the evening of October 25, 2005, Ms. Jordan and Mr. Wilmot spoke with Mr. Doley regarding the sale of the Doley Participants' shares. Mr. Wilmot recommended Mr. Thompson, among others, as a buyer. On the condition that the shares be voted for the Management Nominees, Mr. Thompson agreed to buy them, and in an effort to avoid OTS oversight, proposed a sale using Mr. Wilmot as an intermediary; however, the draft purchase agreement, though circulated by Mr. Thompson's counsel to both Mr. Wilmot's assistant and Mr. Doley, was never signed.

At the end of the night, the shares remained in the Doley Participants' hands, and Mr. Doley apparently intended to vote them for the Bender nominees at the Shareholders' Meeting.

**\*15** The Shareholders' Meeting on the next day was delayed, at least in part, because Mr. Doley was running late. When he arrived, he was whisked away by Ms. Jordan to the Prime Rib, where the two were joined by Messrs. Royer and Wilmot. Negotiations ensued regarding the purchase of the Doley Participants' shares by Mr. Wilmot or a group--again, provided that Mr. Doley would vote those shares for the Management Nominees. A sale price of $17-18 per share, with an earnest money deposit of $1 per share, was discussed. *Mirabile dictu,* Mr. Doley did, in fact, vote the Doley Participants' shares for the Management Nominees.

[11] On these facts, the Court readily concludes that Ms. Jordan and Mr. Wilmot, acting on behalf of the Director Defendants, agreed to act together with Mr. Thompson for the purpose of acquiring, holding, and--at a bare minimum--voting the Doley Participants' shares held by Mr. Doley. This group is thus deemed to have acquired beneficial ownership for purposes of Section 13(d) as of the date of such agreement, *see* 17 C.F.R. § 240.13d-5, which the Court finds to be no later than midday on October 26, 2005. That the actual sale of the Doley Participants' shares may never have been consummated is of no consequence here; the group, as described above, beneficially owned those shares because, as a condition of the agreement, it acquired voting power over them. *See* 17 C.F.R. § 240.13d-3(a). By acquiring voting power over the Doley Participants' shares, which constituted nearly 10% of the Bank's outstanding shares, the group exceeded the 5% threshold set forth in § 13(d), and was required to file a Schedule 13D within 10 days, which it indisputably failed to do. [FN23]

Despite the efforts of all IFSB witnesses to obscure and obfuscate, enough light has been shone into dark corners to find it substantially likely that Mr. Bender will demonstrate that the Director Defendants, acting through Ms. Jordan and Mr. Wilmot, violated § 13(d) of the Exchange Act.

**B. Count II: Section 14(a) of the Exchange Act**

**1. Standing**

In Count II, Plaintiffs seek damages and injunctive relief for Defendants' alleged violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), which

governs the solicitation of proxies. Compl. ¶¶ 50-87; Pls.' Opp'n to Defs.' Mot. at 8.

[12] "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines Holdings Inc. v. Mesa Air Group,* 295 F.Supp.2d 75, 81-82 (D.D.C.2003) (omission in original). Defendants argue that Plaintiffs must allege shareholder reliance to prove that the proxy solicitation was an essential link. Defs.' Mot. at 6. Specifically, although they concede that a plaintiff bringing a direct claim under § 14(a) does not have to allege that he *personally* relied on a misrepresentation, *see Cowin v. Bresler,* 741 F.2d 410, 427 (D.C.Cir.1984), they contend that a nonrelying plaintiff must allege reliance by *other* shareholders. Defs.' Mot. at 6. A close reading of *Cowin,* however, reveals no such limitation.

*16 Mr. Cowin, a minority shareholder in Bresler & Reiner, a property management company, sued that company and its directors for various violations of the securities laws, including § 14(a). As a remedy for the defendants' violations of the proxy rules, Mr. Cowin sought to set aside the elections of the defendant directors. *Cowin,* 741 F.2d at 425. The *Cowin* court reversed the district court's determination that a nonrelying plaintiff lacked standing to assert a direct, as opposed to a derivative, equitable action under § 14(a). *Id.* at 426. In so doing, it characterized Mr. Cowin's claim as follows:

> The injury Cowin alleges was not caused by his individual reliance on deceptive proxy solicitations. Rather, his claim is that other shareholders elected [the defendant] directors because they were misled by the proxy materials.... This injury is totally divorced from any reliance, or lack of reliance, on Cowin's part and falls precisely into the scope of injury that Congress sought to protect.

*Id.* at 427. It is presumably from this language that Defendants derive the limitation they propose; that is, that while *Cowin* frees plaintiffs from the burden of alleging their own reliance, it imposes the requirement that plaintiffs allege the reliance of *other* shareholders. This proposition is nowhere directly stated in *Cowin* and it is, in fact, substantially undercut by other portions of the same opinion. The *Cowin* court straightforwardly said, "Regarding section 14(a), however, we find no language in the relevant statutory materials that leads us to conclude

that reliance is a prerequisite to standing under that section." *Id.* at 426. To the same effect, "It cannot be said then that the language of the statute and the regulation constrains us to find reliance a necessary predicate to standing under section 14(a)." *Id.* at 427. This Court can imagine no clearer language by which the *Cowin* court could have indicated that reliance, whether on the part of plaintiff or other shareholders, is simply not required.

Faced with a situation in which the "neither the congressional enactment nor the administrative regulations offer[ed] conclusive guidance," the *Cowin* court proceeded to "take into account [the] various policy considerations" that animate § 14(a). *Id.* at 427 n. 22. One purpose the court identified was "to protect investors from 'promiscuous' proxy solicitations by 'unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.' " *Id.* at 427 (quoting S.Rep. No. 73-1455, at 77 (1934)). The court concluded: "Because the controlling statutory materials are silent on the question and because we believe a contrary rule would partially frustrate congressional policy, we find that Cowin has standing to pursue his section 14(a) claims." *Id.* at 428. Recognizing the same policy considerations, this Court finds that requiring Plaintiffs to allege reliance by other shareholders "in these circumstances would serve no legitimate policy and ... decline[s] to do so." *Id.* at 427.

*17 [13][14] The fundamental flaw in Defendants' argument is that the touchstone of the analysis is not reliance, but materiality. As the Supreme Court has explained,

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

*Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). And, as the Ninth Circuit has cogently explained, "As materiality is an objective standard, it should not matter whether any

particular shareholder was actually misled by the challenged misrepresentations." *Stahl v. Gibraltar Fin. Corp., 967 F.2d 335, 337 (9th Cir.1992). [FN24]* Thus, based on *Cowin, Mills, and Stahl,* the Court concludes that Plaintiffs need not allege other-shareholder reliance to maintain a § 14(a) claim. Defendants' motion to dismiss will therefore be denied as to this claim.

## 2. Likelihood of Success on the Merits

[15][16] Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Cowin, 741 F.2d at 426* (quoting 15 U.S.C. § 78n(a)). Rule 14a-9, promulgated pursuant to this authority, expressly prohibits false or misleading proxy solicitations:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Id. at 426-27* (quoting 17 C.F.R. § 240.14a-9). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines, 295 F.Supp.2d at 81-82 (D.D.C.2003)* (omission in original). The term "solicitation" includes, *inter alia,* any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).* "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The issue of materiality is a mixed question of law and fact that "involves a delicate assessment of the inferences a reasonable

shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder." *Berg v. First Am. Bankshares, 796 F.2d 489, 495 (D.C.Cir.1986).*

*18 Mr. Bender's allegations in Count II stem from three different communications: (1) the May 4, 2005, Committee Letter; (2) a letter from Ms. Jordan and Mr. Batties titled "Update to Our Shareholders" and related proxy materials circulated by management on October 4, 2005 (the "Management Proxy"); and (3) a letter sent to shareholders on October 21, 2005, purportedly by shareholders Catherine McPhail and A. Gilbert Douglas (the "McPhail/Douglas Letter").

### a. The communications qualify as solicitations

[17][18] As an initial matter, each of the communications referenced above qualifies as a "solicitation" for purposes of Rule 14a-9. The record clarifies that the May 4 Committee Letter was part of a "grass roots" strategy concocted by Mr. Chambers, a bank employee, and Judy Smith, of Impact Strategies, intended to persuade its recipients, including a list of small shareholders, to "not sell[ ] to [B]ender or his allies," Pls.' Exh. 106, in the days before the Shareholders' Meeting then set for May 11, 2005. The letter specifically advocated a "yes" vote for "the Board Slate." Trial Exh. 1 at 1. Engineered by the Bank and sent just days before a contested election, the Committee Letter constitutes a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). There is no question that the Management Proxy, to which the Update Letter was attached, constitutes a proxy solicitation. And as to the October 21 McPhail/Douglas Letter, Mr. Chambers and Impact Strategies again played a substantial role, reviewing and editing drafts and providing inside information known only to the Bank. That letter, while not explicitly urging a vote in favor of the Management Nominees, generally questioned Mr. Bender's past performance and present motives, alleged various regulatory violations by Mr. Bender, lauded the "imagination and courage" of the incumbent directors, and pressed shareholders to "DO THE RIGHT THING!!" Trial Exh. 3 at 1-2. As such, it also qualifies as a solicitation under 17 C.F.R. § 240.14a-1(*l*)(1)(iii).

### b. The communications contained false and misleading statements and omissions

2006 WL 2042962
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

Page 18

[19] The three protested communications contained multiple false and misleading statements. In the interests of speed, if not comprehensiveness, the Court will not here catalog the entirety of the false information and misinformation promulgated by the Defendant Directors and Mr. Batties in anticipation of the Shareholders' Meeting that finally took place on October 26, 2005, though much more ink could be spilled on this topic.

The deception in the Committee Letter began with the first sentence, which claimed that the Committee itself was an "independent group of concerned local citizens, shareholders, and loyal customer[s]" when, of course, the Committee was a phantom part of a Bank-led PR drive. Trial Exh. 1. The "Timeline" portion of the letter, purportedly "compiled from public records, news, concerned shareholders[,] and depositors," implied that OTS regulation of the Bank was entirely one-sided in Mr. Bender's favor; stated that the Board members sympathetic to Mr. Bender were "cronies [that] will ... do his bidding"; and emphasized that Mr. Bender's nominees, though both African-American, were "mere puppets of Bender's with no apparent ties to banking, required to do what he tells them." *Id.* Each of these statements was false. The full record of years of litigation demonstrates that OTS supervision, though not always prompt, has been evenhanded, and that the Board members sympathetic to Mr. Bender have been neither puppets nor cronies, but directors exercising independent judgment, as evidenced by their vote, to Mr. Bender's chagrin, in favor of the Carver merger.

**\*19** A consistent theme of the Management Proxy was that Mr. Bender has repeatedly hauled the Bank into court, each time hurling baseless accusations against the directors and draining the Bank's coffers. Specifically, it states that Mr. Bender "institut[ed] a lawsuit seeking to impose personal liability on those Directors, in each case, in the view of the Majority Directors, without citing any reasonable factual basis." Trial Exh. 2 at 3. The Court is left unsure to which litigation this statement refers. By its count, the instant case is the fifth between Mr. Bender and the Bank. [FN25] Of the four previous suits, three were brought by Mr. Bender, but none was taken in bad faith or lacked a reasonable factual basis. In fact, two were voluntarily dismissed by Mr. Bender after he received the precise relief he sought. Moreover, that the Bank couched its statement in the words of an opinion--"in the view of the Majority Directors"-- does not cure its infirmity. *See Va. Bankshares,* 501 U.S. at 1093, 111 S.Ct. 2749 ("[E]xpressions of such

judgments can be uttered with knowledge of truth or falsity just like more definite statements ...."); *see also id.* at 1094, 111 S.Ct. 2749 (quoting *Vulcan Metals Co. v. Simmons Mfg. Co.,* 248 F. 853, 856 (2d Cir.1918) (L. Hand, J.) ("An opinion is a fact.")).

Sticking with this theme, the Management Proxy blamed Mr. Bender for every difficulty the Bank has faced in the last several years, without noting or taking any responsibility at the Board or Officer level for decisions that have proved costly and detrimental to the Bank and its reputation. For instance, the Update Letter attributes the Bank's extraordinary legal expenses in 2003 to Mr. Bender when, in fact, the Bank was the plaintiff against Mr. Bender and could have avoided that litigation, *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004), and its expenses were magnified by three lawsuits in connection with the Washington Teachers' Union scandal, which was the huge misstep that precipitated the Bank's slide in the first place. In fact, one of the Washington Teachers' Union suits, brought in early 2003, is alive and well today, and surely continues to deplete the Bank's resources. *Am. Fed'n of Teachers v. Bullock,* No. 03-79 (D.D.C.2006). The proxy statement omitted all mention of this litigation expense.

The Management Proxy also asserted that "Management has advised the OTS that [the Committee] was not associated with the Bank or its management." Trial Exh. 2 at 5. That statement, although superficially true (the Bank did so advise OTS), was nonetheless misleading in communicating that the Committee was unassociated with the Bank, when it was, in fact, a creature of the Bank's own creation. *See Va. Bankshares,* 501 U.S. at 1092, 111 S.Ct. 2749 ("Such statements are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed."). Perhaps the Management Proxy's most critical misstatement, though, was its instruction that shares held by brokers would not be voted unless the shareholder instructed otherwise. However, all such votes were cast for the management slate. This instruction was plainly false, as the Bank was well aware preceding the vote. [FN26] Indeed, this much was recognized by the Bank's own expert witness, who testified that the instructions in the Management Proxy were "mistaken" or "not right." Apr. 28, 2006, Hr'g Tr. 119:22-24 (Riley).

**\*20** The McPhail/Douglas letter suffers from many of the same defects as the earlier communications. It

again suggested that OTS favors Mr. Bender, asking at one point "why OTS has behaved so contrary to banking laws, security regulations[,] and sound public banking policy to facilitate handing *Our Bank* to this Bender character?" Trial Exh. 3 at 1. Its assertion that "[t]he only time we are aware we got into U.S. District Court with Bender--though expensive--Independence Won, Bender Lost!" was plainly misleading, as explained above, in that it omits reference to three other actions between the parties, two of which Mr. Bender voluntarily dismissed after receiving favorable relief, and one of which settled after a ruling unfavorable to the Bank. *See supra* n. 25. In view of the editorial control over this letter exerted by Mr. Chambers, and Mr. Batties' supervisory control over Mr. Chambers, insertion of the hedging phrase "we are aware" does not alter this conclusion.

Under Rule 14a-9, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation" may be misleading. 17 C.F.R. § 240.14a-9 n.(b); *see United States v. Matthews,* 787 F.2d 38, 46 (2d Cir.1986). The communications reviewed above were thinly veiled efforts to question Mr. Bender's character and bona fides as a friend of the African-American community. The Committee Letter stated outright that Mr. Bender has "no regard for the African American community" and seeks control of the bank to satisfy his "personal greed." It touted the Bank's role in "helping the African-American community prosper and grow, as well as bridge gaps among all races," yet suggested that Mr. Bender is simply trying to "line [his] own pockets" at the expense of that history. It accused him of "bully tactics" and argued that he will "destroy the independent, minority character of IFSB." And it alleged that his nominees, though African-American, were but puppets, and that Mr. Bender was the puppeteer. The McPhail/Douglas letter contained similar overtones, accusing Mr. Bender of pushing another "black bank ... to failure."

The intent behind these letters is not seriously in question: In Mr. Chambers's own words, "Bender's putative nominees have been painted ... as innocent puppets at best, racial traitors at worst." Pls.' Exh. 104. The Court does not challenge the Bank's ability to question, as part of its solicitations, whether Mr. Bender--who has always been frank about his intentions to gain control of the Bank--has the best interests of the African-American community at heart. But while it is clear that Mr. Bender and the

majority of the Bank's Directors have different ambitions for the Bank, changing its identity as a minority institution is not among them; in fact, the evidence shows that Mr. Bender considers the Bank's minority character advantageous. May 4, 2006, Tr. 94-96 (Bender). And the Court also finds that the Committee Letter's questioning of the Bender Nominees' racial loyalty-- "Even though those men are both African Americans[,] they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them"-- was a direct assault on their character with no factual basis. *See* 17 C.F.R. § 240.14a-9 n.(b).

