# On-Line Cases Cited

Document2



2006 WL 2042962                                                                                    Page 1
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Morton A. BENDER, et al., Plaintiffs,
v.
Carolyn D. JORDAN, et al., Defendants.
**Civil Action No. 06-92(RMC).**

July 21, 2006.

**Background:** Shareholder of federally chartered savings and loan brought action against some of institution's directors, including its chairman, vice chairman, and two board members, and institution's former acting president-chief executive officer (CEO), asserting claims for alleged violations of federal securities laws and seeking both injunctive and monetary relief. Shareholder moved for preliminary injunction, and defendants moved to dismiss complaint.

**Holdings:** The District Court, Collyer, J., held that:
(1) as a matter of apparent first impression, shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase;
(2) shareholder established likelihood of success on the merits of claim for alleged violation of Securities Exchange Act's disclosure requirements;
(3) shareholder established likelihood of success on the merits of claim for alleged violation of proxy solicitation statute;
(4) shareholder could bring direct action for alleged violations of corporate bylaws and Robert's Rules of Order;
(5) shareholder established likelihood of success on merits of claim alleging violation of institution's bylaws and Robert's Rules of Order;
(6) shareholder established irreparable harm; and
(7) doctrine of laches did not apply.
Ordered accordingly.

[1] Injunction ⇐138.1

212k138.1 Most Cited Cases
In considering a request for preliminary injunctive relief, court must examine (1) whether there is a substantial likelihood that plaintiff will succeed on the merits, (2) whether plaintiff will be irreparably injured if an injunction is not granted, (3) whether an injunction will substantially injure the other party, and (4) whether the public interest will be furthered by the injunction; these factors interrelate on a sliding scale and must be balanced against each other, and a particularly strong showing on one or more factors can mitigate a weaker showing on another.

[2] Injunction ⇐132
212k132 Most Cited Cases

[2] Injunction ⇐147
212k147 Most Cited Cases
A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.

[3] Action ⇐3
13k3 Most Cited Cases
*Cort* factors for determining whether Congress intended to provide implied private right of action include (1) whether plaintiff is one of the class for whose benefit the statute was enacted, (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy, (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law; these factors are not necessarily entitled to equal weight, and the central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action.

[4] Action ⇐3
13k3 Most Cited Cases
The question of the existence of a statutory cause of action is one of statutory construction, and the appropriate starting place is therefore the text of the statute itself.

[5] Action ⇐3
13k3 Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In divining legislative intent respecting existence of implied private cause of action, courts look to the design of the statute as a whole, in addition to considering the text of the statute, and, to the extent useful, legislative history.

**[6] Securities Regulation 🗝173**
349Bk173 Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase creates an implied private right of action for injunctive relief brought by an issuer of securities. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[7] Securities Regulation 🗝53.15**
349Bk53.15 Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase was not enacted for the benefit of the issuer; its sole purpose was the protection of shareholders. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[8] Securities Regulation 🗝173**
349Bk173 Most Cited Cases
Shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[9] Securities Regulation 🗝173**
349Bk173 Most Cited Cases
Shareholder of savings and loan had implied private cause of action against institution's directors and former acting president-chief executive officer (CEO) for injunctive relief under provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase, particularly given parties' battle for corporate control and injunctive relief previously sought against shareholder by institution, presumably at directors' behest, under same statute. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[10] Securities Regulation 🗝178.1**
349Bk178.1 Most Cited Cases
Shareholder of savings and loan established likelihood of success on the merits in seeking preliminary injunctive relief based on claim that institution's directors and former acting president-chief executive officer (CEO), acting through institution's chairman and vice chairman, acquired beneficial ownership of shares and voting power of securities firm and related stockholders, and thus violated requirement, under Securities Exchange Act, that stock buyers disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase by not filing requisite disclosures. Securities Exchange Act of 1934, § 13(d)(1, 2), 15 U.S.C.A. § 78m(d)(1, 2); 17 C.F.R. §§ 240.13d-2(a), 240.13d-3(a), 204.13d-5.

**[11] Securities Regulation 🗝52.19**
349Bk52.19 Most Cited Cases
Shareholder of financial institution, who already owned 7.2 percent of institution's shares at the time he acquired voting power over additional shares constituting nearly 10 percent of institution's outstanding shares, was required to amend his Schedule 13D "promptly" under Securities Exchange Act. Securities Exchange Act of 1934, § 13(d)(2), 15 U.S.C.A. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a).

**[12] Securities Regulation 🗝49.20**
349Bk49.20 Most Cited Cases
To prevail on claim under provision of Securities Exchange Act governing solicitation of proxies, plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused plaintiff injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[13] Securities Regulation 🗝49.22(3)**
349Bk49.22(3) Most Cited Cases

**[13] Securities Regulation 🗝49.26(3)**
349Bk49.26(3) Most Cited Cases
Materiality is the touchstone of the analysis for claim under provision of Securities Exchange Act governing solicitation of proxies. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[14] Securities Regulation 🗝49.26(3)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

349Bk49.26(3) Most Cited Cases
Plaintiffs need not allege other-shareholder reliance to maintain a claim under provision of Securities Exchange Act governing solicitation of proxies. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[15] Securities Regulation** 49.22(2)
349Bk49.22(2) Most Cited Cases

**[15] Securities Regulation** 49.26(3)
349Bk49.26(3) Most Cited Cases
A misrepresentation or omission is "material," for purposes of provision of Securities Exchange Act governing solicitation of proxies, if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote; in other words, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[16] Securities Regulation** 49.30
349Bk49.30 Most Cited Cases
In the context of claims under provision of Securities Exchange Act governing solicitation of proxies, issue of materiality is a mixed question of law and fact that involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[17] Securities Regulation** 49.16
349Bk49.16 Most Cited Cases
Letter purportedly sent by committee to save federal financial institution to institution's shareholders qualified as "solicitation" for purposes of securities rule expressly prohibiting false or misleading proxy solicitations, in that letter was part of "grass roots" strategy concocted by institution employee and representative of public relations firm to persuade recipients not to sell their shares to shareholder attempting to gain control of institution or his allies, and advocated "yes" vote for board of directors' slate in upcoming board election. 17 C.F.R. §§ 240.14a-1(*l*)(1)(iii), 240.14a-9.

**[18] Securities Regulation** 49.16
349Bk49.16 Most Cited Cases
Letter sent to shareholders of troubled federal financial institution qualified as "solicitation" for purposes of securities rule expressly prohibiting false or misleading proxy solicitations, given that institution's employee and public relations firm played substantial role in sending of letter, by reviewing and editing drafts and providing inside information known only to institution, and that letter, though not explicitly urging vote in favor of management's nominees for board members, generally questioned past performance and motives of shareholder seeking control of institution, alleged various regulatory violations by such shareholder, lauded imagination and courage of incumbent directors, and urged shareholders to "do the right thing." 17 C.F.R. §§ 240.14a-1(*l*)(1)(iii), 240.14a-9.

**[19] Securities Regulation** 49.21
349Bk49.21 Most Cited Cases
Correspondence sent by financial institution to its shareholders contained false and misleading statements, for purposes of shareholder's claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that two letters falsely represented that they were authored independent of institution, correspondence indicated that shareholder, who sought to gain control of institution, had brought baseless lawsuits against institution and was source of its financial difficulties, and shareholders were incorrectly told that shares held by brokers would not be voted in impending board election absent shareholder instructions. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[20] Securities Regulation** 49.26(3)
349Bk49.26(3) Most Cited Cases
Causation.
False and misleading statements in correspondence sent by financial institution to shareholders were "material," for purposes of shareholder's claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that reasonable investor would have lent importance to facts that, contrary to representations in correspondence, institution's management decisions and unrelated lawsuits were to blame for institution's financial woes, rather than shareholder seeking to gain control of institution, that shareholder had not brought baseless lawsuits against institution, that institution had editorial control over purportedly independent letters sent to shareholders, and that shares held by brokers would be voted in the absence of shareholder instructions in upcoming

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

Page 4

election. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[21] Securities Regulation** 🗝49.26(3)
349Bk49.26(3) Most Cited Cases
When there has been a finding of materiality of false or misleading statements in proxy solicitation, shareholder has made a sufficient showing of causal relationship between violation of proxy solicitation statute and injury for which he seeks redress if he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the challenged transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[22] Securities Regulation** 🗝178.1
349Bk178.1 Most Cited Cases
Shareholder sufficiently demonstrated likelihood of causal connection between proxy solicitations and election of board of director nominees supported by financial institution's management in seeking preliminary injunction based on claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that votes of minority shareholders were necessary to elect management slate and solicitations were essential link in securing those votes. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[23] Corporations** 🗝320(4)
101k320(4) Most Cited Cases
Shareholder alleged special injury unique from that suffered by financial institution, and thus could bring direct action against institution's directors and former acting president-chief executive officer (CEO) for alleged violations of corporate bylaws and Robert's Rules of Order, when gravamen of shareholder's complaint was that defendants conspired, in violation of Securities Exchange Act and bylaws, to rig director election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying votes improperly so as to keep complaining shareholder from participating in matters of corporate governance. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[24] Corporations** 🗝202
101k202 Most Cited Cases
Shareholder can bring a direct action, even when there is harm done to the corporation generally, if he alleges a special injury unique from that suffered by the corporation, and such "special injury" can arise in two contexts: when allegedly wrongful conduct violates a duty to complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, and when the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends.

