2006 WL 2042962
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

again suggested that OTS favors Mr. Bender, asking at one point "why OTS has behaved so contrary to banking laws, security regulations[,] and sound public banking policy to facilitate handing *Our Bank* to this Bender character?" Trial Exh. 3 at 1. Its assertion that "[t]he only time we are aware we got into U.S. District Court with Bender--though expensive--Independence Won, Bender Lost!" was plainly misleading, as explained above, in that it omits reference to three other actions between the parties, two of which Mr. Bender voluntarily dismissed after receiving favorable relief, and one of which settled after a ruling unfavorable to the Bank. *See supra* n. 25. In view of the editorial control over this letter exerted by Mr. Chambers, and Mr. Batties' supervisory control over Mr. Chambers, insertion of the hedging phrase "we are aware" does not alter this conclusion.

Under Rule 14a-9, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation" may be misleading. 17 C.F.R. § 240.14a-9 n.(b); *see United States v. Matthews,* 787 F.2d 38, 46 (2d Cir.1986). The communications reviewed above were thinly veiled efforts to question Mr. Bender's character and bona fides as a friend of the African-American community. The Committee Letter stated outright that Mr. Bender has "no regard for the African American community" and seeks control of the bank to satisfy his "personal greed." It touted the Bank's role in "helping the African-American community prosper and grow, as well as bridge gaps among all races," yet suggested that Mr. Bender is simply trying to "line [his] own pockets" at the expense of that history. It accused him of "bully tactics" and argued that he will "destroy the independent, minority character of IFSB." And it alleged that his nominees, though African-American, were but puppets, and that Mr. Bender was the puppeteer. The McPhail/Douglas letter contained similar overtones, accusing Mr. Bender of pushing another "black bank ... to failure."

The intent behind these letters is not seriously in question: In Mr. Chambers's own words, "Bender's putative nominees have been painted ... as innocent puppets at best, racial traitors at worst." Pls.' Exh. 104. The Court does not challenge the Bank's ability to question, as part of its solicitations, whether Mr. Bender--who has always been frank about his intentions to gain control of the Bank--has the best interests of the African-American community at heart. But while it is clear that Mr. Bender and the majority of the Bank's Directors have different ambitions for the Bank, changing its identity as a minority institution is not among them; in fact, the evidence shows that Mr. Bender considers the Bank's minority character advantageous. May 4, 2006, Tr. 94-96 (Bender). And the Court also finds that the Committee Letter's questioning of the Bender Nominees' racial loyalty-- "Even though those men are both African Americans[,] they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them"-- was a direct assault on their character with no factual basis. *See* 17 C.F.R. § 240.14a-9 n.(b).

**c. The false and misleading statements were material**

*21 [20] Third, there is little question but that these false and misleading statements were material, that is, that there is a substantial likelihood that a reasonable shareholder would have considered them important in deciding how to vote. *TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126.* In view of the Bank's attempt to use Mr. Bender as a scapegoat for its myriad financial woes, a reasonable investor would have lent importance to the facts that management decisions and unrelated lawsuits are to blame for much of the Bank's litigation expenses; that Mr. Bender has not abused the judicial process or brought baseless suits against the Bank or its Directors; and that the Bank's charges of OTS favoritism are greatly exaggerated. Even more critically, however, a reasonable shareholder would have attached significance to the fact that the Committee to Save IFSB was in no sense "independent" as claimed by its materials, any more so than the McPhail/Douglas letter was an independent creation of its purported authors. In battles for political control, by way of comparison, the voting public often considers who sponsors a particular advertisement in determining the weight to accord it. The same principle holds true in a battle for corporate control. The shareholders would surely find it important that Bank staff had editorial control over the Committee Letter and the McPhail/Douglas Letter, and that the statements therein might best be evaluated with skepticism. Finally, a voter whose shares are held by his broker, but who is informed that those shares would not be voted unless he instructed his broker to do so, would want to know that the opposite was, in fact, the case.

**d. The material falsehoods caused injury for purposes of § 14(a)**

[21][22] "Where there has been a finding of

materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." _Mills,_ 396 U.S. at 385, 90 S.Ct. 616. In _Mills,_ although a majority stockholder controlled just over half of the outstanding shares, a two-thirds majority was required to approve the merger at issue. _See Va. Bankshares,_ 501 U.S. at 1099, 111 S.Ct. 2749. The Court found that the plaintiffs established the requisite "essential link" by "showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation." _Mills,_ 396 U.S. at 386, 90 S.Ct. 616. The Court expressly reserved the question "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." _Id._ at 385 n. 7, 90 S.Ct. 616.

Two decades later, in _Virginia Bankshares,_ the Court addressed the question left open in _Mills._ In that case, the majority shareholder, who held 85% of the bank's shares, favored a merger; the remaining 15% of the shares were scattered among 2,000 minority shareholders. _Va. Bankshares,_ 501 U.S. at 1088, 111 S.Ct. 2749. In advance of the shareholders' meeting, at which the merger proposal was to be submitted to a vote, the directors issued a proxy statement to the minority shareholders asserting that the price offered was "high" and "fair," which the Court found materially misleading. _Id._ The Court nonetheless denied relief, holding that the plaintiffs had failed to proffer a theory of causation under which the solicitation was "essential" in the sense required by _Mills,_ namely, where "the solicitation links a directors' proposal with the votes legally required to authorize the action proposed." _Id._ at 1102, 111 S.Ct. 2749; _see also id._ at 1100, 111 S.Ct. 2749 (describing _Mills_ as holding that "causation of damages by a material proxy misstatement could be established by showing that minority proxies necessary and sufficient to authorize the corporate acts had been given in accordance with the tenor of the solicitation"). In the context of merger proposals, _Virginia Bankshares_ has been interpreted as holding that "the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision," though that "does not necessarily mean a causal link between the proxy and some other injury may not exist." _Wilson v. Great Am. Indus.,_ 979 F.2d 924, 931 (2d Cir.1992); _see also Boone v. Carlsbad Bancorp. Inc.,_ 972 F.2d 1545,

1557 (10th Cir.1992) ( "The Court [in _Virginia Bankshares_] generally rejected theories of causation presented by shareholders whose participation was not needed for corporate action....").

**\*22** Here, it is evident that management did not have enough votes to ensure the election of their slate of directors; hence, the solicitations were a critical part of their strategy to convince non-management shareholders to vote in favor of the Management Nominees. The Defendant Directors were plainly worried that their control of the Board was in jeopardy, as made apparent by their desperation to woo minority shareholders just days before the election. The Committee Letter was one facet of a multi-pronged grass-roots campaign that also involved media coverage and lobbying efforts. Pls.' Exh. 106. As the May 2005 meeting approached, a list of smaller shareholders was compiled, _id.,_ and pressure mounted to send out the Committee mailings "immediately." Pls.' Exh. 105. By May 5, the "bigger shareholders ha[d] been contacted" with uncertain effect. Pls.' Exh. 104. And as of October 21, just days before the rescheduled Shareholders' Meeting, Ms. Finlayson fretted that, "In terms of the voting tallies, the numbers are very discouraging." Pls.' Exh. 102.

For the purposes of preliminary injunctive relief, Mr. Bender has sufficiently demonstrated the likelihood of a causal connection between the above-described solicitations and the election of the Management Nominees because the votes of minority shareholders were necessary to elect the management slate, and the solicitations were an essential link in securing those votes. _See Va. Bankshares,_ 501 U.S. at 1102, 111 S.Ct. 2749.

**C. Count III: Corporate Bylaws and Robert's Rules of Order**

In Count III, Plaintiffs seek injunctive relief for Defendants' alleged violations of the Bank's bylaws and Robert's Rules of Order in connection with their conduct of the October 2005 Shareholders' Meeting.

**1. "Standing"** [FN27]

[23] Defendants move to dismiss on the ground that claims based on a violation of corporate bylaws or Robert's Rules of Order must be brought derivatively, not directly. Defs.' Mot. at 9. Although Defendants concede that there is no case law directly on point, they would characterize such claims as complaints of "improper management" that, under _Cowin,_ 741 F.2d at 414, belong to the corporation and not its minority

stockholders. Defs.' Mot. at 9. They further argue that Plaintiffs have alleged no individual injury, unique to themselves, that differentiates them from any other shareholder.

[24] As Defendants recognize, however, a plaintiff can still bring a direct action--even when there is harm done to the corporation generally--if he alleges a "special injury" unique to that suffered by the corporation. *Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 901 (D.C.Cir.1999); *Cowin*, 741 F.2d at 415. Such "special injury" can arise in two contexts: "first, where the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, or second, where the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends." *Labovitz*, 172 F.3d at 901; *see also Cowin*, 741 F.2d at 415.

