Page 21 of 40

--- F.Supp.2d ----                                                    Page 20

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

78m(d)(2); 17 C.F.R. § 240.13d-2(a). The SEC has promulgated regulations reiterating and elaborating on these statutory requirements. These regulations define a "material change" to mean "[a]n acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities." 17 C.F.R. § 240.13d-2(a). FN22 A "beneficial owner" includes, in turn, "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares ... [v]oting power which includes the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3(a). Finally, the regulations provide:

when two or more persons agree to act together for the purpose of acquiring, holding, *voting* or disposing of equity securities of an issuer, *the group formed thereby shall be deemed to have acquired beneficial ownership,* for purposes of Section 13(d) and (g) of the [Exchange] Act, *as of the date of such agreement,* of all equity securities of that issuer beneficially owned by any such person.

17 C.F.R. § 240.13d-5(b)(1) (emphasis added). " The agreement may be formal or informal and may be proved by direct or circumstantial evidence." *Morales v. Quintel Entm't Inc.,* 249 F.3d 115, 124 (2d Cir.2001). Such a group "need only have combined to further a common objective regarding one of the [listed] ... activities." *Id.; see also Gen. Aircraft,* 556 F.2d at 95.

The Court concludes that there is a substantial likelihood that Mr. Bender will succeed on the merits of demonstrating that the Director Defendants, through their chairman and vice chairman, acted as a group with Mr. Thompson to acquire the Doley Participants' shares-and voting power-to solidify their control of the IFSB Board. The record facts strongly suggest that, on the eve and day of the Shareholders' Meeting, Ms. Jordan and Mr. Wilmot facilitated Mr. Thompson's purchase of the Doley Participants' shares, on the express condition that Mr. Doley would vote those shares for the Management Nominees.

On the evening of October 25, 2005, Ms. Jordan and Mr. Wilmot spoke with Mr. Doley regarding the sale of the Doley Participants' shares. Mr.

Wilmot recommended Mr. Thompson, among others, as a buyer. On the condition that the shares be voted for the Management Nominees, Mr. Thompson agreed to buy them, and in an effort to avoid OTS oversight, proposed a sale using Mr. Wilmot as an intermediary; however, the draft purchase agreement, though circulated by Mr. Thompson's counsel to both Mr. Wilmot's assistant and Mr. Doley, was never signed. At the end of the night, the shares remained in the Doley Participants' hands, and Mr. Doley apparently intended to vote them for the Bender nominees at the Shareholders' Meeting.

*15 The Shareholders' Meeting on the next day was delayed, at least in part, because Mr. Doley was running late. When he arrived, he was whisked away by Ms. Jordan to the Prime Rib, where the two were joined by Messrs. Royer and Wilmot. Negotiations ensued regarding the purchase of the Doley Participants' shares by Mr. Wilmot or a group-again, provided that Mr. Doley would vote those shares for the Management Nominees. A sale price of $17-18 per share, with an earnest money deposit of $1 per share, was discussed. *Mirabile dictu,* Mr. Doley did, in fact, vote the Doley Participants' shares for the Management Nominees.

[11] On these facts, the Court readily concludes that Ms. Jordan and Mr. Wilmot, acting on behalf of the Director Defendants, agreed to act together with Mr. Thompson for the purpose of acquiring, holding, and-at a bare minimum-voting the Doley Participants' shares held by Mr. Doley. This group is thus deemed to have acquired beneficial ownership for purposes of Section 13(d) as of the date of such agreement, *see* 17 C.F.R. § 240.13d-5, which the Court finds to be no later than midday on October 26, 2005. That the actual sale of the Doley Participants' shares may never have been consummated is of no consequence here; the group, as described above, beneficially owned those shares because, as a condition of the agreement, it acquired voting power over them. *See* 17 C.F.R. § 240.13d-3(a). By acquiring voting power over the Doley Participants' shares, which constituted nearly 10% of the Bank's outstanding shares, the group exceeded the 5% threshold set forth in § 13(d), and was required to file a Schedule 13D within 10 days,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 21

which it indisputably failed to do.[FN23]

Despite the efforts of all IFSB witnesses to obscure and obfuscate, enough light has been shone into dark corners to find it substantially likely that Mr. Bender will demonstrate that the Director Defendants, acting through Ms. Jordan and Mr. Wilmot, violated § 13(d) of the Exchange Act.

**B. Count II: Section 14(a) of the Exchange Act**

**1. Standing**

In Count II, Plaintiffs seek damages and injunctive relief for Defendants' alleged violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), which governs the solicitation of proxies. Compl. ¶¶ 50-87; Pls.' Opp'n to Defs.' Mot. at 8.

[12] "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines Holdings Inc. v. Mesa Air Group,* 295 F.Supp.2d 75, 81-82 (D.D.C.2003) (omission in original). Defendants argue that Plaintiffs must allege shareholder reliance to prove that the proxy solicitation was an essential link. Defs.' Mot. at 6. Specifically, although they concede that a plaintiff bringing a direct claim under § 14(a) does not have to allege that he *personally* relied on a misrepresentation, *see Cowin v. Bresler,* 741 F.2d 410, 427 (D.C.Cir.1984), they contend that a nonrelying plaintiff must allege reliance by *other* shareholders. Defs.' Mot. at 6. A close reading of *Cowin,* however, reveals no such limitation.

*16 Mr. Cowin, a minority shareholder in Bresler & Reiner, a property management company, sued that company and its directors for various violations of the securities laws, including § 14(a). As a remedy for the defendants' violations of the proxy rules, Mr. Cowin sought to set aside the elections of the defendant directors. *Cowin,* 741 F.2d at 425. The *Cowin* court reversed the district court's

determination that a nonrelying plaintiff lacked standing to assert a direct, as opposed to a derivative, equitable action under § 14(a). *Id.* at 426. In so doing, it characterized Mr. Cowin's claim as follows:
The injury Cowin alleges was not caused by his individual reliance on deceptive proxy solicitations. Rather, his claim is that other shareholders elected [the defendant] directors because they were misled by the proxy materials.... This injury is totally divorced from any reliance, or lack of reliance, on Cowin's part and falls precisely into the scope of injury that Congress sought to protect.

*Id.* at 427. It is presumably from this language that Defendants derive the limitation they propose; that is, that while *Cowin* frees plaintiffs from the burden of alleging their own reliance, it imposes the requirement that plaintiffs allege the reliance of *other* shareholders. This proposition is nowhere directly stated in *Cowin* and it is, in fact, substantially undercut by other portions of the same opinion. The *Cowin* court straightforwardly said, " Regarding section 14(a), however, we find no language in the relevant statutory materials that leads us to conclude that reliance is a prerequisite to standing under that section." *Id.* at 426. To the same effect, "It cannot be said then that the language of the statute and the regulation constrains us to find reliance a necessary predicate to standing under section 14(a)." *Id.* at 427. This Court can imagine no clearer language by which the *Cowin* court could have indicated that reliance, whether on the part of plaintiff or other shareholders, is simply not required.

Faced with a situation in which the "neither the congressional enactment nor the administrative regulations offer[ed] conclusive guidance," the *Cowin* court proceeded to "take into account [the] various policy considerations" that animate § 14(a). *Id.* at 427 n. 22. One purpose the court identified was "to protect investors from 'promiscuous' proxy solicitations by 'unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.' " *Id.* at 427 (quoting S.Rep. No. 73-1455, at 77 (1934)). The court concluded: "Because the controlling statutory materials are silent on the question and because we

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                      Page 22

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

believe a contrary rule would partially frustrate congressional policy, we find that Cowin has standing to pursue his section 14(a) claims." *Id.* at 428. Recognizing the same policy considerations, this Court finds that requiring Plaintiffs to allege reliance by other shareholders "in these circumstances would serve no legitimate policy and . .. decline[s] to do so." *Id.* at 427.

**\*17** [13][14] The fundamental flaw in Defendants' argument is that the touchstone of the analysis is not reliance, but materiality. As the Supreme Court has explained,
Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

*Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). And, as the Ninth Circuit has cogently explained, "As materiality is an objective standard, it should not matter whether any particular shareholder was actually misled by the challenged misrepresentations." *Stahl v. Gibraltar Fin. Corp.,* 967 F.2d 335, 337 (9th Cir.1992).[FN24] Thus, based on *Cowin, Mills, and Stahl,* the Court concludes that Plaintiffs need not allege other-shareholder reliance to maintain a § 14(a) claim. Defendants' motion to dismiss will therefore be denied as to this claim.

