ONLINE CASES CITED

In Alphabetical Order

Westlaw.

Slip Copy
Slip Copy, 2005 WL 3274561 (D.D.C.)
(Cite as: Slip Copy)

Page 1

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
In re: AT & T ACCESS CHARGE LITIGATION
No. Civ.A. 05-1360 ESH.

Nov. 16, 2005.

*MEMORANDUM OPINION*
HUVELLE, J.
**\*1** This case is a coordinated action relating to
defendant AT & T Corp .'s alleged failure to pay
required charges for its use of plaintiffs' local
telephone network facilities to receive and complete
long-distance telephone calls. Before the Court is AT
& T Corp.'s and AT & T Communications, Inc.'s
(collectively "AT & T" or "defendants") Motion to
Transfer Venue to the United States District Court for
the District of New Jersey, which is opposed by
plaintiffs. For the reasons discussed below, the Court
will grant defendants' motion.

BACKGROUND

This coordinated action currently includes eleven
complaints brought by seventeen plaintiffs-a number
that is likely to grow.[FN1] Each plaintiff claims that AT
& T underpaid federal and state mandated switched
access charges to local exchange carriers for the use
of local exchange facilities to originate and terminate
long-distance calls. Plaintiffs allege that defendants
began disguising long-distance calls as interexchange
calls sometime in 2000 in order to avoid detection
and thereby avoid the applicable switched access
charges. Plaintiffs contend defendants orchestrated
and implemented two fraudulent schemes, one using
phone-to-phone Internet Protocol telephony
technology and the other using AT & T's prepaid
calling cards, through concerted action by employees
at AT & T corporate headquarters in New Jersey.

FN1. The current plaintiffs include:
ITCDeltaCom, Inc. ("ITCD"), an Alabama
corporation with its principal place of
business in Huntsville, Alabama; Business
Telecom, Inc. and Business Telecom of
Virginia, Inc. (collectively "BTT"), a North

Carolina and a Virginia corporation,
respectively, with their principal place of
business in Huntsville, Alabama; Granite
Telecommunications, LLC ("Granite"), a
Delaware corporation with its principal
place of business in Quincy, Massachusetts;
RCN Telecom Services of Illinois, an
Illinois company with its principal place of
business in Chicago, Illinois; RCN Telecom
Services, Inc., a Pennsylvania corporation
with its principal place of business in
Princeton, New Jersey; RCN Telecom
Services of Philadelphia, Inc., a
Pennsylvania corporation with its principal
place of business in Princeton, New Jersey;
RCN Telecom Services of Massachusetts,
Inc., a Massachusetts corporation with its
principal place of business in Princeton,
New Jersey; RCN Telecom Services of
Washington, D.C., Inc., a District of
Columbia corporation with its principal
place of business in Princeton, New Jersey;
RCN BecoCom LLC, a Massachusetts
corporation with its principal place of
business in Princeton, New Jersey;
Starpower Communications LLC, a
Delaware corporation with its principal
place of business in Princeton, New Jersey;
McClure Telephone Co. ("McClure"), an
Ohio company with its principal place of
business in McClure, Ohio; Lexcom
Telephone Co. ("Lexcom"), a North
Carolina company with its principal place of
business in Lexington, North Carolina;
Supra Telecommunications and Information
Systems, Inc. ("Supra), a Florida company
with its principal place of business in
Miramar, Florida; Illinois Consolidated
Telephone Co. ("ICTC"), an Illinois
corporation with its principal place of
business in Mattoon, Illinois; Consolidated
Communications of Fort Bend Co.
("CCFB") and Consolidated
Communications of Texas ("CCTX"), both
Texas corporations with their principal place
of business in West Conroe, Texas; and
Prairie Grove Telephone Co. ("Prairie
Grove"), an Arkansas company with its
principal place of business in Prairie Grove,
Arkansas.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Two years after implementing these allegedly fraudulent schemes, AT & T filed two petitions with the Federal Communications Commission ("FCC") requesting that specific types of long-distance calls, calls matching the types alleged by the plaintiffs, be exempt from access charges. The FCC ultimately rejected both of AT & T's petitions on April 21, 2004 and February 23, 2005. *See Petition for a Declaratory Ruling that AT & T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges,* WC Docket No. 02-361, Order, 199 F .C.C.R. 457 (2004); *AT & T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services,* WC Docket Nos. 03-313 and 05-68, Order and Notice of Proposed Rulemaking, 20 F.C.C.R. 4826 (2005). Furthermore, the FCC instructed local exchange carriers to pursue collection actions against AT & T for any unpaid access charges with an appropriate court.

ITCD and BTI initiated this action on July 7, 2005. Several additional plaintiffs subsequently filed identical complaints, causing the Court on September 23, 2005, to issue a Case Management Order coordinating the actions for pre-trial purposes. In response to the Case Management Order, AT & T withdrew the Motion to Transfer Venue it had previously filed on September 12, 2005, in the individual actions and re-filed it ("Defs.' Mot."). on September 30, 2005 as part of the coordinated action. Plaintiffs filed a joint Opposition to the Motion to Transfer Venue ("Pls.' Opp'n") on October 14, 2005, to which defendants filed a Reply ("Defs.' Reply") on October 24, 2005.

## ANALYSIS

*2 Defendants seek to transfer this case pursuant to 28 U.S.C. § 1404(a), which states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The moving party bears the burden of showing that transfer is proper. *Trout Unlimited v. U.S. Dep't of Agric.,* 944 F.Supp. 13, 16 (D.D.C.1996). Section 1404(a) grants the district court discretion to "adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness." ' *Reiffin v. Microsoft Corp.,* 104 F.Supp.2d 48, 50 (D.D.C.2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988)). Courts retain broad discretion in balancing the asserted convenience and fairness to the parties. *Sheraton Operating Corp. v.*

*Just Corporate Travel,* 984 F.Supp. 22, 25 (D.D.C.1997).

To succeed in a motion to transfer, defendants must make two showings. First, they must establish that this action might have been brought in the proposed transferee district, *i.e.,* the District of New Jersey. *DeLoach v. Philip Morris Co.,* 132 F.Supp.2d 22, 24 (D.D.C.2000). Second, they must "demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in their favor." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,* 569 F.Supp. 773, 774 (D.D.C.1983). In analyzing the relative convenience of the competing venues, a court must weigh a number of private and public interest factors. *Reiffin,* 104 F.Supp.2d at 51-52. Private interest factors include, but are not limited to: (1) plaintiffs' privilege of choosing the forum; (2) defendants' preferred forum; (3) location where the claim arose; (4) convenience of the parties; (5) convenience of witnesses, but only to the extent that witnesses may be unavailable for trial in one of the fora; and (6) ease of access to sources of proof. *Airport Working Group of Orange County, Inc. v. U.S. Dep't of Def.,* 226 F.Supp.2d 227, 229 (D.D.C.2002) (citing *Trout Unlimited,* 944 F.Supp. at 16). Public interest considerations include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home. *Id.* Courts may also consider the availability of compulsory process to compel the attendance of unwilling witnesses and other practical aspects of expeditiously and conveniently conducting a trial. *See Reiffin,* 104 F.Supp.2d at 52; *SEC v. Page Airways, Inc.,* 464 F.Supp. 461, 463 (D.D.C.1978); *accord* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § § 3848-3854 (2d ed.1986).

Given the substantial ties of defendants to the District of New Jersey, there can be no dispute that all of the cases that have been transferred here could have been brought in the District of New Jersey. AT & T maintains corporate headquarters in Bedminster, New Jersey, is subject to personal jurisdiction in that district, and venue is proper there under 28 U.S.C. § 1391(b) and (c) as its relevant entities reside in New Jersey. Plaintiffs do not dispute that venue would be appropriate in the District of New Jersey. Thus, the only question before the Court is whether the public and private factors outlined above weigh heavily enough in favor of New Jersey to warrant transfer to that district.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 3274561 (D.D.C.)
**(Cite as: Slip Copy)**

*\*3* The first private factor, plaintiffs' choice of forum, is a "paramount consideration" in any determination of a transfer request. *Sheraton Operating Corp., 984 F.Supp. at 25.* Typically, courts accord plaintiffs' choice of forum "substantial deference" when analyzing a transfer motion. *Gross v. Owen, 221 F.2d 94, 95 (D.C.Cir.1955)* ("It is almost a truism that a plaintiff's choice of a forum will rarely be disturbed ... unless the balance of convenience is strongly in favor of the defendant."); *see also Reiffin, 104 F.Supp.2d at 52.* While a court may not transfer simply because it thinks another forum may be superior to plaintiffs' chosen forum, *Shapiro, Lifschitz & Schram, P.C. v. Hazard,* 24 F.Supp.2d at 66, 71 (D.D.C.1998), such deference is substantially diminished where the chosen forum is neither their home forum nor has any meaningful ties to the controversy. *Trout Unlimited, 944 F.Supp. at 17.* Defendants argue that none of the plaintiffs is located within the District of Columbia and therefore plaintiffs' choice of forum "deserves no deference." (Defs.' Mot. at 7.) Plaintiffs maintain their principal places of business in Alabama, Arkansas, Florida, Illinois, Massachusetts, New Jersey, North Carolina, Ohio, Texas and Virginia. The sole plaintiff that is incorporated under the laws of the District of Columbia, RCN Telecom Services of Washington, D.C. ("RCN DC"), maintains its principal place of business in New Jersey.[FN2] Indeed, a plurality of the plaintiffs maintain New Jersey as their principal place of business.[FN3]

<u>FN2.</u> The Court notes that RCN DC, as a D.C. corporation, arguably has a stronger claim to venue in the District of Columbia than any of the other plaintiffs. Nevertheless, the Court's Case Management Order instructed that if it was necessary for the Court to consider one party separate from the others with regard to any motion, a pleading should filed with a specialized caption alerting the Court to that party's unique status. (9/23/05 Order ¶ II.B.) None of the plaintiffs requested individualized treatment with respect to the Motion to Transfer. Thus, despite slight variations among plaintiffs with respect to the strength of their claim to venue, the Court will treat the plaintiffs as a collective whole for purposes of determining whether to order a transfer.

<u>FN3.</u> Plaintiffs RCN Telecom Services, Inc., RCN Telecom Services of Philadelphia,

Inc., RCN Telecom Services of Massachusetts, Inc., RCN Telecom Services of Washington, D.C., Inc., RCN BecoCom LLC, and Starpower Communications LLC, all have as their principal place of business Princeton, New Jersey. Plaintiffs assert in their Opposition that RCN's New Jersey offices will be closing next year and will be relocated to Pennsylvania, Illinois, and Northern Virginia. Even accepting plaintiffs' assertions as true, the relocation of offices to these three jurisdictions does not strengthen their ties to D.C. or the argument for deference to their decision to file their complaints in the District of Columbia.

Plaintiffs' claim to substantial deference is further vitiated by the lack of any meaningful ties between the chosen forum and the substance of the dispute. *See Trout Unlimited, 944 F.Supp. at 17.* First, of the 17 plaintiffs, eight-ITCD, McClure, Lexcom, Supra, Prairie Grove, ICTC, CCFB and CCTX-provide absolutely *no* services within the District of Columbia. Of the six RCN plaintiffs, only one provides any services in D.C. The remaining plaintiffs maintain what best be described as only minimal business operations within the District. BTI, which provides local phone service on 53 lines (Pls.' Opp'n at 8 n.9), did not bill AT & T for any services provided in the District of Columbia during the year preceding the filing of its complaint. (Defs.' Mot. at 6.) Between August 2004 and July 2005, Granite billed AT & T only $2670.00 for switched access services, which amounted to only 0.14 percent of Granite's nationwide bill to AT & T during that time. (Defs.' Mot., Decl. of Geri Lancaster Ex. 1.) The one RCN entity to service D.C. accounted for only 5.64 percent of RCN's total nationwide bills to AT & T. (Defs.' Mot., Decl. of Geri Lancaster Ex. 2.)

Lacking substantial financial or business ties to the District of Columbia, plaintiffs attempt to fashion an argument based on regulatory ties: AT & T filed petitions regarding switched-access tariffs with the Federal Communications Commission ("FCC") in the District of Columbia and the FCC issued its rulings, which form the basis for plaintiffs' claims, from its headquarters in the District of Columbia. (Pls.' Opp'n at 5-7, 9-14.) This Court has ruled on several occasions, however, that "mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative" of the question of venue. *Shawnee Tribe v. United States,* 298 F.Supp.2d 21, 25-26 (D.D.C.2002). Particularly appropos is the case of *DeLoach v. Philip*

Slip Copy
Slip Copy, 2005 WL 3274561 (D.D.C.)
(Cite as: Slip Copy)

_Morris Co., 132 F.Supp.2d 22 (D.D.C.2000),_ where tobacco producers brought suit in the District of Columbia against Philip Morris under the Sherman Anti-Trust Act, 15 U.S.C. § § 1 and 2, for allegedly anti-competitive actions. The Court granted defendant's motion to transfer venue, finding that "the only real connection this lawsuit has to the District of Columbia is that a federal agency headquartered here ... is charged with generally regulating and overseeing" the process Philip Morris was accused of manipulating. _Id._ at 25. Similarly, even if defendants made fraudulent misrepresentations in their FCC filings, as plaintiffs allege, this is not sufficient to create venue since the FCC has not had any "significant day-to-day role in observing, managing, or running" switched access usage or billing within the telecommunications industry, _id.,_ as compared to the extensive level of agency involvement in _Wilderness Soc'y v. Babbitt,_ 104 F.Supp.2d 10, 13-14 (D.D.C.2000). Moreover, to accept plaintiffs' argument would amount to an open invitation to litigants to sue private parties in this jurisdiction whenever the case has some relationship to an agency action. Such an expansive view of venue finds no support in the law and therefore will not be adopted here. _See Cameron v. Thornburgh,_ 983 F.2d 253, 256 (D.C.Cir.1993) ("Courts in this circuit must examine challenges to ... venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia" by alleging the involvement of government officials.); _see also Airport Working Group of Orange County,_ 226 F.Supp.2d at 230-31 ("Given the lack of any meaningful ties to this jurisdiction, this Court is particularly mindful of the admonition that courts 'must be especially cautious in allowing [cases] to remain in the District of Columbia.' ") (alteration in original) (citing _Trout Unlimited,_ 983 F.Supp. at 17).

*4 Nor does this case rise to the level of "national significance" present in _Wilderness Soc'y._ There, the Court found that the Secretary of the Interior's extensive involvement in the conduct of various environmental studies relating to the development of oil and gas resources in Alaska supported venue in the District of Columbia because of "the national scope of the environmental issues." 104 F.Supp.2d at 14. By contrast, while AT & T's alleged actions may have taken place all over the country, this case does not involve a "national policy decision" or a significant "public interest." _Id._ at 13-14.

Therefore, because the District of Columbia has "no meaningful ties to the controversy and no particular interest in the parties or subject matter," _Chung v._

_Chrysler Corp.,_ 903 F.Supp. 160, 165 (D.D.C.1995) (internal quotation marks omitted), the Court finds that deference to the plaintiffs' choice of forum is not appropriate.

Turning to the other factors relevant to a transfer determination, the Court concludes that New Jersey constitutes a far more appropriate forum. After considering the plaintiffs' and defendants' choice of fora, courts typically look to whether the claim arose in the district in which suit was filed. _Trout Unlimited,_ 944 F.Supp. at 16. In this case, plaintiffs accuse AT & T of "orchestrat[ing] and implement[ing] at least two fraudulent schemes in an attempt to avoid plaintiffs' 'access charges'." (Compl.¶ 2.) While the manifestations of defendants' alleged actions were felt by local carriers nationwide, the conduct forming the basis of plaintiffs' suit took place primarily in New Jersey. As plaintiffs' allege: "AT & T coordinates and controls one overarching position concerning all of these issues from its corporate headquarters." (Compl.¶ 14.) It is therefore clear that the conduct that underlies plaintiffs' claims and caused their alleged harms occurred in New Jersey.

Next, courts consider "the convenience of the parties." _Trout Unlimited,_ 944 F.Supp. at 16. As none of the individual plaintiffs has the District of Columbia as its principal place of business, and the majority are not located in New Jersey, the two fora appear to be of equal inconvenience for plaintiffs. But as plaintiffs' counsel candidly admitted at the initial scheduling conference, plaintiffs' choice of forum is driven by their counsel's location in the District of Columbia.[FN4] Typically, the "location of counsel carries little, if any, weight in an analysis under § 1404(a)," _Armco Steel Co. v. CSX Corp.,_ 790 F.Supp. 311, 324 (D.D.C.1991), since this factor can easily be manipulated thereby permitting forum shopping. Nevertheless, where "convenience of counsel bears directly on the cost of litigation, it becomes a factor to consider." _Blumenthal v. Mgmt. Assistance,_ 480 F.Supp. 470, 474 (N.D.Ill.1979); _see also Green v. Footlocker Retail, Inc.,_ Civ. Action No. 04-1875, 2005 WL 1330686 (D.D.C.2005). Although plaintiffs' argument rests on this cost factor, they do no more than merely assert that a transfer to the District of New Jersey will drive up litigation costs by requiring local counsel to be hired and increasing travel expenses. (Pls.' Opp'n at 16-17.) There is no showing that plaintiffs collectively are not in a position to absorb the difference in cost.[FN5] Furthermore, a substantial amount of pre-trial discovery must be conducted in New Jersey as

Slip Copy
Slip Copy, 2005 WL 3274561 (D.D.C.)
**(Cite as: Slip Copy)**

Page 5

defendants' documents and witnesses are located there. Thus, travel expenses will be significant whether the case remains here or is transferred. Additionally, since the majority of witnesses and relevant documents are found in New Jersey, the ease of access to the sources of proof will be improved if the case is transferred.

> FN4. At the initial scheduling conference, plaintiffs' counsel stated: "Your Honor, I want to be very up front about this. [Our clients] would like to keep the cost down. *We're here.* It's a case that involves a lot of expertise. There are not New Jersey lawyers that are experienced with respect to these FCC orders.... *I know the cases say the convenience of counsel does not mean anything.* But ... it is a lot more economical for our clients to litigate this case in D.C. than in New Jersey." (9/13/05 Tr. of Initial Sch. Conf. at 22 (emphases added).)

> FN5. Given that the combined revenues of plaintiffs, excluding ICTC, CCFB and CCTX (who filed suit after plaintiffs filed their Opposition), were $1,305,000,000 in 2004 (Pls.' Opp'n at 15), there is no reason to assume that plaintiffs would be unable to absorb the extra cost (if any) of litigating in New Jersey. In addition, the need to hire local counsel is not clear, since it appears from Swidler Berlin's website that it has both a New York office and at least two attorneys who are members of both the New Jersey bar and the bar for the U.S. District Court for the District of New Jersey.

**\*5** Considering the public interest factors, the Court finds that New Jersey has a much stronger interest in resolving this dispute as compared to the District of Columbia. Though the case involves alleged damages in a multitude of states, the actions in question were undertaken by a New Jersey corporation and implemented by New Jersey-based employees. The State of New Jersey has a significant interest in allegations of fraudulent activity by its corporations and certainly has a greater interest than the District of Columbia, where very few of the alleged harms were manifested and most of the parties have virtually no interest.

Plaintiffs had a decision to make when filing their lawsuits: either file in each plaintiff's home district and protect their venue choice or file a multitude of lawsuits in one jurisdiction and conserve costs. Having reaped the benefit of cost-sharing, plaintiffs have less standing to complain that their choice of venue is not being honored. The coordination of these cases in a single venue is no doubt more cost-efficient than trying each of them separately. That New Jersey may not be as cost-efficient a location for plaintiffs because they have chosen to hire D.C. counsel is simply not enough to tip the balance when the remaining factors weigh heavily in favor of transfer.

## CONCLUSION

For the foregoing reasons, defendants' Motion to Transfer Venue shall be GRANTED. An appropriate Order accompanies this Memorandum Opinion.

D.D.C.,2005.
In re AT&T Access Charge Litigation
Slip Copy, 2005 WL 3274561 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:05cv01360 (Docket) (Jul. 07, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
**(Cite as: Not Reported in F.Supp.)**

C

United States District Court;  District of Columbia.
**Bayly Corporation**
v.
**Marantette, et al.**
**No. 82-1354**

82-1354

October 19, 1982

PRATT, District Judge.
**\*1** In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

*FINDINGS OF FACT*

*Prior History*

1. This action was brought by Bayly Corporation (Bayly) to enjoin David Marantette, III, his nominees for the Board of Directors of Bayly:  Charles J. Bock (Bock), John J. Brinkel (Brinkel), Leet E. Denton (Denton), Ronald T. Hill (Hill), Charles F. Talbot (Talbot) and Jack A. Tompkins (Tompkins);  his wife Laura R. Marantette;  his father David T. Marantette;  his brother, Lawrence Marantette;  J. Carroll Wood (Carroll Wood), the former President and Chairman of the Board of Bayly;  the brokerage firms of Wm. C. Roney & Co.  (Roney) and Rauscher Pierce Refsnes, Inc. (Rauscher);  and unknown others (collectively, the Marantette defendants or the Marantette group), from further pursuit of their alleged plan to effect illegally a change of control of Bayly.

2. Bayly's complaint, filed on May 17, 1982, alleges a pattern of violations of the federal securities laws and RICO by the Marantette defendants in connection with its alleged attempt to seize control of Bayly for the undisclosed purpose of:  (1) affecting the sale of Bayly to a third party or, (2) liquidating Bayly.  The charges focus on the Marantette defendants' failure to meet the Securities and Exchange Commission's (SEC) disclosure requirements.

3. On May 18, 1982, the Court entered a temporary restraining order preventing defendants from taking any further action in furtherance of a plan to acquire control of Bayly, including acquiring Bayly securities, soliciting proxies or consents, voting any shares of Bayly or attempting to use any Bayly securities as a means of controlling Bayly management, pending a hearing on plaintiff's motion for a preliminary injunction.

4. On June 7, 1982, Marantette filed an answer and counterclaim against Bayly and all seven of its then directors (Bayly counterclaim defendants) joined by order of this Court dated June 9, 1982;  Joe C. Wood, Jr. (Joe Wood), Scott H. McDonald (McDonald), Douglas R. DeCluitt (DeCluitt), Howard Wolf (Wolf), Cyril I. Johnson (Johnson), Raymond W. Pilgrim (Pilgrim), and Donald J. Champeau (Champeau).  Marantette's counterclaim alleges that the Bayly counterclaim defendants violated the federal securities laws and wasted assets of Bayly as part of a plan (1) to preserve control of Bayly, and (2) to turn Bayly into a private corporation without the required disclosures to the SEC, and without regard to the interest of Bayly's public shareholders. Marantette cross-moved for a preliminary injunction based upon its allegations that the Bayly counterclaim defendants (1) solicited proxies without the required disclosure, in violation of Section 14(a) of the Exchange Act;  (2) formed a group within the meaning of Section 13(d) of the Exchange Act and failed to disclose the existence of the group and their plans, in violation of Section 13 of the Exchange Act. The basis for Marantette's counterclaim is substantially similar to that of Bayly's original complaint.

**\*2** 5. On June 9, 1982, the Court entered a temporary restraining order barring the Bayly counterclaim defendants from acquiring or attempting to acquire Bayly securities, soliciting proxies or consents, voting any shares of Bayly, communicating with Bayly shareholders, issuing any Bayly shares or selling or encumbering assets other than in the ordinary course of business.  By agreement, that order remained in effect until this Court issued its order of July 2, 1982.

6. On July 2, 1982, the Court entered an order permitting defendants to begin a proxy contest for the removal and replacement of the Bayly Board.  For purposes of that contest, the Court sterilized all Bayly shares held by Marantette and his family and certain shares held by a Marantette-controlled corporation. The solicitation of consents was enjoined,

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
(Cite as: Not Reported in F.Supp.)

Page 2

conditioned on Bayly's setting a special meeting of shareholders for August 16, 1982 or sooner. The earlier temporary restraining orders were dissolved, and the parties were enjoined from acquiring or issuing Bayly shares, or selling Bayly assets.

7. On September 3, 1982, upon Marantette's motion, the Court vacated that portion of its order of July 2, 1982, which sterilized all Bayly shares held by Marantette and his family and certain shares of a corporation controlled by Marantette. Because of subsequent delays in obtaining SEC clearance of the proxy materials, the date of September 20, 1982 was set for a special meeting of stockholders to consider the removal of Bayly directors and, if removed, for the election of new directors.

8. Under date of September 22, 1982, the Court received the Interim Report of the Inspectors of Election, reporting the uncertified results of the Special Meeting of Stockholders held on September 20, 1982. On October 1, 1982, Bayly filed a motion to nullify the September 20th election results. After considering said motion, the oppositions of Marantette and Rauscher, and the entire record, we have determined that the motion to nullify is without merit and should be denied. Accordingly, by order of this date, we have denied Bayly's motion to nullify the election results.

*Present Posture%*

9. Still pending before the Court are motions by plaintiff Bayly and counterclaimant Marantette for preliminary injunctions. The Court conducted an evidentiary hearing and heard oral argument on June 23, 24, and 25, 1982. Marantette and defendant Charles F. Talbot, Jr., testified. Bayly offered no live testimony. All the numerous depositions taken in the case[FN1] and exhibits thereto have been lodged with the Court under seal.

FN1 Depositions have been taken from David T. Marantette, III, Laura F. Marantette, Lawrence R. Marantette, David T. Marantette, Charles J. Bock, Ronald T. Hill, John J. Brinkel, Leet E. Denton, Charles F. Talbot, Jack A. Tompkins, Joe C. Wood, Jr., Scott H. McDonald, Donald J. Champeau, Raymond W. Pilgrim, Douglas R. DeCluitt, Howard Wolf, Cyril I. Johnson, Edgar Mark Gregory, III, Wage Sloan, Benedict J. Smith, Thomas Tousley, Christene McClung, Don R. Kuykendall,

George E. Adams, John F. Canty, Edward M. Posner, Robert Arneson, Jennifer E. Montgomery, Gibson Gayle, Cantor O'Donnell, and Robert Akeson.

*3 10. No formal offer of deposition testimony or exhibits has been made, nor have the depositions been signed or formally filed or rulings made on disputed matters therein. Nevertheless, the parties have freely made reference to deposition pages in their arguments and in proposed findings of fact and conclusions of law. The Court has considered the *cited* deposition testimony and the *cited* deposition exhibits and considers those *cited* discovery materials, plus all the testimony adduced and affidavits and exhibits received at the June 23-25 hearing, to be the record on which these findings and conclusions are based.

*The Parties*

11. Plaintiff Bayly is a publicly-owned Delaware corporation, with its principal place of business in Englewood, Colorado. Bayly's common stock is registered pursuant to Section 12(g) of the Exchange Act, and is traded in the over-the-counter market and quoted on the National Association of Securities Dealers Automated Quotation System. As of January 21, 1982, it had 679,005 shares of common stock outstanding. Bayly, founded in 1898, is engaged in the manufacture and sale of apparel, primarily jeans and leisure wear, to mass merchandisers. Bayly also owns and operates retail stores.

12. Defendant Marantette is a registered representative and is the branch manager of the Detroit office of Roney, a registered broker-dealer. Marantette is the Chairman of the Board of Comp-U-Check, a verifier of checks for retail stores. Marantette has been in the securities business for many years as a broker-dealer and as an officer and director of a registered investment company. Marantette is an 11% shareholder of OTF Equities, Inc. (OTF) an investment company; formerly he had been Chairman of the Board and Chief Executive Officer. Defendant Roney is a securities firm registered with the SEC and headquartered in Detroit, Michigan. Defendants Laura F. Marantette, Lawrence R. Marantette and David T. Marantette are, respectively, the wife, brother and father of Marantette. Defendants Bock, Brinkel, Denton, Hill, Talbot and Tompkins are businessmen and nominees with Marantette on a slate Marantette has proposed to replace the incumbent Bayly Board of Directors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
**(Cite as: Not Reported in F.Supp.)**

Defendant Carroll Wood is the former Chairman of Bayly's Board of Directors and the father of Bayly's current Chairman of the Board, Joe Wood; he recently rejoined Bayly as a Director.[FN2] Defendant Rauscher is a brokerage firm registered with the SEC and headquarted in Dallas, Texas.

> [FN2] Bayly and Carroll Wood have filed a stipulation purporting to dismiss Carroll Wood as a defendant.

13. The following individuals or firms, listed in the preceding Paragraph 12, hold Bayly stock in the following amounts:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE    TABLE
14. Certain of the above have a record of SEC violations as follows:
David T. Marantette, III-1980 consent decree alleging violations of the Investment Company Act of 1940-was permanently prohibited from associating with any registered investment company. May apply to SEC for permission to act in such capacity.
*4 Jack A. Tompkins-1979 consent decree charging violations of Investment Company Act-censured and ordered to cease all affiliation with any investment company.
Roney-1981 consent decree charging violations of § 17(a) of the Securities Act and Rule 10b-5 of the Exchange Act-censured and options business suspended for 21 days.

15. Counterclaim defendant Joe Wood is Chairman of the Board and Chief Executive Officer of Bayly. Counterclaim defendants Pilgrim, Champeau and Johnson are directors of Bayly. Counterclaim defendant McDonald is President and Chief Operating Officer of Bayly. Counterclaim defendants Wolf and DeCluitt were directors of Bayly when the instant motions were brought for hearing but have since resigned their positions as directors.

*Marantette's Interest in*

*Purchase of Bayly Stock*

16. Marantette has approximately 100 regular brokerage customers. He makes recommendations to customers in person and by telephone, and he produces and distributes to his customers a weekly letter (the Marantette letter) summarizing his recommendations.

17. Bayly came to Marantette's attention as a possible investment opportunity for his customers in the fall of 1979 through Edwin Jones. Jones, a broker in Rauscher's Los Angeles branch, put Marantette in touch with John Canty, a Rauscher broker in San Antonio. At that time, Marantette determined on the basis of his research and professional analysis that Bayly's common stock was undervalued by the market and that it represented an attractive investment for his clients interested in long-term capital appreciation. An October, 1979 article in *Forbes* magazine, which Marantette read, identified Bayly as one of "191 important American corporations . . . selling for less than net working capital per share." Marantette began to recommend to his customers that they invest in Bayly, and some of them began to purchase shares of Bayly in November, 1979. Marantette also began purchasing Bayly stock for his own account.

18. Marantette believed that one way in which his customers and he could realize a profit on their investments in Bayly was to locate a company or individual who would acquire all the stock of Bayly, by tender offer or otherwise, at a price higher than the then-current market. Beginning in the fall of 1980 and continuing at various times until April, 1982, he sought to find such a buyer. Marantette also hoped that such a transaction would result in a commission for his services as a stockbroker, or a finder's fee for locating a buyer, or both.

19. Marantette sent documents, including Bayly's public filings, to prospective purchasers. In the fall of 1980, he met with a group of Canadian investors who were seriously interested in Bayly but who did not wish to undertake a hostile tender offer. Marantette prepared a listing of the known holders of large blocks of Bayly shares, and the number and percentage of outstanding shares held by each. That listing showed that Joe Wood would probably "control" more than 20 percent of Bayly stock in defense of a tender offer. The Canadian investors did not pursue their interest after securing that information. Thereafter, continuing to seek a buyer for Bayly but mindful of the struggle within the Wood family for control of the company, Marantette periodically updated this position listing for his "Bayly binder." During this period, Marantette was in close touch with Carroll Wood, Canty, and others who were interested in a sale or takeover of Bayly, but no final plan was ever agreed upon. Marantette refrained from advising his customers or other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834                    Page 4
**(Cite as: Not Reported in F.Supp.)**

shareholders that he was trying to find a buyer for Bayly because no definite sale transaction had been negotiated. On January 16, 1981, Marantette tabulated that the shares owned or controlled by himself (93,000 shares), Carroll Wood (120,000 shares) and Canty (145,000 shares) represented more than 50% of the total shares outstanding.

***5** *Struggle within the Wood family*

20. At the February, 1980 Annual Shareholder's Meeting, Bayly's Board of Directors removed Carroll Wood as Chairman and Chief Executive Officer, electing his son, Joe Wood, in his place, immediately after their election as directors. To justify their action, the directors claimed that Carroll Wood had long been a disruptive influence on the company, that he drank too much and that he was sometimes incoherent. Carroll Wood asserted by affidavit (before his apparent recent reconciliation with his son) that the directors had schemed to replace him. The directors generally deny this assertion although it is clear from the record that Carroll Wood's removal was not a complete surprise to some of them. No disclosure was made to shareholders in advance of the February, 1980 Annual Meeting of any intent to remove and replace Carroll Wood, nor was any public disclosure made of Carroll Wood's disruption of the company or of the internecine struggle within the Wood family.

21. Recognizing the possibility that Bayly was a potential takeover target, Bayly management in January, 1980 had told the company's bankers then that "the company would be rather difficult to acquire since [a buyer] must get the concurence of either Joe Wood or his father [Carroll Wood] in order to be able to make a reasonable tender offer for the company." When Carroll Wood was removed as Chairman in February, 1980, he owned 122,226 shares of Bayly stock. Carroll Wood's shares thus came to represent a threat to management's control. Bayly management attempted to reduce or eliminate that threat. In September, 1980, Bayly management attempted to negotiate a buy-back of Carroll Wood's shares. One transaction under consideration was the exchange of Baywood Transport Company, a Bayly subsidiary, for Carroll Wood's stock. Simultaneously, according to Carroll Wood, "discussions included a possible management/consultant agreement for Carroll Wood which would provide him with a stable income."

22. On December 5, 1980, at a special meeting of the Board of Directors, Carroll Wood, still a Director,

advised the Board that he was considering filing a lawsuit and nominating a slate of candidates for the Board to oppose the incumbents. In response to ths threat, the Board appointed a Committee consisting of Directors Wolf, Pilgrim, Johnson and Joe Wood, to try and "work out a solution with Carroll on this matter." The Committee explored a range of options, including management or consulting agreements and the purchase of Carroll Wood's stock.

23. On January 14, 1981, following these initial negotiations, the Board of Directors of Bayly, at a special telephonic meeting, adopted a resolution to purchase 122,226 shares of Bayly stock from Carroll Wood and certain members of his family and/or their respective trusts at $30.00 per share (an aggregate amount of $3,666,780) plus indemnification to Carroll Wood for legal fees and expenses incurred in defense of any shareholder lawsuit. A loan for this purpose had been arranged with the First National Bank in Dallas. The purchase was not consummated because of the refusal of a trustee to be party to it. No disclosure of these negotiations, of the Board's resolution to use Bayly funds to resolve the Carroll Wood "problem," or of the trustee's reluctance was ever made to shareholders by Bayly or Joe Wood. Thereafter, Carroll Wood contemplated starting a proxy contest to regain control of Bayly at the April, 1981 Annual Meeting. As early as June, 1980, Carroll Wood and Marantette had considered such a contest. Carroll Wood vacillated about whether to go forward and ultimately did not. In the course of his vacillation, Wood talked several times to Marantette and John Canty about the possibility of a proxy contest, but he did not at that time ask Marantette to serve on any prospective slate of board nominees, nor did any contract, understanding or agreement develop between them.

***6** 24. On February 27, 1981, Bayly mailed to shareholders a notice setting its annual shareholder's meeting for April 3, 1981, and a proxy statement. Neither the notice nor the proxy statement disclosed that the two major shareholders, Joe Wood and Carroll Wood, were quarreling, that Carroll Wood was regarded as a "disruptive influence" within the corporation, that in an effort to buy "peace" the Board had authorized the purchase of 122,226 shares of Carroll Wood's stock at a premium or that the company was continuing to negotiate with Carroll Wood.

25. Joe Wood had told his banker on numerous occasions that his intention was to take Bayly private. After the 1981 Annual Meeting, and after attempts to

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
(Cite as: Not Reported in F.Supp.)

buy out Carroll Wood were unsuccessful, Joe Wood, Wolf and the other Bayly directors planned to work around Carroll Wood in order to consolidate Joe Wood's ownership and control of Bayly. The plan included the threatened issuance of additional shares to persons friendly to Joe Wood, and later, in return for a loan of $4,240,000 from the American National Insurance Company, the issuance of convertible securities. Neither of these efforts were productive.

*Roney's Acquisition of*

*Carroll Wood's Shares*

26. In August, 1981, subsequent to correspondence between Carroll Wood's lawyers at Arnold & Porter and Marantette's lawyer, Marantette and his counsel met with Carroll Wood in Washington in the offices of Arnold & Porter. At that meeting, they proposed a slate of nominees, which would have included Marantette, with which to undertake a proxy contest for control of Bayly. A draft agreement was prepared, and Schedules 14B were drafted for Beasley and Marantette. Carroll Wood subsequently decided not to proceed and no agreement to mount a proxy contest was ever executed or implemented.

27. Following the August, 1981 meeting at Arnold & Porter, Marantette concluded that the Wood family feud was disruptive and that it would be "a positive thing to have Carroll Wood basically out of the picture." Accordingly, Marantette negotiated for the purchase by Roney of stock owned by Carroll Wood or held in trust for certain other members of the family. Arrangements for the transaction, 105,971 shares at $30 per share, were concluded on November 27, 1981. For tax reasons, final settlement was deferred until January 5, 1982.

28. Marantette and other registered representatives at Roney contacted their customers and offered the Carroll Wood block at retail. Marantette advised his customers that the stock came from the block owned by Carroll Wood, the former Board Chairman, and that Marantette considered the stock undervalued and a good buy. Any customer who inquired was told that Marantette was working toward a possible sale of Bayly, but this information was not volunteered.

29. On December 11, 1981, nine days after Carroll Wood had filed a Schedule 13D disclosing his November 27th agreement to sell his stock, Joe Wood (having learned of the 13D filing) telephoned Marantette, expressed an interest in purchasing any of the shares sold by his father to Roney that

remained for sale to others, and stated that he did not want to lose control of Bayly Corp. Marantette told Wood that there were 15,000 shares left that he would purchase if he wished, but Wood never pursued the matter further.

*7 30. On January 5, 1982, Carroll Wood's stock was transferred to Roney, as agent for Roney's customers. By that time, Marantette and various Roney customers had placed (or shortly thereafter did place) "buy" orders for about 91,000 of the approximately 106,000 shares transferred. Marantette and his wife purchased 20,000 shares of the Carroll Wood stock.

*Bayly's Attempt to Buy*

*Out Marantette*

31. Following the transfer of the Carroll Wood stock in early January, 1982, Joe Wood invited Marantette to vist Bayly's offices in Denver. On January 21, Joe flew from Denver to Detroit in Bayly's Learjet, picked up Marantette, flew him back to Denver, and there introduced him to Bayly's Board of Directors. During dinner with the Board, Wood or Wolf asked about the number of shares in the hands of Roney customers. Marantette told them that there were between 225,000 and 240,000 such shares.