### c. The false and misleading statements were material

*21 [20] Third, there is little question but that these false and misleading statements were material, that is, that there is a substantial likelihood that a reasonable shareholder would have considered them important in deciding how to vote. *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126. In view of the Bank's attempt to use Mr. Bender as a scapegoat for its myriad financial woes, a reasonable investor would have lent importance to the facts that management decisions and unrelated lawsuits are to blame for much of the Bank's litigation expenses; that Mr. Bender has not abused the judicial process or brought baseless suits against the Bank or its Directors; and that the Bank's charges of OTS favoritism are greatly exaggerated. Even more critically, however, a reasonable shareholder would have attached significance to the fact that the Committee to Save IFSB was in no sense "independent" as claimed by its materials, any more so than the McPhail/Douglas letter was an independent creation of its purported authors. In battles for political control, by way of comparison, the voting public often considers who sponsors a particular advertisement in determining the weight to accord it. The same principle holds true in a battle for corporate control. The shareholders would surely find it important that Bank staff had editorial control over the Committee Letter and the McPhail/Douglas Letter, and that the statements therein might best be evaluated with skepticism. Finally, a voter whose shares are held by his broker, but who is informed that those shares would not be voted unless he instructed his broker to do so, would want to know that the opposite was, in fact, the case.

### d. The material falsehoods caused injury for purposes of § 14(a)

[21][22] "Where there has been a finding of

materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." _Mills, 396 U.S. at 385, 90 S.Ct. 616._ In _Mills,_ although a majority stockholder controlled just over half of the outstanding shares, a two-thirds majority was required to approve the merger at issue. _See Va. Bankshares, 501 U.S. at 1099, 111 S.Ct. 2749._ The Court found that the plaintiffs established the requisite "essential link" by "showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation." _Mills, 396 U.S. at 386, 90 S.Ct. 616._ The Court expressly reserved the question "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." _Id._ at 385 n. 7, 90 S.Ct. 616.

Two decades later, in _Virginia Bankshares,_ the Court addressed the question left open in _Mills._ In that case, the majority shareholder, who held 85% of the bank's shares, favored a merger; the remaining 15% of the shares were scattered among 2,000 minority shareholders. _Va. Bankshares, 501 U.S. at 1088, 111 S.Ct. 2749._ In advance of the shareholders' meeting, at which the merger proposal was to be submitted to a vote, the directors issued a proxy statement to the minority shareholders asserting that the price offered was "high" and "fair," which the Court found materially misleading. _Id._ The Court nonetheless denied relief, holding that the plaintiffs had failed to proffer a theory of causation under which the solicitation was "essential" in the sense required by _Mills,_ namely, where "the solicitation links a directors' proposal with the votes legally required to authorize the action proposed." _Id._ at 1102, 111 S.Ct. 2749; _see also id._ at 1100, 111 S.Ct. 2749 (describing _Mills_ as holding that "causation of damages by a material proxy misstatement could be established by showing that minority proxies necessary and sufficient to authorize the corporate acts had been given in accordance with the tenor of the solicitation"). In the context of merger proposals, _Virginia Bankshares_ has been interpreted as holding that "the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision," though that "does not necessarily mean a causal link between the proxy and some other injury may not exist." _Wilson v. Great Am. Indus., 979 F.2d 924, 931 (2d Cir.1992); see also Boone v. Carlsbad Bancorp. Inc., 972 F.2d 1545,_ 1557 (10th Cir.1992) ( "The Court [in _Virginia Bankshares]_ generally rejected theories of causation presented by shareholders whose participation was not needed for corporate action....").

**\*22** Here, it is evident that management did not have enough votes to ensure the election of their slate of directors; hence, the solicitations were a critical part of their strategy to convince non-management shareholders to vote in favor of the Management Nominees. The Defendant Directors were plainly worried that their control of the Board was in jeopardy, as made apparent by their desperation to woo minority shareholders just days before the election. The Committee Letter was one facet of a multi-pronged grass-roots campaign that also involved media coverage and lobbying efforts. Pls.' Exh. 106. As the May 2005 meeting approached, a list of smaller shareholders was compiled, _id.,_ and pressure mounted to send out the Committee mailings "immediately." Pls.' Exh. 105. By May 5, the "bigger shareholders ha[d] been contacted" with uncertain effect. Pls.' Exh. 104. And as of October 21, just days before the rescheduled Shareholders' Meeting, Ms. Finlayson fretted that, "In terms of the voting tallies, the numbers are very discouraging." Pls.' Exh. 102.

For the purposes of preliminary injunctive relief, Mr. Bender has sufficiently demonstrated the likelihood of a causal connection between the above-described solicitations and the election of the Management Nominees because the votes of minority shareholders were necessary to elect the management slate, and the solicitations were an essential link in securing those votes. _See Va. Bankshares, 501 U.S. at 1102, 111 S.Ct. 2749._

### C. Count III: Corporate Bylaws and Robert's Rules of Order

In Count III, Plaintiffs seek injunctive relief for Defendants' alleged violations of the Bank's bylaws and Robert's Rules of Order in connection with their conduct of the October 2005 Shareholders' Meeting.

#### 1. "Standing" [FN27]

[23] Defendants move to dismiss on the ground that claims based on a violation of corporate bylaws or Robert's Rules of Order must be brought derivatively, not directly. Defs.' Mot. at 9. Although Defendants concede that there is no case law directly on point, they would characterize such claims as complaints of "improper management" that, under _Cowin, 741 F.2d at 414,_ belong to the corporation and not its minority

stockholders. Defs.' Mot. at 9. They further argue that Plaintiffs have alleged no individual injury, unique to themselves, that differentiates them from any other shareholder.

[24] As Defendants recognize, however, a plaintiff can still bring a direct action--even when there is harm done to the corporation generally--if he alleges a "special injury" unique from that suffered by the corporation. *Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 901 (D.C.Cir.1999); *Cowin*, 741 F.2d at 415. Such "special injury" can arise in two contexts: "first, where the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, or second, where the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends." *Labovitz*, 172 F.3d at 901; *see also Cowin*, 741 F.2d at 415.

*23 Plaintiffs' allegations here describe a special injury that falls within this second category of harms. Though Defendants correctly observe that Plaintiffs allege that "Defendants have deprived Plaintiffs *and the other shareholders* of a fair vote for the election of directors," Compl. ¶ 69 (emphasis added), suggesting that Plaintiffs were harmed only to the same extent as all other shareholders, *see* Defs.' Mot. at 9-10, this is a selective reading of the Complaint. The gravamen of Plaintiffs' Complaint is that Defendants conspired, in violation of the Exchange Act and their bylaws, to rig the election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying the votes improperly--all in an effort to prevent one particular shareholder, Mr. Bender, from participating in matters of corporate governance. The Complaint is explicit on this point, alleging that Defendants' violations caused a material number of shares to be counted for the Management Nominees, and against the Bender Nominees, depriving Plaintiff of a fair and orderly voting process. Compl. ¶ ¶ 67-68. Although, in a sense, all shareholders would certainly benefit from a fair and orderly voting process, it remains that, according to their allegations, Mr. Bender was specifically targeted and disenfranchised by Defendants. This constitutes a special injury peculiar to Plaintiffs. [FN28]

*Cowin's* discussion of *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del.Ch.1967), confirms this conclusion. *Cowin*, 741 F.2d at 416. In

that case, Condec "made a tender offer and received tenders for a controlling percentage of Lunkenheimer's stock. Condec's control over Lunkenheimer was frustrated, however, when Lunkenheimer's management contracted to sell its business to U.S. Industries and, in the context of that agreement, issued 75,000 additional shares of [authorized, but unissued] Lunkenheimer stock." *Id.* The issuance of these additional shares diluted Condec's holdings, depriving it of a majority. *See Condec*, 230 A.2d at 772. Viewing Lunkenheimer's actions in the context of a battle for corporate control, the Delaware Chancery Court found that the "the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec," *id.* at 775, "and allowed Condec to sue, on its own behalf, for cancellation of those 75,000 shares," *Cowin*, 741 F.2d at 416.

The *Cowin* court found the factual scenario in *Condec* "representative of th[e] second category" of special injury. *Id.* In doing so, it reiterated *Condec's* distinction between claims necessarily derivative--like stockholder challenges to management decisionmaking, such as the decision to spend corporate funds in a stock repurchase--and those that may be brought directly. *Id.* Quoting *Condec*, the *Cowin* court agreed that "a personal action was proper because *Condec* was 'a stockholder with a *contractual right* to voting control being deprived of such control.' " *Id.* (quoting *Condec*, 230 A.2d at 777). In the present context, however, the *Condec* court's statement bears repeating in full: "This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. Manipulation of this type is not permissible." *Condec*, 230 A.2d at 777.

*24 While Plaintiffs here are not majority shareholders with a contractual right to voting control, the principle is the same. According to Plaintiffs' allegations, Defendants disregarded their bylaws and Robert's Rules to deprive Plaintiffs of their "right to a proportionate voice and influence in corporate affairs." *Id.* Such a sleight of hand, directed at a particular shareholder and intended to disenfranchise him, suffices as special injury. *See Cowin*, 741 F.2d at 416. Count III may therefore proceed directly.

**2. Likelihood of Success on the Merits**

Article II, Section 13 of the Bank's Amended and Restated Bylaws ("Bylaws") empowers the Board to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

appoint, in advance of a shareholders' meeting, an independent inspector of election ("IIOE") whose duties "shall include," *inter alia,* "determining ... the authenticity, validity, and effect of proxies; ... hearing and determining all challenges and questions in any way arising in connection with the rights to vote; counting and tabulating all votes or consents; determining the result; and such acts as may be proper to conduct the election or vote with fairness to all shareholders." In the course of the October 26 Shareholders' Meeting, Mr. Bender submitted two formal proxy challenges to the IIOE, Creighton Dunlop, one of which challenged the method in which management would allocate its cumulative votes, and the second of which challenged the voting of broker-held shares in favor of the Management Nominees, contrary to the explicit provisions of the Management Proxy. Ms. Jordan ruled both challenges out of order and the IIOE, not wishing to go against the wishes of the Chair, never passed on the merits of those challenges. [FN29] Ultimately, management allocated its votes at a Special Meeting two days after the Shareholders' Meeting, counting broker-held votes in favor of its nominees, and only then considered the polls closed and announced the results of the election. In Count III, Mr. Bender alleges that his proxy challenges were proper and meritorious, and that the Bank's improper conduct of the election violated its Bylaws and Robert's Rules.

### a. Allocation of Cumulative Votes

[25] Article II, Section 12 of the Bank's Bylaws gives shareholders the right to cumulate their votes in an election for directors, but does not address the procedure for allocating such votes. [FN30] Article II, Section 4 of the Bylaws provides, however, that "[a]nnual and special meetings shall be conducted in accordance with ... Robert's Rules of Order unless otherwise prescribed by regulations of the OTS or these bylaws or the board of directors adopts another written procedure for the conduct of meetings." At the October 26 Shareholders' Meeting, Ms. Jordan, in her role as Chair, reiterated that Robert's Rules would govern. Trial Exh. 20 at 2. Robert's Rules, however, much like the Bylaws, speak only in general terms about cumulative voting procedures. Robert's Rules § 46, at 431 ll. 16-29 (10th ed.).

**\*25** Mr. Bender directs the Court to a provision in § 45 of Robert's Rules indicating that, in the context of a vote by ballot, once all who wish to vote have done so, the polls can be closed either on motion of a member or by declaration of the chair. *Id.* § 45, at 401 ll. 11-18. "Thereafter, if other members arrive

who wish to vote, a majority is required to reopen the polls." *Id.* at 401 ll. 18-19; *see also id.* at 400 ll. 25-29 ("Should [the presiding officer] fail to vote before the polls are closed, he cannot do so without the permission of the assembly."). Ms. Jordan did, in fact, officially declare the polls closed at the completion of the voting at the October 26 meeting. Trial Exh. 20 at 7. Accordingly, Mr. Bender suggests that § 45 required that the master ballot (representing proxies received by management) be cast, and its votes allocated, before the polls were closed and the meeting adjourned.

Defendants argue that their method was permissible because the master ballot was *cast* before the Shareholders' Meeting was adjourned, even though those votes were not *allocated* until the Special Meeting two days later. They submit that allocation of cumulative votes was not possible at the Shareholders' Meeting because the IIOE had not yet tabulated the proxies received, and management did not know how many votes could be cast for their nominees. Defendants further note that, under § 45 of Robert's Rules, a voter "has the right to change his vote up to the time the result is announced," *id.* § 45, at 395 ll. 9-10, and suggest that, because the results of the election were not announced until the October 28 Special Meeting, the delayed allocation was not improper. Finally, they argue that determinations about the propriety of the vote, including its allocation, are committed to the IIOE, who they contend discharged his duties in a manner consistent with custom and common practice.

While the Bylaws and Robert's Rules are not a model of clarity on this issue, the Court concludes that Mr. Bender has the better part of the argument. First, Defendants' reliance on § 45 for authority to change their votes until the result is announced is misplaced. The relevant provision bears repeating in full: "A member has a right to change his vote up to the time the result is announced; after that, he can make the change only by the unanimous consent of the assembly granted without debate." Robert's Rules § 45, at 395 ll. 9- 12. That language contemplates the result being announced at the same meeting, giving each voting member an equal opportunity to change his vote should he so desire; if this provision has effect after the meeting has adjourned, then the latter clause is deprived of meaning. Second, the Court has difficulty concluding that at the October 26 Shareholders' Meeting the votes represented by the master ballot were "cast" in any meaningful sense. The master ballot stated:

In lieu of voting as provided above, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, *all* of such votes in a manner that will result in the election of as many of such named management nominees as possible. The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

*26 Trial Exh. 7. Translated to English, this master ballot voted an indeterminate number of votes, because the "number of votes that the undersigned has power and authority to vote" was then unknown-- and allocated nothing, because management intended to apportion its proxies later "in a manner that w[ould] result in the election of as many ... management nominees as possible." The practice of tabulating and allocating management proxy votes after the polls are closed, while regarded as proper and even customary by Defendants' expert, Apr. 28, 2006, Hr'g Tr. 123-25, 130-31 (Riley), is a matter of some debate. Many states, including Delaware, prohibit or restrict the acceptance of ballots, votes, or proxies after the polls close. June 16, 2006, OTS Letter at 2 [Dkt. # 44, Exh. A]. OTS has determined that the allocation of votes after the polls closed constituted a revocation or change in the vote within the meaning of § 45 of Robert's Rules. *See id.* at 1. It has further concluded that "[p]roviding the inspectors of election with the ability to allocate the votes for the benefit of one party's slate of directors and not providing that same ability to all other shareholders after the close of the polls is inherently unfair." *Id.* at 2.

Accordingly, the Court finds there is a substantial likelihood that Mr. Bender will successfully demonstrate that § 45 of Robert's Rules, which prohibits changing or revoking a vote after the polls are closed, governed the Shareholders' Meeting; that unilaterally allocating proxies after the polls are closed constitutes such prohibited action under § 45; and that, in a contested election, the IIOE's permitting management alone to allocate votes after the polls close was incompatible with his duty to conduct the election "with fairness to all shareholders."

**b. Broker-Held Votes**

[26] Mr. Bender's second formal proxy challenge

attacked the counting of broker non-votes in favor of the Management Nominees, contrary to the explicit instructions of the Management Proxy. [FN31] The facts related to this challenge are discussed *supra* in Part III.B.2.b and require no further elaboration here; the legal issue, however, is slightly different. Putting aside the Court's earlier conclusion that the Management Proxy was materially misleading in violation of § 14(a), the question here is whether it was an independent violation of the Bylaws or Robert's Rules to vote broker-held shares for management.

Defendants begin with the premise that, even though the election was contested in fact, it was not considered "contested" in Wall Street parlance because only management solicited proxies; from there, they argue that the broker-held shares were voted in a manner consistent with custom and practice for what Wall Street would call an "uncontested" election. In the context of an uncontested election, Rule 452 of the New York Stock Exchange ("NYSE") permits a broker, absent a client's directions to the contrary, to vote his clients' shares on "routine" matters. This rule was designed to ensure the presence of a quorum at shareholders' meetings. Apr. 28, 2006, Hr'g Tr. 105 (Riley). Uncontested elections for directors are considered routine matters because there is only one set of proxy materials, and therefore only one mechanism to collect votes, all for a single slate. In sum, although Defendants acknowledge that Mr. Bender was caught in a Catch-22--able to nominate a slate of directors, but forbidden to solicit proxies, he essentially contested an "uncontested" election--they urge that the proxy process functioned properly. [FN32] Mr. Bender reiterates that the voting of broker-held shares in favor of management ran contrary to the Management Proxy, and argues that the Bank, which is listed on NASDAQ, is not subject to NYSE rules.