**[25] Injunction** 🗝138.42
212k138.42 Most Cited Cases
Shareholder seeking preliminary injunction, based on claim that financial institution's directors and acting former president-chief executive officer (CEO) violated corporate bylaws and Robert's Rules of Order in conducting shareholder meeting, established substantial likelihood of demonstrating that provision of Robert's Rules prohibiting changing or revoking of vote in director election after polls were closed governed meeting, that unilaterally allocation of proxies after polls were closed was prohibited action under Robert's Rules, and that, in a contested election, permitting management alone to allocate votes after polls closed was incompatible with duty of independent inspector of elections (IIOE) to conduct election with fairness to all shareholders.

**[26] Corporations** 🗝198(3)
101k198(3) Most Cited Cases

**[26] Corporations** 🗝283(1)
101k283(1) Most Cited Cases
Corporation's failure to hold separate meeting to vote on allocation of management proxies in director election did not violate provision of bylaws indicating that proxies solicited on management's behalf were to be voted as directed by shareholder or, in the absence of direction, as determined by majority of board of directors, given that bylaw did not expressly require that meeting be held and master ballot was signed by majority of board of directors.

**[27] Injunction** 🗝138.42
212k138.42 Most Cited Cases
Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

[27] Securities Regulation ⛭178.1
349Bk178.1 Most Cited Cases
Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § §   13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

[28] Injunction ⛭138.6
212k138.6 Most Cited Cases
To establish irreparable injury in support of preliminary injunctive relief, injury must be both certain and great, and must be actual and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, and injury must also be beyond remediation.

[29] Injunction ⛭138.6
212k138.6 Most Cited Cases
Possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm supporting preliminary injunction.

[30] Injunction ⛭138.42
212k138.42 Most Cited Cases
Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

[30] Securities Regulation ⛭178.1
349Bk178.1 Most Cited Cases
Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

[31] Equity ⛭65(1)
150k65(1) Most Cited Cases
Doctrine of unclean hands did not apply to bar equitable relief in shareholder's favor in his action for alleged securities violations against some of financial institution's directors and institution's former acting president-chief executive officer (CEO), given that shareholder had neither abused the judicial process nor brought baseless actions against institution or its directors.

[32] Securities Regulation ⛭134
349Bk134 Most Cited Cases
Doctrine of laches did not apply to bar equitable relief in shareholder's favor in his action against some of financial institution's directors and institution's former acting president-chief executive officer (CEO) for alleged securities violations, given that shareholder moved for preliminary injunction two days after filing complaint and less than three months after challenged election of directors, that shareholder could reasonably have required several months to craft complaint in light of secrecy in which directors had operated, and that shareholder did not appear to have reason to have suspected defendants' involvement in challenged proxy solicitation until after litigation began.

[33] Equity ⛭67
150k67 Most Cited Cases

[33] Equity ⛭69
150k69 Most Cited Cases

[33] Equity ⛭72(1)
150k72(1) Most Cited Cases
"Laches" is an equitable doctrine founded on the notion that equity aids the vigilant and not those who slumber on their rights, and, to establish this defense, defendants must show (1) a lack of diligence by

plaintiff that (2) has caused them prejudice.
Dale A. Cooter, Donna S. Mangold, Cooter, Mangold, Tompert & Wayson, LLP, Washington, DC, for Plaintiffs.

Peter Emanuel Strand, Shook, Hardy & Bacon, L.L.P., Haig V. Kalbian, Kalbian Hagerty L.L.P., Washington, DC, for Defendants.

*MEMORANDUM OPINION*

COLLYER, District Judge.

*1 Morton A. Bender and a majority of the Board of Directors of Independence Federal Savings Bank ("IFSB" or "Bank") are opposing contestants for control of the future direction of the Bank. The Bank was labeled a "troubled" institution by the Office of Thrift Supervision ("OTS") in 2003 and has never shed that label. Together with his wife, Mr. Bender owns 21% of the Bank's outstanding stock. He has been an active and vociferous critic of the Bank's management since 2003 and has tried, with varying degrees of success, to change its direction by voting his candidates onto the Bank's Board of Directors. A majority of the Board of Directors has, to put it mildly, resisted Mr. Bender's efforts. [FN1] The last such vote for members of the Board was held in October 2005. That voting process was riddled with improprieties, of which Mr. Bender complains here.

In this suit, [FN2] Mr. Bender sues certain of the Bank's Directors: chairman Carolyn D. Jordan, vice chairman David Wilmot, and Board members Michael J. Cobb, William B. Fitzgerald IV, and Eugene K. Youngentob ("Director Defendants"), and its former Acting President and Chief Executive Officer, Thomas L. Batties. The Bank itself is a nominal defendant. Mr. Bender [FN3] alleges that the Director Defendants and Mr. Batties violated numerous securities laws and the Bank's bylaws by their actions leading up to, and in conducting, a shareholders' meeting in October 2005. As relief, Mr. Bender seeks an injunction requiring the Defendant Directors and Mr. Batties to comply with their disclosure obligations under § 13(d) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. § 78m(d), and regulations promulgated thereunder; to neutralize shares that the Defendant Directors and Mr. Batties allegedly acquired in violation of those obligations; to void the election results from the October 26, 2005, Shareholders' Meeting; to compel accurate proxy disclosures pursuant to § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and accompanying regulations; to forbid further shareholders' meetings until the procedural irregularities are resolved; and to compel adherence to the Bank's bylaws in any future meetings. Mr. Bender also seeks a court order preventing IFSB from indemnifying, or making advance payments to, the Director Defendants and Mr. Batties for expenses and fees incurred in defending this action. Finally, Mr. Bender prays for $10 million in compensatory damages, $10 million in punitive damages, and an award of attorneys' fees. Compl. at 38-39.

As preliminary relief, Mr. Bender requests an injunction specifying that, until further order of the Court, no proxy materials shall be disseminated to Bank shareholders; no annual or special shareholders' meeting shall occur; and that the Bank shall be prevented from indemnifying, or making advance payments to, the Defendant Directors and Mr. Batties for their defense expenses. [FN4] Pls.' Proposed Order at 46-47 [Dkt. # 37]. The Director Defendants and Mr. Batties oppose the application for a preliminary injunction and move to dismiss Mr. Bender's Complaint on various grounds.

*2 Although the Complaint brings six counts against Defendants, only four of those request preliminary injunctive relief and are relevant for present purposes: alleged violations of § 13(d) of the Exchange Act (Count I) and § 14(a) of the Exchange Act (Count II); alleged violations of the Bank's bylaws (Count III); and the request for a declaratory judgment barring indemnification and advancement of fees (Count VI).

This opinion addresses Counts I, II, and III only; the Court defers decision on Count VI. Finding in Mr. Bender's favor on the main points, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court.

**I. FINDINGS OF FACT**
This matter came on for hearing during three successive weeks, working around the Court's criminal trial schedule. Witnesses for IFSB included Ms. Jordan, Messrs. Wilmot and Batties, and Christopher Chambers, a part-time in-house lawyer at the Bank. From their testimony, one has to conclude that this is the most incurious group of persons in the world. Faced with a crisis at the Bank that all were working frantically to address, they say they never spoke to one another, never followed up on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assignments, never read email or talked to their assistants, and cannot remember the details of critical conversations. To a person, they were evasive, nonresponsive, and internally contradictory. It is an understatement to say that the Court has a difficult time crediting much of their testimony. For present purposes, the Court makes the following findings of fact:

**A. Background Facts**

1. IFSB is a federally-chartered savings and loan ("S & L"), with its principal place of business in the District of Columbia. Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of OTS. IFSB is a historically Black-owned-and-operated S & L that concentrates its marketing and loans in the Black and African-American community.

2. Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are members of the Bank's Board of Directors and, until June 21, 2006, Defendant Batties was its Acting President and Chief Executive Officer. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); *Id.* at 73 (Wilmot); *Id.* at 114 (Batties); Fitzgerald Dep. 44; Defs.' Rule 8K Notice [Dkt. # 49]. Defendants Jordan, Wilmot, and Batties are attorneys and members of the Bar of the District of Columbia. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); *Id.* at 73 (Wilmot); *Id.* at 114 (Batties). The Defendants and all other Bank Directors are African-American.

3. The Bank's fiscal year ends on December 31 of each year. *Id.* at 52 (Jordan). The Board of Directors scheduled a Special Meeting in lieu of the Annual Meeting of Shareholders for May 11, 2005; thereafter, the meeting was scheduled and re-scheduled and ultimately conducted on October 26, 2005. *Id.* at 115-16 (Batties); *Id.* at 6 (Jordan).

*3 4. Plaintiffs Morton and Grace Bender own approximately 21% of the Bank's outstanding shares as joint tenants. Defs.' Exh. 211. The Benders are White.

**B. Communications in Advance of the May 11, 2005, Meeting and Its Delay**

5. In anticipation of the scheduled May 11, 2005, meeting, at which three directors would be elected to the Bank's Board, Mr. Bender notified the Bank's secretary, by letter dated April 26, 2005, that he would be nominating two persons for election to the Board. Mr. Bender wrote to all shareholders on May 2, 2005, [FN5] setting forth his positions regarding the Bank's performance and providing information regarding his nominees. Defs.' Exhs. 207, 208.

6. Mr. Bender had previously submitted a draft copy of his May 2, 2005, letter to OTS and had made certain amendments to it at the request of OTS. Defs.' Exh. 205; Defs.' Exh. 208. However, the May 2, 2005, letter did not contain all of the changes the federal agency had requested. Defs.' Exh. 208.

7. A different letter was sent to shareholders dated May 4, 2005, purportedly from the "Committee to Save Independence Federal Savings Bank" (the "Committee" and the "Committee Letter"). Trial Exh. 1. The Committee Letter was apparently signed by Bishop Clarence Long and Reverend Douglas Moore, who are prominent African-American clergy in the District of Columbia. *Id.* Reverend Walter Fauntroy, a prominent clergyperson and former District representative to the U.S. House of Representatives, was a visible supporter. Fauntroy Dep. 12-14.

• Reverend Fauntroy testified that he had no role in authorship of the letter and did not see it until the day of his deposition. Fauntroy Dep. 65-67.

• Bishop Long testified that he did not write the letter, that he did not authorize anyone to send it on his behalf, and that he saw it for the first time at a press conference on May 10, 2005. Long Dep. 26-27, 36.

• Reverend Moore testified that he has no idea how the letter went out with his name on it; he did not remember seeing it before his deposition. Moore Dep. 37-42, 47.

8. Testimony from Christopher Chambers, an attorney and part-time Bank employee, clarified the provenance of the Committee Letter. Mr. Chambers worked with Judy Smith of Impact Strategies, a public relations ("PR") firm retained by the Bank, to provide information for the Committee Letter and to set its tone and arrange its mailing. Apr. 28, 2006, Hr'g Tr. 57, 67-68 (Chambers). As Mr. Chambers described in an email, he was actively involved in:

PR and grassroots--lining up folks and implementing the strategy, beginning the tactics. There is now a list of small shareholders, but we must be careful to have the "Committee to" contact them, and of course it's not going to be a question of supporting the current management slate--now it is a question of not selling to [B]ender or his allies.

Pls.' Exh. 106 (Apr. 18, 2005, email). Further, Mr. Chambers wrote that he had "some deliverables to Impact Strategies so that they may complete their tasks regarding grassroots and media work." Pls.' Exh. 107 (April 22, 2005, email). Ms. Smith forwarded two mailings for the Bank's use, telling Mr. Chambers that she would call to "di[s]cuss contacting potential signers." Pls.' Exh. 105 (May

4, 2005, email). As Mr. Chambers informed Mr. Batties on May 5, 2005:

*4 Judy Smith is planning the Committee to Save IFSB-related press conference ASAP. FYI the grass roots packages have gone out (last night). They are not as inflammatory as originally envisioned; they are more akin to shareholder fight-letters. I will forward you the essence of what went out to smaller shareholders.... Additionally, another 1500-1800 ... letters went out to friends of the bank....

Consequently ... the fur will be flying.... Bender's putative nominees have been painted in the Committee mailings as innocent puppets at best, racial traitors at worst, so I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting their own horns.

Pls.' Exh. 104 (May 5, 2005, email).

9. Mr. Batties instructed Mr. Chambers to work with Ms. Smith, and Mr. Chambers sent Mr. Batties copies of all email exchanges between Mr. Chambers and Ms. Smith (as an addressee in either the "to" line or the "cc" line). Apr. 28, 2006, Hr'g Tr. 92 (Chambers); *see* Pls.' Exhs. 104-109. Each was sent to Mr. Batties' IFSB email address or to Mr. Batties' home email address or to both. Pls.' Exhs. 104-109. Mr. Chambers also talked directly with Mr. Batties about "grass roots, direct mail, lobbying[,] the whole thing." Apr. 28, 2006, Hr'g Tr. 94 (Chambers). [FN6]

10. Mr. Batties testified that he had no involvement in the Committee Letter. Apr. 21, 2006, Hr'g Tr. 117-19 (Batties). He further testified that he did not read the emails from Mr. Chambers when they were sent and did not know if Judy Smith of Impact Strategies was involved with the Committee or the Committee Letter. *Id.* at 126-31 (Batties). Given the importance of the efforts against Mr. Bender, Mr. Batties' direct instructions to Mr. Chambers, and the involvement of Ms. Jordan, chairman of the Board, and other Board members, the Court does not credit Mr. Batties' denials.

• Mr. Batties appears to have been directly involved with contacts with Reverend Fauntroy and Bishop Long. *See* Pls.' Exh. 108 ("Thomas might have to make *another* call to both [Rev. Fauntroy and Bishop Long]." (emphasis added)).

• Mr. Batties appears to have been making the important decisions rather than delegating them to a part-time employee. *See* Pls.' Exh. 104 ("The bigger shareholders have been contacted.... I don't know how much you would be involved in that specific aspect of preparatory work, Charlie, but my vote is that you attend, *pending what Thomas decides.*" (emphasis added)).

• Mr. Batties received oral reports and copies of all emails from Mr. Chambers. Apr. 28, 2006, Hr'g Tr. 91-94 (Chambers).

• Mr. Batties admitted that some of the information in the Committee Letter and its attachments could only have come from confidential OTS examination reports, which are maintained in the Bank's file. Apr. 21, 2006, Hr'g Tr. 120-24 (Batties).

*5 • Mr. Batties' professed inattention and ignorance of the Committee and the Committee Letter rings hollow. The Bank paid Impact Strategies to develop the PR program, of which the Committee Letter was a part. The Bank paid Impact Strategies, and its own employee, Mr. Chambers, to write the Committee Letter and to mail it. Based on the contents of the Committee Letter, Mr. Chambers or some other Bank representative was the source of confidential Bank documents and information. Only 28 people work in the Bank office where Mr. Batties works and Mr. Chambers has a desk immediately outside Mr. Batties' office. Apr. 21, 2006, Hr'g Tr. 132 (Batties). Mr. Chambers reported to Mr. Batties by email and in-person conversations on his activities. From these facts, the Court concludes that Mr. Batties authorized and was aware of Mr. Chambers' participation in the creation and mailing of the Committee Letter. It also finds that Mr. Batties authorized and was aware that the Committee was being portrayed falsely to shareholders and the public as an independent group. *See* Pls.' Exh. 104 ("The Committee to Save IFSB is an independent association."); Trial Exh. 1, Committee Letter ("Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission.").