*23 Plaintiffs' allegations here describe a special injury that falls within this second category of harms. Though Defendants correctly observe that Plaintiffs allege that "Defendants have deprived Plaintiffs *and the other shareholders* of a fair vote for the election of directors," Compl. ¶ 69 (emphasis added), suggesting that Plaintiffs were harmed only to the same extent as all other shareholders, *see* Defs.' Mot. at 9-10, this is a selective reading of the Complaint. The gravamen of Plaintiffs' Complaint is that Defendants conspired, in violation of the Exchange Act and their bylaws, to rig the election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying the votes improperly--all in an effort to prevent one particular shareholder, Mr. Bender, from participating in matters of corporate governance. The Complaint is explicit on this point, alleging that Defendants' violations caused a material number of shares to be counted for the Management Nominees, and against the Bender Nominees, depriving Plaintiff of a fair and orderly voting process. Compl. ¶ ¶ 67-68. Although, in a sense, all shareholders would certainly benefit from a fair and orderly voting process, it remains that, according to their allegations, Mr. Bender was specifically targeted and disenfranchised by Defendants. This constitutes a special injury peculiar to Plaintiffs. [FN28]

*Cowin's* discussion of *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del.Ch.1967), confirms this conclusion. *Cowin*, 741 F.2d at 416. In

that case, Condec "made a tender offer and received tenders for a controlling percentage of Lunkenheimer's stock. Condec's control over Lunkenheimer was frustrated, however, when Lunkenheimer's management contracted to sell its business to U.S. Industries and, in the context of that agreement, issued 75,000 additional shares of [authorized, but unissued] Lunkenheimer stock." *Id.* The issuance of these additional shares diluted Condec's holdings, depriving it of a majority. *See Condec*, 230 A.2d at 772. Viewing Lunkenheimer's actions in the context of a battle for corporate control, the Delaware Chancery Court found that the "the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec," *id.* at 775, "and allowed Condec to sue, on its own behalf, for cancellation of those 75,000 shares," *Cowin*, 741 F.2d at 416.

The *Cowin* court found the factual scenario in *Condec* "representative of th[e] second category" of special injury. *Id.* In doing so, it reiterated *Condec's* distinction between claims necessarily derivative--like stockholder challenges to management decisionmaking, such as the decision to spend corporate funds in a stock repurchase--and those that may be brought directly. *Id.* Quoting *Condec*, the *Cowin* court agreed that "a personal action was proper because *Condec* was 'a stockholder with a *contractual right* to voting control being deprived of such control.' " *Id.* (quoting *Condec*, 230 A.2d at 777). In the present context, however, the *Condec* court's statement bears repeating in full: "This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. Manipulation of this type is not permissible." *Condec*, 230 A.2d at 777.

*24 While Plaintiffs here are not majority shareholders with a contractual right to voting control, the principle is the same. According to Plaintiffs' allegations, Defendants disregarded their bylaws and Robert's Rules to deprive Plaintiffs of their "right to a proportionate voice and influence in corporate affairs." *Id.* Such a sleight of hand, directed at a particular shareholder and intended to disenfranchise him, suffices as special injury. *See Cowin*, 741 F.2d at 416. Count III may therefore proceed directly.

**2. Likelihood of Success on the Merits**

Article II, Section 13 of the Bank's Amended and Restated Bylaws ("Bylaws") empowers the Board to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appoint, in advance of a shareholders' meeting, an independent inspector of election ("IIOE") whose duties "shall include," *inter alia*, "determining ... the authenticity, validity, and effect of proxies; ... hearing and determining all challenges and questions in any way arising in connection with the rights to vote; counting and tabulating all votes or consents; determining the result; and such acts as may be proper to conduct the election or vote with fairness to all shareholders." In the course of the October 26 Shareholders' Meeting, Mr. Bender submitted two formal proxy challenges to the IIOE, Creighton Dunlop, one of which challenged the method in which management would allocate its cumulative votes, and the second of which challenged the voting of broker-held shares in favor of the Management Nominees, contrary to the explicit provisions of the Management Proxy. Ms. Jordan ruled both challenges out of order and the IIOE, not wishing to go against the wishes of the Chair, never passed on the merits of those challenges. [FN29] Ultimately, management allocated its votes at a Special Meeting two days after the Shareholders' Meeting, counting broker-held votes in favor of its nominees, and only then considered the polls closed and announced the results of the election. In Count III, Mr. Bender alleges that his proxy challenges were proper and meritorious, and that the Bank's improper conduct of the election violated its Bylaws and Robert's Rules.

**a. Allocation of Cumulative Votes**

[25] Article II, Section 12 of the Bank's Bylaws gives shareholders the right to cumulate their votes in an election for directors, but does not address the procedure for allocating such votes. [FN30] Article II, Section 4 of the Bylaws provides, however, that "[a]nnual and special meetings shall be conducted in accordance with ... Robert's Rules of Order unless otherwise prescribed by regulations of the OTS or these bylaws or the board of directors adopts another written procedure for the conduct of meetings." At the October 26 Shareholders' Meeting, Ms. Jordan, in her role as Chair, reiterated that Robert's Rules would govern. Trial Exh. 20 at 2. Robert's Rules, however, much like the Bylaws, speak only in general terms about cumulative voting procedures. Robert's Rules § 46, at 431 ll. 16-29 (10th ed.).

*25 Mr. Bender directs the Court to a provision in § 45 of Robert's Rules indicating that, in the context of a vote by ballot, once all who wish to vote have done so, the polls can be closed either on motion of a member or by declaration of the chair. *Id.* § 45, at 401 ll. 11-18. "Thereafter, if other members arrive

who wish to vote, a majority is required to reopen the polls." *Id.* at 401 ll. 18-19; *see also id.* at 400 ll. 25-29 ("Should [the presiding officer] fail to vote before the polls are closed, he cannot do so without the permission of the assembly."). Ms. Jordan did, in fact, officially declare the polls closed at the completion of the voting at the October 26 meeting. Trial Exh. 20 at 7. Accordingly, Mr. Bender suggests that § 45 required that the master ballot (representing proxies received by management) be cast, and its votes allocated, before the polls were closed and the meeting adjourned.

Defendants argue that their method was permissible because the master ballot was *cast* before the Shareholders' Meeting was adjourned, even though those votes were not *allocated* until the Special Meeting two days later. They submit that allocation of cumulative votes was not possible at the Shareholders' Meeting because the IIOE had not yet tabulated the proxies received, and management did not know how many votes could be cast for their nominees. Defendants further note that, under § 45 of Robert's Rules, a voter "has the right to change his vote up to the time the result is announced," *id.* § 45, at 395 ll. 9-10, and suggest that, because the results of the election were not announced until the October 28 Special Meeting, the delayed allocation was not improper. Finally, they argue that determinations about the propriety of the vote, including its allocation, are committed to the IIOE, who they contend discharged his duties in a manner consistent with custom and common practice.

While the Bylaws and Robert's Rules are not a model of clarity on this issue, the Court concludes that Mr. Bender has the better part of the argument. First, Defendants' reliance on § 45 for authority to change their votes until the result is announced is misplaced. The relevant provision bears repeating in full: "A member has a right to change his vote up to the time the result is announced; after that, he can make the change only by the unanimous consent of the assembly granted without debate." Robert's Rules § 45, at 395 ll. 9-12. That language contemplates the result being announced at the same meeting, giving each voting member an equal opportunity to change his vote should he so desire; if this provision has effect after the meeting has adjourned, then the latter clause is deprived of meaning. Second, the Court has difficulty concluding that at the October 26 Shareholders' Meeting the votes represented by the master ballot were "cast" in any meaningful sense. The master ballot stated:

In lieu of voting as provided above, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, *all* of such votes in a manner that will result in the election of as many of such named management nominees as possible. The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

**\*26** Trial Exh. 7. Translated to English, this master ballot voted an indeterminate number of votes, because the "number of votes that the undersigned has power and authority to vote" was then unknown-- and allocated nothing, because management intended to apportion its proxies later "in a manner that w[ould] result in the election of as many ... management nominees as possible." The practice of tabulating and allocating management proxy votes after the polls are closed, while regarded as proper and even customary by Defendants' expert, Apr. 28, 2006, Hr'g Tr. 123-25, 130-31 (Riley), is a matter of some debate. Many states, including Delaware, prohibit or restrict the acceptance of ballots, votes, or proxies after the polls close. June 16, 2006, OTS Letter at 2 [Dkt. # 44, Exh. A]. OTS has determined that the allocation of votes after the polls closed constituted a revocation or change in the vote within the meaning of § 45 of Robert's Rules. *See id.* at 1. It has further concluded that "[p]roviding the inspectors of election with the ability to allocate the votes for the benefit of one party's slate of directors and not providing that same ability to all other shareholders after the close of the polls is inherently unfair." *Id.* at 2.

Accordingly, the Court finds there is a substantial likelihood that Mr. Bender will successfully demonstrate that § 45 of Robert's Rules, which prohibits changing or revoking a vote after the polls are closed, governed the Shareholders' Meeting; that unilaterally allocating proxies after the polls are closed constitutes such prohibited action under § 45; and that, in a contested election, the IIOE's permitting management alone to allocate votes after the polls close was incompatible with his duty to conduct the election "with fairness to all shareholders."

**b. Broker-Held Votes**

[26] Mr. Bender's second formal proxy challenge

attacked the counting of broker non-votes in favor of the Management Nominees, contrary to the explicit instructions of the Management Proxy. [FN31] The facts related to this challenge are discussed *supra* in Part III.B.2.b and require no further elaboration here; the legal issue, however, is slightly different. Putting aside the Court's earlier conclusion that the Management Proxy was materially misleading in violation of § 14(a), the question here is whether it was an independent violation of the Bylaws or Robert's Rules to vote broker-held shares for management.

Defendants begin with the premise that, even though the election was contested in fact, it was not considered "contested" in Wall Street parlance because only management solicited proxies; from there, they argue that the broker-held shares were voted in a manner consistent with custom and practice for what Wall Street would call an "uncontested" election. In the context of an uncontested election, Rule 452 of the New York Stock Exchange ("NYSE") permits a broker, absent a client's directions to the contrary, to vote his clients' shares on "routine" matters. This rule was designed to ensure the presence of a quorum at shareholders' meetings. Apr. 28, 2006, Hr'g Tr. 105 (Riley). Uncontested elections for directors are considered routine matters because there is only one set of proxy materials, and therefore only one mechanism to collect votes, all for a single slate. In sum, although Defendants acknowledge that Mr. Bender was caught in a Catch-22--able to nominate a slate of directors, but forbidden to solicit proxies, he essentially contested an "uncontested" election--they urge that the proxy process functioned properly. [FN32] Mr. Bender reiterates that the voting of broker-held shares in favor of management ran contrary to the Management Proxy, and argues that the Bank, which is listed on NASDAQ, is not subject to NYSE rules.