### 2. Likelihood of Success on the Merits

[15][16] Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors.' " *Cowin,* 741 F.2d at 426 (quoting 15 U.S.C. § 78n(a)). Rule 14a-9, promulgated pursuant to this authority, expressly prohibits false or misleading proxy solicitations:
No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Id.* at 426-27 (quoting 17 C.F.R. § 240.14a-9). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines,* 295 F.Supp.2d at 81-82 (D.D.C.2003) (omission in original). The term "solicitation" includes, *inter alia,* any " communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The issue of materiality is a mixed question of law and fact that "involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder." *Berg v. First Am. Bankshares,* 796 F.2d 489, 495 (D.C.Cir.1986).

**\*18** Mr. Bender's allegations in Count II stem from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                  Page 23

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

three different communications: (1) the May 4, 2005, Committee Letter; (2) a letter from Ms. Jordan and Mr. Batties titled "Update to Our Shareholders" and related proxy materials circulated by management on October 4, 2005 (the " Management Proxy"); and (3) a letter sent to shareholders on October 21, 2005, purportedly by shareholders Catherine McPhail and A. Gilbert Douglas (the "McPhail/Douglas Letter").

### a. The communications qualify as solicitations

[17][18] As an initial matter, each of the communications referenced above qualifies as a " solicitation" for purposes of Rule 14a-9. The record clarifies that the May 4 Committee Letter was part of a "grass roots" strategy concocted by Mr. Chambers, a bank employee, and Judy Smith, of Impact Strategies, intended to persuade its recipients, including a list of small shareholders, to " not sell[ ] to [B]ender or his allies," Pls.' Exh. 106, in the days before the Shareholders' Meeting then set for May 11, 2005. The letter specifically advocated a "yes" vote for "the Board Slate." Trial Exh. 1 at 1. Engineered by the Bank and sent just days before a contested election, the Committee Letter constitutes a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1($l$)(1)(iii). There is no question that the Management Proxy, to which the Update Letter was attached, constitutes a proxy solicitation. And as to the October 21 McPhail/Douglas Letter, Mr. Chambers and Impact Strategies again played a substantial role, reviewing and editing drafts and providing inside information known only to the Bank. That letter, while not explicitly urging a vote in favor of the Management Nominees, generally questioned Mr. Bender's past performance and present motives, alleged various regulatory violations by Mr. Bender, lauded the "imagination and courage" of the incumbent directors, and pressed shareholders to "DO THE RIGHT THING!!" Trial Exh. 3 at 1-2. As such, it also qualifies as a solicitation under 17 C.F.R. § 240.14a-1($l$)(1)(iii).

### b. The communications contained false and misleading statements and omissions

[19] The three protested communications contained multiple false and misleading statements. In the interests of speed, if not comprehensiveness, the Court will not here catalog the entirety of the false information and misinformation promulgated by the Defendant Directors and Mr. Batties in anticipation of the Shareholders' Meeting that finally took place on October 26, 2005, though much more ink could be spilled on this topic.

The deception in the Committee Letter began with the first sentence, which claimed that the Committee itself was an "independent group of concerned local citizens, shareholders, and loyal customer[s]" when, of course, the Committee was a phantom part of a Bank-led PR drive. Trial Exh. 1. The "Timeline" portion of the letter, purportedly "compiled from public records, news, concerned shareholders[,] and depositors," implied that OTS regulation of the Bank was entirely one-sided in Mr. Bender's favor; stated that the Board members sympathetic to Mr. Bender were "cronies [that] will ... do his bidding"; and emphasized that Mr. Bender's nominees, though both African-American, were "mere puppets of Bender's with no apparent ties to banking, required to do what he tells them." *Id.* Each of these statements was false. The full record of years of litigation demonstrates that OTS supervision, though not always prompt, has been evenhanded, and that the Board members sympathetic to Mr. Bender have been neither puppets nor cronies, but directors exercising independent judgment, as evidenced by their vote, to Mr. Bender's chagrin, in favor of the Carver merger.

*19 A consistent theme of the Management Proxy was that Mr. Bender has repeatedly hauled the Bank into court, each time hurling baseless accusations against the directors and draining the Bank's coffers. Specifically, it states that Mr. Bender " institut[ed] a lawsuit seeking to impose personal liability on those Directors, in each case, in the view of the Majority Directors, without citing any reasonable factual basis." Trial Exh. 2 at 3. The Court is left unsure to which litigation this statement refers. By its count, the instant case is the fifth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 24

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

between Mr. Bender and the Bank.[FN25] Of the four previous suits, three were brought by Mr. Bender, but none was taken in bad faith or lacked a reasonable factual basis. In fact, two were voluntarily dismissed by Mr. Bender after he received the precise relief he sought. Moreover, that the Bank couched its statement in the words of an opinion-"in the view of the Majority Directors" -does not cure its infirmity. *See Va. Bankshares,* 501 U.S. at 1093, 111 S.Ct. 2749 ("[E]xpressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements ...." ); *see also id.* at 1094, 111 S.Ct. 2749 (quoting *Vulcan Metals Co. v. Simmons Mfg. Co.,* 248 F. 853, 856 (2d Cir.1918) (L. Hand, J.) ("An opinion is a fact.")).

Sticking with this theme, the Management Proxy blamed Mr. Bender for every difficulty the Bank has faced in the last several years, without noting or taking any responsibility at the Board or Officer level for decisions that have proved costly and detrimental to the Bank and its reputation. For instance, the Update Letter attributes the Bank's extraordinary legal expenses in 2003 to Mr. Bender when, in fact, the Bank was the plaintiff against Mr. Bender and could have avoided that litigation, *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004), and its expenses were magnified by three lawsuits in connection with the Washington Teachers' Union scandal, which was the huge misstep that precipitated the Bank's slide in the first place. In fact, one of the Washington Teachers' Union suits, brought in early 2003, is alive and well today, and surely continues to deplete the Bank's resources. *Am. Fed'n of Teachers v. Bullock,* No. 03-79 (D.D.C.2006). The proxy statement omitted all mention of this litigation expense.

The Management Proxy also asserted that " Management has advised the OTS that [the Committee] was not associated with the Bank or its management." Trial Exh. 2 at 5. That statement, although superficially true (the Bank did so advise OTS), was nonetheless misleading in communicating that the Committee was unassociated with the Bank, when it was, in fact, a creature of the Bank's own creation. *See Va. Bankshares,* 501 U.S. at 1092, 111 S.Ct. 2749 ("

Such statements are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed."). Perhaps the Management Proxy's most critical misstatement, though, was its instruction that shares held by brokers would not be voted unless the shareholder instructed otherwise. However, all such votes were cast for the management slate. This instruction was plainly false, as the Bank was well aware preceding the vote.[FN26] Indeed, this much was recognized by the Bank's own expert witness, who testified that the instructions in the Management Proxy were " mistaken" or "not right." Apr. 28, 2006, Hr'g Tr. 119:22-24 (Riley).

*20 The McPhail/Douglas letter suffers from many of the same defects as the earlier communications. It again suggested that OTS favors Mr. Bender, asking at one point "why OTS has behaved so contrary to banking laws, security regulations[,] and sound public banking policy to facilitate handing ***Our Bank*** to this Bender character?" Trial Exh. 3 at 1. Its assertion that "[t]he only time we are aware we got into U.S. District Court with Bender-though expensive-Independence Won, Bender Lost!" was plainly misleading, as explained above, in that it omits reference to three other actions between the parties, two of which Mr. Bender voluntarily dismissed after receiving favorable relief, and one of which settled after a ruling unfavorable to the Bank. *See supra* n. 25. In view of the editorial control over this letter exerted by Mr. Chambers, and Mr. Batties' supervisory control over Mr. Chambers, insertion of the hedging phrase "we are aware" does not alter this conclusion.