32. Following Marantette's visit, Bayly's Board met on January 22, 1982. As reflected in the minutes of that meeting, "the ownership of common stock of the Company by the firm of Wm. C. Roney & Co. was discussed at some length." Also at that meeting, the Board authorized Wolf to draft new three-year employment contracts for Bayly with three counterclaim defendants: Wood, McDonald, President and Chief Operating Officer of Bayly, and Champeau, Vice-President, Apparel Marketing Services of Bayly.

33. On January 28, 1982, Joe Wood, along with McDonald and DeCluitt, a Bayly director, met with Marantette in Detroit. Wood told Marantette that the purpose of the meeting was to discuss whether Marantette would cooperate with a "leveraged buy-out" in which all publicly held shares would be bought with borrowed funds secured by the assets of Bayly. During this meeting, however, Wood raised for the first time the question of whether Bayly could purchase the shares of Roney customers alone. Marantette's counsel identified legal problems with such a transaction, including the SEC issuer tender offer rules, and advised Wood to consult with his

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
(Cite as: Not Reported in F.Supp.)

Page 6

own attorneys about these problems.

34. Thereafter, Wood invited Marantette and his counsel to a meeting in Houston on February 3, 1982. At that meeting, Wolf stated that Joe would do "whatever was necessary to maintain control of the company" and that "if there were to be any change in the partners" in Bayly, then "Joe Wood was going to chose who the new partners were going to be." Wolf also stated that unidentified investors had been "waiting" for years, who were ready and able to buy stock, or somehow make it possible that there would be dilution to any threatening block of stock in the company."

35. At the February 3 meeting, which Marantette expected again would concern a leveraged buy-out proposal, Wood and Wolf instead presented an offer to buy 240,000 shares of Bayly stock from Roney customers, falsely representing that the offer was being made by an undisclosed, third-party "investor" when in fact the offer was being made by them on behalf of Bayly and/or by Joe Wood. The counterclaim defendants also represented to Marantette that the unidentified purchaser of the 240,000 shares was financially capable of purchasing the stock, when in fact it was not. Marantette did not have the authority to sell (or commitments from customers to sell) such shares. He agreed to such a sale, however, believing that he could secure the shares by extending the offer to his customers since the price per share was a substantial premium over the current market. A deal was struck for the sale of 240,000 shares at $37.25 gross, for a total of $8,940,000 and the trade was confirmed. Roney was to receive a fee of $300,000 which reduced the price per share to $36 and a fraction.

*8 36. Wood and Wolf subsequently withdrew from the deal. They reported to Marantette that the necessary financing could not be obtained.

37. On March 24, 1982, Marantette and Herbert Kerr of Adience Industries travelled to Denver to meet with Joe Wood. Marantette knew that in the past Kerr had been interested in purchasing Bayly. After the meeting, Marantette believed that Kerr and Joe Wood had reached a tentative agreement for a leveraged buy-out of Bayly by Kerr at a price in the range of $38.50 per share, which, Marantette believed, would be attractive to all Bayly shareholders. In the expectation that agreement to this transaction could be reached in conjunction with the Bayly annual meeting on April 16, 1982, Marantette made plans to attend the annual meeting.

38. Since he was going to the meeting, Marantette arranged to take with him a proxy for the Bayly shares held by Roney in "street name." He asked Roney to obtain the proxy from the Independent Election Company of American (IECA), the company retained by Roney to fulfill Roney's duties to contact beneficial owners and vote their shares in accordance with instructions timely given by them to IECA. In requesting the issuance of the proxy, Roney made clear to IECA that it was seeking the revocation of the "discretionary voting" posted to its account on routine proposals. Roney's duty was to vote in accordance with the instructions of beneficial owners received ten days or more before an annual meeting, but it could vote other shares in its discretion. As of that date, April 6th, IECA had received no votes for or against management. Subsequent to April 6th and prior to the annual meeting, IECA did, in fact, receive instructions from beneficial owners to vote 5,850 shares for management and 400 against, but neither Marantette nor Roney was informed by IECA about these specific instructions. Although Marantette did ask some of his customers to delay sending their proxies until he could talk to them about the annual meeting, he did not actually request that any of them withhold or revoke a proxy. Although Marantette and Canty were presumably in touch with each other, there is no evidence that Marantette induced Rauscher to cause its customers to withhold any proxies. Marantette travelled to Houston for the April 16 Annual Meeting with a blank proxy for 123,660 shares of Bayly stock and with additional proxies of four individuals for a total of 164,160 shares. He testified that his intent was to vote all of these shares in favor of management.

39. On April 15, 1982, Marantette and Keer met with Joe Wood, Wolf, and others in Houston (the site of the annual meeting) to discuss the proposed Kerr-Adience transaction. At the end of that day Marantette believed an agreement had been reached, not for sale to Adience, but for the employment by Bayly of Kerr as a consultant while Kerr attempted to arrange financing. The following morning, April 16, however, Kerr told Marantette he had reached the conclusion Wood and Wolf were not negotiating in good faith, and that Bayly's proposal to him was a "stall." Kerr decided to leave Houston. In an effort to convince Kerr and his lawyer not to leave, and to keep the proposed consulting agreement alive, Marantette refused to put in an appearance at the meeting to establish a quorum, but accompanied Kerr to the airport. As a consequence of his absence from

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
(Cite as: Not Reported in F.Supp.)

the annual meeting he did not vote any of the shares for which he held proxies. Marantette's absence from the annual meeting, and his resulting failure to vote, had no effect on the outcome of the meeting; a quorum was declared present nonetheless and management's slate of directors was reelected.

*9 *Marantette's Relationship*

*with John Canty*

40. Between August, 1980 and April, 1982 there were numerous telephone conversations and more than one meeting between Marantette and John Canty, a Rauscher broker who has a number of customers who hold Bayly stock. Canty and Marantette had similar interests to the extent that each wanted his customers to realize the maximum possible return from their investment in Bayly. They discussed certain actions they each might take and/or recommend to their respective customers regarding Bayly. In January, 1981, they met with Carroll Wood, at Wood's request, to discuss the possibility of a proxy contest. (See Finding No. 22).

41. Canty and Marantette, however, have also frequently pursued opposing objectives. Roland Walters of Kerrville, Texas, proposed to buy the stock of Canty and his customers at $32.50 a share, but would do so only if Marantette would recommend to Roney customers that they also sell their stock to him at that price. Canty was prepared to recommend the sale to his customers. Marantette would not. As a result, the deal died, and Canty became very upset with Marantette. When Marantette agreed to Bayly's February 3, 1982 offer to purchase 240,000 shares of stock from Roney, Canty, was again less than enthusiastic. In addition, when Marantette asked Canty to join the group he was putting together in late April, 1982 to mount a proxy contest, Canty declined. Canty and his superiors at Rauscher wanted no participatory role whatever in the proxy contest.

*Commencement of the Proxy Contest*

42. After the annual meeting of April 16, 1982, and the breakdown of the proposed Kerr-Adience transaction, Marantette determined to commence a proxy contest in order that the Bayly shareholders, including himself and those whom he could influence, would be given a clear opportunity to decide whether existing management best served their interests. Marantette invited the prospective members of his slate to a meeting attended by

counsel on April 29, 1982 (and all but two attended). He apprised them of his plans and of the requirements of law applicable to proxy contests. The group has no definitive plan for management of Bayly if they gain control, except for the removal of Joe Wood as CEO. While the members of the Bayly slate were all experienced businessmen, none has had any operating experience in the field of apparel manufacturing. Marantette subsequently caused public disclosure forms to be filed with the SEC. These disclosure forms, when filed, contained material omissions.

43. On May 12, 1982, Marantette, accompanied by counsel, met with four Rauscher brokers in Dallas. Marantette and his counsel brought with them copies of the Schedule 13D and the Schedules 14B, public material that was already on file with the SEC, which were displayed to those who attended the meeting. Rauscher, by its President, had already made clear to Marantette that it would not participate in the proxy solicitation. The purpose of this meeting was to learn whether Rauscher would solicit its customers and to discuss procedures for contacting Rauscher customers owning Bayly stock after SEC clearance on or after May 18. Marantette was told that Rauscher could not and would not solicit its customers. No solicitation of Rauscher customers by Marantette took place at this meeting on May 12, 1982.

*10 44. On May 13, 1982, Marantette discussed the proposed proxy contest at a meeting of approximately fourteen members of the Young President's Organization (YPO), of which he is a member. YPO members are substantial and sophisticated businessmen, several of whom held Bayly stock. Marantette testified that at this meeing he also displayed to the several participants numerous copies of the Schedule 13D and Schedules 14B, and stated that he was not soliciting proxies or consents, or requesting support, and could not do so until SEC clearance. There is no evidence to the contrary.

45. The Schedule 13D filed by Marantette on May 10, 1982 and the Schedules 14B filed by Marantette, his proposed slate of nominees and Roney on May 11, 1982 have all been amended since they were made the subject of factual claims by Bayly. Defendant Roney, which originally declared itself a participant in the proposed solicitation, has withdrawn from participation.

*Factual Conclusions*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

46. Marantette and his fellow board nominees (defendants Bock, Brinkel, Denton, Hill, Talbot and Tompkins) first formed a group for the purpose of holding and voting Bayly stock on April 29, 1982. They did not act together as a group for the purpose of acquiring holding, voting or disposing of Bayly stock before that date, and no other persons have joined their group at any time. All group members were disclosed in a Schedule 13D that was filed on May 10, 1982.

47. Marantette did not at any time form a group for the purpose of acquiring, holding, voting, or disposing of Bayly stock with Luke Beasley, John Canty, Carroll Wood, Roney or Rauscher. They never acted together for any such common purpose, nor did there ever exist between or among any of them an agreement, arrangement or understanding with respect to acquiring, holding, voting or disposing of Bayly stock.

48. Neither Marantette nor any of the other defendants solicited the revocation or withholding of proxies in connection with the April 16, 1982 annual meeting of Bayly. Defendant Marantette did not induce defendant Rauscher to cause shares owned by Rauscher's customers and held of record by Rauscher to be withheld from voting in the election of directors at the annual meeting.

49. Marantette and Roney did not unlawfully solicit the revocation of proxies given by the beneficial shareowners of 5,850 shares of stock (held in street name by Roney) who had returned specific voting instructions to IECA, nor did they unlawfully fail to vote those powers. No such voting instructions had been received from such beneficial owners by the tenth day before the annual meeting and IECA did not inform Marantette or Roney of subsequent instructions; thus, Roney was free to vote those shares in its discretion. In any event, the failure to vote the shares for which specific voting instructions had been submitted had no effect on the result of the voting at the annual meeting since the management slate was reelected.

50. Defendant Marantette did not solicit proxies or consents from Bayly shareholders either at his May 12, 1982 meeting with four Rauscher brokers in Dallas or at the May 13, 1982 meeting of the Detroit Young President's Organization.

*11 51. The Schedules 13D and 14B filed by Marantette and his slate of nominees were and are accurate and adequate on the subject of the nominees

plans and purposes. The failure of Marantette to disclose certain SEC violations was a material omission, which warrants a finding of violation of the disclosure requirements. This omission and any other omissions, inaccuracies, or technical inconsistencies in these filings, assuming their materiality, have been corrected by amended filings.

52. Neither Marantette nor any of the other Marantette defendants has committed any of the offenses defined as predicate offenses in the RICO provisions of the Organized Crime Control Act.

53. Joe Wood and the other counterclaim defendants formed a group in February, 1982 for the purpose of acquiring some or all of the shares of Bayly stock that Marantette could deliver, but did not file a Schedule 13D with the SEC.

54. The counterclaim defendants offered to buy 240,000 shares of Bayly from Roney and engaged in a series of transactions, the purpose of which was to make a tender offer by Bayly for the purchase of its shares, without filing a Schedule 13E-4 with the SEC.

55. On or about February 3, 1982, the counterclaim defendants failed to disclose to Marantette that Bayly and/or Joe Wood was the putative purchaser of 240,000 shares of Bayly, which information was material. They also falsely represented that the unidentified purchaser of the stock was financially capable of performing.

56. Information about the struggle within the Wood family for control of Bayly, about the allegedly disruptive conduct of Carroll Wood while Chairman of the Board of Bayly, about the Board's resolution of January 14, 1981, to purchase 122,226 shares from Carroll Wood at a premium price, about the Board's offer to buy 240,000 shares of Bayly, and about Joe Wood's various plans for taking the company private was factual information material to the marketplace for Bayly stock. Bayly's proxy materials disseminated to shareholders in connection with the 1981 and 1982 annual meetings, as well as its periodic and annual reports filed under Section 13(a), failed to state these facts.

### CONCLUSIONS OF LAW

1. The claims before the Court arise principally under the Securities Exchange Act of 1934, 15 U. S. C. § 78a, et seq. (1976 & Supp. IV 1980). Bayly also

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
**(Cite as: Not Reported in F.Supp.)**

asserts claims under the Racketeer Influenced and Corrupt Organizations (RICO) provisions of the Organized Crime Control Act of 1976, 18 U. S. C. § 1961 *et seq.* (1976 & Supp. IV 1980). The Court has jurisdiction and venue is proper under 15 U. S. C. § 78aa (1976).

2. To be entitled to a preliminary injunction, the moving party has the burden of establishing that: (1) there is a strong likelihood of success on the merits; (2) irreparable injury will result to it absent injunctive relief; (3) the balance of equities favors the grant of the requested relief; and (4) it is in the public interest to grant injunctive relief. *See Virginia Petroleum Jobbers Association v. FPC,* 259 F. 2d 921, 925 (D. C. Cir. 1958).

***12 A. *Bayly's Motion for Preliminary Injunction***

3. Bayly has failed to satisfy its burden as to any of the four factors essential to the grant of a preliminary injunction.

*Section 14(a) Claim*

4. Bayly has presented no probative evidence in support of its claim that Marantette, the Marantette defendants, or Roney solicited proxies and/or the revocation of proxies in connection with the April, 1982 Annual Meeting of Bayly in violation of Section 14(a), 15 U. S. C. § 78n(a), and Rule 14a-3, 17 C. F. R. § 240.14a-3 (1982).

5. Bayly's principal claim-that defendants Marantette and Roney violated Section 14(a), the SEC proxy rules, and/or the proxy rules of the New York Stock Exchange (NYSE) when Roney obtained for use in connection with the April, 1982 Annual Meeting a legal proxy for 123,660 shares of Bayly stock beneficially owned by Roney customers (and held in street name by Roney) and delivered the proxy to Marantette-is not supportable. In the absence of voting instructions, Roney was free to vote those shares as it saw fit, or not to vote them at all. There was no violation of any NYSE rule or federal statute. Even if there had been a failure to vote proxies in accordance with voting instructions, no harm resulted to Bayly or any stockholder because the meeting took place and the management slate of directors was reelected.

6. Defendant Marantette did not induce defendant Rauscher to cause shares owned by Rauscher customers and held of record by Rauscher to be withheld from voting for the election of directors at the April, 1982 Annual Meeting of Bayly in violation of Section 14(a) and Rule 14a-3.

7. No illegal solicitation of proxies or consents in violation of Section 14(a) and Rule 14a-3 occurred at either the May 12, 1982 meeting in Dallas or the May 13, 1982 meeting of the Detroit Young President's Organization. There is no evidence that anyone at either of these meetings was "solicited" within the meaning of Rule 14a-1(f), 17 C.F.R. § 240.14a-1(f) (1982). If any solicitation *arguendo* did occur at either or both of these meetings, we conclude that the requirements of Rule 14a-11(d) were satisfied (or would have been but for the May 18 temporary restraining order) in connection with any such solicitation.

*Section 13(d) Claim*

8. Although it is not necessary to show a formal written agreement among group members in order to prove the existence of a "group" under Section 13(d), 15 U.S.C. § 78m(d) (1976 & Supp. V 1980), plaintiff must show that each and every one of the alleged group members individually agreed at a specific point in time to act together for a common purpose to acquire, hold, vote or dispose of Bayly securities, but it is not necessary that all group members join at the same time. *See, e.g., SEC v. Savoy Industries,* 587 F. 2d 1149 (D. C. Cir. 1978), *cert. denied,* 440 U.S. 913 (1979); *Financial General Bankshares, Inc. v. Lance,* [1978 Transfer Binder] FED.SEC.L.REP. (CCH) § 96,403 (D.D.C. Apr. 27, 1978). *See also GAF Corp. v. Milstein,* 453 F. 2d 709, 718 (2d Cir. 1971), *cert. denied,* 406 U.S. 910 (1972).

***13 9. Mere relationship among persons, whether family, personal or business, is insufficient to create a group for purposes of Section 13(d). *See, e.g., Texasgulf, Inc. v. Canada Development Corp.,* 366 F. Supp. 374, 403 (S.D.Tex. 1973).

10. Applying these legal principles, the Court concludes that Marantette never formed a group with Luke Beasley, with Carroll Wood, with John Canty, with his customers or with Roney or Rauscher. The first group within the meaning of Section 13(d) was formed among Marantette and his fellow Board nominees on April 29, 1982. Thereafter, all group members were disclosed in a Schedule 13D.

*Claims Relating to Disclosures in the Schedule 13D and Schedules 14B*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
**(Cite as: Not Reported in F.Supp.)**

11. Bayly's principal nondisclosure claim relates to the alleged inadequate statement of the plans and purposes of the Marantette nominees and the original failure of Marantette to disclose the SEC violations. The Court concludes that the disclosures in the Schedules 13D and 14B are substantially accurate and adequate as to Marantette's plans and purposes. The nondisclosure of the SEC violations was a material omission, which is a clear violation of the disclosure requirements.    If there were any other inaccuracies or technical inconsistencies in the Schedules 13D and 14B and amendments thereto, they were not material, and consequently do not support a finding of a Section 13(d) or 14(a) violation.    In any event, the material omission and any other inaccuracies and technical inconsistencies have been corrected in amended filings, and cannot support an injunction for violation of Section 13(d) or 14(a), _15 U.S.C. § § 78m(d), 78n(a) (1976)._    *See Rondeau v. Mosinee Paper Corp., 422 U.S. 49 (1975); Chromalloy American Corp. v. Sun Chemical Corp., 611 F.2d 240, 249 (8th Cir. 1979)._

*RICO Claim*

12. Plaintiff has failed to establish that Marantette or any other of the Marantette defendants has committed any of the offenses defined as predicate acts in the RICO provisions of the Organized Crime Control Act of 1976, _18 U.S.C. § 1961, et seq._

13. Marantette did not omit material facts in connection with trading in Bayly securities, and therefore did not violate Section 17(a), 15 U.S.C. § 278q(a) (1976), _Section 10(b), 15 U.S.C. § 78j(b) (1976),_ or Rule 10b-5, _17 C.F.R. § 240.10b-5 (1982)._

14. Marantette received legal advice about his disclosure obligations and Bayly therefore cannot establish *scienter,* an essential element of private causes of action for violation of _Section 17(a), Section 10(b)_ and Rule 10b-5. *See Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).*

15. In any event, the RICO provisions of the Organized Crime Control Act have no application as a federal common law of fraud, or as an alternative or cumulative remedy for private plaintiffs alleging securities fraud. *See Adair v. Hunt International Resources Corp., 526 F. Supp. 736 (N.D.Ill. 1981).*

*Irreparable Injury*

16. Plaintiff has failed to establish that it or its shareholders will suffer irreparable injury if injunctive relief is not granted.    The federal securities laws are designed to provide full disclosure and ordinarily do not warrant injunctive relief. _Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 57-59 (1975)._    Injunctive relief will be granted only if it is clearly demonstrated that damages would not adequately compensate an injured party. _Studebaker Corp. v. Gittlin, 360 F.2d 692, 698 (2d Cir. 1966)._

**\*14** 17. Marantette and his slate of nominees have filed an amended Schedule 13D and amended Schedules 14B to correct previous omissions and to make the additional disclosures required by the federal securities laws.    Such corrective disclosure is all the relief to which plaintiff would be entitled even were it ultimately to prevail on the merits of its claim of inadequate disclosure. *See, e.g., Rondeau v. Mosinee Paper Corp., supra; Chromalloy American Corp. v. Sun Chemical Corp., supra; Schy v. Susquehanna Corp., 419 F.2d 1112 (7th Cir.) cert. denied, 400 U.S. 826 (1970);* and _Ludlow Corporation v. Tyco Laboratories, Inc., 529 F. Supp. 62, 65-66 (D.Mass. 1981).*    In these circumstances, the issuance of a preliminary injunction is unnecessary and therefore inappropriate.

18. Plaintiff has failed to establish that injunctive relief is necessary to protect the interests of shareholders who may have been injured as a result of the defendants' failure to make required disclosures.    No nexus has been shown between defendants' alleged failure to make proper disclosure and plaintiff's alleged injury.    Shareholders who sold their stock at predisclosure prices, failed to sell, or would not have invested had full disclosure been made have an adequate remedy in law, "thus negating the basis for equitable relief." _Rondeau v. Mosinee Paper Corp., supra, at 60. See also Schy v. Susquehanna Corp., supra at 1117 (noncompliant proxy solicitation will not support injunctive relief under Section 14(a) of the Exchange Act where compliant materials were distributed)._

*Balance of Equities and the Public Interest*

19. Plaintiff has failed to establish that consideration of the balance of the equities and the public interest, the two remaining factors, weigh in its favor.    The preliminary injunction that Bayly seeks would impair the right of Bayly shareholders to exercise their franchise, and would thwart the strong public interest in maintaining the rights of shareholders to challenge management for control.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
(Cite as: Not Reported in F.Supp.)

B.  *Counterclaimant's Motion for Preliminary Injunction*

20. Counterclaimant Marantette also has not satisfied its burden as to each of the four factors essential to the grant of a preliminary injunction.

*Claims Under Section 13(a) of the Exchange Act*

21. Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a) (1976), requires issuers of securities registered under § 12 of the Act, 15 U.S.C. § 78l (1976), to file periodic and current reports "to insure fair dealing in the security." Among other things, these reports must disclose materially important events affecting the issuer. Failure to disclose such information or filing a report containing false and misleading statements violates Section 13(a).

22. Counterclaimant Marantette has failed to establish that Bayly and the other counterclaim defendants violated Section 13(a) by failing to disclose in Bayly's annual and periodic reports and in its proxy materials sent to stockholders in conection with the 1981 and 1982 annual meetings, their plan to entrench current management and to take the company private, although we have previously found such information to be material. (*See* Finding of Fact 56).

***15** Claims Under Sections 13(d) and 13(e) of the Exchange Act*

23. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)1 (1976 & Supp. IV 1980) requires any person who acquires more than five percent of a company's registered security to submit a Schedule 13D to the SEC and the issuing company. Schedules 13D disclose, *inter alia*, information about the person filing, any plans or proposals that the person has affecting the issuer; arrangements or understandings between the person and others with respect to securities of the issuer; and any other information necessary to fulfill the full disclosure objectives of the federal securities law. Section 13(d)(2) of the Exchange Act, 15 U. S. C. § 78m(d)(2)(1976), requires any person who has filed a Schedule 13D to amend his statement promptly to disclose any material changes in the facts previously set forth.

24. Joe Wood and certain counterclaim defendants violated Section 13(d) by failing to file a Schedule 13D to disclose their formation of a group in February, 1982 for the purpose of purchasing some or all of the shares of Bayly stock in Marantette's control. *See Podesta v. Calumet Industries, Inc.,* [1978 Transfer Binder] FED.SEC.L.REP. (CCH) § 96,433 (N.D.Ill. May 9, 1978); *Jewelcor, Inc. v. Pearlman,* 397 F. Supp. 221 (S.D.N.Y. 1975); *Tony Lama Co.,* [1974-75 Transfer Binder] FED.SEC.L.REP. (CCH) § 79,901 (SEC Letter of May 14, 1974).

25. Rule 13e-4, 17 C.F.R. § 240.13e-4 (1982), establishes the rules under which an issuer may make a tende offer for its own shares. The rule defines issuer tender offers to include both offers by the issuer and offers by an affiliate of the issuer. An issuer or its affiliate making an issuer tender offer is required to file a Schedule 13E-4.

26. The SEC has identified seven elements of an issuer tender offer: (1) active and widespread solicitation of a substantial number of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) an offer to purchase made at a premium over the prevailing price; (4) the terms of the offer are firm rather than negotiable; (5) the offer is contingent on the tender of a fixed number of shares, and subject to a fixed maximum number to be purchased; (6) the offer is open only for a limited period of time; (7) the offeree is subject to pressure to sell his stock. *See Wellman v. Dickinson,* 475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd.,* 682 F.2d 355 (2d Cir. 1982); *Hoover Co. v. Fuqua Industries, Inc.,* [1979-80 Transfer Binder] FED. SEC. L. REP. (CCH) P 97,107 (N.D. Ohio June 11, 1979).

27. When Bayly and Joe Wood offered to buy 240,000 shares from Roney customers, their purpose was to make a tender offer for the purchase of its shares. Their failure to file a Schedule 13E-4 violated Section 13(e) of the Exchange Act. *See Crane Co. v. Harsco Corp.,* 511 F. Supp. 294 (D.C. Del. 1981).

*Claims Under Section 10(b)*

*of the Exchange Act*

28. Section 10(b) of the Exchange Act prohibits all fraudulent schemes in connection with the purchase or sale of securities. *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6 (1971).

***16** 29. The management of a company whose securities are registered under the Exchange Act has a duty to the company's shareholders to disclose all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834
**(Cite as: Not Reported in F.Supp.)**

material facts in connection with the purchase or sale of securities. _Chiarella v. United States,_ 445 U.S. 222 (1980). The identity of a purchaser of securities is a material fact when it would likely affect a shareholder's decision to sell his stock. _Strong v. Repid,_ 213 U.S. 419 (1909); _Barnett v. Kirshner,_ 527 F.2d 781, 785 (2d Cir. 1975). However, since Bayly and/or Joe Wood was not an actual purchaser of the 240,000 shares in February, 1982, Marantette has no valid claim under Section 10(b) of the Exchange Act. _Blue Chip Stamps v. Manor Drug Stores,_ 421 U.S. 723, 731 (1975); _Sacks v. Reynolds Securities,_ 593 F.2d 1234 (D.C.Cir. 1978).

30. Bayly's and/or Joe Wood's failure to disclose the identity of the purchaser and its representation that an unidentified purchaser was financially capable of buying the 240,000 shares does not give rise to a cause of action under Section 10(b).

_Irreparable Injury_

31. Defendants in their counterclaim have failed to establish that they will suffer irreparable injury if injunctive relief is not granted. As stated previously (Conclusions of Law 16) the federal securities laws provide for disclosure and ordinarily do not warrant injunctive relief. Defendants have failed to show that injunctive relief is necessary to protect their interests.

_Balance of Equities and the Public Interest_

32. The remaining two factors to be considered clearly do not warrant the issuance of the preliminary injunction requested by counter claimant. The balance of the equities does not tilt in favor of Marantette. As for the public interest, such has been furthered by permitting all Bayly shareholders to exercise their franchise rights freely, unimpaired by the numerous maneuvers on both sides to achieve tactical advantage.

_CONCLUSION_

It is an ancient maxim of equity jurisprudence that "those who come into equity must come with clean hands." In a suit such as this which concerns the public interest as well as the private interests of the litigants, this doctrine assumes a greater importance, since in denying to wrongdoers the fruits of their improper conduct, it also avoids causing injury to the public.

Applying this standard in the exercise of our jurisdiction, it is clear to us that neither party, in seeking the extraordinary relief in the form of a preliminary injunction, has come with "clean hands." There have been violations on both sides of the disclosure requirements of the securities laws. Some of these have been serious, but most of them technical. In this bitter and hard fought struggle for corporate control, each side is subject to sharp criticism for disregarding its responsibilities under the law. As we said at least once during this dreary performance, "a plague on both your houses." All Bayly stockholders, whether or not affiliated with either side, are bearing the cost of this expensive litigation.

**\*17** We will leave the parties where we found them and grant neither the relief sought. In the meantime, a special meeting of the Bayly stockholders has been held and the stockholders have spoken. We will not intervene to disturb the result which they have accomplished.

Bayly Corp. v. Marantette.
Not Reported in F.Supp., 1982 WL 1337 (D.D.C.), Fed. Sec. L. Rep. P 98,834

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

<u>Briefs and Other Related Documents</u>
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
Morton A. BENDER, et al., Plaintiffs,
v.
Carolyn D. JORDAN, et al., Defendants.
**Civil Action No. 06-92(RMC).**

July 21, 2006.

**Background:** Shareholder of federally chartered savings and loan brought action against some of institution's directors, including its chairman, vice chairman, and two board members, and institution's former acting president-chief executive officer (CEO), asserting claims for alleged violations of federal securities laws and seeking both injunctive and monetary relief. Shareholder moved for preliminary injunction, and defendants moved to dismiss complaint.

**Holdings:** The District Court, <u>Collyer</u>, J., held that:

8<u>(1)</u> as a matter of apparent first impression, shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase;

10<u>(2)</u> shareholder established likelihood of success on the merits of claim for alleged violation of Securities Exchange Act's disclosure requirements;

19<u>(3)</u> shareholder established likelihood of success on the merits of claim for alleged violation of proxy solicitation statute;

23<u>(4)</u> shareholder could bring direct action for alleged violations of corporate bylaws and Robert's Rules of Order;

25<u>(5)</u> shareholder established likelihood of success on merits of claim alleging violation of institution's bylaws and Robert's Rules of Order;

27<u>(6)</u> shareholder established irreparable harm; and

32<u>(7)</u> doctrine of laches did not apply.

Ordered accordingly.

**[1] Injunction 212** ⟸138.1

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
       212IV(A)2 Grounds and Objections
         212k138.1 k. In General. <u>Most Cited Cases</u>
In considering a request for preliminary injunctive relief, court must examine (1) whether there is a substantial likelihood that plaintiff will succeed on the merits, (2) whether plaintiff will be irreparably injured if an injunction is not granted, (3) whether an injunction will substantially injure the other party, and (4) whether the public interest will be furthered by the injunction; these factors interrelate on a sliding scale and must be balanced against each other, and a particularly strong showing on one or more factors can mitigate a weaker showing on another.

**[2] Injunction 212** ⟸132

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
       212IV(A)1 In General
         212k132 k. Nature and Scope of Provisional Remedy. <u>Most Cited Cases</u>

**Injunction 212** ⟸147

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
       212IV(A)4 Proceedings
         212k147 k. Counter Affidavits and Other Evidence. <u>Most Cited Cases</u>
A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.

**[3] Action 13** ⟸3

13 Action
   13I Grounds and Conditions Precedent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

13k3 k. Statutory Rights of Action. Most Cited Cases

*Cort* factors for determining whether Congress intended to provide implied private right of action include (1) whether plaintiff is one of the class for whose benefit the statute was enacted, (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy, (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme, and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law; these factors are not necessarily entitled to equal weight, and the central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action.

[4] Action 13 ⚖️3

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most Cited Cases
The question of the existence of a statutory cause of action is one of statutory construction, and the appropriate starting place is therefore the text of the statute itself.

[5] Action 13 ⚖️3

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most Cited Cases
In divining legislative intent respecting existence of implied private cause of action, courts look to the design of the statute as a whole, in addition to considering the text of the statute, and, to the extent useful, legislative history.

[6] Securities Regulation 349B ⚖️173

349B Securities Regulation
    349BI Federal Regulation
        349BI(E) Remedies
            349BI(E)2 Injunction
                349Bk173 k. Proxy or Take-Over Regulation Violations. Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase creates

an implied private right of action for injunctive relief brought by an issuer of securities. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

[7] Securities Regulation 349B ⚖️53.15

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)6 Insider Reporting and Short-Term Trading
                349Bk53.12 Insider Trading
                349Bk53.15 k. Insiders Subject to Regulation. Most Cited Cases
Provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase was not enacted for the benefit of the issuer; its sole purpose was the protection of shareholders. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

[8] Securities Regulation 349B ⚖️173

349B Securities Regulation
    349BI Federal Regulation
        349BI(E) Remedies
            349BI(E)2 Injunction
                349Bk173 k. Proxy or Take-Over Regulation Violations. Most Cited Cases
Shareholder has standing to seek injunctive relief under Securities Exchange Act's requirement that stock buyers disclose acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

[9] Securities Regulation 349B ⚖️173

349B Securities Regulation
    349BI Federal Regulation
        349BI(E) Remedies
            349BI(E)2 Injunction
                349Bk173 k. Proxy or Take-Over Regulation Violations. Most Cited Cases
Shareholder of savings and loan had implied private cause of action against institution's directors and former acting president-chief executive officer (CEO) for injunctive relief under provision of Securities Exchange Act requiring stock buyers to disclose the acquisition of beneficial ownership of more than five

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

percent of company's equity securities within 10 days of purchase, particularly given parties' battle for corporate control and injunctive relief previously sought against shareholder by institution, presumably at directors' behest, under same statute. Securities Exchange Act of 1934, § 13(d)(1), 15 U.S.C.A. § 78m(d)(1).

**[10]** Securities Regulation 349B 🔗178.1

349B Securities Regulation
  349BI Federal Regulation
    349BI(E) Remedies
      349BI(E)2 Injunction
        349Bk178 Preliminary Injunction
          349Bk178.1 k. In General. Most Cited Cases
Shareholder of savings and loan established likelihood of success on the merits in seeking preliminary injunctive relief based on claim that institution's directors and former acting president-chief executive officer (CEO), acting through institution's chairman and vice chairman, acquired beneficial ownership of shares and voting power of securities firm and related stockholders, and thus violated requirement, under Securities Exchange Act, that stock buyers disclose the acquisition of beneficial ownership of more than five percent of company's equity securities within 10 days of purchase by not filing requisite disclosures. Securities Exchange Act of 1934, § 13(d)(1, 2), 15 U.S.C.A. § 78m(d)(1, 2); 17 C.F.R. § § 240.13d-2(a), 240.13d-3(a), 204.13d-5.

**[11]** Securities Regulation 349B 🔗52.19

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)5 Take-Over Regulation
        349Bk52.19 k. Cure of Misstatements or Omissions; Amendment. Most Cited Cases
Shareholder of financial institution, who already owned 7.2 percent of institution's shares at the time he acquired voting power over additional shares constituting nearly 10 percent of institution's outstanding shares, was required to amend his Schedule 13D "promptly" under Securities Exchange Act. Securities Exchange Act of 1934, § 13(d)(2), 15 U.S.C.A. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a).

**[12]** Securities Regulation 349B 🔗49.20

349B Securities Regulation

349BI Federal Regulation
  349BI(C) Trading and Markets
    349BI(C)4 Proxies
      349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
        349Bk49.20 k. In General. Most Cited Cases
To prevail on claim under provision of Securities Exchange Act governing solicitation of proxies, plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused plaintiff injury, and (3) that the proxy solicitation was an essential link in the accomplishment of the transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[13]** Securities Regulation 349B 🔗49.22(3)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)4 Proxies
        349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
          349Bk49.22 Items to Be Disclosed; Nondisclosure
            349Bk49.22(3) k. Particular Matters. Most Cited Cases

Securities Regulation 349B 🔗49.26(3)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)4 Proxies
        349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
          349Bk49.26 Grounds of and Defenses to Liability
            349Bk49.26(3) k. Materiality of Violation; Reliance and Causation. Most Cited Cases
Materiality is the touchstone of the analysis for claim under provision of Securities Exchange Act governing solicitation of proxies. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[14]** Securities Regulation 349B 🔗49.26(3)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)4 Proxies

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.26 Grounds of and Defenses to Liability
349Bk49.26(3) k. Materiality of Violation; Reliance and Causation. Most Cited Cases
Plaintiffs need not allege other-shareholder reliance to maintain a claim under provision of Securities Exchange Act governing solicitation of proxies. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[15] Securities Regulation 349B ⚷49.22(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.22 Items to Be Disclosed; Nondisclosure
349Bk49.22(2) k. Materiality of Omissions. Most Cited Cases

**Securities Regulation 349B ⚷49.26(3)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
349Bk49.26 Grounds of and Defenses to Liability
349Bk49.26(3) k. Materiality of Violation; Reliance and Causation. Most Cited Cases
A misrepresentation or omission is "material," for purposes of provision of Securities Exchange Act governing solicitation of proxies, if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote; in other words, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[16] Securities Regulation 349B ⚷49.30**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets

349BI(C)4 Proxies
349Bk49.30 k. Questions of Law or Fact; Jury Questions. Most Cited Cases
In the context of claims under provision of Securities Exchange Act governing solicitation of proxies, issue of materiality is a mixed question of law and fact that involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[17] Securities Regulation 349B ⚷49.16**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.16 k. Contested Solicitations; Furnishing Lists of Holders or Mailing Proxies. Most Cited Cases
Letter purportedly sent by committee to save federal financial institution to institution's shareholders qualified as "solicitation" for purposes of securities rule expressly prohibiting false or misleading proxy solicitations, in that letter was part of "grass roots" strategy concocted by institution employee and representative of public relations firm to persuade recipients not to sell their shares to shareholder attempting to gain control of institution or his allies, and advocated "yes" vote for board of directors' slate in upcoming board election. 17 C.F.R. § § 240.14a-1(*l*)(1)(iii), 240.14a-9.

**[18] Securities Regulation 349B ⚷49.16**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)4 Proxies
349Bk49.16 k. Contested Solicitations; Furnishing Lists of Holders or Mailing Proxies. Most Cited Cases
Letter sent to shareholders of troubled federal financial institution qualified as "solicitation" for purposes of securities rule expressly prohibiting false or misleading proxy solicitations, given that institution's employee and public relations firm played substantial role in sending of letter, by reviewing and editing drafts and providing inside information known only to institution, and that letter, though not explicitly urging vote in favor of management's nominees for board members,

generally questioned past performance and motives of shareholder seeking control of institution, alleged various regulatory violations by such shareholder, lauded imagination and courage of incumbent directors, and urged shareholders to "do the right thing." 17 C.F.R. § § 240.14a-1(*l*)(1)(iii), 240.14a-9.