*27 This practice arguably violated Article II, Section 9 of the Bank's Bylaws, which requires that management proxies "shall be voted as directed by the shareholder." Shareholders were entitled to rely on the proxy materials, and by refraining from instructing their brokers, might be viewed as having "directed" that their votes be withheld pursuant to the Management Proxy's instructions. On the present record, however, the Court declines to delve into the complexities of how Wall Street runs their proxy contests, because the root of the problem is the alleged § 14(a) violation--which, for reasons already explained, is an adequate basis for preliminary injunctive relief.

2006 WL 2042962
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

Page 24

**D. Equitable Factors**

Of course, establishing a likelihood of success on the merits does not entitle Mr. Bender to a preliminary injunction. He still must establish the other traditional prerequisites to preliminary injunctive relief: whether he will suffer irreparable harm absent an injunction; whether an injunction will substantially injure the Defendants; and whether an injunction will further the public interest. _Serono Labs., 158 F.3d at 1317-18._

**1. Irreparable Harm**

[27][28][29] Although the equitable factors interrelate on a sliding scale, _Davenport, 166 F.3d at 360-61_, a showing of irreparable harm is a _sine qua non_ of preliminary injunctive relief. _Chaplaincy of Full Gospel Churches v. England,_ No. 05-5143, --- F.3d ----, ----, 2006 WL 1867203, at *4, 2006 U.S.App. LEXIS 16952, at *14 (D.C.Cir. July 7, 2006) ("A movant's failure to show any irreparable harm is ... grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and ... of such _imminence_ that there is a clear and present need for equitable relief to prevent irreparable harm." _Id._ at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15 (citations and internal quotation marks omitted). "Second, the injury must be beyond remediation.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." _Id._ at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15-16 (citations and internal quotation marks omitted).

The Court perceives Mr. Bender to allege two varieties of irreparable harm. First, Mr. Bender--indeed, all shareholders--were deprived of their statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions. Second, Mr. Bender, unlike his peers, was the specific target of Defendants' machinations, and was unnecessarily frustrated in his attempts to participate in corporate governance. Such injuries are the precise harms against which securities laws were intended to guard. _See Edelson, 405 F.3d at 626_ ("[T]he overriding purpose of Congress in enacting [§ 13(d) ] was to protect the individual investor when substantial

shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."); _Cowin, 741 F.2d at 427_ (stating that a § 14(a) claim alleging that "shareholders elected [the defendant] directors because they were misled by the proxy materials ... falls precisely into the scope of injury that Congress sought to protect"); _Condec, 230 A.2d at 777_ (finding that the denial of a shareholder's "proportionate voice and influence in corporate affairs" through corporate manipulation is impermissible). And these harms are not only actual and imminent, they are realized and ongoing. A vote based on this information has taken place; new, possibly illegitimate, directors have been installed; and a second election looms.

*28 It is well established that such harms can be irreparable. _See, e.g., Gen. Aircraft, 556 F.2d at 97_ ("[I]rreparable injury would occur to shareholders and the investing public if [defendants] were allowed to continue their activities without correcting and amplifying their Schedule 13D."); _Lichtenberg v. Besicorp Group, 43 F.Supp.2d 376, 390 (S.D.N.Y.1999)_ ( "Irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." (alteration in original; citation omitted)); _ODS Techs. LP v. Marshall, 832 A.2d 1254, 1262 (Del.Ch.2003)_ ("The threat of an uninformed stockholder vote constitutes irreparable harm."). This harm is compounded where, as here, an uninformed election has come to pass, and another election is imminent. Allowing the second election to go forward, where there is a substantial likelihood that the prior one was at best tainted, at worst void, would helplessly complicate matters, perhaps making it impossible to "unscramble the eggs" should the "post-hoc reorganization of a standing board" prove necessary. _ODS Techs., 832 A.2d at 1263._

Finally, Mr. Bender has no adequate remedy at law. It is generally agreed that an individual shareholder lacks standing to bring a damages suit under § 13(d). _See, e.g., Hallwood, 286 F.3d at 619_ (collecting cases); _Berman,_ No. 80- 0394, 1981 WL 1596, at *2, 1981 U.S. Dist. LEXIS 10866, at *5. And although Mr. Bender seeks both injunctive and monetary relief for Defendants' alleged § 14(a) violations, "an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies." _In re Staples Inc., 792 A.2d 934, 960 (Del.Ch.2001)._ As the Delaware Chancery Court has explained,

A post-hoc evaluation will necessarily require the court to speculate about the effect that certain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                          Page 25
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.

Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue--the right to receive fair disclosure of the material facts necessary to cast a fully informed vote--in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*Id.* The persuasive force of this reasoning is undiminished by the fact that the misinformed vote has already occurred. In view of the impending second election, which if allowed to proceed may hopelessly jumble the Board's membership, injunctive relief remains the preferred remedy here, and is necessary to protect investors and effectuate the purposes of the Exchange Act.

**2. Injury to the Bank**

In an earlier dispute between these parties, the Court stated that the securities laws

*29 cannot be used merely as a ploy to keep incumbent management safe from hostile takeover. Thus, the harm here cannot be to the individual members of the Board of Directors, who might be replaced if Mr. Bender has his way, or to the individual officers of the Bank who might be discharged. The harm must be to the institution, which in this case means irreparable harm to the Bank's shareholders.

*Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203, 217 (D.D.C.2004). In the present dispute, the Court recognizes that delaying the next shareholders' meeting would not come without cost. It would add further uncertainty to the leadership of a troubled institution. And "it is axiomatic that enjoining a shareholder[s'] meeting may affect the price of a company's stock." *ODS Techs.,* 832 A.2d at 1263. But these prospects are insufficient to allow a tainted Board to become further entrenched by a second election. *See id.*

Defendants argue that if the October 26 election is ultimately voided, innocent shareholders who would have voted for the Management Nominees despite the nonexistent § 13(d) disclosures and misleading § 14(a) solicitations will effectively be disenfranchised. But this is an unprovable hypothesis. The Court has

no way to predict how such shareholders might have voted if given the benefit of lawful disclosures. They, like Mr. Bender, have been harmed by a misinformed vote, and will benefit from an injunction that requires the Bank to comply with its disclosure obligations under the securities laws.

**3. Public Interest**

[30] At this point, it should be clear that a preliminary injunction would serve the public interest in effective enforcement of the securities laws, and this factor need not long detain the Court. "Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service." *Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.,* 476 F.2d 687, 699 (2d Cir.1973).

**4. Other Equitable Considerations**

[31] Defendants lastly argue that the doctrines of unclean hands and laches should bar equitable relief in Mr. Bender's favor. The first argument can be quickly dispatched, as the Court has already found that, contrary to Defendants' claims, Mr. Bender has neither abused the judicial process nor brought baseless suits against the Bank or its Directors. *See supra* at ---- - ----. The latter argument, however, deserves brief discussion.

[32][33] Laches is an equitable doctrine "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football Inc. v. Harjo,* 415 F.3d 44, 47 (D.C.Cir.2005). To establish this defense, Defendants must show (1) a lack of diligence by Mr. Bender that (2) has caused them prejudice. *Id.* "[T]he rationale for this defense is [that] as claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *CarrAmerica Realty Corp. v. Kaidanow,* 321 F.3d 165, 171 (D.C.Cir.2003). In the corporate context, the D.C. Circuit has noted that "[t]he prejudice that can result from such delay is particularly unsettling when ... the claim affects the validity of stock which is central to a merger between the named corporation and corporate entities foreign to the complaint." *Id. at*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                        Page 26
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

171-72.

**\*30** Mr. Bender filed his Complaint on January 18, 2006, and moved for a preliminary injunction two days later--less than three months after the election at issue. Given the secrecy with which the Defendant Directors operated before the Court's intervention, and the dissembling that has continued since, it is no surprise that it took Mr. Bender several months to untangle defendants' transactions and craft a complaint. It can hardly be said that Mr. Bender has slumbered on his rights, especially when viewed in the context of past litigation--after all, there has been a live controversy in this Court between these parties for 30 of the past 40 months. Moreover, Mr. Bender raised several claims now at issue as formal proxy challenges at the October 26 Shareholders' Meeting, but Ms. Jordan refused to entertain them. The Bank cannot now be heard to cry prejudice as to claims it previously chose to ignore.

The Court finds that laches is arguable only as to Mr. Bender's § 14(a) claim relating to the first proxy solicitation, the May 4 Committee Letter, which was sent months before the October 26 Shareholders' Meeting; several misstatements in that letter might have been cured by a corrective disclosure preceding the rescheduled meeting. However, it is not clear that Mr. Bender had any reason to believe that the Board played a role in drafting that letter--one of its central omissions--until this litigation began. Therefore, the Court concludes that Defendants have not met their burden to establish either a lack of diligence or prejudice, and therefore fail in their attempt to invoke laches to bar relief. In any event, even if Defendants could establish laches as to the Committee Letter claim, their other violations are a sufficient independent basis to grant preliminary injunctive relief.

### IV. CONCLUSION

The courts are usually loath to get involved in these kinds of corporate contests, but there are rules of engagement that the Defendants ignored. Mr. Bender has shown that he is entitled to the preliminary relief he seeks. For the foregoing reasons, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court. The Court defers decision on Mr. Bender's request for a declaratory judgment barring indemnification (Count VI). A separate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the Memorandum Opinion filed concurrently herewith, it is hereby

**ORDERED** that the Director Defendants' Motion to Dismiss [Dkt. # 24] is **DENIED** as to Counts I, II, and III, and **DEFERRED** as to the balance; and it is

**FURTHER ORDERED** that the Plaintiffs' Application for a Preliminary Injunction [Dkt. # 3] is **GRANTED** in part and **DEFERRED** in part; and it is

**FURTHER ORDERED** that Defendants shall be **ENJOINED** from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court; and it is

**\*31 FURTHER ORDERED** that this Order shall have immediate effect, conditioned on Plaintiffs' posting, no later than **July 28, 2006,** of a secured bond in the amount of $20,000, which the Court estimates to be the costs of Defendants' proxy materials that may be found to have been wrongfully enjoined or restrained. *See* Fed.R.Civ.P. 65(c); and it is

**FURTHER ORDERED** that the parties shall appear before the Court at a Status Conference on August 3, 2006, at 10:00 a.m.

This is an appealable Order. *See* 28 U.S.C. § 1292(a)(1).

**SO ORDERED.**

> FN1. The subtext to this dispute is race: while the Bank is a historically Black-owned-and-operated federal savings and loan, Mr. Bender is White. The Bank's in-house counsel ballyhooed that Mr. Bender's nominees to the Board were portrayed to shareholders by the Bank as "racial traitors." Pls.' Exh. 104. Harold Doley, an African American who controls almost 10% of the Bank's shares, testified that "race is not just an elephant in the courtroom, it is a pack of elephants." Doley Dep. 70. The racial overtones in the record would be hard to miss, but the Court concludes that they do not affect the legal issues.

> FN2. The parties have appeared before the Court in earlier versions of this long-running

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                                      Page 27
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

business dispute. *See, e.g., Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203 (D.D.C.2004); *Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004); *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, 2004 U.S. Dist LEXIS 17090 (D.D.C. Jan. 15, 2004).

FN3. Although Mr. Bender owns his IFSB shares jointly with his wife, and both Benders consequently are plaintiffs here, Mrs. Bender "is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender." Compl. ¶ 3. Accordingly, the Court often refers only to Mr. Bender in the text of this opinion.

FN4. The Court notes that the preliminary relief requested in Mr. Bender's Proposed Order [Dkt. # 37] varies from that requested in his Complaint [Dkt. # 1] and Application for a Preliminary Injunction [Dkt. # 3]. Because the Proposed Order was submitted most recently and in response to the Court's direction that the parties file proposed findings of fact and conclusions of law, the Court presumes that it contains the most accurate version of the relief immediately desired.

FN5. Mr. Bender's letter to all shareholders is dated April 29, 2005. Defs.' Exh. 207. Based on the evidence presented, however, it appears that this letter was not sent until approximately May 2, 2005. *See* Defs.' Exh. 208.

FN6. Asked by the Court if he ever had "a face to face or telephone conversation with Mr. Batties" about his activities, Mr. Chambers insisted that he did not. Only when the Court expressed open skepticism, did Mr. Chambers admit that he regularly talked to Mr. Batties about "the whole thing" and that he had thought the Court's question referred only to a sit-down conference. Apr. 28, 2006, Hr'g Tr. 94 (Chambers).

FN7. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *SEC*

*v. Bilzerian,* 29 F.3d 689, 692 n. 3 (D.C.Cir.1994).

FN8. Mr. Bender brought suit to force the meeting to proceed as scheduled in September but withdrew it when OTS approved the further delay. *See Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C. Sep. 19, 2005) (order approving voluntary dismissal).

FN9. In 2004, Carver and IFSB agreed to merge after a unanimous Board resolution in favor of merger. Mr. Bender opposed the merger, publically and vociferously. The Board adopted a "poison pill" resolution to restrain Mr. Bender from acquiring more shares and sued Mr. Bender. *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004). Eventually, Carver withdrew from the merger and OTS disapproved it.

FN10. In one of her more incredible statements, Ms. Jordan insists that she has no recollection of this call. Apr. 21, 2006, Hr'g Tr. 24 (Jordan) ("I don't recollect talking to Mr. Doley on the 25th."); *id.* at 26 ("I have no recollection of that, that call."); *id.* ("I did not [discuss the notion that Mr. Doley wanted to sell the stock he controlled].").

FN11. As a result of what appears to be a production error, every even-numbered "master" page of the Delaney Deposition, containing 4 pages of deposition testimony, was omitted from the Court's exhibits. The Court will rely on the submissions of the parties regarding the omitted sections of the Delaney Deposition.

FN12. Ms. Jordan and Mr. Wilmot insist that the meeting was postponed until 3 p.m. so that the Bank's attorney, Mr. Royer, could contact OTS and get advice on how to handle Mr. Bender's voting challenges. Apr. 21, 2006, Hr'g Tr. 9-10 (Jordan); *Id.* at 87-89 (Wilmot). Mr. Royer told a different story: he testified that his calls to OTS were not to seek advice but simply to advise OTS that the meeting was delayed. Royer Dep. 68. Mr. Royer's emails, Defs.' Exh. 219 and 200, tell the same story. *See* Defs.' Exh. 219 ("delay was necessary due to possible securities regulatory issues and possible

voter disenfranchisement"). The Court credits Mr. Royer.

FN13. At the hearing on this matter, Ms. Jordan and Mr. Wilmot denied any involvement in the purchase of the Doley Participant shares. Given the paper record of draft purchase agreements with Mr. Wilmot's name, Trial Exhs. 72, 73; Mr. Wilmot's acknowledged discussion with Mr. Thompson in the middle of the night, Apr. 21, 2006, Hr'g Tr. 74 (Wilmot); the fact that Mr. Thompson arranged for a cashier's check in the amount of $165,000 to be issued to Mr. Wilmot, Trial Exh. 78; and Mr. Doley's testimony that he "talked with Wilmo[ ]t, Carolyn Jordan, Royer ... about the possibility of the sale" at $18 per share, Doley Dep. 185, the Court finds that the testimony of Ms. Jordan and Mr. Wilmot is not to be credited.

FN14. See *Rosenberg v. XM Ventures,* 274 F.3d 137, 142 (3d Cir.2001) ("Section 16(b) of the Securities and Exchange Act of 1934 provides that any profit realized by a corporation's principal stockholders arising from the purchase and sale of a corporation's equity securities within a period of less than six months must be disgorged to the corporation. *See* 15 U.S.C. § 78p(b); *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).").

FN15. Mr. Doley probably meant hornswoggled and snookered, both of which mean bamboozled.