• Further, the Court finds that it is more likely than not that certain Directors of the Bank were, at a minimum, informed of the Committee Letter before its mailing. The emails strongly suggest that Defendants Jordan, Wilmot and Fitzgerald were either involved in, or aware of, the fabrication of the Committee and the Committee Letter. *See* Pls.' Exh. 107 (Apr. 22, 2005, email) ("Pls. note that in addition to Carolyn Jordan of our Board, Director David Wilmot, Esq. wishes to be included in some of these discussions confidentially."); Pls.' Exh. 104 (May 5, 2005, email) ("I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting

their own horns.").

11. On May 9, 2005, OTS notified Mr. Bender that it was "considering whether to issue a cease and desist order, and to assess civil money penalties, against you for false and misleading statements" contained in Mr. Bender's May 2, 2005, letter to shareholders. Defs.' Exh. 208. Mr. Bender sent a detailed response to OTS, Pls.' Exh. 113, and OTS notified Mr. Bender on September 14, 2005, that no enforcement action would be taken. See Defs.' Exh. 214.

12. On May 10, 2005, OTS sent a letter to IFSB indicating its initiation of an investigation into the Committee Letter and asking IFSB to tell OTS "whether any officer, director or employee of Independence is affiliated with the Committee or has provided information to the Committee." Defs.' Exh. 209. The Bank conducted an "investigation" limited to officers (vice presidents and above) and Board members, which, naturally, failed to ask Mr. Chambers anything. Apr. 21, 2006, Hr'g Tr. 143-44 (Batties). The Bank's responses all declared no role in providing information to the Committee. Mr. Chambers helped process these inquiries and compile the response to OTS but, because "[t]he [Bank's] position was I believe it was Mr. Batties and the board members" who were asked to respond, he did not correct their erroneous response to OTS. Apr. 28, 2006, Hr'g Tr. 67 (Chambers). In fact, Mr. Chambers was intimately involved in developing the Committee Letter and creating the charade that a Committee even existed. Id. at 68.

*6 13. Mr. Batties and all Director Defendants have consistently denied any individual or Bank involvement with the preparation or mailing of the Committee Letter. See Defs.' Opp'n ¶ 27 ("No officer, director of employee of the Bank was involved with the Committee [L]etter."); Apr. 21, 2006, Hr'g Tr. 119-24 (Batties) (same). Those denials were obviously untrue but no one has so informed OTS, even now. By letter dated September 14, 2005, OTS notified the Bank that no enforcement action would be taken with regard to the May 4 Committee Letter. See Defs.' Exh. 215.

14. The shareholders' meeting scheduled for May 11, 2005, was continued to June 8, 2005. Because new proxy materials were not ready, the meeting was again continued to September 14, 2005. Mr. Bender filed an amended Schedule 13D [FN7] in early September, indicating that he had filed a change-of-control application with OTS and, upon its approval, would seek to increase his ownership interest to 51% through purchases from existing shareholders. Defs.' Exh. 211. As a result, the Board continued the shareholders' meeting to October 26, 2005. [FN8] Trial Exh. 47.

**C. Communications In Advance of the October 26, 2005, Shareholders' Meeting**

15. On October 3, 2005, Mr. Bender sent a letter to IFSB shareholders which identified his nominees for directors as Osborne George and John Silvaneous Wilson Jr. ("Bender Nominees"). Trial Exh. 33. The letter explained that Mr. Bender was not soliciting proxies and that the only way to vote for the Bender Nominees was to attend the meeting in person or to send someone with a legal proxy.

16. The Bank distributed its proxy materials to shareholders on October 4, 2005. The Bank's nominees for directors were Marion O. Greene Jr. and Defendants Fitzgerald and Wilmot ("Management Nominees"). Trial Exh. 2.

17. On October 21, 2005, a letter was sent to shareholders by Gilbert Douglas and Catherine McPhail, IFSB shareholders. See Trial Exh. 3. Mr. Douglas drafted the letter with input from Mr. Chambers, who "responded positively" when Mr. Douglas suggested sending a letter. Apr. 28, 2006, Hr'g Tr. 75 (Chambers). Mr. Chambers reviewed and commented upon one or more drafts of the letter, id. at 77-78, put Mr. Douglas in contact with Impact Strategies so that the letter could be mailed, id. at 80, and helped Mr. Douglas find citations to bank documents for the text. Id. at 76-77. "[I]t did not occur" to Mr. Chambers that the Committee Letter had forced a postponement of the May 11 shareholders' meeting and that sending another letter might not be a good idea. Id. at 86.

**D. The Thompson and Doley Shares**

18. On March 3, 2005, Doley Securities LLC entered into an agreement to purchase all of the IFSB shares owned by Carver Bancorp Inc. ("Carver") for $10.50 per share. [FN9] Trial Exh. 58 (Securities Share Agreement). At the time, Carver owned 150,000 shares, or 9.47% of the total IFSB shares outstanding. See Trial Exhs. 58, 59. Prior to the purchase of Carver shares, Doley Securities and its affiliates owned 3,834 IFSB shares. Trial Exh. 59.

*7 19. Some of the shares purchased by Doley Securities were retained by that firm; some were sold to Logan Delany, a friend of Mr. Doley; and others were sold to clients of Doley Securities (collectively, "Doley Participants"). Doley Dep. 90-95. All told, the Doley Participants together owned 154,685 shares of IFSB stock, which was just under 10% of the total shares outstanding. Neither Doley Securities nor any of the Doley

Participants has ever filed a Form 13D with OTS. *See* Trial Exh. 2 at 20-21; May 4, 2006, Hr'g Tr. 89 (Freedman).

20. Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005, Record Date for the Shareholders' Meeting, Jeffrey Thompson--a friend and client of Defendant Wilmot and a partner with Defendant Cobb in the same accounting firm--purchased 98,600 shares of IFSB stock. Trial Exh. 42. Mr. Thompson filed a Schedule 13D in late September indicating that he owned 111,600 shares, which is 7.2% of IFSB stock. *Id.*

21. On the evening of October 25, 2005, Mr. Doley was contacted by Ms. Jordan, who then connected Mr. Wilmot to the call at approximately 11 p.m. Doley Dep. 158-59; Apr. 21, 2006, Hr'g Tr. 74 (Wilmot). The parties discussed the sale of the Doley Participants' shares, to persons suggested by Mr. Wilmot. [FN10] Doley Dep. 158-62; Apr. 21, 2006, Hr'g Tr. 74-77 (Wilmot) (Wilmot suggested Jeffrey Thompson, Bob Johnson, and a Mr. Liggen). Immediately upon hanging up the telephone, Mr. Wilmot called Mr. Thompson and left a message, talked directly to Mr. Liggen, and then talked to Mr. Thompson. *Id.* at 76- 77.

22. The evidence shows that Mr. Thompson was willing to purchase the Doley Participants' stock, at $18 per share (well above market), conditioned upon Mr. Doley's voting all shares for the Management Nominees. *Id.* at 99; *see* Trial Exh. 70. However, a combination of the Doley Participants' stock and the stock Mr. Thompson already owned would exceed 10% of the Bank's outstanding shares; no such agreement could be reached without prior OTS approval. Apr. 21, 2006, Hr'g Tr. 101 (Wilmot); *see* 12 C.F.R. § 574.3(b). Apparently for this reason, Mr. Thompson directed his counsel, Daniel Weitzel, to prepare a purchase agreement for the Doley Participants' stock with Mr. Wilmot's name on it as the purchaser. *Id.; see* Trial Exh. 70. Mr. Weitzel forwarded the purchase agreement to Marie Wood, Mr. Wilmot's assistant, by email to her home on the evening of October 25, 2005. Defs.' Supp. Facts ¶ 3. Ms. Wood then forwarded Mr. Weitzel's email and attached draft purchase agreement to Mr. Doley during the evening of October 25, 2005. *Id.* ¶ 5. When Mr. Wilmot talked to Mr. Thompson "shortly after talking to Mr. Doley" around 1 a.m. on October 26, 2005, Mr. Thompson explained his plan. Mr. Wilmot testified that he responded, "[Y]ou can't do that." Apr. 21, 2006, Hr'g Tr. 101 (Wilmot).