**\*27** This practice arguably violated Article II, Section 9 of the Bank's Bylaws, which requires that management proxies "shall be voted as directed by the shareholder." Shareholders were entitled to rely on the proxy materials, and by refraining from instructing their brokers, might be viewed as having "directed" that their votes be withheld pursuant to the Management Proxy's instructions. On the present record, however, the Court declines to delve into the complexities of how Wall Street runs its proxy contests, because the root of the problem is the alleged § 14(a) violation--a violation which, for reasons already explained, is an adequate basis for preliminary injunctive relief.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                                                      Page 24
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

**D. Equitable Factors**

Of course, establishing a likelihood of success on the merits does not entitle Mr. Bender to a preliminary injunction. He still must establish the other traditional prerequisites to preliminary injunctive relief: whether he will suffer irreparable harm absent an injunction; whether an injunction will substantially injure the Defendants; and whether an injunction will further the public interest. *Serono Labs.,* 158 F.3d at 1317-18.

**1. Irreparable Harm**

[27][28][29] Although the equitable factors interrelate on a sliding scale, *Davenport,* 166 F.3d at 360-61, a showing of irreparable harm is a *sine qua non* of preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England,* No. 05-5143, --- F.3d ----, ----, 2006 WL 1867203, at *4, 2006 U.S.App. LEXIS 16952, at *14 (D.C.Cir. July 7, 2006) ("A movant's failure to show any irreparable harm is ... grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and ... of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15 (citations and internal quotation marks omitted). "Second, the injury must be beyond remediation.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15-16 (citations and internal quotation marks omitted).

The Court perceives Mr. Bender to allege two varieties of irreparable harm. First, Mr. Bender--indeed, all shareholders--were deprived of their statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions. Second, Mr. Bender, unlike his peers, was the specific target of Defendants' machinations, and was unnecessarily frustrated in his attempts to participate in corporate governance. Such injuries are the precise harms against which securities laws were intended to guard. *See Edelson,* 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting [§ 13(d)] was to protect the individual investor when substantial

shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."); *Cowin,* 741 F.2d at 427 (stating that a § 14(a) claim alleging that "shareholders elected [the defendant] directors because they were misled by the proxy materials ... falls precisely into the scope of injury that Congress sought to protect"); *Condec,* 230 A.2d at 777 (finding that the denial of a shareholder's "proportionate voice and influence in corporate affairs" through corporate manipulation is impermissible). And these harms are not only actual and imminent, they are realized and ongoing. A vote based on this information has taken place; new, possibly illegitimate, directors have been installed; and a second election looms.

*28 It is well established that such harms can be irreparable. *See, e.g., Gen. Aircraft,* 556 F.2d at 97 ("[I]rreparable injury would occur to shareholders and the investing public if [defendants] were allowed to continue their activities without correcting and amplifying their Schedule 13D."); *Lichtenberg v. Besicorp Group,* 43 F.Supp.2d 376, 390 (S.D.N.Y.1999) ( "Irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." (alteration in original; citation omitted)); *ODS Techs. LP v. Marshall,* 832 A.2d 1254, 1262 (Del.Ch.2003) ("The threat of an uninformed stockholder vote constitutes irreparable harm."). This harm is compounded where, as here, an uninformed election has come to pass, and another election is imminent. Allowing the second election to go forward, where there is a substantial likelihood that the prior one was at best tainted, at worst void, would helplessly complicate matters, perhaps making it impossible to "unscramble the eggs" should the "post-hoc reorganization of a standing board" prove necessary. *ODS Techs.,* 832 A.2d at 1263.

Finally, Mr. Bender has no adequate remedy at law. It is generally agreed that an individual shareholder lacks standing to bring a damages suit under § 13(d). *See, e.g., Hallwood,* 286 F.3d at 619 (collecting cases); *Berman,* No. 80-0394, 1981 WL 1596, at *2, 1981 U.S. Dist. LEXIS 10866, at *5. And although Mr. Bender seeks both injunctive and monetary relief for Defendants' alleged § 14(a) violations, "an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies." *In re Staples Inc.,* 792 A.2d 934, 960 (Del.Ch.2001). As the Delaware Chancery Court has explained,

A post-hoc evaluation will necessarily require the court to speculate about the effect that certain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.

Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue--the right to receive fair disclosure of the material facts necessary to cast a fully informed vote--in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*Id.* The persuasive force of this reasoning is undiminished by the fact that the misinformed vote has already occurred. In view of the impending second election, which if allowed to proceed may hopelessly jumble the Board's membership, injunctive relief remains the preferred remedy here, and is necessary to protect investors and effectuate the purposes of the Exchange Act.

**2. Injury to the Bank**

In an earlier dispute between these parties, the Court stated that the securities laws

> **\*29** cannot be used merely as a ploy to keep incumbent management safe from hostile takeover. Thus, the harm here cannot be to the individual members of the Board of Directors, who might be replaced if Mr. Bender has his way, or to the individual officers of the Bank who might be discharged. The harm must be to the institution, which in this case means irreparable harm to the Bank's shareholders.

*Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203, 217 (D.D.C.2004). In the present dispute, the Court recognizes that delaying the next shareholders' meeting would not come without cost. It would add further uncertainty to the leadership of a troubled institution. And "it is axiomatic that enjoining a shareholder[s'] meeting may affect the price of a company's stock." *ODS Techs.,* 832 A.2d at 1263. But these prospects are insufficient to allow a tainted Board to become further entrenched by a second election. *See id.*

Defendants argue that if the October 26 election is ultimately voided, innocent shareholders who would have voted for the Management Nominees despite the nonexistent § 13(d) disclosures and misleading § 14(a) solicitations will effectively be disenfranchised. But this is an unprovable hypothesis. The Court has

no way to predict how such shareholders might have voted if given the benefit of lawful disclosures. They, like Mr. Bender, have been harmed by a misinformed vote, and will benefit from an injunction that requires the Bank to comply with its disclosure obligations under the securities laws.

**3. Public Interest**

[30] At this point, it should be clear that a preliminary injunction would serve the public interest in effective enforcement of the securities laws, and this factor need not long detain the Court. "Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service." *Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.,* 476 F.2d 687, 699 (2d Cir.1973).

**4. Other Equitable Considerations**

[31] Defendants lastly argue that the doctrines of unclean hands and laches should bar equitable relief in Mr. Bender's favor. The first argument can be quickly dispatched, as the Court has already found that, contrary to Defendants' claims, Mr. Bender has neither abused the judicial process nor brought baseless suits against the Bank or its Directors. *See supra* at ---- - ----. The latter argument, however, deserves brief discussion.

[32][33] Laches is an equitable doctrine "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football Inc. v. Harjo,* 415 F.3d 44, 47 (D.C.Cir.2005). To establish this defense, Defendants must show (1) a lack of diligence by Mr. Bender that (2) has caused them prejudice. *Id.* "[T]he rationale for this defense is [that] as claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *CarrAmerica Realty Corp. v. Kaidanow,* 321 F.3d 165, 171 (D.C.Cir.2003). In the corporate context, the D.C. Circuit has noted that "[t]he prejudice that can result from such delay is particularly unsettling when ... the claim affects the validity of stock which is central to a merger between the named corporation and corporate entities foreign to the complaint." *Id.* at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962                                                                                Page 26
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: 2006 WL 2042962 (D.D.C.))

171-72.

*30 Mr. Bender filed his Complaint on January 18, 2006, and moved for a preliminary injunction two days later--less than three months after the election at issue. Given the secrecy with which the Defendant Directors operated before the Court's intervention, and the dissembling that has continued since, it is no surprise that it took Mr. Bender several months to untangle defendants' transactions and craft a complaint. It can hardly be said that Mr. Bender has slumbered on his rights, especially when viewed in the context of past litigation--after all, there has been a live controversy in this Court between these parties for 30 of the past 40 months. Moreover, Mr. Bender raised several claims now at issue as formal proxy challenges at the October 26 Shareholders' Meeting, but Ms. Jordan refused to entertain them. The Bank cannot now be heard to cry prejudice as to claims it previously chose to ignore.

The Court finds that laches is arguable only as to Mr. Bender's § 14(a) claim relating to the first proxy solicitation, the May 4 Committee Letter, which was sent months before the October 26 Shareholders' Meeting; several misstatements in that letter might have been cured by a corrective disclosure preceding the rescheduled meeting. However, it is not clear that Mr. Bender had any reason to believe that the Board played a role in drafting that letter--one of its central omissions--until this litigation began. Therefore, the Court concludes that Defendants have not met their burden to establish either a lack of diligence or prejudice, and therefore fail in their attempt to invoke laches to bar relief. In any event, even if Defendants could establish laches as to the Committee Letter claim, their other violations are a sufficient independent basis to grant preliminary injunctive relief.