Under Rule 14a-9, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation" may be misleading. 17 C.F.R. § 240.14a-9 n.(b); *see United States v. Matthews,* 787 F.2d 38, 46 (2d Cir.1986). The communications reviewed above were thinly veiled efforts to question Mr. Bender's character and bona fides as a friend of the African-American community. The Committee Letter stated outright

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 25

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

that Mr. Bender has "no regard for the African American community" and seeks control of the bank to satisfy his "personal greed." It touted the Bank's role in "helping the African-American community prosper and grow, as well as bridge gaps among all races," yet suggested that Mr. Bender is simply trying to "line [his] own pockets" at the expense of that history. It accused him of " bully tactics" and argued that he will "destroy the independent, minority character of IFSB." And it alleged that his nominees, though African-American, were but puppets, and that Mr. Bender was the puppeteer. The McPhail/Douglas letter contained similar overtones, accusing Mr. Bender of pushing another "black bank ... to failure. "

The intent behind these letters is not seriously in question: In Mr. Chambers's own words, "Bender's putative nominees have been painted ... as innocent puppets at best, racial traitors at worst." Pls.' Exh. 104. The Court does not challenge the Bank's ability to question, as part of its solicitations, whether Mr. Bender-who has always been frank about his intentions to gain control of the Bank-has the best interests of the African-American community at heart. But while it is clear that Mr. Bender and the majority of the Bank's Directors have different ambitions for the Bank, changing its identity as a minority institution is not among them; in fact, the evidence shows that Mr. Bender considers the Bank's minority character advantageous. May 4, 2006, Tr. 94-96 (Bender). And the Court also finds that the Committee Letter's questioning of the Bender Nominees' racial loyalty-" Even though those men are both African Americans[,] they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them"-was a direct assault on their character with no factual basis. See 17 C.F.R. § 240.14a-9 n.(b).

### c. The false and misleading statements were material

*21 [20] Third, there is little question but that these false and misleading statements were material, that is, that there is a substantial likelihood that a

reasonable shareholder would have considered them important in deciding how to vote. *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126. In view of the Bank's attempt to use Mr. Bender as a scapegoat for its myriad financial woes, a reasonable investor would have lent importance to the facts that management decisions and unrelated lawsuits are to blame for much of the Bank's litigation expenses; that Mr. Bender has not abused the judicial process or brought baseless suits against the Bank or its Directors; and that the Bank's charges of OTS favoritism are greatly exaggerated. Even more critically, however, a reasonable shareholder would have attached significance to the fact that the Committee to Save IFSB was in no sense " independent" as claimed by its materials, any more so than the McPhail/Douglas letter was an independent creation of its purported authors. In battles for political control, by way of comparison, the voting public often considers who sponsors a particular advertisement in determining the weight to accord it. The same principle holds true in a battle for corporate control. The shareholders would surely find it important that Bank staff had editorial control over the Committee Letter and the McPhail/Douglas Letter, and that the statements therein might best be evaluated with skepticism. Finally, a voter whose shares are held by his broker, but who is informed that those shares would not be voted unless he instructed his broker to do so, would want to know that the opposite was, in fact, the case.

### d. The material falsehoods caused injury for purposes of § 14(a)

[21][22] "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills*, 396 U.S. at 385, 90 S.Ct. 616. In *Mills*, although a majority stockholder controlled just over half of the outstanding shares, a two-thirds majority was required to approve the merger at issue. *See Va.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 26

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

*Banksharcs,* 501 U.S. at 1099, 111 S.Ct. 2749. The Court found that the plaintiffs established the requisite "essential link" by "showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation." *Mills,* 396 U.S. at 386, 90 S.Ct. 616. The Court expressly reserved the question "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." *Id.* at 385 n. 7, 90 S.Ct. 616.

Two decades later, in *Virginia Bankshares,* the Court addressed the question left open in *Mills.* In that case, the majority shareholder, who held 85% of the bank's shares, favored a merger; the remaining 15% of the shares were scattered among 2,000 minority shareholders. *Va. Bankshares,* 501 U.S. at 1088, 111 S.Ct. 2749. In advance of the shareholders' meeting, at which the merger proposal was to be submitted to a vote, the directors issued a proxy statement to the minority shareholders asserting that the price offered was "high" and "fair," which the Court found materially misleading. *Id.* The Court nonetheless denied relief, holding that the plaintiffs had failed to proffer a theory of causation under which the solicitation was "essential" in the sense required by *Mills,* namely, where "the solicitation links a directors' proposal with the votes legally required to authorize the action proposed." *Id.* at 1102, 111 S.Ct. 2749; *see also id.* at 1100, 111 S.Ct. 2749 (describing *Mills* as holding that "causation of damages by a material proxy misstatement could be established by showing that minority proxies necessary and sufficient to authorize the corporate acts had been given in accordance with the tenor of the solicitation"). In the context of merger proposals, *Virginia Bankshares* has been interpreted as holding that "the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision," though that "does not necessarily mean a causal link between the proxy and some other injury may not exist." *Wilson v. Great Am. Indus.,* 979 F.2d 924, 931 (2d Cir.1992); *see also Boone v. Carlsbad Bancorp. Inc.,* 972 F.2d 1545, 1557 (10th Cir.1992) ("The Court [in *Virginia Bankshares*] generally rejected theories of causation presented by shareholders

whose participation was not needed for corporate action....").

**\*22** Here, it is evident that management did not have enough votes to ensure the election of their slate of directors; hence, the solicitations were a critical part of their strategy to convince non-management shareholders to vote in favor of the Management Nominees. The Defendant Directors were plainly worried that their control of the Board was in jeopardy, as made apparent by their desperation to woo minority shareholders just days before the election. The Committee Letter was one facet of a multi-pronged grass-roots campaign that also involved media coverage and lobbying efforts. Pls.' Exh. 106. As the May 2005 meeting approached, a list of smaller shareholders was compiled, *id.,* and pressure mounted to send out the Committee mailings "immediately." Pls.' Exh. 105. By May 5, the "bigger shareholders ha[d] been contacted" with uncertain effect. Pls.' Exh. 104. And as of October 21, just days before the rescheduled Shareholders' Meeting, Ms. Finlayson fretted that, "In terms of the voting tallies, the numbers are very discouraging." Pls.' Exh. 102.

For the purposes of preliminary injunctive relief, Mr. Bender has sufficiently demonstrated the likelihood of a causal connection between the above-described solicitations and the election of the Management Nominees because the votes of minority shareholders were necessary to elect the management slate, and the solicitations were an essential link in securing those votes. *See Va. Bankshares,* 501 U.S. at 1102, 111 S.Ct. 2749.

### C. Count III: Corporate Bylaws and Robert's Rules of Order

In Count III, Plaintiffs seek injunctive relief for Defendants' alleged violations of the Bank's bylaws and Robert's Rules of Order in connection with their conduct of the October 2005 Shareholders' Meeting.

#### 1. "Standing"[FN27]

[23] Defendants move to dismiss on the ground that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 27

claims based on a violation of corporate bylaws or Robert's Rules of Order must be brought derivatively, not directly. Defs.' Mot. at 9. Although Defendants concede that there is no case law directly on point, they would characterize such claims as complaints of "improper management" that, under *Cowin,* 741 F.2d at 414, belong to the corporation and not its minority stockholders. Defs.' Mot. at 9. They further argue that Plaintiffs have alleged no individual injury, unique to themselves, that differentiates them from any other shareholder.

[24] As Defendants recognize, however, a plaintiff can still bring a direct action-even when there is harm done to the corporation generally-if he alleges a "special injury" unique from that suffered by the corporation. *Labovitz v. Wash. Times Corp.,* 172 F.3d 897, 901 (D.C.Cir.1999); *Cowin,* 741 F.2d at 415. Such "special injury" can arise in two contexts: "first, where the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, or second, where the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends." *Labovitz,* 172 F.3d at 901; *see also Cowin,* 741 F.2d at 415.

**\*23** Plaintiffs' allegations here describe a special injury that falls within this second category of harms. Though Defendants correctly observe that Plaintiffs allege that "Defendants have deprived Plaintiffs *and the other shareholders* of a fair vote for the election of directors," Compl. ¶ 69 (emphasis added), suggesting that Plaintiffs were harmed only to the same extent as all other shareholders, *see* Defs.' Mot. at 9-10, this is a selective reading of the Complaint. The gravamen of Plaintiffs' Complaint is that Defendants conspired, in violation of the Exchange Act and their bylaws, to rig the election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying the votes improperly-all in an effort to prevent one particular shareholder, Mr. Bender, from participating in matters of corporate governance.