**[19] Securities Regulation 349B ⟶ 49.21**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)4 Proxies
    349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
     349Bk49.21 k. False or Misleading Statements; Misrepresentation. Most Cited Cases
Correspondence sent by financial institution to its shareholders contained false and misleading statements, for purposes of shareholder's claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that two letters falsely represented that they were authored independent of institution, correspondence indicated that shareholder, who sought to gain control of institution, had brought baseless lawsuits against institution and was source of its financial difficulties, and shareholders were incorrectly told that shares held by brokers would not be voted in impending board election absent shareholder instructions. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[20] Securities Regulation 349B ⟶ 49.26(3)**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)4 Proxies
    349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
    349Bk49.26 Grounds of and Defenses to Liability
     349Bk49.26(3) k. Materiality of Violation; Reliance and Causation. Most Cited Cases
False and misleading statements in correspondence sent by financial institution to shareholders were "material," for purposes of shareholder's claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that reasonable investor would have lent importance to facts that, contrary to representations in correspondence, institution's

management decisions and unrelated lawsuits were to blame for institution's financial woes, rather than shareholder seeking to gain control of institution, that shareholder had not brought baseless lawsuits against institution, that institution had editorial control over purportedly independent letters sent to shareholders, and that shares held by brokers would be voted in the absence of shareholder instructions in upcoming election. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a); 17 C.F.R. § 240.14a-9.

**[21] Securities Regulation 349B ⟶ 49.26(3)**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)4 Proxies
    349Bk49.19 False or Fraudulent Proxies; Accuracy and Completeness
    349Bk49.26 Grounds of and Defenses to Liability
     349Bk49.26(3) k. Materiality of Violation; Reliance and Causation. Most Cited Cases
When there has been a finding of materiality of false or misleading statements in proxy solicitation, shareholder has made a sufficient showing of causal relationship between violation of proxy solicitation statute and injury for which he seeks redress if he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the challenged transaction. Securities Exchange Act of 1934, § 14(a), 15 U.S.C.A. § 78n(a).

**[22] Securities Regulation 349B ⟶ 178.1**

349B Securities Regulation
 349BI Federal Regulation
  349BI(E) Remedies
   349BI(E)2 Injunction
    349Bk178 Preliminary Injunction
     349Bk178.1 k. In General. Most Cited Cases
Shareholder sufficiently demonstrated likelihood of causal connection between proxy solicitations and election of board of director nominees supported by financial institution's management in seeking preliminary injunction based on claim that some of institution's directors and its former acting president-chief executive officer (CEO) violated proxy solicitation statute, in that votes of minority shareholders were necessary to elect management slate and solicitations were essential link in securing those votes. Securities Exchange Act of 1934, §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

14(a), 15 U.S.C.A. § 78n(a).

**[23] Corporations 101 ☙320(4)**

101 Corporations
  101X Officers and Agents
    101X(C) Rights, Duties, and Liabilities as to Corporation and Its Members
      101k320 Actions Between Shareholders and Officers or Agents
        101k320(4) k. Right to Sue, and Parties in General. Most Cited Cases
Shareholder alleged special injury unique from that suffered by financial institution, and thus could bring direct action against institution's directors and former acting president-chief executive officer (CEO) for alleged violations of corporate bylaws and Robert's Rules of Order, when gravamen of shareholder's complaint was that defendants conspired, in violation of Securities Exchange Act and bylaws, to rig director election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying votes improperly so as to keep complaining shareholder from participating in matters of corporate governance. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[24] Corporations 101 ☙202**

101 Corporations
  101IX Members and Stockholders
    101IX(C) Suing or Defending on Behalf of Corporation
      101k202 k. Right to Sue or Defend in General. Most Cited Cases
Shareholder can bring a direct action, even when there is harm done to the corporation generally, if he alleges a special injury unique from that suffered by the corporation, and such "special injury" can arise in two contexts: when allegedly wrongful conduct violates a duty to complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, and when the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends.

**[25] Injunction 212 ☙138.42**

212 Injunction
  212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
      212IV(A)3 Subjects of Relief
        212k138.42 k. Corporate Management and Dealings. Most Cited Cases
Shareholder seeking preliminary injunction, based on claim that financial institution's directors and acting former president-chief executive officer (CEO) violated corporate bylaws and Robert's Rules of Order in conducting shareholder meeting, established substantial likelihood of demonstrating that provision of Robert's Rules prohibiting changing or revoking of vote in director election after polls were closed governed meeting, that unilaterally allocation of proxies after polls were closed was prohibited action under Robert's Rules, and that, in a contested election, permitting management alone to allocate votes after polls closed was incompatible with duty of independent inspector of elections (IIOE) to conduct election with fairness to all shareholders.

**[26] Corporations 101 ☙198(3)**

101 Corporations
  101IX Members and Stockholders
    101IX(B) Meetings
      101k198 Proxies
        101k198(3) k. Solicitation; Proxy Statements. Most Cited Cases

**Corporations 101 ☙283(1)**

101 Corporations
  101X Officers and Agents
    101X(A) Election or Appointment, Qualification, and Tenure
      101k283 Election of Directors
        101k283(1) k. Requisites and Validity in General. Most Cited Cases
Corporation's failure to hold separate meeting to vote on allocation of management proxies in director election did not violate provision of bylaws indicating that proxies solicited on management's behalf were to be voted as directed by shareholder or, in the absence of direction, as determined by majority of board of directors, given that bylaw did not expressly require that meeting be held and master ballot was signed by majority of board of directors.

**[27] Injunction 212 ☙138.42**

212 Injunction
  212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
      212IV(A)3 Subjects of Relief
        212k138.42 k. Corporate Management

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

and Dealings. Most Cited Cases

**Securities Regulation 349B** 🖘178.1

349B Securities Regulation
   349BI Federal Regulation
     349BI(E) Remedies
      349BI(E)2 Injunction
       349Bk178 Preliminary Injunction
        349Bk178.1 k. In General. Most
Cited Cases
Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

Shareholder established irreparable harm in seeking preliminary injunctive relief in connection with alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO), given that shareholder, along with institution's other shareholders, allegedly was deprived of statutory right to receive accurate information and be free of deceptive information bearing on investment and voting decisions and was unnecessarily frustrated in his personal attempts to participate in corporate governance, that vote based on alleged misinformation had already occurred, resulting in installation of possibly illegitimate directors, and second election loomed, and that shareholder had no adequate remedy at law. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[28] Injunction 212** 🖘138.6

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
      212IV(A)2 Grounds and Objections
       212k138.6 k. Nature and Extent of Injury; Irreparable Injury. Most Cited Cases
To establish irreparable injury in support of preliminary injunctive relief, injury must be both certain and great, and must be actual and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, and injury must also be beyond remediation.

**[29] Injunction 212** 🖘138.6

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
      212IV(A)2 Grounds and Objections
       212k138.6 k. Nature and Extent of Injury; Irreparable Injury. Most Cited Cases
Possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm supporting preliminary injunction.

**[30] Injunction 212** 🖘138.42

212 Injunction
   212IV Preliminary and Interlocutory Injunctions
     212IV(A) Grounds and Proceedings to Procure
      212IV(A)3 Subjects of Relief
       212k138.42 k. Corporate Management and Dealings. Most Cited Cases

**Securities Regulation 349B** 🖘178.1

349B Securities Regulation
   349BI Federal Regulation
     349BI(E) Remedies
      349BI(E)2 Injunction
       349Bk178 Preliminary Injunction
        349Bk178.1 k. In General. Most
Cited Cases
Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

Preliminary injunction based on alleged violations of securities laws and financial institution's bylaws by some of institution's directors and its former acting president-chief executive officer (CEO) would serve

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

the public interest in effective enforcement of securities laws. Securities Exchange Act of 1934, § § 13(d)(1), 14(a), 15 U.S.C.A. § § 78m(d)(1), 78n(a).

**[31] Equity 150 ☞65(1)**

150 Equity
   150I Jurisdiction, Principles, and Maxims
      150I(C) Principles and Maxims of Equity
         150k65 He Who Comes Into Equity Must Come with Clean Hands
            150k65(1) k. In General. Most Cited Cases

Doctrine of unclean hands did not apply to bar equitable relief in shareholder's favor in his action for alleged securities violations against some of financial institution's directors and institution's former acting president-chief executive officer (CEO), given that shareholder had neither abused the judicial process nor brought baseless actions against institution or its directors.

**[32] Securities Regulation 349B ☞134**

349B Securities Regulation
   349BI Federal Regulation
      349BI(E) Remedies
         349BI(E)1 In General
            349Bk134 k. Time to Sue and Limitations. Most Cited Cases

Doctrine of laches did not apply to bar equitable relief in shareholder's favor in his action against some of financial institution's directors and institution's former acting president-chief executive officer (CEO) for alleged securities violations, given that shareholder moved for preliminary injunction two days after filing complaint and less than three months after challenged election of directors, that shareholder could reasonably have required several months to craft complaint in light of secrecy in which directors had operated, and that shareholder did not appear to have reason to have suspected defendants' involvement in challenged proxy solicitation until after litigation began.

**[33] Equity 150 ☞67**

150 Equity
   150II Laches and Stale Demands
      150k67 k. Nature and Elements in General. Most Cited Cases

**Equity 150 ☞69**

150 Equity
   150II Laches and Stale Demands
      150k68 Grounds and Essentials of Bar
         150k69 k. In General. Most Cited Cases

**Equity 150 ☞72(1)**

150 Equity
   150II Laches and Stale Demands
      150k68 Grounds and Essentials of Bar
         150k72 Prejudice from Delay in General
            150k72(1) k. In General. Most Cited Cases

"Laches" is an equitable doctrine founded on the notion that equity aids the vigilant and not those who slumber on their rights, and, to establish this defense, defendants must show (1) a lack of diligence by plaintiff that (2) has caused them prejudice.

Dale A. Cooter, Donna S. Mangold, Cooter, Mangold, Tompert & Wayson, LLP, Washington, DC, for Plaintiffs.

Peter Emanuel Strand, Shook, Hardy & Bacon, L.L.P., Haig V. Kalbian, Kalbian Hagerty L.L.P., Washington, DC, for Defendants.

*MEMORANDUM OPINION*

COLLYER, District Judge.

*\*1* Morton A. Bender and a majority of the Board of Directors of Independence Federal Savings Bank ("IFSB" or "Bank") are opposing contestants for control of the future direction of the Bank. The Bank was labeled a "troubled" institution by the Office of Thrift Supervision ("OTS") in 2003 and has never shed that label. Together with his wife, Mr. Bender owns 21% of the Bank's outstanding stock. He has been an active and vociferous critic of the Bank's management since 2003 and has tried, with varying degrees of success, to change its direction by voting his candidates onto the Bank's Board of Directors. A majority of the Board of Directors has, to put it mildly, resisted Mr. Bender's efforts.[FN1] The last such vote for members of the Board was held in October 2005. That voting process was riddled with improprieties, of which Mr. Bender complains here.

In this suit,[FN2] Mr. Bender sues certain of the Bank's Directors: chairman Carolyn D. Jordan, vice chairman David Wilmot, and Board members Michael J. Cobb, William B. Fitzgerald IV, and Eugene K. Youngentob ("Director Defendants"), and its former Acting President and Chief Executive Officer, Thomas L. Batties. The Bank itself is a nominal defendant. Mr. Bender[FN3] alleges that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Director Defendants and Mr. Batties violated numerous securities laws and the Bank's bylaws by their actions leading up to, and in conducting, a shareholders' meeting in October 2005. As relief, Mr. Bender seeks an injunction requiring the Defendant Directors and Mr. Batties to comply with their disclosure obligations under § 13(d) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. § 78m(d), and regulations promulgated thereunder; to neutralize shares that the Defendant Directors and Mr. Batties allegedly acquired in violation of those obligations; to void the election results from the October 26, 2005, Shareholders' Meeting; to compel accurate proxy disclosures pursuant to § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and accompanying regulations; to forbid further shareholders' meetings until the procedural irregularities are resolved; and to compel adherence to the Bank's bylaws in any future meetings. Mr. Bender also seeks a court order preventing IFSB from indemnifying, or making advance payments to, the Director Defendants and Mr. Batties for expenses and fees incurred in defending this action. Finally, Mr. Bender prays for $10 million in compensatory damages, $10 million in punitive damages, and an award of attorneys' fees. Compl. at 38-39.

As preliminary relief, Mr. Bender requests an injunction specifying that, until further order of the Court, no proxy materials shall be disseminated to Bank shareholders; no annual or special shareholders' meeting shall occur; and that the Bank shall be prevented from indemnifying, or making advance payments to, the Defendant Directors and Mr. Batties for their defense expenses.[FN4] Pls.' Proposed Order at 46-47 [Dkt. # 37]. The Director Defendants and Mr. Batties oppose the application for a preliminary injunction and move to dismiss Mr. Bender's Complaint on various grounds.

**\*2** Although the Complaint brings six counts against Defendants, only four of those request preliminary injunctive relief and are relevant for present purposes: alleged violations of § 13(d) of the Exchange Act (Count I) and § 14(a) of the Exchange Act (Count II); alleged violations of the Bank's bylaws (Count III); and the request for a declaratory judgment barring indemnification and advancement of fees (Count VI).

This opinion addresses Counts I, II, and III only; the Court defers decision on Count VI. Finding in Mr. Bender's favor on the main points, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary

injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court.

## I. FINDINGS OF FACT

This matter came on for hearing during three successive weeks, working around the Court's criminal trial schedule. Witnesses for IFSB included Ms. Jordan, Messrs. Wilmot and Batties, and Christopher Chambers, a part-time in-house lawyer at the Bank. From their testimony, one has to conclude that this is the most incurious group of persons in the world. Faced with a crisis at the Bank that all were working frantically to address, they say they never spoke to one another, never followed up on assignments, never read email or talked to their assistants, and cannot remember the details of critical conversations. To a person, they were evasive, nonresponsive, and internally contradictory. It is an understatement to say that the Court has a difficult time crediting much of their testimony. For present purposes, the Court makes the following findings of fact:

### A. Background Facts

1. IFSB is a federally-chartered savings and loan ("S & L"), with its principal place of business in the District of Columbia. Its stock is publicly traded on the NASDAQ Stock Exchange and it is under the regulatory jurisdiction of OTS. IFSB is a historically Black-owned-and-operated S & L that concentrates its marketing and loans in the Black and African-American community.

2. Defendants Jordan, Wilmot, Cobb, Fitzgerald, and Youngentob are members of the Bank's Board of Directors and, until June 21, 2006, Defendant Batties was its Acting President and Chief Executive Officer. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); Id. at 73 (Wilmot); Id. at 114 (Batties); Fitzgerald Dep. 44; Defs.' Rule 8K Notice [Dkt. # 49]. Defendants Jordan, Wilmot, and Batties are attorneys and members of the Bar of the District of Columbia. Apr. 21, 2006, Hr'g Tr. 5 (Jordan); Id. at 73 (Wilmot); Id. at 114 (Batties). The Defendants and all other Bank Directors are African-American.

3. The Bank's fiscal year ends on December 31 of each year. Id. at 52 (Jordan). The Board of Directors scheduled a Special Meeting in lieu of the Annual Meeting of Shareholders for May 11, 2005; thereafter, the meeting was scheduled and re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

scheduled and ultimately conducted on October 26, 2005. *Id.* at 115-16 (Batties); *Id.* at 6 (Jordan).
**\*3 4.** Plaintiffs Morton and Grace Bender own approximately 21% of the Bank's outstanding shares as joint tenants. Defs.' Exh. 211. The Benders are White.

### B. Communications in Advance of the May 11, 2005, Meeting and Its Delay

5. In anticipation of the scheduled May 11, 2005, meeting, at which three directors would be elected to the Bank's Board, Mr. Bender notified the Bank's secretary, by letter dated April 26, 2005, that he would be nominating two persons for election to the Board. Mr. Bender wrote to all shareholders on May 2, 2005,[FN5] setting forth his positions regarding the Bank's performance and providing information regarding his nominees. Defs.' Exhs. 207, 208.
6. Mr. Bender had previously submitted a draft copy of his May 2, 2005, letter to OTS and had made certain amendments to it at the request of OTS. Defs.' Exh. 205; Defs.' Exh. 208. However, the May 2, 2005, letter did not contain all of the changes the federal agency had requested. Defs.' Exh. 208.
7. A different letter was sent to shareholders dated May 4, 2005, purportedly from the "Committee to Save Independence Federal Savings Bank" (the "Committee" and the "Committee Letter"). Trial Exh. 1. The Committee Letter was apparently signed by Bishop Clarence Long and Reverend Douglas Moore, who are prominent African-American clergy in the District of Columbia. *Id.* Reverend Walter Fauntroy, a prominent clergyperson and former District representative to the U.S. House of Representatives, was a visible supporter. Fauntroy Dep. 12-14.
• Reverend Fauntroy testified that he had no role in authorship of the letter and did not see it until the day of his deposition. Fauntroy Dep. 65-67.
• Bishop Long testified that he did not write the letter, that he did not authorize anyone to send it on his behalf, and that he saw it for the first time at a press conference on May 10, 2005. Long Dep. 26-27, 36.
• Reverend Moore testified that he has no idea how the letter went out with his name on it; he did not remember seeing it before his deposition. Moore Dep. 37-42, 47.
8. Testimony from Christopher Chambers, an attorney and part-time Bank employee, clarified the provenance of the Committee Letter. Mr. Chambers worked with Judy Smith of Impact Strategies, a public relations ("PR") firm retained by the Bank, to provide information for the Committee Letter and to set its tone and arrange its mailing. Apr. 28, 2006, Hr'g Tr. 57, 67-68 (Chambers). As Mr. Chambers described in an email, he was actively involved in:
PR and grassroots-lining up folks and implementing the strategy, beginning the tactics. There is now a list of small shareholders, but we must be careful to have the "Committee to" contact them, and of course it's not going to be a question of supporting the current management slate-now it is a question of not selling to [B]ender or his allies.
Pls.' Exh. 106 (Apr. 18, 2005, email). Further, Mr. Chambers wrote that he had "some deliverables to Impact Strategies so that they may complete their tasks regarding grassroots and media work." Pls.' Exh. 107 (April 22, 2005, email). Ms. Smith forwarded two mailings for the Bank's use, telling Mr. Chambers that she would call to "di[s]cuss contacting potential signers." Pls.' Exh. 105 (May 4, 2005, email). As Mr. Chambers informed Mr. Batties on May 5, 2005:
**\*4** Judy Smith is planning the Committee to Save IFSB-related press conference ASAP. FYI the grass roots packages have gone out (last night). They are not as inflammatory as originally envisioned; they are more akin to shareholder fight-letters. I will forward you the essence of what went out to smaller shareholders.... Additionally, another 1500-1800 ... letters went out to friends of the bank....
Consequently ... the fur will be flying.... Bender's putative nominees have been painted in the Committee mailings as innocent puppets at best, racial traitors at worst, so I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting their own horns.
Pls.' Exh. 104 (May 5, 2005, email).
9. Mr. Batties instructed Mr. Chambers to work with Ms. Smith, and Mr. Chambers sent Mr. Batties copies of all email exchanges between Mr. Chambers and Ms. Smith (as an addressee in either the "to" line or the "cc" line). Apr. 28, 2006, Hr'g Tr. 92 (Chambers); *see* Pls.' Exhs. 104-109. Each was sent to Mr. Batties' IFSB email address or to Mr. Batties' home email address or to both. Pls.' Exhs. 104-109. Mr. Chambers also talked directly with Mr. Batties about "grass roots, direct mail, lobbying[,] the whole thing." Apr. 28, 2006, Hr'g Tr. 94 (Chambers).[FN6]
10. Mr. Batties testified that he had no involvement in the Committee Letter. Apr. 21, 2006, Hr'g Tr. 117-19 (Batties). He further testified that he did not read the emails from Mr. Chambers when they were sent and did not know if Judy Smith of Impact Strategies was involved with the Committee or the Committee

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Letter. *Id.* at 126-31 (Batties). Given the importance of the efforts against Mr. Bender, Mr. Batties' direct instructions to Mr. Chambers, and the involvement of Ms. Jordan, chairman of the Board, and other Board members, the Court does not credit Mr. Batties' denials.

• Mr. Batties appears to have been directly involved with contacts with Reverend Fauntroy and Bishop Long. *See* Pls.' Exh. 108 ("Thomas might have to make *another* call to both [Rev. Fauntroy and Bishop Long]." (emphasis added)).

• Mr. Batties appears to have been making the important decisions rather than delegating them to a part-time employee. *See* Pls.' Exh. 104 ("The bigger shareholders have been contacted.... I don't know how much you would be involved in that specific aspect of preparatory work, Charlie, but my vote is that you attend, *pending what Thomas decides."* (emphasis added)).

• Mr. Batties received oral reports and copies of all emails from Mr. Chambers. Apr. 28, 2006, Hr'g Tr. 91-94 (Chambers).

• Mr. Batties admitted that some of the information in the Committee Letter and its attachments could only have come from confidential OTS examination reports, which are maintained in the Bank's file. Apr. 21, 2006, Hr'g Tr. 120-24 (Batties).

**\*5** • Mr. Batties' professed inattention and ignorance of the Committee and the Committee Letter rings hollow. The Bank paid Impact Strategies to develop the PR program, of which the Committee Letter was a part. The Bank paid Impact Strategies, and its own employee, Mr. Chambers, to write the Committee Letter and to mail it. Based on some of the Committee Letter, Mr. Chambers or some other Bank representative was the source of confidential Bank documents and information. Only 28 people work in the Bank office where Mr. Batties works and Mr. Chambers has a desk immediately outside Mr. Batties' office. Apr. 21, 2006, Hr'g Tr. 132 (Batties). Mr. Chambers reported to Mr. Batties by email and in-person conversations on his activities. From these facts, the Court concludes that Mr. Batties authorized and was aware of Mr. Chambers' participation in the creation and mailing of the Committee Letter. It also finds that Mr. Batties authorized and was aware that the Committee was being portrayed falsely to shareholders and the public as an independent group. *See* Pls.' Exh. 104 ("The Committee to Save IFSB is an independent association."); Trial Exh. 1, Committee Letter ("Acting separately from IFSB, we aim to expose the motivations of those wishing to harm IFSB's mission.").

• Further, the Court finds that it is more likely than not that certain Directors of the Bank were, at a minimum, informed of the Committee Letter before its mailing. The emails strongly suggest that Defendants Jordan, Wilmot and Fitzgerald were either involved in, or aware of, the fabrication of the Committee and the Committee Letter. *See* Pls.' Exh. 107 (Apr. 22, 2005, email) ("Pls. note that in addition to Carolyn Jordan of our Board, Director David Wilmot, Esq. wishes to be included in some of these discussions confidentially."); Pls.' Exh. 104 (May 5, 2005, email) ("I would suggest [that] Carolyn Jordan brief Mr. Parks.... We must make sure that Dave Wilmot and Bill Fitzgerald are playing along with the orchestra rather than tooting their own horns.").

11. On May 9, 2005, OTS notified Mr. Bender that it was "considering whether to issue a cease and desist order, and to assess civil money penalties, against you for false and misleading statements" contained in Mr. Bender's May 2, 2005, letter to shareholders. Defs.' Exh. 208. Mr. Bender sent a detailed response to OTS, Pls.' Exh. 113, and OTS notified Mr. Bender on September 14, 2005, that no enforcement action would be taken. *See* Defs.' Exh. 214.

12. On May 10, 2005, OTS sent a letter to IFSB indicating its initiation of an investigation into the Committee Letter and asking IFSB to tell OTS "whether any officer, director or employee of Independence is affiliated with the Committee or has provided information to the Committee." Defs.' Exh. 209. The Bank conducted an "investigation" limited to officers (vice presidents and above) and Board members, which, naturally, failed to ask Mr. Chambers anything. Apr. 21, 2006, Hr'g Tr. 143-44 (Batties). The Bank's responses all declared no role in providing information to the Committee. Mr. Chambers helped process these inquiries and compile the response to OTS but, because "[t]he [Bank's] position was I believe it was Mr. Batties and the board members" who were asked to respond, he did not correct their erroneous response to OTS. Apr. 28, 2006, Hr'g Tr. 67 (Chambers). In fact, Mr. Chambers was intimately involved in developing the Committee Letter and creating the charade that a Committee even existed. *Id.* at 68.

**\*6** 13. Mr. Batties and all Director Defendants have consistently denied any individual or Bank involvement with the preparation or mailing of the Committee Letter. *See* Defs.' Opp'n ¶ 27 ("No officer, director of employee of the Bank was involved with the Committee [L]etter."); Apr. 21, 2006, Hr'g Tr. 119-24 (Batties) (same). Those denials were obviously untrue but no one has so informed OTS, even now. By letter dated September 14, 2005, OTS notified the Bank that no enforcement action would be taken with regard to the May 4 Committee Letter. *See* Defs.' Exh. 215.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

14. The shareholders' meeting scheduled for May 11, 2005, was continued to June 8, 2005. Because new proxy materials were not ready, the meeting was again continued to September 14, 2005. Mr. Bender filed an amended Schedule 13D [FN7] in early September, indicating that he had filed a change-of-control application with OTS and, upon its approval, would seek to increase his ownership interest to 51% through purchases from existing shareholders. Defs.' Exh. 211. As a result, the Board continued the shareholders' meeting to October 26, 2005.[FN8] Trial Exh. 47.

C. Communications In Advance of the October 26, 2005, Shareholders' Meeting

15. On October 3, 2005, Mr. Bender sent a letter to IFSB shareholders which identified his nominees for directors as Osborne George and John Silvaneous Wilson Jr. ("Bender Nominees"). Trial Exh. 33. The letter explained that Mr. Bender was not soliciting proxies and that the only way to vote for the Bender Nominees was to attend the meeting in person or to send someone with a legal proxy.

16. The Bank distributed its proxy materials to shareholders on October 4, 2005. The Bank's nominees for directors were Marion O. Greene Jr. and Defendants Fitzgerald and Wilmot ("Management Nominees"). Trial Exh. 2.

17. On October 21, 2005, a letter was sent to shareholders by Gilbert Douglas and Catherine McPhail, IFSB shareholders. See Trial Exh. 3. Mr. Douglas drafted the letter with input from Mr. Chambers, who "responded positively" when Mr. Douglas suggested sending a letter. Apr. 28, 2006, Hr'g Tr. 75 (Chambers). Mr. Chambers reviewed and commented upon one or more drafts of the letter, id. at 77-78, put Mr. Douglas in contact with Impact Strategies so that the letter could be mailed, id. at 80, and helped Mr. Douglas find citations to bank documents for the text. Id. at 76-77. "[I]t did not occur" to Mr. Chambers that the Committee Letter had forced a postponement of the May 11 shareholders' meeting and that sending another letter might not be a good idea. Id. at 86.

D. The Thompson and Doley Shares

18. On March 3, 2005, Doley Securities LLC entered into an agreement to purchase all of the IFSB shares owned by Carver Bancorp Inc. ("Carver") for $10.50

per share.[FN9] Trial Exh. 58 (Securities Share Agreement). At the time, Carver owned 150,000 shares, or 9.47% of the total IFSB shares outstanding. See Trial Exhs. 58, 59. Prior to the purchase of Carver shares, Doley Securities and its affiliates owned 3,834 IFSB shares. Trial Exh. 59.

*7 19. Some of the shares purchased by Doley Securities were retained by that firm; some were sold to Logan Delany, a friend of Mr. Doley; and others were sold to clients of Doley Securities (collectively, "Doley Participants"). Doley Dep. 90-95. All told, the Doley Participants together owned 154,685 shares of IFSB stock, which was just under 10% of the total shares outstanding. Neither Doley Securities nor any of the Doley Participants has ever filed a Form 13D with OTS. See Trial Exh. 2 at 20-21; May 4, 2006, Hr'g Tr. 89 (Freedman).

20. Beginning in early August 2005, and during the 45-day period immediately prior to the September 26, 2005, Record Date for the Shareholders' Meeting, Jeffrey Thompson-a friend and client of Defendant Wilmot and a partner with Defendant Cobb in the same accounting firm-purchased 98,600 shares of IFSB stock. Trial Exh. 42. Mr. Thompson filed a Schedule 13D in late September indicating that he owned 111,600 shares, which is 7.2% of IFSB stock. Id.

21. On the evening of October 25, 2005, Mr. Doley was contacted by Ms. Jordan, who then connected Mr. Wilmot to the call at approximately 11 p.m. Doley Dep. 158-59; Apr. 21, 2006, Hr'g Tr. 74 (Wilmot). The parties discussed the sale of the Doley Participants' shares, to persons suggested by Mr. Wilmot. [FN10] Doley Dep. 158-62; Apr. 21, 2006, Hr'g Tr. 74-77 (Wilmot) (Wilmot suggested Jeffrey Thompson, Bob Johnson, and a Mr. Liggen). Immediately upon hanging up the telephone, Mr. Wilmot called Mr. Thompson and left a message, talked directly to Mr. Liggen, and then talked to Mr. Thompson. Id. at 76-77.

22. The evidence shows that Mr. Thompson was willing to purchase the Doley Participants' stock, at $18 per share (well above market), conditioned upon Mr. Doley's voting all shares for the Management Nominees. Id. at 99; see Trial Exh. 70. However, a combination of the Doley Participants' stock and the stock Mr. Thompson already owned would exceed 10% of the Bank's outstanding shares; no such agreement could be reached without prior OTS approval. Apr. 21, 2006, Hr'g Tr. 101 (Wilmot); see 12 C.F.R. § 574.3(b). Apparently for this reason, Mr. Thompson directed his counsel, Daniel Weitzel, to prepare a purchase agreement for the Doley Participants' stock with Mr. Wilmot's name on it as the purchaser. Id.; see Trial Exh. 70. Mr. Weitzel

forwarded the purchase agreement to Marie Wood, Mr. Wilmot's assistant, by email to her home on the evening of October 25, 2005. Defs.' Supp. Facts ¶ 3. Ms. Wood then forwarded Mr. Weitzel's email and attached draft purchase agreement to Mr. Doley during the evening of October 25, 2005. *Id.* ¶ 5. When Mr. Wilmot talked to Mr. Thompson "shortly after talking to Mr. Doley" around 1 a.m. on October 26, 2005, Mr. Thompson explained his plan. Mr. Wilmot testified that he responded, "[Y]ou can't do that." Apr. 21, 2006, Hr'g Tr. 101 (Wilmot).

23. Mr. Doley traveled from New York on October 26 to attend the shareholders' meeting, which was scheduled to start at 11 a.m. He planned to vote all Doley Participant shares for Mr. Bender's nominees. Delany Dep. 43 ("Q. And did Doley tell you that was his intention? A. Yes.").[FN11] In part because Mr. Doley had not arrived on time, Royer Dep. 51-52, and in part because Mr. Bender had made two challenges to the vote-counting procedure which threw the Board into a tizzy, the start of the meeting was delayed to 3 p.m. by the unilateral action of Ms. Jordan. Apr. 21, 2006, Hr'g Tr. 8 (Jordan). [FN12] As soon as Mr. Doley arrived, he was whisked away by Ms. Jordan to lunch at the Prime Rib, a local restaurant, even though the Bank was buying lunch for all shareholders at the Mayflower Hotel because the meeting was delayed. *Id.* at 34-35. According to Ms. Jordan, she and Mr. Doley did not at any time discuss the Bank. *Id.* at 34-36. The Court declines to credit this testimony: Ms. Jordan was a singularly incredible witness and, at a minimum, she would have explained to Mr. Doley why the meeting was continued to 3 p.m., but her denials were absolute.

*8 24. Mr. Royer and then Mr. Wilmot joined Ms. Jordan and Mr. Doley at the Prime Rib. A discussion ensued concerning whether there was a buyer for the stock Mr. Doley controlled. Apr. 21, 2006, Hr'g Tr. 39 (Jordan) ("There was a discussion of, it was Mr. Doley I guess inquiring whether there would be anyone interested in buying his stock and that he was interested in selling."). Messrs. Wilmot and Doley discussed a purchase whereby either Mr. Wilmot or a group assembled by Mr. Wilmot would purchase the Doley Participants' shares. Delaney Dep. 39-40; Doley Dep. 184-85; Royer Dep. 76. The price per share under discussion was either $17.00, Thompson Dep. 110-11, or $18.00, Delany Dep. 39-40; Doley Dep. 184-85. A down payment of $1.00 per share was also discussed. Delany Dep. 50-51; *see also* Doley Dep. 185.[FN13]

25. An integral part of the sale agreement required Mr. Doley to vote the shares he controlled for the Management Nominees. Delany Dep. 39-40, 44; *see also* Trial Exhs. 70-77. Mr. Doley called Mr. Delany

and said that he was going to vote for the Management Nominees and that Mr. Delany should do so as well. Delany Dep. 43-44. Mr. Doley told Mr. Delany "that there were a bunch of people from the community saying if Bender takes over the Bank, they were going to withdraw their money." Delany Dep. 38; *see also id.* at 46, 133. Mr. Delany's initial response to Mr. Doley's calls was negative; he said, "no, I am voting for Bender because Bender knows how to make money." Delany Dep. 39. Ultimately, Mr. Doley called after he "met with a group of people"-at the Prime Rib-and told Mr. Delany "that [Mr.] Wilmo[ ]t is thinking about putting together a group that would buy-that would be willing to buy my stock for $18 ... but the condition of that was that the management had to retain control of the Bank. I asked Harold [Doley] whether that was real, whether he had the money, and Harold said, yes, he thought it was real and that he had the money." *Id.* at 39-40. Mr. Delaney responded that he "still thought that Bender knew how to make money, Wilmo[ ]t could not write a check." *Id.* at 41. In one call, Mr. Doley told Mr. Delany that he had been promised a deposit worth $1 per share. *Id.* at 50; *see* Doley Dep. 185. Based on these discussions, Mr. Delany agreed to vote his shares for the Management Nominees. Delany Dep. 46.

26. Proxies representing the Doley Participants' shares were faxed from Doley Securities in New Orleans to the Mayflower Hotel on October 26, 2005, between 12:47 and 12:55 p.m. (presumably Central Time). *See* Trial Exh. 56; Doley Dep. 47. They were then voted by Mr. Doley for the Management Nominees. *See* Trial Exh. 56.

27. At his deposition, Mr. Thompson produced an Adams National Bank cashier's check dated October 26, 2005, in the amount of $165,000, made payable to David Wilmot, and apparently endorsed by Mr. Wilmot. *See* Trial Exh. 78. The tale of this check is convoluted and need not be detailed here. Suffice it to say that, at the direction of Mr. Wilmot's assistant, this check was deposited into an escrow account at Mr. Wilmot's firm, and a cashier's check dated October 26, 2005, in the amount of $163,000 and made payable to Harold Doley, was issued by United Bank, where "David Wilmot & Associates" has two accounts. *See* Pls.' Exh. 115. It is unclear whether the check for $163,000 was ever delivered to Mr. Doley; eventually, on November 14, 2005, it was returned to United Bank and split between two law firm accounts. The Court finds, based on the evidence of record, that the check to Mr. Doley was designed to provide the $1 per share earnest money. It constitutes a clear and tangible piece of evidence that there was an agreement to sell the Doley Participants' shares on

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                                    Page 14
**(Cite as: --- F.Supp.2d ----)**

October 25, 2005.

**\*9** 28. The sale of the Doley Participants' stock never occurred. Delany Dep. 54-57. In fact, Messrs. Doley and Delaney consulted counsel in the weeks after the shareholders' meeting and were told "do not reach an agreement, do not reach a forward agreement, cease and desist from all negotiations, there will be no agreement, written or verbal." Doley Dep. 185. The legal problem was that any "[s]hort swing profit" would have had to have been disgorged to the Bank because the Doley Participants' stock had been held for less than six months. Delany Dep. 54-55.[FN14] Mr. Doley complained that he had "been boondoggled or snooked, whatever the word you use, by the people at-at Independence." Doley Dep. 6.[FN15]

### E. The Shareholders' Meeting

29. The Shareholders' Meeting was convened at 3 p.m. on October 26, 2005. During the course of the meeting, Mr. Bender made two formal proxy challenges. *See* Trial Exhs. 17, 18. Ms. Jordan promptly ruled the challenges "out of order," Apr. 21, 2006, Hr'g Tr. 43 (Jordan), and the Independent Inspector of Elections ("IIOE") "did not want to go against the wishes of the Chair." Dunlop Dep. 92. As a result the IIOE "did not rule on the challenges, and really did not consider the challenges." *Id.* at 114.

30. One of Mr. Bender's challenges was based on the fact that the master ballot (which represented proxies received by management) was submitted to the IIOE without allocating the votes among the candidates. Trial Exh. 17. Thus, after the Director Defendants received the report reflecting the proxies giving authority to management to vote, Trial Exh. 12, the Director Defendants were able to allocate their votes in such a way as to ensure the election of two of the Management Nominees.[FN16] This allocation took place on October 28, 2005, long after the polls closed on October 26, 2005. *Id.*

31. The second of Mr. Bender's challenges was based on the fact that votes by brokers who had not received instruction from the owner of shares held by the broker were counted in favor of Management Nominees, despite the clear instructions in the Bank's proxy materials to the contrary. Trial Exh. 18. Before the Shareholders' Meeting, the Bank had told its shareholders:

Q. What will happen if I abstain from voting or fail to vote?

A.... If you fail to vote for the election of directors, the votes of those supporting Bender's nominees will have a greater impact in helping Bender gain operating control of the Bank.

....

Q. If my broker or other nominee holds my shares for me, will my broker or such other nominee vote those shares for me?

A. Your broker or other nominee will vote your shares only if you provide instructions on how to vote to your broker or other nominee. You should instruct your broker or other nominee on how to vote your shares, using the procedures provided by your broker or other nominee. **Your broker will not vote your shares without your instructions.**

**\*10** Trial Exh. 2 at 11. Both of these answers were incorrect, Apr. 28, 2006, Hr'g Tr. 119 (Riley), and votes cast by brokers who were not instructed on how to vote were all counted for the Management Nominees, in an amount of approximately 396,000 shares. May 2, 2006, Hr'g Tr. 82 (Freedman).[FN17]

32. The non-instructed broker votes were counted for the Management Nominees pursuant to the "10-day rule" of the New York Stock Exchange. Apr. 28, 2006, Hr'g Tr. 102 (Riley) ("[T]he New York Stock Exchange has a rule that allows the brokers to vote the shares of people who have not responded to them [to give instructions on how to vote].... If they haven't responded in 10 days prior to the meeting and it's a routine matter, the broker has the right to vote those shares on that routine matter."). Only "smart investors" would know that the consequence of not instructing your broker is that the broker votes for management. *Id.* at 128. When a Board election is not "contested," it is considered a routine matter on which non-instructed brokers automatically vote for management.