FN16. All federal thrifts allow cumulative voting. May 5, 2006, Hr'g Tr. 74 (Freedman). Under cumulative voting, shareholders "have the right to accumulate votes based upon the number of direct[or] seats to be filled. So if you have three director seats to be filled and you're the owner of a hundred shares, you would in essence have 300 votes. You can apportion those votes across the director candidates in the way that you choose to do it. So you could give 300 votes to one director and no votes to the other directors.... Or you could apportion them however you choose across that. Or you could check the box that says proxy committee do it for me which is what

management hopes people do." Apr. 28, 2006, Hr'g Tr. 121-22 (Riley).

FN17. The Court credits the analysis and arithmetic of Mr. Freedman, an expert witness for Mr. Bender, over Mr. Riley, an expert witness for the Defendants, on these points. Mr. Riley first relied on Mr. Bender's lay-person's estimate of the potential number of broker votes and then absolutely resisted any suggestion that it would be possible to provide an expert estimate.... Given Mr. Freedman's explanation of his dual approaches, the Court concludes that Mr. Riley was avoiding a response that would not be helpful to his client.

FN18. Pls.' Exh. 102 (Oct. 21, 2005 email) (discussing attempt "to combat Bender's attempts to dissuade ... shareholders from voting for management even though the routine broker vote has been turned in already (in favor of management).... [M]ost of these holders will take out legal proxies if they wish to vote against management which would negate the broker routine vote that has already been turned in on behalf of their vote.").

FN19. In *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 63, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court stated that "the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer," a description consistent with the facts there presented. *Rondeau,* 422 U.S. at 60, 95 S.Ct. 2069. The legislative history, however, suggests a broader mission that is more apt in the instant fact pattern:
"The Bill before you deals with stock acquisitions in three specific contexts--first, the acquisition by means of a cash tender offer of more than [5 percent] of any class of stock of a publicly held company; second *other acquisitions by any person or group of more than [5 percent] of any class of stock of a publicly held company;* and third, the repurchase by a corporation of its own outstanding shares." S.Rep. No. 550, 90th Cong., 1st Sess., 16, 33 (1967) (remarks of then Chairman Cohen). Section 13(d) is concerned with the second type of stock acquisition, requiring after-the-fact disclosure of substantial open market

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accumulations of securities within a relatively short period of time. H.R.Rep. No. 1711, 1968 U.S.Code Cong. & Admin. News at 2818.
*Gen. Aircraft Corp. v. Lampert,* 556 F.2d 90, 94 (1st Cir.1977) (emphasis added).

FN20. The Court has previously recognized that Plaintiffs' interests are not perfectly aligned with those of the Bank's other investors and, on that basis, declined to permit Plaintiffs to maintain a derivative suit. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, at *3-4, 2004 U.S. Dist. LEXIS 17090, at *12-13 (D.D.C. Jan. 15, 2004). Given that background, it might be suggested that, to the extent Plaintiffs' standing is deemed representational, Plaintiffs are inappropriate representatives of the other shareholders. The answer to this criticism is that Plaintiffs are deemed to "act[ ] on the shareholders' behalf *until* an accurate Schedule 13D is filed," but not beyond. *Indiana Nat'l,* 712 F.2d at 1185 (emphasis added). That Plaintiffs do not necessarily "represent the interest of the shareholders in relation to who *wins* the struggle for control," *id.,* does not, therefore, call into question the propriety of their representation at this stage.

FN21. "The Schedule 13D mandates disclosure, *inter alia,* of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control)." *MITE Corp. v. Dixon,* 633 F.2d 486, 492 (7th Cir.1980).

FN22. In some circumstances, an acquisition or disposition of less than one percent may be deemed material. 17 C.F.R. § 240.13d-2(a).

FN23. The Court also notes that, because Mr. Thompson already owned 7.2% of the Bank's shares as of September 2005, and had filed a Schedule 13D with respect to those shares, when he acquired voting power over the Doley Participants' shares--an amount that was clearly material under 17 C.F.R. § 240.13d-2--he was required to

amend his 13D "promptly." *See* 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). There is no evidence that he did so.

FN24. For this reason, Defendants' reliance on *Berg v. First Am. Bankshares,* No. 83-3887, 1985 WL 2232, 1985 U.S. Dist. LEXIS 20631 (D.D.C.1985), *aff'd on other grounds,* 796 F.2d 489 (D.C.Cir.1986), is unavailing. The court in *Berg* read *Mills* as crafting a principle of "constructive reliance" applicable only in situations where "the requisite proof of reliance by other shareholders would be impossible to reproduce." *Id.* at *7, 1985 U.S. Dist. LEXIS 20631, at *20. *Berg* declined to extend this principle beyond the context of class actions, which *Mills* was. However, as explained in the text, the principle enunciated in *Mills* was not subjective (reliance) but objective (materiality); on this point, therefore, the Court parts company with *Berg.* The Court also notes that the D.C. Circuit affirmed dismissal of the § 14(a) claim in *Berg* on the ground that the plaintiff failed to raise genuine issues of falsity and materiality, and expressly declined to reach the district court's "alternative determination that [the plaintiff's] complaint must be dismissed for failure to demonstrate reliance." 796 F.2d at 501 n. 11.

FN25. In the first, Mr. Bender sued the Bank for access to minutes of meetings of the Board; that suit was voluntarily dismissed after the Bank provided Mr. Bender the relief he sought. *Bender v. Indep. Fed. Sav. Bank,* No. 03-865 (D.D.C.2003). In the second, Mr. Bender sued the Bank to force a special Shareholders' Meeting. The Court ruled against Mr. Bender, finding that Mr. Bender's interests were too divergent from those of other shareholders to permit him to proceed derivatively, and that the negotiations with Carver were of such a delicate nature that a special Shareholders' Meeting would disrupt the bid process. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124 (D.D.C. Jan. 15, 2004). In the third, the Bank brought suit against Bender under § 13(d), but after losing its bid for preliminary injunctive relief, opted to settle. *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004). And in the fourth, Mr.

Bender brought suit to force a long-delayed Shareholders' Meeting to take place, but voluntarily dismissed the action when OTS allowed the meeting to be delayed. *Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C.2005).

FN26. Ms. Finlayson's October 21, 2005, email to Ms. Jordan and Messrs. Batties and Royer, among others, makes this point clearly: "In terms of the voting tallies, the numbers are very discouraging.... As of today, most of the 'for votes' for management consist of the routine broker votes that w[ere] turned in.... [T]his number can change based on those street name holders who elect to take out legal proxies or who contact their broker before Wednesday's meeting and instruct such broker to 'withhold authority to vote for all nominees.' The broker then of course would reverse the earlier routine broker vote turned in on their behalf." Pls.' Exh. 102.

FN27. The Court recognizes that this issue is not properly termed one of standing, at least not in the Article III sense. Rather, the question is more accurately phrased, "[W]ho is the real party in interest to bring a lawsuit under the governing substantive law to enforce the asserted right [?]" *Labovitz v. Wash. Times Corp.,* 172 F.3d 897, 900 n. 6 (D.C.Cir.1999) (quoting *Whelan v. Abell,* 953 F.2d 663, 672 (D.C.Cir.1992) (internal quotation marks and citations omitted)). Specifically, in the shareholder context, the question is "whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of shareholders' suits." *Id.*

FN28. The Court also notes that another rationale for requiring derivative suits-- preventing an individual shareholder from securing a benefit at the expense of others similarly situated, *see Cowin,* 741 F.2d at 414--is not implicated here, as Plaintiffs seek no monetary relief for this count.

FN29. Ms. Jordan peremptorily rejected the challenges as "out of order" because they were "procedural question[s]" and "procedures for these votes have been set up according to the bylaws." Trial Exh. 20 at 5. She later testified that she rejected the challenges because Mr. Bender failed to place them on the agenda in advance of the meeting, an explanation the Court considers a post-hoc justification. Mr. Dunlop testified that, although in his experience the IIOE usually rules on proxy challenges, he "did not want to go against the wishes of the Chair." Dunlop Dep. 91-92. Moreover, he "did not rule on the challenges, and really did not consider the challenges once they were presented to the meeting, and the Chair ruled them out of order." *Id.* at 114.

FN30. That section provides, in full: "Every shareholder entitled to a vote at an election for directors shall have the right to vote, in person or by proxy, the number of shares owned by the shareholder for as many persons as there are directors to be elected and for whose election the shareholder has the right to vote, or to cumulate the votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares shall equal[,] or by distributing such votes on the same principle among any number of candidates."

FN31. Mr. Bender also argues that the Bank's failure to hold a separate meeting to vote on the allocation of management proxies violated Article II, Section 9 of the Bylaws. That section provides, in relevant part, that "[p]roxies solicited on behalf of management shall be voted as directed by the shareholder or, in absence of such direction, as determined by a majority of the board of directors." However, this text contains no express requirement that a meeting be held, and the master ballot was, in fact, signed by a majority of the board of directors. The Court perceives no violation of the Bylaws here.

FN32. OTS permitted Mr. Bender to solicit votes, but not proxies, for reasons known to them but not made clear by the record.

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1343712 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities In Reply to Defendants' Response to the

Benders' Application for Preliminary Injunctive Relief (Apr. 14, 2006)

• 2006 WL 1046717 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief (Mar. 31, 2006)

• 2006 WL 1046716 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Directors and Thomas Batties' Motion to Dismiss Counts I - IV of the Complaint (Mar. 15, 2006)

• 2006 WL 645058 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Counts I, II, III, and IV of Plaintiffs' Complaint (Feb. 22, 2006)

• 2006 WL 645059 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendant Independent Federal Savings Bank's Motion to Dismiss Count VI of Plaintiffs' Complaint (Feb. 22, 2006)

• 2006 WL 645051 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645052 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645053 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645054 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645055 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645056 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645057 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 318855 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006)

• 2006 WL 381806 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006)

• 2006 WL 318881 (Trial Pleading) Verified Complaint (Jan. 18, 2006)

• 1:06cv00092 (Docket) (Jan. 18, 2006)

END OF DOCUMENT

Westlaw.

1981 WL 17552                                                                              Page 1
Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402
**(Cite as: 1981 WL 17552 (E.D.Mo.))**

**C**

United States District Court, E.D. Missouri.
General Steel Industries, Inc.
v.
Walco National Corporation, et al.
**No. 81-1410-C**

November 24, 1981

WANGELIN, District Judge

**\*1** 1. Plaintiff General Steel Industries, Inc. ("GSI") is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 11 S. Meramec, St. Louis, Missouri. GSI's common stock is registered for trading pursuant to Section 12 of the 1934 Act, 15 U. S. C. § 781, and is listed and traded on the New York Stock Exchange. As of October 23, 1981, there were 3,924,453 shares of common stock outstanding.

2. Defendant Walco National Corporation ("Walco") is a corporation founded by defendant Frederick W. Richmond ("Richmond"). Walco is organized under the laws of the State of New York, and has its principal place of business at 743 Fifth Avenue, New York, New York. As a result of purchases of GSI stock made by Walco during 1981, defendant Walco presently owns 1,330,047 shares of GSI common stock, which amounts to approximately 34% of GSI's outstanding common shares.

3. Defendant Richmond is a member of the United States House of Representatives. He is the founder, a director, and a member of the Executive Committee of Walco, and the former Chairman of the Walco board of directors. Richmond directly owns approximately 42.9 percent of the outstanding common stock of Walco. In addition, Richmond beneficially owns an additional 4.5 percent of the outstanding common stock of Walco through the Frederick W. Richmond Foundation, Inc., a New York not-for-profit corporation of which he is a director.

4. On November 2, 1981 Walco made a partial tender offer (the "Offer") to purchase 750,000 shares of GSI at $19 per share. On November 9, 1981 GSI filed its Complaint in this action, seeking injunctive and other relief for alleged violations of the federal securities laws.

5. Acts constituting part of the transactions complained of have occurred and are occurring in this judicial district.

II. *Walco's Stock Purchases Leading up to the Tender Offer*

6. Between January 1 and April 28, 1981, Walco purchased 930,273, or approximately 29.6%, of GSI shares of common stock outstanding in private and open market transactions.

7. On or about May 1, 1981 Walco filed a Schedule 13D with the Securities and Exchange Commission ("SEC"), which reported Walco's acquisition of over 5% of GSI's common stock. The Schedule 13D, under Item 4, stated that GSI shares were "purchased for investment" and disclaimed any intention to control GSI. In fact, the purpose of Walco's purchases of GSI stock was to obtain control of GSI. This fact was not revealed in the Schedule 13D, and the disclosure that Walco's purpose was to purchase "for investment" was materially false and misleading.

8. After filing the false and misleading Schedule 13D, Walco continued purchasing GSI shares in open market transactions until September 29, 1981. During the period between May 1 and September 29, 1981, Walco filed three amendments to its Schedule 13D, dated June 26, 1981, July 29, 1981 and August 28, 1981, in which Walco continued to make the materially false statement that the purpose of these purchases was "for investment." During this period, Walco acquired an additional 4.5% of GSI's outstanding common stock from GSI's public shareholders who were unaware of defendants' intention to gain control of GSI.

**\*2** 9. All of the purchases of GSI shares by Walco were made pursuant to its scheme to obtain majority control of GSI by obtaining a large GSI stock position from which it could block any competing offer and any merger or other business combination which might have been favorable to all GSI shareholders. This intent was reflected in a memorandum dated June 26, 1981, in which Richmond admitted that "our aim is to own 51% of the Company."

10. Walco's additional objective was to conceal defendants' true intention so that Walco could

Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402
**(Cite as: 1981 WL 17552 (E.D.Mo.))**

purchase as many shares as possible without paying the control premium which is now being offered.

### III. *Richmond Controls and Dominates Walco*

11. Richmond controls and dominates Walco and its management. Specifically:

(a) Richmond directly owns 1,342,929 or 42.9%, of Walco's outstanding shares of common stock and has the power to direct voting and disposition of another 4.5% of Walco's shares held by the Frederick W. Richmond Foundation;

(b) Until 1975, Richmond served as Walco's Chairman of the Board and President. Although Richmond relinquished his formal title and salary as Chairman on December 31, 1978, he continues to serve as chairman of Walco's Board meetings, and is a member of the Board's Executive Committee;

(c) Richmond currently-and historically-has made all major decisions with respect to the expansion of Walco's business and selection of potential acquisition candidates. Walco's President, Schurgot, does not make any major corporate decisions without consultation with and the approval of Richmond;

(d) Richmond considers Walco his "family business," and considers himself to be Walco's "senior partner";

(e) Richmond's long-time personal friends and political allies permeate Walco's Board and management.

### IV. *Material Facts Relating to the Integrity of Richmond and Walco Management.*

12. Richmond has improperly utilized Walco's resources to advance his personal, financial and political interests. Richmond's ability to effect these "events" are further indicia of his control over Walco. Moreover, the following material facts bear on the character and integrity of Richmond and of the Walco management.

13. Richmond has funneled hundreds of thousands of Walco dollars into ""charitable contributions" and "pet projects" to further his political career. Walco has systematically disbursed money to various organizations pursuant to Richmond's explicit instructions.

14. The Richmond Garden Market Center (the "Richmond Garden") was organized by the Richmond Foundation, and was designed to benefit

Richmond politically. Richmond has derived much favorable publicity from the Richmond Garden, while Walco has contributed approximately $270,000 and countless man-hours to the Richmond Garden in the past 4 years.

15. Walco employees and other resources are improperly utilized by Richmond and Richmond's personal foundation known as the Frederick W. Richmond Foundation. The Richmond Foundation is located in the Walco offices, on the 7th floor of 743 Fifth Avenue. Although Walco leases and pays for the space, the Richmond Foundation pays no rent to Walco. The Foundation, which is run by Walco's employees and supported by other Walco resources, is designed to further Richmond's political career, to the extent that Richmond's political aides have advised Foundation officials to keep money within Richmond's district. In addition, Richmond uses Walco employees to look after his personal financial and political affairs.

**\*3** 16. Richmond has improperly channeled Walco money to satisfy personal obligations and provide him expensive, unreportable perquisites. Walco pays 90% of the expenses attributable to a luxury apartment in an exclusive section of Manhattan, owned by Richmond and used for his personal and political benefit. Richmond uses this apartment as a personal residence.