23. Mr. Doley traveled from New York on October 26 to attend the shareholders' meeting, which was scheduled to start at 11 a.m. He planned to vote all Doley Participant shares for Mr. Bender's nominees. Delany Dep. 43 ("Q. And did Doley tell you that was his intention? A. Yes."). [FN11] In part because Mr. Doley had not arrived on time, Royer Dep. 51-52, and in part because Mr. Bender had made two challenges to the vote-counting procedure which threw the Board into a tizzy, the start of the meeting was delayed to 3 p.m. by the unilateral action of Ms. Jordan. Apr. 21, 2006, Hr'g Tr. 8 (Jordan). [FN12] As soon as Mr. Doley arrived, he was whisked away by Ms. Jordan to lunch at the Prime Rib, a local restaurant, even though the Bank was buying lunch for all shareholders at the Mayflower Hotel because the meeting was delayed. *Id.* at 34-35. According to Ms. Jordan, she and Mr. Doley did not at any time discuss the Bank. *Id.* at 34-36. The Court declines to credit this testimony: Ms. Jordan was a singularly incredible witness and, at a minimum, she would have explained to Mr. Doley why the meeting was continued to 3 p.m., but her denials were absolute.

*8 24. Mr. Royer and then Mr. Wilmot joined Ms. Jordan and Mr. Doley at the Prime Rib. A discussion ensued concerning whether there was a buyer for the stock Mr. Doley controlled. Apr. 21, 2006, Hr'g Tr. 39 (Jordan) ("There was a discussion of, it was Mr. Doley I guess inquiring whether there would be anyone interested in buying his stock and that he was interested in selling."). Messrs. Wilmot and Doley discussed a purchase whereby either Mr. Wilmot or a group assembled by Mr. Wilmot would purchase the Doley Participants' shares. Delaney Dep. 39-40; Doley Dep. 184-85; Royer Dep. 76. The price per share under discussion was either $17.00, Thompson Dep. 110-11, or $18.00, Delany Dep. 39- 40; Doley Dep. 184-85. A down payment of $1.00 per share was also discussed. Delany Dep. 50-51; *see also* Doley Dep. 185. [FN13]

25. An integral part of the sale agreement required Mr. Doley to vote the shares he controlled for the Management Nominees. Delany Dep. 39-40, 44; *see also* Trial Exhs. 70-77. Mr. Doley called Mr. Delany and said that he was going to vote for the Management Nominees and that Mr. Delany should do so as well. Delany Dep. 43-44. Mr. Doley told Mr. Delany "that there were a bunch of people from the community saying if Bender takes over the Bank, they were going to withdraw their money." Delany Dep. 38; *see also id.* at 46, 133. Mr. Delany's initial response to Mr. Doley's calls was negative; he said, "no, I am voting for Bender

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because Bender knows how to make money." Delany Dep. 39. Ultimately, Mr. Doley called after he "met with a group of people"--at the Prime Rib-- and told Mr. Delany "that [Mr.] Wilmo[ ]t is thinking about putting together a group that would buy--that would be willing to buy my stock for $18 ... but the condition of that was that the management had to retain control of the Bank. I asked Harold [Doley] whether that was real, whether he had the money, and Harold said, yes, he thought it was real and that he had the money." *Id.* at 39-40. Mr. Delaney responded that he "still thought that Bender knew how to make money, Wilmo[ ]t could not write a check." *Id.* at 41. In one call, Mr. Doley told Mr. Delany that he had been promised a deposit worth $1 per share. *Id.* at 50; *see* Doley Dep. 185. Based on these discussions, Mr. Delany agreed to vote his shares for the Management Nominees. Delany Dep. 46.

26. Proxies representing the Doley Participants' shares were faxed from Doley Securities in New Orleans to the Mayflower Hotel on October 26, 2005, between 12:47 and 12:55 p.m. (presumably Central Time). *See* Trial Exh. 56; Doley Dep. 47. They were then voted by Mr. Doley for the Management Nominees. *See* Trial Exh. 56.

27. At his deposition, Mr. Thompson produced an Adams National Bank cashier's check dated October 26, 2005, in the amount of $165,000, made payable to David Wilmot, and apparently endorsed by Mr. Wilmot. *See* Trial Exh. 78. The tale of this check is convoluted and need not be detailed here. Suffice it to say that, at the direction of Mr. Wilmot's assistant, this check was deposited into an escrow account at Mr. Wilmot's firm, and a cashier's check dated October 26, 2005, in the amount of $163,000 and made payable to Harold Doley, was issued by United Bank, where "David Wilmot & Associates" has two accounts. *See* Pls.' Exh. 115. It is unclear whether the check for $163,000 was ever delivered to Mr. Doley; eventually, on November 14, 2005, it was returned to United Bank and split between two law firm accounts. The Court finds, based on the evidence of record, that the check to Mr. Doley was designed to provide the $1 per share earnest money. It constitutes a clear and tangible piece of evidence that there was an agreement to sell the Doley Participants' shares on October 25, 2005.

*9 28. The sale of the Doley Participants' stock never occurred. Delany Dep. 54-57. In fact, Messrs. Doley and Delaney consulted counsel in the weeks after the shareholders' meeting and were told "do not reach an agreement, do not reach a forward agreement, cease and desist from all negotiations, there will be no agreement, written or verbal." Doley Dep. 185. The legal problem was that any "[s]hort swing profit" would have had to have been disgorged to the Bank because the Doley Participants' stock had been held for less than six months. Delany Dep. 54-55. [FN14] Mr. Doley complained that he had "been boondoggled or snooked, whatever the word you use, by the people at--at Independence." Doley Dep. 6. [FN15]

**E. The Shareholders' Meeting**

29. The Shareholders' Meeting was convened at 3 p.m. on October 26, 2005. During the course of the meeting, Mr. Bender made two formal proxy challenges. *See* Trial Exhs. 17, 18. Ms. Jordan promptly ruled the challenges "out of order," Apr. 21, 2006, Hr'g Tr. 43 (Jordan), and the Independent Inspector of Elections ("IIOE") "did not want to go against the wishes of the Chair." Dunlop Dep. 92. As a result the IIOE "did not rule on the challenges, and really did not consider the challenges." *Id.* at 114.

30. One of Mr. Bender's challenges was based on the fact that the master ballot (which represented proxies received by management) was submitted to the IIOE without allocating the votes among the candidates. Trial Exh. 17. Thus, after the Director Defendants received the report reflecting the proxies giving authority to management to vote, Trial Exh. 12, the Director Defendants were able to allocate their votes in such a way as to ensure the election of two of the Management Nominees. [FN16] This allocation took place on October 28, 2005, long after the polls closed on October 26, 2005. *Id.*

31. The second of Mr. Bender's challenges was based on the fact that votes by brokers who had not received instruction from the owner of shares held by the broker were counted in favor of Management Nominees, despite the clear instructions in the Bank's proxy materials to the contrary. Trial Exh. 18. Before the Shareholders' Meeting, the Bank had told its shareholders:

Q. What will happen if I abstain from voting or fail to vote?
A. ... If you fail to vote for the election of directors, the votes of those supporting Bender's nominees will have a greater impact in helping Bender gain operating control of the Bank.
....
Q. If my broker or other nominee holds my shares for me, will my broker or such other nominee vote those shares for me?
A. Your broker or other nominee will vote your shares only if you provide instructions on how to

vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. **Your broker will not vote your shares without your instructions.**

*10 Trial Exh. 2 at 11. Both of these answers were incorrect, Apr. 28, 2006, Hr'g Tr. 119 (Riley), and votes cast by brokers who were not instructed on how to vote were all counted for the Management Nominees, in an amount of approximately 396,000 shares. May 2, 2006, Hr'g Tr. 82 (Freedman). [FN17]

32. The non-instructed broker votes were counted for the Management Nominees pursuant to the "10-day rule" of the New York Stock Exchange. Apr. 28, 2006, Hr'g Tr. 102 (Riley) ("[T]he New York Stock Exchange has a rule that allows the brokers to vote the shares of people who have not responded to them [to give instructions on how to vote].... If they haven't responded in 10 days prior to the meeting and it's a routine matter, the broker has the right to vote those shares on that routine matter."). Only "smart investors" would know that the consequence of not instructing your broker is that the broker votes for management. Id. at 128. When a Board election is not "contested," it is considered a routine matter on which non-instructed brokers automatically vote for management.