## IV. CONCLUSION

The courts are usually loath to get involved in these kinds of corporate contests, but there are rules of engagement that the Defendants ignored. Mr. Bender has shown that he is entitled to the preliminary relief he seeks. For the foregoing reasons, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court. The Court defers decision on Mr. Bender's request for a declaratory judgment barring indemnification (Count VI). A separate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the Memorandum Opinion filed concurrently herewith, it is hereby

ORDERED that the Director Defendants' Motion to Dismiss [Dkt. # 24] is DENIED as to Counts I, II, and III, and DEFERRED as to the balance; and it is

FURTHER ORDERED that the Plaintiffs' Application for a Preliminary Injunction [Dkt. # 3] is GRANTED in part and DEFERRED in part; and it is

FURTHER ORDERED that Defendants shall be ENJOINED from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court; and it is

*31 FURTHER ORDERED that this Order shall have immediate effect, conditioned on Plaintiffs' posting, no later than July 28, 2006, of a secured bond in the amount of $20,000, which the Court estimates to be the costs of Defendants' proxy materials that may be found to have been wrongfully enjoined or restrained. See Fed.R.Civ.P. 65(c); and it is

FURTHER ORDERED that the parties shall appear before the Court at a Status Conference on August 3, 2006, at 10:00 a.m.

This is an appealable Order. See 28 U.S.C. § 1292(a)(1).

SO ORDERED.

FN1. The subtext to this dispute is race: while the Bank is a historically Black-owned-and-operated federal savings and loan, Mr. Bender is White. The Bank's in-house counsel ballyhooed that Mr. Bender's nominees to the Board were portrayed to shareholders by the Bank as "racial traitors." Pls.' Exh. 104. Harold Doley, an African American who controls almost 10% of the Bank's shares, testified that "race is not just an elephant in the courtroom, it is a pack of elephants." Doley Dep. 70. The racial overtones in the record would be hard to miss, but the Court concludes that they do not affect the legal issues.

FN2. The parties have appeared before the Court in earlier versions of this long-running

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business dispute. *See, e.g., Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203 (D.D.C.2004); *Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004); *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, 2004 U.S. Dist LEXIS 17090 (D.D.C. Jan. 15, 2004).

FN3. Although Mr. Bender owns his IFSB shares jointly with his wife, and both Benders consequently are plaintiffs here, Mrs. Bender "is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender." Compl. ¶ 3. Accordingly, the Court often refers only to Mr. Bender in the text of this opinion.

FN4. The Court notes that the preliminary relief requested in Mr. Bender's Proposed Order [Dkt. # 37] varies from that requested in his Complaint [Dkt. # 1] and Application for a Preliminary Injunction [Dkt. # 3]. Because the Proposed Order was submitted most recently and in response to the Court's direction that the parties file proposed findings of fact and conclusions of law, the Court presumes that it contains the most accurate version of the relief immediately desired.

FN5. Mr. Bender's letter to all shareholders is dated April 29, 2005. Defs.' Exh. 207. Based on the evidence presented, however, it appears that this letter was not sent until approximately May 2, 2005. *See* Defs.' Exh. 208.

FN6. Asked by the Court if he ever had "a face to face or telephone conversation with Mr. Batties" about his activities, Mr. Chambers insisted that he did not. Only when the Court expressed open skepticism, did Mr. Chambers admit that he regularly talked to Mr. Batties about "the whole thing" and that he had thought the Court's question referred only to a sit-down conference. Apr. 28, 2006, Hr'g Tr. 94 (Chambers).

FN7. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *SEC*

*v. Bilzerian,* 29 F.3d 689, 692 n. 3 (D.C.Cir.1994).

FN8. Mr. Bender brought suit to force the meeting to proceed as scheduled in September but withdrew it when OTS approved the further delay. *See Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C. Sep. 19, 2005) (order approving voluntary dismissal).

FN9. In 2004, Carver and IFSB agreed to merge after a unanimous Board resolution in favor of merger. Mr. Bender opposed the merger, publically and vociferously. The Board adopted a "poison pill" resolution to restrain Mr. Bender from acquiring more shares and sued Mr. Bender. *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004). Eventually, Carver withdrew from the merger and OTS disapproved it.

FN10. In one of her more incredible statements, Ms. Jordan insists that she has no recollection of this call. Apr. 21, 2006, Hr'g Tr. 24 (Jordan) ("I don't recollect talking to Mr. Doley on the 25th."); *id.* at 26 ("I have no recollection of that, that call."); *id.* ("I did not [discuss the notion that Mr. Doley wanted to sell the stock he controlled].").

FN11. As a result of what appears to be a production error, every even-numbered "master" page of the Delaney Deposition, containing 4 pages of deposition testimony, was omitted from the Court's exhibits. The Court will rely on the submissions of the parties regarding the omitted sections of the Delaney Deposition.

FN12. Ms. Jordan and Mr. Wilmot insist that the meeting was postponed until 3 p.m. so that the Bank's attorney, Mr. Royer, could contact OTS and get advice on how to handle Mr. Bender's voting challenges. Apr. 21, 2006, Hr'g Tr. 9-10 (Jordan); *Id.* at 87-89 (Wilmot). Mr. Royer told a different story: he testified that his calls to OTS were not to seek advice but simply to advise OTS that the meeting was delayed. Royer Dep. 68. Mr. Royer's emails, Defs.' Exh. 219 and 200, tell the same story. *See* Defs.' Exh. 219 ("delay was necessary due to possible securities regulatory issues and possible

2006 WL 2042962                                                                Page 28
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

voter disenfranchisement"). The Court credits Mr. Royer.

FN13. At the hearing on this matter, Ms. Jordan and Mr. Wilmot denied any involvement in the purchase of the Doley Participant shares. Given the paper record of draft purchase agreements with Mr. Wilmot's name, Trial Exhs. 72, 73; Mr. Wilmot's acknowledged discussion with Mr. Thompson in the middle of the night, Apr. 21, 2006, Hr'g Tr. 74 (Wilmot); the fact that Mr. Thompson arranged for a cashier's check in the amount of $165,000 to be issued to Mr. Wilmot, Trial Exh. 78; and Mr. Doley's testimony that he "talked with Wilmo[ ]t, Carolyn Jordan, Royer ... about the possibility of the sale" at $18 per share, Doley Dep. 185, the Court finds that the testimony of Ms. Jordan and Mr. Wilmot is not to be credited.

FN14. See *Rosenberg v. XM Ventures*, 274 F.3d 137, 142 (3d Cir.2001) ("Section 16(b) of the Securities and Exchange Act of 1934 provides that any profit realized by a corporation's principal stockholders arising from the purchase and sale of a corporation's equity securities within a period of less than six months must be disgorged to the corporation. *See* 15 U.S.C. § 78p(b); *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).").

FN15. Mr. Doley probably meant hornswoggled and snookered, both of which mean bamboozled.

FN16. All federal thrifts allow cumulative voting. May 5, 2006, Hr'g Tr. 74 (Freedman). Under cumulative voting, shareholders "have the right to accumulate votes based upon the number of direct[or] seats to be filled. So if you have three director seats to be filled and you're the owner of a hundred shares, you would in essence have 300 votes. You can apportion those votes across the director candidates in the way that you choose to do it. So you could give 300 votes to one director and no votes to the other directors.... Or you could apportion them however you choose across that. Or you could check the box that says proxy committee do it for me which is what

management hopes people do." Apr. 28, 2006, Hr'g Tr. 121-22 (Riley).

FN17. The Court credits the analysis and arithmetic of Mr. Freedman, an expert witness for Mr. Bender, over Mr. Riley, an expert witness for the Defendants, on these points. Mr. Riley first relied on Mr. Bender's lay-person's estimate of the potential number of broker votes and then absolutely resisted any suggestion that it would be possible to provide an expert estimate. Given Mr. Freedman's explanation of his dual approaches, the Court concludes that Mr. Riley was avoiding a response that would not be helpful to his client.

FN18. Pls.' Exh. 102 (Oct. 21, 2005 email) (discussing attempt "to combat Bender's attempts to dissuade ... shareholders from voting for management even though the routine broker vote has been turned in already (in favor of management).... [M]ost of these holders will take out legal proxies if they wish to vote against management which would negate the broker routine vote that has already been turned in on behalf of their vote.").

FN19. In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 63, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court stated that "the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer," a description consistent with the facts there presented. *Rondeau*, 422 U.S. at 60, 95 S.Ct. 2069. The legislative history, however, suggests a broader mission that is more apt in the instant fact pattern:
"The Bill before you deals with stock acquisitions in three specific contexts--first, the acquisition by means of a cash tender offer of more than [5 percent] of any class of stock of a publicly held company; second *other acquisitions by any person or group of more than [5 percent] of any class of stock of a publicly held company;* and third, the repurchase by a corporation of its own outstanding shares." S.Rep. No. 550, 90th Cong., 1st Sess., 16, 33 (1967) (remarks of then Chairman Cohen). Section 13(d) is concerned with the second type of stock acquisition, requiring after-the-fact disclosure of substantial open market

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

accumulations of securities within a relatively short period of time. H.R.Rep. No. 1711, 1968 U.S.Code Cong. & Admin. News at 2818.
*Gen. Aircraft Corp. v. Lampert,* 556 F.2d 90, 94 (1st Cir.1977) (emphasis added).

FN20. The Court has previously recognized that Plaintiffs' interests are not perfectly aligned with those of the Bank's other investors and, on that basis, declined to permit Plaintiffs to maintain a derivative suit. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, at *3-4, 2004 U.S. Dist. LEXIS 17090, at *12-13 (D.D.C. Jan. 15, 2004). Given that background, it might be suggested that, to the extent Plaintiffs' standing is deemed representational, Plaintiffs are inappropriate representatives of the other shareholders. The answer to this criticism is that Plaintiffs are deemed to "act[ ] on the shareholders' behalf *until* an accurate Schedule 13D is filed," but not beyond. *Indiana Nat'l,* 712 F.2d at 1185 (emphasis added). That Plaintiffs do not necessarily "represent the interest of the shareholders in relation to who *wins* the struggle for control," *id.,* does not, therefore, call into question the propriety of their representation at this stage.