The Complaint is explicit on this point, alleging that Defendants' violations caused a material number of shares to be counted for the Management Nominees, and against the Bender Nominees, depriving Plaintiff of a fair and orderly voting process. Compl. ¶ ¶ 67-68. Although, in a sense, all shareholders would certainly benefit from a fair and orderly voting process, it remains that, according to their allegations, Mr. Bender was specifically targeted and disenfranchised by Defendants. This constitutes a special injury peculiar to Plaintiffs.[FN28]

*Cowin's* discussion of *Condec Corp. v. Lunkenheimer Co.,* 230 A.2d 769 (Del.Ch.1967), confirms this conclusion. *Cowin,* 741 F.2d at 416. In that case, Condec "made a tender offer and received tenders for a controlling percentage of Lunkenheimer's stock. Condec's control over Lunkenheimer was frustrated, however, when Lunkenheimer's management contracted to sell its business to U.S. Industries and, in the context of that agreement, issued 75,000 additional shares of [authorized, but unissued] Lunkenheimer stock." *Id.* The issuance of these additional shares diluted Condec's holdings, depriving it of a majority. *See Condec,* 230 A.2d at 772. Viewing Lunkenheimer's actions in the context of a battle for corporate control, the Delaware Chancery Court found that the "the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec," *id.* at 775, "and allowed Condec to sue, on its own behalf, for cancellation of those 75,000 shares," *Cowin,* 741 F.2d at 416.

The *Cowin* court found the factual scenario in *Condec* "representative of th[e] second category" of special injury. *Id.* In doing so, it reiterated *Condec's* distinction between claims necessarily derivative-like stockholder challenges to management decisionmaking, such as the decision to spend corporate funds in a stock repurchase-and those that may be brought directly. *Id.* Quoting *Condec,* the *Cowin* court agreed that "a personal action was proper because *Condec* was 'a stockholder with a *contractual right* to voting control being deprived of such control.' " *Id.* (quoting *Condec,* 230 A.2d at 777). In the present context, however, the *Condec* court's statement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 28

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

bears repeating in full: "This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. Manipulation of this type is not permissible." *Condec*, 230 A.2d at 777.

*24 While Plaintiffs here are not majority shareholders with a contractual right to voting control, the principle is the same. According to Plaintiffs' allegations, Defendants disregarded their bylaws and Robert's Rules to deprive Plaintiffs of their "right to a proportionate voice and influence in corporate affairs." *Id.* Such a sleight of hand, directed at a particular shareholder and intended to disenfranchise him, suffices as special injury. *See Cowin*, 741 F.2d at 416. Count III may therefore proceed directly.

### 2. Likelihood of Success on the Merits

Article II, Section 13 of the Bank's Amended and Restated Bylaws ("Bylaws") empowers the Board to appoint, in advance of a shareholders' meeting, an independent inspector of election ("IIOE") whose duties "shall include," *inter alia,* " determining ... the authenticity, validity, and effect of proxies; ... hearing and determining all challenges and questions in any way arising in connection with the rights to vote; counting and tabulating all votes or consents; determining the result; and such acts as may be proper to conduct the election or vote with fairness to all shareholders. " In the course of the October 26 Shareholders' Meeting, Mr. Bender submitted two formal proxy challenges to the IIOE, Creighton Dunlop, one of which challenged the method in which management would allocate its cumulative votes, and the second of which challenged the voting of broker-held shares in favor of the Management Nominees, contrary to the explicit provisions of the Management Proxy. Ms. Jordan ruled both challenges out of order and the IIOE, not wishing to go against the wishes of the Chair, never passed on the merits of those challenges.[FN29] Ultimately, management allocated its votes at a Special Meeting two days after the Shareholders' Meeting, counting broker-held votes in favor of its nominees, and only

then considered the polls closed and announced the results of the election. In Count III, Mr. Bender alleges that his proxy challenges were proper and meritorious, and that the Bank's improper conduct of the election violated its Bylaws and Robert's Rules.

#### a. Allocation of Cumulative Votes

[25] Article II, Section 12 of the Bank's Bylaws gives shareholders the right to cumulate their votes in an election for directors, but does not address the procedure for allocating such votes.[FN30] Article II, Section 4 of the Bylaws provides, however, that " [a]nnual and special meetings shall be conducted in accordance with ... Robert's Rules of Order unless otherwise prescribed by regulations of the OTS or these bylaws or the board of directors adopts another written procedure for the conduct of meetings." At the October 26 Shareholders' Meeting, Ms. Jordan, in her role as Chair, reiterated that Robert's Rules would govern. Trial Exh. 20 at 2. Robert's Rules, however, much like the Bylaws, speak only in general terms about cumulative voting procedures. Robert's Rules § 46, at 431 ll. 16-29 (10th ed.).

*25 Mr. Bender directs the Court to a provision in § 45 of Robert's Rules indicating that, in the context of a vote by ballot, once all who wish to vote have done so, the polls can be closed either on motion of a member or by declaration of the chair. *Id.* § 45, at 401 ll. 11-18. "Thereafter, if other members arrive who wish to vote, a majority is required to reopen the polls." *Id.* at 401 ll. 18-19; *see also id.* at 400 ll. 25-29 ("Should [the presiding officer] fail to vote before the polls are closed, he cannot do so without the permission of the assembly."). Ms. Jordan did, in fact, officially declare the polls closed at the completion of the voting at the October 26 meeting. Trial Exh. 20 at 7. Accordingly, Mr. Bender suggests that § 45 required that the master ballot (representing proxies received by management) be cast, and its votes allocated, before the polls were closed and the meeting adjourned.

Defendants argue that their method was permissible because the master ballot was *cast* before the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Page 29

Shareholders' Meeting was adjourned, even though those votes were not *allocated* until the Special Meeting two days later. They submit that allocation of cumulative votes was not possible at the Shareholders' Meeting because the IIOE had not yet tabulated the proxies received, and management did not know how many votes could be cast for their nominees. Defendants further note that, under § 45 of Robert's Rules, a voter "has the right to change his vote up to the time the result is announced," *id.* § 45, at 395 ll. 9-10, and suggest that, because the results of the election were not announced until the October 28 Special Meeting, the delayed allocation was not improper. Finally, they argue that determinations about the propriety of the vote, including its allocation, are committed to the IIOE, who they contend discharged his duties in a manner consistent with custom and common practice.

While the Bylaws and Robert's Rules are not a model of clarity on this issue, the Court concludes that Mr. Bender has the better part of the argument. First, Defendants' reliance on § 45 for authority to change their votes until the result is announced is misplaced. The relevant provision bears repeating in full: "A member has a right to change his vote up to the time the result is announced; after that, he can make the change only by the unanimous consent of the assembly granted without debate." Robert's Rules § 45, at 395 ll. 9-12. That language contemplates the result being announced at the same meeting, giving each voting member an equal opportunity to change his vote should he so desire; if this provision has effect after the meeting has adjourned, then the latter clause is deprived of meaning. Second, the Court has difficulty concluding that at the October 26 Shareholders' Meeting the votes represented by the master ballot were "cast" in any meaningful sense. The master ballot stated:
In lieu of voting as provided above, the undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, *all* of such votes in a manner that will result in the election of as many of such named management nominees as possible.

The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

**\*26** Trial Exh. 7. Translated to English, this master ballot voted an indeterminate number of votes, because the "number of votes that the undersigned has power and authority to vote" was then unknown-and allocated nothing, because management intended to apportion its proxies later " in a manner that w[ould] result in the election of as many ... management nominees as possible." The practice of tabulating and allocating management proxy votes after the polls are closed, while regarded as proper and even customary by Defendants' expert, Apr. 28, 2006, Hr'g Tr. 123-25, 130-31 (Riley), is a matter of some debate. Many states, including Delaware, prohibit or restrict the acceptance of ballots, votes, or proxies after the polls close. June 16, 2006, OTS Letter at 2 [Dkt. # 44, Exh. A]. OTS has determined that the allocation of votes after the polls closed constituted a revocation or change in the vote within the meaning of § 45 of Robert's Rules. *See id.* at 1. It has further concluded that "[p]roviding the inspectors of election with the ability to allocate the votes for the benefit of one party's slate of directors and not providing that same ability to all other shareholders after the close of the polls is inherently unfair." *Id.* at 2.

Accordingly, the Court finds there is a substantial likelihood that Mr. Bender will successfully demonstrate that § 45 of Robert's Rules, which prohibits changing or revoking a vote after the polls are closed, governed the Shareholders' Meeting; that unilaterally allocating proxies after the polls are closed constitutes such prohibited action under § 45; and that, in a contested election, the IIOE's permitting management alone to allocate votes after the polls close was incompatible with his duty to conduct the election "with fairness to all shareholders."

**b. Broker-Held Votes**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

[26] Mr. Bender's second formal proxy challenge attacked the counting of broker non-votes in favor of the Management Nominees, contrary to the explicit instructions of the Management Proxy.[FN31] The facts related to this challenge are discussed *supra* in Part III.B.2.b and require no further elaboration here; the legal issue, however, is slightly different. Putting aside the Court's earlier conclusion that the Management Proxy was materially misleading in violation of § 14(a), the question here is whether it was an independent violation of the Bylaws or Robert's Rules to vote broker-held shares for management.