33. Although Mr. Bender proposed two nominees to the IFSB Board who were running in opposition to the management candidates, the election at the October 2005 Shareholders' Meeting was not considered "contested" in the parlance of Wall Street. As explained by Mr. Riley, "A contested election is one in which there are two proxies, and two proxy committees and material is sent out to the stock holders ... from both sets of [committees]." Apr. 28, 2006, Hr'g Tr. 106 (Riley). When, as here, there are two nominated slates without competing proxies, it is not considered a "contested" election because "a contested election requires a mechanism to gather votes.... [T]he only way that the, the [S]treet and the industry [have] of conducting a contested election is to have two sets of proxies." *Id.* at 106-07. The situation facing Mr. Bender-in which OTS approved his proxy material and told him he could solicit votes but could not collect proxies-created a "Catch-22." *Id.* at 148. With "two slates in competition with each other ..., a contest exist[ed]" *in fact* but was not

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

recognized by ADP Proxy Services, the company that collected the votes, because only the Bank was allowed to solicit proxies. *Id.* at 146-47.

34. Mr. Riley opined that "[t]he practice of allocating votes [after the polls close] is available to both the management proxy committee, and to a competing proxy committee if one exists. This process insures that neither side in a contested election has an undue advantage after the votes have been cast." *Id.* at 161. The process "only works" when competing sides can allocate their votes at the same time. *Id.* In the October 2005 Board election, however, Mr. Bender was forced to allocate his votes while the polls remained open and the Defendant Directors allocated their votes two days later.

35. The Court finds that counting the broker "routine" votes for the Management Nominees was in direct contradiction to the Proxy Statement issued by the Bank. The Court also finds that the Bank's Proxy Statement was materially wrong: it said that a failure to instruct a broker on how to vote would (1) help Mr. Bender and (2) result in no vote being cast. In fact, a failure to instruct a broker on how to vote (1) resulted in a vote for the Management Nominees and (2) reduced the chances that any of Mr. Bender's candidates would be elected. Given the Bank's intense attention to broker votes,[FN18] the Court also finds that it is likely that the misstatement in the Bank's proxy materials was intentional.

## II. LEGAL STANDARDS

### A. Preliminary Injunction

**\*11** [1][2] In considering a request for preliminary injunctive relief, a court must examine whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Serono Labs, Inc. v. Shalala,* 158 F.3d 1313, 1317-18 (D.C.Cir.1998). "These factors interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360-61 (D.C.Cir.1999). A particularly strong showing on one or more factors can mitigate a weaker showing on another. *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995); *Wash. Metro. Area Transit Comm'n v. Holiday Tours,* 559 F.2d 841, 843-45 (D.C.Cir.1977). A preliminary injunction is "an

extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C.Cir.2004).

### B. Motion to Dismiss

In addition to opposing the Plaintiffs' application for preliminary injunctive relief, Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion challenges the adequacy of a complaint on its face, testing whether the plaintiffs have properly stated a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The plaintiffs need not plead the elements of a *prima facie* case in the complaint. *See Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C.Cir.2000). In deciding a Rule 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao,* 226 F.Supp.2d 191, 196 (D.D.C.2002) (citation omitted).

### III. DISCUSSION

### A. Count I: Section 13(d) of the Exchange Act

Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. *SEC v. Bilzerian,* 29 F.3d 689, 692 n. 3 (D.C.Cir.1994). In Count I, Mr. Bender alleges that the Director Defendants and Mr. Batties violated § 13(d) by acting as a group, together with Messrs. Thompson and Doley, to acquire, hold, vote, or dispose of more than 5% of IFSB's outstanding stock and that no Schedule 13D was ever filed. Mr. Bender seeks injunctive relief-but not damages-to remedy Defendants' alleged violations of § 13(d). Complaint ¶¶ 41-49; Pls.' Opp'n to Defs.' Mot. at 4.

### 1. Standing

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

**\*12** As a preliminary matter, Defendants move to dismiss on the ground that an implied private right of action for injunctive relief is available, if at all, only to an issuer of securities-not an individual shareholder. Defs.' Mot. at 3-4. The issue before the Court, then, is whether Congress intended to provide a private remedy to individual shareholders, in the form of injunctive relief, for violations of § 13(d) of the Exchange Act. This question has not been definitively answered in this circuit.

[3][4][5] The analytical starting point is *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), which "articulated four factors for the courts to weigh in discerning congressional intent to provide an implied private right of action." *Tax Analysts v. IRS*, 214 F.3d 179, 185 (D.C.Cir.2000). The four *Cort* factors, as they are now known, are:
(1) whether the plaintiff is one of the class for whose benefit the statute was enacted; (2) whether some indication exists of legislative intent, explicit or implicit, either to create or to deny a private remedy; (3) whether implying a private right of action is consistent with the underlying purposes of the legislative scheme; and (4) whether the cause of action is one traditionally relegated to state law, such that it would be inappropriate for the court to infer a cause of action based solely on federal law.

*Id.* at 185-86 (quoting *Cort*, 422 U.S. at 78, 95 S.Ct. 2080). The *Cort* factors are not necessarily entitled to equal weight, however, and the "central inquiry remains whether Congress intended to create, whether expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). "The question of the existence of a statutory cause of action is, of course, one of statutory construction." *Id.* at 568, 99 S.Ct. 2479. The appropriate starting place is therefore the text of the statute itself. *Id.* In divining legislative intent, courts also look to the design of the statute as a whole and, to the extent useful, legislative history. *See, e.g., Edelson v. Ch'ien*, 405 F.3d 620, 632-33 (7th Cir.2005).

[6][7] In this enterprise, the Court is not without guidance. The Courts of Appeals are in widespread agreement that § 13(d) creates an implied private right of action for injunctive relief brought by an *issuer* of securities. *See, e.g., GAF Corp. v. Milstein*, 453 F.2d 709, 719-20 (2d Cir.1971); *Dan River Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1224 (4th Cir.1980); *Indiana Nat'l Corp. v. Rich*, 712 F.2d 1180, 1185 (7th Cir.1983); *Fl. Comm. Banks v. Culverhouse*, 772 F.2d 1513 (11th Cir.1985); *Chevron Corp. v.*

*Pennzoil Co.*, 974 F.2d 1156, 1158 (9th Cir.1992). What is critical to recognize is that these decisions rest on the concept that the issuer's standing under § 13(d) is *representational*. Indeed, § 13(d) was not enacted for the benefit of the issuer; its "sole purpose was the protection of shareholders." *Indiana Nat'l*, 712 F.2d at 1185. It is "for this limited purpose, therefore, [that] the issuer corporation acts on the shareholders' behalf in bringing a suit for injunctive relief until an accurate Schedule 13D is filed." *Id.*

**\*13** The reasons for this are practical and widely recognized. One is that because Schedules 13D must be sent to the issuer and the SEC or OTS-but not to shareholders-shareholders normally do not have immediate access to the filings. *Indiana Nat'l*, 712 F.2d at 1184; *GAF Corp.*, 453 F.2d at 721. Another is that shareholders are "generally unaware of the necessary background information to judge the truth or falsity of statements" in a Schedule 13D. *GAF Corp.*, 453 F.2d at 721. In short, the cases recognize that shareholders often do not have the knowledge, expertise, or incentive to maintain an action under § 13(d) and, for that reason, allow an issuer to maintain an action on the shareholders' behalf. They do not, however, suggest that a shareholder who *does* have such knowledge and expertise cannot maintain an action on his own-rather, it is from this antecedent concept that the issuer's standing flows. Indeed, this much was assumed in the earliest cases, *see GAF*, 453 F.2d at 719 & n. 21, and is not called into question by the more recent ones, *see, e.g., Sea Containers*, 890 F.2d at 1208 (ruling on a § 13(d) claim by plaintiff, an issuer, and a § 13(d) counterclaim by defendant, a minority shareholder, without specifically addressing the standing issue). And this conclusion is consistent with the D.C. Circuit's recognition that § 13(d) "was designed, in part, to allow investors an opportunity to know of potential changes in corporate control and to evaluate the situation." *SEC v. Savoy Indusits. Inc.*, 587 F.2d 1149, 1165 (D.C.Cir.1978); *see also Sea Containers*, 890 F.2d at 1209; *Edelson*, 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting this legislation was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed.").[FN19]

In support of a contrary conclusion, Defendants cite district court cases holding that shareholders cannot mount a private right of action for *damages* under § 13(d). Defs.' Mot. at 3-4 (citing, *inter alia, Berman v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

_Metzger,_ No. 80-0394, 1981 WL 1596, at *1, 1981 U.S. Dist. LEXIS 10866, at *2 (D.D.C. Feb. 9, 1981)). The considerations governing the right to injunctive relief, however, are quite different, _see, e.g., Hallwood Realty Partners v. Gotham Partners,_ 286 F.3d 613, 620-21 (2d Cir.2002) (concluding that injunctive relief, but not damages, furthers congressional intent) and the damages cases do not control the outcome here.

[8][9] Contrary to Defendants' protestations, the Court makes no new law here; it merely recognizes what has always been assumed: Because the foundation for the issuer's standing is its action on behalf of shareholders, a shareholder _a fortiori_ has standing to seek injunctive relief. Even were this not the case, it would be appropriate to recognize a shareholder's standing here. In a battle for corporate control, it has long been understood that § 13(d) was not meant to be a weapon wielded only by issuers attempting to fend off takeover bids. _Rondeau,_ 422 U.S. at 58, 95 S.Ct. 2069. In fact, not two years ago, the Bank, presumably at Defendants' direction, sought injunctive relief against Plaintiffs under § 13(d). _Indep. Fed. Sav. Bank v. Bender,_ 332 F.Supp.2d 203 (D.D.C.2004).[FN20] "[W]here a legal structure of private statutory rights has developed without clear indications of congressional intent, the contours of that structure need not be frozen absolutely when the result would be demonstrably inequitable to a class of would-be plaintiffs with claims comparable to those previously recognized." _Va. Bankshares v. Sandberg,_ 501 U.S. 1083, 1104, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). To place the parties on the "same footing," it is appropriate to consider "policy reasons for deciding where the outer limits of the right should lie." _Id._ at 1104-05, 111 S.Ct. 2749. Here, both congressional intent and fundamental fairness demand that if an issuer can advance a private right of action to defend shareholder rights, shareholders must have a private right of action against hidden machinations by that issuer's directors. Preserving the availability of injunctive relief under § 13(d) to shareholders as well as issuers "avoid[s] tipping the balance" that Congress sought to achieve. _Rondeau,_ 422 U.S. at 58, 95 S.Ct. 2069; _see Hallwood,_ 286 F.3d at 621.

*14 Because a private right of action is "consistent with the legislative scheme and necessary for the protection of investors," _Rondeau,_ 422 U.S. at 62, 95 S.Ct. 2069, the Court will deny Defendants' motion to dismiss as to this claim.

## 2. Likelihood of Success on the Merits

[10] As noted above, § 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D,[FN21] the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. _Bilzerian,_ 29 F.3d at 692 n. 3. In addition, an amendment must be submitted "promptly" any time there is a "material change" in the facts set forth in the Schedule 13D. 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). The SEC has promulgated regulations reiterating and elaborating on these statutory requirements. These regulations define a "material change" to mean "[a]n acquisition or disposition of beneficial ownership of securities in an amount equal to one percent or more of the class of securities." 17 C.F.R. § 240.13d-2(a). A "beneficial owner" includes, in turn, "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares ... [v]oting power which includes the power to vote, or to direct the voting of, such security." 17 C.F.R. § 240.13d-3(a). Finally, the regulations provide:

when two or more persons agree to act together for the purpose of acquiring, holding, _voting_ or disposing of equity securities of an issuer, _the group formed thereby shall be deemed to have acquired beneficial ownership,_ for purposes of Section 13(d) and (g) of the [Exchange] Act, _as of the date of such agreement,_ of all equity securities of that issuer beneficially owned by any such person.

17 C.F.R. § 240.13d-5(b)(1) (emphasis added). "The agreement may be formal or informal and may be proved by direct or circumstantial evidence." _Morales v. Quintel Entm't Inc.,_ 249 F.3d 115, 124 (2d Cir.2001). Such a group "need only have combined to further a common objective regarding one of the [listed] ... activities." _Id.; see also Gen. Aircraft,_ 556 F.2d at 95.

The Court concludes that there is a substantial likelihood that Mr. Bender will succeed on the merits of demonstrating that the Director Defendants, through their chairman and vice chairman, acted as a group with Mr. Thompson to acquire the Doley Participants' shares-and voting power-to solidify their control of the IFSB Board. The record facts strongly suggest that, on the eve and day of the Shareholders' Meeting, Ms. Jordan and Mr. Wilmot facilitated Mr. Thompson's purchase of the Doley Participants' shares, on the express condition that Mr. Doley would vote those shares for the Management

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                                    Page 18
**(Cite as: --- F.Supp.2d ----)**

Nominees.

On the evening of October 25, 2005, Ms. Jordan and Mr. Wilmot spoke with Mr. Doley regarding the sale of the Doley Participants' shares. Mr. Wilmot recommended Mr. Thompson, among others, as a buyer. On the condition that the shares be voted for the Management Nominees, Mr. Thompson agreed to buy them, and in an effort to avoid OTS oversight, proposed a sale using Mr. Wilmot as an intermediary; however, the draft purchase agreement, though circulated by Mr. Thompson's counsel to both Mr. Wilmot's assistant and Mr. Doley, was never signed. At the end of the night, the shares remained in the Doley Participants' hands, and Mr. Doley apparently intended to vote them for the Bender nominees at the Shareholders' Meeting.

**\*15** The Shareholders' Meeting on the next day was delayed, at least in part, because Mr. Doley was running late. When he arrived, he was whisked away by Ms. Jordan to the Prime Rib, where the two were joined by Messrs. Royer and Wilmot. Negotiations ensued regarding the purchase of the Doley Participants' shares by Mr. Wilmot or a group-again, provided that Mr. Doley would vote those shares for the Management Nominees. A sale price of $17-18 per share, with an earnest money deposit of $1 per share, was discussed. *Mirabile dictu,* Mr. Doley did, in fact, vote the Doley Participants' shares for the Management Nominees.

[11] On these facts, the Court readily concludes that Ms. Jordan and Mr. Wilmot, acting on behalf of the Director Defendants, agreed to act together with Mr. Thompson for the purpose of acquiring, holding, and-at a bare minimum-voting the Doley Participants' shares held by Mr. Doley. This group is thus deemed to have acquired beneficial ownership for purposes of Section 13(d) as of the date of such agreement, *see* 17 C.F.R. § 240.13d-5, which the Court finds to be no later than midday on October 26, 2005. That the actual sale of the Doley Participants' shares may never have been consummated is of no consequence here; the group, as described above, beneficially owned those shares because, as a condition of the agreement, it acquired voting power over them. *See* 17 C.F.R. § 240.13d-3(a). By acquiring voting power over the Doley Participants' shares, which constituted nearly 10% of the Bank's outstanding shares, the group exceeded the 5% threshold set forth in § 13(d), and was required to file a Schedule 13D within 10 days, which it indisputably failed to do.[FN23]

Despite the efforts of all IFSB witnesses to obscure and obfuscate, enough light has been shone into dark corners to find it substantially likely that Mr. Bender will demonstrate that the Director Defendants, acting through Ms. Jordan and Mr. Wilmot, violated § 13(d) of the Exchange Act.

**B. Count II: Section 14(a) of the Exchange Act**

**1. Standing**

In Count II, Plaintiffs seek damages and injunctive relief for Defendants' alleged violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), which governs the solicitation of proxies. Compl. ¶¶ 50-87; Pls.' Opp'n to Defs.' Mot. at 8.

[12] "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines Holdings Inc. v. Mesa Air Group,* 295 F.Supp.2d 75, 81-82 (D.D.C.2003) (omission in original). Defendants argue that Plaintiffs must allege shareholder reliance to prove that the proxy solicitation was an essential link. Defs.' Mot. at 6. Specifically, although they concede that a plaintiff bringing a direct claim under § 14(a) does not have to allege that he *personally* relied on a misrepresentation, *see Cowin v. Bresler,* 741 F.2d 410, 427 (D.C.Cir.1984), they contend that a nonrelying plaintiff must allege reliance by *other* shareholders. Defs.' Mot. at 6. A close reading of *Cowin,* however, reveals no such limitation.

**\*16** Mr. Cowin, a minority shareholder in Bresler & Reiner, a property management company, sued that company and its directors for various violations of the securities laws, including § 14(a). As a remedy for the defendants' violations of the proxy rules, Mr. Cowin sought to set aside the elections of the defendant directors. *Cowin,* 741 F.2d at 425. The *Cowin* court reversed the district court's determination that a nonrelying plaintiff lacked standing to assert a direct, as opposed to a derivative, equitable action under § 14(a). *Id.* at 426. In so doing, it characterized Mr. Cowin's claim as follows: The injury Cowin alleges was not caused by his individual reliance on deceptive proxy solicitations. Rather, his claim is that other shareholders elected [the defendant] directors because they were misled by the proxy materials.... This injury is totally divorced

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

from any reliance, or lack of reliance, on Cowin's part and falls precisely into the scope of injury that Congress sought to protect.

*Id.* at 427. It is presumably from this language that Defendants derive the limitation they propose; that is, that while *Cowin* frees plaintiffs from the burden of alleging their own reliance, it imposes the requirement that plaintiffs allege the reliance of *other* shareholders. This proposition is nowhere directly stated in *Cowin* and it is, in fact, substantially undercut by other portions of the same opinion. The *Cowin* court straightforwardly said, "Regarding section 14(a), however, we find no language in the relevant statutory materials that leads us to conclude that reliance is a prerequisite to standing under that section." *Id.* at 426. To the same effect, "It cannot be said then that the language of the statute and the regulation constrains us to find reliance a necessary predicate to standing under section 14(a)." *Id.* at 427. This Court can imagine no clearer language by which the *Cowin* court could have indicated that reliance, whether on the part of plaintiff or other shareholders, is simply not required.

Faced with a situation in which the "neither the congressional enactment nor the administrative regulations offer[ed] conclusive guidance," the *Cowin* court proceeded to "take into account [the] various policy considerations" that animate § 14(a). *Id.* at 427 n. 22. One purpose the court identified was "to protect investors from 'promiscuous' proxy solicitations by 'unscrupulous corporate officials seeking to retain control of the management by concealing and distorting facts.'" *Id.* at 427 (quoting S.Rep. No. 73-1455, at 77 (1934)). The court concluded: "Because the controlling statutory materials are silent on the question and because we believe a contrary rule would partially frustrate congressional policy, we find that Cowin has standing to pursue his section 14(a) claims." *Id.* at 428. Recognizing the same policy considerations, this Court finds that requiring Plaintiffs to allege reliance by other shareholders "in these circumstances would serve no legitimate policy and ... decline[s] to do so." *Id.* at 427.

*17 [13][14] The fundamental flaw in Defendants' argument is that the touchstone of the analysis is not reliance, but materiality. As the Supreme Court has explained,

Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

*Mills v. Elec. Auto-Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). And, as the Ninth Circuit has cogently explained, "As materiality is an objective standard, it should not matter whether any particular shareholder was actually misled by the challenged misrepresentations." *Stahl v. Gibraltar Fin. Corp.,* 967 F.2d 335, 337 (9th Cir.1992).[FN24] Thus, based on *Cowin, Mills, and Stahl,* the Court concludes that Plaintiffs need not allege other-shareholder reliance to maintain a § 14(a) claim. Defendants' motion to dismiss will therefore be denied as to this claim.

### 2. Likelihood of Success on the Merits

[15][16] Section 14(a) of the Exchange Act "makes it unlawful to solicit proxies 'in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Cowin,* 741 F.2d at 426 (quoting 15 U.S.C. § 78n(a)). Rule 14a-9, promulgated pursuant to this authority, expressly prohibits false or misleading proxy solicitations:

No solicitation subject to this regulation shall be made by means of any proxy statement ... which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

*Id.* at 426-27 (quoting 17 C.F.R. § 240.14a-9). "To prevail on a Section 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation ... was an essential link in the accomplishment of the transaction." *Atl. Coast Airlines,* 295 F.Supp.2d at 81-82 (D.D.C.2003) (omission in original). The term

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

"solicitation" includes, *inter alia,* any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l*)(1)(iii). A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus. Inc. v. Northway Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The issue of materiality is a mixed question of law and fact that "involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder." *Berg v. First Am. Bankshares,* 796 F.2d 489, 495 (D.C.Cir.1986).

*18 Mr. Bender's allegations in Count II stem from three different communications: (1) the May 4, 2005, Committee Letter; (2) a letter from Ms. Jordan and Mr. Batties titled "Update to Our Shareholders" and related proxy materials circulated by management on October 4, 2005 (the "Management Proxy"); and (3) a letter sent to shareholders on October 21, 2005, purportedly by shareholders Catherine McPhail and A. Gilbert Douglas (the "McPhail/Douglas Letter").

### a. The communications qualify as solicitations

[17][18] As an initial matter, each of the communications referenced above qualifies as a "solicitation" for purposes of Rule 14a-9. The record clarifies that the May 4 Committee Letter was part of a "grass roots" strategy concocted by Mr. Chambers, a bank employee, and Judy Smith, of Impact Strategies, intended to persuade its recipients, including a list of small shareholders, to "not sell[ ] to [B]ender or his allies," Pls.' Exh. 106, in the days before the Shareholders' Meeting then set for May 11, 2005. The letter specifically advocated a "yes" vote for "the Board Slate." Trial Exh. 1 at 1. Engineered by the Bank and sent just days before a contested election, the Committee Letter constitutes a "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a-1(*l* )(1)(iii). There is no question that the Management Proxy, to which the

Update Letter was attached, constitutes a proxy solicitation. And as to the October 21 McPhail/Douglas Letter, Mr. Chambers and Impact Strategies again played a substantial role, reviewing and editing drafts and providing inside information known only to the Bank. That letter, while not explicitly urging a vote in favor of the Management Nominees, generally questioned Mr. Bender's past performance and present motives, alleged various regulatory violations by Mr. Bender, lauded the "imagination and courage" of the incumbent directors, and pressed shareholders to "DO THE RIGHT THING!!" Trial Exh. 3 at 1-2. As such, it also qualifies as a solicitation under 17 C.F.R. § 240.14a-1(*l* )(1)(iii).

### b. The communications contained false and misleading statements and omissions

[19] The three protested communications contained multiple false and misleading statements. In the interests of speed, if not comprehensiveness, the Court will not here catalog the entirety of the false information and misinformation promulgated by the Defendant Directors and Mr. Batties in anticipation of the Shareholders' Meeting that finally took place on October 26, 2005, though much more ink could be spilled on this topic.

The deception in the Committee Letter began with the first sentence, which claimed that the Committee itself was an "independent group of concerned local citizens, shareholders, and loyal customer[s]" when, of course, the Committee was a phantom part of a Bank-led PR drive. Trial Exh. 1. The "Timeline" portion of the letter, purportedly "compiled from public records, news, concerned shareholders[,] and depositors," implied that OTS regulation of the Bank was entirely one-sided in Mr. Bender's favor; stated that the Board members sympathetic to Mr. Bender were "cronies [that] will ... do his bidding"; and emphasized that Mr. Bender's nominees, though both African-American, were "mere puppets of Bender's with no apparent ties to banking, required to do what he tells them." *Id.* Each of these statements was false. The full record of years of litigation demonstrates that OTS supervision, though not always prompt, has been evenhanded, and that the Board members sympathetic to Mr. Bender have been neither puppets nor cronies, but directors exercising independent judgment, as evidenced by their vote, to Mr. Bender's chagrin, in favor of the Carver merger.

*19 A consistent theme of the Management Proxy

was that Mr. Bender has repeatedly hauled the Bank into court, each time hurling baseless accusations against the directors and draining the Bank's coffers. Specifically, it states that Mr. Bender "institut[ed] a lawsuit seeking to impose personal liability on those Directors, in each case, in the view of the Majority Directors, without citing any reasonable factual basis." Trial Exh. 2 at 3. The Court is left unsure to which litigation this statement refers. By its count, the instant case is the fifth between Mr. Bender and the Bank.[FN25] Of the four previous suits, three were brought by Mr. Bender, but none was taken in bad faith or lacked a reasonable factual basis. In fact, two were voluntarily dismissed by Mr. Bender after he received the precise relief he sought. Moreover, that the Bank couched its statement in the words of an opinion-"in the view of the Majority Directors"-does not cure its infirmity. See *Va. Bankshares*, 501 U.S. at 1093, 111 S.Ct. 2749 ("[E]xpressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements ...."); *see also id.* at 1094, 111 S.Ct. 2749 (quoting *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir.1918) (L. Hand, J.) ("An opinion is a fact.")).

Sticking with this theme, the Management Proxy blamed Mr. Bender for every difficulty the Bank has faced in the last several years, without noting or taking any responsibility at the Board or Officer level for decisions that have proved costly and detrimental to the Bank and its reputation. For instance, the Update Letter attributes the Bank's extraordinary legal expenses in 2003 to Mr. Bender when, in fact, the Bank was the plaintiff against Mr. Bender and could have avoided that litigation, *Indep. Fed. Sav. Bank v. Bender*, No. 04-736 (D.D.C.2004), and its expenses were magnified by three lawsuits in connection with the Washington Teachers' Union scandal, which was the huge misstep that precipitated the Bank's slide in the first place. In fact, one of the Washington Teachers' Union suits, brought in early 2003, is alive and well today, and surely continues to deplete the Bank's resources. *Am. Fed'n of Teachers v. Bullock*, No. 03-79 (D.D.C.2006). The proxy statement omitted all mention of this litigation expense.

The Management Proxy also asserted that "Management has advised the OTS that [the Committee] was not associated with the Bank or its management." Trial Exh. 2 at 5. That statement, although superficially true (the Bank did so advise OTS), was nonetheless misleading in communicating that the Committee was unassociated with the Bank, when it was, in fact, a creature of the Bank's own

creation. *See Va. Bankshares*, 501 U.S. at 1092, 111 S.Ct. 2749 ("Such statements are factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reason or belief expressed."). Perhaps the Management Proxy's most critical misstatement, though, was its instruction that shares held by brokers would not be voted unless the shareholder instructed otherwise. However, all such votes were cast for the management slate. This instruction was plainly false, as the Bank was well aware preceding the vote.[FN26] Indeed, this much was recognized by the Bank's own expert witness, who testified that the instructions in the Management Proxy were "mistaken" or "not right." Apr. 28, 2006, Hr'g Tr. 119:22-24 (Riley).

*20 The McPhail/Douglas letter suffers from many of the same defects as the earlier communications. It again suggested that OTS favors Mr. Bender, asking at one point "why OTS has behaved so contrary to banking laws, security regulations[,] and sound public banking policy to facilitate handing **Our Bank** to this Bender character?" Trial Exh. 3 at 1. Its assertion that "[t]he only time we are aware we got into U.S. District Court with Bender-though expensive-Independence Won, Bender Lost!" was plainly misleading, as explained above, in that it omits reference to three other actions between the parties, two of which Mr. Bender voluntarily dismissed after receiving favorable relief, and one of which settled after a ruling unfavorable to the Bank. *See supra* n. 25. In view of the editorial control over this letter exerted by Mr. Chambers, and Mr. Batties' supervisory control over Mr. Chambers, insertion of the hedging phrase "we are aware" does not alter this conclusion.

Under Rule 14a-9, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation" may be misleading. 17 C.F.R. § 240.14a-9 n.(b); *see United States v. Matthews*, 787 F.2d 38, 46 (2d Cir.1986). The communications reviewed above were thinly veiled efforts to question Mr. Bender's character and bona fides as a friend of the African-American community. The Committee Letter stated outright that Mr. Bender has "no regard for the African American community" and seeks control of the bank to satisfy his "personal greed." It touted the Bank's role in "helping the African-American community prosper and grow, as well as bridge gaps among all races," yet suggested that Mr. Bender is simply trying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

to "line [his] own pockets" at the expense of that history. It accused him of "bully tactics" and argued that he will "destroy the independent, minority character of IFSB." And it alleged that his nominees, though African-American, were but puppets, and that Mr. Bender was the puppeteer. The McPhail/Douglas letter contained similar overtones, accusing Mr. Bender of pushing another "black bank ... to failure."

The intent behind these letters is not seriously in question: In Mr. Chambers's own words, "Bender's putative nominees have been painted ... as innocent puppets at best, racial traitors at worst." Pls.' Exh. 104. The Court does not challenge the Bank's ability to question, as part of its solicitations, whether Mr. Bender-who has always been frank about his intentions to gain control of the Bank-has the best interests of the African-American community at heart. But while it is clear that Mr. Bender and the majority of the Bank's Directors have different ambitions for the Bank, changing its identity as a minority institution is not among them; in fact, the evidence shows that Mr. Bender considers the Bank's minority character advantageous. May 4, 2006, Tr. 94-96 (Bender). And the Court also finds that the Committee Letter's questioning of the Bender Nominees' racial loyalty-"Even though those men are both African Americans[,] they are mere puppets of Bender's with no apparent ties to banking, required to do what he tells them"-was a direct assault on their character with no factual basis. See 17 C.F.R. § 240.14a-9 n.(b).

### c. The false and misleading statements were material

*21 [20] Third, there is little question but that these false and misleading statements were material, that is, that there is a substantial likelihood that a reasonable shareholder would have considered them important in deciding how to vote. TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126. In view of the Bank's attempt to use Mr. Bender as a scapegoat for its myriad financial woes, a reasonable investor would have lent importance to the facts that management decisions and unrelated lawsuits are to blame for much of the Bank's litigation expenses; that Mr. Bender has not abused the judicial process or brought baseless suits against the Bank or its Directors; and that the Bank's charges of OTS favoritism are greatly exaggerated. Even more critically, however, a reasonable shareholder would have attached significance to the fact that the Committee to Save IFSB was in no sense "independent" as claimed by its materials, any more

so than the McPhail/Douglas letter was an independent creation of its purported authors. In battles for political control, by way of comparison, the voting public often considers who sponsors a particular advertisement in determining the weight to accord it. The same principle holds true in a battle for corporate control. The shareholders would surely find it important that Bank staff had editorial control over the Committee Letter and the McPhail/Douglas Letter, and that the statements therein might best be evaluated with skepticism. Finally, a voter whose shares are held by his broker, but who is informed that those shares would not be voted unless he instructed his broker to do so, would want to know that the opposite was, in fact, the case.

### d. The material falsehoods caused injury for purposes of § 14(a)

[21][22] "Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." Mills, 396 U.S. at 385, 90 S.Ct. 616. In Mills, although a majority stockholder controlled just over half of the outstanding shares, a two-thirds majority was required to approve the merger at issue. See Va. Bankshares, 501 U.S. at 1099, 111 S.Ct. 2749. The Court found that the plaintiffs established the requisite "essential link" by "showing that proxies necessary to approval of the merger were obtained by means of a materially misleading solicitation." Mills, 396 U.S. at 386, 90 S.Ct. 616. The Court expressly reserved the question "whether causation could be shown where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." Id. at 385 n. 7, 90 S.Ct. 616.

Two decades later, in Virginia Bankshares, the Court addressed the question left open in Mills. In that case, the majority shareholder, who held 85% of the bank's shares, favored a merger; the remaining 15% of the shares were scattered among 2,000 minority shareholders. Va. Bankshares, 501 U.S. at 1088, 111 S.Ct. 2749. In advance of the shareholders' meeting, at which the merger proposal was to be submitted to a vote, the directors issued a proxy statement to the minority shareholders asserting that the price offered was "high" and "fair," which the Court found materially misleading. Id. The Court nonetheless

denied relief, holding that the plaintiffs had failed to proffer a theory of causation under which the solicitation was "essential" in the sense required by *Mills,* namely, where "the solicitation links a directors' proposal with the votes legally required to authorize the action proposed." *Id.* at 1102, 111 S.Ct. 2749; *see also id.* at 1100, 111 S.Ct. 2749 (describing *Mills* as holding that "causation of damages by a material proxy misstatement could be established by showing that minority proxies necessary and sufficient to authorize the corporate acts had been given in accordance with the tenor of the solicitation"). In the context of merger proposals, *Virginia Bankshares* has been interpreted as holding that "the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision," though that "does not necessarily mean a causal link between the proxy and some other injury may not exist." *Wilson v. Great Am. Indus.,* 979 F.2d 924, 931 (2d Cir.1992); *see also Boone v. Carlsbad Bancorp. Inc.,* 972 F.2d 1545, 1557 (10th Cir.1992) ( "The Court [in *Virginia Bankshares]* generally rejected theories of causation presented by shareholders whose participation was not needed for corporate action....").

**\*22** Here, it is evident that management did not have enough votes to ensure the election of their slate of directors; hence, the solicitations were a critical part of their strategy to convince non-management shareholders to vote in favor of the Management Nominees. The Defendant Directors were plainly worried that their control of the Board was in jeopardy, as made apparent by their desperation to woo minority shareholders just days before the election. The Committee Letter was one facet of a multi-pronged grass-roots campaign that also involved media coverage and lobbying efforts. Pls.' Exh. 106. As the May 2005 meeting approached, a list of smaller shareholders was compiled, *id.,* and pressure mounted to send out the Committee mailings "immediately." Pls.' Exh. 105. By May 5, the "bigger shareholders ha[d] been contacted" with uncertain effect. Pls.' Exh. 104. And as of October 21, just days before the rescheduled Shareholders' Meeting, Ms. Finlayson fretted that, "In terms of the voting tallies, the numbers are very discouraging." Pls.' Exh. 102.

For the purposes of preliminary injunctive relief, Mr. Bender has sufficiently demonstrated the likelihood of a causal connection between the above-described solicitations and the election of the Management Nominees because the votes of minority shareholders were necessary to elect the management slate, and the solicitations were an essential link in securing those

votes. *See Va. Bankshares,* 501 U.S. at 1102, 111 S.Ct. 2749.

## C. Count III: Corporate Bylaws and Robert's Rules of Order

In Count III, Plaintiffs seek injunctive relief for Defendants' alleged violations of the Bank's bylaws and Robert's Rules of Order in connection with their conduct of the October 2005 Shareholders' Meeting.

### 1. "Standing"[FN27]

[23] Defendants move to dismiss on the ground that claims based on a violation of corporate bylaws or Robert's Rules of Order must be brought derivatively, not directly. Defs.' Mot. at 9. Although Defendants concede that there is no case law directly on point, they would characterize such claims as complaints of "improper management" that, under *Cowin,* 741 F.2d at 414, belong to the corporation and not its minority stockholders. Defs.' Mot. at 9. They further argue that Plaintiffs have alleged no individual injury, unique to themselves, that differentiates them from any other shareholder.

[24] As Defendants recognize, however, a plaintiff can still bring a direct action-even when there is harm done to the corporation generally-if he alleges a "special injury" unique from that suffered by the corporation. *Labovitz v. Wash. Times Corp.,* 172 F.3d 897, 901 (D.C.Cir.1999); *Cowin,* 741 F.2d at 415. Such "special injury" can arise in two contexts: "first, where the allegedly wrongful conduct violates a duty to the complaining shareholder independent of the fiduciary duties owed that party along with all other shareholders, such as a duty that arises out of an employment relationship, or second, where the conduct causes an injury to the shareholders distinct from any injury to the corporation itself, such as losses resulting from a company wrongfully withholding dividends." *Labovitz,* 172 F.3d at 901; *see also Cowin,* 741 F.2d at 415.

**\*23** Plaintiffs' allegations here describe a special injury that falls within this second category of harms. Though Defendants correctly observe that Plaintiffs allege that "Defendants have deprived Plaintiffs *and the other shareholders* of a fair vote for the election of directors," Compl. ¶ 69 (emphasis added), suggesting that Plaintiffs were harmed only to the same extent as all other shareholders, see Defs.' Mot. at 9-10, this is a selective reading of the Complaint.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                                          Page 24
**(Cite as: --- F.Supp.2d ----)**

The gravamen of Plaintiffs' Complaint is that Defendants conspired, in violation of the Exchange Act and their bylaws, to rig the election by secretly solidifying their voting power, spreading misinformation to outside shareholders, and tallying the votes improperly-all in an effort to prevent one particular shareholder, Mr. Bender, from participating in matters of corporate governance. The Complaint is explicit on this point, alleging that Defendants' violations caused a material number of shares to be counted for the Management Nominees, and against the Bender Nominees, depriving Plaintiff of a fair and orderly voting process. Compl. ¶ ¶ 67-68. Although, in a sense, all shareholders would certainly benefit from a fair and orderly voting process, it remains that, according to their allegations, Mr. Bender was specifically targeted and disenfranchised by Defendants. This constitutes a special injury peculiar to Plaintiffs.[FN28]

*Cowin's* discussion of _Condec Corp. v. Lunkenheimer Co., 230 A.2d 769 (Del.Ch.1967)_, confirms this conclusion. _Cowin, 741 F.2d at 416_. In that case, Condec "made a tender offer and received tenders for a controlling percentage of Lunkenheimer's stock. Condec's control over Lunkenheimer was frustrated, however, when Lunkenheimer's management contracted to sell its business to U.S. Industries and, in the context of that agreement, issued 75,000 additional shares of [authorized, but unissued] Lunkenheimer stock." _Id_. The issuance of these additional shares diluted Condec's holdings, depriving it of a majority. See _Condec, 230 A.2d at 772_. Viewing Lunkenheimer's actions in the context of a battle for corporate control, the Delaware Chancery Court found that the "the primary purpose of the issuance of such shares was to prevent control of Lunkenheimer from passing to Condec," _id. at 775_, "and allowed Condec to sue, on its own behalf, for cancellation of those 75,000 shares," _Cowin, 741 F.2d at 416_.

The _Cowin_ court found the factual scenario in _Condec_ "representative of th[e] second category" of special injury. _Id._ In doing so, it reiterated _Condec's_ distinction between claims necessarily derivative-like stockholder challenges to management decisionmaking, such as the decision to spend corporate funds in a stock repurchase-and those that may be brought directly. _Id._ Quoting _Condec_, the _Cowin_ court agreed that "a personal action was proper because _Condec_ was 'a stockholder with a *contractual right* to voting control being deprived of such control.' " _Id._ (quoting _Condec, 230 A.2d at 777_). In the present context, however, the _Condec_

court's statement bears repeating in full: "This rather is a case of a stockholder with a contractual right to assert voting control being deprived of such control by what is virtually a corporate legerdemain. Manipulation of this type is not permissible." _Condec, 230 A.2d at 777_.