17. Richmond has improperly used Walco funds to satisfy personal pledges. On December 31, 1978 Richmond and Walco entered into an Agreement which provides Richmond with a $1 million, $100,000 per year pension ostensibly in consideration for Richmond's "past services." The pension was made payable upon Richmond's "termination of employment," which he feigned by relinquishing his title and $175,000 salary as Walco's Chairman on December 31, 1978. In reality, the purpose of the pension agreement was to retain and compensate Richmond for services to be provided to Walco.

### V. *Walco's Tender Offer and Offering Materials Are False and Misleading*

18. Walco commenced its tender offer on November 2, 1981 by filing a Schedule 14D-1, Offer to Purchase, and related offering materials with the SEC. Walco also published its Offer and has taken steps to disseminate its Offer to Purchase to GSI and its shareholders.

19. Walco's Offer to Purchase and offering materials do not disclose that Walco's intent was to gain control

1981 WL 17552                                                                                                                    Page 3
Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402
(Cite as: 1981 WL 17552 (E.D.Mo.))

of GSI when it filed its Schedule 13D and Amendments Nos. 1-3 thereto, and when it purchased GSI shares from May 1, 1981 through September 29, 1981.

20. Walco's Offer to Purchase and offering materials do not disclose that Richmond has the power to and does control Walco, nor the facts which would allow a reasonable investor to understand this material fact.

21. Walco's Offer to Purchase and offering materials do not disclose that Richmond has utilized his dominant controlling position improperly to influence Walco management and improperly and unethically to appropriate Walco resources for his own personal financial and political benefit.

22. Walco's Offer to Purchase and offering materials do not disclose that Walco management has acquiesced and cooperated with Richmond is carrying out these activities.

23. Walco's Offer to Purchase and offering materials do not disclose the material fact that Walco has been found liable, within the past year, for violating the Securities and Exchange Act of 1934 by improperly taking "insider profits" in connection with its transactions in Reece Corporation common stock.

24. The shareholders will be irreparably harmed unless an injunction is issued in that they will be forced to make their investment decision as to whether to tender, hold or sell their shares in the market without the full and accurate disclosure of the aforementioned material information.

25. Additionally, an injunction pending rescission is appropriate to deter future violations of law and to prohibit Walco from taking advantage of the blocking position it has illegally obtained.

*CONCLUSIONS OF LAW*
**\*4** 1. This Court has jurisdiction of this action under Section 27 of the Securities Exchange Act of 1934 (the "1934 Act"). 15 U. S. C. § 78a *et seq.* and 28 U. S. C. § § 1331(a), 1332(a) and 1337. Venue is properly placed in the District under Section 27 of the 1934 Act and under 28 U. S. C. § § 1391(b) and (c).

2. The factors to be considered in determining whether preliminary injunctive relief is appropriate are (1) the great threat of irreparable harm to the plaintiff; (2) the state of balance between this harm and the injury that granting the injunction will inflict on others parties litigant; (3) the probability that

plaintiff will succeed on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.,* 640 F. 2d 109, 113 (8th Cir. 1981).

I. *GSI HAS ESTABLISHED THE PROBABILITY THAT IT\* WILL SUCCEED ON THE MERITS*
3. Section 14(d) of the 1934 Act requires any person making a tender offer for a registered equity security to publicly file with the SEC a Schedule 14D-1 containing prescribed information. Section 14(e) of the 1934 Act, the antifraud section of the Williams Act, makes it unlawful

> to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, ... in connection with any tender offer ....

15 U. S. C. § 78n(e).

A. *Walco's Offer To Purchase Is Materially False And Misleading In Violation Of Sections 14(d) And (e) Of The 1934 Act.*
4. A misstatement or omission is "material" if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to accept the tender offer. *See Vervaecke v. Chiles, Heider & Co.,* 578 F. 2d 713, 717 (8th Cir. 1978); *Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F. 2d 916, 919-20 (8th Cir. 1977).

*The Offer To Purchase Fails To Disclose That Richmond Controls Walco*
5. The Offer to Purchase does not disclose that Richmond controls Walco. This is a material omission from the Offer to Purchase in that

(a) Any person who controls the offeror must be disclosed. Schedule 14D-1, 17 C. F. R. § 240.14D-100 (Instruction C); Rule 14d-6, 17 C. F. R. Section 240.14D-6. *Ronson Corp. v. Liquinfi Aktiengesellshaft Liquigas,* 370 F. Supp. 597 (D. N. J.), *aff'd,* 497 F. 2d 394 (3d Cir.), *cert. denied,* 419 U. S. 870 (1974).

(b) The term "control" is to be afforded a broad definition. *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F. 2d 240, 246-47 (8th Cir. 1979).

(c) As set forth in this Court's Findings of Fact, each of the following indicia of control exists with respect to Richmond's relationship with Walco: (i) Ownership or control of a significant amount of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1981 WL 17552                                                                                      Page 4
Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402
**(Cite as: 1981 WL 17552 (E.D.Mo.))**

stock of Walco. *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F. 2d 240, 246 (8th Cir. 1979); (ii) Representation on Walco's Board of Directors. *Chromalloy American Corp. v. Sun Chemical Corp., supra,* 611 F. 2d at 246; (iii) An actual and demonstrable influence over the policies and important decisions of Walco. *Westlake v. Abrams,* 504 F. Supp. 337 (N. D. Ga. 1981); (iv) The historical relationship between the controlling person and Walco. *North American Co. v. SEC,* 327 U. S. 686, 692-93 (1945); and (v) Business relationship between the controlling person and Walco. *Morgan Stanley & Co. v. SEC, supra,* 126 F. 2d at 329.

*The Offer To Purchase Fails To Disclose Facts Relating To The Integrity Of Richmond And Walco Management*

**\*5** 6. Facts relating to the integrity of Richmond and Walco's management are material and must be disclosed. 113 *Cong. Rec.* 24662-66 (Remarks of Senator Williams, emphasis added). *See also* H. R. No. 1711, 90th Cong., 2d Sess., *reprinted in* [1968] *U. S. Code Cong. & Admin. Newco* 2811, 2812. *Berman v. Gerber Products Co.,* 454 F. Supp. 1310 (W. D. Mich. 1978).

7. The character and integrity of Richmond and Walco's management take on added significance because the Offer is for less than all the outstanding stock of GSI and will leave a substantial "locked-in" minority in the new enterprise. S. Rep. No. 550, 90th Cong., 1st Sess., 2 (1967).

8. The following factors, discussed more fully under this Court's Findings of Facts, relate to the integrity of Richmond and Walco's management and are material to the GSI shareholders (*Gaines v. Haughton,* 645 F. 2d 761, 779 (9th Cir. 1981)):
 (i) Richmond has used Walco employees during regular working hours to further his political career without reimbursing Walco.
 (ii) Richmond has diverted Walco's corporate funds to satisfy obligations of the Richmond Foundation and to benefit himself politically.
 (iii) Richmond regularly receives from Walco secret and substantial subsidies for his use of an apartment at 25 Sutton Place.
 (iv) Richmond has caused Walco to make "charitable" contributions in Richmond's name (rather than Walco's) for his political aggrandizement.
 (v) Walco management has acquiesced in and, indeed, cooperated with Richmond in carrying out these activities.

*The Offer Fails To Disclose Walco's Violation Of Section 16(b) Of the 1934 Act*

10. The Offer to Purchase is materially false and misleading in that it does not disclose that Walco, in the action entitled *Reece Corp. v. Walco National Corp.,* [Current] FED. SEC. L. REP. (CCH) ¶ 98,289 (S. D. N. Y. 1981), has been found in violation of Section 16(b) of the 1934 Act. All violations of federal securities laws must be disclosed in the Offer to Purchase. Item 2(f) of Schedule 14D-1; 17 C. F. R. § 240.14d-100; *U. S. v. Fields,* 592 F. 2d 638 (2d Cir. 1978), *cert. denied,* 442 U. S. 917 (1979).

*B. Walco Has Filed A Materially False Schedule 13D In Violation Of Section 13(d) Of The 1934 Act.*

11. Walco's Schedule 13D, dated on May 1, 1981, and the amendments thereto, violated Section 13(d) of the 1934 Act in that they did not disclose Walco's intention to obtain control of GSI and falsely stated that the purpose of the acquisition of GSI stock was "for investment." This information would have been material to the shareholders of GSI who sold their stock during the period of Walco's non-compliance with Section 13(d). H. Rep. No. 1711, 90th Cong., 2nd Sess. (1968), [1968] U. S. Code Cong. & Admin. News, 2811 at 2813; *SEC v. Savoy Industries,* 587 F. 2d 1149, 1165 (D. C. Cir. 1978), *cert. denied sub nom. Zimmerman v. SEC,* 440 U. S. 913 (1979).

*II. IRREPARABLE HARM, THE BALANCE OF THE HARDSHIPS AND THE PUBLIC INTEREST MANDATE THE ISSUANCE OF AN INJUNCTION*
*A. The Irreparable Harm To GSI And Its Shareholders.*
*For Violation of Sections 14(d) and (e)*

**\*6** 12. Unless an injunction is issued, GSI and its shareholders will suffer irreparable harm in that they are being asked to decide whether to tender, hold or sell their shares without the full and accurate disclosure required by Sections 14(d) and (e) of the federal securities laws. *Life Investors, Inc. v. AGO Holding, N.V.* (No. 812065) (8th Cir. October 21, 1981).

*For Violation of Section 13(d)*

13. Unless an injunction is issued, GSI and its shareholders, both those who presently own shares and those who sold during Walco's non-compliance with the requirements of Section 13(d) of the 1934 Act, will be irreparably harmed in that:
 (i) Walco's illegally obtained blocking position has placed it in a position to inhibit competing offers and has made it extremely difficult for GSI to

1981 WL 17552
Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402
(Cite as: 1981 WL 17552 (E.D.Mo.))

Page 5

arrange for a merger, business combination or to pursue other possible business opportunities which would be favorable to *all* GSI shareholders (as opposed to the 19 percent which Walco seeks). Once Walco controls GSI, it will have little, if any, incentive to pay a premium to the remaining GSI shareholders in a subsequent merger of GSI and Walco. In addition, Walco's acquisition of over 51% of GSI will reduce the liquidity of GSI stock held by the remaining GSI shareholders.

(ii) The knowledge that Walco's ultimate purpose was to seek control of GSI may have led many shareholders who sold in the open market to hold onto such shares in anticipation of a higher price or to stay with the new entity. The stockholders that sold could not be compensated for the irretrievable loss of the opportunity to consider whether they wished to sell their shares at a time when a takeover was intended or whether they wished to facilitate, directly or indirectly, the acquisition by Walco of GSI.

(iii) Shareholders who sold to Walco irretrievably lost their ability to obtain a control premium for their shares-a loss not compensable by a monetary award-and unwittingly sacrificed their right to knowingly determine who should be in a position to control GSI.

14. Further, Walco's wilful violation of the Williams Act, followed on the heels by its Offer, provides additional basis for the issuance of an injunction. *See Rondeau v. Mosinee Paper Corp., 422 U.S. 49 (1975)*; *Universal Container Corp. v. Horwitz,* [1977-1978 Transfer Binder] FED. SEC. L. REP. (CCH) ¶ 96,161 at 92,255-56 (S.D.N.Y. 1977).

15. Because of the irreparable harm to GSI shareholders, both past and present, it is appropriate that Walco offer recision to all GSI shareholders that sold in the open market during the period of its noncompliance and that the Offer be enjoined pending the completion of that process. *Financial General Bankshares, Inc. v. Lance,* [1978 Transfer Binder] FED. SEC. L. REP. (CCH) ¶ 96,403 (D.D.C. 1978); *Ozark Air Lines, Inc. v. Cox, 326 F. Supp. 1113, 1120 (E.D. Mo. 1971)*.

16. Additionally, an injunction pending recision is appropriate to deter future violations of law and to prohibit Walco from taking advantage of a position it has illegally obtained. *Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F. 2d 842, 845 (2d Cir. 1970)*; *See, Universal Container Corp. v. Horwitz,* [1977-78 Transfer Binder] FED. SEC. L. REP. (CCH) ¶ 96,161 at 92,257 (S.D.N.Y. 1977).

## B. *The Balance Of The Hardships And The Public Interest Mandate Injunctive Relief*

**\*7** 17. In sharp contrast to the immediate and irreparable harm which will befall GSI and its shareholders should equitable relief be denied, Walco will suffer no harm whatsoever if its purchase of tendered shares is restrained until such time as it has cured its violations of law. *See, Life Investors, Inc. v. AGO Holding, N.V., supra; Sonesta International Hotels Corp. v. Wellington Associates, 483 F. 2d 247 (2d Cir. 1973)*.

18. Finally, as stated by the Court in *Life Investors Inc. v. AGO Holding, N.V., supra,* there is a strong public interest in furthering the policy of full and fair disclosure underlying the Williams Act.

Not Reported in F.Supp., 1981 WL 17552 (E.D.Mo.), Fed. Sec. L. Rep. P 98,402

END OF DOCUMENT



Slip Copy
Slip Copy, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: 2006 WL 1720461 (E.D.N.Y.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
KEYBANK, NATIONAL ASSOCIATION, Plaintiff,
v.
QUALITY PAYROLL SYSTEMS, INC., et al.,
Defendants.
**No. CV 06-3013(JS)(AKT).**

June 22, 2006.
Andrew P. Karamouzis, Moran Karamouzis LLP,
Rockville Centre, NY, for Plaintiff.

### ORDER

A. KATHLEEN TOMLINSON, Magistrate Judge.

*1 This is a breach of contract action which has been referred to me for a Report and Recommendation on Plaintiffs' motion for a preliminary injunction. However, during the preliminary injunction hearing on June 21, 2006, it became clear that certain segments of the various requests for relief were based upon KeyBank, National Association's ("KeyBank" or "Plaintiff") asserted need for expedited discovery, separate and apart from the other segments seeking injunctive relief. Therefore, I am dealing with the requests for relief in two parts. This Order deals solely with the request for expedited, pre-answer discovery. The remainder of the motion for a preliminary injunction which seeks affirmative injunctive relief was also heard during the June 21, 2006 proceeding and those issues and findings will be set forth in a separate Report and Recommendation to Judge Seybert, the District Judge assigned to this case.

### Procedural Setting

On June 16, 2006, KeyBank filed a Complaint and an Order to Show Cause, with supporting documentation, seeking a preliminary injunction, pursuant to Fed.R.Civ.P. 65, against Quality Payroll Systems, Inc. ("Quality Payroll") with respect to various records and correspondence between KeyBank and Quality Payroll and Quality Payroll's customers. On June 16, 2006, District Judge Feuerstein signed the Order to Show Cause as well as a Temporary Restraining Order directing that

"[p]ending the hearing of this motion, defendant is enjoined from and restrained from altering, modifying or destroying any and all relevant documents, correspondence, e-mails and financial records of its customers." See Order Granting TRO, June 16, 2006. The Order to Show Cause also directed Quality Payroll to appear and show cause, at a hearing to be conducted before me on June 26, 2006, why Plaintiff's requested relief should not be granted.

KeyBank moves the Court for an Order directing and enjoining Quality Payroll from (i) altering, modifying or destroying any documents, correspondence, e-mails, financial records and the like related to KeyBank; (ii) altering, modifying or destroying any and all documents, correspondence, e-mails, financial records and the like related to any of its customers; (iii) directing Quality Payroll to immediately produce true, accurate and complete copies of all executed authorizations from its customers as required under paragraph 4 of the Electronic Fund Transfer Service Agreement between the parties dated June 11, 1998; and (iv) directing Quality Payroll to immediately produce true, accurate and complete copies of all Client Services Agreements with its customers as required by paragraph 4 of that same Electronic Fund Transfer Service Agreement. This Order is directed only to sections (iii) and (iv) above.

At the June 26, 2006 hearing, Plaintiff's counsel appeared, along with his client's Senior Vice-President who had provided an affidavit in support of the original Order to Show Cause. In addition, counsel for two other entities, DZ Bank and Three Village Bennett Agency, were present in the courtroom. These attorneys asserted that their clients were being adversely impacted by the actions of the parties in this case. I advised both attorneys that although I permitted them to speak as a professional courtesy, they have no standing in this action currently. It appears that these entities plan to file motions to intervene, but such prospective activity has no bearing on the current hearing.