33. Although Mr. Bender proposed two nominees to the IFSB Board who were running in opposition to the management candidates, the election at the October 2005 Shareholders' Meeting was not considered "contested" in the parlance of Wall Street. As explained by Mr. Riley, "A contested election is one in which there are two proxies, and two proxy committees and material is sent out to the stock holders ... from both sets of [committees]." Apr. 28, 2006, Hr'g Tr. 106 (Riley). When, as here, there are two nominated slates without competing proxies, it is not considered a "contested" election because "a contested election requires a mechanism to gather votes.... [T]he only way that the, the [S]treet and the industry [have] of conducting a contested election is to have two sets of proxies." Id. at 106-07. The situation facing Mr. Bender--in which OTS approved his proxy material and told him he could solicit votes but could not collect proxies--created a "Catch-22." Id. at 148. With "two slates in competition with each other ..., a contest exist[ed]" *in fact* but was not recognized by ADP Proxy Services, the company that collected the votes, because only the Bank was allowed to solicit proxies. Id. at 146-47.

34. Mr. Riley opined that "[t]he practice of allocating votes [after the polls close] is available to both the management proxy committee, and to a competing proxy committee if one exists. This process insures that neither side in a contested election has an undue advantage after the votes have been cast." Id. at 161. The process "only works" when competing sides can allocate their votes at the same time. Id. In the October 2005 Board election, however, Mr. Bender was forced to allocate his votes while the polls remained open and the Defendant Directors allocated their votes two days later.

35. The Court finds that counting the broker "routine" votes for the Management Nominees was in direct contradiction to the Proxy Statement issued by the Bank. The Court also finds that the Bank's Proxy Statement was materially wrong: it said that a failure to instruct a broker on how to vote would (1) help Mr. Bender and (2) result in no vote being cast. In fact, a failure to instruct a broker on how to vote (1) resulted in a vote for the Management Nominees and (2) reduced the chances that any of Mr. Bender's candidates would be elected. Given the Bank's intense attention to broker votes, [FN18] the Court also finds that it is likely that the misstatement in the Bank's proxy materials was intentional.

## II. LEGAL STANDARDS
### A. Preliminary Injunction

*11 [1][2] In considering a request for preliminary injunctive relief, a court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs. Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C.Cir.1998). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360-61 (D.C.Cir.1999). A particularly strong showing on one or more factors can mitigate a weaker showing on another. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C.Cir.1995); *Wash. Metro. Area Transit Comm'n v. Holiday Tours*, 559 F.2d 841, 843-45 (D.C.Cir.1977). A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C.Cir.2004).

### B. Motion to Dismiss

In addition to opposing the Plaintiffs' application for preliminary injunctive relief, Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The plaintiffs need not plead the elements of a *prima facie* case in the complaint. *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C.Cir.2000). In deciding a Rule 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F.Supp.2d 191, 196 (D.D.C.2002) (citation omitted).

### III. DISCUSSION
#### A. Count I: Section 13(d) of the Exchange Act

Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *SEC v. Bilzerian*, 29 F.3d 689, 692 n. 3 (D.C.Cir.1994). In Count I, Mr. Bender alleges that the Director Defendants and Mr. Batties violated § 13(d) by acting as a group, together with Messrs. Thompson and Doley, to acquire, hold, vote, or dispose of more than 5% of IFSB's outstanding stock and that no Schedule 13D was ever filed. Mr. Bender seeks injunctive relief--but not damages--to remedy Defendants' alleged violations of § 13(d). Complaint ¶¶ 41-49; Pls.' Opp'n to Defs.' Mot. at 4.

#### 1. Standing

*12 As a preliminary matter, Defendants move to dismiss on the ground that an implied private right of action for injunctive relief is available, if at all, only to an issuer of securities--not an individual shareholder. Defs.' Mot. at 3-4. The issue before the Court, then, is whether Congress intended to provide a private remedy to individual shareholders, in the form of injunctive relief, for violations of § 13(d) of the Exchange Act. This question has not been definitively answered in this circuit.

[3][4][5] The analytical starting point is *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which "articulated four factors for the courts to weigh in discerning congressional intent to provide an implied private right of action." *Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C.Cir.2000). The four *Cort* factors, as they are now known, are:
  (1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.
*Id.* at 185-86 (quoting *Cort*, 422 U.S. at 78, 95 S.Ct. 2080). The *Cort* factors are not necessarily entitled to equal weight, however, and the "central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). "The question of the existence of a statutory cause of action is, of course, one of statutory construction." *Id.* at 568, 99 S.Ct. 2479. The appropriate starting place is therefore the text of the statute itself. *Id.* In divining legislative intent, courts also look to the design of the statute as a whole and, to the extent useful, legislative history. *See, e.g., Edelson v. Chi'en*, 405 F.3d 620, 632-33 (7th Cir.2005).

[6][7] In this enterprise, the Court is not without guidance. The Courts of Appeals are in widespread agreement that § 13(d) creates an implied private right of action for injunctive relief brought by an *issuer* of securities. *See, e.g., GAF Corp. v. Milstein*, 453 F.2d 709, 719-20 (2d Cir.1971); *Dan River Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1224 (4th Cir.1980); *Indiana Nat'l Corp. v. Rich*, 712 F.2d 1180, 1185 (7th Cir.1983); *Fl. Comm. Banks v. Culverhouse*, 772 F.2d 1513 (11th Cir.1985); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1158 (9th Cir.1992). What is critical to recognize is that these decisions rest on the concept that the issuer's standing under § 13(d) is *representational*. Indeed, § 13(d) was not enacted for the benefit of the issuer; its "sole purpose was the protection of shareholders." *Indiana Nat'l*, 712 F.2d at 1185. It is "for this limited purpose, therefore, [that] the issuer corporation acts on the shareholders' behalf in bringing a suit for injunctive relief until an accurate Schedule 13D is filed." *Id.*

*13 The reasons for this are practical and widely

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recognized. One is that because Schedules 13D must be sent to the issuer and the SEC or OTS--but not to shareholders--shareholders normally do not have immediate access to the filings. *Indiana Nat'l,* 712 F.2d at 1184; *GAF Corp.,* 453 F.2d at 721. Another is that shareholders are "generally unaware of the necessary background information to judge the truth or falsity of the statements" in a Schedule 13D. *GAF Corp.,* 453 F.2d at 721. In short, the cases recognize that shareholders often do not have the knowledge, expertise, or incentive to maintain an action under § 13(d) and, for that reason, allow an issuer to maintain an action on the shareholders' behalf. They do not, however, suggest that a shareholder who *does* have such knowledge and expertise cannot maintain an action on his own--rather, it is from this antecedent concept that the issuer's standing flows. Indeed, this much was assumed in the earliest cases, *see GAF,* 453 F.2d at 719 & n. 21, and is not called into question by the more recent ones, *see, e.g., Sea Containers,* 890 F.2d at 1208 (ruling on a § 13(d) claim by plaintiff, an issuer, and a § 13(d) counterclaim by defendant, a minority shareholder, without specifically addressing the standing issue). And this conclusion is consistent with the D.C. Circuit's recognition that § 13(d) "was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation." *SEC v. Savoy Industs. Inc.,* 587 F.2d 1149, 1165 (D.C.Cir.1978); *see also Sea Containers,* 890 F.2d at 1209; *Edelson,* 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."). [FN19]

In support of a contrary conclusion, Defendants cite district court cases holding that shareholders cannot mount a private right of action for *damages* under § 13(d). Defs.' Mot. at 3-4 (citing, *inter alia, Berman v. Metzger,* No. 80-0394, 1981 WL 1596, at *1, 1981 U.S. Dist. LEXIS 10866, at *2 (D.D.C. Feb. 9, 1981)). The considerations governing the right to injunctive relief, however, are quite different, *see, e.g., Hallwood Realty Partners v. Gotham Partners,* 286 F.3d 613, 620-21 (2d Cir.2002) (concluding that injunctive relief, but not damages, furthers congressional intent), and the damages cases do not control the outcome here.