FN21. "The Schedule 13D mandates disclosure, *inter alia,* of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control)." *MITE Corp. v. Dixon,* 633 F.2d 486, 492 (7th Cir.1980).

FN22. In some circumstances, an acquisition or disposition of less than one percent may be deemed material. 17 C.F.R. § 240.13d-2(a).

FN23. The Court also notes that, because Mr. Thompson already owned 7.2% of the Bank's shares as of September 2005, and had filed a Schedule 13D with respect to those shares, when he acquired voting power over the Doley Participants' shares--an amount that was clearly material under 17 C.F.R. § 240.13d-2--he was required to

amend his 13D "promptly." *See* 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). There is no evidence that he did so.

FN24. For this reason, Defendants' reliance on *Berg v. First Am. Bankshares,* No. 83-3887, 1985 WL 2232, 1985 U.S. Dist. LEXIS 20631 (D.D.C.1985), *aff'd on other grounds,* 796 F.2d 489 (D.C.Cir.1986), is unavailing. The court in *Berg* read *Mills* as crafting a principle of "constructive reliance" applicable only in situations where "the requisite proof of reliance by other shareholders would be impossible to reproduce." *Id.* at *7, 1985 U.S. Dist. LEXIS 20631, at *20. *Berg* declined to extend this principle beyond the context of class actions, which *Mills* was. However, as explained in the text, the principle enunciated in *Mills* was not subjective (reliance) but objective (materiality); on this point, therefore, the Court parts company with *Berg.* The Court also notes that the D.C. Circuit affirmed dismissal of the § 14(a) claim in *Berg* on the ground that the plaintiff failed to raise genuine issues of falsity and materiality, and expressly declined to reach the district court's "alternative determination that [the plaintiff's] complaint must be dismissed for failure to demonstrate reliance." 796 F.2d at 501 n. 11.

FN25. In the first, Mr. Bender sued the Bank for access to minutes of meetings of the Board; that suit was voluntarily dismissed after the Bank provided Mr. Bender the relief he sought. *Bender v. Indep. Fed. Sav. Bank,* No. 03-865 (D.D.C.2003). In the second, Mr. Bender sued the Bank to force a special Shareholders' Meeting. The Court ruled against Mr. Bender, finding that Mr. Bender's interests were too divergent from those of other shareholders to permit him to proceed derivatively, and that the negotiations with Carver were of such a delicate nature that a special Shareholders' Meeting would disrupt the bid process. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124 (D.D.C. Jan. 15, 2004). In the third, the Bank brought suit against Bender under § 13(d), but after losing its bid for preliminary injunctive relief, opted to settle. *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004). And in the fourth, Mr.

Bender brought suit to force a long-delayed Shareholders' Meeting to take place, but voluntarily dismissed the action when OTS allowed the meeting to be delayed. *Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C.2005).

FN26. Ms. Finlayson's October 21, 2005, email to Ms. Jordan and Messrs. Batties and Royer, among others, makes this point clearly: "In terms of the voting tallies, the numbers are very discouraging.... As of today, most of the 'for votes' for management consist of the routine broker votes that w[ere] turned in.... [T]his number can change based on those street name holders who elect to take out legal proxies or who contact their broker before Wednesday's meeting and instruct such broker to 'withhold authority to vote for all nominees.' The broker then of course would reverse the earlier routine broker vote turned in on their behalf." Pls.' Exh. 102.

FN27. The Court recognizes that this issue is not properly termed one of standing, at least not in the Article III sense. Rather, the question is more accurately phrased, "[W]ho is the real party in interest to bring a lawsuit under the governing substantive law to enforce the asserted right [?]" *Labovitz v. Wash. Times Corp., 172 F.3d 897, 900 n. 6 (D.C.Cir.1999)* (quoting *Whelan v. Abell, 953 F.2d 663, 672 (D.C.Cir.1992)* (internal quotation marks and citations omitted)). Specifically, in the shareholder context, the question is "whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of shareholders' suits." *Id.*

FN28. The Court also notes that another rationale for requiring derivative suits-- preventing an individual shareholder from securing a benefit at the expense of others similarly situated, *see Cowin, 741 F.2d at 414*--is not implicated here, as Plaintiffs seek no monetary relief for this count.

FN29. Ms. Jordan peremptorily rejected the challenges as "out of order" because they were "procedural question[s]" and "procedures for these votes have been set up according to the bylaws." Trial Exh. 20 at 5. She later testified that she rejected the

challenges because Mr. Bender failed to place them on the agenda in advance of the meeting, an explanation the Court considers a post-hoc justification. Mr. Dunlop testified that, although in his experience the IIOE usually rules on proxy challenges, he "did not want to go against the wishes of the Chair." Dunlop Dep. 91-92. Moreover, he "did not rule on the challenges, and really did not consider the challenges once they were presented to the meeting, and the Chair ruled them out of order." *Id.* at 114.

FN30. That section provides, in full: "Every shareholder entitled to a vote at an election for directors shall have the right to vote, in person or by proxy, the number of shares owned by the shareholder for as many persons as there are directors to be elected and for whose election the shareholder has the right to vote, or to cumulate the votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares shall equal[,] or by distributing such votes on the same principle among any number of candidates."

FN31. Mr. Bender also argues that the Bank's failure to hold a separate meeting to vote on the allocation of management proxies violated Article II, Section 9 of the Bylaws. That section provides, in relevant part, that "[p]roxies solicited on behalf of management shall be voted as directed by the shareholder or, in absence of such direction, as determined by a majority of the board of directors." However, this text contains no express requirement that a meeting be held, and the master ballot was, in fact, signed by a majority of the board of directors. The Court perceives no violation of the Bylaws here.

FN32. OTS permitted Mr. Bender to solicit votes, but not proxies, for reasons known to them but not made clear by the record.

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1343712 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities In Reply to Defendants' Response to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2042962

Page 31

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: 2006 WL 2042962 (D.D.C.))**

Benders' Application for Preliminary Injunctive Relief (Apr. 14, 2006)

• 2006 WL 1046717 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief (Mar. 31, 2006)

• 2006 WL 1046716 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Directors and Thomas Batties' Motion to Dismiss Counts I - IV of the Complaint (Mar. 15, 2006)

• 2006 WL 645058 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Counts I, II, III, and IV of Plaintiffs' Complaint (Feb. 22, 2006)

• 2006 WL 645059 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendant Independent Federal Savings Bank's Motion to Dismiss Count VI of Plaintiffs' Complaint (Feb. 22, 2006)

• 2006 WL 645051 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645052 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645053 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645054 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645055 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645056 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 645057 (Trial Pleading) Answer (Feb. 15, 2006)

• 2006 WL 318855 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006)

• 2006 WL 381806 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006)

• 2006 WL 318881 (Trial Pleading) Verified Complaint (Jan. 18, 2006)

• 1:06cv00092 (Docket) (Jan. 18, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1985 WL 572                                                                                  Page 1
Not Reported in F.Supp., 1985 WL 572 (N.D.Ill.)
**(Cite as: 1985 WL 572 (N.D.Ill.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
ROBERT R. BODLUND, BRUCE K.
CHAMBERLAIN, JAMES T. LINDSTROM, and
WILLIAM D.
GRAVER, Individually and on behalf of a Plaintiff
Class described therein,
Plaintiffs and Counterdefendants,
v.
FIRST NATIONAL BANK OF CHICAGO, a
national banking association, LYON METAL
PRODUCTS, INC., a Delaware corporation, HENRY
A. GARDNER, JR., LAWRENCE HOWE,
JR., STUART E. HUGHES, WALTER
ALEXANDER, EDWARD L. ANDERSON,
Defendants and
Counterplaintiffs.
No. 84 C 10341.

April 11, 1985.

TEMPORARY RESTRAINING ORDER

NORGLE, District Judge.

*1 This matter coming before this court, sitting as
emergency judge for Judge Plunkett, on the Motion
for Temporary Restraining Order of counterplaintiffs
LYON METAL PRODUCTS, INC., Henry A.
Gardner, Jr., Lawrence Howe, Jr., Stuart E. Hughes,
Walter Alexander, Edward L. Anderson, for an order
against Robert R. Bodlund, Bruce K. Chamberlain,
James T. Lindstrom, William D. Graver, Peter
Washington, Irwin Jacobs, Daniel T. Lindsay, Dennis
M. Mathisen and Gerald A. Schwalback; this court
having jurisdiction over the matter and having heard
the arguments of counsel for the parties and certain
testimony of witnesses at a hearing beginning at 4:30
P.M. on April 11, 1985; this court makes the
following findings an order:

THIS COURT FINDS that counterplaintiffs have
demonstrated a substantial probability of success on
the merits on their claim that certain consents were
obtained in violation of the proxy solicitation rules of
Section 14(a) of the Securities and Exchange Act of
1934 and the rules thereunder; that there would be
immediate and irreparable harm to the public interest

in permitting exercise of such consents by the
counterdefendants; that the balance of equity and of
harms favors the counterplaintiffs; that there is no
adequate remedy at law; and that a temporary
restraining order should be entered to preserve the
status quo until this court can hear and rule on a
motion of preliminary injunction.