Defendants begin with the premise that, even though the election was contested in fact, it was not considered "contested" in Wall Street parlance because only management solicited proxies; from there, they argue that the broker-held shares were voted in a manner consistent with custom and practice for what Wall Street would call an "uncontested" election. In the context of an uncontested election, Rule 452 of the New York Stock Exchange ("NYSE") permits a broker, absent a client's directions to the contrary, to vote his clients' shares on "routine" matters. This rule was designed to ensure the presence of a quorum at shareholders' meetings. Apr. 28, 2006, Hr'g Tr. 105 (Riley). Uncontested elections for directors are considered routine matters because there is only one set of proxy materials, and therefore only one mechanism to collect votes, all for a single slate. In sum, although Defendants acknowledge that Mr. Bender was caught in a Catch-22-able to nominate a slate of directors, but forbidden to solicit proxies, he essentially contested an "uncontested" election-they urge that the proxy process functioned properly.[FN32] Mr. Bender reiterates that the voting of broker-held shares in favor of management ran contrary to the Management Proxy, and argues that the Bank, which is listed on NASDAQ, is not subject to NYSE rules.

**\*27** This practice arguably violated Article II, Section 9 of the Bank's Bylaws, which requires that management proxies "shall be voted as directed by the shareholder." Shareholders were entitled to rely on the proxy materials, and by refraining from instructing their brokers, might be viewed as having "directed" that their votes be withheld pursuant to the Management Proxy's instructions. On the present record, however, the Court declines to delve into the complexities of how Wall Street runs their proxy contests, because the root of the problem is the alleged § 14(a) violation-a violation which, for reasons already explained, is an adequate basis for preliminary injunctive relief.

## D. Equitable Factors

Of course, establishing a likelihood of success on the merits does not entitle Mr. Bender to a preliminary injunction. He still must establish the other traditional prerequisites to preliminary injunctive relief: whether he will suffer irreparable harm absent an injunction; whether an injunction will substantially injure the Defendants; and whether an injunction will further the public interest. *Serono Labs.,* 158 F.3d at 1317-18.

## 1. Irreparable Harm

[27][28][29] Although the equitable factors interrelate on a sliding scale, *Davenport,* 166 F.3d at 360-61, a showing of irreparable harm is a *sine qua non* of preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England,* No. 05-5143, --- F.3d ----, ----, 2006 WL 1867203, at *4, 2006 U.S.App. LEXIS 16952, at *14 (D.C.Cir. July 7, 2006) ("A movant's failure to show any irreparable harm is ... grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). The D.C. Circuit "has set a high standard for irreparable injury. First, the injury must be both certain and great; it must be actual and ... of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm. " *Id.* at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15 (citations and internal quotation marks omitted). "Second, the injury must be beyond remediation.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at ----,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                          Page 31

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15-16 (citations and internal quotation marks omitted).

The Court perceives Mr. Bender to allege two varieties of irreparable harm. First, Mr. Bender-indeed, all shareholders-were deprived of their statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions. Second, Mr. Bender, unlike his peers, was the specific target of Defendants' machinations, and was unnecessarily frustrated in his attempts to participate in corporate governance. Such injuries are the precise harms against which securities laws were intended to guard. *See Edelson,* 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting [§ 13(d) ] was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."); *Cowin,* 741 F.2d at 427 (stating that a § 14(a) claim alleging that " shareholders elected [the defendant] directors because they were misled by the proxy materials ... falls precisely into the scope of injury that Congress sought to protect"); *Condec,* 230 A.2d at 777 (finding that the denial of a shareholder's " proportionate voice and influence in corporate affairs" through corporate manipulation is impermissible). And these harms are not only actual and imminent, they are realized and ongoing. A vote based on this information has taken place; new, possibly illegitimate, directors have been installed; and a second election looms.

**\*28** It is well established that such harms can be irreparable. *See, e.g., Gen. Aircraft,* 556 F.2d at 97 ( "[I]rreparable injury would occur to shareholders and the investing public if [defendants] were allowed to continue their activities without correcting and amplifying their Schedule 13D."); *Lichtenberg v. Besicorp Group,* 43 F.Supp.2d 376, 390 (S.D.N.Y.1999) ( "Irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." (alteration in original; citation omitted)); *ODS Techs. LP v.*

*Marshall,* 832 A.2d 1254, 1262 (Del.Ch.2003) (" The threat of an uninformed stockholder vote constitutes irreparable harm."). This harm is compounded where, as here, an uninformed election has come to pass, and another election is imminent. Allowing the second election to go forward, where there is a substantial likelihood that the prior one was at best tainted, at worst void, would helplessly complicate matters, perhaps making it impossible to "unscramble the eggs" should the "post-hoc reorganization of a standing board" prove necessary. *ODS Techs.,* 832 A.2d at 1263.

Finally, Mr. Bender has no adequate remedy at law. It is generally agreed that an individual shareholder lacks standing to bring a damages suit under § 13(d). *See, e.g., Hallwood,* 286 F.3d at 619 (collecting cases); *Berman,* No. 80-0394, 1981 WL 1596, at *2, 1981 U.S. Dist. LEXIS 10866, at *5. And although Mr. Bender seeks both injunctive and monetary relief for Defendants' alleged § 14(a) violations, "an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies." *In re Staples Inc.,* 792 A.2d 934, 960 (Del.Ch.2001). As the Delaware Chancery Court has explained,
A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.
Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue-the right to receive fair disclosure of the material facts necessary to cast a fully informed vote-in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*Id.* The persuasive force of this reasoning is undiminished by the fact that the misinformed vote has already occurred. In view of the impending second election, which if allowed to proceed may hopelessly jumble the Board's membership,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                   Page 32

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

injunctive relief remains the preferred remedy here, and is necessary to protect investors and effectuate the purposes of the Exchange Act.

### 2. Injury to the Bank

In an earlier dispute between these parties, the Court stated that the securities laws *29 cannot be used merely as a ploy to keep incumbent management safe from hostile takeover. Thus, the harm here cannot be to the individual members of the Board of Directors, who might be replaced if Mr. Bender has his way, or to the individual officers of the Bank who might be discharged. The harm must be to the institution, which in this case means irreparable harm to the Bank's shareholders.

*Indep. Fed. Sav. Bank v. Bender*, 332 F.Supp.2d 203, 217 (D.D.C.2004). In the present dispute, the Court recognizes that delaying the next shareholders' meeting would not come without cost. It would add further uncertainty to the leadership of a troubled institution. And "it is axiomatic that enjoining a shareholder[s'] meeting may affect the price of a company's stock." *ODS Techs.*, 832 A.2d at 1263. But these prospects are insufficient to allow a tainted Board to become further entrenched by a second election. *See id.*

Defendants argue that if the October 26 election is ultimately voided, innocent shareholders who would have voted for the Management Nominees despite the nonexistent § 13(d) disclosures and misleading § 14(a) solicitations will effectively be disenfranchised. But this is an unprovable hypothesis. The Court has no way to predict how such shareholders might have voted if given the benefit of lawful disclosures. They, like Mr. Bender, have been harmed by a misinformed vote, and will benefit from an injunction that requires the Bank to comply with its disclosure obligations under the securities laws.

### 3. Public Interest

[30] At this point, it should be clear that a

preliminary injunction would serve the public interest in effective enforcement of the securities laws, and this factor need not long detain the Court. "Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service." *Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 699 (2d Cir.1973).

### 4. Other Equitable Considerations

[31] Defendants lastly argue that the doctrines of unclean hands and laches should bar equitable relief in Mr. Bender's favor. The first argument can be quickly dispatched, as the Court has already found that, contrary to Defendants' claims, Mr. Bender has neither abused the judicial process nor brought baseless suits against the Bank or its Directors. *See supra* at ---- - ----. The latter argument, however, deserves brief discussion.

[32][33] Laches is an equitable doctrine "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football Inc. v. Harjo*, 415 F.3d 44, 47 (D.C.Cir.2005). To establish this defense, Defendants must show (1) a lack of diligence by Mr. Bender that (2) has caused them prejudice. *Id.* "[T]he rationale for this defense is [that] as claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 171 (D.C.Cir.2003). In the corporate context, the D.C. Circuit has noted that "[t]he prejudice that can result from such delay is particularly unsettling when ... the claim affects the validity of stock which is central to a merger between the named corporation and corporate entities foreign to the complaint." *Id.* at 171-72.