*24 While Plaintiffs here are not majority shareholders with a contractual right to voting control, the principle is the same. According to Plaintiffs' allegations, Defendants disregarded their bylaws and Robert's Rules to deprive Plaintiffs of their "right to a proportionate voice and influence in corporate affairs." _Id._ Such a sleight of hand, directed at a particular shareholder and intended to disenfranchise him, suffices as special injury. See _Cowin, 741 F.2d at 416_. Count III may therefore proceed directly.

### 2. Likelihood of Success on the Merits

Article II, Section 13 of the Bank's Amended and Restated Bylaws ("Bylaws") empowers the Board to appoint, in advance of a shareholders' meeting, an independent inspector of election ("IIOE") whose duties "shall include," *inter alia,* "determining ... the authenticity, validity, and effect of proxies; ... hearing and determining all challenges and questions in any way arising in connection with the rights to vote; counting and tabulating all votes or consents; determining the result; and such acts as may be proper to conduct the election or vote with fairness to all shareholders." In the course of the October 26 Shareholders' Meeting, Mr. Bender submitted two formal proxy challenges to the IIOE, Creighton Dunlop, one of which challenged the method in which management would allocate its cumulative votes, and the second of which challenged the voting of broker-held shares in favor of the Management Nominees, contrary to the explicit provisions of the Management Proxy. Ms. Jordan ruled both challenges out of order and the IIOE, not wishing to go against the wishes of the Chair, never passed on the merits of those challenges.[FN29] Ultimately, management allocated its votes at a Special Meeting two days after the Shareholders' Meeting, counting broker-held votes in favor of its nominees, and only then considered the polls closed and announced the results of the election. In Count III, Mr. Bender alleges that his proxy challenges were proper and meritorious, and that the Bank's improper conduct of the election violated its Bylaws and Robert's Rules.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

### a. Allocation of Cumulative Votes

[25] Article II, Section 12 of the Bank's Bylaws gives shareholders the right to cumulate their votes in an election for directors, but does not address the procedure for allocating such votes.[FN30] Article II, Section 4 of the Bylaws provides, however, that "[a]nnual and special meetings shall be conducted in accordance with ... Robert's Rules of Order unless otherwise prescribed by regulations of the OTS or these bylaws or the board of directors adopts another written procedure for the conduct of meetings." At the October 26 Shareholders' Meeting, Ms. Jordan, in her role as Chair, reiterated that Robert's Rules would govern. Trial Exh. 20 at 2. Robert's Rules, however, much like the Bylaws, speak only in general terms about cumulative voting procedures. Robert's Rules § 46, at 431 ll. 16-29 (10th ed.).

**\*25** Mr. Bender directs the Court to a provision in § 45 of Robert's Rules indicating that, in the context of a vote by ballot, once all who wish to vote have done so, the polls can be closed either on motion of a member or by declaration of the chair. Id. § 45, at 401 ll. 11-18. "Thereafter, if other members arrive who wish to vote, a majority is required to reopen the polls." Id. at 401 ll. 18-19; see also id. at 400 ll. 25-29 ("Should [the presiding officer] fail to vote before the polls are closed, he cannot do so without the permission of the assembly."). Ms. Jordan did, in fact, officially declare the polls closed at the completion of the voting at the October 26 meeting. Trial Exh. 20 at 7. Accordingly, Mr. Bender suggests that § 45 required that the master ballot (representing proxies received by management) be cast, and its votes allocated, before the polls were closed and the meeting adjourned.

Defendants argue that their method was permissible because the master ballot was *cast* before the Shareholders' Meeting was adjourned, even though those votes were not *allocated* until the Special Meeting two days later. They submit that allocation of cumulative votes was not possible at the Shareholders' Meeting because the IIOE had not yet tabulated the proxies received, and management did not know how many votes could be cast for their nominees. Defendants further note that, under § 45 of Robert's Rules, a voter "has the right to change his vote up to the time the result is announced," id. § 45, at 395 ll. 9-10, and suggest that, because the results of the election were not announced until the October 28 Special Meeting, the delayed allocation was not improper. Finally, they argue that determinations about the propriety of the vote, including its

allocation, are committed to the IIOE, who they contend discharged his duties in a manner consistent with custom and common practice.

While the Bylaws and Robert's Rules are not a model of clarity on this issue, the Court concludes that Mr. Bender has the better part of the argument. First, Defendants' reliance on § 45 for authority to change their votes until the result is announced is misplaced. The relevant provision bears repeating in full: "A member has a right to change his vote up to the time the result is announced; after that, he can make the change only by the unanimous consent of the assembly granted without debate." Robert's Rules § 45, at 395 ll. 9-12. That language contemplates the result being announced at the same meeting, giving each voting member an equal opportunity to change his vote should he so desire; if this provision has effect after the meeting has adjourned, then the latter clause is deprived of meaning. Second, the Court has difficulty concluding that at the October 26 Shareholders' Meeting the votes represented by the master ballot were "cast" in any meaningful sense. The master ballot stated:

In lieu of voting as provided above, the undersigned vote as per proxies filed, allocating among management nominees to be named by the undersigned, or a duly appointed representative thereof, upon the announcement by the Inspector of Election of the number of votes that the undersigned has power and authority to vote, *all* of such votes in a manner that will result in the election of as many of such named management nominees as possible. The undersigned acknowledge that this vote is intended to provide a reasonable opportunity for the undersigned as holder of proxies to allocate votes among management nominees based on proxies verified by the Inspector of Elections.

**\*26** Trial Exh. 7. Translated to English, this master ballot voted an indeterminate number of votes, because the "number of votes that the undersigned has power and authority to vote" was then unknown- and allocated nothing, because management intended to apportion its proxies later "in a manner that w[ould] result in the election of as many ... management nominees as possible." The practice of tabulating and allocating management proxy votes after the polls are closed, while regarded as proper and even customary by Defendants' expert, Apr. 28, 2006, Hr'g Tr. 123-25, 130-31 (Riley), is a matter of some debate. Many states, including Delaware, prohibit or restrict the acceptance of ballots, votes, or proxies after the polls close. June 16, 2006, OTS Letter at 2 [Dkt. # 44, Exh. A]. OTS has determined

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                                          Page 26
**(Cite as: --- F.Supp.2d ----)**

that the allocation of votes after the polls closed constituted a revocation or change in the vote within the meaning of § 45 of Robert's Rules. *See id.* at 1. It has further concluded that "[p]roviding the inspectors of election with the ability to allocate the votes for the benefit of one party's slate of directors and not providing that same ability to all other shareholders after the close of the polls is inherently unfair." *Id.* at 2.

Accordingly, the Court finds there is a substantial likelihood that Mr. Bender will successfully demonstrate that § 45 of Robert's Rules, which prohibits changing or revoking a vote after the polls are closed, governed the Shareholders' Meeting; that unilaterally allocating proxies after the polls are closed constitutes such prohibited action under § 45; and that, in a contested election, the IIOE's permitting management alone to allocate votes after the polls close was incompatible with his duty to conduct the election "with fairness to all shareholders."

### b. Broker-Held Votes

[26] Mr. Bender's second formal proxy challenge attacked the counting of broker non-votes in favor of the Management Nominees, contrary to the explicit instructions of the Management Proxy.[FN31] The facts related to this challenge are discussed *supra* in Part III.B.2.b and require no further elaboration here; the legal issue, however, is slightly different. Putting aside the Court's earlier conclusion that the Management Proxy was materially misleading in violation of § 14(a), the question here is whether it was an independent violation of the Bylaws or Robert's Rules to vote broker-held shares for management.

Defendants begin with the premise that, even though the election was contested in fact, it was not considered "contested" in Wall Street parlance because only management solicited proxies; from there, they argue that the broker-held shares were voted in a manner consistent with custom and practice for what Wall Street would call an "uncontested" election. In the context of an uncontested election, Rule 452 of the New York Stock Exchange ("NYSE") permits a broker, absent a client's directions to the contrary, to vote his clients' shares on "routine" matters. This rule was designed to ensure the presence of a quorum at shareholders' meetings. Apr. 28, 2006, Hr'g Tr. 105 (Riley). Uncontested elections for directors are considered routine matters because there is only one set of proxy

materials, and therefore only one mechanism to collect votes, all for a single slate. In sum, although Defendants acknowledge that Mr. Bender was caught in a Catch-22-able to nominate a slate of directors, but forbidden to solicit proxies, he essentially contested an "uncontested" election-they urge that the proxy process functioned properly.[FN32] Mr. Bender reiterates that the voting of broker-held shares in favor of management ran contrary to the Management Proxy, and argues that the Bank, which is listed on NASDAQ, is not subject to NYSE rules.

*27 This practice arguably violated Article II, Section 9 of the Bank's Bylaws, which requires that management proxies "shall be voted as directed by the shareholder." Shareholders were entitled to rely on the proxy materials, and by refraining from instructing their brokers, might be viewed as having "directed" that their votes be withheld pursuant to the Management Proxy's instructions. On the present record, however, the Court declines to delve into the complexities of how Wall Street runs their proxy contests, because the root of the problem is the alleged § 14(a) violation-a violation which, for reasons already explained, is an adequate basis for preliminary injunctive relief.

### D. Equitable Factors

Of course, establishing a likelihood of success on the merits does not entitle Mr. Bender to a preliminary injunction. He still must establish the other traditional prerequisites to preliminary injunctive relief: whether he will suffer irreparable harm absent an injunction; whether an injunction will substantially injure the Defendants; and whether an injunction will further the public interest. *Serono Labs.*, 158 F.3d at 1317-18.

### 1. Irreparable Harm

[27][28][29] Although the equitable factors interrelate on a sliding scale, *Davenport*, 166 F.3d at 360-61, a showing of irreparable harm is a *sine qua non* of preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, No. 05-5143, --- F.3d ----, ----, 2006 WL 1867203, at *4, 2006 U.S.App. LEXIS 16952, at *14 (D.C.Cir. July 7, 2006) ("A movant's failure to show any irreparable harm is ... grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."). The D.C. Circuit "has set a high standard for irreparable injury. First, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injury must be both certain and great; it must be actual and ... of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15 (citations and internal quotation marks omitted). "Second, the injury must be beyond remediation.... The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at ----, 2006 WL 1867203, at *5, 2006 U.S.App. LEXIS 16952, at *15-16 (citations and internal quotation marks omitted).

The Court perceives Mr. Bender to allege two varieties of irreparable harm. First, Mr. Bender-indeed, all shareholders-were deprived of their statutory rights to receive accurate information, and to be free of deceptive information, bearing on their investment and voting decisions. Second, Mr. Bender, unlike his peers, was the specific target of Defendants' machinations, and was unnecessarily frustrated in his attempts to participate in corporate governance. Such injuries are the precise harms against which securities laws were intended to guard. *See Edelson,* 405 F.3d at 626 ("[T]he overriding purpose of Congress in enacting [§ 13(d) ] was to protect the individual investor when substantial shareholders or management undertake to acquire shares in a corporation for the purpose of solidifying their own position in a contest over how or by whom the corporation should be managed."); *Cowin,* 741 F.2d at 427 (stating that a § 14(a) claim alleging that "shareholders elected [the defendant] directors because they were misled by the proxy materials ... falls precisely into the scope of injury that Congress sought to protect"); *Condec,* 230 A.2d at 777 (finding that the denial of a shareholder's "proportionate voice and influence in corporate affairs" through corporate manipulation is impermissible). And these harms are not only actual and imminent, they are realized and ongoing. A vote based on this information has taken place; new, possibly illegitimate, directors have been installed; and a second election looms.

**\*28** It is well established that such harms can be irreparable. *See, e.g., Gen. Aircraft,* 556 F.2d at 97 ("[I]rreparable injury would occur to shareholders and the investing public if [defendants] were allowed to continue their activities without correcting and amplifying their Schedule 13D."); *Lichtenberg v. Besicorp Group,* 43 F.Supp.2d 376, 390 (S.D.N.Y.1999) ( "Irreparable injury results from the use of [materially] false and misleading proxies when the free exercise of shareholders' voting rights will be frustrated." (alteration in original; citation omitted)); *ODS Techs. LP v. Marshall,* 832 A.2d 1254, 1262 (Del.Ch.2003) ("The threat of an uninformed stockholder vote constitutes irreparable harm."). This harm is compounded where, as here, an uninformed election has come to pass, and another election is imminent. Allowing the second election to go forward, where there is a substantial likelihood that the prior one was at best tainted, at worst void, would helplessly complicate matters, perhaps making it impossible to "unscramble the eggs" should the "post-hoc reorganization of a standing board" prove necessary. *ODS Techs.,* 832 A.2d at 1263.

Finally, Mr. Bender has no adequate remedy at law. It is generally agreed that an individual shareholder lacks standing to bring a damages suit under § 13(d). *See, e.g., Hallwood,* 286 F.3d at 619 (collecting cases); *Berman,* No. 80-0394, 1981 WL 1596, at *2, 1981 U.S. Dist. LEXIS 10866, at *5. And although Mr. Bender seeks both injunctive and monetary relief for Defendants' alleged § 14(a) violations, "an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies." *In re Staples Inc.,* 792 A.2d 934, 960 (Del.Ch.2001). As the Delaware Chancery Court has explained,

A post-hoc evaluation will necessarily require the court to speculate about the effect that certain deficiencies may have had on a stockholder vote and to award some less-than-scientifically quantified amount of money damages to rectify any perceived harm.

Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected. An injunctive remedy of that nature specifically vindicates the stockholder right at issue-the right to receive fair disclosure of the material facts necessary to cast a fully informed vote-in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

*Id.* The persuasive force of this reasoning is undiminished by the fact that the misinformed vote has already occurred. In view of the impending second election, which if allowed to proceed may hopelessly jumble the Board's membership, injunctive relief remains the preferred remedy here, and is necessary to protect investors and effectuate the purposes of the Exchange Act.

**2. Injury to the Bank**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
**(Cite as: --- F.Supp.2d ----)**

In an earlier dispute between these parties, the Court stated that the securities laws **\*29** cannot be used merely as a ploy to keep incumbent management safe from hostile takeover. Thus, the harm here cannot be to the individual members of the Board of Directors, who might be replaced if Mr. Bender has his way, or to the individual officers of the Bank who might be discharged. The harm must be to the institution, which in this case means irreparable harm to the Bank's shareholders.

*Indep. Fed. Sav. Bank v. Bender,* 332 F.Supp.2d 203, 217 (D.D.C.2004). In the present dispute, the Court recognizes that delaying the next shareholders' meeting would not come without cost. It would add further uncertainty to the leadership of a troubled institution. And "it is axiomatic that enjoining a shareholder[s'] meeting may affect the price of a company's stock." *ODS Techs.,* 832 A.2d at 1263. But these prospects are insufficient to allow a tainted Board to become further entrenched by a second election. *See id.*

Defendants argue that if the October 26 election is ultimately voided, innocent shareholders who would have voted for the Management Nominees despite the nonexistent § 13(d) disclosures and misleading § 14(a) solicitations will effectively be disenfranchised. But this is an unprovable hypothesis. The Court has no way to predict how such shareholders might have voted if given the benefit of lawful disclosures. They, like Mr. Bender, have been harmed by a misinformed vote, and will benefit from an injunction that requires the Bank to comply with its disclosure obligations under the securities laws.

**3. Public Interest**

[30] At this point, it should be clear that a preliminary injunction would serve the public interest in effective enforcement of the securities laws, and this factor need not long detain the Court. "Since it is impossible as a practical matter for the government to seek out and prosecute every important violation of laws designed to protect the public in the aggregate, private actions brought by members of the public in their capacities as investors or competitors, which incidentally benefit the general public interest, perform a vital public service." *Gulf & W. Indus. v. Great Atl. & Pac. Tea Co.,* 476 F.2d 687, 699 (2d Cir.1973).

**4. Other Equitable Considerations**

[31] Defendants lastly argue that the doctrines of unclean hands and laches should bar equitable relief in Mr. Bender's favor. The first argument can be quickly dispatched, as the Court has already found that, contrary to Defendants' claims, Mr. Bender has neither abused the judicial process nor brought baseless suits against the Bank or its Directors. *See supra* at ---- - ----. The latter argument, however, deserves brief discussion.

[32][33] Laches is an equitable doctrine "founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football Inc. v. Harjo,* 415 F.3d 44, 47 (D.C.Cir.2005). To establish this defense, Defendants must show (1) a lack of diligence by Mr. Bender that (2) has caused them prejudice. *Id.* "[T]he rationale for this defense is [that] as claims become increasingly stale, pertinent evidence becomes lost; equitable boundaries blur as defendants invest capital and labor into their claimed property; and plaintiffs gain the unfair advantage of hindsight, while defendants suffer the disadvantage of an uncertain future outcome." *CarrAmerica Realty Corp. v. Kaidanow,* 321 F.3d 165, 171 (D.C.Cir.2003). In the corporate context, the D.C. Circuit has noted that "[t]he prejudice that can result from such delay is particularly unsettling when ... the claim affects the validity of stock which is central to a merger between the named corporation and corporate entities foreign to the complaint." *Id.* at 171-72.

**\*30** Mr. Bender filed his Complaint on January 18, 2006, and moved for a preliminary injunction two days later-less than three months after the election at issue. Given the secrecy with which the Defendant Directors operated before the Court's intervention, and the dissembling that has continued since, it is no surprise that it took Mr. Bender several months to untangle defendants' transactions and craft a complaint. It can hardly be said that Mr. Bender has slumbered on his rights, especially when viewed in the context of past litigation-after all, there has been a live controversy in this Court between these parties for 30 of the past 40 months. Moreover, Mr. Bender raised several claims now at issue as formal proxy challenges at the October 26 Shareholders' Meeting, but Ms. Jordan refused to entertain them. The Bank cannot now be heard to cry prejudice as to claims it previously chose to ignore.

The Court finds that laches is arguable only as to Mr. Bender's § 14(a) claim relating to the first proxy

solicitation, the May 4 Committee Letter, which was sent months before the October 26 Shareholders' Meeting; several misstatements in that letter might have been cured by a corrective disclosure preceding the rescheduled meeting. However, it is not clear that Mr. Bender had any reason to believe that the Board played a role in drafting that letter-one of its central omissions-until this litigation began. Therefore, the Court concludes that Defendants have not met their burden to establish either a lack of diligence or prejudice, and therefore fail in their attempt to invoke laches to bar relief. In any event, even if Defendants could establish laches as to the Committee Letter claim, their other violations are a sufficient independent basis to grant preliminary injunctive relief.

### IV. CONCLUSION

The courts are usually loath to get involved in these kinds of corporate contests, but there are rules of engagement that the Defendants ignored. Mr. Bender has shown that he is entitled to the preliminary relief he seeks. For the foregoing reasons, the Court will deny the Director Defendants' motion to dismiss in part; grant Mr. Bender's application for a preliminary injunction in part; and enjoin the Bank and its Board from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court. The Court defers decision on Mr. Bender's request for a declaratory judgment barring indemnification (Count VI). A separate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the Memorandum Opinion filed concurrently herewith, it is hereby

**ORDERED** that the Director Defendants' Motion to Dismiss [Dkt. # 24] is **DENIED** as to Counts I, II, and III, and **DEFERRED** as to the balance; and it is

**FURTHER ORDERED** that the Plaintiffs' Application for a Preliminary Injunction [Dkt. # 3] is **GRANTED** in part and **DEFERRED** in part; and it is

**FURTHER ORDERED** that Defendants shall be **ENJOINED** from disseminating proxy materials to shareholders and holding shareholders' meetings until further order of the Court; and it is

**\*31 FURTHER ORDERED** that this Order shall have immediate effect, conditioned on Plaintiffs' posting, no later than **July 28, 2006,** of a secured bond in the amount of $20,000, which the Court estimates to be the costs of Defendants' proxy materials that may be found to have been wrongfully enjoined or restrained. See Fed.R.Civ.P. 65(c); and it is

**FURTHER ORDERED** that the parties shall appear before the Court at a Status Conference on August 3, 2006, at 10:00 a.m.

This is an appealable Order. See 28 U.S.C. § 1292(a)(1).

**SO ORDERED.**

FN1. The subtext to this dispute is race: while the Bank is a historically Black-owned-and-operated federal savings and loan, Mr. Bender is White. The Bank's in-house counsel ballyhooed that Mr. Bender's nominees to the Board were portrayed to shareholders by the Bank as "racial traitors." Pls.' Exh. 104. Harold Doley, an African American who controls almost 10% of the Bank's shares, testified that "race is not just an elephant in the courtroom, it is a pack of elephants." Doley Dep. 70. The racial overtones in the record would be hard to miss, but the Court concludes that they do not affect the legal issues.

FN2. The parties have appeared before the Court in earlier versions of this long-running business dispute. See, e.g., Indep. Fed. Sav. Bank v. Bender, 332 F.Supp.2d 203 (D.D.C.2004); Indep. Fed. Sav. Bank v. Bender, 326 F.Supp.2d 36 (D.D.C.2004); Bender v. Parks, No. 03-2485, 2004 WL 3737124, 2004 U.S. Dist LEXIS 17090 (D.D.C. Jan. 15, 2004).

FN3. Although Mr. Bender owns his IFSB shares jointly with his wife, and both Benders consequently are plaintiffs here, Mrs. Bender "is not an active participant in the matters relevant to this litigation and she is a party solely in her capacity as a joint tenant shareholder with Bender." Compl. ¶ 3. Accordingly, the Court often refers only to Mr. Bender in the text of this opinion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. The Court notes that the preliminary relief requested in Mr. Bender's Proposed Order [Dkt. # 37] varies from that requested in his Complaint [Dkt. # 1] and Application for a Preliminary Injunction [Dkt. # 3]. Because the Proposed Order was submitted most recently and in response to the Court's direction that the parties file proposed findings of fact and conclusions of law, the Court presumes that it contains the most accurate version of the relief immediately desired.

FN5. Mr. Bender's letter to all shareholders is dated April 29, 2005. Defs.' Exh. 207. Based on the evidence presented, however, it appears that this letter was not sent until approximately May 2, 2005. See Defs.' Exh. 208.

FN6. Asked by the Court if he ever had "a face to face or telephone conversation with Mr. Batties" about his activities, Mr. Chambers insisted that he did not. Only when the Court expressed open skepticism, did Mr. Chambers admit that he regularly talked to Mr. Batties about "the whole thing" and that he had thought the Court's question referred only to a sit-down conference. Apr. 28, 2006, Hr'g Tr. 94 (Chambers).

FN7. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), requires stock purchasers to disclose, on Schedule 13D, the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase. SEC v. Bilzerian, 29 F.3d 689, 692 n. 3 (D.C.Cir.1994).

FN8. Mr. Bender brought suit to force the meeting to proceed as scheduled in September but withdrew it when OTS approved the further delay. See Bender v. Indep. Fed. Sav. Bank, No. 05-1787 (D.D.C. Sep. 19, 2005) (order approving voluntary dismissal).

FN9. In 2004, Carver and IFSB agreed to merge after a unanimous Board resolution in favor of merger. Mr. Bender opposed the merger, publically and vociferously. The Board adopted a "poison pill" resolution to restrain Mr. Bender from acquiring more

shares and sued Mr. Bender. See Indep. Fed. Sav. Bank v. Bender, 326 F.Supp.2d 36 (D.D.C.2004). Eventually, Carver withdrew from the merger and OTS disapproved it.

FN10. In one of her more incredible statements, Ms. Jordan insists that she has no recollection of this call. Apr. 21, 2006, Hr'g Tr. 24 (Jordan) ("I don't recollect talking to Mr. Doley on the 25th."); id. at 26 ("I have no recollection of that, that call."); id. ("I did not [discuss the notion that Mr. Doley wanted to sell the stock he controlled].").

FN11. As a result of what appears to be a production error, every even-numbered "master" page of the Delaney Deposition, containing 4 pages of deposition testimony, was omitted from the Court's exhibits. The Court will rely on the submissions of the parties regarding the omitted sections of the Delaney Deposition.

FN12. Ms. Jordan and Mr. Wilmot insist that the meeting was postponed until 3 p.m. so that the Bank's attorney, Mr. Royer, could contact OTS and get advice on how to handle Mr. Bender's voting challenges. Apr. 21, 2006, Hr'g Tr. 9-10 (Jordan); Id. at 87-89 (Wilmot). Mr. Royer told a different story: he testified that his calls to OTS were not to seek advice but simply to advise OTS that the meeting was delayed. Royer Dep. 68. Mr. Royer's emails, Defs.' Exh. 219 and 200, tell the same story. See Defs.' Exh. 219 ("delay was necessary due to possible securities regulatory issues and possible voter disenfranchisement"). The Court credits Mr. Royer.

FN13. At the hearing on this matter, Ms. Jordan and Mr. Wilmot denied any involvement in the purchase of the Doley Participant shares. Given the paper record of draft purchase agreements with Mr. Wilmot's name, Trial Exhs. 72, 73; Mr. Wilmot's acknowledged discussion with Mr. Thompson in the middle of the night, Apr. 21, 2006, Hr'g Tr. 74 (Wilmot); the fact that Mr. Thompson arranged for a cashier's check in the amount of $165,000 to be issued to Mr. Wilmot, Trial Exh. 78; and Mr. Doley's testimony that he "talked with Wilmo[ ]t, Carolyn Jordan, Royer ... about

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                    Page 31
(Cite as: --- F.Supp.2d ----)

the possibility of the sale" at $18 per share, Doley Dep. 185, the Court finds that the testimony of Ms. Jordan and Mr. Wilmot is not to be credited.

FN14. See *Rosenberg v. XM Ventures*, 274 F.3d 137, 142 (3d Cir.2001) ("Section 16(b) of the Securities and Exchange Act of 1934 provides that any profit realized by a corporation's principal stockholders arising from the purchase and sale of a corporation's equity securities within a period of less than six months must be disgorged to the corporation. *See* 15 U.S.C. § 78p(b); *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).").

FN15. Mr. Doley probably meant hornswoggled and snookered, both of which mean bamboozled.

FN16. All federal thrifts allow cumulative voting. May 5, 2006, Hr'g Tr. 74 (Freedman). Under cumulative voting, shareholders "have the right to accumulate votes based upon the number of direct[or] seats to be filled. So if you have three director seats to be filled and you're the owner of a hundred shares, you would in essence have 300 votes. You can apportion those votes across the director candidates in the way that you choose to do it. So you could give 300 votes to one director and no votes to the other directors.... Or you could apportion them however you choose across that. Or you could check the box that says proxy committee do it for me which is what management hopes people do." Apr. 28, 2006, Hr'g Tr. 121-22 (Riley).

FN17. The Court credits the analysis and arithmetic of Mr. Freedman, an expert witness for Mr. Bender, over Mr. Riley, an expert witness for the Defendants, on these points. Mr. Riley first relied on Mr. Bender's lay-person's estimate of the potential number of broker votes and then absolutely resisted any suggestion that it would be possible to provide an expert estimate. Given Mr. Freedman's explanation of his dual approaches, the Court concludes that Mr. Riley was avoiding a response that would not be helpful to his client.

FN18. Pls.' Exh. 102 (Oct. 21, 2005 email) (discussing attempt "to combat Bender's attempts to dissuade ... shareholders from voting for management even though the routine broker vote has been turned in already (in favor of management).... [M]ost of these holders will take out legal proxies if they wish to vote against management which would negate the broker routine vote that has already been turned in on behalf of their vote.").

FN19. In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 63, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court stated that "the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer," a description consistent with the facts there presented. *Rondeau, 422 U.S. at 60, 95 S.Ct. 2069.* The legislative history, however, suggests a broader mission that is more apt in the instant fact pattern:

"The Bill before you deals with stock acquisitions in three specific contexts-first, the acquisition by means of a cash tender offer of more than [5 percent] of any class of stock of a publicly held company; second *other acquisitions by any person or group of more than [5 percent] of any class of stock of a publicly held company;* and third, the repurchase by a corporation of its own outstanding shares." S.Rep. No. 550, 90th Cong., 1st Sess., 16, 33 (1967) (remarks of then Chairman Cohen). Section 13(d) is concerned with the second type of stock acquisition, requiring after-the-fact disclosure of substantial open market accumulations of securities within a relatively short period of time. H.R.Rep. No. 1711, 1968 U.S.Code Cong. & Admin. News at 2818.

*Gen. Aircraft Corp. v. Lampert*, 556 F.2d 90, 94 (1st Cir.1977) (emphasis added).

FN20. The Court has previously recognized that Plaintiffs' interests are not perfectly aligned with those of the Bank's other investors and, on that basis, declined to permit Plaintiffs to maintain a derivative suit. *Bender v. Parks*, No. 03-2485, 2004 WL 3737124, at *3-4, 2004 U.S. Dist. LEXIS 17090, at *12-13 (D.D.C. Jan. 15, 2004). Given that background, it might be suggested that, to the extent Plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)                                    Page 32
(Cite as: --- F.Supp.2d ----)

standing is deemed representational, Plaintiffs are inappropriate representatives of the other shareholders. The answer to this criticism is that Plaintiffs are deemed to "act[ ] on the shareholders' behalf *until* an accurate Schedule 13D is filed," but not beyond. *Indiana Nat'l,* 712 F.2d at 1185 (emphasis added). That Plaintiffs do not necessarily "represent the interest of the shareholders in relation to who *wins* the struggle for control," *id.,* does not, therefore, call into question the propriety of their representation at this stage.

FN21. "The Schedule 13D mandates disclosure, *inter alia,* of the background and identity of the purchaser, the source and amount of funds for the purchase, the number of shares owned and of any plans to materially alter the target corporation's business or corporate structure (if the intent of the purchases is to obtain control)." *MITE Corp. v. Dixon,* 633 F.2d 486, 492 (7th Cir.1980).

FN22. In some circumstances, an acquisition or disposition of less than one percent may be deemed material. 17 C.F.R. § 240.13d-2(a).

FN23. The Court also notes that, because Mr. Thompson already owned 7.2% of the Bank's shares as of September 2005, and had filed a Schedule 13D with respect to those shares, when he acquired voting power over the Doley Participants' shares-an amount that was clearly material under 17 C.F.R. § 240.13d-2-he was required to amend his 13D "promptly." *See* 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a). There is no evidence that he did so.

FN24. For this reason, Defendants' reliance on *Berg v. First Am. Bankshares,* No. 83-3887, 1985 WL 2232, 1985 U.S. Dist. LEXIS 20631 (D.D.C.1985), *aff'd on other grounds,* 796 F.2d 489 (D.C.Cir.1986), is unavailing. The court in *Berg* read *Mills* as crafting a principle of "constructive reliance" applicable only in situations where "the requisite proof of reliance by other shareholders would be impossible to reproduce." *Id.* at *7, 1985 U.S. Dist. LEXIS 20631, at *20. *Berg* declined to extend this principle beyond the context of

class actions, which *Mills* was. However, as explained in the text, the principle enunciated in *Mills* was not subjective (reliance) but objective (materiality); on this point, therefore, the Court parts company with *Berg.* The Court also notes that the D.C. Circuit affirmed dismissal of the § 14(a) claim in *Berg* on the ground that the plaintiff failed to raise genuine issues of falsity and materiality, and expressly declined to reach the district court's "alternative determination that [the plaintiff's] complaint must be dismissed for failure to demonstrate reliance." 796 F.2d at 501 n. 11.

FN25. In the first, Mr. Bender sued the Bank for access to minutes of meetings of the Board; that suit was voluntarily dismissed after the Bank provided Mr. Bender the relief he sought. *Bender v. Indep. Fed. Sav. Bank,* No. 03-865 (D.D.C.2003). In the second, Mr. Bender sued the Bank to force a special Shareholders' Meeting. The Court ruled against Mr. Bender, finding that Mr. Bender's interests were too divergent from those of other shareholders to permit him to proceed derivatively, and that the negotiations with Carver were of such a delicate nature that a special Shareholders' Meeting would disrupt the bid process. *Bender v. Parks,* No. 03-2485, 2004 WL 3737124 (D.D.C. Jan. 15, 2004). In the third, the Bank brought suit against Bender under § 13(d), but after losing its bid for preliminary injunctive relief, opted to settle. *Indep. Fed. Sav. Bank v. Bender,* No. 04-736 (D.D.C.2004). And in the fourth, Mr. Bender brought suit to force a long-delayed Shareholders' Meeting to take place, but voluntarily dismissed the action when OTS allowed the meeting to be delayed. *Bender v. Indep. Fed. Sav. Bank,* No. 05-1787 (D.D.C.2005).

FN26. Ms. Finlayson's October 21, 2005, email to Ms. Jordan and Messrs. Batties and Royer, among others, makes this point clearly: "In terms of the voting tallies, the numbers are very discouraging.... As of today, most of the 'for votes' for management consist of the routine broker votes that w[ere] turned in.... [T]his number can change based on those street name holders who elect to take out legal proxies or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

who contact their broker before Wednesday's meeting and instruct such broker to 'withhold authority to vote for all nominees.' The broker then of course would reverse the earlier routine broker vote turned in on their behalf." Pls.' Exh. 102.

FN27. The Court recognizes that this issue is not properly termed one of standing, at least not in the Article III sense. Rather, the question is more accurately phrased, "[W]ho is the real party in interest to bring a lawsuit under the governing substantive law to enforce the asserted right [?]" _Labovitz v. Wash. Times Corp., 172 F.3d 897, 900 n. 6 (D.C.Cir.1999)_ (quoting _Whelan v. Abell, 953 F.2d 663, 672 (D.C.Cir.1992)_ (internal quotation marks and citations omitted)). Specifically, in the shareholder context, the question is "whether the corporation should be entitled to bring an action, at least in the first instance, without the distraction of shareholders' suits." _Id._

FN28. The Court also notes that another rationale for requiring derivative suits-preventing an individual shareholder from securing a benefit at the expense of others similarly situated, _see Cowin, 741 F.2d at 414_-is not implicated here, as Plaintiffs seek no monetary relief for this count.

FN29. Ms. Jordan peremptorily rejected the challenges as "out of order" because they were "procedural question[s]" and "procedures for these votes have been set up according to the bylaws." Trial Exh. 20 at 5. She later testified that she rejected the challenges because Mr. Bender failed to place them on the agenda in advance of the meeting, an explanation the Court considers a post-hoc justification. Mr. Dunlop testified that, although in his experience the IIOE usually rules on proxy challenges, he "did not want to go against the wishes of the Chair." Dunlop Dep. 91-92. Moreover, he "did not rule on the challenges, and really did not consider the challenges once they were presented to the meeting, and the Chair ruled them out of order." _Id._ at 114.

FN30. That section provides, in full: "Every shareholder entitled to a vote at an election for directors shall have the right to vote, in person or by proxy, the number of shares owned by the shareholder for as many persons as there are directors to be elected and for whose election the shareholder has the right to vote, or to cumulate the votes by giving one candidate as many votes as the number of such directors to be elected multiplied by the number of shares shall equal[,] or by distributing such votes on the same principle among any number of candidates."

FN31. Mr. Bender also argues that the Bank's failure to hold a separate meeting to vote on the allocation of management proxies violated Article II, Section 9 of the Bylaws. That section provides, in relevant part, that "[p]roxies solicited on behalf of management shall be voted as directed by the shareholder or, in absence of such direction, as determined by a majority of the board of directors." However, this text contains no express requirement that a meeting be held, and the master ballot was, in fact, signed by a majority of the board of directors. The Court perceives no violation of the Bylaws here.

FN32. OTS permitted Mr. Bender to solicit votes, but not proxies, for reasons known to them but not made clear by the record.

D.D.C.,2006.
Bender v. Jordan
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1343712 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities In Reply to Defendants' Response to the Benders' Application for Preliminary Injunctive Relief (Apr. 14, 2006) Original Image of this Document (PDF)
• 2006 WL 1046717 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Memorandum of Points and Authorities in Support of the Benders' Application for Preliminary Injunctive Relief (Mar. 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1046716 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Directors and Thomas Batties' Motion to Dismiss Counts I - IV of the Complaint (Mar. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 645058 (Trial Motion, Memorandum and

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 2042962 (D.D.C.)
(Cite as: --- F.Supp.2d ----)

Affidavit) Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Counts I, II, III, and IV of Plaintiffs' Complaint (Feb. 22, 2006) Original Image of this Document (PDF)

• 2006 WL 645059 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Defendant Independent Federal Savings Bank's Motion to Dismiss Count VI of Plaintiffs' Complaint (Feb. 22, 2006) Original Image of this Document (PDF)

• 2006 WL 645051 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645052 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645053 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645054 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645055 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645056 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 645057 (Trial Pleading) Answer (Feb. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 318855 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006)

• 2006 WL 381806 (Trial Motion, Memorandum and Affidavit) The Benders' Application for Preliminary Injunctive Relief (Jan. 20, 2006) Original Image of this Document (PDF)

• 2006 WL 318881 (Trial Pleading) Verified Complaint (Jan. 18, 2006)

• 1:06cv00092 (Docket) (Jan. 18, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
HIGHLAND SELECT EQUITY FUND, L.P., a
Delaware Limited Partnership, Plaintiff,
v.
MOTIENT CORPORATION, a Delaware
Corporation, Defendant.
**No. Civ.A.2092-N.**

Submitted June 7, 2006.
Decided July 6, 2006.

Kevin G. Abrams, A. Thompson Bayliss, Abrams &
Laster, LLP, Wilmington, Delaware; Layne E. Kruse,
Gerard G. Pecht, Fulbright & Jaworski, LLP,
Houston, Texas, for the Plaintiff.
Gregory P. Williams, Lisa A. Schmidt, Richard P.
Rollo, Harry Tasjian, Richards, Layton & Finger
P.A., Wilmington, Delaware; T. Ray Guy, Robert R.
Summerhays, Nicole S. Gambrell, Paige Holden
Montgomery, Weil, Gotshal & Manges LLP, Dallas,
Texas; Richard W. Slack, Weill Gotshal & Manges,
LLP, New York, New York, for the Defendant.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

*1 A substantial stockholder of a Delaware
corporation seeks access to the company's books and
records pursuant to 8 *Del. C.* § 220, purportedly to
investigate suspected mismanagement and for use in
conjunction with an ongoing proxy contest. The
demand letter spans 25 single-spaced pages and
includes 47 categories requiring the production of
"all books, records, documents, and correspondence
in the Company's possession, custody, or control that
constitute, identify, analyze, discuss, evaluate,
consider or address" a wide variety of issues. The
corporation refused to comply with this demand.

The stockholder filed suit on April 24, 2006, seeking
an order requiring the corporation to provide it with
the documents. The parties agreed to proceed on an
expedited schedule, and the court held a one-day trial
on June 2, 2006. On the eve of trial, following
contentious and largely unproductive discovery
proceedings, the stockholder revised its demand,

although the revisions did little to narrow the breadth
of the original request.