*2 As to Quality Payroll, Stephen D. Haber, Esq. was present in the courtroom but emphasized that he did not and was not representing Quality Payroll. According to Mr. Haber, he only came to court to ask for an adjournment of the proceedings because he understood that Quality Payroll's principals were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

looking for counsel to represent them in this matter. [FN1] When I asked Mr. Haber if he were representing the corporation solely for the purpose of appearing in the proceedings on June 26, 2006, Mr. Haber responded "no" and confirmed on several different occasions that he did not represent Quality Payroll in any capacity for any purpose at the proceedings. Mr. Haber also later confirmed that Quality Payroll essentially was not appearing and had no one appearing on its behalf, but nonetheless was seeking an adjournment. Based on those responses, Plaintiff's counsel requested that the court hold Quality Payroll in default.

> FN1. KeyBank's counsel, Andrew Karamouzis, Esq. stated on the record at the June 26 hearing that he personally served the Order to Show Cause with Temporary Restraining Order upon Quality Payroll at its offices in Bohemia, New York in and around 4 p.m. on June 20, 2006, approximately an hour or so after District Judge Feuerstein signed the documents. An affidavit of service to that effect has been filed on ECF and appears as docket entry no. 6.

*Background*

KeyBank Electronic Services, a division of KeyBank provides electronic banking services and acts as an "Originating Financial Institution"--as that term is defined under the Operating Guidelines of the National Automated Clearing House Association ("NACHA")--on behalf of various payroll processors and their customers. *See* Affidavit of Robert E. Harrison, ¶ 5. [FN2] On or about June 11, 1998, Quality Payroll entered into three agreements with KeyBank. Quality Payroll, one of the defendants in this action, provides payroll services, tax and banking services, time attendance systems, human resources and benefits administration, including 401k and Flexible Spending Accounts, to clients throughout the United States. *Id.*, ¶ ¶ 6, 7; *see also* Quality Payroll Systems web site at www.qualitypayroll.com. One of those clients is KeyBank. Pursuant to these three agreements, KeyBank provided electronic banking services on behalf of Quality Payroll and its customers and acted as an Originating Financial Institution. *See* Harrison Aff. ¶ 9.

> FN2. Hereafter, cited as "Harrison Aff., ¶ ----." These references are to the Affidavit of Robert E. Harrison, Senior Vice President of KeyBank Electronic Services, a division of

KeyBank, National Association.

For purposes of this Order, two of these agreements are pertinent. KeyBank asserts that Quality Payroll should be required to produce immediately true and accurate copies of (1) the authorizations executed by its customers which permit debit entries to the customers' accounts and which are required to be maintained pursuant to paragraph 4 of the "Service Agreement for Electronic Fund Transfers" (hereafter referred to as the EFT Service Agreement), annexed as Exhibit C to the Harrison Affidavit, and (2) all the Client Services Agreements Quality Payroll has with its customers which are also required under paragraph 4 of that same Service Agreement.

The other agreement relevant to this Order is the July 1998 "Automated Clearing House Electronic Data Interchange Service Agreement." *See* Harrison Aff. Ex. B. Paragraph 14 of this Agreement provides as follows:

> 14. Record Retention. Client agrees to keep all written authorizations required by the Rules on file for at least two years after such authorization has been terminated. ***Authorizations should be available upon request to Bank or RDFI*** (emphasis supplied).

**\*3** The "Bank" referenced here is Plaintiff.

Plaintiff asserts that it has an urgent need to access these records and will be irreparably harmed if it cannot do so. This entire action is precipitated by KeyBank's having come to learn in and around June 5, 2006 that one of Quality Payroll's accounts with Plaintiff had an overdraft in the amount of $1,241,522.30. KeyBank promptly notified Quality Payroll's President Geller and demanded that Quality Payroll make immediate payment to satisfy the overdraft. *See* Harrison Aff. ¶ ¶ 12, 13. Notwithstanding some initial brief response from Quality Payroll, the overdraft was not paid, and, by June 12, 2006, the overdraft had increased to $2,429,949.95. *Id.* at ¶ 16. On June 14, 2006, KeyBank notified Quality Payroll, in writing, that it was in default of its obligations under the EFT Service Agreement and that KeyBank was terminating the Agreement on two days' written notice, effective June 16, 2006, pursuant to paragraph 19(a) of the EFT Service Agreement. KeyBank asserts that Quality Payroll defaulted and as a result, KeyBank exercised its right of set-off under paragraph 9 of the Master Agreement, annexed as Exhibit A to the Harrison Affidavit. *Id.* at ¶ ¶ 18, 19.

At the hearing, KeyBank stated that as a result of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

overdraft by Quality Payroll and the lack of available funds, KeyBank will not be able to issue the necessary credits on behalf of Quality Payroll to its various customers as they come due. Plaintiff therefore concludes that when Quality Payroll's various customers realize that payroll checks to their employees are not being funded, they will, in all likelihood, assert claims against KeyBank. *Id.* at ¶ 20. In its papers as well as at the hearing, KeyBank also stated that Quality Payroll's Geller had tole KeyBank representatives that Quality Payroll had sold its client list to ADP, a national payroll processor for consideration somewhere between $1 million and $2.5 million. Quality Payroll also acknowledged that it had already received a $1million payment from ADP in connection with the transaction. *Id.* at ¶ 15. During the hearing, it was also brought to the Court's attention that Quality Payroll had put its building up for sale. In addition, no accounting has been given for the whereabouts of the overdraft monies in the amount of $2.4 million.

### Discussion

As noted previously, and as acknowledged by KeyBank's counsel during the hearing, the relief sought by KeyBank in the third and fourth prongs of its order to show cause is essentially a request for expedited discovery. Fed.R.Civ.P. 26(d) states in pertinent part that "unless the court upon motion, for the convenience of the parties and witnesses and in the interests of justice, orders otherwise, methods of discovery may be used in any sequence ..." Fed.R.Civ.P. 26(d). Fed.R.Civ.P. 34(b), which concerns the procedure with respect to the production of documents states, that "without leave of the court or written stipulation, a request may not be served before the time specified in Rule 26(d)." Fed.R.Civ.P. 34(b). However, the Court may expedite discovery under certain circumstances.

*4 As stated in *Better Packages, Inc. v. Zheng*, No. 05-CV-4477, 2006 WL 1373055, at *2 (D.N.J.2006), courts generally employ two standards in determining whether expedited discovery is appropriate. *Id.* The first is the so-called "reasonableness standard," which "requires the party seeking the discovery to prove that the requests are reasonable under the circumstances." *Id.* The second standard is a multi-part test set forth in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y.1982) and requires a plaintiff seeking expedited discovery to show:

(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance

of irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted.
*Id.* at 405.

As noted by Judge Edelstein in *Notaro,* the four requirements set forth above "parallel those showings necessary to obtain a preliminary injunction." *Id.* at 405 n. 4. Under either test, I find that the Plaintiff has satisfied the standard for obtaining expedited discovery. The Plaintiff has made a sufficient showing of irreparable harm if expedited discovery is not granted based on the uncontroverted facts presented in its motion papers and on the record at today's hearing. As stated in the Affidavit of Robert E. Harrison, Senior Vice-President of KeyBank, Plaintiff is faced with the possibility of being inundated with claims from various third-parties seeking their payroll monies which KeyBank will not be able to properly address without the documents sought. *See* Harrison Aff. ¶ 23. In addition, KeyBank is subject to the rules and regulations of the National Automated Clearing House Association ("NACHA") which requires it to maintain and comply with certain disclosure requirements. By not having access to Quality Payroll's documentation, KeyBank faces the possibility of irreparable harm because of their inability to comply with NACHA's rules and regulations--not to mention the harm to KeyBank's commercial reputation in the marketplace. What the Court knows of Quality Payroll's circumstances as of the hearing is disturbing. First, this entity has sold its client list very recently to ADP. Second, the Court is advised that Quality Payroll's building has been placed on the market. Third, and most importantly, $2.4 million which represents the overdraft is still unaccounted for. Fourth, Quality Payroll, despite having been served with the order to show cause and temporary restraining order has not appeared in this action, despite Mr. Haber's presence in court. I further find that the relief which KeyBank seeks is nothing more than it is entitled to under paragraph 14 of the Automated Clearing House Electronic Data Interchange Service Agreement.

Further, Plaintiff satisfies the second prong of the *Notaro* test in that it has shown some probability of success on the merits. The Master Agreement, the Automated Clearing House Electronic Data Interchange Service Agreement, both dated July 13, 1998, the Service Agreement for Electronic Fund Transfers dated July 11, 1998, and the Key Exchange Services Amendment Agreement dated December 10,

Slip Copy
Slip Copy, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: 2006 WL 1720461 (E.D.N.Y.))**

2004 (collectively the "Agreements") clearly define the rights and duties of the parties. Specifically, paragraph 9 of the July 13, 1998 Master Agreement permits Plaintiff to "set off the unpaid balance of any amount owed" to it. *See* Harrison Aff., Ex. A. Therefore, I find that Plaintiff has shown some possibility of success at least with respect to its claim for a declaratory judgment. *See* Compl. ¶ 37.

**\*5** In addition, there is some connection between documents requested here and the avoidance of irreparable injury. As stated by Harrison in his affidavit, the documentation sought is critical in addressing third-party questions or claims that have already arisen from Quality Payroll's customers as a result of the overdraft. *See* Harrison Aff. ¶ 22. Therefore, I find that the injury which KeyBank faces in not having Quality Payroll provide its customer documentation to KeyBank is far greater than in directing them to provide it. This factor also satisfies the so-called "reasonableness test" for expedited discovery. *See Better Packages, Inc.*, 2006 WL 1373055, at \*2. Paragraph 14 of the Automated Clearing House Electronic Data Interchange Service Agreement, both dated July 13, 1998, states that "client agrees to keep all written authorizations required by the Rules on file for at least two years after such authorization has been terminated. Authorizations should be available upon request to Bank or RDFI." *See* Compl. Ex. B. Therefore, Quality Payroll is already under an obligation to maintain the records sought.

Based on the foregoing, I find that expedited discovery is warranted therefore, pursuant to Fed.R.Civ.P. 34(b), it is hereby;

**ORDERED,** that Defendant Quality Payroll make available for discovery and inspection by Plaintiff's counsel no later than June 27, 2006 all executed authorizations from its customers as required under paragraph 4 of the Electronic Fund Transfer Service Agreement dated June 11, 1998; and it is further

**ORDERED,** that Defendant Quality Payroll make available for discovery and inspection by Plaintiff's counsel no later than June 27, 2006 all Client Services Agreements with its customers as required by paragraph 4 of the Electronic Fund Transfer Service Agreement dated June 11, 1998; and it is further

**ORDERED,** that Defendant Quality Payroll cooperate with Plaintiff's counsel in providing the necessary documentation for discovery and

inspection by June 27, 2006; and it is further

**ORDERED,** that Plaintiff's counsel is directed to serve a copy of this Order upon Quality Payroll Services, Inc. by personal service no later than the close of business on June 23, 2006.

Defendant Quality Payroll is hereby put on notice that failure to comply with this Order may subject it to contempt proceedings before this Court.

**SO ORDERED.**

Slip Copy, 2006 WL 1720461 (E.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1987 WL 5793                                                                    Page 1
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

**H**
United States District Court, S.D. New York.
LEBHAR FRIEDMAN, INC., a New York
Corporation, Plaintiff,
v.
MOVIELAB, INC., a New York Corporation, Saul
Jeffee, John J. Kowalak, S.
Richard Di Bona, Norman W. Elson, Henry Mendler,
Leonard P. Weg and Michael P.
Mayer, Defendants.
**No. 86 CIV. 9965 (SWK).**

Jan. 13, 1987.

*MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

*1 This is an action for preliminary relief brought by
plaintiff to redress allegedly unlawful activities by
the defendants in connection with their solicitation of
defendant corporation's shareholder proxies by means
of an allegedly materially misleading Proxy
Statement, dated December 16, 1986.

*THE PARTIES*
Defendant, Movielab, Inc. ("Movielab") is a
corporation organized and existing under New York
State law, with its principal place of business at 619
West 54 Street in Manhattan. Movielab engages
primarily in video post-production services.
Movielab is also involved in various commercial real
estate transactions.

Movielab is a public corporation whose common
stock is listed on the American Stock Exchange. As
of December 15, 1986 there were 1,643,908 shares of
Movielab stock outstanding, and as of May 28, 1986,
there were 1,336 record holders of Movielab
common stock.

Defendant Saul Jeffee is Chairman of the Board of
Directors and President of Movielab. As of
December 1, 1986, Jeffee was the beneficial owner of
671,858 shares of Movielab common stock,
approximately 40.9 percent of all issued and
outstanding shares. Defendant Leonard P. Weg is
Vice President, Treasurer, and Secretary of Movielab
and a member of Movielab's Board of Directors.
Defendants John J. Kowalak, S. Richard DiBona,
Norman W. Elson, Henry Mendler, and Michael

Mayer are members of Movielab's Board of
Directors.

Plaintiff Lebhar Friedman, Inc. ("Lebhar") is a
corporation organized and existing under New York
State law, with its principal place of business at 425
Park Avenue in Manhattan. Lebhar is the record and
beneficial owner of Movielab common stock, and as
of December 1, 1986 was the beneficial owner of
338,400 shares of Movielab common stock,
approximately 20.6 percent of all shares issued and
outstanding.

*FACTS*

On June 2, 1986, Lebhar wrote a letter to the Board
of Directors of Movielab demanding that Movielab
commence an action for rescission and damages
against defendants Jeffee, Kowalak, DiBona, Elson,
Mendler, Weg and certain other persons. [FN1] In
this letter, Lebhar alleged that these defendants had
caused Movielab to sell substantially all of its assets
without shareholder approval, in violation of Section
909 of the New York Business Corporation Law, and
had also engaged in other transactions which wasted
the company's assets and violated the directors' duties
to Movielab's public shareholders. [FN2]

On June 25, 1986, defendant Jeffee informed Lebhar
by letter that on June 19, 1986 the Movielab Board of
Directors had appointed defendant Mayer to analyze
the claims in Lebhar's letter and that Mayer had been
authorized by the Board to retain independent
counsel to assist him in his investigation.

In July, 1986, defendant Mayer retained as
independent counsel the New York law firm of
Kramer, Levin, Nessen, Kamin & Frankel to prepare
an investigative report analyzing Lebhar's charges.
Arthur H. Aufses is the Kramer Levin attorney who
has been responsible for the investigation and
preparation of the report.

*2 On October 31, 1986, the independent counsel
informed plaintiff that its work on the report was
"nearing its end" and that the report "will soon be
submitted to the Board". During the first or second
week in November the independent counsel began to
write the report. On November 14, 1986, the
independent counsel submitted a draft version of the
report, at that time still devoid of legal conclusions,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793                                                                    Page 2
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

to Mayer.  At some time during Thanksgiving week of 1986, the independent counsel submitted a second draft to Mayer.  On some date in the middle of December, but after December 15, the independent counsel submitted a third draft to Mayer.  Then, on January 1, 1987, the independent counsel submitted the final version of the report to Mayer.  The final report was released to Movielab's Board members on January 7, 1987, on the eve of the evidentiary hearing before this Court.

The report discusses the Movielab business decisions challenged by Lebhar in their June, 1986 letter: the Technicolor sale, defendant Jeffee's employment contract, the Besega loans, the failure to lease the vacant office space, and the directors' fees.  The report does not recommend a shareholder derivative suit based on Lebhar's dissatisfaction with these aspects of Movielab's conduct.  The report does recommend, however, the following action by Movielab's Board:  1) reconsidering Jeffee's employment contract in light of Movielab's present financial difficulties;  2) addressing the issues of short and long term planning, including Lebhar's demand for liquidation of the company;  3) meeting more frequently;  and 4) seeking individual Board members with relevant experience in videotape post-production and commercial real estate, because although Movielab now engages almost exclusively in these areas, neither of these businesses is now represented on the Movielab Board.