[8][9] Contrary to Defendants' protestations, the Court makes no new law here; it merely recognizes what has always been assumed: Because the foundation for the issuer's standing is its action on behalf of shareholders, a shareholder *a fortiori* has standing to seek injunctive relief. Even were this not the case, it would be appropriate to recognize a shareholder's standing here. In a battle for corporate control, it has long been understood that § 13(d) was not meant to be a weapon wielded only by issuers attempting to fend off takeover bids. *Rondeau,* 422 U.S. at 58, 95 S.Ct. 2069. In fact, not two years ago, the Bank, presumably at Defendants' direction, sought injunctive relief against Plaintiffs under § 13(d). *Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203 (D.D.C.2004). [FN20] "[W]here a legal structure of private statutory rights has developed without clear indications of congressional intent, the contours of that structure need not be frozen absolutely when the result would be demonstrably inequitable to a class of would-be plaintiffs with claims comparable to those previously recognized." *Va. Bankshares v. Sandberg,* 501 U.S. 1083, 1104, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). To place the parties on the "same footing," it is appropriate to consider "policy reasons for deciding where the outer limits of the right should lie." *Id.* at 1104-05, 111 S.Ct. 2749. Here, both congressional intent and fundamental fairness demand that if an issuer can advance a private right of action to defend shareholder rights, shareholders must have a private right of action against hidden machinations by that issuer's directors. Preserving the availability of injunctive relief under § 13(d) to shareholders as well as issuers "avoid[s] tipping the balance" that Congress sought to achieve. *Rondeau,* 422 U.S. at 58, 95 S.Ct. 2069; *see Hallwood,* 286 F.3d at 621.

*14 Because a private right of action is "consistent with the legislative scheme and necessary for the protection of investors," *Rondeau,* 422 U.S. at 62, 95 S.Ct. 2069, the Court will deny Defendants' motion to dismiss as to this claim.

**2. Likelihood of Success on the Merits**

[10] As noted above, § 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, [FN21] the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *Bilzerian,* 29 F.3d at 692 n. 3. In addition, an amendment must be submitted "promptly" any time there is a "material change" in the facts set forth in the Schedule 13D. 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). The SEC has promulgated regulations reiterating and elaborating

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on these statutory requirements. These regulations define a "material change" to mean "[a]n acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities." 17 C.F.R. § 240.13d-2(a). [FN22] A "beneficial owner" includes, in turn, "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares ... [v]oting power which includes the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3(a). Finally, the regulations provide:

> when two or more persons agree to act together for the purpose of acquiring, holding, *voting* or disposing of equity securities of an issuer, *the group formed thereby shall be deemed to have acquired beneficial ownership,* for purposes of Section 13(d) and (g) of the [Exchange] Act, *as of the date of such agreement,* of all equity securities of that issuer beneficially owned by any such person.

17 C.F.R. § 240.13d-5(b)(1) (emphasis added). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Morales v. Quintel Entm't Inc.,* 249 F.3d 115, 124 (2d Cir.2001). Such a group "need only have combined to further a common objective regarding one of the [listed] ... activities." *Id.; see also Gen. Aircraft,* 556 F.2d at 95.

The Court concludes that there is a substantial likelihood that Mr. Bender will succeed on the merits of demonstrating that the Director Defendants, through their chairman and vice chairman, acted as a group with Mr. Thompson to acquire the Doley Participants' shares--and voting power--to solidify their control of the IFSB Board. The record facts strongly suggest that, on the eve and day of the Shareholders' Meeting, Ms. Jordan and Mr. Wilmot facilitated Mr. Thompson's purchase of the Doley Participants' shares, on the express condition that Mr. Doley would vote those shares for the Management Nominees.

On the evening of October 25, 2005, Ms. Jordan and Mr. Wilmot spoke with Mr. Doley regarding the sale of the Doley Participants' shares. Mr. Wilmot recommended Mr. Thompson, among others, as a buyer. On the condition that the shares be voted for the Management Nominees, Mr. Thompson agreed to buy them, and in an effort to avoid OTS oversight, proposed a sale using Mr. Wilmot as an intermediary; however, the draft purchase agreement, though circulated by Mr. Thompson's counsel to both Mr. Wilmot's assistant and Mr. Doley, was never signed. At the end of the night, the shares remained in the Doley Participants' hands, and Mr. Doley apparently intended to vote them for the Bender nominees at the Shareholders' Meeting.

*15 The Shareholders' Meeting on the next day was delayed, at least in part, because Mr. Doley was running late. When he arrived, he was whisked away by Ms. Jordan to the Prime Rib, where the two were joined by Messrs. Royer and Wilmot. Negotiations ensued regarding the purchase of the Doley Participants' shares by Mr. Wilmot or a group--again, provided that Mr. Doley would vote those shares for the Management Nominees. A sale price of $17-18 per share, with an earnest money deposit of $1 per share, was discussed. *Mirabile dictu,* Mr. Doley did, in fact, vote the Doley Participants' shares for the Management Nominees.

[11] On these facts, the Court readily concludes that Ms. Jordan and Mr. Wilmot, acting on behalf of the Director Defendants, agreed to act together with Mr. Thompson for the purpose of acquiring, holding, and--at a bare minimum--voting the Doley Participants' shares held by Mr. Doley. This group is thus deemed to have acquired beneficial ownership for purposes of Section 13(d) as of the date of such agreement, *see* 17 C.F.R. § 240.13d-5, which the Court finds to be no later than midday on October 26, 2005. That the actual sale of the Doley Participants' shares may never have been consummated is of no consequence here; the group, as described above, beneficially owned those shares because, as a condition of the agreement, it acquired voting power over them. *See* 17 C.F.R. § 240.13d-3(a). By acquiring voting power over the Doley Participants' shares, which constituted nearly 10% of the Bank's outstanding shares, the group exceeded the 5% threshold set forth in § 13(d), and was required to file a Schedule 13D within 10 days, which it indisputably failed to do. [FN23]

Despite the efforts of all IFSB witnesses to obscure and obfuscate, enough light has been shone into dark corners to find it substantially likely that Mr. Bender will demonstrate that the Director Defendants, acting through Ms. Jordan and Mr. Wilmot, violated § 13(d) of the Exchange Act.

**B. Count II: Section 14(a) of the Exchange Act**

**1. Standing**

In Count II, Plaintiffs seek damages and injunctive relief for Defendants' alleged violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), which

governs the solicitation of proxies. Compl. ¶¶ 50-87; Pls.' Opp'n to Defs.' Mot. at 8.

[12] "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." Atl. Coast Airlines Holdings Inc. v. Mesa Air Group, 295 F.Supp.2d 75, 81-82 (D.D.C.2003) (omission in original). Defendants argue that Plaintiffs must allege shareholder reliance to prove that the proxy solicitation was an essential link. Defs.' Mot. at 6. Specifically, although they concede that a plaintiff bringing a direct claim under § 14(a) does not have to allege that he *personally* relied on a misrepresentation, see Cowin v. Bresler, 741 F.2d 410, 427 (D.C.Cir.1984), they contend that a nonrelying plaintiff must allege reliance by *other* shareholders. Defs.' Mot. at 6. A close reading of Cowin, however, reveals no such limitation.

*16 Mr. Cowin, a minority shareholder in Bresler & Reiner, a property management company, sued that company and its directors for various violations of the securities laws, including § 14(a). As a remedy for the defendants' violations of the proxy rules, Mr. Cowin sought to set aside the elections of the defendant directors. Cowin, 741 F.2d at 425. The Cowin court reversed the district court's determination that a nonrelying plaintiff lacked standing to assert a direct, as opposed to a derivative, equitable action under § 14(a). Id. at 426. In so doing, it characterized Mr. Cowin's claim as follows:

> The injury Cowin alleges was not caused by his individual reliance on deceptive proxy solicitations. Rather, his claim is that other shareholders elected [the defendant] directors because they were misled by the proxy materials.... This injury is totally divorced from any reliance, or lack of reliance, on Cowin's part and falls precisely into the scope of injury that Congress sought to protect.

Id. at 427. It is presumably from this language that Defendants derive the limitation they propose; that is, that while Cowin frees plaintiffs from the burden of alleging their own reliance, it imposes the requirement that plaintiffs allege the reliance of *other* shareholders. This proposition is nowhere directly stated in Cowin and it is, in fact, substantially undercut by other portions of the same opinion. The Cowin court straightforwardly said, "Regarding section 14(a), however, we find no language in the relevant statutory materials that leads us to conclude that reliance is a prerequisite to standing under that section." Id. at 426. To the same effect, "It cannot be said then that the language of the statute and the regulation constrains us to find reliance a necessary predicate to standing under section 14(a)." Id. at 427. This Court can imagine no clearer language by which the Cowin court could have indicated that reliance, whether on the part of plaintiff or other shareholders, is simply not required.