IT IS HEREBY ORDERED:

1. That a temporary restraining order be issued in
this cause enjoining counterdefendants Robert R.
Bodlund, Bruce K. Chamberlain, James T.
Lindstrom, William D. Graver, Peter Washington,
Irwin Jacobs, Daniel T. Lindsay, Dennis M. Mathisen
and Gerald A. Schwalback and others acting in active
concert or participation with them, and all unknown
persons who receive notice of this order, from taking
any actions pursuant to the consents at issue in the
counterclaim, and particularly (i) from convening a
meeting of any 'reconstituted Board,' (ii) from
publicly announcing their purported control of Lyon
or taking any steps to effectuate such purposed
control, (iii) from acting on behalf of the Board of
Directors in any way, or (iv) from soliciting consents
of shareholders of Lyon for any purpose without
compliance with the Securities Exchange Act of 1934
and the rules thereunder;

2. That this order be entered effective as of 8:30
P.M. April 11, 1985, and shall continue in full force
and effect, unless extended pursuant to Rule 65 of the
Federal Rules of Civil Procedure, until 11:59 P.M. on
April 18, 1985;

3. That this matter be set for a preliminary
injunction hearing on April 18, 1985, before Judge
Plunkett, subject to Judge Plunkett's schedule and
availability; and

4. That counterplaintiffs post a bond with the clerk
of this court in the amount of $1,000,000.00 by the
close of business on April 12, 1985.

Not Reported in F.Supp., 1985 WL 572 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1983 WL 1315                                                                                          Page 1
Not Reported in F.Supp., 1983 WL 1315 (D.N.H.), Fed. Sec. L. Rep. P 99,205
**(Cite as: 1983 WL 1315 (D.N.H.))**

C

United States District Court; D. New Hampshire.
**Clarostat Mfg. Co., Inc.**
v.
**Ostrau, et al.**
**No. C82-299-L**

May 26, 1983

LOUGHLIN, *District Judge.*

*1 Plaintiff herein complains of violations of Section 13(d) and 14(a) of the Securities Exchange Act of 1934. Plaintiff is a New York Corporation with a principal place of business in Dover, New Hampshire, and plants in Maine and California. This suit involves a proxy fight for control of the plaintiff corporation. The defendants are a group of independent shareholders who hold approximately 13% of the outstanding shares.

Because plaintiff bases its cause of action on inaccuracies in defendant's Schedule 13D and Schedule 14B disclosure statements, and because defendants have interposed a laches defense, the chronology of events is particularly important. Bertram Ostrau filed his Schedule 13D November 2, 1979; Stanley Ostrau filed his Schedule 13D December 11, 1979. Spielman filed his Schedule 13D December 12, 1980. The Ostrau 13D was amended in March, 1980 to reflect the addition of Spielman, Muller and Egan. The Management Proxy statement was mailed on or about April 8, 1982. The defendant's proxy statement was mailed April 13, 1982. Defendant's first fight letter went out the same date. Management's second fight letter was sent May 3, 20, 1982. The defendant's second fight letter was mailed April 28, 1982. Management's escond fight letter was sent May 3, 1982; a third followed May 11, 1982. The annual meeting was convened May 20, 1982. After brief statements and a question/answer period, the ballots were collected and the meeting adjourned. Plaintiff filed his complaint and instant motions May 24, 1982. Oral argument was held today, May 25, 1982. It is anticipated that the vote will be certified May 27, 1982. A preliminary tally, prior to the challenge round, indicates that the Independents will win by approximately 5,000 of the 554,194 shares outstanding as of the record date.

Plaintiff's complaint is in three counts. Count 1 alleges that the independent shareholders failed to disclose all of the members of their group in their Schedule 13D and 14B. Count II alleges that members of the group made a deceitful oral solicitation in violation of Section 14(a) of the Securities Exchange Act and 17 C. F. R. § 240.14a-9 whereby defendants tricked shareholders into revoking their management proxies. Count III alleges that defendants' proxy materials contained false and misleading statements in violation of Section 14(a). As pertinent hereto, plaintiffs request a temporary restraining order to prevent the certification of the vote until June 4, 1982.

The standard to be applied to a motion for a temporary restraining order in this Circuit is set out in *Planned Parenthood League of Mass. v. Bellotti,* 641 F. 2d 1006, 1009 (1st Cir. 1981). That standard requires a four prong showing by the moving party; 1) plaintiff will suffer irreparable injury; 2) plaintiff's injury outweighs potential injury to defendants; 3) a likelihood of success on the merits; 4) public interest will not be adversely affected. The decision to issue a TRO is within the sound discretion of the trial court. *See, also, Palmigiano v. Travisono,* 317 F. Supp. 776 (D. R. I. 1970); *Saloman North America v. AMF Inc.* 484 F. Supp. 846, 848 (D. Mass. 1980).

*2 Plaintiff's argument for a showing of irreparable harm is simple: if the independents control, the case will be dismissed and the violations of the securities laws will never be redressed; the takeover scheme will be accomplished. Plaintiff further argues that the violation of Section (d) in and of itself constitutes irreparable harm. *General Aircraft Corp. v. Lampert,* 556 F. 2d 90, 96-97 (1st Cir. 1977) supports this contention:

The only irreparable harm alleged by GAC in its complaint is the failure to receive information mandated by Section 13(d). The District Court found that "not necessarily the plaintiff corporation but the investigating persons who hold shares in that corporation and potential shareholders in that corporation" had demonstrated irreparable harm sufficient to warrant the issuance of a preliminary injunction. As the very *raison d'etre* of Section 13(d) was thwarted by appellants' continued failure to disclose the statutorily required information, we discover no error in the decision that irreparable injury would occur to shareholders and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1983 WL 1315                                                                      Page 2
Not Reported in F.Supp., 1983 WL 1315 (D.N.H.), Fed. Sec. L. Rep. P 99,205
**(Cite as: 1983 WL 1315 (D.N.H.))**

investing public if appellants were allowed to continue their activities without correcting and amplifying their Schedule 13D. We therefore affirm the order granting the preliminary injunction insofar as its enjoined appellants from further violations of Section 13(d), from failing to amend their inaccurate Schedule 13D, and from acquiring further shares of GAC common stock or soliciting proxies or consents from GAC stockholders until the Schedule 13D is amended to reflect accurately their intentions. See _Bath Industries v. Blot, 427 F. 2d 97, 113 (7th Cir. 1970); Graphic Sciences v. International Mogul Mines, supra at 128; Jewelcor v. Pearlman, 397 F. Supp. 221, 253 (S. D. N. Y. 1975);_ cf. _Corenco Corp. v. Schiavone & Sons, 488 F. 2d 207, 214-15 (2d Cir. 1973.)_

Accord: _Kaufmann & Broad, Inc. v. Belzberg, 522 F. Supp. 35, 46 (S. D. N. Y. 1981); Saunders Leasing v. Societe Holding Gray D'Albion, 507 F. Supp. 627, 532 (N. D. Ala. 1981); Standard Metals Corp. v. Tomlin, 503 F. Supp. 586 (S. D. N. Y. 1980); Kirsch Co. v. Bliss & Laughlin Industries, Inc., 495 F. Supp. 438, 502 (W. D. Mich. 1980)._

The gist of plaintiffs' Schedule 13D violation argument is that defendants did not make a complete and timely revelation of the existence of the group. Section 13(d)(3) indicates that a group of shareholders acting together "for the purpose of acquiring, holding, or disposing of securities of an issuer" is a "person" for purposes of the subsection. Section 13(d)(1)(A) requires disclosure of the identity of "such person". See, _General Aircraft Corp. v. Lampert, supra at 95, S. E. C. v. Savoy Industries, 587 F. 2d 1149 (D. C. App. 1978),_ cert. denied _440 U. S. 913 (1979)._ Plaintiff here contends that defendants' actions demonstrate a purpose of obtaining stock and of voting stock. They point to purchases of stock by group members in March and April 1982, a gross disparity between the votes for management of stock held in street name as compared to stock voted by shareholders, and statements by shareholders of their "commitment" to the independents slate.

**\*3** Defendants contend that all the evidence of group members outside the named defendants is circumstantial. This, of course, necessarily so. Where parties combine covertly for the purpose of wrenching control from the incumbents, its follows that they will seek to conceal the existence of that intent until the desired numerical advantage is achieved. The contention that the fact defendants have been successful in concealing the group's

existence negates the group's existence is specious. As the District of Columbia Circuit explained in _SEC v. Savoy Industries, supra_ at 1163:

The fact that the quoted passage speaks of "those who seek to pool . . . their interests," and of those who "agree to act in concert," implies strongly that some type of combination toward concerted action is necessary. However, it is equally clear that whatever meeting of the minds, understanding, or arrangement that may exist need not be written. It is possible, indeed commonplace, for two or more to take concerted action informally.

This interpretation is fortified by the language in the last sentence of the above-quoted passage. The use of "any", "understanding," "relationship," and "other arrangement" emphasizes the notion that concerted action need not be formalized or express. The scope of section 13(d)(3) was clearly intended to extend beyond agreements and contracts in the classical contractual "offer" and "acceptance" sense. Surely, the broad language demonstrates an unmistakable congressional intent to bring pooling arrangements within the purview of section 13(d)(3), irrespective of whether they are formal or informal, written or unwritten.