*30 Mr. Bender filed his Complaint on January 18,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 33

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

2006, and moved for a preliminary injunction two days later-less than three months after the election at issue. Given the secrecy with which the Defendant Directors operated before the Court's intervention, and the dissembling that has continued since, it is no surprise that it took Mr. Bender several months to untangle defendants' transactions and craft a complaint. It can hardly be said that Mr. Bender has slumbered on his rights, especially when viewed in the context of past litigation-after all, there has been a live controversy in this Court between these parties for 30 of the past 40 months. Moreover, Mr. Bender raised several claims now at issue as formal proxy challenges at the October 26 Shareholders' Meeting, but Ms. Jordan refused to entertain them. The Bank cannot now be heard to cry prejudice as to claims it previously chose to ignore.

The Court finds that laches is arguable only as to Mr. Bender's § 14(a) claim relating to the first proxy solicitation, the May 4 Committee Letter, which was sent months before the October 26 Shareholders' Meeting; several misstatements in that letter might have been cured by a corrective disclosure preceding the rescheduled meeting. However, it is not clear that Mr. Bender had any reason to believe that the Board played a role in drafting that letter-one of its central omissions-until this litigation began. Therefore, the Court concludes that Defendants have not met their burden to establish either a lack of diligence or prejudice, and therefore fail in their attempt to invoke laches to bar relief. In any event, even if Defendants could establish laches as to the Committee Letter claim, their other violations are a sufficient independent basis to grant preliminary injunctive relief.

## IV. CONCLUSION

The courts are usually loath to get involved in these kinds of corporate contests, but there are rules of engagement that the Defendants ignored. Mr. Bender has shown that he is entitled to the preliminary relief he seeks. For the foregoing reasons, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in

part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court. The Court defers decision on Mr. Bender's request for a declaratory judgment barring indemnification (Count VI). A separate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the Memorandum Opinion filed concurrently herewith, it is hereby

**ORDERED** that the Director Defendants' Motion to Dismiss [Dkt. # 24] is **DENIED** as to Counts I, II, and III, and **DEFERRED** as to the balance; and it is

**FURTHER ORDERED** that the Plaintiffs' Application for a Preliminary Injunction [Dkt. # 3] is **GRANTED** in part and **DEFERRED** in part; and it is

**FURTHER ORDERED** that Defendants shall be **ENJOINED** from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court; and it is

**\*31 FURTHER ORDERED** that this Order shall have immediate effect, conditioned on Plaintiffs' posting, no later than **July 28, 2006**, of a secured bond in the amount of $20,000, which the Court estimates to be the costs of Defendants' proxy materials that may be found to have been wrongfully enjoined or restrained. *See* Fed.R.Civ.P. 65(c); and it is

**FURTHER ORDERED** that the parties shall appear before the Court at a Status Conference on August 3, 2006, at 10:00 a.m.

This is an appealable Order. *See* 28 U.S.C. § 1292(a)(1).

**SO ORDERED.**

    FN1. The subtext to this dispute is race:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 34

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

while the Bank is a historically Black-owned-and-operated federal savings and loan, Mr. Bender is White. The Bank's in-house counsel ballyhooed that Mr. Bender's nominees to the Board were portrayed to shareholders by the Bank as " racial traitors." Pls.' Exh. 104. Harold Doley, an African American who controls almost 10% of the Bank's shares, testified that "race is not just an elephant in the courtroom, it is a pack of elephants." Doley Dep. 70. The racial overtones in the record would be hard to miss, but the Court concludes that they do not affect the legal issues.

FN2. The parties have appeared before the Court in earlier versions of this long-running business dispute. *See, e.g., Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203 (D.D.C.2004); *Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004); *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, 2004 U.S. Dist LEXIS 17090 (D.D.C. Jan. 15, 2004).

FN3. Although Mr. Bender owns his IFSB shares jointly with his wife, and both Benders consequently are plaintiffs here, Mrs. Bender "is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender." Compl. ¶ 3. Accordingly, the Court often refers only to Mr. Bender in the text of this opinion.

FN4. The Court notes that the preliminary relief requested in Mr. Bender's Proposed Order [Dkt. # 37] varies from that requested in his Complaint [Dkt. # 1] and Application for a Preliminary Injunction [Dkt. # 3]. Because the Proposed Order was submitted most recently and in response to the Court's direction that the parties file proposed findings of fact and conclusions of law, the Court presumes that it contains the most accurate version of the relief immediately desired.

FN5. Mr. Bender's letter to all shareholders is dated April 29, 2005. Defs.' Exh. 207. Based on the evidence presented, however, it appears that this letter was not sent until approximately May 2, 2005. *See* Defs.' Exh. 208.

FN6. Asked by the Court if he ever had "a face to face or telephone conversation with Mr. Batties" about his activities, Mr. Chambers insisted that he did not. Only when the Court expressed open skepticism, did Mr. Chambers admit that he regularly talked to Mr. Batties about "the whole thing" and that he had thought the Court's question referred only to a sit-down conference. Apr. 28, 2006, Hr'g Tr. 94 (Chambers).

FN7. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *SEC v. Bilzerian,* 29 F.3d 689, 692 n. 3 (D.C.Cir.1994).

FN8. Mr. Bender brought suit to force the meeting to proceed as scheduled in September but withdrew it when OTS approved the further delay. *See Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C. Sep. 19, 2005) (order approving voluntary dismissal).

FN9. In 2004, Carver and IFSB agreed to merge after a unanimous Board resolution in favor of merger. Mr. Bender opposed the merger, publically and vociferously. The Board adopted a "poison pill" resolution to restrain Mr. Bender from acquiring more shares and sued Mr. Bender. *See Indep. Fed. Sav. Bank v. Bender,* 326 F.Supp.2d 36 (D.D.C.2004). Eventually, Carver withdrew from the merger and OTS disapproved it.

FN10. In one of her more incredible

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

statements, Ms. Jordan insists that she has no recollection of this call. Apr. 21, 2006, Hr'g Tr. 24 (Jordan) ("I don't recollect talking to Mr. Doley on the 25th."); *id.* at 26 ("I have no recollection of that, that call. "); *id.* ("I did not [discuss the notion that Mr. Doley wanted to sell the stock he controlled].").

FN11. As a result of what appears to be a production error, every even-numbered " master" page of the Delaney Deposition, containing 4 pages of deposition testimony, was omitted from the Court's exhibits. The Court will rely on the submissions of the parties regarding the omitted sections of the Delaney Deposition.

FN12. Ms. Jordan and Mr. Wilmot insist that the meeting was postponed until 3 p.m. so that the Bank's attorney, Mr. Royer, could contact OTS and get advice on how to handle Mr. Bender's voting challenges. Apr. 21, 2006, Hr'g Tr. 9-10 (Jordan); *Id.* at 87-89 (Wilmot). Mr. Royer told a different story: he testified that his calls to OTS were not to seek advice but simply to advise OTS that the meeting was delayed. Royer Dep. 68. Mr. Royer's emails, Defs.' Exh. 219 and 200, tell the same story. *See* Defs.' Exh. 219 ("delay was necessary due to possible securities regulatory issues and possible voter disenfranchisement"). The Court credits Mr. Royer.

FN13. At the hearing on this matter, Ms. Jordan and Mr. Wilmot denied any involvement in the purchase of the Doley Participant shares. Given the paper record of draft purchase agreements with Mr. Wilmot's name, Trial Exhs. 72, 73; Mr. Wilmot's acknowledged discussion with Mr. Thompson in the middle of the night, Apr. 21, 2006, Hr'g Tr. 74 (Wilmot); the fact that Mr. Thompson arranged for a cashier's check in the amount of $165,000 to be issued to Mr. Wilmot, Trial Exh. 78; and Mr. Doley's testimony that he "talked

with Wilmo[ ]t, Carolyn Jordan, Royer ... about the possibility of the sale" at $18 per share, Doley Dep. 185, the Court finds that the testimony of Ms. Jordan and Mr. Wilmot is not to be credited.

FN14. *See Rosenberg v. XM Ventures,* 274 F.3d 137, 142 (3d Cir.2001) ("Section 16(b) of the Securities and Exchange Act of 1934 provides that any profit realized by a corporation's principal stockholders arising from the purchase and sale of a corporation's equity securities within a period of less than six months must be disgorged to the corporation. *See* 15 U.S.C. § 78p(b); *Foremost-McKesson, Inc. v. Provident Sec. Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).").