The issue presented, after trial, is whether the
stockholder made a proper demand or, instead, has
presented such a sweeping and overbroad request as
to constitute an impermissible use of the statutory
right to inspect the corporation's books and records.
For the reasons explained herein, the court will deny
the plaintiff's demand in total, reemphasizing the
limited nature of the books and records remedy in
contrast to the broader scope of discovery under Rule
34. Section 220 is an important stockholder right that,
by statute, this court is directed to resolve in a
summary proceeding. Its very importance requires
that the court act vigilantly to prevent it from being
used as a tool of oppression, especially when the
stockholder makes a demand in the context of an
ongoing proxy contest.

I.

A. *Parties*

The plaintiff, Highland Select, is a Delaware limited
partnership with its principal place of business in
Dallas, Texas. The combined holdings of Highland
Select and its affiliates in defendant Motient
Corporation are worth an estimated $230 million.
James Dondero, a former Motient director, is a
principal of Highland Capital Management, L.P., the
primary investment advisor to the multiple Highland-
related entities, including Highland Select. Highland
Capital, in aggregate, currently manages
approximately $20 billion of investments.

Motient is a publicly held Delaware corporation that
has historically been engaged in two-way wireless
mobile data services and nationwide wireless internet
services. Motient's primary assets now, however, are
its direct and indirect equity interests in Mobile
Satellite Ventures, L.P. and TerreStar Networks, Inc.,
which are attempting to develop satellite-based
communications systems based on U.S. government
licenses to use particular segments of the spectrum.
Steven G. Singer is chairman of the Motient board of
directors.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 2

### B. *Highland's Suspicions Of Mismanagement*

**\*2** Only a brief overview of Motient's structure and business is relevant to the court's decision. Motient owns, operates, and seeks to develop a two-way wireless communications business primarily through two separate entities, the majority owned TerreStar Networks, Inc.,[FN1] and a limited partnership known as Mobile Satellite Ventures, or MSV,[FN2] in which Motient is a minority investor. The unwieldiness of that structure has led Motient management to propose two separate transactions aimed at consolidating ownership of those entities.[FN3] Highland has publicly and vigorously opposed both of these proposals, the so-called "roll-up" transaction and the TerreStar transaction, believing that they incorrectly value the underlying Motient assets, and that they may be motivated by self-dealing.

FN1. JX 66.

FN2. *Id.*

FN3. JX 34; JX 84.

Highland also has raised concerns about certain consulting arrangements Motient maintains with Communications Technology Advisors ("CTA"), as well as with CTA's parent, the Tejas investment bank. It suffices to say here that both the Tejas and CTA management teams have close ties to that of Motient, and that Motient has paid both companies material sums of money in each of the past several years in return for various services.[FN4] Those potentially self-dealing transactions also implicate payments made to Steven Singer's brother, Gary Singer, who is prohibited by permanent injunction from acting as an officer or director for any public company on the basis of now decade old convictions for various financial crimes.[FN5]

FN4. JX 16; JX 66.

FN5. JX 81 at 22.

Motient has also experienced considerable difficulties in managing its financial reporting in the recent past. It has twice disclosed material weaknesses in its internal controls. Further, it has repeatedly amended its quarterly reports, and, in 2003, decided to dismiss its independent public accountant in the midst of its year-end work, on the basis of disagreements about certain accounting and auditing matters relating to

2000 and 2001 transactions.[FN6] Finally, Motient has disclosed that it is at risk of being classified as an investment company under the Investment Company Act of 1940. If found to be regulated under that statute, Motient would face serious sanctions that would materially affect its business.[FN7]

FN6. JX 7 at 2.

FN7. JX 66.

In mid-2005, Dondero requested that Motient's audit committee investigate all these concerns and pursued information regarding transactions he considered suspect. In response, Motient's board ordered an investigation into Dondero's allegations, to be conducted by the audit committee and assisted by independent special counsel. Although that report purported to exonerate the board of any wrongdoing,[FN8] Dondero has never been given the entire audit committee report for review. Whatever the result of that investigation, therefore, Highland has reason to suspect that the audit committee's efforts may not have been sufficiently comprehensive, or that they were so marked by conflicts of interest that they amounted to a sham.[FN9]

FN8. JX 40.

FN9. Motient's general counsel, Robert Macklin, is apparently married to Heather Macklin, who is listed as an associate on the special counsel's website. JX 87.

### II.

### A. *Non-Delaware Litigation Between Highland And Motient*

**\*3** This books and records case is only part of a much wider ongoing dispute between Motient and Highland Select and its affiliates. On August 16, 2005, an affiliate of Highland Select filed a derivative action in this court, alleging breaches of fiduciary duty by Motient's directors, officers, and others. This court dismissed the derivative claim on March 17, 2006 for failure to state demand futility under Court of Chancery Rule 23.1.[FN10]

FN10. *Highland Legacy Ltd. v. Singer,* 2006 Del. Ch. LEXIS 55 (Del. Ch. Mar. 17,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

2006).

Also, on August 16, 2005, affiliates of Highland Select filed an action in Texas state court against Motient seeking the rescission of the $90 million sale of the company's Series A preferred stock to the Highland affiliates. [FN11] On October 7, 2005, certain Highland Select affiliates, who were holders of Motient Series A preferred stock, filed a class action lawsuit in this court to enjoin an exchange offer for that stock. [FN12]

> FN11. *Highland Crusader Offshore Partners L.P. v. Motient Corp.*, No. 05-07996-E (101st D. Ct., filed Aug. 16, 2005).

> FN12. *Highland Crusader Offshores Partners, L.P. v. Motient Corp.*, No. 1702-N (Del. Ch. filed Oct. 7, 2005).

Motient has, in response, initiated two lawsuits against Highland affiliates. On October 19, 2005, Motient filed a breach of fiduciary duty lawsuit against Dondero in a Texas state court. [FN13] The fiduciary duty violations alleged in that case all are based on the same facts as those at issue here. That is, Motient's claims in the Texas case that Dondero violated his fiduciary duties are intimately bound up with the question of whether Dondero was justified in opposing the Motient board. [FN14]

> FN13. *Motient Corp. v. Dondero*, No. 05-10742 (101st D. Ct. filed Oct. 19, 2005).

> FN14. JX 157. For example, Count I of Motient's complaint in that case alleges that Dondero violated his "fiduciary duty of loyalty by engaging in a course of litigation that is contrary to his fiduciary duties and the best interests of Motient and its shareholders." *Id.* at ¶ 43. Assuming that this allegation sets out a cognizable legal claim, its vitality is dependent on Dondero's accusations being false.

On the same day, Motient filed a lawsuit in a Texas federal district court alleging that Dondero made misleading statements and solicited proxies to replace Motient's current board and management without complying with the federal proxy rules. [FN15] That suit claims that Dondero's accusations against the Motient board are factually false. For example, Motient alleges that Dondero's claims that the roll-up transaction was self-dealing are "objectively false, as verified by a recent comprehensive independent investigation conducted by the Board's audit committee." [FN16] As with the state court claims, the truth of Dondero's accusations is central to Motient's argument.

> FN15. *Motient Corp. v. Dondero*, No. 3-05-CV-2070-P (N.D.Tex. filed Oct. 19, 2005).

> FN16. JX 158, ¶ 17.

All the suits, other than the Delaware derivative action dismissed on March 17, are still pending. Significantly, Dondero and the various Highland entities named as defendants in the Motient securities suit in federal court have invoked a stay of litigation pursuant to the Private Securities Law Reform Act and the Securities Litigation Uniform Standards Act. Discovery in that case is therefore stayed pending the ruling on the motion to dismiss. Further, Dondero attempted to use those same statutes to induce the federal court to stay discovery in Motient's state court fiduciary duty case. That motion was denied on May 1, 2006.

## B. *Highland Announces A Proxy Contest*

On February 14, 2006, Dondero resigned from the Motient board. [FN17] On the same day, Highland issued a press release announcing its intention to engage in a proxy contest against the Motient board. [FN18] That press release noted that Highland Capital had grown increasingly disturbed about what it called "continued mismanagement" over the past year, and specifically pointed to the material weaknesses in financial controls, certain disclosure inadequacies, a flawed April 2005 stock issuance, as well as the failed roll-up transaction, as sources of its discontent. Therefore, Highland claimed, it would "nominate and support highly qualified individuals for election to an entirely new Board of the Company, including individuals who are independent of Highland and the Company...." [FN19] Highland Capital and its affiliates have since filed a proxy statement with the SEC relating to the annual meeting of the Motient stockholders to be held on July 12, 2006. That proxy statement reiterates and expands upon the concerns identified in the February 14 press release. [FN20]

> FN17. JX 52.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 4

FN18. Id.

FN19. Id.

FN20. As the proxy statement explains, "[t]he Highland Parties decided to seek the election of the Highland Parties director nominees after concluding that, in their opinion, the Motient director nominees cannot be relied upon to guide and oversee Motient's management in the future." Highland Proxy, June 2, 2006 at 4.

### C. *Highland Demands Books And Records, Is Refused, And Files Suit*

**\*4** On April 12, 2006, shortly after this court's dismissal of the Highland derivative complaint, Highland Select issued a Section 220 demand letter for Motient's books and records, alleging eight different purposes for the demand. In contrast to a typically concise Section 220 demand, Highland's letter ran for a full 25 pages, and interspersed 47 separate paragraphs of substantive demands in between sections of text explaining in detail Highland's suspicions of mismanagement at Motient. Moreover, each of Highland Select's 47 demands was itself exceptionally broad. For example, referring to the financial control problems Motient has experienced, Highland demands "all books, records, documents, and correspondence in the Company's possession, custody, or control that constitute, identify, analyze, discuss, evaluate, consider or address any deficiencies, or material weaknesses in the Company's internal controls .... " with respect to certain years of financial reporting .[FN21] This is language generally found in Rule 34 requests, (and overbroad ones at that) and not in demands made pursuant to Section 220.

FN21. JX 81.

On April 20, 2006, Motient refused Highland Select's Section 220 demand, claiming, among other things, that Highland fails to show a proper purpose, and that its demand is "unreasonably broad and burdensome."[FN22] In response, on April 24, 2006, Highland Select filed this suit. Citing the impending proxy contest, Highland Select asked the court and Motient to agree to a highly expedited schedule, in contemplation that documents obtained following trial could be incorporated into its proxy materials. After Motient's counsel indicated their willingness to try the case in the contemplated time frame, the court agreed to set

trial for June 2, 2006.

FN22. JX 82.

### C. *Discovery And The Current Litigation*

The discovery process did not proceed smoothly. On May 4, 2006, Motient served a notice of deposition for a corporate representative of Highland Select to testify on designated topics pursuant to Court of Chancery Rule 30(b)(6). In response, Highland Select designated Michael Minces, a lawyer then serving as Highland Capital's chief compliance officer, and since sometime in April, Highland Select's sole officer. Motient also separately noticed Dondero, and after discussions with Highland Select's counsel, May 15 was chosen as the day when both deponents would be made available.

Soon after Minces's deposition began, it became apparent to any reasonable observer that Minces was an inadequate Rule 30(b)(6) witness. On numerous occasions, he could give no informative answer to important questions about Highland Select's motives in framing its Section 220 demand. When asked why Highland Select published the Section 220 demand in an SEC Form 14A filing, for example, Minces refused to answer on privilege grounds, and then explained that, aside from himself, there was literally no one else available at Highland Select who could give testimony as to that issue.[FN23] And again, when Minces was asked at deposition whether anyone at Highland Select had reported Motient to the SEC for the possible 1940 Act violation, Minces refused to provide any answer other than to suggest that Motient pursue its inquiry with the SEC.[FN24]

FN23. Dep. Tr. 68:1-8.

FN24. Dep. Tr. 213:17.

**\*5** On those occasions that Minces was able to provide some answer, it often consisted of references to Highland Select's demand letter or other public filings. When asked what Highland Select intended to do with the documents demanded in the Section 220 letter, for example, Minces replied only that "we'd use the documents for the stated proper purposes that were dictated in our 220 demand letter."[FN25]

FN25. Dep. Tr. 135:5-15.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Further, on numerous occasions, Minces refused to testify concerning subjects about which he appeared to have personal knowledge, and about which Highland Select as an entity necessarily had knowledge, but that predated his appointment in April as the sole officer of Highland Select for purposes of coordinating the Section 220 effort.[FN26] In Highland Select's view, such testimony was inappropriate because Minces was only appearing in his capacity as an officer of Highland Select. This did not stop Minces from testifying about matters outside that exceedingly narrow scope when it might be useful to Highland. Asked how Highland Select might have known that Dondero was not given a fair opportunity to explain his objections to the roll-up transaction at a board meeting on October 6, 2005, Minces forthrightly explained that this was the "general consensus and opinion from the participants of that meeting after the meeting." [FN27] How Minces could possibly have known this information solely in his role as a Highland Select officer is entirely unclear, since the meeting occurred months before Minces's designation as an officer of that entity. Yet, for some reason he was willing to answer that question, and not others dealing with knowledge presumably acquired in exactly the same way.

FN26. For repeated examples of this objection, see Dep. Tr. 35:15-18; 47:1-10; 53-54:1-6; 61:1-12; 71:18-25; 109:8-20.

FN27. Dep. Tr. 159:17-23.

Nevertheless, Motient's counsel proceeded to depose Minces for nine hours, in what Motient's counsel must have known would be a bootless quest.[FN28] The full day spent deposing Minces made it impossible for Motient's counsel to depose Dondero, who was unavailable for that purpose afterward.

FN28. The deposition testimony demonstrates, in fact, that Motient's counsel knew precisely how unhelpful it would be to continue in the same way. Dep. Tr. 45:12-17 ("Mr. Abrams: Please ask your questions on a question-by-question basis. You know our position with respect to the scope of his testimony. Mr. Guy: I do know your position by now."). Further, Motient's counsel twice described Minces's inadequate answers as a "mantra." Dep. Tr. 54:4; 72:1.

A one-day trial followed on June 2, 2006, where

Minces testified to many issues about which Highland Select's counsel did not permit him to be deposed. Minces was able, for example, to speak more fully than he spoke at his deposition as to the content of the suspicions that Highland Select harbored concerning Motient. The court found this testimony to be credible. It supports a conclusion that Highland Select has reasonable grounds to suspect corporate misconduct.

Second, Minces was able to testify more fully as to the plaintiff's purpose in filing the Section 220 demand. As became evident from cross-examination, the Section 220 demand was spurred by this court's dismissal of Highland's previous derivative suit. As Minces explained, the Section 220 demand was formulated soon after that decision: just as soon as Highland was able to hire new legal counsel to prepare the demand.[FN29] One aspect of Minces's testimony that the court did find puzzling, however, and crucially so, was his equivocation as to whether Highland Select had definitively decided to go forward with its proxy contest. Minces repeatedly testified that the final decision to go forward with that contest had not yet been made. Minces first claimed that the final proxy had not yet been filed, and that Highland Select would "evaluate potential corrective action" after it received the Section 220 documents.[FN30] Later, Minces claimed that the decision whether or not to mail out the proxy statement was "not entirely in my court, and has not been made yet." [FN31] At the end of trial, however, Highland Select's counsel contradicted Minces's testimony, stating that any belief that the decision to proceed with the proxy contest had not been made was "inconsistent with the facts." [FN32] Indeed, the official filing of Highland Select's proxy statement followed soon after trial, as noted above.

FN29. Tr. 77:9-12.

FN30. Tr. 98:2-22.

FN31. Tr. 148:7-8.

FN32. Tr. 205:24-206:1.

*6 Additionally, the approach of trial appeared to precipitate a dramatic series of revisions in Highland's original Section 220 demand. The first of these was included in Highland's opening brief, where Highland claimed to have engaged in "substantial narrowing" of its initial demand.[FN33] Then, on the eve of trial,[FN34] Highland revised its

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

document request a second time, producing a list of documents that purported to cut down its original request of 47 separate categories to only 10.[FN35] The court directed Highland Select to provide a comparison between this 10 item list and the original 47 category demand, in order to help the court understand whether Highland's demand had truly been limited. Highland responded with a letter detailing those changes, apparently reducing the scope of its demand even more. Nevertheless, a careful study of Highland Select's various statements of its demand shows that Highland Select's revised, eve of trial, demand still suffers from the same overbreadth as its original letter.

FN33. Pl.'s Opening Br. Exs. A and B.

FN34. Tr. 86:7-8.

FN35. JX 211.

The changes that Highland did make are essentially of three kinds. First, six of the new Highland Select demands seek documents within a specified date range or documents that relate to a subject matter that inherently limits the range of responsiveness. Second, Highland Select limits its demand by using "creator/recipient" limitations.[FN36] That is to say, rather than demanding all documents in Motient's possession and control, as the original letter had done, the new demand seeks documents provided, or in some cases, provided or prepared by and to, the board, executive committee, audit committee, SEC, or any outside auditor. Finally, Highland Select's revised demand eliminates 8 categories of the original 47 categories. In the context of the original demand, therefore, Highland Select's revised demand list includes 39 categories.[FN37]

FN36. Highland Select Letter, June 5, 2006.

FN37. Motient Letter Ex. A, June 7, 2006.

III.

Highland Select believes that it is entitled to all the documents requested in its most recent demand, pursuant to its stated purposes of investigating mismanagement in order to either launch another derivative suit or to engage in a proxy contest to unseat Motient's board. It believes that the facts it has presented set out a clear case of credible suspicion of possible mismanagement, and that all the documents requested are necessary and essential to its wide-ranging purposes. In response, Motient half-heartedly argues that Highland has failed to prove any basis to suspect malfeasance at the company. More important, Motient argues that the nature of the plaintiff's demand, and the way it was pursued, demonstrates clearly that Motient has an improper purpose in pursuing this Section 220 claim. That improper purpose, in Motient's view, is to use the Section 220 demand as a vehicle through which to attack Motient's management in preparation for the proxy contest, with little regard for whether it receives any information or not.

IV.

Delaware law provides a statutory right for a stockholder to inspect the books and records of a corporation under 8 Del. C. § 220, so long as the form and manner requirements for making a demand are met, and the inspection is for a proper purpose. The statute defines "proper purpose" as any purpose "reasonably related to such person's interest as a stockholder." [FN38] A Section 220 plaintiff with a proper purpose must further prove that it has some credible evidence of wrongdoing sufficient to warrant continued investigation. [FN39] It is not enough for a Section 220 claim, however, merely to satisfy the proper purpose and credible suspicion prongs of the test. Rather, the scope of such relief will typically be limited only to the inspection of those books and records that are necessary and *essential* to the satisfaction of the stated purpose, a burden of proof with which the plaintiff is charged. [FN40]

FN38. Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 8.6(e)(1) (2005)

FN39. Id.

FN40. Id.

*7 All of these elements are underlined by a clear requirement that a Section 220 plaintiff has a responsibility to make its demand in good faith, policed by the court's duty to closely examine any Section 220 demand to "prevent possible abuse of the shareholder's right of inspection." [FN41] Recent experience teaches that the potential for abuse is very much alive when the Section 220 demand is made-as this one is-in the context of an impending or ongoing

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

proxy contest. While a <u>Section 220</u> books and records action is a summary proceeding that demands prompt attention from this court, it can be difficult to process from start to finish on a schedule that accommodates the foreshortened time frame of an ongoing proxy fight. This is especially true where the stockholder makes a broad demand and expects to be able to publicly disclose in its proxy materials otherwise confidential documents or information obtained from the corporation after trial. In that situation, the court is not only required to try and decide the case in the space of a few weeks, but also is expected to make itself available to referee the inevitable series of disputes arising from the corporation's interest in maintaining the confidentiality of its information and the stockholder's interest in using otherwise confidential information in furtherance of its proxy solicitation. [FN42] In those circumstances, a stockholder must of necessity, make a narrow request calling for the production of only a small number of categories of particular documents.

> FN41. <u>CM & M Group, Inc. v. Carroll,</u> 453 A.2d 788, 793-94 (Del.1982), *cited with approval in* <u>Disney v. The Walt Disney Co.,</u> 857 A.2d 444, 447 (Del. Ch.2004).

> FN42. In <u>Disney,</u> 857 A.2d at 449, the court discussed the dynamics of that process and stressed both the heavy burden a person seeking to publicly disclose confidential information should be required to meet and the limited circumstances that would justify such relief. As the court said, the lever for court intervention in that particular circumstance is a showing of a likelihood that disclosure is needed to "prevent the corporation's proxy materials from being false and misleading in some material respect, or equally compelling circumstances." This high standard is needed, the court observed, because a lower standard would simply lead to the corporation itself being compelled "to disclose even more otherwise non-public information in order to put the stockholder's disclosures in what the corporation believes to be the proper context." <u>Id.</u> at 450.

<u>Section 220</u> is also not a way to circumvent discovery proceedings, and certainly not meant to be a forum for the kinds of wide-ranging document requests permissible under Rule 34. Indeed, the Supreme Court emphasized exactly this point in *Security First*

*Corporation v. U.S. Die Casting and Development Company,* [FN43] where it was confronted with a wide, eight category demand letter. [FN44] Although the Supreme Court ordered production of some documents, to be determined by this court on remand, the key aspect of *Security First* is what the opinion says about the scope of a permissible <u>Section 220</u> request. Notably, the Supreme Court observed that <u>Section 220</u> and discovery under Rule 34 are entirely different procedures, and that a <u>Section 220</u> inspection is meant to be substantially limited in scope:

> FN43. <u>*Security First,*</u> 687 A.2d 563 (Del.1997).

> FN44. <u>*Id.*</u> at 569.

The scope of the production which the Court of Chancery ordered in this case is more akin to a comprehensive discovery order under <u>Court of Chancery Rule 34</u> than a <u>Section 220</u> order. The procedures are not the same and should not be confused. A <u>Section 220</u> proceeding should result in an order circumscribed with *rifled precision.* <u>Rule 34</u> production orders may often be broader in keeping with the scope of discovery under <u>Court of Chancery Rule 26(b).</u> [FN45] (emphasis added)

> FN45. <u>*Id.*</u> at 570.

Our <u>Section 220</u> cases hold, therefore, that while the right to books and records is an important stockholder protection, it is not unlimited. Rather, any <u>Section 220</u> demand is subject to close inspection for appropriateness under our law.

**\*8** The demand in this case, in both form and spirit, is inconsistent with the holding in *Security First.* [FN46] Most important, the plaintiff here filed an extraordinarily overbroad <u>Section 220</u> demand. Indeed, Highland Select's April 12 letter makes the lengthy demand in *Security First* seem a model of brevity. Moreover, it filed that <u>Section 220</u> demand, despite the fact that it (or its affiliates) could have conducted full discovery into the very same questions of mismanagement in various other cases filed in Texas federal and state court, but chose to foreclose that possibility by invoking the mandatory stay provisions of the PSLRA and the SLUSA. Of course, there is nothing objectionable about availing oneself of federal rights to stay discovery. But that action should not then be followed by a <u>Section 220</u> demand

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

that seeks what amounts to one-way discovery into the same matters.

> FN46. *See also Khanna v. Covad Commc'ns Group, Inc.*, 2004 Del. Ch. LEXIS 11 n.33 (Del. Ch. Jan. 23, 2004) ("Indeed, if Section 220 afforded a shareholder the full panoply of discovery rights, the goal of avoiding the costs and burdens of unnecessary discovery reflected in the policy of staying discovery while derivative and class actions are tested by motions to dismiss would be frustrated."); *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 114-15 (Del.2002) (A stockholder's right to inspect a corporations books and records under Section 220 "does not open the door to the wide ranging discovery that would be available in support of litigation ..."); *Carapico v. Phila. Stock Exch.*, 791 A.2d 787 n.13 (Del. Ch.2000) ("Of course, a person making a § 220 demand is entitled to demand documents by category and will frequently not be in a position to demand specific documents. What is required is that, at least where the purpose is to investigate particularized claims of mismanagement, the categories of documents be identified more narrowly and precisely than is typical in ordinary civil discovery."); *Freund v. Lucent Techs.*, 2003 Del. Ch. LEXIS 3, *14 (Del. Ch. Jan. 9, 2003) (Section 220 does not authorize a "broad fishing expedition").

Having issued the patently inappropriate demand, Highland Select then filed suit in this court and sought extraordinary expedition of its claim in preparation for a proxy contest that was to culminate just a month from trial. Had the court ordered the demanded documents to be turned over, it would then have spent the month of June sorting through the inevitable disputes over confidentiality that would have arisen from that production. And, despite asking the court to consider this case on an expedited basis, and thereby asking Motient to prepare its defense extremely quickly, Highland hamstrung Motient's efforts to defend itself by proffering a Rule 30(b)(6) witness who was so bound by attorney-client privilege, a self-serving lack of tenure in the plaintiff corporation, and a simple lack of knowledge, that his designation raises serious legal questions about Highland's compliance with the rule.[FN47] The court was particularly concerned by Highland's cramped belief that a Rule 30(b)(6) witness can only testify for the corporation to the extent that he acquired the relevant information while acting in his capacity as an officer of that corporation. A designee under Rule 30(b)(6) is expected to inform himself as to the entity's knowledge, and to testify to the limits of the designation.[FN48]

> FN47. Court of Chancery Rule 30(b)(6) is functionally identical to Federal Rule of Civil Procedure 30(b)(6). As is clear from authorities on that rule, an entity asked to designate a Rule 30(b)(6) witness has "an affirmative duty to produce a witness who can answer questions regarding the subject matter listed in the notice. 7 James Wm. Moore Et Al., Moore's Federal Practice ¶ 30.25 (3d ed.2006), citing *Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C.1998) (delineating the entity's duties in response to a Rule 30(b)(6) notice). Indeed, "as a practical matter, producing a person who knows nothing about the subject matter of the litigation is the functional equivalent of having spurned the deposition altogether. Consequently, Rule 30(b)(6) can be violated when a corporate party literally sends a human being to the deposition but the person is unequipped to participate meaningfully in the deposition." *Id.* at ¶ 30.72. Further, although Rule 30(b)(6) "implicitly restricts the scope of examination by requiring the deposing party to describe 'with reasonable particularity the matters on which examination is requested," 'courts read the notice broadly to permit substantial inquiry so that the witness does not avoid testimony on the basis of a technicality. *Id.* at 30.25[4]. Minces's deposition testimony, as reflected in the record, violated all of these important premises of the relevant law, and would have been remedied had this deficiency been brought to the court's attention at the time of the flawed deposition.

> FN48. *See supra,* note 47. None of this means, of course, that all of Highland Select's objections to Motient's questions were illegitimate. A Rule 30(b)(6) deposition is a limited discovery vehicle, and focuses on topics for which the deposition has been noticed. Minces was once asked, for instance, as the chief compliance officer of Highland Capital, why

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Highland Capital declined to exchange its shares in a July 2005 share exchange offer initiated by Motient. Dep. Tr. 279-280. Minces properly refused to answer that question as being far outside of the scope of a Rule 30(b)(6) deposition.

The trial further revealed that the need for a quick resolution was largely of Highland's own making. Highland Capital and its affiliates have known almost every detail of the alleged mismanagement they seek to investigate for months. [FN49] Dondero could thus have chosen any moment to resign his position and start agitating for change, but instead chose to wait until February to take that ultimate step. Indeed, this pattern began in August 2005, when, instead of using Section 220 as a tool to gather information, as our courts have repeatedly admonished potential plaintiffs to do,[FN50] a Highland affiliate chose instead to file an inadequately pleaded derivative suit, which this court later had no choice but to dismiss.

FN49. This court has observed that the timeliness of a demand can be a factor in the credibility of the petitioner's stated purpose. *Amalgamated Bank v. UICI*, 2005 Del. Ch. LEXIS 82, *9-10 (Del. Ch. June 2, 2005) ("[T]he passage of time, as may be measured against a statute of limitations, or the outcome of earlier litigation, as a source of collateral estoppel or *res judicata* defense, may be relevant to the Court's inquiry as to whether certain corporate books and records are necessary for a shareholder's purpose of evaluating a potential derivative action. For example, as time goes by, it may be that the shareholder's proper need for a corporate record would diminish.").

FN50. *See, e.g., Rales v. Blasband,* 634 A.2d 927, 935 (Del.1993); *White v. Panic,* 793 A.2d 356, 364-65 (Del. Ch.2000).

In the meantime, Highland proceeded to publish its detailed and excessive Section 220 demand publicly several times.[FN51] Finally faced with the reality of trial, Highland began to pare down its demand, first in a minor way in its opening brief, and then apparently wholesale at 11:00 p.m. the night before trial. When the court was compelled to order additional submissions because Highland Select was not prepared to explain at trial how the new demand differed from the original demand, Highland's

responsive letter changed its demand again.[FN52] None of these revisions adequately address the court's concern as to the breadth of the original demand sued upon or the scope of relief Highland Select continues to seek.

FN51. JX 142; JX 143.

FN52. Highland Select Letter at 3, June 5, 2006 ("In addition, to further alleviate any purported burden on Motient, Highland Select has withdrawn Request No. 2 from the revised 220 demand presented at trial which requested that the Company provide to Highland Select 'all documents provided to the Board, Executive Committee, Audit Committee, SEC or any outside auditor relating to PWC's dismissal.' ").

**\*9** These facts describe a remarkable confluence of events that amount to an abuse of the Section 220 process, designed for some purpose other than to exercise Highland Select's legitimate rights as a stockholder.[FN53] Indeed, the facts adduced at trial clearly suggest that Highland's purported purpose in bringing this Section 220 action to gain information for use in its proxy fight verges on being a ruse.[FN54] Highland, from the beginning of this process, intended to file a proxy contest, and had all the information it needed to take that step, whether from public filings or from Dondero's long service as a Motient director. Highland thus appears to have maintained its books and records demand in large part because it has derived utility from the demand itself as a rhetorical platform.[FN55] That is not the kind of compelling circumstance this court described in *Disney,* that would authorize the use of Section 220 as a way of publicizing concerns about mismanagement.

FN53. The Section 220 right is bound by a requirement of good faith and lack of abuse, as explained herein. Where those factors are in doubt or missing, the court must use its statutory powers to deny relief. *See Cohen v. El Paso Corp.,* 2004 Del. Ch. LEXIS 149, *8 (Del. Ch. Oct. 18, 2004) ("[T]he Court will not allow a party to proceed with a § 220 action if it is brought in bad faith."); *Compaq Computer Corp. v. Horton,* 631 A.2d 1, 5 (Del.1993) ("On the whole, a fair reading of these cases leads to the conclusion that where the person making

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)
(Cite as: Not Reported in A.2d)

demand is acting in bad faith ... access to the ledger will be denied.").

FN54. *Sutherland v. Dardanelle,* 2006 Del. Ch. LEXIS 88, *29 (Del. Ch. May 16, 2006) ("a defendant facing a Section 220 action may resist that demand by showing that the plaintiff's purpose, although a valid one, is not the actual purpose. In other words, the defendant may try to show that the plaintiff has pursued its claim under false pretenses.").

FN55. As the Superior Court held in a foundational books and records case, an allegation that the petitioner "lack[s] any genuine desire to obtain the information, or any part thereof, which it alleges it seeks through the order of this honorable court" would, if true, "deprive [the petitioner] of any right to inspect the books of the corporation of which it is a stockholder." *State v. Jessup & Moore Paper Co.,* 88 A. 449 (Del.Super.1913); *Skoglund v. Ormand Indus.,* 372 A.2d 204, 212 (Del. Ch.1976) (citing *Jessup & Moore, supra,* with approval).

In these circumstances, it is not the court's responsibility to pick through the debris of a Section 220 demand in this state of disarray and to find the few documents that might be justified as necessary and essential to the plaintiff's demand. In short, Section 220 contemplates a limited, discrete investigation into possible mismanagement for a number of proper purposes. But the evidence adduced at trial shows conclusively that Highland Select's demand is broadly inconsistent with that statutory scheme. For that reason, the demand in this case must be denied.

IV.

For the foregoing reasons, the complaint is DISMISSED and judgment is entered in favor of Motient Corporation, with costs. IT IS SO ORDERED.

Del.Ch.,2006.
Highland Select Equity Fund, L.P. v. Motient Corp.
Not Reported in A.2d, 2006 WL 1903129 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1489740 (Trial Pleading) Answer, Defenses, and Affirmative Defenses to Plaintiff's Complaint (May 3, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1990 WL 3899 (Del.Ch.), 16 Del. J. Corp. L. 467
**(Cite as: Not Reported in A.2d)**

▷

UNPUBLISHED OPINION.  CHECK  COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
JIM WALTER CORPORATION, a Florida
corporation, and the Celotex Corporation, a Delaware
corporation, Plaintiffs,
v.
Daniel ALLEN and Beatrice ALLEN, et al.,
Defendants.
**CIV. A. No. 10974.**

Submitted Jan. 10, 1990.
Decided Jan. 12, 1990.

**469 Paul P. Welsh, A. Gilchrist Sparks, III, and
Robert J. Valihura, Jr., of Morris, Nichols, Arsht &
Tunnell, Wilmington, and Timothy A. Andreu, of
Holland & Knight, Tampa, Florida, for plaintiff Jim
Walter Corporation.
Robert B. Anderson, and Paul A. Bradley, of
McCarter & English, Wilmington, for plaintiff the
Celotex Corporation.
Irving Morris, and Kevin Gross, of Morris,
Rosenthal, Monhait & Gross, P.A., Wilmington, and
Thomas W. Paterson, of Susman, Godfrey, Houston,
Texas, for defendants.

MEMORANDUM OPINION
ALLEN, Chancellor.
*1 Defendants have moved to stay or dismiss this
declaratory judgment action on the alternative
grounds (1) that they have asserted no claim against
plaintiffs of the kind that plaintiffs seek to now have
adjudicated, and (2) litigation of the issue sought to
be determined should be stayed in this court in any
event, in light of the fact that the same issue is being
litigated in an action brought (but not yet certified) as
a class action and presently pending in the United
States District Court for the Eastern District of Texas.

The declaration sought is that plaintiff Jim Walter
Corporation is not liable in its capacity as sole
shareholder of plaintiff The Celotex Corporation on
an alter ego or "piercing the corporate veil" theory
for any torts for which Celotex may be found liable.

The question is far from academic.  In excess of
80,000 individuals have asserted claims arising from

personal injuries allegedly proximately caused by
Celotex's activities as a manufacturer or distributor of
products containing asbestos.  Of these, some
number include litigation claims that join Jim Walter
Corporation as a defendant **470 and assert an alter
ego theory as a basis for liability against it.

In Delaware, approximately 180 personal injury
claims against Celotex and Jim Walter Corporation
have been filed in 55 civil actions in the Superior
Court.  Defendants are all of the plaintiffs in those
suits.  On May 16, 1989, counsel for declaratory
defendants made statements in the Superior Court
that would lead a reasonable mind to conclude that
the theory or theories urged in support of the claim
that Jim Walter Corporation was liable included a
theory that the distinct corporate identity of Celotex
should be ignored and its sole shareholder held
accountable for its liabilities.

On July 24, 1989, this suit was filed seeking a
declaratory judgment to the contrary.  This action
was brought in this court because under the split
law/equity jurisdiction that subsists in our State, a
determination that the corporate fiction may be set
aside is an equitable remedy available solely from
this court.  Sonne v. Sacks, Del.Supr., 314 A.2d 194
(1973).

On July 13, 1989, a class action suit was filed in the
state court of Texas purportedly on behalf of all
persons asserting personal injury claims arising from
Celotex's asbestos related activities.  Named as
defendants were some sixteen persons and companies
allegedly liable on any judgment that might be
entered against Celotex, including plaintiffs in this
action.  That suit did not seek to recover for personal
injuries, but sought a declaration on the validity of
Celotex as a corporate entity.  The theory of that suit,
insofar as Jim Walter Corporation is concerned,
includes an alter ego or veil piercing theory of the
kind Jim Walter Corporation seeks to litigate here.
The complaint apparently is that Celotex has been
rendered unable to satisfy all of the judgments that
will or may be rendered against it.  None of the four
plaintiffs in that suit have a judgment against Celotex
that they have been unable to collect, but all do have
other pending actions in which they hope to be
awarded a judgment.

*2 Discovery has proceeded to some extent in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1990 WL 3899 (Del.Ch.), 16 Del. J. Corp. L. 467
(Cite as: Not Reported in A.2d)

Texas action. A large number of documents have been produced and some depositions have been taken, apparently in connection with a challenge to the *in personam* jurisdiction of the court. That jurisdiction has now been determined by the court to be sound. The Texas action has been removed to the United States District Court and motions to transfer the case to the Middle District of Florida and to remand to the state court are pending in the District Court.

Certain entities that are defendants in that action (but not the plaintiffs in this suit-Jim Walter Corporation or Celotex) have **471 sought the protection of the United States Bankruptcy Court in Tampa and have moved that court to extend its automatic stay to include related actions against others-including plaintiffs here.

## I.

I turn first to defendants' motion to dismiss. The principal argument in support of this request is the assertion that the case is not ripe for declaratory determination. In this connection, it is not contended that the facts underlying the legal determination sought are in flux or still developing. Rather, it is urged that the Delaware personal injury plaintiffs (defendants here) did not intend to introduce an "alter ego" or "piercing of the veil" theory into their Delaware Superior Court case and have subsequently dropped Jim Walter Corporation as a defendant in that action in order to make clear their desire not to litigate any such theory in Delaware. Moreover, it is said that the possibility that such a claim may be advanced in the future by these persons is too speculative to have the immediate real impact upon plaintiffs that would be required to make declaratory relief appropriate.

The first of these points, however, appears irrelevant in the circumstances as they now appear, and the second is unpersuasive in light of the fact that defendants have, subsequent to their statements asserting rights against the parent corporation, expressly relied upon the fact that this theory was being raised elsewhere in a purported class action from which, should it succeed, they would benefit.

Despite the declaratory plaintiffs' action in dismissing Jim Walter Corporation from their personal injury actions, it is the case that the statements made to the Superior Court in connection with dismissing that corporation constitute the assertion of rights of the very sort now sought to be litigated. It is true that these defendants have now in effect said that they are content to rely upon the class litigation in Texas to adjudicate these claims, but such a statement is in effect merely a statement of forum preference. It cannot hide, indeed it is premised upon, the existence of the claim. Moreover, it is established that the willingness of a declaratory defendant to adjudicate the claim, if he has an interest in the matter that is actual and adverse, is irrelevant. *Stabler v. Ramsay,* Del.Supr., 88 A.2d 546, 549 (1952).