Meanwhile, on December 16, 1986, Movielab's Board of Directors disseminated a Proxy Statement to the corporation's shareholders.  The Proxy Statement is intended for use at a shareholder meeting to be held on January 13, 1987, the first such meeting within past 2 months.  The agenda for the annual meeting-- as set forth in the Proxy Statement-- includes the election of a Board of Directors, and the slate of nominees provided in the statement consists of the incumbent directors.  The Proxy Statement contains no reference to the existence of an investigation or report or the recommendations contained in the report.

*ALLEGATIONS*
Based on these facts plaintiff alleges that defendants will violate Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and the provisions of the Securities and Exchange Commission's Rule 14a-9, 17 CFR 240.14a-9, promulgated thereunder, if Movielab's shareholders' vote on the current Proxy Statement at the shareholder meeting on January 13, 1987. Plaintiff alleges that the Proxy Statement as

issued is unlawful under § 14(a) and Rule 14a-9 because it does not disclose, at the very least, the recommendations of the report as they relate to the individual defendants. Plaintiff alleges that these recommendations are material facts which have been omitted, and which by their omission, rendered other statements in the Proxy Statement misleading.

**\*3** Plaintiff also alleges that defendants' actions described above with regard to the Proxy Statement-- which plaintiff alleges are designed to mislead Movielab's shareholders and entrench the individual defendants in office--also constitute a breach of their fiduciary duty to the shareholders, and are, therefore, also prohibited under New York State law.

In response, defendants assert that they were not required to disclose the recommendations in the Proxy Statement because at the time that it was issued-- December 16, 1986--these recommendations were not in existence, or at the very least defendants were unaware of their existence.

*PRELIMINARY INJUNCTION*
Plaintiff  [FN3] moves this Court for a preliminary injunction directing defendants, to:  1) refrain from violating the provisions of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and the provisions of Rule 14a-9 promulgated thereunder;  2) immediately file a corrective proxy statement with the Securities and Exchange Commission and immediately mail copies to Movielab's shareholders after such corrective proxy statement has been reviewed by plaintiff and this Court;  3) refrain from taking any steps to solicit or vote any proxies, consents, or authorizations with respect to the Movielab's Proxy Statement, dated December 16, 1986;  4) refrain from making any false or misleading public statements regarding Movielab or its directors; or 5) refrain from filing or disseminating any false or misleading proxy solicitation materials relating to the voting of Movielab common stock.

On December 31, 1986, Judge Leisure, acting as Part One Judge, granted a temporary restraining order on plaintiff's behalf.  On January 8, 1987, this Court extended the temporary restraining order in order to maintain the status quo until disposition of the motion for preliminary injunction.

This Court held an evidentiary hearing on January 8, 1987.  The Court heard testimony from Aufses. [FN4]  The Court also received pleadings, affidavits, and exhibits from both parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In order to obtain a preliminary injunction in this Circuit, a plaintiff must demonstrate both (a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor. _In re Feit & Drexler, Inc._, 760 F.2d 406, 415 (2d Cir.1986); _Kaplan v. Board of Education_, 759 F.2d 256, 259 (2d Cir.1985).

_Merits_

_Securities Claim_

Section 14(a) of the Securities Exchange Act of 1934 provides,

"It shall be unlawful for any person, by the use of mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 78l]."

*4 15 U.S.C. § 78n.

Rule 14a-9 provides, in relevant part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to a material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Under Rule 14a-9 "[a] proxy solicitor's obligation to disclose is a continuing one". _Aegis v. Goldman_, 523 F.Supp. 1273, 1280 (S.D.N.Y.1981). Although a proxy solicitor is not required to disclose information in an original proxy which was either not in existence or of which the solicitor was unaware on the date that

the proxy was issued, _Nemo v. Allen_, 466 F.Supp. 192, 195 (S.D.N.Y.1979), see also _Diamond v. Arend_, No. 84 Cr. 0751, _slip op._ at 13 (S.D.N.Y. November 17, 1976), if new information becomes available before the shareholder vote which is material and whose omission would render the existing statement false or misleading, it is the solicitor's obligation to disclose that information before the vote. _Aegis_, 523 F.Supp. at 1180. When requesting relief, it is plaintiff's burden to demonstrate that defendant proxy solicitor became aware of the information at some time before the vote. _Nemo_, 466 F.Supp. at 195. (court refused to undo the results of a vote based on a proxy statement which did not disclose material information of which the defendant corporation was not aware at the time it issued the proxy, as plaintiff offered no proof that defendant became aware of the information at any time before the vote).

Plaintiff has offered proof, in the form of sworn testimony, that even if defendants were not aware of the report's conclusions and recommendations [FN5] when the proxy was issued on December 16, 1986, they have become aware of the recommendations before the shareholder vote has taken place. Aufses testified that copies of the report in its final form were sent to the Board members on the evening of January 7, 1987. [FN6] The shareholder's vote is not scheduled to take place until January 13, 1987.

The report's recommendations are clearly material information. A fact is material under Rule 14a-9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote". _TSC Industries, Inc. v. Northway, Inc._, 426 U.S. 438, 449 (1976); see _GAF Corp. v. Heyman_, 724 F.2d 727, 741 (2d Cir.1983) (upholding use of this standard in a proxy case but disagreeing with district court's application of it). The report contains information regarding the capabilities of Movielab's incumbent directors; the report concludes that no one on the present Board is experienced in the very areas in which the corporation does business. Based on this conclusion, the report recommends that the Movielab Board should seek additional members with relevant experience in, among other areas, videotape post-production and commercial real estate. The report also concludes that defendant Jeffee's employment contract was reasonable at the time it was negotiated. The report recommends, however, that the Board reconsider Jeffee's contract in light of newly available comparative data regarding companies of Movielab's size and Movielab's competitors in the industry. These

1987 WL 5793                                                                                          Page 4
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

conclusions and recommendations are highly relevant to Movielab's shareholders' decisions whether to reelect the entire slate of incumbent Board members presented in the Proxy Statement, which includes Mr. Jeffee.

*5 The current omission of these material recommendations from the Proxy Statement renders the statement misleading. There is nothing in the current statement which indicates that the incumbent Board's qualifications to be the exclusive directors of Movielab have been questioned, or that Jeffee's salary has been questioned. Both have been questioned by an independent neutral body hired by the corporation to conduct an internal investigation. The current Proxy Statement is, therefore, misleading.

*State Claims*

Because plaintiff has met its burden of demonstrating a likelihood of success on the merits of its federal claim, the Court need not address the merits of plaintiff's state claims.

*Irreparable Harm*

Where plaintiff seeks an injunction because of defendant's violation of a statute, it need only show that unless the injunction is granted, plaintiff will suffer harm which cannot be repaired. *Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1962) (Friendly, J.).

Plaintiff meets this burden. If this injunction were not granted, Movielab's shareholders could elect a Board of Directors based on misleading information which has been presented to them in violation of the securities laws. Courts recognize that the wrongful positioning of corporate heads wreaks irreparable harm on a corporation and its shareholders because it may require the unravelling of transactions wrongfully entered into. *See Calumet Industries, Inc. v. MacClure,* 464 F.Supp. 19, 28 (N.D.Ill.1978); *Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F.Supp. 787, 794 (S.D.N.Y.1978). The harm is particularly acute in this case because the directors who could be elected have been deemed unqualified to run the corporation without additional assistance.

### CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary injunction is GRANTED, as modified. Defendants are (1) to refrain from taking any steps to solicit or vote any proxies, consents, or authorizations, with respect to the Proxy Statement; and (2) to file a corrective proxy statement with the Securities and Exchange Commission and mail such corrective statement to Movielab's shareholders prior to any future shareholders' meeting concerning the election of directors. Defendants' motion for a protective order is denied.

SO ORDERED.

FN1. This letter was not the first time Lebhar voiced its grievances against Movielab. In July 1985--approximately three months after it first purchased stock in Movielab--Lebhar brought a shareholder derivative and individual action against Movielab, its directors and others premised upon charges of waste and mismanagement as well as allegations that Movielab's directors had sold substantially all of the corporation's assets without shareholder approval in violation of § 909 of the Business Corporation Law. Lebhar sought the appointment of a temporary receiver for Movielab pursuant to CPLR § 6401.
On January 9, 1986, the Supreme Court, New York County (S. Schwartz, J.) rendered a memorandum decision, followed by a February 10, 1986 order, dismissing Lebhar's state court action and denying Lebhar's motion for appointment of a temporary receiver. The Court held that Lebhar had improperly failed to serve a demand upon the Movielab Board of Directors pursuant to § 626(c) of the Business Corporation Law; that Lebhar had failed adequately to allege that such a demand would have been futile; and that Lebhar's claims of unlawful liquidation, misappropriation and waste were improperly pleaded as individual claims. On May 29, 1986, the Appellate Division, First Department, unanimously affirmed the dismissal of Lebhar's action without opinion.
Movielab disclosed Lebhar's lawsuit, and the claims of waste and mismanagement asserted therein in the corporation's 1985 Annual Report on Form 10-K filed with the Securities and Exchange Commission in early June 1986.

FN2. Lebhar challenged these transactions: 1) Movielab's sale of all its film processing assets to Technicolor in 1984; 2) Jeffee's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793                                                                                          Page 5
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

employment contract, which provides for a term of employment--at $175,000 per year (Jeffee waived the increase, which was to be effective January 1, 1986 to $200,000 per year)--and a lifetime consulting arrangement--at $100,000 a year--after that; 3) the Besega loans, which Jeffee secured for Movielab from the Besega Corporation in which he is a principal; 4) Movielab's decision not to lease vacant office space to Lebhar, and its failure to consummate a lease with another tenant; 5) Movielab's directors' fees.

FN3. A private cause of action is available to corporate shareholders under Section 14(a) to redress "deceptive or inadequate disclosure in proxy solicitations". *J.I. Case Co. v. Borak,* 377 U.S. 426, 431 (1964).

FN4. At this hearing Aufses provided copies of the final draft of the report, which had been mailed to the members of Movielab's Board of Directors on the previous evening, to plaintiff's and defendants' counsel. Defendants' counsel moved for a protective order barring disclosure of the contents of the report to plaintiff. Defendant alleged that such disclosure would constitute use of this Court as a means for producing discovery materials pertaining to the now dormant state action between the parties. The Court declined to rule on the protective order at that time.

FN5. Defendants were not required to disclose Lebhar's mere allegations. *See Markewich v. Adikes,* 422 F.Supp. 1144, 1146 (E.D.N.Y.1976).

FN6. It is, in fact, highly likely that Movielab's Board members were aware of the recommendations contained in the report before January 7, 1987. Aufses testified that Mayer, who is a member of the Board, had access to these recommendations immediately after New Year's day, 1987. Lebhar, however, has not demonstrated to this Court that Mayer shared this information with the rest of the Movielab Board. Because Movielab gained access to the information before the vote, this Court need not reach the issue of whether Mayer's knowledge should be imputed to the other Board members.

Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                 Page 1

Not Reported in F.Supp., 1980 WL 1424 (D.D.C.), Fed. Sec. L. Rep. P 97,576
**(Cite as: Not Reported in F.Supp.)**

**c**

United States District Court; District of Columbia.
**Macke Company (The)**
v.
**Allegheny Beverage Corporation.**
**No. 80-1452**
80-1452
July 11, 1980

PENN, District Judge.
**\*1** This case came back before the Court on July 10, 1980 on plaintiff's renewed Application for a Temporary Restraining Order. This Court had previously denied the Application after hearing held on July 8, 1980.

Plaintiff moves, pursuant to Fed. R. Civ. P. 65 (b) to have the Court restrain the defendant, Allegheny Beverage Corporation (ABC) from acquiring for itself or others, stock of the plaintiff. Plaintiff contends that ABC is engaged in a take over bid and that in doing so ABC has failed to comply with Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 (Act), 15 U.S.C. §§ 78m(d) and 78n(d) . As was noted above, this Court denied a similar application, having concluded at that time that ABC did not fail to comply with Section 13(d) and further that plaintiff had not demonstrated to the satisfaction of the Court that ABC and Yorkton Securities, Inc., constituted a group which had purchased more than 5% of plaintiff's stock without the required filing pursuant to Section 13(d).

After denying plaintiff's Application on July 8, 1980, the Court scheduled a hearing on plaintiff's motion for a preliminary injunction for July 15 at 10:00 a.m. and ruled respecting certain discovery motions filed by the plaintiff. [FN1] The Court also ruled that the denial of plaintiff's Application was without prejudice to plaintiff renewing its Application prior to June 15 if warranted by the facts.

FN1 This Court had previously authorized the parties to engage in expedited discovery. Plaintiff contends that it needs that discovery in order to present its case in support of its motion for preliminary injunction. After the Court had granted expedited discovery, the parties entered into a lengthy stipulation providing the scheduling of expedited discovery with respect to both sides to this litigation.

The plaintiff has renewed the Application and filed two additional affidavits which reveal that there was heavy buying of plaintiff's stock on July 9. (Karnes affidavit.) Meyer Gelfand, Chairman of the Board and Chief Executive Officer of plaintiff also stated that an officer of plaintiff had been called by E. F. Hutton and Company, Inc. (Hutton) which expressed an interest in buying his substantial number of shares and was further told that Hutton was trying to accumulate up to 300,000 shares of stock in the plaintiff. Hutton also advised that Hutton intended to offer between 200,000 and 300,000 shares to ABC on July 10 at 14 3/4 per share. (Gelfand affidavit.)

As the result of these events, plaintiff renewed its Application out of fear that ABC was attempting to acquire control of plaintiff prior to the hearing on July 15.

I

Prior to addressing the merits of the renewed Application, some discussion is required of the failure of counsel for ABC to appear at the hearing on July 10, 1980. Counsel for ABC did appear at the hearing on July 8.

Plaintiff's counsel called the Court's chambers at approximately 11:00 a.m. on July 10 to request an emergency hearing on plaintiff's renewed Application for a Temporary Restraining Order.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1980 WL 1424 (D.D.C.), Fed. Sec. L. Rep. P 97,576
**(Cite as: Not Reported in F.Supp.)**

Counsel advised the Court that their request was being made because of the information they had concerning the intent by ABC to buy a substantial number of shares of plaintiff's stock on July 10. Counsel further advised the Court that they had notified counsel for ABC, Harvey D. Myerson, of the request just a few moments before calling the Court. Mr. Myerson is the lead counsel for ABC but maintains his office in New York City. Plaintiff requested that the Court hear their application as soon as possible and the Court set the matter down for 1:00 p.m. on July 10. Plaintiff's counsel were also advised that they should take necessary action to notify local counsel for ABC although it is quite obvious that counsel in New York would also contact local counsel.

**\*2** Mr. Myerson thereafter called the Court's chambers and requested that the Court delay any hearing on the Application until later in the day so that he would have an opportunity to come to Washington and participate in the hearing. He was advised by the Court's chambers, at the direction of the Court, that the Court would do so provided the parties could reach an agreement that ABC would not purchase any stock of plaintiff pending the delayed hearing. When he advised the Court's chambers that he could not agree to such delay on behalf of his client, he was informed that the hearing would go forth at 1:00 p.m.

A delay to allow ABC's counsel to come to Washington from New York would clearly have frustrated plaintiff's attempt to obtain a temporary restraining order and to maintain the status quo since a hearing could not have been held until later in the afternoon of July 10. It is obvious that within that period of time, resulting from the delay caused by ABC's counsel's trip from New York to Washington, ABC could have acquired the very shares of stock which plaintiff sought to enjoin. Accordingly, this Court concluded that the notice accorded to ABC's counsel was sufficient under the circumstances of this case.

In this regard, the Court also notes that while an attorney who is a member of the bar in another jurisdiction and not admitted to this Court may be granted leave to practice in the Court, it is with the proviso that he join with a member of the bar who maintains an office in the District of Columbia or in a contiguous area. Local Rule 1-4(a)(1) and (2). Moreover, the rules provide that the "local" attorney "will at all times be prepared to go forward with the case." Local Rule 1-4(a)(2). Obviously, a reason for the rule is a very problem raised in this case.

Furthermore, the Court notes that ABC was on notice on July 8, 1980 that the Court would entertain a renewed Application prior to July 15, and should have alerted local counsel to that possiblity. ABC could have made arrangements for local counsel to appear at the hearing but did not do so.

Under the circumstances of this case, this Court is satisfied that ABC had adequate notice to appear for the hearing.