Faced with a situation in which the "neither the congressional enactment nor the administrative regulations offer[ed] conclusive guidance," the Cowin court proceeded to "take into account [the] various policy considerations" that animate § 14(a). Id. at 427 n. 22. One purpose the court identified was "to protect investors from 'promiscuous' proxy solicitations by 'unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.' " Id. at 427 (quoting S.Rep. No. 73-1455, at 77 (1934)). The court concluded: "Because the controlling statutory materials are silent on the question and because we believe a contrary rule would partially frustrate congressional policy, we find that Cowin has standing to pursue his section 14(a) claims." Id. at 428. Recognizing the same policy considerations, this Court finds that requiring Plaintiffs to allege reliance by other shareholders "in these circumstances would serve no legitimate policy and ... decline[s] to do so." Id. at 427.

*17 [13][14] The fundamental flaw in Defendants' argument is that the touchstone of the analysis is not reliance, but materiality. As the Supreme Court has explained,

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). And, as the Ninth Circuit has cogently explained, "As materiality is an objective standard, it should not matter whether any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

particular shareholder was actually misled by the challenged misrepresentations." *Stahl v. Gibraltar Fin. Corp.,* 967 F.2d 335, 337 (9th Cir.1992). [FN24] Thus, based on *Cowin, Mills, and Stahl,* the Court concludes that Plaintiffs need not allege other-shareholder reliance to maintain a § 14(a) claim. Defendants' motion to dismiss will therefore be denied as to this claim.

**2. Likelihood of Success on the Merits**

[15][16] Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.' " *Cowin,* 741 F.2d at 426 (quoting 15 U.S.C. § 78n(a)). Rule 14a-9, promulgated pursuant to this authority, expressly prohibits false or misleading proxy solicitations:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Id.* at 426-27 (quoting 17 C.F.R. § 240.14a-9). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines,* 295 F.Supp.2d at 81-82 (D.D.C.2003) (omission in original). The term "solicitation" includes, *inter alia,* any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The issue of materiality is a mixed question of law and fact that "involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder." *Berg v. First Am. Bankshares,* 796 F.2d 489, 495 (D.C.Cir.1986).

*18 Mr. Bender's allegations in Count II stem from three different communications: (1) the May 4, 2005, Committee Letter; (2) a letter from Ms. Jordan and Mr. Batties titled "Update to Our Shareholders" and related proxy materials circulated by management on October 4, 2005 (the "Management Proxy"); and (3) a letter sent to shareholders on October 21, 2005, purportedly by shareholders Catherine McPhail and A. Gilbert Douglas (the "McPhail/Douglas Letter").

**a. The communications qualify as solicitations**

[17][18] As an initial matter, each of the communications referenced above qualifies as a "solicitation" for purposes of Rule 14a-9. The record clarifies that the May 4 Committee Letter was part of a "grass roots" strategy concocted by Mr. Chambers, a bank employee, and Judy Smith, of Impact Strategies, intended to persuade its recipients, including a list of small shareholders, to "not sell[ ] to [B]ender or his allies," Pls.' Exh. 106, in the days before the Shareholders' Meeting then set for May 11, 2005. The letter specifically advocated a "yes" vote for "the Board Slate." Trial Exh. 1 at 1. Engineered by the Bank and sent just days before a contested election, the Committee Letter constitutes a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). There is no question that the Management Proxy, to which the Update Letter was attached, constitutes a proxy solicitation. And as to the October 21 McPhail/Douglas Letter, Mr. Chambers and Impact Strategies again played a substantial role, reviewing and editing drafts and providing inside information known only to the Bank. That letter, while not explicitly urging a vote in favor of the Management Nominees, generally questioned Mr. Bender's past performance and present motives, alleged various regulatory violations by Mr. Bender, lauded the "imagination and courage" of the incumbent directors, and pressed shareholders to "DO THE RIGHT THING!!" Trial Exh. 3 at 1-2. As such, it also qualifies as a solicitation under 17 C.F.R. § 240.14a-1(*l*)(1)(iii).

**b. The communications contained false and misleading statements and omissions**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[19] The three protested communications contained multiple false and misleading statements. In the interests of speed, if not comprehensiveness, the Court will not here catalog the entirety of the false information and misinformation promulgated by the Defendant Directors and Mr. Batties in anticipation of the Shareholders' Meeting that finally took place on October 26, 2005, though much more ink could be spilled on this topic.

The deception in the Committee Letter began with the first sentence, which claimed that the Committee itself was an "independent group of concerned local citizens, shareholders, and loyal customer[s]" when, of course, the Committee was a phantom part of a Bank-led PR drive. Trial Exh. 1. The "Timeline" portion of the letter, purportedly "compiled from public records, news, concerned shareholders[,] and depositors," implied that OTS regulation of the Bank was entirely one-sided in Mr. Bender's favor; stated that the Board members sympathetic to Mr. Bender were "cronies [that] will ... do his bidding"; and emphasized that Mr. Bender's nominees, though both African-American, were "mere puppets of Bender's with no apparent ties to banking, required to do what he tells them." Id. Each of these statements was false. The full record of years of litigation demonstrates that OTS supervision, though not always prompt, has been evenhanded, and that the Board members sympathetic to Mr. Bender have been neither puppets nor cronies, but directors exercising independent judgment, as evidenced by their vote, to Mr. Bender's chagrin, in favor of the Carver merger.

*19 A consistent theme of the Management Proxy was that Mr. Bender has repeatedly hauled the Bank into court, each time hurling baseless accusations against the directors and draining the Bank's coffers. Specifically, it states that Mr. Bender "institut[ed] a lawsuit seeking to impose personal liability on those Directors, in each case, in the view of the Majority Directors, without citing any reasonable factual basis." Trial Exh. 2 at 3. The Court is left unsure to which litigation this statement refers. By its count, the instant case is the fifth between Mr. Bender and the Bank. [FN25] Of the four previous suits, three were brought by Mr. Bender, but none was taken in bad faith or lacked a reasonable factual basis. In fact, two were voluntarily dismissed by Mr. Bender after he received the precise relief he sought. Moreover, that the Bank couched its statement in the words of an opinion--"in the view of the Majority Directors"--does not cure its infirmity. See Va. Bankshares, 501 U.S. at 1093, 111 S.Ct. 2749 ("[E]xpressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements ...."); see also id. at 1094, 111 S.Ct. 2749 (quoting Vulcan Metals Co. v. Simmons Mfg. Co., 248 F. 853, 856 (2d Cir.1918) (L. Hand, J.) ("An opinion is a fact.")).

Sticking with this theme, the Management Proxy blamed Mr. Bender for every difficulty the Bank has faced in the last several years, without noting or taking any responsibility at the Board or Officer level for decisions that have proved costly and detrimental to the Bank and its reputation. For instance, the Update Letter attributes the Bank's extraordinary legal expenses in 2003 to Mr. Bender when, in fact, the Bank was the plaintiff against Mr. Bender and could have avoided that litigation, Indep. Fed. Sav. Bank v. Bender, No. 04-736 (D.D.C.2004), and its expenses were magnified by three lawsuits in connection with the Washington Teachers' Union scandal, which was the huge misstep that precipitated the Bank's slide in the first place. In fact, one of the Washington Teachers' Union suits, brought in early 2003, is alive and well today, and surely continues to deplete the Bank's resources. Am. Fed'n of Teachers v. Bullock, No. 03-79 (D.D.C.2006). The proxy statement omitted all mention of this litigation expense.

The Management Proxy also asserted that "Management has advised the OTS that [the Committee] was not associated with the Bank or its management." Trial Exh. 2 at 5. That statement, although superficially true (the Bank did so advise OTS), was nonetheless misleading in communicating that the Committee was unassociated with the Bank, when it was, in fact, a creature of the Bank's own creation. See Va. Bankshares, 501 U.S. at 1092, 111 S.Ct. 2749 ("Such statements are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed."). Perhaps the Management Proxy's most critical misstatement, though, was its instruction that shares held by brokers would not be voted unless the shareholder instructed otherwise. However, all such votes were cast for the management slate. This instruction was plainly false, as the Bank was well aware preceding the vote. [FN26] Indeed, this much was recognized by the Bank's own expert witness, who testified that the instructions in the Management Proxy were "mistaken" or "not right." Apr. 28, 2006, Hr'g Tr. 119:22-24 (Riley).

*20 The McPhail/Douglas letter suffers from many of the same defects as the earlier communications. It

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.