Further, this result seems dictated by common sense. A contrary interpretation would exalt form over substance, as group disclosure under section 13(d)(3) would then hinge on the degree of formality of the arrangement. The purpose of the statute would unquestionably be frustrated, _Water & Wall Associates, Inc. v. American Consumer Industries,_ [1973 Transfer Binder FED. SEC. L. REP. (CCH) P 93,943, at 93,756 (D. N. J. 1973), and a tremendous and unwarranted burden would be placed on the plaintiff. See _Bath Industries, Inc. v. Blot, 427 F. 2d at 110._

Defendants have submitted affidavits in support of their argument of lack of a contract. Peter Nisselson's affidavit indicates he agreed after personal solicitation by Bertram Ostrau, whom he had known for ten years. Gerald Spielman's affidavit is to the same effect. It is a very thin hair plaintiffs seek to split here. We do not think that every proxy returned in favor of one party or the other requires an amendment to the Schedule 13D. The purpose of Section 13(d) is to inform investors of changes in ownership that may effect corporate control and the investment decision. But, just as one individual with large holdings may have this effect, so may a large group of individuals each with small holdings that have agreed to vote a certain way. The teaching of _Sec. v. Savoy Industries,_ is that this agreement to vote for a common purpose need not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1983 WL 1315
Not Reported in F.Supp., 1983 WL 1315 (D.N.H.), Fed. Sec. L. Rep. P 99,205
**(Cite as: 1983 WL 1315 (D.N.H.))**

Page 3

have coalesced into traditional contractual form to fall within Section 13(d)'s periphery.

**\*4** For these reasons, we do not find the fact that plaintiff's evidence is circumstantital to be a hindrance to the relief it seeks. The court finds that there is a likelihood of success.

The court also finds defendants' argument that the anticipated change in control should the preliminary vote be certified following the challenge round will not result in great, if not irreparable, harm is unpersuasive. Whether the corporation funds the prosecution of this lawsuit as it is now doing or funds the defense as it undoubtedly will if the independents are seated is a red herring. The litigation will continue; the legal costs will not differ markedly. The harm foreseeable is the expense and disruption precipitated by the two changes in management should the independents be seated and then unseated as a result of this lawsuit. Business policies will be changed and then redirected. At least top levels of management will be replaced, and changes into lower levels of operations are foreseeable. This business disruption may never be totally remedied even should plaintiffs ultimately prevail. The court finds that this harm and the Schedule 13D violations compel a finding of irreparable harm.

We turn to a balancing of the relative harms. Both parties argue that the status quo favors their position. Plaintiffs contend that the election process should be stopped so that they may complete discovery. Defendants argue that the status quo favors honoring the electoral process and the will of the shareholders. The shortcoming of this argumeint is that it is this will that plaintiffs claim was misled by defendants' alleged Securities Act violations. Should defendants be seated, the alleged scheme will be completed. Nor does the court foresee, as defendants have argued at length, that this case will fall heir to the delays of *Horizon Corp. v. Anselmi*, 483 F. Supp. 653 (D. C. C. 1980). A Temporary Retraining Order is of limited purpose and duration, and plaintiffs have tailored their request accordingly. In balance, the status quo favors the plaintiffs.

Finally, the court does not consider laches to bar plaintiff's relief. As plaintiffs point out, the evidence of Section 13(d) violations did not fully surface until immediately prior to the election, although the initial Schedule 13D was filed quite some time ago. Plaintiff has not sat on its rights to such an extent that it should be barred from bringing this action. Plaintiffs' motion for a temporary restraining order is

granted. Defendants are enjoined from taking or causing to be taken any action to certify the vote and from taking office prior to June 4, 1982. The plaintiff shall put up a $50,000 bond to be paid on or before June 1, 1982.

SO ORDERED.

Not Reported in F.Supp., 1983 WL 1315 (D.N.H.), Fed. Sec. L. Rep. P 99,205

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1987 WL 5793                                                                                                  Page 1
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

**H**
United States District Court, S.D. New York.
LEBHAR FRIEDMAN, INC., a New York
Corporation, Plaintiff,
v.
MOVIELAB, INC., a New York Corporation, Saul
Jeffee, John J. Kowalak, S.
Richard Di Bona, Norman W. Elson, Henry Mendler,
Leonard P. Weg and Michael P.
Mayer, Defendants.
**No. 86 CIV. 9965 (SWK).**

Jan. 13, 1987.

*MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

*1 This is an action for preliminary relief brought by
plaintiff to redress allegedly unlawful activities by
the defendants in connection with their solicitation of
defendant corporation's shareholder proxies by means
of an allegedly materially misleading Proxy
Statement, dated December 16, 1986.

*THE PARTIES*

Defendant, Movielab, Inc. ("Movielab") is a
corporation organized and existing under New York
State law, with its principal place of business at 619
West 54 Street in Manhattan.   Movielab engages
primarily in video post-production services.
Movielab is also involved in various commercial real
estate transactions.

Movielab is a public corporation whose common
stock is listed on the American Stock Exchange.  As
of December 15, 1986 there were 1,643,908 shares of
Movielab stock outstanding, and as of May 28, 1986,
there were 1,336 record holders of Movielab
common stock.

Defendant Saul Jeffee is Chairman of the Board of
Directors and President of Movielab.    As of
December 1, 1986, Jeffee was the beneficial owner of
671,858 shares of Movielab common stock,
approximately 40.9 percent of all issued and
outstanding shares.   Defendant Leonard P. Weg is
Vice President, Treasurer, and Secretary of Movielab
and a member of Movielab's Board of Directors.
Defendants John J. Kowalak, S. Richard DiBona,
Norman W. Elson, Henry Mendler, and Michael

Mayer are members of Movielab's Board of
Directors.

Plaintiff Lebhar Friedman, Inc. ("Lebhar") is a
corporation organized and existing under New York
State law, with its principal place of business at 425
Park Avenue in Manhattan.   Lebhar is the record and
beneficial owner of Movielab common stock, and as
of December 1, 1986 was the beneficial owner of
338,400 shares of Movielab common stock,
approximately 20.6 percent of all shares issued and
outstanding.

*FACTS*

On June 2, 1986, Lebhar wrote a letter to the Board
of Directors of Movielab demanding that Movielab
commence an action for rescission and damages
against defendants Jeffee, Kowalak, DiBona, Elson,
Mendler, Weg and certain other persons. [FN1]   In
this letter, Lebhar alleged that these defendants had
caused Movielab to sell substantially all of its assets
without shareholder approval, in violation of Section
909 of the New York Business Corporation Law, and
had also engaged in other transactions which wasted
the company's assets and violated the directors' duties
to Movielab's public shareholders. [FN2]

On June 25, 1986, defendant Jeffee informed Lebhar
by letter that on June 19, 1986 the Movielab Board of
Directors had appointed defendant Mayer to analyze
the claims in Lebhar's letter and that Mayer had been
authorized by the Board to retain independent
counsel to assist him in his investigation.

In July, 1986, defendant Mayer retained as
independent counsel the New York law firm of
Kramer, Levin, Nessen, Kamin & Frankel to prepare
an investigative report analyzing Lebhar's charges.
Arthur H. Aufses is the Kramer Levin attorney who
has been responsible for the investigation and
preparation of the report.

*2 On October 31, 1986, the independent counsel
informed plaintiff that its work on the report was
"nearing its end" and that the report "will soon be
submitted to the Board".    During the first or second
week in November the independent counsel began to
write the report.    On November 14, 1986, the
independent counsel submitted a draft version of the
report, at that time still devoid of legal conclusions,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793                                                                                      Page 2
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

to Mayer. At some time during Thanksgiving week of 1986, the independent counsel submitted a second draft to Mayer. On some date in the middle of December, but after December 15, the independent counsel submitted a third draft to Mayer. Then, on January 1, 1987, the independent counsel submitted the final version of the report to Mayer. The final report was released to Movielab's Board members on January 7, 1987, on the eve of the evidentiary hearing before this Court.

The report discusses the Movielab business decisions challenged by Lebhar in their June, 1986 letter: the Technicolor sale, defendant Jeffee's employment contract, the Besega loans, the failure to lease the vacant office space, and the directors' fees. The report does not recommend a shareholder derivative suit based on Lebhar's dissatisfaction with these aspects of Movielab's conduct. The report does recommend, however, the following action by Movielab's Board: 1) reconsidering Jeffee's employment contract in light of Movielab's present financial difficulties; 2) addressing the issues of short and long term planning, including Lebhar's demand for liquidation of the company; 3) meeting more frequently; and 4) seeking individual Board members with relevant experience in videotape post-production and commercial real estate, because although Movielab now engages almost exclusively in these areas, neither of these businesses is now represented on the Movielab Board.

Meanwhile, on December 16, 1986, Movielab's Board of Directors disseminated a Proxy Statement to the corporation's shareholders. The Proxy Statement is intended for use at a shareholder meeting to be held on January 13, 1987, the first such meeting within past 2 months. The agenda for the annual meeting-- as set forth in the Proxy Statement-- includes the election of a Board of Directors, and the slate of nominees provided in the statement consists of the incumbent directors. The Proxy Statement contains no reference to the existence of an investigation or report or the recommendations contained in the report.

*ALLEGATIONS*

Based on these facts plaintiff alleges that defendants will violate Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and the provisions of the Securities and Exchange Commission's Rule 14a-9, 17 CFR 240.14a-9, promulgated thereunder, if Movielab's shareholders' vote on the current Proxy Statement at the shareholder meeting on January 13, 1987. Plaintiff alleges that the Proxy Statement as

issued is unlawful under § 14(a) and Rule 14a-9 because it does not disclose, at the very least, the recommendations of the report as they relate to the individual defendants. Plaintiff alleges that these recommendations are material facts which have been omitted, and which by their omission, rendered other statements in the Proxy Statement misleading.

**\*3** Plaintiff also alleges that defendants' actions described above with regard to the Proxy Statement-- which plaintiff alleges are designed to mislead Movielab's shareholders and entrench the individual defendants in office--also constitute a breach of their fiduciary duty to the shareholders, and are, therefore, also prohibited under New York State law.

In response, defendants assert that they were not required to disclose the recommendations in the Proxy Statement because at the time that it was issued-- December 16, 1986--these recommendations were not in existence, or at the very least defendants were unaware of their existence.