FN15. Mr. Doley probably meant hornswoggled and snookered, both of which mean bamboozled.

FN16. All federal thrifts allow cumulative voting. May 5, 2006, Hr'g Tr. 74 (Freedman). Under cumulative voting, shareholders "have the right to accumulate votes based upon the number of direct[or] seats to be filled. So if you have three director seats to be filled and you're the owner of a hundred shares, you would in essence have 300 votes. You can apportion those votes across the director candidates in the way that you choose to do it. So you could give 300 votes to one director and no votes to the other directors.... Or you could apportion them however you choose across that. Or you could check the box that says proxy committee do it for me which is what management hopes people do." Apr. 28, 2006, Hr'g Tr. 121-22 (Riley).

FN17. The Court credits the analysis and arithmetic of Mr. Freedman, an expert witness for Mr. Bender, over Mr. Riley, an expert witness for the Defendants, on these points. Mr. Riley first relied on Mr. Bender's lay-person's estimate of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                      Page 36

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

potential number of broker votes and then absolutely resisted any suggestion that it would be possible to provide an expert estimate. Given Mr. Freedman's explanation of his dual approaches, the Court concludes that Mr. Riley was avoiding a response that would not be helpful to his client.

FN18. Pls.' Exh. 102 (Oct. 21, 2005 email) (discussing attempt "to combat Bender's attempts to dissuade ... shareholders from voting for management even though the routine broker vote has been turned in already (in favor of management).... [M]ost of these holders will take out legal proxies if they wish to vote against management which would negate the broker routine vote that has already been turned in on behalf of their vote.").

FN19. In *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 63, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court stated that "the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer," a description consistent with the facts there presented. *Rondeau,* 422 U.S. at 60, 95 S.Ct. 2069. The legislative history, however, suggests a broader mission that is more apt in the instant fact pattern:
"The Bill before you deals with stock acquisitions in three specific contexts-first, the acquisition by means of a cash tender offer of more than [5 percent] of any class of stock of a publicly held company; second *other acquisitions by any person or group of more than [5 percent] of any class of stock of a publicly held company;* and third, the repurchase by a corporation of its own outstanding shares." S.Rep. No. 550, 90th Cong., 1st Sess., 16, 33 (1967) (remarks of then Chairman Cohen). Section 13(d) is concerned with the second type of stock acquisition, requiring after-the-fact disclosure of substantial open market accumulations of securities within a

relatively short period of time. H.R.Rep. No. 1711, 1968 U.S.Code Cong. & Admin. News at 2818.
*Gen. Aircraft Corp. v. Lampert,* 556 F.2d 90, 94 (1st Cir.1977) (emphasis added).

FN20. The Court has previously recognized that Plaintiffs' interests are not perfectly aligned with those of the Bank's other investors and, on that basis, declined to permit Plaintiffs to maintain a derivative suit. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124, at *3-4, 2004 U.S. Dist. LEXIS 17090, at *12-13 (D.D.C. Jan. 15, 2004). Given that background, it might be suggested that, to the extent Plaintiffs' standing is deemed representational, Plaintiffs are inappropriate representatives of the other shareholders. The answer to this criticism is that Plaintiffs are deemed to "act[ ] on the shareholders' behalf *until* an accurate Schedule 13D is filed," but not beyond. *Indiana Nat'l,* 712 F.2d at 1185 (emphasis added). That Plaintiffs do not necessarily "represent the interest of the shareholders in relation to who *wins* the struggle for control," *id.,* does not, therefore, call into question the propriety of their representation at this stage.

FN21. "The Schedule 13D mandates disclosure, *inter alia,* of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control). " *MITE Corp. v. Dixon,* 633 F.2d 486, 492 (7th Cir.1980).

FN22. In some circumstances, an acquisition or disposition of less than one percent may be deemed material. 17 C.F.R. § 240.13d-2(a).

FN23. The Court also notes that, because Mr. Thompson already owned 7.2% of the Bank's shares as of September 2005, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had filed a Schedule 13D with respect to those shares, when he acquired voting power over the Doley Participants' shares-an amount that was clearly material under 17 C.F.R. § 240.13d-2-he was required to amend his 13D "promptly." *See* 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). There is no evidence that he did so.

FN24. For this reason, Defendants' reliance on *Berg v. First Am. Bankshares,* No. 83-3887, 1985 WL 2232, 1985 U.S. Dist. LEXIS 20631 (D.D.C.1985), *aff'd on other grounds,* 796 F.2d 489 (D.C.Cir.1986), is unavailing. The court in *Berg* read *Mills* as crafting a principle of "constructive reliance" applicable only in situations where "the requisite proof of reliance by other shareholders would be impossible to reproduce." *Id.* at *7, 1985 U.S. Dist. LEXIS 20631, at *20. *Berg* declined to extend this principle beyond the context of class actions, which *Mills* was. However, as explained in the text, the principle enunciated in *Mills* was not subjective (reliance) but objective (materiality); on this point, therefore, the Court parts company with *Berg*. The Court also notes that the D.C. Circuit affirmed dismissal of the § 14(a) claim in *Berg* on the ground that the plaintiff failed to raise genuine issues of falsity and materiality, and expressly declined to reach the district court's "alternative determination that [the plaintiff's] complaint must be dismissed for failure to demonstrate reliance." 796 F.2d at 501 n. 11.

FN25. In the first, Mr. Bender sued the Bank for access to minutes of meetings of the Board; that suit was voluntarily dismissed after the Bank provided Mr. Bender the relief he sought. *Bender v. Indep. Fed. Sav. Bank,* No. 03-865 (D.D.C.2003). In the second, Mr. Bender sued the Bank to force a special Shareholders' Meeting. The Court ruled against Mr. Bender, finding that Mr.

Bender's interests were too divergent from those of other shareholders to permit him to proceed derivatively, and that the negotiations with Carver were of such a delicate nature that a special Shareholders' Meeting would disrupt the bid process. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124 (D.D.C. Jan. 15, 2004). In the third, the Bank brought suit against Bender under § 13(d), but after losing its bid for preliminary injunctive relief, opted to settle. *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004). And in the fourth, Mr. Bender brought suit to force a long-delayed Shareholders' Meeting to take place, but voluntarily dismissed the action when OTS allowed the meeting to be delayed. *Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C.2005).

FN26. Ms. Finlayson's October 21, 2005, email to Ms. Jordan and Messrs. Batties and Royer, among others, makes this point clearly: "In terms of the voting tallies, the numbers are very discouraging.... As of today, most of the 'for votes' for management consist of the routine broker votes that w[ere] turned in.... [T]his number can change based on those street name holders who elect to take out legal proxies or who contact their broker before Wednesday's meeting and instruct such broker to 'withhold authority to vote for all nominees.' The broker then of course would reverse the earlier routine broker vote turned in on their behalf." Pls.' Exh. 102.

FN27. The Court recognizes that this issue is not properly termed one of standing, at least not in the Article III sense. Rather, the question is more accurately phrased, "[W]ho is the real party in interest to bring a lawsuit under the governing substantive law to enforce the asserted right [?]" *Labovitz v. Wash. Times Corp.,* 172 F.3d 897, 900 n. 6 (D.C.Cir.1999) (quoting *Whelan v. Abell,* 953 F.2d 663, 672 (D.C.Cir.1992) (internal quotation marks

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                              Page 38

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

and citations omitted)). Specifically, in the shareholder context, the question is " whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of shareholders' suits." *Id.*

FN28. The Court also notes that another rationale for requiring derivative suits-preventing an individual shareholder from securing a benefit at the expense of others similarly situated, *see Cowin,* 741 F.2d at 414-is not implicated here, as Plaintiffs seek no monetary relief for this count.

FN29. Ms. Jordan peremptorily rejected the challenges as "out of order" because they were "procedural question[s]" and " procedures for these votes have been set up according to the bylaws." Trial Exh. 20 at 5. She later testified that she rejected the challenges because Mr. Bender failed to place them on the agenda in advance of the meeting, an explanation the Court considers a post-hoc justification. Mr. Dunlop testified that, although in his experience the IIOE usually rules on proxy challenges, he "did not want to go against the wishes of the Chair." Dunlop Dep. 91-92. Moreover, he "did not rule on the challenges, and really did not consider the challenges once they were presented to the meeting, and the Chair ruled them out of order." *Id.* at 114.