*3 Nor, for present purposes, can I conclude that the assertion by these defendants does not have the sort of practically significant present impact upon plaintiffs that is the *raison d'etre* of the declaratory **472 judgment form of action. *See Stroud v. Milliken Enterprises, Inc.,* Del.Supr., 552 A.2d 476 (1989); *Schick v. Amalgamated Clothing & Textile Workers Union,* 533 A.2d 1235 (1987); *Heathergreen Commons Condo. Assoc. v. Paul,* Del.Ch., 503 A.2d 636 (1985). Plainly the assertion of various claims of this sort are capable of having a significant impact upon the present value of shares of Celotex stock owned by Jim Walter Corporation. If those shares have the customary characteristic of limited liability, they have one value. If those shares do not have that characteristic with respect to any Celotex liability for personal injuries, they have a very different value. The bankruptcy filings, while not involving plaintiffs as debtors, plainly reflect the significance of such a distinction. It is unlikely that the statements of defendants alone have resulted in the present uncertainty and the resulting impact upon Jim Walter Corporation as shareholder of Celotex. Surely the number of other cases pending in five or six jurisdictions in which similar statements have been made or claims asserted have had a role and perhaps a more important role in causing that effect. But just as surely the assertions in litigation in this State have contributed to the impact upon Jim Walter Corporation. Thus, one must conclude for purposes of this motion that defendants have made statements concerning their rights against Jim Walter Corporation which appear to have a present detrimental impact on that corporation, and defendants have not submitted those claims to adjudication nor waived them in a binding way. This set of facts seems to fit perfectly within the model contemplated by the declaratory judgment act.

The question posed does not have the hypothetical quality and remote impact that marks a declaratory judgment action that is not yet ripe. *See Stroud v. Milliken Enterprises, Inc., supra.* Defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

motion to dismiss will therefore be denied.

## II.

The next aspect of this matter to be considered is defendants' motion to stay this action in favor of the Texas action. Resolution of such a motion requires an exercise of discretion informed by consideration of fairness, comity and efficiency. The starting place for that analysis is the observation that, ordinarily, a later filed Delaware action will be stayed in favor of an earlier filed action in another jurisdiction if that other action is between the same parties, arises from the same acts of transaction, and is capable of doing complete justice in the circumstances. **473*McWane Cast Iron Pipe Corp. v. McDowell Wellman Engineering Co., Del.Supr., 263 A.2d 281 (1970). Conversely, where plaintiffs have first chosen to commence litigation in this forum, we will only in rare circumstances stay that action in favor of a later filed action between the same parties. ANR Pipeline Co. v. Shell Oil Co., Del.Supr., 525 A.2d 991 (1987). These rules are not ironclad; circumstances may exist in which the governing concerns of fairness, comity and efficiency dictate a different result (as in Stepak v. Tracinda Corp., Del.Ch., C.A. No. 8457, (August 18, 1989) where a first filed action was stayed) but they provide the general orientation.

*4 Here, plaintiffs say that the presumptive approach of McWane does not apply to the Texas action. They say (1) the Texas action ought not to be regarded as the first filed action since the Delaware Superior Court action in which the statements giving rise to the declaratory claim were made was itself earlier filed and the claim here made would, in most jurisdictions (in which law and equity have been merged), be a compulsory counterclaim in that action; (2) the defendants are not parties to the Texas action and, until that action is certified as a nationwide class action in which they are included, they ought not be deemed to be parties to that action for purposes of a stay motion; and (3) in a nationwide class action, a plaintiff's choice of forum should be given less respect (a proposition for which it cites a number of federal transfer cases).[FN1]

The second of these points has force in the particular context of this case. It appears to me particularly pertinent here that we are dealing not with litigation between the same parties in different jurisdictions, but with litigation involving different class members raising the same legal issue. At least prior to the time one of those actions is certified as a class action encompassing the plaintiffs in the other action, the test of McWane cannot be said to be satisfied.[FN2] That does not mean that fairness, comity and efficiency might not still counsel a stay, however. It does mean that the more demanding test of forum non conveniens should be used to determine whether such a stay should be granted.

**474 What does seem apparent here is that the question of Jim Walter Corporation's possible liability should be litigated in only one jurisdiction, not each one of the five or six jurisdictions in which it has been raised. A number of factors would bear upon the question where that determination should be made. The cases construing the federal transfer statute, 28 U.S.C. § 1404, or applying the narrower common law forum non conveniens doctrine identify those considerations.

The factors relevant to such a motion largely concern the convenience of the parties and witnesses and the availability of processes and procedures conducive to efficient and fair adjudication. See Parvin v. Kaufman, Del.Supr., 236 A.2d 425 (1967); ANR Pipeline Co. v. Shell Oil Co., Del.Supr., 525 A.2d 991 (1987). Also considered on a forum non conveniens motion in this jurisdiction is whether Delaware law is applicable. Parvin v. Kaufman, supra. See also Moses H. Cone Hosp. v. Mercury Const. Corp., 460 U.S. 1, 23, 26 (1983). Respect for other courts demands that we acknowledge that the courts of a sister state are fully competent to decide questions of Delaware law, but recognition of the special, continuous experience that this court has in construing our corporation law requires as well recognition of the fact that that experience creates a certain expertise. As I have had occasion to say earlier:

*5 The legal issues relating to that contract are governed by matters of Florida law. A Florida court could, of course, be expected to be more familiar with and offer greater expertise in Florida law than will this court or any court sitting outside of that jurisdiction. However, questions of Delaware corporation law are ultimately posed by the complaint and as to those, this court, by reason of its constant exposure, has developed a "feel" that might not be duplicated elsewhere. While I do not regard the law to be applied as the most significant of the factors that are evaluated on a forum non conveniens motion, I do think the application of Delaware law does explain plaintiff's choice of forum and is entitled to some weight. See Armstrong v. Pomerance,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1990 WL 3899 (Del.Ch.), 16 Del. J. Corp. L. 467
**(Cite as: Not Reported in A.2d)**

Del.Supr., 423 A.2d 174, 177 (1980); *McDermott, Inc. v. Lewis,* Del.Supr., 531 A.2d 206 (1987).

*Hoover Industries, Inc. v. Chase,* Del.Ch., C.A. No. 9276 (July 13, 1988) at pp. 10-11. Similarly here, I think plaintiffs' apparent interest in having this question of Delaware corporation law decided in this forum is referable in part at least to the expertise that the courts of this State have developed in applying Delaware corporation law. *See,* **\*\*475** *e.g., Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983 (1987) (claim that creditor controlled and was liable along with corporation); *Pauley Petroleum Inc. v. Continental Oil Co.,* Del.Ch., 231 A.2d 629, *aff'd,* 239 A.2d 629 (1968) (piercing corporate veil discussed); *Equitable Trust v. Gallagher,* Del.Supr., 99 A.2d 490 (1953). While a plaintiff's desire to avail itself of such experience in applying its own law as a forum court may have developed is legitimate and is entitled to some weight, it should by no means be regarded as conclusive in my opinion, but rather as one factor.

Passing beyond the applicable law, I must conclude that defendants have not shown that the convenience of the witnesses, the availability of evidence, differences in available processes or procedures or other factors support the conclusion that this jurisdiction is an inappropriate one for the resolution of this question of Delaware corporation law. I will therefore decline to stay prosecution of this case at this time. I do so mindful of the fact that the debtors will request that the Bankruptcy Court restrain the prosecution of similar actions pending against them and plaintiffs elsewhere. I am as well under the impression that the Bankruptcy Court has the power to restrain prosecution of this suit should it conclude that the efficient and fair administration of the debtors' estates in the matters before it requires or warrants that result. Thus, it appears that the question of where and when the issue will be determined whether Celotex has the most elementary characteristic of a corporation-limited liability-will be chiefly decided by the United States Bankruptcy Court.[FN3] Pending its determination, I will decline to stay litigation of this matter.

**\*6** Should that court leave matters in a posture in which litigation of this issue is going forward in several jurisdictions, defendants may renew their motion to stay once the motions to remand and to transfer the Texas litigation have been decided and a more informed judgment concerning convenience and any other relevant factor can be made.

The pending motions will therefore be denied.

It is so ordered.

FN1. *E.g., Supco Automotive Parts Inc. v. Triange Auto Spring Co.,* 538 F.Supp. 1187, 1192 (E.D.Pa.1982); *Firmani v. Clarke,* 325 F.Supp. 689, 691 (D.Del.1971); *Gender v. Merrill Lynch,* 621 F.Supp. 780, 782 (D.C.Ill.1985).

FN2. I need express no opinion on the question whether the concept of same-party for *McWane* purposes includes different individuals who are members of a certified class.

FN3. Should that impression be incorrect, this court would nevertheless accord substantial weight, on a subsequent motion to stay this action, to an indication from the Bankruptcy Court that fair and efficient adjudication of the issue here tendered for determination would be more likely achieved if the adjudication occurred elsewhere.

Del.Ch.,1990.
Jim Walter Corp. v. Allen
Not Reported in A.2d, 1990 WL 3899 (Del.Ch.), 16 Del. J. Corp. L. 467

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 486143 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Daniel S. O'SHEA, Plaintiff,
v.
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL UNION NO. 639, et al.,
Defendants.
No. Civ.A. 04-0207(RBW).

March 2, 2005.

Mindy G. Farber, James Edward Rubin, Farber
Taylor, LLC, Rockville, MD, for Plaintiff.
Mark J. Murphy, Mooney, Green, Baker & Saindon,
Washington, DC, Brooks R. Amiot, Piper Rudnick
LLP, Richard J. Hafets, DLA Piper Rudnick Gray
Cary US LLP, Baltimore, MD, for Defendants.

*MEMORANDUM OPINION*
WALTON, J.

**\*1** This case was initiated by the filing of the
plaintiff's complaint based upon section 301 of the
Labor Management Relations Act of 1947, 29 U.S.C.
§ 185; section 102 of the Labor-Management
Reporting and Disclosure Act of 1959 ("LMRDA"),
29 U.S.C. § 412; and Maryland common law, to
recover damages from defendant United Parcel
Service, Inc. ("UPS") for its alleged unlawful actions
related to the termination of his employment and
from defendant Local Union No. 639, International
Brotherhood of Teamsters ("Union"), for the alleged
breach of its duty to represent him. Complaint
("Compl.") at 1-2. Currently before the Court is the
Defendant, UPS's, Motion to Transfer this action to
the United States District Court for the District of
Maryland ("Defs.' Mot.") [FN1] pursuant to 28 U.S.C. §
1404(a) (2005) and their Memorandum in Support of
Motion to Transfer ("Defs.' Mem."). Also before the
Court are the Plaintiff's Memorandum in Support of
Plaintiff's Opposition to Defendants' Motion to
Transfer this Matter to the United States District
Court of Maryland ("Pl.'s Opp'n") and the Defendant
UPS's Reply to Opposition to Motion to Transfer
("Defs.' Reply"). For the following reasons, this
Court grants the defendants' motion.

FN1. The Union filed a Motion to Transfer

and Extend Filing Deadline for Responding
to Complaint Pending Court's Resolution of
Motion to Transfer. In its motion, the Union
incorporated the factual summary and legal
arguments set forth in the motions filed by
defendant United Parcel Service ("UPS").

*I. Background*

The Court will only briefly review the facts of this
case to the extent necessary to resolve the pending
motion. The plaintiff, Daniel S. O'Shea is a resident
of Maryland and was employed by UPS as a full-time
delivery driver at UPS's Laurel, Maryland facility.
Compl. ¶ ¶ 3-4; Defs.' Mot., Affidavit of Mark
Aaron ¶ 3. The plaintiff was a member of the Union
(headquartered in Washington, D.C.), which is a
party to a collective bargaining agreement ("CBA")
with UPS covering, among other things, full-time
delivery drivers. Compl. ¶ ¶ 4, 5. During his
employment with UPS, the plaintiff submitted a total
of twenty four letters and grievances complaining
about illegal employment practices allegedly
perpetrated against him in retaliation for a workman's
compensation claim he filed. Id. ¶ 9. In May of 2003,
UPS terminated the plaintiff's employment for
allegedly failing "to follow UPS methods, procedures
and policies and the dishonest use of a tape recorder."
Id. ¶ 18. The plaintiff contends, however, that his
termination was illegal. Compl. ¶ ¶ 41-44.

Following his termination, the Union shop steward
submitted a grievance to the plaintiff's UPS manager
on the plaintiff's behalf. Id. ¶ 21. However, the
plaintiff asserts that the Union did not support him
during this grievance process. Id. ¶ 31. For example,
the plaintiff alleges that the Union twice postponed a
hearing in his termination grievance case in violation
of the collective bargaining agreement. Id. ¶ ¶ 24,
26. Moreover, in the months preceding the grievance
hearing, the plaintiff requested that the Union
conduct an investigation into his claim of unfair
treatment. Id. ¶ 27. However, this request went
unfulfilled and his termination was eventually upheld
by the Atlantic Area Grievance Committee. Id. ¶ ¶
31-33. Following this ruling, the plaintiff filed this
civil action against UPS and the Union alleging,
among other things, a breach of the duty of fair
representation and a breach of the collective
bargaining agreement. Id. ¶ ¶ 38-44. In the current
motion before the Court, the defendants request that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this Court transfer this case to the United States District Court for the District of Maryland. Defs.' Mot. at 1.

## II. *The Parties' Arguments*

**\*2** The defendants contend that Maryland would serve as a more appropriate forum for the litigation of this case. Defs.' Mem. at 2, 5. The defendants note that the plaintiff is a Maryland resident, he was employed by UPS exclusively in Maryland, and all the events that form the basis of this suit occurred in Maryland. *Id.* at 2-4. In his opposition, the plaintiff contends that one of the defendants, the Union, is located in the District of Columbia and hence, the transfer would be less convenient to the Union. Pl.'s Opp'n. at 1-2. The plaintiff opines that the defendants' transfer request has little merit and is unjustified and contrary to the interests of justice. *Id.* at 2. Furthermore, the plaintiff argues that the District of Columbia has a strong interest of insuring that unions based here are held responsible for their failings in this jurisdiction. *Id.* at 8.

The plaintiff also notes that he chose this forum because his claim against the Union arose in the District of Columbia and because this is a "hybrid" claim, *i.e.,* a claim where the plaintiff simultaneously charges the employer with breach of the collective bargaining agreement and the Union with a breach of its statutory duty of fair representation. *Id.* at 5. In addition, the plaintiff relies on the fact that in 1989 he filed a suit in this district against the same parties. *Id.* at 3. In response, the defendants assert that the forum of the plaintiff's prior lawsuit is irrelevant to the determination of whether this current dispute should be transferred to the district of Maryland. Defs.' Reply at 3. Moreover, the defendants point out that the plaintiff ignores the fact that he is also bringing a claim against UPS for wrongful discharge *under Maryland common law, id.* at 5 (emphasis in original), which will require the interpretation and application of Maryland statutory and common law. *Id.* at 6.

## III. *Standard of Review*

28 U.S.C. § 1404(a) provides that: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Under Section 1404(a), the court may grant a transfer request if at the time when the

suit was filed, the plaintiffs could have pursued the same lawsuit in the transferee state. *Van Dusen v. Barrack*, 376 U.S. 612, 613, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). And a civil action may be brought in a judicial district in which a substantial part of the event giving rise to the claim occurred. 28 U.S.C. § 1391(a)(2) (2005). Therefore, the threshold question that must be answered in this case is whether this action could have been brought in Maryland. *Kafack v. Primerica Life Ins. Co.*, 934 F.Supp. 3, 5 (D.D.C.1996) (quoting *Van Dusen*, 376 U.S. at 613).

A district court has discretion to grant transfers based upon "individualized, case-by-case consideration of convenience and fairness." *Liban v. Churchey Group II, L.L.C.*, 305 F.Supp.2d 136, 139 (D.D.C.2004) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)). Under section 1404(a), the moving party bears the burden of establishing that transfer is appropriate. *Liban*, 305 F.Supp.2d at 139; *Schmidt v. Am. Inst. of Physics*, 322 F.Supp.2d 28, 31 (D.D.C.2004). As the movant, the defendants must show that (1) "the plaintiff originally could have brought the action in the proposed transferee district," and (2) "considerations of convenience and the interest of justice weigh in favor of transfer to that court." *Liban*, 305 F.Supp.2d at 139. As to the second prong of the test, the court can weigh a number of private and public interest factors. *Id.* The private interest considerations being: "(1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; ... and (6) the ease of access to sources of proof ." *Id.* (quoting *Trout Unlimited v. Dep't. of Agric.*, 944 F.Supp. 13, 16 (D.D.C.1996)). Whereas, the public interest considerations are: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies [in the courts of that forum]." *Id.* at 139.

## IV. *Legal Analysis*

### A. *Was Maryland an Available Forum for this Lawsuit?*

**\*3** In an action based on diversity, such as this one, venue is proper in:
(1) a judicial district where any defendant resides, if

Not Reported in F.Supp.2d                                                                                          Page 3
Not Reported in F.Supp.2d, 2005 WL 486143 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

all defendants reside in the same State; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred; ... or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Based upon the facts alleged in the complaint, this action could have been brought in Maryland pursuant to 28 U.S.C. § 1391(a)(2) because the plaintiff's claim arose out of a nucleus of facts that took place almost exclusively in Maryland. *See Kafack,* 934 F.Supp. at 5. Specifically, the plaintiff resides in Maryland, worked as a full-time driver at the defendant UPS' facility in Maryland, and the alleged unlawful termination also occurred in Maryland, Compl. ¶¶ 2-4, 18; Defs.' Mot., Affidavit of Mark Aaron ¶ 3. Moreover, the plaintiff's claims against the Union are based on the Union's alleged breach of its duty to provide fair representation with respect to the grievance filed by the plaintiff concerning his termination. Compl. ¶¶ 21-37. Although the Union is headquartered in Washington, D.C., the nucleus of facts underlying his dispute with the Union are primarily based in Maryland. For example, the plaintiff contends that the Union failed to procure documents that are located in Maryland and failed to conduct an investigation of the termination, which occurred in Maryland. In fact, it appears that the only nexus between this lawsuit and the District of Columbia is that the fact that the plaintiff sent multiple letters to the Union at its Washington, D.C. headquarters and the fact that the Union allegedly made decisions regarding the plaintiff's grievances in Washington, D.C. Pl.'s Opp'n at 7. On this record it is unquestionable that the plaintiff could have brought this lawsuit in Maryland. *See Kafack,* 934 F.Supp. at 6.

### B. *Do the Private and Public Interests Weigh in Favor of Transfer?*

Upon consideration of the second prong of the transfer test under section 1404(a)-whether the case should be transferred based on a balancing of private and public-interest considerations, *id.* at 6-9, it is clear that this case should be transferred to the District of Maryland.

#### 1. The Private-Interest Factors

Admittedly, the Court must afford some deference to the plaintiff's choice of the forum where he brought this lawsuit. *Kafack,* 934 F.Supp. at 4. However, the deference accorded to this decision is mitigated when the plaintiff is not a resident of the chosen forum. *Liban,* 305 F.Supp.2d at 141-42 (citing *Piper Aircraft Co., v. Reyno,* 454 U.S. 235, 255-56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). "This deference is further mitigated if a plaintiff's choice of forum has 'no meaningful ties to the controversy and no particular interest in the parties or subject matter." ' *Id.* at 142 (quoting *Wilderness Soc'y v. Babbitt,* 104 F.Supp.2d 10, 13 (D.D.C.2000)). Here, the plaintiff is not a resident of the District of Columbia. Defs.' Mot. at 1. In addition, the plaintiff worked out of the defendant UPS's Laurel, Maryland facility. Compl. ¶¶ 3-4. Moreover, all of the alleged discriminatory actions by UPS took place at the Laurel, Maryland facility. Compl. ¶¶ 3-20. Although the plaintiff's complaint also raises challenges about the Union's conduct that allegedly occurred in the District of Columbia, this alleged conduct centers around the plaintiff's discharge, which occurred in Maryland. While the fact that the Union is headquartered in the District of Columbia bears on whether the District of Columbia is also a proper forum for ths litigation of this action, the Court finds that the plaintiff's choice of forum should be given little deference, *see Liban,* 305 F.Supp.2d at 142, because overall this matter has minimal meaningful ties to the District of Columbia. *Id.*

**\*4** With regards to the convenience to the parties, the Court notes that the District of Columbia and the District of Maryland are in close proximity, thereby minimizing any inconvenience to the parties and any witnesses if this case is transferred to Maryland. *Id.* Moreover, all of the witnesses identified on the defendants' witness list reside in Maryland, Defs.' Mot., Affidavit of Mark Aaron ¶ 7, and there is no evidence indicating that any witnesses residing in the District of Columbia would be inconvenienced if this case is transferred to the District of Maryland. In addition, all of the relevant documentation regarding the plaintiff's employment with UPS and his termination is located at UPS' Laurel, Maryland facility. All of these factors weigh in favor of the transfer of this case.[FN2] *Kafack,* 934 F.Supp. at 8.

> FN2. Admittedly, some documentation regarding the plaintiff's claim against the Union may be located at the Union's headquarters in Washington, D.C. This, however, is insufficient to deny the transfer in light of the other private factors discussed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 486143 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

above.

### 2. The Public-Interest Factors

The public interests factors also favor transferring this case to Maryland. The public interest is "best served by having a case decided by the federal court in the state whose laws govern the interests at stake." *Id.* (citation omitted). While some of the plaintiff's claims are brought under federal statutes, the plaintiff has also brought a claim under Maryland common law. Compl. at 1-2. Obviously, a Maryland judge who is more informed about Maryland law is better equipped to interpret and apply Maryland common law. *See Armco Steel Co. v. CSX Corp.,* 790 F.Supp. 311, 324 (D.D.C.1991). Thus, this factor strongly favors transferring this case to Maryland, *id.,* as doing so will promote judicial economy. *Trout Unlimited,* 944 F.Supp. at 19.

As to the local-interest factor, this Court also concludes that the State of Maryland has a greater interest in this case than does the District of Columbia. *See Schmidt,* 322 F.Supp.2d at 36. The plaintiff resides in Maryland, UPS's Laurel operations are in Maryland, and the majority of the operative events occurred in Maryland. Controversies should be resolved in the locale where they arise, *Kafack,* 934 F.Supp. at 9, which is in Maryland.[FN3] Accordingly, on the record in this case, the defendants have clearly met their burden of showing that the public-interest factors weigh in favor of transferring this matter to the District of Maryland.[FN4] *Id.*

> [FN3.] The plaintiff places significance on the fact that the same three parties-the plaintiff, the Union and UPS-previously litigated a similar suit in this Court. Pl.'s Opp'n. at 2. However, this is a separate and unrelated matter and therefore the fact that the prior case was litigated in this Court has no bearing on where this case should be litigated.

> [FN4.] The relative congestion of the transferor and transferee courts does not enter into this Court's equation because the Court has no reason to believe that the docket of the District of Maryland is more or less congested than this Court's docket. *Liban,* 305 F.Supp.2d at 143.

### C. Additional Considerations

The plaintiff opines that the defendants' actual reason for requesting the transfer of this case is their belief that the district court of Maryland, as opposed to this Court, is a better forum from the defendants' perspective. Pl.'s Opp'n at 2. However, in light of the Court's analysis for the factors just discussed, this argument does not persuade the Court that transferring this case to the District of Maryland is not proper. And while the plaintiff continually points out that the defendant Union's alleged actions occurred in the District of Columbia, he cannot deny that UPS's alleged unlawful actions occurred solely in Maryland. In addition, the plaintiff fails to recognize that the original events giving rise to the Union's alleged actions occurred in Maryland, *i .e.,* the plaintiff's discharge and the events leading up to his discharge occurred in Maryland. Defs.' Mem. at 4.

**\*5** Many other cases with similar factual backgrounds have been transferred to other federal districts. For example, in *Liban* the plaintiff was a Maryland resident and the defendants were a real-estate development, marketing, and management company, incorporated in Maryland. *Liban,* 305 F.Supp.2d at 138. The plaintiff claimed that she was discriminated against by the defendants when she inquired about acquiring property at one of the defendants' Maryland real estate sites after reading the defendants' advertisement about the property in the Washington Post. *Id.* The plaintiff filed suit in the District of Columbia alleging violations of the Fair Housing Act and the District of Columbia Human Rights Act, and the defendants filed a motion to transfer the action to the District of Maryland. *Id.* at 138-39. In determining that transfer to the District of Maryland was appropriate, the court considered significant the fact that almost all the challenged actions of the defendants occurred in Maryland and that documentary evidence and witnesses were all in Maryland. *Id.* at 140. Consequently, the court concluded that the plaintiff's claims did not have meaningful ties to the District of Columbia. *Id.* at 142. In *Kafack,* the plaintiff was a resident of the District of Columbia and the defendants were insurance companies that sold three life insurance policies to the plaintiff's father. *Kafack,* 934 F.Supp. at 4. Two of the policies were executed in Maryland and the third policy was executed in the District of Columbia. *Id.* The plaintiff filed his claims against the insurance companies in this court and argued in response to a transfer motion that transferring the case to Maryland would be inconvenient to a number of witnesses. *Id.* at 7. However, the *Kafack* court granted the defendants' motion to transfer the case to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 486143 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

Maryland because the majority of witnesses and records relevant to the case were located in Maryland. *Id.* at 8. In addition, the court determined that despite the fact that one of the three policies had been executed in the District of Columbia, which itself had connections to Maryland as a result of events that occurred following its execution, the bulk of the acts relevant to the suit occurred in Maryland. *Id.* Consistent with the holdings in *Liban* and *Kafack,* this Court similarly concludes that transfer of this action to the District of Maryland is proper because it is the more appropriate forum to adjudicate this action.

SO ORDERED.[FN5]

     [FN5.] An Order consistent with this Court's ruling was issued on February 28, 2005.

D.D.C.,2005.
O'Shea v. International Broth. of Teamsters, Local Union No. 639
Not Reported in F.Supp.2d, 2005 WL 486143 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2057542 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendants' Motion to Transfer This Matter to the United States District Court of Maryland (May 3, 2004) Original Image of this Document (PDF)
• 2004 WL 2057531 (Trial Pleading) Complaint (Feb. 11, 2004) Original Image of this Document (PDF)
• 1:04cv00207 (Docket) (Feb. 11, 2004)
• 2004 WL 2057548 (Trial Motion, Memorandum and Affidavit) Defendant United Parcel Service's Reply to Opposition to Motion to Transfer (2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**c**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Michel RAPAPORT, William A. Marquard, Thomas
R. Wall, IV, and Robert A. Young, III, Plaintiffs,
v.
THE LITIGATION TRUST OF MDIP INC., a
Delaware express trust, and Stephen S. Gray, Julie
Dien Ledoux and Carol McDonald, in their capacity
as trustees for the Litigation Trust of MDIP Inc.,
Defendants.
**No. Civ.A. 1035-N.**

Submitted Aug. 9, 2005.
Decided Nov. 23, 2005.

Eric M. Davis, Paul J. Lockwood, Davis Lee Wright,
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, Delaware; Robert E. Zimet, Susan L.
Saltzstein, Skadden Arps, Slate, Meagher & Flom
LLP, New York, New York, for Plaintiffs.
Michael F. Bonkowski, Saul Ewing LLP,
Wilmington, Delaware; Howard B. Levi, Richard F.
Lubarsky, Levi Lubarsky & Feigenbaum LLP, New
York, New York, for Defendants.

MEMORANDUM OPINION
PARSONS, Vice Chancellor.
*1 Before the Court are a motion to enjoin the
prosecution of an allegedly later filed action in Ohio
and a motion to dismiss or stay this action in favor of
the Ohio action. The parties' dispute concerns the pre-
bankruptcy filing conduct of certain directors of the
former Mosler, Inc. ("Mosler") and is one dispute
among several arising out of Mosler's bankruptcy.
For the reasons stated in this memorandum opinion,
the Court concludes that the two actions were, for
purposes of these motions, simultaneously filed and
declines to stay this action on *forum non conveniens*
grounds.

I. BACKGROUND [FN1]

FN1. The facts are taken from the pleadings,
the affidavit of Paul J. Lockwood

("Lockwood Aff.), attached to Plaintiffs'
Opening Brief ("POB"), the affidavit of
Richard F. Lubarsky ("Lubarsky Aff.),
attached to Defendants' Opening Brief
("DOB"), the reply affidavit of Lockwood
("Lockwood Reply Aff."), attached to
Plaintiffs' Reply Brief ("PRB"), the affidavit
of Davis Lee Wright, attached to PRB, and
the reply affidavit of Lubarsky ("Lubarsky
Reply Aff."), attached to Defendants' Reply
Brief ("DRB"). The majority of the facts
pertinent to the pending motions are
undisputed; where the parties do dispute a
fact, it is so noted.

A. The Parties

Plaintiffs Michael Rapoport ("Rapoport"), William
A. Marquard, Thomas R. Wall, IV, and Robert A.
Young (collectively the "Directors") were directors
of Mosler from at least 1996 until and including
August 6, 2001. [FN2] During this time, Rapoport was
also Chief Executive Officer of Mosler. [FN3]

FN2. Lockwood Aff. ¶ 2; *see also* Lubarsky
Aff. ¶ 3 (Directors were directors of Mosler
from 1995 to 2001).

FN3. Lubarsky Aff. ¶ 3.

Mosler was a Delaware corporation headquartered in
Ohio. [FN4] It filed a voluntary petition under Chapter
11 of the U.S. Bankruptcy Code in the District of
Delaware on August 6, 2001. [FN5] On August 17, 2001,
Mosler sold substantially all of its assets to a third
party. [FN6]

FN4. *Id.* ¶ 5.

FN5. *Id.* ¶ 4; Lockwood Aff. ¶ 3.

FN6. Lockwood Aff. ¶ 4.

The Litigation Trust of MDIP Inc. (the "Trust"), a
defendant in this action, was created pursuant to
Mosler's Second Amended Joint Plan of Liquidation
(the "Liquidation Plan"). [FN7] The Liquidation Plan
assigned any and all of Mosler's potential claims to
the Trust.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN7. *Id.* ¶ 7; Lubarsky Aff. ¶ 8.

Defendants Stephen S. Gray, Julie Dien Ledoux and Carol McDonald (collectively the "Trustees") are trustees of the Trust. They have been sued only in their capacity as trustees.

### B. The District of Delaware Action

In August 2003, the Trust sued the Directors for breach of fiduciary duties in the U.S. District Court for the District of Delaware (the "District of Delaware Action").[FN8] All parties actively litigated the case and trial was scheduled to begin on June 6, 2005.[FN9] In January 2005, the Directors filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).[FN10] On May 25, 2005, the district court dismissed the District of Delaware Action for lack of subject matter jurisdiction.[FN11]

FN8. Lockwood Aff. ¶ 8; Lubarsky Aff. ¶ 9. *See also Litig. Trust of MDIP, Inc. v. Rapoport,* 2004 WL 3101575 (D.Del. Nov. 29, 2004) (denying defendants' motion to dismiss for failure to state a claim).

FN9. Lubarsky Aff. ¶ 10; *see also* Lockwood Aff. ¶¶ 13-15.

FN10. Lockwood Aff. ¶ 10.

FN11. *Litig. Trust of MDIP, Inc. v. Rapoport,* 2005 WL 1242157, at *4 & n. 5 (D.Del. May 29, 2005) (assuming without deciding that the relevant citizenships for purposes of diversity jurisdiction were those of the creditor-beneficiaries of the Trust and finding that neither the citizenships of the creditor-beneficiaries nor those of the Trustees were completely diverse from the citizenships of the Directors).

### C. The Chancery Action

The day after the Directors moved to dismiss the District of Delaware Action, they filed suit against the Trust in this Court seeking a declaratory judgment that they "did not breach their fiduciary duties as directors or officers of Mosler" (the "Chancery Action").[FN12] The Directors and the Trust agreed to stay the Chancery Action until the Directors terminated the stay.[FN13] On May 10, 2005, the Directors filed an Amended Complaint in this action that added the Trustees as defendants.[FN14] On May 25-the same day the district court dismissed the District of Delaware Action-counsel for the Directors terminated the stay and so notified counsel for the Trust.[FN15]

FN12. Compl. at 7; Lockwood Aff. ¶ 11.

FN13. Lockwood Aff. ¶ 12; Lubarsky Aff. ¶ 19.

FN14. Am. Compl. at 1; Lockwood Aff. ¶ 16; Lubarsky Aff. ¶ 18.

FN15. Lockwood Aff. ¶ 19; Lubarsky Aff. ¶ 20.

### D. The Ohio Action

**\*2** The very next day, the Trust sued the Directors in the Ohio Court of Common Pleas alleging the same breaches of fiduciary duties that it had alleged in the District of Delaware Action (the "Ohio Action").[FN16]

FN16. Lubarsky Aff. ¶ 21 ("The Ohio Action involves the same parties and fiduciary duty claims as in the [District of Delaware Action]."); Lockwood Aff. Ex. C (Ohio Action Complaint). The only difference between the parties to the Ohio Action and the Chancery Action is that the Directors named the Trustees of the Trust in addition to the Trust as defendants in the Chancery Action.

### E. The Pending Motions

On June 3, 2005, the Directors moved to enjoin the Trust and Trustees [FN17] from prosecuting the Ohio Action on the ground that the Chancery Action was the first filed action.[FN18] On June 8, the Trust moved to dismiss or stay the Chancery Action on the ground that, under Delaware law, the Ohio Action was filed first.[FN19] The Court heard argument on both motions on August 9, 2005. Per the Court's request, the Directors and the Trust submitted supplemental letter briefs addressing the applicability of *HFTP Investments, L.L.C. v. Ariad Pharmaceuticals, Inc.*[FN20] in these circumstances .[FN21]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN17. For purposes of the pending motions, the Trust and Trustees are indistinguishable. As such, they will be referred to collectively as the "Trust."

FN18. POB at 7.

FN19. DOB at 9-10.

FN20. 752 A.2d 115 (Del. Ch.1999).

FN21. Letter from Paul J. Lockwood, Esq. to the Court (Aug. 30, 2005) ("Lockwood Letter"); Letter from Richard F. Lubarsky, Esq. to the Court (Aug. 30, 2005) ("Lubarsky Letter").

## II. ANALYSIS

### A. Legal Framework

The granting of a stay rests within the sound discretion of the trial court. FN22 The threshold issue when deciding whether to stay an action in this Court in favor of an action pending elsewhere is which action was filed first. If the action in this Court is the first-filed action, "our courts will uphold a plaintiff's choice of forum except in the rare case where that choice imposes overwhelming hardship on the defendant." FN23 If the foreign action is the first-filed action, "principles of fairness, comity, judicial economy and the possibility of inconsistent results generally favor the granting of a stay." FN24 If the actions were contemporaneously filed, our courts will evaluate a motion for a stay "under the traditional *forum non conveniens* framework without regard to a *McWane*-type preference of one action over the other." FN25

FN22. *Adirondack GP, Inc. v. Am. Power Corp.*, 1996 WL 684376, at *6 (Del. Ch. Nov. 13, 1996) (citing *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del.1970)).

FN23. *United Phosphorus, Ltd. v. Micro-Flo, LLC*, 808 A.2d 761, 764 (Del.2002).

FN24. *Kurtin v. KRE, LLC*, 2005 WL 1200188, at *3 (Del. Ch. May 16, 2005) (internal citation omitted); Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 5-1 (2005) [hereinafter *Wolfe & Pittenger* ] ("Under the so-called first-filed rule, a Delaware court typically will defer to a first-filed action in another forum and will stay Delaware litigation pending adjudication of the same or similar issues in the competing forum.").

FN25. *Wolfe & Pittenger* § 5-1[a] (citing cases); *HFTP Invs.*, 752 A.2d at 122 (holding that where two actions are simultaneously filed, the question for the Court is "towards which of the two competing fora do the *forum non conveniens* factors preponderate?") (citing *New Castle County v. Acierno*, 1995 WL 694426 (Del. Ch. Oct. 19, 1995)).

The determination of which action was filed first is a question of fact determined by reference to the underlying procedural facts. FN26 The Court, however, does not make that determination mechanically or using a bright-line test. FN27 Rather, this Court's complementary objectives of discouraging both forum shopping FN28 and contrived races to the courthouse FN29 require a more nuanced analysis.

FN26. *Azurix Corp. v. Synagro Techs., Inc.*, 2000 WL 193117, at *3 (Del. Ch. Feb. 3, 2000); *Kingsland Holdings Inc. v. Bracco*, 1997 WL 55954, at *1 (Del. Ch. Feb. 4, 1997).

FN27. *Dura Pharms., Inc. v. Scandipharm, Inc.*, 713 A.2d 925, 928 (Del. Ch.1998); *In re IBP, Inc. S'holders Litig.*, 2001 WL 406292, at *7 (Del. Ch. Apr. 18, 2001) ("[T]he *McWane* doctrine does not denude a trial court of all discretion simply based on the fact that there are situations where actions should be considered to have been filed contemporaneously.").

FN28. *Kurtin*, 2005 WL 1200188, at *7 ("Delaware courts have long discouraged forum shopping.") (internal citation omitted); *see also United Phosphorus*, 808 A.2d at 764 (noting that both *forum non conveniens* standards discourage forum shopping).

FN29. *Azurix*, 2000 WL 193117, at *3 (noting "Court's desire to avoid rewarding

the winner of a race to the courthouse.") (citing *Tex. Instruments, Inc. v. Cyrix Corp.,* 1994 WL 96983, at \*3-4 (Del. Ch. Mar. 22, 1994)).

### B. *United Phosphorus* Does Not Control

The Trust argues that this case is on all fours with *United Phosphorus.* [FN30] In that case, the plaintiffs filed an action in the District Court for the District of Delaware alleging state and federal claims (the "Federal Action").[FN31] The defendant moved to dismiss for failure to state a federal cause of action. While that motion was under consideration, the defendant filed an action in state court in Georgia asserting claims very similar to those asserted by the plaintiffs in Delaware (the "Georgia Action"). [FN32] The district court eventually granted the defendant's motion to dismiss and the U.S. Court of Appeals for the Third Circuit affirmed. [FN33] The plaintiffs then filed an action in the Delaware Superior Court (the "Superior Court Action") that repeated "all of the factual allegations and all of the state law claims" from the original Federal Action.[FN34] Soon thereafter, the defendant moved to dismiss or stay the Superior Court Action in favor of its first-in-time Georgia Action. The Superior Court granted that motion under the *McWane* first-filed rule.[FN35]

FN30. DOB at 12; DRB at 2-4.

FN31. *United Phosphorus,* 808 A.2d at 763.

FN32. *Id.*

FN33. *Id. United Phosphorous Ltd. v. Micro-Flo LLC,* 276 F.3d 582 (Table) (3d Cir.2001).