II

After taking into consideration the renewed Application, and the arguments of counsel, and the evidence presented to the Court at the hearing on July 8 and the hearing on July 10, the Court finds that there is substantial evidence that ABC intends to obtain control of plaintiff, that ABC has been purchasing a large number of plaintiff's stock on the market, that if ABC should purchase a 300,000 shares held by Hutton or others on July 10 that it might hold up to 30% of the outstanding stock in the plaintiff, that ABC has filed 13D disclosures as required by Section 13(d) of the Act, that those filings were made within ten days after purchases of 5% or more of plaintiff's stock, that ABC has failed to comply with Section 14(d) of the Act in that it is not filed 13D disclosures prior to purchasing 5% or more of the stock in plaintiff, that in its 13D disclosures ABC has not clearly indicated that it attempts to obtain control of plaintiff, that the facts presented

**\*3** Court as of this date supports plaintiff's contention that ABC intends to take control of plaintiff, that it appears that ABC has engaged in actions and wide-spread solicitation of some public

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 3

Not Reported in F.Supp., 1980 WL 1424 (D.D.C.), Fed. Sec. L. Rep. P 97,576
**(Cite as: Not Reported in F.Supp.)**

stock holders of plaintiff, e.g., Gelfand and Goldman, that there is at least a suggestion that Yorkton may have been purchasing stock on behalf of ABC, that the prior solicitation to Gelfand and Goldman was for 22% of plaintiff's stock, that the offer to Gelfand and Goldman was made at a price over the prevailing market rate, that ABC has accumulated substantial shares of plaintiff stock within the last month, that all of the above actions have undoubtedly subjected plaintiff's share holders to pressure to sell their shares, that if ABC continues to purchase the stock at the current rate, there is a strong likelihood that it will own a controlling interest on or before July 15, when this Court has set the matter down for a preliminary injunction, and that there is a likelihood that if successful in purchasing the 200,000 to 300,000 shares held by Hutton, ABC will have acquired that controlling interest.

### III

Based upon the present evidence, the Court concludes at this time that ABC's acquisitions of stock in plaintiff constitute "tender offers." *See, Wellman v. Dickson* 475 Fed.Supp. 783 (S.D.N.Y. 1979); *S.G. Securities Inc. v. Fuqua Investment Company,* 466 Fed.Supp. 1114 (D.Mass 1978); *Cattleman's Investment Company v. Fears,* 343 Fed.Supp. 1248 (W.D. Okla 1972). If the offers are in fact tender offers, ABC is required to comply with Section 14(d) of the Act, which it has not done in this case. Under these circumstances, the Court concludes that it must enter a restraining order and preserve the status quo until the parties can be heard in full on July 15, 1980.

Plaintiff in seeking an injunction, must show a likelihood of success on the merits, that it will suffer irreparable injury if the injunction is not granted, that other parties to the action would not be substantially harmed if the injunction is granted, and where lies the public interest. *Virginia Petroleum Jobbers Assoc. v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). That test has been somewhat modified by *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 559 F.2d 841

(1977). The Court concludes that the plaintiff has demonstrated the likelihood of success on the merits at this time and based upon the present evidence before the court, in showing that ABC has failed to abide with Section 14(d) of the Act, that plaintiff will suffer irreparable injury if the order is not entered since the record supports plaintiff's common stock and to thereby require a controlling interest in plaintiff, that the entry of the order will not cause substantial harm to ABC, or for that matter Yorkton Securities Inc., and finally that the entry of the restraining order at this time is in the public interest. As has been stated, the Congress in enacting this legislation did so to provide investors in public corporations with material information with respect to the potential impact of any effort to acquire control of a company and to give those investors time in which to make an investment decision. *See Cattleman's Investment Company v. Fears,* supra at 1251.

**\*4** Accordingly this Court entered a temporary restraining order on July 10, 1980 which restrains ABC from receiving the transfer or acquiring, directly or indirectly, for itself or any others, stock of the Macke Company. The Court has provided that the order shall expire within 10 days unless extended by further order of the Court and the Court has also set the matter down for a hearing on the preliminary injunction on July 15, 1980.

Macke Co. v. Allegheny Beverage Corp.
Not Reported in F.Supp., 1980 WL 1424 (D.D.C.), Fed. Sec. L. Rep. P 97,576

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1972 WL 323                                                                                                Page 1
Not Reported in F.Supp., 1972 WL 323 (E.D.Pa.), Fed. Sec. L. Rep. P 93,505
**(Cite as: 1972 WL 323 (E.D.Pa.))**

C

United States District Court; E.D. Pennsylvania.
**Rafal**
v.
**Geneen.**
**Civil Action No. 72-536**

May 8, 1972

HIGGINBOTHAM, District Judge.

*1 The facts have been dictated from the bench and the attached is a rough draft Memorandum and Order. [FN1]

> FN1 The attached Memorandum has been revised slightly as to form but not as to substance. Counsel for IT&T had asserted that they were prepared to seek a supersedeas order and this memorandum was prepared so that the Court of Appeals would have a written opinion noting the rationale for my Order. This Amended Opinion has been filed on May 10, 1972.

The International Telephone and Telegraph Company stockholders' meeting is scheduled for Wednesday, May 10, 1972, for the election of members to the Board of Directors. In view of the time pressures in this matter, the evidence and arguments of counsel were heard the morning and afternoon of May 8, 1972; Court was then recessed and at 10:00 P. M., May 8, 1972, in open court, the findings of fact (pursuant to Rule 52a) were dictated from the bench and the attached rough draft Memorandum and Order were filed.

### I. *THE APPLICABLE LAW* [FN2]

> FN2 For findings of fact pursuant to Rule 52, please see the notes of testimony where findings were dictated on the evening of May 8, 1972. This Memorandum constitutes the prerequisite conclusions of law for Rule 52(a), Federal Rules of Civil Procedure.

§ 14(a) of the Securities Exchange Act of 1934 provides as follows:

"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title."

In addition, in furtherance of its rulemaking function the Securities and Exchange Commission (SEC) has issued Rule 14a(9) which provides the following:

"False or Misleading Statements.

"(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

The initial question under the statute and accompanying regulation is whether the failure to disclose the existence of the three aforementioned lawsuits [FN3] in IT&T's proxy materials is proscribed by Rule 14a(9) as an omission ". . . to state any material fact necessary in order to make the statements therein not false . . ." At the threshold the focus must first be on what is meant by "material," for purposes of Rule 14a(9). In *Mills v. Electric Auto-Lite Company,* 90 S. Ct. 616, 621 (1970), the United States Supreme Court discussed "materiality" as follows:

> FN3 *Opinion of* HIGGINBOTHAM, J., May 8, 1972, N. T., pp. 126-128.

*2 "Where the misstatement or omission in a proxy statement has been shown to be 'material' as it was found here to be, that determination itself indubitably embodies a conclusion that the defect was of *such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote.* (Footnote omitted.) (Emphasis added.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Supreme Court then went on to state, at 621:

"This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a(9), and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so *unrelated to transaction for which approval is sought. . . .*" (Emphasis added.)

See also, *Kohn v. American Metal Climax, et al.*, (19,175, 19,176, 19,537, 19,538, 71-1099, 71-1100, 71-1101), Third Circuit, filed March 31, 1972, at pages 22-23, affirming as modified, 313 F. Supp. 1251 (E. D. Pa., 1970).

For the stockholders' meeting to be held on Wednesday, May 10, 1972, there are three nominees, R. Newton Laughlin, Hart Perry and Harry V. Williams, (proposed by management) who are defendants in lawsuits where these nominees are charged with violations of the Securities and Exchange Act of 1934, §    16b relating to insider trading. [FN4]

> FN4 Section 16(b) of the Securities Exchange Act of 1934 is "designed to protect 'outside' stockholders against short-swing speculation by ' insiders' with advance information." Louis Loss, *Securities Regulation* Vol II, 2nd Ed. (1961), p. 1041. For a complete discussion of the insider trading problem, see generally, Louis Loss, *Securities Regulation*, Vol. II, 2nd Ed. (1961), pp. 1073-1132, and Louis Loss, *Securities Regulation*, Vol. V, Supp. to 2nd Ed. (1969), pp. 2999-3107.

The election of these persons to the Board of Directors is clearly a   "transaction" for which stockholders' approval is sought within the context of § 14a. The election of a board of directors may be the most important, and in some cases the only, transaction in which the stockholder has any significant voice in determining the company's destiny. For the directors collectively are the captain of the IT&T ship. Presumably, after evaluating the rolling seas of competition, and the winds of public policy and corporate ethics, the directors then chart the course for their multi-million dollar conglomerate. The failure to report that three proposed members of the Board of Directors are defendants in at least one of the aforementioned lawsuits is clearly a defect related to the transaction for which approval is sought and an omission which

certainly might be considered important by a reasonable shareholder who is in the process of deciding how to vote. See, *Mills v. Electric Auto-Lite Company*, 90 S. Ct. 616, 621 (1970). Thus, I find both as a matter of fact and law that the failure to disclose at least the three lawsuits filed months prior to March 24, 1972, the date of the proxy statement, is a violation of §  14(a) of the Securities Exchange Act of 1934, 15 U. S. C. § 78n(a).

*3 There can be no doubt that having determined that the proxy is illegal and in violation of §  14(a), that there is an implied, private right of action in the plaintiff to remedy that violation. *J. I. Case v. Borak*, 84 S. Ct. 1555 (1964). See also, *Robinson v. Penn Central*, 366 F. Supp. 655 (E. D. Pa., 1971); *Cooke v. Teleprompter Corporation*, 344 F. Supp. 467 (E. D. Pa., 1971); *Beatty v. Bright*, 318 F. Supp. 169 (D. Iowa, 1970).

## II. REMEDIES

In the exercise of its equitable powers, on the present record, the Court has three broad choices of remedy: (1) The Court could enjoin the entire stockholders' meeting and require that new proxy statements be issued which explain adequately the three prior lawsuits. (2) Except for three of the twenty positions now up for voting, it could permit the stockholders' meeting to go forth and to permit votes to be cast for the remaining positions. As to the three vacancies involving Hart Perry, R. Newton Laughlin and Harry V. Williams, there would have to be a subsequent stockholders' meeting which would be held after proper proxy statements had gone out noting the prior lawsuits involving Perry, Laughlin and Williams, or, (3) it could deny to plaintiff any relief and permit the stockholders' meeting to go forth without any restrictions.

In *Mills v. Electric Auto-Lite Company*, supra, Mr. Justice Harlan reminded us that, "In selecting a remedy, the lower courts should exercise 'the sound discretion which guides the determination of courts of equity,' keeping in mind the role of equity as the 'instrument of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims'."

In this delicate balancing process there are factors which militate against granting plaintiff the full relief requested. One factor is the laches doctrine. The Annual Report is dated March 8, 1972 and the Proxy Statement is dated March 24, 1972; absent proof to the contrary, I must conclude that plaintiff had notice of the proxy statement for almost five weeks, and of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1972 WL 323                                                                                                Page 3
Not Reported in F.Supp., 1972 WL 323 (E.D.Pa.), Fed. Sec. L. Rep. P 93,505
**(Cite as: 1972 WL 323 (E.D.Pa.))**

the Annual Report for approximately seven weeks before he requested injunctive relief on the issue of the prior lawsuits.   On the other hand, defendants have had knowledge of the lawsuits for months; in their proxy statement they have elegant pictures of the directors and precise notations of their academic background and corporate experience.   In short, these qualifications suggest an imprimatur of extraordinary excellence, responsibility and good judgment-on the basis of their past positions in the corporate world and in the nation. Certainly the fact that these individuals who are being asked to guide the destiny of IT&T have been charged (though admittedly not proven) with insider trading violations of the Securities Exchange Act of 1934 may be sufficient to cause some stockholders to pause before granting these individuals the important fiduciary responsibility of managing one of the world's largest corporations.

**\*4** The failure to disclose these lawsuits is almost tantamount to what Judge Brieant in *Cooke v. Teleprompter*, 344 F. Supp. 467, 470 said was the exposition of facts, "while not untruthful per se, is somewhat slanted and one-sided." Thus, "the shareholders may well view the matters referred to in a different context and may or may not conclude to reelect [those three] to the management slate."

In a real sense, here, as in *Cooke*, the concepts of corporate democracy and self-determination by the shareholders are at stake.

No substantial reason has been given as to why IT&T shareholders were not informed of these suits, and no one could argue that the information would have been "trivial" or irrelevant to some stockholders. See, *Mills, supra,* at p. 621.   I am not unaware of the facts of corporate proxy life.   Maybe it won't make any difference to a majority, maybe it will make a difference to only a few, but those few cannot be precluded from knowing the salient facts.

With the above rationale, one might ask then why shouldn't one enjoin the entire stockholders' meeting? My answer is that this violation is not of the same magnitude of many in the past where the entire meeting was enjoined.   In *Robinson*, there was involved a major refinancing plan whereby the debt would have grown from $50,000,000 to $80,000,000. In *Beatty*, there would have been a merger, and *Mills* and *Borak* involved mergers. *Cooke, supra*, involved a conviction of the chairman and president on federal bribery charges.

## II. *THE PROXY CARD*

In addition to the failure to disclose the existence of several lawsuits the plaintiff also alleges that the means provided on the proxy cards (Exhibits 3a and 3b) to permit a shareholder to withhold a vote for the directors are so vague as to render the proxy card void.   Rule 14a-4(b)(2), which regulates the form of the proxy card, provides:

"(2) A form of proxy which provides for the election of directors and for action on other specified matters shall be prepared so as *clearly to provide, by a box or otherwise*, means by which the security holder may withhold authority to vote for the election of directors.   Any such form of proxy which is executed by the security holder in such manner as not to withhold authority to vote for the election of directors shall be deemed to grant such authority, provided the form of proxy so states in *boldface type*." (Emphasis added.)

My independent examination of the proxy cards submitted as Exhibits 3a and 3b reveals that both cards provide that "authority to vote said shares *for the election of directors as stated in the proxy statement shall be deemed granted unless by striking these bold-face words such authority is withheld.*" (Bold face indicated by [italics.].)   While the type face used to indicate the ability to withhold a vote for directors could be more bold, I cannot say that the difference between the type face of the clause in question and the body of the proxy card is so similar as to cause confusion for the reasonable shareholder upon a careful reading of the card.   Thus, I conclude that while the "strike out" method of withholding a vote for the election of directors here employed could be improved, it is not here misleading so as to require that the card be declared void.

## IV.

**\*5** In the two strident arguments, counsel for plaintiff made most caustic remarks as to the Republican Party and IT&T.   It should be emphasized that any findings of fact and order are not in any respect predicated on the allegations as to IT&T's purported efforts to have the Republican National Convention in San Diego, California. Similarly, my findings are not predicated on any comments made by any counsel as to the intense proceedings before the United States Judiciary Committee on the nomination of the acting United States Attorney General, Richard G. Kleindienst.

## *ORDER*
AND NOW, THIS 8th day of May, 1972, it is hereby ORDERED that as to the exact form of relief

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to be granted to the instant plaintiff because of my finding that the proxy materials were particularly misleading as to those directors who are standing for election and who have been sued for allegedly trading for their personal accounts in violation of the "insider trading" rule of the SEA of 1934, § 16(b), 15 U. S. C. § 78p(b), any proxy power granted to cause the election of the following candidates for directors of IT&T is declared NULL AND VOID and WITHOUT EFFECT.

   R. Newton Laughlin
   Hart Perry
   Harry V. Williams

IT IS FURTHER ORDERED that the proxy designees are hereby enjoined from electing more than seventeen (17) directors to the Board of Directors of IT&T at the May 10, 1972 Annual Meeting.

After there has been a full disclosure to the shareholders within the meaning of § 14a, a stockholders' meeting may be held for the election of the three remaining positions on the Board of Directors. For that election, if there is proper disclosure, Messrs. Laughlin, Perry and Williams may be candidates for election. IT&T may mail out fair and truthful proxy materials subject to review by this Court in pursuance of its right to fill the positions which will be left vacant by reason of my Order.

Jurisdiction of this Court is retained to determine question of the suitability of the proxy materials prepared pursuant to the Order.

BY THE COURT:

Not Reported in F.Supp., 1972 WL 323 (E.D.Pa.), Fed. Sec. L. Rep. P 93,505

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.