*PRELIMINARY INJUNCTION*

Plaintiff [FN3] moves this Court for a preliminary injunction directing defendants, to: 1) refrain from violating the provisions of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n, and the provisions of Rule 14a-9 promulgated thereunder; 2) immediately file a corrective proxy statement with the Securities and Exchange Commission and immediately mail copies to Movielab's shareholders after such corrective proxy statement has been reviewed by plaintiff and this Court; 3) refrain from taking any steps to solicit or vote any proxies, consents, or authorizations with respect to the Movielab's Proxy Statement, dated December 16, 1986; 4) refrain from making any false or misleading public statements regarding Movielab or its directors; or 5) refrain from filing or disseminating any false or misleading proxy solicitation materials relating to the voting of Movielab common stock.

On December 31, 1986, Judge Leisure, acting as Part One Judge, granted a temporary restraining order on plaintiff's behalf. On January 8, 1987, this Court extended the temporary restraining order in order to maintain the status quo until disposition of the motion for preliminary injunction.

This Court held an evidentiary hearing on January 8, 1987. The Court heard testimony from Aufses. [FN4] The Court also received pleadings, affidavits, and exhibits from both parties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793                                                                                    Page 3
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

In order to obtain a preliminary injunction in this Circuit, a plaintiff must demonstrate both (a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor. *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir.1986); *Kaplan v. Board of Education*, 759 F.2d 256, 259 (2d Cir.1985).

*Merits*

*Securities Claim*

Section 14(a) of the Securities Exchange Act of 1934 provides,

"It shall be unlawful for any person, by the use of mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. § 78l]."

**\*4** 15 U.S.C. § 78n.

Rule 14a-9 provides, in relevant part:

"No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to a material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in an earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Under Rule 14a-9 "[a] proxy solicitor's obligation to disclose is a continuing one". *Aegis v. Goldman*, 523 F.Supp. 1273, 1280 (S.D.N.Y.1981). Although a proxy solicitor is not required to disclose information in an original proxy which was either not in existence or of which the solicitor was unaware on the date that the proxy was issued, *Nemo v. Allen*, 466 F.Supp. 192, 195 (S.D.N.Y.1979), *see also Diamond v. Arend*, No. 84 Cr. 0751, *slip op.* at 13 (S.D.N.Y. November 17, 1976), if new information becomes available before the shareholder vote which is material and whose omission would render the existing statement false or misleading, it is the solicitor's obligation to disclose that information before the vote. *Aegis*, 523 F.Supp. at 1180. When requesting relief, it is plaintiff's burden to demonstrate that defendant proxy solicitor became aware of the information at some time before the vote. *Nemo*, 466 F.Supp. at 195. (court refused to undo the results of a vote based on a proxy statement which did not disclose material information of which the defendant corporation was not aware at the time it issued the proxy, as plaintiff offered no proof that defendant became aware of the information at any time before the vote).

Plaintiff has offered proof, in the form of sworn testimony, that even if defendants were not aware of the report's conclusions and recommendations [FN5] when the proxy was issued on December 16, 1986, they have become aware of the recommendations before the shareholder vote has taken place. Aufses testified that copies of the report in its final form were sent to the Board members on the evening of January 7, 1987. [FN6] The shareholder's vote is not scheduled to take place until January 13, 1987.

The report's recommendations are clearly material information. A fact is material under Rule 14a-9 "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote". *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *see GAF Corp. v. Heyman*, 724 F.2d 727, 741 (2d Cir.1983) (upholding use of this standard in a proxy case but disagreeing with district court's application of it). The report contains information regarding the capabilities of Movielab's incumbent directors; the report concludes that no one on the present Board is experienced in the very areas in which the corporation does business. Based on this conclusion, the report recommends that the Movielab Board should seek additional members with relevant experience in, among other areas, videotape post-production and commercial real estate. The report also concludes that defendant Jeffee's employment contract was reasonable at the time it was negotiated. The report recommends, however, that the Board reconsider Jeffee's contract in light of newly available comparative data regarding companies of Movielab's size and Movielab's competitors in the industry. These

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793                                                                    Page 4
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
**(Cite as: 1987 WL 5793 (S.D.N.Y.))**

conclusions and recommendations are highly relevant to Movielab's shareholders' decisions whether to reelect the entire slate of incumbent Board members presented in the Proxy Statement, which includes Mr. Jeffee.

**\*5** The current omission of these material recommendations from the Proxy Statement renders the statement misleading. There is nothing in the current statement which indicates that the incumbent Board's qualifications to be the exclusive directors of Movielab have been questioned, or that Jeffee's salary has been questioned. Both have been questioned by an independent neutral body hired by the corporation to conduct an internal investigation. The current Proxy Statement is, therefore, misleading.

*State Claims*

Because plaintiff has met its burden of demonstrating a likelihood of success on the merits of its federal claim, the Court need not address the merits of plaintiff's state claims.

*Irreparable Harm*

Where plaintiff seeks an injunction because of defendant's violation of a statute, it need only show that unless the injunction is granted, plaintiff will suffer harm which cannot be repaired. *Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1962) (Friendly, J.).

Plaintiff meets this burden. If this injunction were not granted, Movielab's shareholders could elect a Board of Directors based on misleading information which has been presented to them in violation of the securities laws. Courts recognize that the wrongful positioning of corporate heads wreaks irreparable harm on a corporation and its shareholders because it may require the unravelling of transactions wrongfully entered into. *See Calumet Industries, Inc. v. MacClure,* 464 F.Supp. 19, 28 (N.D.Ill.1978); *Berkman v. Rust Craft Greeting Cards, Inc.,* 454 F.Supp. 787, 794 (S.D.N.Y.1978). The harm is particularly acute in this case because the directors who could be elected have been deemed unqualified to run the corporation without additional assistance.

CONCLUSION

For the foregoing reasons, plaintiff's motion for preliminary injunction is GRANTED, as modified. Defendants are (1) to refrain from taking any steps to solicit or vote any proxies, consents, or authorizations, with respect to the Proxy Statement; and (2) to file a corrective proxy statement with the Securities and Exchange Commission and mail such corrective statement to Movielab's shareholders prior to any future shareholders' meeting concerning the election of directors. Defendants' motion for a protective order is denied.

SO ORDERED.

FN1. This letter was not the first time Lebhar voiced its grievances against Movielab. In July 1985--approximately three months after it first purchased stock in Movielab--Lebhar brought a shareholder derivative and individual action against Movielab, its directors and others premised upon charges of waste and mismanagement as well as allegations that Movielab's directors had sold substantially all of the corporation's assets without shareholder approval in violation of § 909 of the Business Corporation Law. Lebhar sought the appointment of a temporary receiver for Movielab pursuant to CPLR § 6401.

On January 9, 1986, the Supreme Court, New York County (S. Schwartz, J.) rendered a memorandum decision, followed by a February 10, 1986 order, dismissing Lebhar's state court action and denying Lebhar's motion for appointment of a temporary receiver. The Court held that Lebhar had improperly failed to serve a demand upon the Movielab Board of Directors pursuant to § 626(c) of the Business Corporation Law; that Lebhar had failed adequately to allege that such a demand would have been futile; and that Lebhar's claims of unlawful liquidation, misappropriation and waste were improperly pleaded as individual claims. On May 29, 1986, the Appellate Division, First Department, unanimously affirmed the dismissal of Lebhar's action without opinion.

Movielab disclosed Lebhar's lawsuit, and the claims of waste and mismanagement asserted therein in the corporation's 1985 Annual Report on Form 10-K filed with the Securities and Exchange Commission in early June 1986.

FN2. Lebhar challenged these transactions: 1) Movielab's sale of all its film processing assets to Technicolor in 1984; 2) Jeffee's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1987 WL 5793
Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162
(Cite as: 1987 WL 5793 (S.D.N.Y.))

employment contract, which provides for a term of employment--at $175,000 per year (Jeffee waived the increase, which was to be effective January 1, 1986 to $200,000 per year)--and a lifetime consulting arrangement--at $100,000 a year--after that; 3) the Besega loans, which Jeffee secured for Movielab from the Besega Corporation in which he is a principal; 4) Movielab's decision not to lease vacant office space to Lebhar, and its failure to consummate a lease with another tenant; 5) Movielab's directors' fees.

FN3. A private cause of action is available to corporate shareholders under Section 14(a) to redress "deceptive or inadequate disclosure in proxy solicitations". *J.I. Case Co. v. Borak,* 377 U.S. 426, 431 (1964).

FN4. At this hearing Aufses provided copies of the final draft of the report, which had been mailed to the members of Movielab's Board of Directors on the previous evening, to plaintiff's and defendants' counsel. Defendants' counsel moved for a protective order barring disclosure of the contents of the report to plaintiff. Defendant alleged that such disclosure would constitute use of this Court as a means for producing discovery materials pertaining to the now dormant state action between the parties. The Court declined to rule on the protective order at that time.

FN5. Defendants were not required to disclose Lebhar's mere allegations. *See Markewich v. Adikes,* 422 F.Supp. 1144, 1146 (E.D.N.Y.1976).

FN6. It is, in fact, highly likely that Movielab's Board members were aware of the recommendations contained in the report before January 7, 1987. Aufses testified that Mayer, who is a member of the Board, had access to these recommendations immediately after New Year's day, 1987. Lebhar, however, has not demonstrated to this Court that Mayer shared this information with the rest of the Movielab Board. Because Movielab gained access to the information before the vote, this Court need not reach the issue of whether Mayer's knowledge should be imputed to the other Board members.

Not Reported in F.Supp., 1987 WL 5793 (S.D.N.Y.), Fed. Sec. L. Rep. P 93,162

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.