FN30. That section provides, in full: " Every shareholder entitled to a vote at an election for directors shall have the right to vote, in person or by proxy, the number of shares owned by the shareholder for as many persons as there are directors to be elected and for whose election the shareholder has the right to vote, or to cumulate the votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares shall equal[,] or by distributing such votes on the same

principle among any number of candidates. "

FN31. Mr. Bender also argues that the Bank's failure to hold a separate meeting to vote on the allocation of management proxies violated Article II, Section 9 of the Bylaws. That section provides, in relevant part, that "[p]roxies solicited on behalf of management shall be voted as directed by the shareholder or, in absence of such direction, as determined by a majority of the board of directors." However, this text contains no express requirement that a meeting be held, and the master ballot was, in fact, signed by a majority of the board of directors. The Court perceives no violation of the Bylaws here.

FN32. OTS permitted Mr. Bender to solicit votes, but not proxies, for reasons known to them but not made clear by the record.

D.D.C.,2006.

Bender v. Jordan

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1343712 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities In Reply to Defendants' Response to the Benders' Application for Preliminary Injunctive Relief (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1046717 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief (Mar. 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1046716 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Directors and Thomas Batties' Motion to Dismiss Counts I - IV of the Complaint (Mar. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 645058 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 39

--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**


Authorities in Support of Defendants' Motion to
Dismiss Counts I, II, III, and IV of Plaintiffs'
Complaint (Feb. 22, 2006) Original Image of this
Document (PDF)
• 2006 WL 645059 (Trial Motion, Memorandum
and Affidavit) Memorandum of Points and
Authorities in Support of Defendant Independent
Federal Savings Bank's Motion to Dismiss Count
VI of Plaintiffs' Complaint (Feb. 22, 2006) Original
Image of this Document (PDF)
• 2006 WL 645051 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645052 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645053 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645054 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645055 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645056 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 645057 (Trial Pleading) Answer (Feb.
15, 2006) Original Image of this Document (PDF)
• 2006 WL 318855 (Trial Motion, Memorandum
and Affidavit) The Benders' Application for
Preliminary Injunctive Relief (Jan. 20, 2006)
• 2006 WL 381806 (Trial Motion, Memorandum
and Affidavit) The Benders' Application for
Preliminary Injunctive Relief (Jan. 20, 2006)
Original Image of this Document (PDF)
• 2006 WL 318881 (Trial Pleading) Verified
Complaint (Jan. 18, 2006)
• 1:06cv00092 (Docket) (Jan. 18, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

1981 WL 1605                                                                    Page 1
Not Reported in F.Supp., 1981 WL 1605 (D.D.C.), Fed. Sec. L. Rep. P 97,888
**(Cite as: 1981 WL 1605 (D.D.C.))**

C

United States District Court;  District of Columbia.
**Davy Corporation Limited**
v.
**Enserch Corporation, et al.**
**No. 81-0117**

February 9, 1981

PARKER, District Judge.

**\*1** Plaintiff Davy Corporation Limited has filed this action alleging violations of federal securities statutes to enjoin a proposed tender offer by Enserch Corporation for all outstanding Davy shares. Defendants and prospective offerors, Enserch, its Board of Directors and chief executive officer, have moved to transfer this case to the United States District Court for the District of Texas in Dallas. After considering defendants' motion, plaintiff Davy Corporation's opposition and defendants' reply, the Court has determined that this case should not be transferred.

*Background*

Enserch Corporation, a Texas corporation with its principal place of business in Dallas, Texas, has announced its intention to make an offer, subject to clearance by appropriate government authorities and other conditions, for all the issued and outstanding ordinary shares of Davy Corporation Limited, an English corporation with its principal place of business in the United Kingdom.  In conformity with SEC requirements, Enserch announced its intention to make the offer in a press release issued in Dallas on December 17, 1980. On the same date Enserch issued another press release in the United Kingdom which also announced its intention to make the same offer.  On December 23, Enserch filed with the SEC for comment a draft Form S-7 Registration Statement it planned to issue and offer in exchange for Davy shares.  In the United Kingdom, the Office of Fair Trading is studying the proposed offer of Enserch. No tender offer by Ensearch for Davy stock is effective at this time.

On January 19, 1981, Davy Corporation filed a complaint alleging that the above actions of Enserch relating to the proposed tender offer violated various provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Public

Utility Holding Company Act of 1935.

Specifically, the Complaint alleges in Count I that by issuing the press releases in Dallas and the United Kingdom, and by other alleged actions of Enserch and its representatives in relation to the stock of Enserch and Davy prior to the final approval of the Form S-7 Registration Statement, defendants violated section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and Rule 135, 17 C. F. R. § 230.135. Count II of the complaint alleges that these same activities were for the purpose of engendering manipulative activity with respect to the stock of Enserch and Davy in violation of sections 9(a), 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § § 78i(a), 78j(b), 78n(e) and rules issued thereunder. Count III alleges that defendants' public statements, press releases, news announcements and SEC filings included false statements and omissions of material facts, regarding particularly the operations and internal procedures of the business of Enserch in Texas and in foreign countries, in violation of section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), sections 10(b) and 14(e) of the Securities Exchange Act, and rules issued thereunder.  Count IV alleges that defendants' internal books and records and systems of accounting control do not meet the requirements of section 13(b)(2) of the Securities Exchange Act, 15 U.S.C. § 78m (b)(2). Count V alleges that defendants have made or permitted payments to foreign officials in violation of section 30A of the Securities Exchange Act, 15 U.S.C. § 78dd-1, and have failed to take adequate steps in their business operations to discover, prevent or correct such alleged practices.  Count VI alleges that information relating to the operations and conditions of Enserch has not been filed with the SEC as required by section 13(a) of the SEcurities Act, 15 U.S.C. § 78m(a) and the rules thereunder. Finally, Count VII alleges that Enserch has carried on a natural gas transmission and distribution business in Texas without registering as a public utility holding company and that allegedly Enserch thereby has violated sections 5, 6, 9, 12 and 27 of the Public Utility Holding Company Act, 15 U. S. C. 79e, 79f, 79i, 79l, 79z-1.  The complaint charges that the activities alleged in Counts I-VII have caused injury to Davy Company and its shareholders and requests a judgment declaring that defendants have violated the provisions cited in the Counts, enjoining defendants from taking various actions relating to the proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1981 WL 1605 (D.D.C.), Fed. Sec. L. Rep. P 97,888

**(Cite as: 1981 WL 1605 (D.D.C.))**

tender offer, ordering defendants to divest themselves of any shares of Davy stock they may own and awarding damages to Davy.

*Analysis*

**\*2** Defendants have moved, pursuant to 28 U.S.C. § 1404(a) to transfer this proceeding to the United States District Court for the Northern District of Texas in Dallas. Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Defendants raise three points in their motion: first, that this litigation has no "substantial" connection with the District of Columbia; second, that since most of the witnesses and relevant documentary materials are in Dallas, the Northern District of Texas provides a far more convenient forum than the District of Columbia; and third, that transfer will serve the interests of justice in that the numerous legal issues which undoubtedly will be raised as discovery progresses in this case can be considered more expeditiously in Dallas.

After reviewing the record in the case to date, however, the Court concludes that these reasons do not justify transfer of this action. Although the enactment of section 1404(a) lessened somewhat the weight to be accorded plaintiff's choice of a forum, *see Norwood v. Kirkpatrick,* 349 U. S. 29, 32 (1955), it is still entitled to some weight. *SEC v. Savoy Industries,* 587 F. 2d 1149, 1154-55 (D. C. Cir. 1978). And in any event, the Court believes that the three points raised by Enserch do not support transfer.

First, this action does indeed have a connection with this District in that one of the major acts challenged in the complaint-the filing of a registration statement containing false statements and omissions of material facts with the SEC- occurred here. *See SEC v. Savoy Industries,* 587 F. 2d at 1155. Second, it is far from clear that most of the witnesses and discoverable material are to be found in Dallas. The record in this case to date reveals document requests filed by both parties for materials maintained in Louisiana, Washington, D. C., and probably the United Kingdom, as well as at Enserch's headquarters in Dallas. Moreover, the parties have noticed depositions for Boston, New York and Washington, in addition to those scheduled for Dallas. While Dallas may be the most convenient location from *Enserch's* perspective, the international character of

this litigation appears to make Washington as readliy accessible as any forum from an overall standpoint.

Finally, this Court is confident it can serve the interests of justice as speedily and as well as its counterpart in the Northern District of Texas. Lead counsel for both parties are located in this District and have already demonstrated considerable celerity in bringing discovery problems to the Court's attention.

Not Reported in F.Supp., 1981 WL 1605 (D.D.C.), Fed. Sec. L. Rep. P 97,888

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.