FN34. *United Phosphorus,* 808 A.2d at 763.

FN35. *United Phosphorus, Ltd. v. Micro-Flo, LLC,* 797 A.2d 1208, 1213-16 (Del.Super.2001) ("The first-filed doctrine, as set forth in [*McWane* ], holds that the Court has the discretion to stay or dismiss an action pending before it when there 'is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." '), *rev'd,* 808 A.2d 761 (Del.2002).

\*3 The Delaware Supreme Court reversed,

concluding that, "to give effect to the policies guiding our *forum non conveniens* holdings, the [Superior Court Action] must be considered the first filed." [FN36] The Supreme Court reasoned that, for *forum non conveniens* purposes, "the two salient facts are that: 1) [United Phosphorous] did not voluntarily abandon its first choice of forum, and 2) when forced to refile in State court, [United Phosphorous] repeated the exact same state law claims as it raised in its original federal complaint." [FN37] The Supreme Court then observed that United Phosphorous chose to litigate in Delaware and held that the Superior Court Action "is a continuation of the viable claims from the Federal Action." [FN38] As such, the Court remanded the case to the Superior Court for a determination of whether the defendant could satisfy the heavy burden of establishing overwhelming hardship to overcome the plaintiffs' choice of forum in the first-filed action.[FN39]

FN36. *United Phosphorus,* 808 A.2d at 764.

FN37. *Id.* at 765.

FN38. *Id.*

FN39. *Id.*

The Trust argues that, "[a]s in *United Phosphorous,* in this case: (1) the Trust originally sued in a federal court and asserted state law claims, (2) the state law claims were dismissed for lack of subject matter jurisdiction; and (3) the Trust refiled the state law claims in a state court." [FN40] Accordingly, the Trust concludes, the Court should deem the Ohio Action a continuation of the District of Delaware Action and thus the first-filed action for purposes of the pending motions.[FN41]

FN40. DRB at 2.

FN41. *Id.*

The Trust's argument elides a key aspect of the *United Phosphorous* decision. There, as here, the plaintiff originally "chose to litigate in Delaware." [FN42] When the Federal Action was dismissed in *United Phosphorous,* however, the plaintiff, unlike the Trust, refiled *in Delaware state court.* "In short," wrote the Supreme Court, the plaintiff "is pursuing its original plan to litigate in Delaware and [the defendant who filed in Georgia] is forum shopping." [FN43] *United Phosphorous* thus does not stand for the proposition that a plaintiff whose state law claims are

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 5

dismissed from federal court may choose to refile in any state court with jurisdiction over the parties and effectively receive the benefit of the earlier filing date of the federal action. Where, as here, the plaintiff in a federal action refiles the state law claims in a state court of a state other than where the federal court is located, *United Phosphorous* does not control.[FN44]

> FN42. *United Phosphorous, 808 A.2d at 765.*

> FN43. *Id.*

> FN44. The Trust's citations to *Kurtin* and *W.C. McQuaide, Inc. v. McQuaide,* 2005 WL 1288523 (Del. Ch. May 24, 2005), DOB at 14, do not save its argument. In both *Kurtin* and *McQuaide,* this court cited *United Phosphorous,* in dicta, in a review of Delaware case law addressing motions to stay or dismiss. *See Kurtin,* 2005 WL 1200188, at *4 ("Where the substance of the original case remains unchanged, however, the courts have viewed the filing of intervening suits *in other jurisdictions* as forum shopping and have maintained the case's first-filed status.") (emphasis added) (citing *United Phosphorous, 808 A.2d at 765*); *McQuaide,* 2005 WL 1288523, at *4 (same).

The Trust also makes much of the meaning of "forum." In some contexts, it may well mean, as the Trust argues, "a particular court, tribunal or judicial body."[FN45] And, Delaware courts generally do respect a plaintiff's choice of forum.[FN46] For purposes of determining whether *United Phosphorous* controls here, however, the meaning of forum urged by the Trust is not persuasive. The *United Phosphorous* decision turned on the geographical aspect of forum selection: the plaintiff "chose to litigate in Delaware" and then "pursu[ed] its original plan to litigate in Delaware."[FN47]

> FN45. DRB at 3.

> FN46. *Wolfe & Pittenger* § 5-1 ("*McWane* and its progeny establish a strong preference for the litigation of a dispute in the forum in which the first action relating to such dispute is filed.") (citing cases).

> FN47. *United Phosphorous, 808 A.2d at*

765.

**\*4** Further distinguishing the situation in this case from that of *United Phosphorous* is the Trust's blatant forum shopping in search of a jury trial.[FN48] In *United Phosphorous,* it was the defendant who was forum shopping.[FN49] Here, it is the Trust, by abandoning its initial choice of Delaware after the parties had fully prepared the case for trial here.

> FN48. *See* DOB at 18-19 (describing desire for a jury trial); DRB at 4 (same).

> FN49. *United Phosphorous, 808 A.2d at 765.*

### C. The Chancery Action and the Ohio Action Should be Treated as Contemporaneously Filed

The Court's conclusion that *United Phosphorous* does not control this case does not end the first-filed inquiry because the Directors are unquestionably forum shopping, too. It is a long-established general rule that "a party should not be permitted to defeat its adversary's choice of forum by commencing litigation involving the same cause of action in another jurisdiction of its own choosing."[FN50] The Chancery and Ohio Actions admittedly involve the same parties and the same claims.[FN51] The Directors filing of the Chancery Action was an attempt not so much to defeat its adversary's choice of forum as to preempt them from abandoning their initial choice and filing a new suit in a different state. In other words, the Directors raced to this courthouse-while the District of Delaware Action was pending-to secure first-filed status for the Chancery Action in the event its motion to dismiss succeeded. While this is not a classical race to the courthouse, where opposing parties file within hours, if not minutes, of each other,[FN52] it is a race nonetheless. The Directors had no other reason to file the Chancery Action while the District of Delaware Action was pending. In such races, this court has not hesitated to treat the cases as contemporaneously filed.[FN53]

> FN50. *Kurtin,* 2005 WL 1200188, at *4 (citing *Dura Pharm., 713 A.2d at 928*); *McQuaide,* 2005 WL 1288523, at *4 (citing *McWane, 263 A.2d at 283*).

> FN51. Lockwood Aff. ¶ 20 ("The Ohio Action is essentially a mirror image of [the Chancery Action]."); Lubarsky Letter ¶ 4

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 6

("The two competing actions are 'mirror-image' cases in that one (the Ohio Action) asserts the Trust's substantive claims for damages, whereas the other (the Chancery Action) asserts only claims for declaratory relief arising out of the Trust's claims.").

FN52. *See, e.g., In re IBP,* 2001 WL 406292 (treating complaints-filed five hours apart as if they had been filed contemporaneously).

FN53. *Wolfe & Pittenger* § 5-1[a] n. 19 (citing cases).

It is also well known that this Court takes a rather dim view of "tactical maneuvers and improper manipulation of the litigation process by parties who seek to invoke the principles of comity and efficiency underlying the *McWane* doctrine." [FN54] It is unlikely that the Directors had any intention of prosecuting the Chancery Action unless the District of Delaware Action was dismissed. [FN55] Rather, it is more likely that the filing of the Chancery Action was a tactical maneuver designed to confer first-filed status on the Directors. The Court will neither reward the winner of a race to the courthouse nor the manipulator of the litigation process by affording them first-filed status and imposing the accompanying heavy burden on the opposing party to defeat their choice of forum. Therefore, the Court will not treat the Chancery Action as first-filed, [FN56] but rather concludes that, under the present circumstances, the Chancery Action and the Ohio Action should be considered contemporaneously filed. [FN57]

FN54. *Id.* at text accompanying n. 38. Although parties often engage in these maneuvers in an attempt to have a Delaware action stayed, the Court will not take a brighter view of them when they are aimed at staying a foreign action.

FN55. *See* Lockwood Aff. ¶ 12 (describing agreement "to extend time for Trust to answer, move, or otherwise respond to the complaint in [the Chancery Action]" entered into shortly after the Directors filed the Chancery Action); Lubarsky Aff. ¶ 19 ("Other than that agreement, there was no activity in the Chancery Action for nearly three months, from its filing on January 20 until the Directors served their amended complaint on May 10.").

FN56. The Trust's argument that the Chancery Action should be "disregarded" for purposes of determining which action was first filed because it is a declaratory judgment action, DOB at 11, is without support in the case law. *See Williams Gas Supply Co. v. Apache Corp.,* 594 A.2d 34, 36 (Del.1991) (affirming Superior Court decision that, notwithstanding its language, accorded first-filed status to a declaratory judgment action); *but see In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 1010584, at *5 (Del. Ch. July 17, 2000) (declining, in dicta, to accord first filed status to a later-filed cross claim for declaratory judgment). Rather, Delaware courts engage in a "more discerning analysis" of the relevant *forum non conveniens* factors where the first-filed action seeks a declaratory judgment. *Wolfe & Pittenger* § 5-1[a]. Where, as here, the Directors' decision to file a declaratory judgment action was "merely strategic [and] not inequitable," *Am. Legacy Found. v. Lorillard Tobacco Co.,* 2002 WL 927383, at *4 (Del. Ch. Apr. 29, 2002), and "justice may be had without hardship to any party," *id.,* this Court will not "disregard" the Chancery Action.

FN57. The Trust's filing of the Ohio Action immediately after the dismissal of the District of Delaware Action supports treating it and the Chancery Action as contemporaneously filed. The Trust refiled as soon as it knew it needed to. Conversely, the Directors had no need to file their action until after the dismissal of the District of Delaware Action. The fact that they filed the Chancery Action earlier is inconsequential, as evidenced by the Directors' voluntary agreement to stay that action.

### D. The *Forum Non Conveniens* Factors Preponderate Towards Delaware

Since the Chancery and Ohio Actions "must be considered contemporaneously filed, neither action commands the high ground which would otherwise force the court to approach the analysis in a manner which defers to a plaintiff's choice of forum." [FN58] The Court therefore will employ a traditional *forum non conveniens* analysis. [FN59] Six factors are relevant for purposes of this analysis: (1) the applicability of Delaware law; (2) the relative ease of access to proof;

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 7

(3) the availability of compulsory process for witnesses; (4) the possibility of a view of the premises; (5) the pendency or nonpendency of a similar action in another jurisdiction; and (6) all other practical considerations that would make the trial easy, expeditious and inexpensive. [FN60] In balancing these factors, the Court focuses on which forum would be the more "easy, expeditious, and inexpensive in which to litigate." [FN61] This approach leads to the following burden of persuasion for purposes of the motion to stay: "towards which of the two competing fora do the *forum non conveniens* factors preponderate?" [FN62] The resolution of this question rests within the discretion of the trial court, "to be determined in light of all the facts and circumstances and in the interest of the expeditious and economic administration of justice.[FN63]

FN58. *Azurix Corp.,* 2000 WL 193117, at *4; *see also HFTP Invs.,* 752 A.2d at 122 (holding that where two actions were contemporaneously filed, the Court will decide a motion to stay "without giving deference to either party's choice of forum.").

FN59. *Azurix Corp.,* 2000 WL 193117, at *4.

FN60. *Wolfe & Pittenger* § § 5-1, 5-2 & n. 9 (noting that the Delaware courts have grafted the sixth factor on to the five factors enunciated by the Delaware Supreme Court in *Gen. Foods Corp. v. Cryo-Maid, Inc.,* 198 A.2d 681, 684 (Del.1964), *overruled on other grounds, Pepsico, Inc. v. Pepsi-Cola Bottling Co.,* 261 A.2d 520 (Del.1969); *Azurix Corp.,* 2000 WL 193117, at *4; *HFTP Invs.,* 752 A.2d at 122-23.

FN61. *HFTP Invs.,* 752 A.2d at 122.

FN62. *Id.; see also Azurix Corp.,* 2000 WL 193117, at *4 (holding that moving party must demonstrate "on balance" that *forum non conveniens* factors warrant a stay). For the Chancery Action to be *dismissed,* the Trust "would have to demonstrate that it would suffer undue, overwhelming or significant hardship if it is required to litigate in Delaware." *Id.* at *4.

FN63. *Wolfe & Pittenger* § 5-2; *Apple Computer, Inc. v. Exponential Tech., Inc.,*

*1999 WL 39547, at *14 & n. 61 (Del. Ch. Jan. 21, 1999)* (noting significant discretion afforded the trial court in deciding motion to stay).

1. The applicability of Delaware law

**\*5** Delaware law unquestionably governs this dispute. The Directors seek a declaratory judgment that they did not breach the fiduciary duties they owed Mosler or, alternatively, a declaration that Mosler's 102(b)(7) provision precludes the recovery of money damages for any breach(es) they may have committed.[FN64] Mosler was a Delaware corporation.[FN65] "It is now well-established that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs." [FN66] A corporation's internal affairs include "those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders." [FN67] The fiduciary duties owed by directors and officers to the corporation unquestionably pertain to the relationships among the corporation and its officers and directors. Therefore, Delaware law governs this dispute.

FN64. Am. Compl. ¶ ¶ 13, 14, 18.

FN65. Lockwood Aff. Ex. A ¶ 6 ("At all relevant times, Mosler was a Delaware corporation....").

FN66. *VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1113 (Del.2005) (citing *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 89-93 (1987)).

FN67. *Id.*

Although the applicability of Delaware law is not conclusive in every *forum non conveniens* analysis,[FN68] "actions raising novel and substantial issues of Delaware corporate law are best resolved in Delaware courts." [FN69] This action will likely raise at least one novel issue of Delaware corporate law: whether directors and officers' duties change materially in the face of "deepening insolvency." [FN70] This action also raises "substantial issues" of Delaware corporate law. Indeed, the liability or lack thereof of the Directors will turn on their compliance with their duties of good faith and loyalty, as elucidated by the Delaware courts. Such questions of substantive Delaware corporate law "are more properly decided here rather than another jurisdiction,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 8

even though the other jurisdiction's courts are quite capable of applying Delaware law and rendering prompt justice." [FN71] Further, the Delaware Supreme Court has observed, albeit in another context, that "Delaware has a substantial interest in defining, regulating and enforcing the fiduciary obligations which directors of Delaware corporations owe to such corporations and the shareholders who elected them." [FN72]

FN68. *Wolfe & Pittenger* § 5-2[a] (citing cases).

FN69. *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at *3 (Del. Ch. May 20, 1993)* (internal citation omitted).

FN70. *See* Am. Compl. Ex. A ¶ 3 (Trust alleging in District of Delaware Action that Directors "[r]ecklessly failed to appropriately respond to the company's deepening insolvency"). *See* Donald F. Parsons, Jr., V.C., Del. Ct. of Ch., Recent Developments in the Wonderful World of Fiduciary Duties from *Disney* to the Zone of Insolvency, Address at the SMU Corporate Counsel Symposium (Oct. 28, 2005) (manuscript on file with the SMU Law Review) (observing that the question of whether directors and officers duties change in the zone of insolvency is a "relatively new and uncharted issue"). For a thorough exposition of whether directors owe any special duties in the zone of insolvency, *see Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 787-92 (Del. Ch.2004).

FN71. *In re Walt Disney Co. Derivative Litig.,* 1997 WL 118402, at *3 (Del. Ch. Mar. 13, 1997).

FN72. *Armstrong v. Pomerance,* 423 A.2d 174, 180 n. 8 (Del.1980) (internal quotation omitted).

The Court therefore concludes that the applicability of Delaware law weighs heavily in favor of this forum.

2. The relative ease of access to proof

Mosler's headquarters were located in Hamilton, Ohio.[FN73] Some marginal inconvenience thus

normally would arise if documents had to be brought to Delaware.[FN74] The parties, however, were ready to go to trial in Delaware in the District of Delaware Action less than two weeks after that case was dismissed.[FN75] The Court therefore accepts the Directors' assertion that most of the relevant documents were already in Delaware and, if the Court stays this action, would have to be moved to Ohio.[FN76] In any event, the potential inconvenience of having to transport documents is slight because, as then Vice Chancellor, now Chief Justice Steele observed, "[m]odern methods of information transfer render concerns about transmission of documents virtually irrelevant." [FN77]

FN73. Lubarsky Aff. ¶ 5.

FN74. *HFTP Invs.,* 752 A.2d at 123 ("Because ARIAD has its principal place of business in Massachusetts, it will bear some marginal inconvenience in producing documents in either New York or Delaware.").

FN75. Lubarsky Aff. ¶ ¶ 15-16; PRB at 15. The New Castle County Courthouse is located just a few blocks away from the federal courthouse in Wilmington, Delaware.

FN76. POB at 12; PRB at 15.

FN77. *Asten v. Wangner,* 1997 WL 634330, at *3 (Del. Ch. Oct. 3, 1997).

*6 Similarly, modern methods of transportation lessen the Court's concern about the travel of witnesses who live neither in Delaware nor Ohio. Sixteen of the nineteen witnesses identified by the Trust in the District of Delaware Action do not reside in Delaware or Ohio and, in fact, are scattered around the country.[FN78] In addition, two of the additional, "important fact witnesses" identified by the Trust in briefing the pending motions reside in Texas and Kentucky.[FN79] Thus, among the witnesses identified by the Trust in the District of Delaware Action and in briefing the pending motions, only five of 23 reside in Ohio, while none reside in Delaware. The five Ohio witnesses will suffer some inconvenience if they ultimately are called to Delaware to testify, but where, as here, "there is no single forum or locality in which the bulk of witnesses ... is located ... the location of witnesses ... [does] not weigh in favor of one forum or the other." [FN80]

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN78. Lockwood Reply Aff. Ex. B (attaching Trust's List of Witnesses from the District of Delaware Action).

FN79. Davis Aff. ¶¶ 5, 8.

FN80. *Wolfe & Pittenger* § 5-2[b].

In sum, (1) the majority of relevant documents are likely located in Delaware, and, if they are not, can be moved here with only marginal inconvenience; (2) several witnesses are located in Ohio; and (3) the majority of the witnesses are scattered around the country. Accordingly, this factor is neutral. It neither favors nor disfavors this forum.

### 3. The availability of compulsory process for witnesses

For this factor to favor the Trust, it must have identified the witnesses and "the specific substance of their testimony." [FN81] Further, for this factor to be relevant, the other forum should "provide a substantial improvement as to the number of witnesses who would be subject to compulsory process." [FN82] Of the nineteen non-party witnesses identified by the Trust, five live in Ohio.[FN83] Ohio thus provides some improvement over Delaware in terms of the number of witnesses subject to compulsory process. Because the Trust failed to identify the relative importance of its various witnesses or what they would testify to, the Court cannot determine how much of an improvement Ohio would be over Delaware. One factor relevant to that issue is the Trust's declared intention to bring the five Ohio witnesses to Delaware to appear in its chosen forum until the Federal Action was dismissed. Indeed, the Trust's readiness to proceed to trial as the plaintiff in the District of Delaware Action suggests that the improvement would not be substantial.

FN81. *Id.* § 5-2[c].

FN82. *Id.*

FN83. The Trust identified nineteen potential witnesses in the District of Delaware Action, but four of them are the defendant Directors. Lockwood Reply Aff. Ex. B. The Trust identified four additional witnesses in briefing the pending motions,

Lubarsky Aff. ¶ 27, for a total of nineteen potential nonparty witnesses.

Where, as here, "potential witnesses are located in numerous jurisdictions, so that no single forum has a distinct advantage in terms of the availability of compulsory process, such circumstance will militate against a stay or dismissal absent a specific showing of hardship by the defendant." [FN84] Again, the Trust has made no such showing. In addition, to the extent the nonparty witnesses are fact witnesses, the Trust could obtain their testimony by deposition.[FN85]

FN84. *Wolfe & Pittenger* § 5-2[c].

FN85. *HFTP Invs.*, 752 A.2d at 123.

Accordingly, the availability of compulsory process favors Ohio, but only very slightly.

### 4. The possibility of a view of the premises

*7 The parties have presented no evidence that this factor is relevant. As such, it neither favors nor disfavors this forum.

### 5. The pendency or nonpendency of a similar action in another jurisdiction

The Chancery and Ohio Actions are mirror images of each other.[FN86] Moreover, there is no reason to believe that the Ohio court cannot fully adjudicate the parties' dispute and provide full, final and complete relief.

FN86. *See supra* n. 51.

There is also no evidence that if this Court declined to stay this action, then it and the Ohio Action would be on a collision course. Neither the Trust nor the Directors have "taken any steps to advance the progress of the Ohio Action." [FN87] Further, there is no evidence that the Ohio court has a particular or strong interest in resolving this dispute, as opposed to having it proceed in this Court.[FN88]

FN87. Letter from Richard F. Lubarsky, Esq. to the Court ¶ 4 (Oct. 6, 2005). In the PRB, the Directors assert that "counsel for the Trust has advised the Directors that the

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Page 10

Trust will proceed in Ohio absent an injunction." PRB at 18. Absent any direct evidence of the Trust's intentions, the Court will not presume that the Trust will take actions that could put this action and the Ohio Action on a collision course.

FN88. The parties have represented to this Court that the "Notice of Report" sent by the Ohio court appears to have been "generated by the Ohio Court in the ordinary course." Letter from Richard F. Lubarsky, Esq. to the Court ¶ 4 (Oct. 6, 2005).

"Since [the Chancery Action] does not differ significantly from the [Ohio Action] nor can this Court provide relief that the [Ohio] court cannot," FN89 this factor is neutral. It neither favors nor disfavors this forum.

FN89. *Azurix,* 2000 WL 193117, at *6.

6. All other practical considerations

The Trust argues that both Mosler's historic significant contacts with Ohio and the present location of "dozens of unsecured creditors of Mosler on whose behalf this action has been brought" in Ohio give Ohio a stronger interest in resolving this controversy than Delaware.FN90 Although Delaware courts occasionally have considered such contacts in the context of a *forum non conveniens* analysis,FN91 the Court finds the Trust's argument significantly undercut by its original decision to litigate this dispute in Delaware. That decision, and the Trust's failure to explain why these contacts with Ohio have become any more significant now in the wake of the dismissal of the District of Delaware Action, cause the Court to conclude that the Trust's contacts argument deserves little weight.

FN90. DRB at 8-9.

FN91. *Wolfe & Pittenger* § 5-2[f].

Further, the Court notes that Mosler's past incorporation in Delaware weighs slightly in favor of litigation here. Delaware has an interest in opening its courts to Delaware entities, like Mosler was and the Trust is, in order to provide a forum in which they may seek justice.FN92 This is especially so where the dispute between the parties involves the internal affairs of a Delaware corporation.

FN92. *Id.*

The Trust also argues that the possibility of a jury trial in the Ohio Action weighs in favor of that forum. This Court, however, consistently has rejected such pleas.FN93 As noted by Chief Justice Steele, it is likely that "our Delaware corporate citizens often find it advantageous to be based in a state where business disputes can be resolved without a jury trial...." FN94

FN93. *Id.; Asten,* 1997 WL 634330, at *3 ("I can find no Delaware case that says that our non-jury Court of Chancery should yield dispute resolution between its Delaware corporate citizens to jury trials in other jurisdictions."); *Azurix,* 2000 WL 193117, at *7 ("[T]he parties relative taste for lay resolution of their purely commercial dispute[ ] is not relevant to my decision.").

FN94. *Asten,* 1997 WL 634330, at *3.

Finally, the Court will consider the motives of the parties in filing their respective actions.FN95 In this situation, both parties clearly are forum shopping. The Trust is forum shopping based on its preference for a jury trial; the Directors are forum shopping in that they presumably would prefer to keep this case in Delaware, where the Trust originally filed it, and to take advantage of this Court's familiarity with Delaware corporate law and nonjury trials. The motives of the parties tip the scales slightly in favor of the Directors because "this is not a case where [they] ha[ve] chosen a forum solely to inconvenience the defendant." FN96 Rather, Delaware was Mosler's state of incorporation, this dispute is governed by Delaware law, and, perhaps most importantly, the Trust initially brought suit and prosecuted its case until it was trial-ready in Delaware.

FN95. *See Wolfe & Pittenger* § 5-2[f] (noting Delaware courts consideration of the motives of each party).

FN96. *Leach v. Solar Bldg. Sys., Inc.,* 1999 WL 252386, at *3 (Del. Ch. Apr. 8, 1999).

*8 Accordingly, this last, catch-all factor weighs slightly in favor of Delaware.

Taking all of the relevant *forum non conveniens*

factors into account, the Court concludes, in the exercise of its discretion, that they preponderate towards Delaware. Therefore, the Trust's motion to dismiss or stay this action in favor of the Ohio Action will be denied.


E. Injunction

It is well-settled that this Court "is empowered to enjoin a party to an action from removing the subject of the controversy to a foreign jurisdiction by filing a later action or proceeding in a foreign forum." [FN97] It is equally well-settled, however, that the exercise of such authority "is discretionary in nature and should be exercised cautiously." [FN98] A sense of comity owed to the courts of other states drives this caution.[FN99]


FN97. *Ivanhoe Partners v. Newmont Mining Corp.*, 1988 WL 34526, at *3 (Del. Ch. Apr. 7, 1988) (internal citations omitted).

FN98. *Wolfe & Pittenger* § 5-3 (citing cases); *Household Int'l, Inc. v. Eljer Indus., Inc.*, 1993 WL 133065, at *2 (Del. Ch. Apr. 22, 1993) ("I do not read *ANR v. Shell* as holding that the Court of Chancery is obligated in each case to enjoin prosecution of a later filed suit between the same parties whenever it determines that a first filed suit in Chancery should not be stayed.").

FN99. See *Household Int'l, Inc. v. Eljer Indus., Inc.*, 1995 WL 405741, at *1 ("In both instances [where the plaintiff sought to enjoin the defendant from prosecuting a later-filed action] the denial of the injunction was premised upon a sense of comity owed to the courts of the State of Texas...."); *Wolfe & Pittenger* § 5-3 ("[R]ecent case law tends to reflect this cautious approach by giving a great deal of weight to considerations of comity.").


Where the courts of Delaware have issued injunctions in aid of jurisdiction, they have done so in favor of a first-filed Delaware action.[FN100] In fact, the Court has found no case enjoining the prosecution of a contemporaneously filed action in another jurisdiction. This Court's sense of comity towards the courts of other states would seem to counsel against such an injunction, especially where, as here, the court in the Ohio Action has yet to address whether it

should stay its hand in favor of this action. As former Chancellor Allen observed, the better practice is to rely upon the comity of sister state courts to respect the judgment of this Court that this controversy ought to be heard in Delaware.[FN101]


FN100. See, e.g., *Household Int'l*, 1995 WL 405741, at *3 (enjoining prosecution of later-filed Texas suit); *Air Prods. & Chems., Inc. v. Lummus Co.*, 235 A.2d 274, 278 (Del. Ch.1967) (enjoining defendant from bringing suit in Puerto Rico when a suit between the same parties concerning the same controversy was pending in the Delaware Superior Court); *Williams Natural Gas Co. v. BHP Petroleum Co.*, 574 A.2d 264 (Table) (Del.1990) (enjoining prosecution of later-filed suit between the same parties concerning the same controversy).

FN101. *Household Int'l*, 1993 WL 133065, at *2 ("I confess my preference is to issue such an injunction only on rare occasions. It would seem to me the better practice to rely upon the comity of sister state courts to respect the judgment that has now been made concerning the feasibility of litigating these claims in the first filed jurisdiction.").


In declining to grant an injunction in favor of its jurisdiction, the Court has proceeded with the understanding that a collision with the Ohio Action is not imminent. No action has been taken with respect to the Ohio Action and it remains to be seen whether the Trust will challenge, in the Ohio Action, the decision of this Court to hear this controversy.[FN102] If the circumstances change, and a collision course seems unavoidable, this Court would entertain a renewed motion to enjoin the Trust from proceeding with the Ohio Action.[FN103]


FN102. See supra at II.D.5.

FN103. See *Household Int'l*, 1995 WL 405741, at *3 (enjoining prosecution of later-filed suit in Texas after Texas court declined to stay prosecution of later-filed suit); *Williams Natural Gas Co.*, 574 A.2d 264 (enjoining parties from proceeding with a later-filed action to avoid a "collision course").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 12

### III. CONCLUSION

For the reasons stated, the Trust's motion to stay or dismiss this action is DENIED, and the Directors' motion to enjoin the prosecution of the Ohio Action also is DENIED.

IT IS SO ORDERED.

Del.Ch.,2005.
Rapoport v. Litigation Trust of MDIP Inc.
Not Reported in A.2d, 2005 WL 3277911 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 356337 (Trial Pleading) Complaint for Declaratory Relief (Jan. 21, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 301414 (Del.Ch.), 20 Del. J. Corp. L. 1134
**(Cite as: Not Reported in A.2d)**

Page 1

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
U.S. DIE CASTING AND DEVELOPMENT CO.
v.
SECURITY FIRST CORP.
**Civ.A. No. 14019.**

April 28, 1995.

Thomas Herlihy, III, Herlihy, Harker & Kavanaugh,
Wilmington.
Robert K. Payson, Peter J. Walsh, Jr., Kevin R.
Shannon, Wilmington.
STEELE, Vice-Chancellor.
*1 Plaintiff U.S. Die Casting and Development
Company ("U.S. Die") filed a Complaint pursuant to
8 Del. C. § 220 seeking inspection of defendant
Security First Corporation's ("Security First") books
and records relating to an agreement and plan of
merger between Security First and Mid Am
Incorporated ("Mid Am"). U.S. Die served a request
for production of documents and a Rule 30(b)(6)
Notice of Deposition on Security First. U.S. Die also
filed a Motion for a Commission and Notice of
Deposition *Duces Tecum* of Mid Am. Security First
filed a Motion asking the Court to enter a protective
order with respect to particular portions of the request
for production of documents, the Rule 30(b)(6)
deposition, and the Motion for a Commission
preventing U.S. Die from taking the requested
discovery.

I. Background

U.S. Die alleges it made a demand on Security First
for its and its subsidiaries' books and records directly
or indirectly related to the September 1, 1994
Agreement and Plan of Merger between Security
First and Mid Am pursuant to 8 Del. C. § 220.
Amend. Compl. ¶ 4.

U.S. Die's Complaint states the purpose of the request
is "so that [U.S. Die] can investigate and determine if
improper transactions and/or mismanagement
occurred as a result of Security First's actions and
dealings regarding the merger with Mid Am." Am.

Complaint at ¶ 5.

On March 24, 1995, U.S. Die filed a First Request for
Production of Documents. The challenged portions of
the Request for Production request production of the
following:
1. Any and all documents, including, but not limited
to correspondence and memoranda, which describe,
concern or relate to the failure of the Defendant and
Mid Am to consummate the Agreement.
2. Any and all documents, including, but not limited
to cancelled checks, receipts and checking account
statements which describe, concern or relate to the
transfer of funds to Mid Am by or on behalf of the
Defendant from August 1, 1994 to the present.
3. Any and all documents, including, but not limited
to, minutes of meetings, correspondence and
memoranda, which describe, concern or relate to the
decision by the Defendant and/or Mid Am not to
consummate the Agreement.
4. Any and all documents, including, but not limited
to, financial statements, which describe, concern or
relate to the value of the Defendant's shares and/or
the value of the Defendant's assets.

On March 28, 1995 U.S. Die filed a Rule 30(b)(6)
Notice of Deposition. The challenged portion
identifies the following matters for examination:1.
The September 1, 1994 Agreement and Plan of
Merger (the "Agreement") between the Defendant
and Mid Am Incorporated ("Mid Am").
2. The failure of the Defendant and Mid Am to
consummate the Agreement.
3. The decision by the Defendant and/or Mid Am to
terminate the Agreement.
4. The transfer of funds to Mid Am by or on behalf of
the Defendant.
5. The value of the Defendant's shares.
*2 6. The Defendant's assets.

On April 5, 1995, U.S. Die filed a Motion for a
Commission and Notice of Deposition *Duces Tecum*
of Mid Am.

On April 6, 1995, Security First filed a Motion for
Protective Order pursuant to Rule 26(c) and 37(a),
seeking a protective order preventing U.S. Die from
conducting the challenged discovery.

II. Contentions of the Parties

Not Reported in A.2d                                                                                                      Page 2
Not Reported in A.2d, 1995 WL 301414 (Del.Ch.), 20 Del. J. Corp. L. 1134
(Cite as: Not Reported in A.2d)

Security First argues the challenged areas of discovery exceed the narrow scope of discovery allowed in a § 220 proceeding. Security First argues if U.S. Die is allowed to take the requested discovery, the § 220 action becomes moot because U.S. Die will have, through the discovery process itself, access to the papers and records it seeks through the § 220 action.

U.S. Die asserts it has the burden to prove it has stated a proper purpose in its Complaint and the discovery it seeks is calculated to identify relevant evidence tending to prove the assertion. U.S. Die argues, therefore, since Security First challenged the sufficiency of its stated proper purpose in the Motion for a Protective Order the discovery sought is essential to satisfy its ultimate burden of proof at a § 220 hearing.

### III. Security First's Motion for A Protective Order

The focus of the analysis must be the protective order requested by Security First. Court of Chancery Rule 26(c) states, in pertinent part:
(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the Court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including 1 or more of the following: (1) That the discovery not be had; ... (4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters ....

Of course, the purpose behind protective orders is prohibiting improper discovery requests, outside the proper scope of discovery, through Court intervention.

The general rule regarding scope of discovery is found in Chancery Court Rule 26(b)(1), which states: Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable manner. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated

to lead to the discovery of admissible evidence.

Ch. Ct. R. 26(b)(1) (emphasis added). Therefore, the focus of the inquiry must be whether U.S. Die's requests are reasonably calculated to lead to the discovery of admissible evidence.

8 Del. C. § 220(b) states, in pertinent part:
*3 Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders, and its other books and records, and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.

Proceedings pursuant to § 220 are narrow in purpose and scope. Mite Corp. v. Heli-Coil Corp., Del. Ch., 256 A.2d 855, 857 (1969). Because the issues created by a § 220 action are narrow and specific, the scope of discovery is restricted to these issues. Fink v. R.P. Scherer Corp., Del. Ch., C.A. No. 9989, Allen, C. (July 1, 1988) Letter Op. at 3; II Ernest L. Folk, III, et al., Folk on the Delaware General Corporation Law § 220.8 (3d ed. 1992).

In the present case, the sole issue is whether U.S. Die's stated purpose is proper. U.S. Die stated in its complaint its purpose is "so that U.S. Die Casting can investigate and determine if improper transactions and/or mismanagement occurred as a result of Security First's actions and dealings regarding the merger with Mid Am." Amend. Compl. ¶ 5. U.S. Die is limited to discovery reasonably necessary to establish the propriety of this purpose. Accordingly, U.S. Die's request for the production of the Merger Agreement, any communication confirming the cancellation of the merger, and the record of the alleged payment to Mid Am by Security First is proper. All other requests for production are overbroad within the context of this § 220 action. To grant U.S. Die its complete requested discovery would obviate the need for the § 220 action because U.S. Die would obtain through discovery all of the documents requested before a determination of the scope of its rights under § 220. Customarily, plaintiffs elect to pursue an expedited, summary § 220 action understanding one price paid for the election is limited discovery because of the limited relief available. Section 220 "contemplates summary proceedings and the accelerated scheduling of cases under it emphasizes prompt processing and disposition." Mite, 256 A.2d at 857.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 301414 (Del.Ch.), 20 Del. J. Corp. L. 1134
(Cite as: Not Reported in A.2d)

Page 3

The Rule 30(b)(6) deposition is likewise limited to the Merger Agreement and its terms, any communication confirming the cancellation of the merger agreement, and any record of the alleged payment to Mid Am by Security First. All other matters of examination are beyond the scope of discovery of this § 220 action.

The Commission and Notice of Deposition *Duces Tecum* of Mid Am will not give U.S. Die access to information related to its stated purpose. As such, U.S. Die's requests may be proper for a later derivative action; however, they are beyond the scope of this summary § 220 proceeding and the protective order requested is granted.

I decline, as invited by Security First in this discovery issue, to examine whether U.S. Die's stated purpose is improper at this time. In theory, demand to investigate corporate mismanagement is a proper purpose. *Weiland v. Central & South West Corp.,* Del. Ch., C.A. No. 9769, Berger, V.C. (May 9, 1989) Letter Op. at 3. This is an issue properly resolved on a motion to dismiss or at trial. In the absence of a motion to dismiss, the issue of whether U.S. Die's complaint sufficiently avers a proper purpose will be resolved at trial.

**\*4** U.S. Die suggests Security First's discovery requests mirror its requests for production. Generally, defendants have the right to test the truth or accuracy of the plaintiffs' assertions. *Fink, supra,* at 3-4. U.S. Die has not objected to Security First's Requests for Document production nor moved for a protective order attacking the scope of Security First's requests. Therefore, U.S. Die's "concerns" are not before me.

### IV. Security First's Request for Attorney's Fees

Security First requests the Court award the costs and attorney's fees connected to its motion for a protective order. Court of Chancery Rule 37(a)(4) states, in pertinent part:

Award of Expenses of Motion. (A) If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the Court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the Court finds that the opposition to the motion was substantially

justified or that other circumstances make an award of expenses unjust.

Rule 26(c) incorporates the provisions of Rule 37(a)(4) by stating, in pertinent part:The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

Attorney's fees are only awarded, in my view, when a discovery request which no reasonable attorney would file is propounded, forcing attorneys to act to protect their client from harassment or abuse. Here, U.S. Die's requests are not obviously or clearly unreasonably related to the § 220 action so as to constitute abuse or harassment. I find the opposition to the motion for a protective order substantially justified, therefore, attorney's fees will not be awarded to Security First.

### IV. Conclusion

Security First's motion for a protective order concerning U.S. Die's First Request for Production of Documents is *denied* with regard to the merger agreement, any communication confirming the cancellation of the merger and any record of the transfer of funds from Security First to Mid Am in connection with the termination of the merger. Security First's motion for a protective order is *granted* in regard to U.S. Die's First Request for Production of Documents in all other respects. Concerning the U.S. Die's Rule 30(b)(6) Notice of Deposition, Security First's motion for a protective order is *granted* with regard to items 2, 3, 4, 5, 6, and *denied* with respect to item 1. Security First's Motion for a Protective Order is *granted* concerning U.S. Die's Motion for a Commission and Notice of Deposition *Duces Tecum* of Mid Am. Security First's request for costs and attorney's fees is *denied.*

IT IS SO ORDERED.

Del.Ch.,1995.
U.S. Die Casting and Development Co. v. Security First Corp.
Not Reported in A.2d, 1995 WL 301414 (Del.Ch.), 20 Del. J. Corp. L. 1134

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.